**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

--------------------------------------------------------------- x

| | |
|---|---|
| In re | Chapter 11 |
| CHINOS HOLDINGS, INC., *et al.*, | Case No. 20–_____ |
| Debtors.[1] | (Joint Administration Requested) |

--------------------------------------------------------------- x

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS
## TO (A) PAY PREPETITION WAGES, SALARIES, REIMBURSABLE
## EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION
## AND BENEFITS PROGRAMS AND (B) CONTINUE COMPENSATION
## AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

Chinos Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as

follows in support of this motion (the "**Motion**"):[2]

## Relief Requested

1.      By this Motion, pursuant to sections 105(a), 363, and 507(a) of title 11 of

the United States Code (the "**Bankruptcy Code**"), the Debtors request entry of interim and final

orders (i) authorizing, but not directing, the Debtors to (a) pay and honor certain prepetition claims

and obligations in the ordinary course of business, in the exercise of their sole discretion, relating

to the business practices, programs, and policies for their employees, non-employee directors, and

supplemental workforce, including, among other things, prepetition wages, salaries, reimbursable

expenses, and other obligations on account of the Compensation and Benefits Programs (as defined

herein) and (b) continue to administer the Compensation and Benefits Programs, and (ii) granting

related relief.   The Debtors are not seeking interim relief with respect to their Non-Insider

Severance Program, and such relief will be sought at the final hearing on this Motion.

2.      The Debtors further request that the Court (a) authorize all applicable

financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks

presented for payment and electronic payment requests relating to the foregoing to the extent

directed by the Debtors in accordance with this Motion and to the extent the Debtors have sufficient

funds on deposit in their accounts with such Bank, whether such checks were presented or

electronic requests were submitted before or after the date hereof, and (b) authorize all Banks to

rely on the Debtors' designation of any particular check or electronic payment request as

---

[2]      The facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration (as
defined herein) filed contemporaneously herewith.  Capitalized terms used but not defined herein shall have the
respective meanings ascribed to such terms in the First Day Declaration.

appropriate pursuant to this Motion, without any duty of further inquiry, and without liability for following the Debtors' instructions.

3.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**"), and a proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**" and together with the Proposed Interim Order, the "**Proposed Orders**").

### Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157(b) and 1334, and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  This proceeding is core pursuant to 28 U.S.C. § 157(b) and may be determined by the Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

5.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

6.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Bankruptcy Rules**").

7.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Nicholson in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## The Debtors' Workforce

8.      As discussed in the First Day Declaration, the Debtors are facing the unprecedented health and economic impact of the COVID-19 global pandemic.  As the state of emergency continues, the Debtors have and continue to implement various cash conservation and liquidity enhancing measures to preserve enterprise value until the crisis abates.  In particular, the Debtors initiated a variety of temporary employee-related measures to ensure public health and safety and manage the impact of the crisis until business stabilizes, including closing all retail store locations, furloughing Employees (as defined below), reducing certain Employee hours, and decreasing the salary of certain field, distribution, and corporate Employees.  Unequivocally, the Debtors' Workforce (as defined below) has been materially adversely impacted by the pandemic, and they have collectively sacrificed to ensure the Debtors are in a position to meaningfully weather the pandemic and successfully restructure during these chapter 11 cases.  The Debtors are seeking the relief requested in this Motion to ensure they can resume, at the appropriate time, their Compensation and Benefit Programs historically in place and honor their obligations to their Workforce – the people that have created value for all stakeholders and made the Company's iconic brand a household name.

9.      The Debtors' Workforce performs a wide variety of critical functions, including sales, marketing, design, research and development, quality control, vendor negotiations, manufacturing, information technology, administrative, compliance, legal, finance, and

management-related tasks.  Prior to the Petition Date and before the furlough program that began on April 1, 2020 and continues on an as needed basis (the "**Furlough Program**"),[3] the Debtors employed approximately 13,000 individuals, approximately 4,000 of whom were employed on a full-time basis, and approximately 9,000 of whom were employed on a part-time basis (collectively, the "**Employees**").[4]  Approximately 11,500 Employees were paid on an hourly basis, and approximately 1,500 Employees were paid a salary.  None of the Debtors' Employees are party to a collective bargaining agreements or other similar labor agreements.

10.    The Debtors also utilize the services of temporary workers sourced from various staffing agencies (the "**Staffing Agencies**") to service their distribution facilities, fulfill various short-term roles in the corporate office, and provide additional assistance in their stores during peak seasons (the "**Temporary Workforce**").  The Temporary Workforce is employed on an as needed basis and, depending on the season and business needs, may vary in size at a given time.  As of the Petition Date, and given the increased e-commerce demands and need for fulfillment through the Virginia distribution facility, the Temporary Workforce is currently operating at levels similar to those seen during peak seasons.

11.    In addition to the Temporary Workforce, the Debtors also employ independent contractors throughout the entire organization to perform various services, including, without limitation, graphic design, information technology systems management, merchandising,

---

[3]    Under the Furlough Program, the Debtors have placed approximately 11,000 Employees on temporary, unpaid furlough.  As of the Petition Date, the Debtors have approximately 2,000 active full-time Employees. At the appropriate time, the Debtors intend to rehire a sufficient number of Employees, up to the levels in place prior to the Furlough Program, which would include rehiring furloughed Employees and/or new employees to the extent necessary.  Accordingly, this Motion describes the Compensation and Benefit Programs applicable to the Debtors' Employees prior to the Furlough Program.

[4]    The Debtors' foreign entities provide compensation and benefits programs to Employees in those countries.  The Debtors do not seek authority to use funds from any Debtor entity to administer any foreign compensation or benefit program.

procurement, material design, e-commerce, facilities, human resources, and creative marketing (the "**Independent Workforce**"). The terms of the employment, including payment, of the Independent Workforce is determined on an individual basis between the Debtors and the independent contractor (or the agency such contractor is employed with). The Independent Workforce and Temporary Workforce (collectively, the "**Supplemental Workforce**" and, together with the Employees, the Debtors' "**Workforce**") are a critical complement to the work performed by the Debtors' Employees and in many instances create key components of the Debtors' operational infrastructure.

12. The Debtors are cognizant that the only way to manage a seamless transition to normal operations when the government restrictions and public health concerns caused by the COVID-19 pandemic subside is to rely on their existing Workforce and those furloughed Employees that remain ready and willing to resume working for the Debtors. The Debtors' Workforce includes highly trained individuals who possess invaluable institutional knowledge of the Debtors' business and key relationships with the Debtors' customers and vendors. The Debtors' failure to honor their obligations to their dedicated Workforce could result in attrition during a highly volatile time, upend the Debtors' reorganization efforts, and jeopardize their business as a going concern. By this motion, the Debtors are seeking the authority to retain their current Workforce, continue to pay the Staffing Agencies, hire new and/or rehire furloughed Employees, in their discretion, and continue the Compensation and Benefits Programs upon which the Debtors' Workforce relies, both as currently in place and – at the appropriate time – as was in place before the Debtors took action to conserve liquidity in response to the COVID-19 pandemic.

### Compensation and Benefits Programs

13. As with similarly situated companies, the Debtors maintain various compensation and benefits programs on behalf of their Workforce (each as defined herein and,

collectively, the "**Compensation and Benefits Programs**"), including: (a) Compensation Obligations; (b) Employee Incentive Programs; (c) Employee Benefits Programs, and (d) the Non-Insider Severance Program (each as defined herein).  In addition to the direct costs of the various Compensation and Benefits Programs, the Debtors also incur and pay various administrative fees and premiums (each an "**Administration Fee**") in connection therewith.

14.    As summarized in the following chart and described in further detail below, the Debtors estimate that, as of the Petition Date, they owe approximately $7.67 million on account of the Compensation and Benefits Programs, $5.87 million of which will become due and payable during the period between the Petition Date and the final hearing on the Motion (the "**Interim Period**"):

| Compensation and Benefits Program | Interim Amounts | Final Amounts (Inclusive of Interim Amounts) |
|---|---|---|
| Compensation Obligations | $2.02 million | $3.82 million |
| Employee Incentive Programs | $0.15 million | $0.15 million |
| Employee Benefits Programs | $3.70 million | $3.70 million |
| Non-Insider Severance Program | $0 | $0 |
| **Total Compensation and Benefit Obligations** | **$5.87 million** | **$7.67 million** |

15.    The Debtors believe that none of their current Employees are owed any prepetition amounts in excess of the $13,650 cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Nevertheless, for the avoidance of doubt, the Debtors do not seek authority in this motion to pay any Employee prepetition amounts in excess of $the statutory caps.

A.    **Compensation Obligations**

(i)    **Employee Compensation**

16.    The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable Business-Related Expenses and Paid Time Off (each as defined herein)),

on a weekly, bi-weekly, monthly, or less frequent basis (collectively, the "**Employee Compensation**"). The Debtors' full-time Employees are paid on a bi-weekly basis, which accounts for amounts owed for the preceding two weeks. Employees that the Debtors employ on an hourly basis are paid weekly, one week in arrears. Prior to the Furlough Program, the Debtors' monthly gross payroll totals were approximately $30.5 million, including Deductions (defined below).

17.     The Debtors' current obligations on account of Employee Compensation are significantly lower than average due to the Furlough Program,[5] and the salary reductions the Debtors made to Employees, effective as of March 29, 2020, in response to the current market instability caused by COVID-19. As of the Petition Date, the Debtors do not owe any amounts on account of unpaid Employee Compensation for salaried Employees. With respect to unpaid Employee Compensation earned by hourly Employees prior to the Petition Date, the Debtors estimate that, as of the Petition Date, the Debtors owe approximately $920,000, all of which will become due and payable during the Interim Period. Amounts due on account of unpaid Employee Compensation for hourly Employees reflect one week of accrued amounts due to such Employees and no Employee is owed Employee Compensation in an amount exceeding the $13,650 cap imposed by sections 507(a)(4) of the Bankruptcy Code. The Debtors request the authority to pay outstanding prepetition Employee Compensation due to Employees and to continue to pay Employee Compensation in the ordinary course of business, including, at the Debtors' sole discretion, at the levels in place before the March 2020 salary reductions and Furlough Program.

---

[5]     Though not currently on the Debtor's payroll, furloughed Employees are eligible to collect unemployment benefits and certain economic relief under the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**").

**(ii)    Supplemental Workforce Compensation**

18.    To compensate the Supplemental Workforce, the Debtors either pay members of the Supplemental Workforce directly or pay Staffing Agencies, which then make payments to the Supplemental Workforce on the Debtors' behalf (the "**Supplemental Workforce Compensation**").  The Debtors remit compensation for the Supplemental Workforce as part of their regular accounts payable processes, with the frequency of payment varying depending on the individual contract or which of the Staffing Agencies manages the Supplemental Workforce.

19.    It is critical that the Debtors are able to continue honoring their obligations with respect to the Supplemental Workforce Compensation.  Staying current with respect to the Supplemental Workforce Compensation will help minimize unnecessary disruption to the Debtors' business at a critical time.  The Debtors rely on the Supplemental Workforce to perform many tasks that have allowed the Debtors to continue generating revenue despite the temporary closure of their retail locations, such as maintaining the information technology infrastructure and staffing the distribution centers that service all of the Debtors' e-commerce customers.  The work performed by the Supplemental Workforce is essential to the Debtors' ongoing ability to create revenue.  Failure to make timely payments on account of the Supplemental Workforce Compensation has the potential to cause deleterious effects on the Debtors' business at all times, but especially during this unstable time where they are facing extraordinary external challenges.

20.    On average, the Debtors generally pay approximately $27 million in aggregate Supplemental Workforce Compensation each year.  As of the Petition Date, the Debtors estimate that they owe approximately $2.9 million in Supplemental Workforce Compensation, approximately $1.1 million of which will come due and payable during the Interim Period.  The Debtors do not seek authority to compensate any individual member of the Supplemental

Workforce for prepetition services in excess of the statutory cap of $13,650 imposed by section 507(a)(4) of the Bankruptcy Code.

21.     Accordingly, the Debtors request the authority to continue to retain the Supplemental Workforce in the ordinary course of business and consistent with past practices, and to continue to honor the Supplemental Workforce Compensation.

**(iii)    Director Compensation**

22.     Certain of the Debtors maintain boards of directors (or boards of managers, as applicable) that include non-Employee independent directors (each, a "**Director**").   The Directors currently receive compensation that generally includes, without limitation, an annual retainer, paid on a quarterly basis in cash, amounts on account of serving as a member of a committee or chairperson, expense reimbursement for out of pocket expenses, such as outside counsel fees, and "per diem" or supplemental compensation for specific activities/service (collectively, the "**Director Compensation**" and, together with the Employee Compensation Obligations and Supplemental Workforce Compensation, the "**Compensation Obligations**"). Generally, Directors seek reimbursement of their respective Business-Related Expenses (as defined below) incurred in connection with their service on the Debtors' board of directors by submitting receipts to the Debtors' Chief Financial Officer and, upon review and approval, the reimbursement request is funded through the Debtors' accounts payable system.   In some instances, Director Compensation related to outside counsel fees is paid directly to outside counsel pursuant to a separate engagement agreement with the Debtors.   As of the Petition Date, the Debtors do not believe they owe any amounts on account of Director Compensation.   Although the Debtors believe they are authorized to pay any postpetition Director Compensation in the ordinary course, out of an abundance of caution the Debtors seek authority to continue to pay

Director Compensation, including any outstanding prepetition amounts, on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### (iv)   Payroll Processing Fees

23.     The Debtors utilize Automatic Data Processor, Inc. ("**ADP**") to administer payroll and several other employee-related benefits programs.  Specifically, ADP provides, among other things, the Debtors' payroll processing system and ensures proper tax and benefits withholdings are made.  The Debtors pay ADP an Administration Fee averaging approximately $85,500 (the "**Payroll Processing Fees**") per month and such amounts are prepaid in advance.  As of the Petition Date, the Debtors believe that they do not owe ADP any Payroll Processing Fees. Nevertheless, continued payment of the Payroll Processing Fees is important in ensuring the smooth functioning of the Debtors' payroll system. Thus, out of the abundance of caution, the Debtors seek authority to pay any Payroll Processing Fees (whether or not related to the prepetition period), as they come due in the ordinary course of business.

### (v)   Withholding Obligations

24.     Historically, during applicable pay periods, the Debtors deduct certain amounts from Employees' paychecks, including garnishments, levies, child support and related fees, 401(k) contributions, and pre-tax contributions to certain of the Employee Benefit Programs (as defined herein) (collectively, the "**Deductions**").  The Debtors transfer the amounts comprising such Deductions to various designated third-party recipients.  The Debtors deduct an aggregate amount of approximately $750,000 on a bi-weekly basis from Employees (other than Supplemental Workforce) in Deductions, and such amounts are subsequently remitted by the Debtors to the appropriate third-party recipients.   As of the Petition Date, Debtors have not forwarded to the appropriate third-party recipients approximately $750,000 in Deductions already withheld from their prepetition Employee payroll.

25.    The Debtors also are required by law to withhold amounts from an Employee's gross pay related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withholdings**").  The Debtors must then match the Withholdings from their own funds and pay, based upon a percentage of  gross payroll,  additional amounts for state and federal unemployment insurance (collectively, the "**Employer Payroll Tax**" and, together with the Withholdings, the "**Payroll Taxes**").  Typically, the Payroll Taxes, which are not included in the outstanding unpaid Employee Compensation amounts set forth above, total approximately $2.55 million per payroll for Employees paid on a bi-weekly basis and approximately $950,000 for Employees paid on a weekly basis.  Due to the decreased number of active Employees, the Debtors owe approximately $250,000 in Payroll Taxes as of the Petition Date, $180,000 of which will become due during the Interim Period.

26.    In response to the COVID-19 pandemic, the Federal Government of the United States enacted relief under the CARES Act to allow businesses to defer paying the employer portion of contributions under Federal Insurance Contributions Act ("**FICA Tax**") on account of the social security tax and Medicare tax imposed on Employee earnings.  In furtherance of the Debtors' liquidity preservation efforts, the Debtors have elected to defer payment of their FICA Tax contributions.

27.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Deductions and Payroll Taxes (together, the "**Withholding Obligations**") is approximately $1 million, $930,000 of which will come due during the Interim Period.  By this Motion, the Debtors seek authority to forward to the appropriate third-party recipients, consistent with their historical practice, any unremitted Withholding Obligations and to continue to honor the

Withholding Obligations in the ordinary course of business on a postpetition basis (whether or not related to the prepetition period and, to the extent applicable, in the case of the employer portion of FICA Tax contributions, when their FICA Tax deferral period ceases).[6]

### (vi)   Business-Related Expenses

28.    In the ordinary course of business, the Debtors provide certain Employees with allowances to cover the costs associated with owning or leasing a vehicle (the "**Automotive Allowance Program**").  Allowances under the Automotive Allowance Program are disbursed to Employees in fixed amounts and are paid through the Debtors' payroll system.  As of the Petition Date, fewer than ten Employees participate in the Automotive Allowance Program.  The Debtors estimate that the average annual cost of the Automotive Allowance Program is approximately $43,200.  As of the Petition Date, the Debtors estimate that they do not owe any prepetition amounts on account of the Automotive Allowance Program.

29.    Additionally, the Debtors provide Directors and certain Employees reimbursements for reasonable and customary expenses incurred in the scope of their employment, including but not limited to business-related travel, business office expenses, business phone calls, postage, parking, taxis, and tolls (collectively, the "**Business-Related Expenses**").   Generally, Employees directly pay for their respective Business-Related Expenses with a corporate credit card issued by American Express in their name and guaranteed by the Debtors (the "**Amex Credit Cards**").  The Debtors provide Amex Credit Cards to Employees with average monthly Business-Related Expenses in excess of $500.  To the extent an Employee is issued an Amex Credit Card,

---

[6]    Contemporaneously herewith, the Debtors have sought authority, but not direction, to pay certain prepetition taxes, assessments, fees, and other charges in the ordinary course of business pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Certain Prepetition Tax Obligations, and (II) Granting Related Relief* (the "**Taxes Motion**").  The Debtors do not seek relief in this Motion to pay prepetition claims that may be covered by the relief sought in the Taxes Motion.

it is the Debtors' policy that all Business-Related Expenses must be charged to the card. Over 500 Employees have been issued Amex Credit Cards. Those Employees who incur Business-Related Expenses in amounts that do not meet the average monthly spend to qualify for an Amex Credit Card may also seek reimbursement from the Debtors for qualified expenses.

30.     Employees are reimbursed for the costs associated with paying for qualified Business-Related Expenses by submitting requests for reimbursement through the Debtors' reimbursement software provider, Concur Technologies, Inc., a third-party expense consolidator, in accordance with the Debtors travel and expense policy. Employees seek reimbursement of their respective Business-Related Expenses by submitting receipts to the Debtors' accounting department and, upon review and approval, the reimbursement request is funded through the Debtors' accounts payable system. Business-Related Expenses are typically reimbursed within a few days after the expense report or qualifying receipt is approved.

31.     Continuing to reimburse Business-Related Expenses is an important benefit provided to the Debtors' Employees and their Directors, who are incurring expenses for the benefit of the Debtors' enterprise. The Debtors' failure to honor their obligations under the Business-Related Expenses reimbursement program may result in, among other negative impacts, Employees being held liable for underlying purchases charged for Business-Related Expenses.

32.     As of the Petition Date, the Debtors believe that all Business-Related Expenses have not yet been processed and, in some cases, Employees and Directors may not have submitted Business-Related Expenses in time to be processed prior to the Petition Date. Based on historical averages, and not accounting for the temporary reductions in Workforce, the Debtors estimate a monthly expenditure of approximately $450,000 on account of prepetition Business-Related Expenses. The Debtors seek authority, but not the direction, to pay all prepetition amounts

owed with respect to the Business-Related Expenses in the ordinary course of business during the chapter 11 cases, including all prepetition amounts accrued and outstanding under the Amex Credit Cards, and to continue the Amex Credit Card program, as needed, in the ordinary course.

33.    Additionally, in the ordinary course of business, the Debtors pay certain expenses incurred by Employees who are required to relocate in connection with their employment (the "**Relocation Expenses**").  The majority of Relocation Expenses are directly billed to the Debtors by Cornerstone Relocation Group, the Debtors' relocation provider.  The Relocation Expenses include, but are not limited to, costs associated with the acquisition of rented or purchased homes, a *de minimis* Administration Fee paid to Cornerstone Relocation Group for services, the transportation of household goods, and temporary living accommodations.  On an average annual basis, the Debtors spend approximately $1 million on account of Relocation Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $70,000 on account of Relocation Expenses, approximately all of which will become due and payable during the Interim Period.  The Debtors seek authority, but not direction, to pay all prepetition amounts owed with respect to the Relocation Expenses in the ordinary course of business, including paying any Administration Fees related thereto.

**B.    Employee Incentive Programs**

34.    The Debtors develop and implement certain incentive programs to motivate and reward certain of their Employees (collectively, the "**Employee Incentive Programs**").[7]  The

---

[7]    The relief sought in this Motion with respect to the Employee Incentive Programs does not include the payment of any obligations to any "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, an "**Insider**").  For the avoidance of doubt, certain Insiders are also eligible to participate in certain Employee Incentive Programs; however, the Debtors are not seeking authority in this Motion to honor any obligations to Insiders under any Employee Incentive Programs.  The Debtors reserve all rights with respect to the classification of any Employee as "Insider" and "non-Insider" and to file a separate motion seeking relief from the Court to honor any existing bonus obligations to Insiders or to implement a new postpetition incentive program for such Employees.

Debtors believe that the Employee Incentive Programs are integral to the Debtors' business operations because they generally align Employees' interests with those of the Debtors by linking payments under the Employee Incentive Programs to the overall performance and efficiency of the Debtors' operations. Further, the Debtors believe that certain Employees who are eligible for awards under the Employee Incentive Programs view such awards as an integral part of their overall compensation and rely on such awards to pay their living expenses and support their families.

35.     Primarily due to store closures, many of the customary Employee Incentive Programs are suspended. As of the Petition Date, no amounts are due to Employees on account of the LTIP Awards and/or Contract Awards (each as defined below). However, subject to the satisfaction of certain conditions, the Debtors may owe approximately $1.8 million on account of outstanding obligations under the Employee Incentive Programs related solely to LTIP Awards and up to approximately $2 million on account of Contract Awards, although authority to make such payments is not being sought in this Motion. Through this Motion, the Debtors seek authority, but not direction, to pay any outstanding amounts under the Employee Incentive Programs (other than LTIP Awards and Contract Awards) to non-Insider Employees and to continue the Employee Incentive Programs, if and when the Debtors determine it is appropriate in their sole discretion, in the ordinary course of business on a postpetition basis. The Employee Incentive Programs include:

**(i)     Annual Incentive Programs**

36.     The Debtors maintain an annual incentive program (the "**AIP**") designed to reward Employees for their individual contributions to the Debtors' annual operating performance based upon the achievement of pre-established performance standards in a given fiscal year. The operating and performance metrics, including EBITDA targets, are typically developed and

approved by the compensation committee of the Debtors' board of directors (the "**Compensation Committee**") in the first quarter of each fiscal year. Payments made to qualifying Employees under the AIP (the "**AIP Awards**") are based on individual employee performance evaluated at the end of the fiscal year, coupled with various metrics established by the Compensation Committee to determine the bonus pool. AIP Awards for a given fiscal year are paid at the beginning of the following fiscal year. The Debtors are current on all payments due under the AIP for fiscal year 2019 and are not seeking authority to pay AIP Awards at this time, but reserve the right to seek payment of AIP Awards in the future through a separate motion.

37.     Additionally, certain corporate level Employees participate in the Debtors' long-term incentive program (the "**LTIP Awards**") and/or are party to individual contractual arrangements pursuant to which they receive a cash incentive award (the "**Contract Awards**") based on a variety of factors, including the need to retain the Employee, the individual Employee's performance, division performance, overall company performance, or other important corporate milestones that generate meaningful value to the entire enterprise. The Debtors believe that, as of the Petition Date, no amounts are currently due to Employees on account of the LTIP Awards and/or Contract Awards. The Debtors are not seeking authority in this Motion to continue the LTIP Awards program or to make payments on account of Contract Awards, but are reserving their right to do so at a later date.

**(ii)     Field Incentive Programs**

38.     Assistant managers, associate managers, district managers, and store directors (each, a "**Field Manager**") are eligible to participate in incentive programs that are tied to the achievement of certain thresholds, such as gross sales, customer enrollment in customer rewards or credit programs, and the achievement of a certain number of payroll hours (the "**Field Incentive Program**"). To be eligible to receive payment under the Field Incentive Program, a

Field Manager must be employed by the Debtors on the program payout date and reach target sale goals as defined by the Debtors' teams responsible for analyzing finances and/or operations (the "**Finance/Operations Teams**").  In a given bonus period, Field Managers are eligible to earn awards (the "**Field Incentive Awards**") between 5% and 10% of their combined monthly gross earnings, composed of base pay, commissions, Paid Time Off (as defined below), and overtime (collectively, the "**Gross Earnings**").

39.     Field Incentive Awards are calculated on a monthly basis by the Finance/Operations Teams, and Employees are paid Field Incentive Awards in the second bi-weekly paycheck following the close of the applicable monthly period.  In certain instances, the Debtors may receive inquiries from Employees who believe they were entitled to receive an award but, due to administrative updates and pending reconciliations, were not paid such awards in full (the "**Omitted Incentive Awards**").  As of the Petition Date, primarily due to the temporary store closures and the Furlough Program, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid Field Incentive Awards and Omitted Incentive Awards.  The Debtors believe the Field Incentive Awards are ordinary course transactions that do not require Court approval; however, out of abundance of caution, the Debtors seek authority to continue the Field Incentive Programs on a postpetition basis and honor the related obligations.

**(iii)     SPH Incentive Program**

40.     Certain store-level Employees responsible for selling merchandise are eligible to participate in a bonus program tied to their hourly sales (the "**SPH Incentive Program**").  Performance metrics under the SPH Incentive Program are calculated by dividing that Employee's net sales in a given time period by hours worked in the same time period, excluding certain designated time ("**SPH Goals**").  Qualifying Employees who exceed individual SPH Goals are eligible to receive a percentage of their Gross Earnings (the "**SPH Awards**")

depending on the monetary amount of sales per hour and total sales in the given year.  SPH Goals are communicated to eligible Employees by their Store Director at the start of a bonus period and are set at a store-by-store level by the Finance/Operations Teams.  SPH Goals are based on the performance or needs of both a particular location and the Debtors at large.  Accordingly, SPH Goals are subject to change each performance period.

41.     SPH Awards are calculated on a monthly basis by the Finance/Operation Teams and paid in the second bi-weekly paycheck following the close of the applicable monthly bonus period.  Following a payout date, however, the Debtors may receive inquiries from Employees on account of Omitted Incentive Awards.

42.     As of the Petition Date, similarly due to the temporary store closures and the Furlough Program, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid SPH Awards and Omitted Incentive Awards.  The Debtors believe the SPH Awards are ordinary course transactions that do not require Court approval; however, out of abundance of caution, the Debtors seek authority to continue the SPH Awards on a postpetition basis and honor the related obligations.

**(iv)     Store and Distribution Center Incentive Programs**

43.     In addition to the AIP, Field Incentive Programs, and SPH Incentive Program, the Debtors have, from time to time, granted awards on an ad hoc basis to store level Employees (the "**Store Incentive Programs**").  Under the Store Incentive Programs, store-level Employees may receive incentives to promote the sale of certain merchandise, to reward individual or team efforts, or to encourage collegial interaction among Employees.  The Debtors believe that such Store Incentive Programs are an important method of rotating inventory and maintaining Employee morale with a relatively *de minimis* cost.  In 2019, the aggregate cost of the Store Incentive Programs was approximately $600,000.  In addition, from time to time, the Debtors have

also granted perks and additional incentives on an ad hoc basis to distribution center Employees

(the "**DC Incentive Programs**").    Under the DC Incentive Programs, distribution center

Employees may receive incentives to promote attendance and productivity, and to also reward

individual or team efforts.    The Debtors believe that such DC Incentive Programs are vital to

maintaining e-commerce channel fulfillment at crucial peak times.    In 2019, the aggregate cost of

the DC Incentive Program was approximately $1 million.

44.    The Debtors believe they owe approximately $152,000 in accrued but

unpaid amounts on account of the DC Incentive Programs and do not owe any unpaid amounts on

account of the Store Incentive Programs.    The Debtors further believe that awards issued pursuant

to the Store Incentive Programs and DC Incentive Programs are ordinary course transactions that

do not require Court approval; however, out of an abundance of caution, the Debtors seek authority

to continue both programs on a postpetition basis and to honor the related obligations (whether or

not related to the prepetition period), as they come due in the ordinary course of business.

## C.    Employee Benefit Programs

45.    In the ordinary course of business, the Debtors maintain various

employment benefit plans and policies, including, without limitation, a medical plan, a dental plan,

a vision plan, consumer choice health savings and flexible spending accounts, life insurance,

accidental death and dismemberment insurance, short and long term disability insurance, statutory

disability benefit programs, homeowners insurance, critical illness insurance, hospital indemnity

insurance, accident insurance, legal assistance, identity theft protection, a work-life employee

assistance program, severance programs, vacation and other paid time off policies, Employee

discount programs, and other Employee programs (collectively, the "**Employee Benefit**

**Programs**").    The Employee Benefit Programs are generally available to active, full-time

Employees and other Employees determined by the Debtors, such as certain furloughed

Employees, and does not include the Supplemental Workforce (collectively, the "**Eligible Employees**").[8]

46.      The Debtors believe that continuing to honor their obligations under the Employee Benefits Programs, particularly those related to healthcare, reflect their dedication to their Employees, underscores the high value they place on their Employee's welfare, and is essential to maintain the viability of the Workforce on a go-forward basis.   After careful consideration of their current situation, including the evolving economic landscape in light of the COVID-19 pandemic, the Debtors modified certain aspects of the Employee Benefits Program. For example, among others, the Debtors have suspended telemedicine copay obligations for Employees during the COVID-19 pandemic and have extended coverage for COVID-19 related testing.

47.      The Debtors seek authority, in the exercise of their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practice, relating to the Employee Benefits Programs, subject to the Debtors' rights, if any, to modify or discontinue any Employee Benefit Programs to reduce applicable costs or the benefits provided thereunder.

48.      The estimated potential outstanding prepetition obligations owed by the Debtors on account of the Employee Benefit Programs as of the Petition Date are summarized in the chart below:

---

[8]    The Debtors' foreign affiliates maintain their own benefits programs to supplement any state-provided benefits. Such programs are administered at the local level and do not require any cash outlay from the Debtors. Accordingly, the Debtors are not seeking authority to fund costs associated with any benefits plans for non-Debtor foreign affiliates or foreign Employees.

| Employee Benefit Obligations | Interim Amount | Final Amount (inclusive of Interim Amount) |
|---|---|---|
| **Health Benefits Plans[9]** | **$2,806,000** | **$2,806,000** |
| Medical Plans | $2,650,000 | $2,650,000 |
| Vision Plans | $23,000 | $23,000 |
| Dental Plans | $133,000 | $133,000 |
| **Consumer Choice Health Accounts (HSA and FSA)** | **$40,000** | **$40,000** |
| **Welfare and Benefits Programs** | **$143,000** | **$143,000** |
| Life and AD&D Insurance | $50,000 | $50,000 |
| Short Term Disability Benefits | $52,000 | $52,000 |
| Long Term Disability Benefits | $26,000 | $26,000 |
| Miscellaneous Assistance Programs | $15,000 | $15,000 |
| **401(k) Savings Plan** | **$710,000** | **$710,000** |
| **Paid Leave** | **$0** | **$0** |
| **Total Employee Benefit Obligations** | **$3,699,000** | **$3,699,000** |

### (i)  Health Benefits Plans

49.     Eligible Employees may participate in a number of health and welfare programs, including Medical Plans, Vision Plans, and Dental Plans (each as defined herein and, collectively, the "**Health Benefits Plans**").  The Debtors also subsidize or continue to provide health benefits to certain current and former Employees, including benefits provided under the

---

[9]    The amounts due under the Health Benefits Plans include both estimated outstanding claims and Administration Fees.

Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").  Eligible Employees who have been furloughed are currently still eligible to participate in the Health Benefits Plans.

50.    The Health Benefits Plans are, for the most part, self-insured by the Debtors, but administered through preferred provider organizations that offer to Employees and their families improved benefits when using a doctor, dentist, or other healthcare provider within a network of preferred providers (the "**Health Benefits Providers**").  In the ordinary course of business, the Debtors pay an Administration Fee to the Health Benefits Providers for the administrative services the Health Benefits Providers provide to Employees who subscribe to the Health Benefits Plans.

51.    Under the Health Benefit Plans, the Health Benefits Providers pay the covered Employee's healthcare costs directly to the healthcare provider (other than any required deductible or similar payment) and then seek reimbursement from the Debtors (the "**Health Benefits Claims**").  Employees and Health Benefits Providers submit Health Benefits Claims on a rolling basis after incurring the relevant medical expenses.  Health Benefits Claims can vary daily with respect to Medical Plans (as defined below), monthly with respect to Vision Plans, or every 90 days with respect to Dental Plans. Accordingly, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Health Benefits Claims. On average, the Debtors spend approximately $2.15 million per month on Health Benefits Claims, with high variability depending on the number, timeliness, and type of Health Benefits Claims submitted.

52.    <u>Medical, Prescription, Vision, and Dental Plans</u>.  The Debtors offer medical and prescription drug benefit programs (the "**Medical Plans**") to Eligible Employees.  The Medical Plans are self-insured by the Debtors.  Approximately 3,000 Employees are enrolled in

the Medical Plans.  Anthem, Inc. ("**Anthem**"), which is part of the Blue Cross Blue Shield Association, and Aetna Inc. ("**Aetna**") are the primary administrators of the medical benefit programs, with prescription drug benefits provided by CVS Caremark.  The total cost of the Medical Plans is approximately $2.65 million per month, including an Administration Fee.

53.     Eligible Employees may participate in vision insurance plans (the "**Vision Plans**"), administered by VSP Vision Care.  Approximately 2,500 Employees are enrolled in the Vision Plans.  The total cost of the Vision Plans is approximately $23,000 per month including an Administration fee, which is partially covered by premiums paid by Eligible Employees.

54.     Similarly, the Debtors offer Eligible Employees the option to participate in dental insurance plans (the "**Dental Plans**"), which Dental Plans are administered by Anthem. The Administration Fee for the Dental Plans is separate from Anthem's Administration Fee under the Medical Plan.  The total cost of the Dental Plans is approximately $133,000 per month, which is predominantly covered by premiums paid by Eligible Employees.

55.     Under COBRA, Eligible Employees who are terminated, and covered family members who become ineligible for coverage due to divorce or age, have the right to continue health benefits for a limited period of time and under certain circumstances.  COBRA benefits are provided as required by law.  As of the Petition Date, approximately 50 of the Debtors' former Employees or covered family members are receiving claim payments on account of their participation in COBRA.  The Debtors' COBRA program is administered by WageWorks Inc. ("**WageWorks**").  Terminated Employees utilizing COBRA benefits pay premiums directly to WageWorks, which are remitted to the Debtors in connection with and allocated to the Debtors' applicable Health Benefits Plan.  In exchange for administration of the Debtors' COBRA program, WageWorks charges an annual Administration Fee in the amount of approximately $21,700.  As

24

of the Petition Date, the Debtors do not owe any amounts to WageWorks on account of the Administration Fee.

56.     The Debtors maintain a stop-loss policy through Voya Financial to protect themselves against exposure to large Health Benefits Claims.  Under the stop-loss policy, if the Debtors pay a Health Benefits Claim in excess of $300,000 for a single event, the Debtors can make a claim against the stop-loss policy for the amount of the Health Benefits Claim in excess of $300,000.  The Debtors pay approximately $125,000 per month in premiums to maintain this stop-loss policy, all of which will become due during the Interim Period.[10]

57.     The Debtors seek authority to pay Health Benefits Claims for unreimbursed amounts the Health Benefits Providers already paid to the healthcare providers, amounts for medical services provided to Eligible Employees but not yet paid by the Health Benefits Providers, and any outstanding Administration Fees and stop-loss policy premium.  The Debtors seek authority to continue to pay Health Benefits Claims, Administration Fees, and stop loss premiums as they come due in the ordinary course of business.

**(ii)     Consumer Choice Health Accounts**

58.     Eligible Employees under certain consumer choice Medical Plans may enroll in certain flexible spending accounts (an "**FSA**") and/or a health savings account (an "**HSA**", and together with the FSA, the "**Consumer Choice Health Accounts**"), each administered by WageWorks.  Under the terms of the FSA and HSA, during the annual enrollment

---

[10]     Contemporaneously herewith, the Debtors have sought authority, but not direction, to pay certain prepetition claims held by claimants under the Debtors' workers' compensation insurance policies pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Insurance Policies, and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (the "**Insurance Motion**"). By this Motion, the Debtors do not seek authority to pay prepetition claims that may be covered by the relief sought in the Insurance Motion.  The stop-loss policy is not included in the Insurance Motion, and accordingly the Debtors seek authority in this Motion to continue the policy and honor their obligations thereunder.

period, Eligible Employees may choose to designate a portion of their pre-tax wages or salary towards an FSA and/or HSA up to the maximum amount permitted by the Internal Revenue Service (the "**IRS**"), which they can then use for eligible health care expenses.  The Debtors contribute between $500 and $1000 to HSAs per Employee per year depending on coverage selection.  Additionally, Employees have access to an FSA specifically for dependent care. Currently, approximately 525 Employees contribute to an FSA and approximately 300 Employees contribute to an HSA.

59.     The Debtors remit approximately $90,000 per month to WageWorks on account of the Consumer Choice Health Accounts, including amounts deducted from Employee pay checks, employer contributions, and Administration Fees.  As of the Petition Date, the Debtors estimate that are responsible for remitting approximately $40,000 related to the Consumer Choice Health Accounts, all of which will become due during the Interim Period.  The Debtors seek authority to continue to pay these fees as they come due in the ordinary course of business.

### (iii)     Welfare and Benefit Programs

60.     The chart below outlines the available welfare benefit programs (collectively, the "**Welfare and Benefits Programs**") available to Eligible Employees, including those programs the Debtors pay directly and voluntary programs the Debtors fund through payroll deductions from participating Eligible Employees:

| Type of Benefit | Health Benefits Provider | Provided by Debtors/ Voluntary |
|---|---|---|
| Basic Life Insurance | Hartford Life and Accident Insurance Company ("**Hartford**") | Benefit Provided by Debtors |
| Basic AD&D Insurance | Hartford | Benefit Provided by Debtors |
| Dependent Life Insurance | Hartford | Voluntary Benefit |

| Type of Benefit | Health Benefits Provider | Provided by Debtors/ Voluntary |
|---|---|---|
| Supplemental Life Insurance | Hartford | Voluntary Benefit |
| Short Term Disability Benefits | Prudential Financial, Inc. ("**Prudential**") | Benefit Provided by Debtors |
| Basic Long Term Disability Benefits | Prudential | Benefit Provided by Debtors |
| Supplemental Long-Term Disability Benefits | Prudential | Voluntary Benefit |
| Automobile Insurance | Metlife, Inc. ("**Metlife**") | Voluntary Benefit |
| Homeowners Insurance | Metlife | Voluntary Benefit |
| Critical Illness Insurance | Metlife | Voluntary Benefit |
| Hospital Indemnity Insurance | Metlife | Voluntary Benefit |
| Accident Insurance | Metlife | Voluntary Benefit |
| MetLaw | Hyatt Legal | Voluntary Benefit |
| Identity Theft Protection | InfoArmor | Voluntary Benefit |
| Employee Assistance Program | ComPsych | Benefit Provided by Debtors |
| Smoking Cessation Program | Quit for Life | Benefit Provided by Debtors |
| Employee Assistance Program | ComPsych | Benefit Provided by Debtors |
| Weight Loss Program | WW International, Inc. ("**Weight Watchers**") | Benefit Provided by Debtors |

61.     <u>Life and AD&D Insurance</u>.  The Debtors provide life and accidental death

and dismemberment insurance coverage to Eligible Employees (the "**Basic Life and AD&D**

**Insurance**") at no cost to Eligible Employees through Hartford.  The Basic Life and AD&D

Insurance provides coverage of up to $500,000 in the event of an Employee's death or

dismemberment.  Additionally, current Eligible Employees may elect to self-purchase life

insurance on an after-tax basis for spouses and children up to age 26 (the "**Dependent Life Insurance**") and/or supplemental life insurance to provide up to $500,000 in additional coverage (the "**Supplemental Life Insurance**," and together with the Basic Life and AD&D Insurance and the Dependent Life Insurance, the "**Life and AD&D Insurance Programs**") through Hartford.

62.     The total cost to the Debtors of the Life and AD&D Insurance Programs is approximately $50,000 each month, including Administration Fees. As of the Petition Date, the Debtors estimate that they owe $50,000 on account of the Life and AD&D Insurance Programs, all of which will become due during the Interim Period.  The Debtors seek authority to continue to pay outstanding amounts under the Life and AD&D Insurance Programs as they come due in the ordinary course of business.

63.     <u>Short Term Disability Benefits</u>.  The Debtors provide Eligible Employees with short-term disability benefits (the "**Short-Term Disability Benefits**").  Eligible Employees are entitled to, among other things, continuation of 70% of their weekly earnings for up to twenty-six (26) weeks in the event of a short-term medical disability due to an illness, injury, or pregnancy-related condition.  The Short-Term Disability Benefits are administered by Prudential.  Currently, approximately 150 Employees receive Short-Term Disability Benefits.

64.     In the twelve months prior to the Petition Date, the Debtors paid approximately $52,000 per month with respect to Short-Term Disability Benefits, plus Administration Fees.  As of the Petition Date, the Debtors estimate that they owe $52,000 on account of Short-Term Disability Benefits, all of which will become due during the Interim Period.  The Debtors seek authority to continue to pay outstanding amounts under Short-Term Disability Benefits as they come due in the ordinary course of business.

65.    <u>Long Term Disability Benefits.</u>    The Debtors provide Eligible Employees with basic long-term disability insurance plans (the "**Basic LTD Benefits**"), and Employees may purchase additional and supplemental long-term disability coverage (the "**Supplemental LTD Benefits**," and together with the Basic LTD Benefits, the "**Long-Term Disability Benefits**").    The Basic LTD Benefits offered by the Debtors replace 60% of an Eligible Employee's annual base annual salary, up to $1,000 per month.    The Supplemental LTD Benefits provide an additional 60% of an Eligible Employee's annual salary up $15,000 per month.    The Long-Term Disability Benefits are administered by Prudential.

66.    Currently, approximately 35 Employees receive Long-Term Disability Benefits.    In 2019, the Debtors paid approximately $310,000 with respect to the Long-Term Disability Benefits, including Administration Fees.    As of the Petition Date, the Debtors estimate that they owe $26,000 on account of the Long-Term Disability Benefits, all of which will become due during the Interim Period.    The Debtors seek authority to continue to pay outstanding amounts under the Long-Term Disability Benefits as they come due in the ordinary course of business.

67.    The Debtors pay Prudential approximately $895,000 annually, including Administration Fees, to administer the Short-Term Disability Benefits and the Long-Term Disability Benefits, approximately $78,000 of which will become due during the Interim Period. The Debtors seek authority to pay the Administration Fees related to the Short-Term Disability Benefits and the Long-Term Disability Benefits as they become due.

68.    <u>Miscellaneous Assistance Programs.</u>    The Debtors make available a variety of other benefits designed to assist Eligible Employees in managing health, work, and family issues (the "**Miscellaneous Assistance Programs**").    For example, if an Eligible Employee elects to purchase automobile insurance, homeowners insurance, critical illness insurance, hospital

indemnity insurance, or accident insurance from Metlife, professional legal services through Hyatt Legal, or identity theft protection through InfoArmor, the Employee is eligible for a group discount by virtue of employment through the Debtors.  Furloughed Employees who were previously enrolled in such programs continue to receive the discounted group rate.  Additionally, the Debtors fund a work-life employee assistance program administered by ComPsych Corporation to address a wide variety of personal and work concerns, which includes multiple in-person and telephonic sessions with counselors.  The Debtors also offer certain Eligible Employees weight loss and tobacco cessation programs.  Various other Miscellaneous Assistance Programs include, but are not limited to, a personal nurse advocate service, a behavioral health support services line, a diabetes support program, and a legal assistance program.

69.    The majority of the Miscellaneous Assistance Programs are Employee funded.  The Debtors deduct Employee allocations on a per pay period basis and remit payment to the various service providers.[11]  Accordingly, the Debtors seek authority to continue such programs out of an abundance of caution.  For the Miscellaneous Assistance Programs funded by the Debtors, namely the work-life assistance program, the weight loss program, and the tobacco cessation program, the Debtors estimate they have spent approximately $7,500 per month prior to the Petition Date.  As of the Petition Date, the Debtors estimate that they owe $15,000 on account of payments, deductions, and Administration Fees related to the Miscellaneous Assistance Programs, all of which will become due during the Interim Period.  The Debtors seek authority to continue all Miscellaneous Assistance Programs, to continue deducting and remitting payment to various service providers on account of the Miscellaneous Assistance Programs, and to pay outstanding amounts as they come due in the ordinary course of business.

---

[11]    Such withholdings included in the above discussion and definition of Deductions.

### (iv)      401(k) Retirement Plan

70.      The Debtors offer Eligible Employees the opportunity to participate in a 401(k) plan (the "**401(k) Plan**").  Eligible Employees who participate in the 401(k) Plan can make payroll contributions to their 401(k) accounts up to the maximum amount permitted by the IRS.  There are approximately 13,200 eligible participants (which includes some former employees), some with current account balances in the 401(k) Plan; approximately 2,850 Employees are active participants.

71.      Each Eligible Employee's 401(k) contributions are deducted automatically from his or her paychecks.[12]  The Debtors match an Eligible Employee's 401(k) contributions up to an annual maximum of $11,400 per Eligible Employee (the "**401(k) Contributions**").  Generally, the 401(k) Contributions are made by the Debtors on a bi-weekly basis.  In 2019, the Debtors spent approximately $5,100,000 on account of 401(k) Contributions.  As of the Petition Date, the Debtors estimate that they owe approximately $110,000 with respect to outstanding 401(k) Contributions.

72.      The 401(k) Plan is administered by Fidelity Investments.  The 401(k) Plan is administered by Fidelity Investments.  Additionally, Westminster Consulting LLC provides investment consulting advice as a third-party fiduciary for the 401(k) Plan.  As of the Petition Date, the Debtors estimate that they owe $710,000 on account of the 401(k) Plan, including Administration Fees, all of which will become due during the Interim Period.  The Debtors seek authority to continue the 401(k) Plan and to pay outstanding amounts thereunder as they come due in the ordinary course of business.

---

[12]    Such withholdings included in the above discussion and definition of Deductions.

(v)    **Paid Leave**

73.    The Debtors maintain a policy for providing Eligible Employees paid leave in the form of paid time off ("**Paid Time Off**") and certain other paid leave (collectively, the "**Paid Leave**").    In the ordinary course of business, the Debtors provide Paid Time Off to Eligible Employees, which may be used for any reason.  Eligible Employees are advanced a certain amount of Paid Time Off at the beginning of each year[13] and, typically, any unused portion does not carry over to the subsequent year, nor are Employees eligible to receive cash payouts for unused Paid Time Off, except in instances where the Debtors are required pursuant to applicable state laws.[14]

74.    In addition, the Debtors provide certain other forms of Paid Leave, many of which are required by law, including paid holidays throughout the year for certain Employees, statutory sick leave, workers' compensation leave, parental leave, bereavement leave, jury or court attendance, and time spent voting.

75.    The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.  By this Motion, the Debtors seek authority, but not direction, to pay any "cash out" amounts due with respect to earned but unused Paid Time Off as required by law and to continue providing the Paid Leave in the ordinary course of business.

---

[13]    Employees hired later in the year receive a pro rata allotment of Paid Time Off.

[14]    For instance, under California law, the Company is required to cash out accrued Paid Time Off, including for furloughed Employees. Further, to the extent state law requires the Debtors to permit an Employee to carry-over accrued Paid Time Off to a subsequent year, in the subsequent year the Debtors will offset the amount of Paid Time Off typically advanced so as to ensure no Employee receives preferential treatment purely on due to geographic location.

D.    **Non-Insider Severance Program**

76.    In the ordinary course of business, the Debtors maintain a written severance program for the benefit of certain Employees terminated in specified circumstances, including performance-related termination or job elimination (the "**Non-Insider Severance Program**").[15]

77.    Generally, the Non-Insider Severance Program provides that an Employee is eligible for severance if, among other things, such Employee is not a party to a separate written agreement that provides for severance, the Debtors enter into a separation agreement with the Employee providing for such benefits, and the Employee is not otherwise required to receive such benefits pursuant to state or local law requirements.[16]    The Debtors have historically provided Employees with a severance payment in an amount based on the Employee's length of service with the Debtors and job level.    Specifically, the Non-Insider Severance Program provides that certain Employees, upon termination, are eligible to receive severance payments equal to a certain number of weeks, reimbursements for premium payments made under COBRA for the continuation of healthcare services, and outplacement assistance (the "**Non-Insider Severance Benefits**").    The Non-Insider Severance Program may be modified, amended, suspended, canceled, or terminated by Debtors, in their sole discretion and to the maximum extend allowed by law, including with respect to the severance payment guidelines and any Non-Insider Severance

---

[15]    Notwithstanding the use of the defined term "Non-Insider Severance Program", the Debtors' prepetition severance program is applicable to "Insiders" so long as such Employee is otherwise eligible under the terms of the program. For the avoidance of doubt, the relief sought in this Motion with respect to the Non-Insider Severance Program does not include the payment of any severance obligations that may be due to an Insider. The Debtors reserve all rights with respect to the classification of any Employee as "Insider" and "non-Insider" and to file a separate motion seeking relief from the Court to honor any pre- or postpetition severance obligations to Insiders.

[16]    Full-time Employees regularly based outside of the United States are also excluded from receiving severance under the Non-Insider Severance Program, unless otherwise agreed to by the Debtors in writing.  This exclusion applies to all such Employees who are entitled to severance pay under the laws of any foreign jurisdiction and also to those Associates regularly based abroad who are not eligible under foreign severance or similar pay laws.

Benefit that would otherwise be payable.   Non-Insider Severance Benefits also terminate in specified situations, including upon the date an Employee is employed by a new employer.

78.     The Debtors' ability to continue the Non-Insider Severance Program is critical to maintaining positive Employee morale and loyalty.  Increased instability in the Debtors' Workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.  As a condition to receiving Non-Insider Severance Benefits, the Debtors typically require that each terminated Employee release all potential claims against the Debtors.  The Debtors believe that the Non-Insider Severance Program meaningfully reduces the time and expense that the Debtors otherwise would spend defending against the assertion of claims by terminated Employees.

79.     By this Motion, the Debtors are solely seeking authority, but not direction, to continue the Non-Insider Severance Program for current eligible non-Insider Employees, and to honor any postpetition obligations that may arise to provide Non-Insider Severance Benefits to such Employees if terminated postpetition.  The Debtors are not requesting authority through this Motion to and will not make any payments that fall outside the limitations of section 503(c) of the Bankruptcy Code, to the extent applicable.

<u>**Relief Requested Should Be Granted**</u>

**A.     Payment of Obligations on Account of Compensation and Benefits Programs Is Warranted Under Sections 363(b)(1) and 105(a) of the Bankruptcy Code and Doctrine of Necessity**

80.     The Court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code.  11 U.S.C. § 363(b)(1). Section 363(b) provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve the use of assets outside the ordinary course of business, courts require only that the debtor show that a sound

business purpose justifies such actions.  *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D.

Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.")

(citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)).  Courts in this and other

districts have consistently been reluctant to interfere with corporate decisions "unless it is shown

that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained

business discretion." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043,

1047 (4th Cir. 1985).

81.     In addition, the Court has the authority, pursuant to its equitable powers

under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such

relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the

Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the

debtor-in-possession" to "protect and preserve the estate, including an operating business' going-

concern value," on behalf of the debtor's creditors and other parties in interest.

11 U.S.C. § 1107(a); *see In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004); *see

also In re Penick Pharm., Inc.*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its

petition, the Debtor became debtor in possession and, through its management . . . was burdened

with the duties and responsibilities of a bankruptcy trustee.").

82.     Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to

"issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."  11 U.S.C. § 105(a); *see In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va.

2005) (acknowledging payment of select prepetition unsecured claims is a necessary deviation

from equal treatment of creditors because "otherwise there will be no reorganization and no

creditor will have an opportunity to recoup any part of its prepetition claim"); *In re Synteen Tech.,*

*Inc.*, 2000 WL 33709667, at *2 (Bankr. D. S.C. Apr. 14, 2000) (allowing the payment of prepetition obligation upon a showing of a compelling business justification); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that if a prepetition claim "is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945). This "doctrine of necessity" thus provides that the Court can exercise its equitable power to allow payment of prepetition claims.

83.    Furthermore, in a long line of well-established decisions, courts in this district consistently granted similar relief to that requested in this Motion in previous chapter 11 cases. *See*, *e.g.*, *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH), [Docket No. 348] (Bankr. E.D. Va. Mar. 13, 2020); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP), [Docket No. 703] (Bankr. E.D. Va. Oct. 24, 2017); *In re Gymboree Group, Inc.*, No. 17-32986 (KLP), [Docket No. 376] (Bankr. E.D. Va. July 11, 2017); *In re Penn Virginia Corporation*, No. 16-32395 (KLP), [Docket No. 251] (Bankr. E.D. Va. June 9, 2016); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH), [Docket No. 356] (Bankr. E.D. Va. Sep. 3, 2015); *In re Patriot Coal Corp.*, No. 15-32450 (KLP), [Docket No. 243] (Bankr. E.D. Va. June 14, 2015); *In re James River Coal Co.*, No. 14-31848 (KRH), [Docket No. 211] (Bankr. E.D. Va. May 7, 2014).

84.    Authorizing the Debtors to pay prepetition amounts related to the Compensation and Benefits Programs is in the best interests of the Debtors, their estates, and their economic stakeholders. Employees are essential to the Debtors' revenue generating capacity both at this critical time and in the normal course of operations, and it is imperative for the Debtors to

maintain a workforce that will drive enterprise value. The loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' Workforce and thereby hinder the Debtors' ability to meet customer demands. Such an outcome would diminish stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy and to continue operating as a going-concern. Failure to satisfy the prepetition obligations in connection with the Compensation and Benefits Programs will exhaust Employee morale and loyalty at a time of already perceived uncertainty. Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations in connection with the Compensation and Benefits Programs.

85.     Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefit Programs, Employees will not receive appropriate coverage and, thus, may become obligated to pay certain healthcare-related claims in cases where the Debtors have not paid the respective providers. The loss of such coverage, particularly during a global healthcare crisis, will result in considerable anxiety for Employees at a time when the Employees are most in need and when the Debtors need such remaining Employees to perform at peak efficiency.

86.     Finally, payment of the Payroll Processing Fees and the other Administration Fees in connection with the Compensation and Benefits Programs also is necessary. Without the continued services of ADP, the Health Benefits Providers, and the administrators of the Welfare and Benefits Programs, among others, the Debtors will be unable to continue to honor their obligations to Employees in an efficient and cost-effective manner and maintain their employee base, both of which are critical to the smooth functioning of the Debtors' operations.

87.     Accordingly, the relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 105(a) of the Bankruptcy Code.

**B.      Payment of Employee Obligations Would Not Prejudice Parties in Interest**

88.     Moreover, the Debtors believe that the vast majority of the prepetition obligations under the Compensation and Benefits Programs are entitled to priority treatment under Bankruptcy Code sections 507(a)(4) (establishing priority treatment for, among others, wages, salaries, commissions, and severance) and 507(a)(5) (establishing priority treatment for contributions to employee benefit plans).   As priority claims, the obligations under the Compensation and Benefits Program are entitled to payment in full before any general unsecured claims asserted against the Debtors can be satisfied.   Accordingly, making the payments covered by these sections of the Bankruptcy Code only will alter the timing, and not the priority, of their payment and should not prejudice the rights of general unsecured creditors or other parties in interest.

**C.      Payment of Certain Obligations in Connection with the Compensation and Benefits Programs Is Required by Law**

89.     The Debtors seek authority to remit the Withholding Obligations to the appropriate third parties.   These amounts principally represent Employee earnings that governments, judicial authorities, and Employees themselves have designated for deduction from their paychecks.   Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.   *See* 11 U.S.C. § 541(b) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's

legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold"); *see also In re Dameron*, 155 F.3d 718, 722 (4th Cir. 1998) (finding that a Debtor acting merely as an intermediary does not own an equitable interest in property sufficient to constitute property of the estate).  Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. § 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that a state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. Michigan (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

D.    **Continuation of the Employee Incentive Programs and the Non-Insider Severance Program Does Not Implicate Section 503(c) of the Bankruptcy Code**

90.    By this Motion, the Debtors seek authority to continue the Employee Incentive Programs and Non-Insider Severance Program to the extent requested herein and to honor obligations that arise after the Petition Date exclusively for non-Insider Employees.

91.    Out of an abundance of caution and in an effort to provide comfort to the Employees given the uncertainty attendant to a company operating in chapter 11, the Debtors request authority to continue the Non-Insider Severance Program with respect to non-Insider Employees terminated postpetition in the ordinary course of business.

92.    Neither the Employee Incentive Programs nor the Non-Insider Severance Program implicate sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code because no payments

thereunder will be made to any Insider. *See* 11 U.S.C. § 503(c)(1)–(2). Compensation plans commenced within the ordinary course of business that do not implicate section 503(c)(1) are governed by the business judgment standard of section 363 of the Bankruptcy Code. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007). Additionally, the Employee Incentive Programs and the Non-Insider Severance Program do not implicate section 503(c)(3) of the Bankruptcy Code because they were commenced within the ordinary course of the Debtors' business. *Cf.* 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside of the ordinary course of business").

93.     If section 503(c) of the Bankruptcy Code is not implicated, the Court may grant the requested relief if it finds that the Employee Incentive Programs and the Non-Insider Severance Program satisfy the requirements of section 363(b) of the Bankruptcy Code. *See In re Mesa Air Group, Inc.*, Ch. 11 Case No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that compensation plans commenced within the ordinary course of business are governed by section 363 of the Bankruptcy Code, not section 503(c)).

94.     Courts in this jurisdiction have permitted debtors to maintain their prepetition employee incentive programs during the pendency of chapter 11 cases, and also have permitted debtors to continue existing severance programs and pay severance obligations that become due in the ordinary course to non-Insider employees who are terminated postpetition. *See, e.g.*, *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH), [Docket No. 348] (Bankr. E.D. Va. Mar. 13, 2020); *In re Gymboree Group, Inc.*, No. 17-32986 (KLP), [Docket No. 376] (Bankr. E.D. Va. July 11, 2017); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP), [Docket No. 703] (Bankr. E.D. Va. Oct. 24, 2017).

95.     As discussed herein, the Debtors have substantial business justification for continuing the Employee Incentive Programs and the Non-Insider Severance Program in the ordinary course of business, including (i) maintaining Employee morale, (ii) disincentivizing Employees to pursue other employment opportunities, and (iii) reassuring Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.  Certain store-level Employees who are eligible for awards under the Employee Incentive Programs view such awards as an integral part of their overall compensation and rely on such awards to pay their living expenses and support their families.  Additionally, failure to honor the Non-Insider Severance Program will likely render the Debtors unable to incentivize certain Employees to continue employment with the Debtors during the chapter 11 cases.  Immediate and unpredictable attrition could significantly impact the Debtors' ability to successfully reorganize. The Debtors believe that the costs associated with the Employee Incentive Programs and Non-Insider Severance Program, to the extent any are incurred postpetition, would greatly outweigh the potential negative consequences of failing to do so, including the hiring of replacement employees on a short-term, temporary basis, or accepting diminished proceeds due to an accelerated inventory liquidation.

96.     For the reasons stated, continuation of the Employee Incentive Programs and the Non-Insider Severance Program—like all of the relief sought in this Motion—is critical and necessary to assuage Employee fears and motivate them to achieve the Debtors' chapter 11 objectives.  Accordingly, the requested relief should be approved.

**E.    Cause Exists to Authorize Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

97.     The Debtors anticipate having sufficient funds to pay the amounts due on account of the Compensation and Benefits Programs in the ordinary course of business using

expected cash flows from ongoing business operations and, subject to Court approval, cash collateral and proceeds from postpetition financing.  In addition, under the Debtors' existing cash management system, the Debtors can identify readily whether checks or wire transfer requests are payments authorized by the relief requested in this Motion.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize the Banks, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein, to the extent that the Debtors have sufficient funds on deposit in their accounts with such Banks, and such Banks may rely on the representations of the Debtors without any duty of further inquiry and without liability for following the Debtors' instructions.

## Debtors Have Satisfied Bankruptcy Rule 6003(b)

98.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  For the reasons described above and in the First Day Declaration, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and maximize the value of their estates for the benefit of all stakeholders. Specifically, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs would cause severe personal hardship to the Debtors' Workforce and likely would result in attrition at a time when the Debtors need their Workforce to perform at peak efficiency.  Accordingly, the Debtors believe that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Bankruptcy Rules 6004(a) and (h)

99.     To implement the foregoing successfully, the Debtors request that the Court

find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances,

and waive the 14-day stay of an order authorizing the use, sale, or lease of property under

Bankruptcy Rule 6004(h).   As explained above and in the First Day Declaration, the relief

requested herein is necessary to avoid immediate and irreparable harm to the Debtors.

Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy

Rule 6004(a) have been satisfied and to grant a waiver of the 14 day stay imposed by Bankruptcy

Rule 6004(h), to the extent such notice requirements and such stay apply.

## Waiver of Separate Memorandum of Points and Authorities

100.     The Debtors respectfully request that the Court regard any argument and

citations set forth herein as a written memorandum of facts, reasons, and authorities that has been

combined with the relief requested herein, as permitted by Local Bankruptcy Rule 9013-1(G)(1).

Alternatively, the Debtors respectfully request that the Court waive any requirement set forth in

Local Bankruptcy Rule 9013-1(G)(1) that this Motion be accompanied by such a written

memorandum.

## Reservation of Rights

101.     Nothing contained herein is intended or shall be construed as (a) an

admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim

against the Debtors; (c) a waiver of any claims or causes of action which may exist against any

creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement,

contract, lease, program, or policy between the Debtors and any third party under section 365 of

the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made

pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

102.    Notice of this Motion will be provided to (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) counsel to the DIP Agent; (d) counsel to the Prepetition ABL Agent; (e) counsel to the Prepetition Term Loan Agent; (f) counsel to the IPCo Notes Trustees; (g) counsel to the Ad Hoc Committee; (h) counsel to the Sponsors; (i) the Internal Revenue Service; (j) the United States Attorney's Office for the Eastern District of Virginia; (k) the Securities and Exchange Commission; (l) ADP; (m) third-party providers of Employee Benefit Programs; (n) former Employees currently receiving Non-Insider Severance Benefits; and (o) any other party that has requested service pursuant to Bankruptcy Rule 2002 as of the time of service (collectively, the "**Notice Parties**").  The Debtors believe that no further notice is required under the circumstances.

## No Prior Request

103.    No previous request for the relief sought herein has been made by the Debtors to this or any other court

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 4, 2020
      Richmond, Virginia

*/s/ Henry P. (Toby) Long, III*

HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

- and -

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

-------------------------------------------------------------- x
                                 :
**In re**                         :     **Chapter 11**
                                 :
**CHINOS HOLDINGS, INC.**, *et al.*,    :     **Case No. 20–_____**
                                 :
               **Debtors.**[1]   :     **(Jointly Administered)**
                                 :
-------------------------------------------------------------- x

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO
### (A) PAY PREPETITION WAGES, SALARIES, REIMBURSABLE
### EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION
### AND BENEFITS PROGRAMS AND (B) CONTINUE COMPENSATION
### AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Chinos Holdings, Inc. and its affiliated debtors

in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]    Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

"**Debtors**"), pursuant to sections 105(a), 363(b) and 507 of the Bankruptcy Code and Bankruptcy

Rules 6003 and 6004, for entry of interim and final orders (i) authorizing, but not directing, the

Debtors to (a) pay and honor certain prepetition claims and obligations in the ordinary course of

business, in the exercise of their sole discretion, relating to, the business practices, programs, and

policies for their Employees, Supplemental Workforce, and Directors, including, among other

things, Compensation Obligations, Payroll Processing Fees, Business Related Expenses,

Employee Incentive Programs, Employee Benefit Programs, and other obligations on account of

the Compensation and Benefits Programs and (b) continue to administer the Compensation and

Benefits Programs, and (ii) granting related relief, all as more fully set forth in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

U.S.C. §§ 157(a)–(b) and 1334; and the *Standing Order of Reference from the United States*

*District Court for the Eastern District of Virginia*, dated July 10, 1984; and consideration of the

Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the Motion having been provided to the Notice Parties under the circumstances, and it appearing

that no other or further notice need be provided; and this Court having held a hearing to consider

the relief requested in the Motion; and upon the First Day Declaration and the record of the hearing

on the Motion on an interim basis; and all objections to the relief requested in the Motion on an

interim basis having been withdrawn, resolved, or overruled; and the Court having determined that

the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and it appearing that the relief requested in the Motion is necessary to avoid immediate and

irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003 of the

Federal Rules of Bankruptcy Procedure; and after due deliberation and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT**:

1.　　The Motion is granted on an interim basis to the extent set forth herein.

2.　　The Debtors are authorized, but not directed, pursuant to sections 105(a),

363(b), and 507(a) of the Bankruptcy Code, to pay and honor all prepetition obligations associated

with the Compensation and Benefits Programs, including (a) Compensation Obligations;

(b) Payroll Processing Fees; (c) Withholding Obligations; (d) Business-Related Expenses;

(e) Employee Incentive Programs; (f) Health Benefits Plans; (g) Consumer Choice Health

Accounts, (h) Welfare and Benefits Programs, including the various insurance, disability, and

miscellaneous employee assistance programs, (i) 401(k) Plans; (j) Paid Leave; and (k)

Administration Fees, and to continue programs and maintain funding in the ordinary course of

business; *provided* that, no payment for wages, salaries, or commissions, and sick leave earned by

an individual Employee shall exceed $13,650, other than by permission of this Court; and

*provided*, *further*, that subject to entry of the Final Order, the Debtors shall not honor or make any

payment on account of obligations related to the Non-Insider Severance Program.

3.　　Nothing contained in the Motion or this Interim Order shall be deemed as

authorizing or approving (a) any payments or transfers that violate section 503(c) of the

Bankruptcy Code or (b) the Debtors to cash out unpaid vacation upon termination of an Employee,

unless applicable non-bankruptcy law requires such payment.

4.　　The Debtors are authorized, but not directed, to modify or discontinue any

Compensation and Benefits Program to reduce or eliminate program expenses or the benefits

provided thereunder, at any time, in their sole discretion without prior Court approval to the extent

permitted by the applicable agreement or law.

5. The Debtors are further authorized, but not directed, to discontinue the Furlough Program, hire new and/or rehire furloughed Employees, reinstate salary levels, and otherwise continue any of the Compensation and Benefits Programs at the levels that were in place before the Furlough Program and other temporary measures taken by the Debtors in response to the COVID-19 pandemic.

6. The Debtors and any applicable third parties are authorized to continue to allocate and distribute Withholding Obligations to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

7. Each of the Banks at which the Debtors maintain their accounts relating to the payment of obligations on account of the Compensation and Benefits Programs are authorized to (a) receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire otherwise.

8. The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds transfers, on account of obligations in connection with the Compensation and Benefits Programs as set forth herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the

commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid under this Interim Order.

9.      Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) an agreement or obligation to pay any claims; (c) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (e) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

10.     Notwithstanding anything to the contrary contained in the Motion or this Interim Order, any payment to be made and any relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and authorizing the use of cash collateral (any such order, a "**DIP Order**").  To the extent that there may be any inconsistency between the terms of this Interim Order and the terms of any DIP Order, the terms of the DIP Order will govern.

11.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis.

12.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

13.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

14.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules.

15.    Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

16.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived to the extent necessary.

17.    A hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2020, at _____ (Eastern Time) (the "**Final Hearing**") and any objections or responses to the Motion shall be in writing, filed with the Court, and served by no later than **4:00 p.m. (Eastern Time) on _____, 2020** (the "**Objection Deadline**") on the following:

    a.    proposed counsel for the Debtors: Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com), Ryan Preston Dahl, Esq. (ryan.dahl@weil.com), Candace M. Arthur, Esq. (candace.arthur@weil.com), and Daniel Gwen, Esq. (daniel.gwen@weil.com));

    b.    proposed co-counsel for the Debtors: Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn: Tyler P. Brown, Esq. (tpbrown@HuntonAK.com), Henry P. (Toby) Long, III, Esq. (hlong@HuntonAK.com), and Nathan Kramer, Esq. (nkramer@HuntonAK.com));

    c.    counsel to the DIP Agent: Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004 (Attn: Gregg S. Bateman, Esq. (bateman@sewkis.com); and

    d.    the U.S. Trustee: 701 East Broad Street, Suite 4304, Richmond, VA 23219 (Attn: Kenneth N. Whitehurst, III (USTPRegion4.RH.ECF@usdoj.gov)).

18.    If no objections or responses are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially

in the form of the Final Order attached to the Motion, which Final Order may be entered with no

further notice or need for the Final Hearing.

       19.      The Debtors are authorized to take all action necessary to effectuate the

relief granted in this Interim Order.

       20.      The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Interim Order.


Dated: _____, 2020      _____
      Richmond, Virginia      UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

*/s/ Henry P. (Toby) Long, III*
HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Tel:  (804) 788-8200
Fax:  (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Henry P. (Toby) Long, III*

## **Exhibit B**

**Proposed Final Order**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

---------------------------------------------------------- x
          :
**In re**               :     **Chapter 11**
          :
**CHINOS HOLDINGS, INC.,** *et al.,*  :     **Case No. 20–_____**
          :
        **Debtors.** [1]   :     **(Jointly Administered)**
          :
---------------------------------------------------------- x

**FINAL ORDER (I) AUTHORIZING DEBTORS TO**
**(A) PAY PREPETITION WAGES, SALARIES, REIMBURSABLE**
**EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION**
**AND BENEFITS PROGRAMS AND (B) CONTINUE COMPENSATION**
**AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

        Upon the motion (the "**Motion**")[2] of Chinos Holdings, Inc. and its affiliated debtors

in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]  Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

"**Debtors**"), pursuant to sections 105(a), 363(b) and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, for entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and honor certain prepetition claims and obligations in the ordinary course of business, in the exercise of their sole discretion, relating to, the business practices, programs, and policies for their Employees, Supplemental Workforce, and Directors, including, among other things, Compensation Obligations, Payroll Processing Fees, Business Related Expenses, Employee Incentive Programs, Employee Benefit Programs, and the Non-Insider Severance Program, and other obligations on account of the Compensation and Benefits Programs and (b) continue to administer the Compensation and Benefits Programs, and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334; and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held one or more hearing(s) to consider the relief requested in the Motion; and upon the First Day Declaration and the record of the hearing(s) on the Motion; and all objections to the relief requested in the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, to pay and honor all prepetition obligations associated with the Compensation and Benefits Programs, including (a) Compensation Obligations; (b) Payroll Pressing Fees; (c) Withholding Obligations; (d) Business-Related Expenses; (e) Employee Incentive Programs; (f) Health Benefits Plans; (g) Consumer Choice Health Accounts, (h) Welfare and Benefits Programs, including the various insurance, disability, and miscellaneous employee assistance programs, (i) 401(k) Plans; (j) Paid Leave; (k) the Non-Insider Severance Program; and (l) Administration Fees, and to continue programs and maintain funding in the ordinary course of business; *provided that,* no payment for wages, salaries, or commissions, and sick leave earned by an individual Employee shall exceed $13,650, other than by permission of this Court.

3.      Nothing contained in the Motion or this Interim Order shall be deemed as authorizing or approving (a) any payments or transfers that violate section 503(c) of the Bankruptcy Code or (b) the Debtors to cash out unpaid vacation upon termination of an Employee, unless applicable non-bankruptcy law requires such payment.

4.      The Debtors are authorized, but not directed, to modify or discontinue any Compensation and Benefits Program to reduce or eliminate program expenses or the benefits provided thereunder, at any time, in their sole discretion without prior Court approval to the extent permitted by the applicable agreement or law.

5.      The Debtors are further authorized, but not directed, to discontinue the Furlough Program, hire new and/or rehire furloughed Employees, reinstate salary levels, and

3

otherwise continue any of the Compensation and Benefits Programs at the levels that were in place
before the Furlough Program and other temporary measures taken by the Debtors in response to
the COVID-19 pandemic.

6.      The Debtors and any applicable third parties are authorized to continue to
allocate and distribute Withholding Obligations to the appropriate third-party recipients or taxing
authorities in accordance with the Debtors' stated policies and prepetition practices.

7.      Each of the Banks at which the Debtors maintain their accounts relating to
the payment of obligations on account of the Compensation and Benefits Programs are authorized
to (a) receive, process, honor, and pay all checks presented for payment and to honor all funds
transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on
deposit in those accounts and (b) accept and rely on all representations made by the Debtors with
respect to which checks, drafts, wires, or automated clearing house transfers should be honored or
dishonored in accordance with this or any other order of the Court, whether such checks, drafts,
wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire
otherwise.

8.      The Debtors are authorized, but not directed, to issue new postpetition
checks, or effect new electronic funds transfers, on account of obligations in connection with the
Compensation and Benefits Programs as set forth herein, and to replace any prepetition checks or
electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the
commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are
authorized to be paid under this Final Order.

9.      Nothing contained in the Motion or this Final Order, nor any payment made
pursuant to the authority granted by this Final Order, is intended to be or shall be construed as

(a) an admission as to the validity of any claim against the Debtors; (b) an agreement or obligation to pay any claims; (c) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (e) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

10.     Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment to be made and any relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and authorizing the use of cash collateral (any such order, a "**DIP Order**").  To the extent that there may be any inconsistency between the terms of this Final Order and the terms of any DIP Order, the terms of the DIP Order will govern.

11.     Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

12.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules.

13.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

14.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived to the extent necessary.

15.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order.

16.     The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Final Order.


Dated: _____, 2020
      Richmond, Virginia                        _____
                                               UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:


*/s/ Henry P. (Toby) Long, III*
HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Tel:  (804) 788-8200
Fax:  (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*


## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)


I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Henry P. (Toby) Long, III*