**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

------------------------------------------------------------ x
                       :

**In re**                       :        **Chapter 11**
                       :

**CHINOS HOLDINGS, INC.,** *et al.,*   :        **Case No. 20–_____**
                       :

             **Debtors.**[1]   :        **(Joint Administration Requested)**
                       :

------------------------------------------------------------ x

**MOTION OF DEBTORS FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO**
**PAY CERTAIN PREPETITION VENDOR CLAIMS, LIEN CLAIMS, AND**
**503(B)(9) CLAIMS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF**
**UNDISPUTED PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF**

        Chinos Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

follows in support of this motion (the "**Motion**"):[2]

## Preliminary Statement

1.      The proven high quality and selection of the Debtors' clothes, accessories, and other merchandise (collectively, the "**Merchandise**") have permitted the Debtors to develop their internationally recognized brands across the United States, Canada, the United Kingdom, and their e-commerce platform.   A critical component of the Debtors' ability to timely produce and deliver Merchandise and therefore generate revenue is preserving, to the best of their ability, an uninterrupted production and supply chain.   Given the seasonality of the Merchandise and the fact that the Debtors design and produce their own clothing and accessories, avoiding delays or interruptions in the design and production process is necessary to ensure that the Merchandise can be timely sold to customers in a way that maximizes value and revenue generation.   A disruption in the production of seasonal clothing (*e.g.*, swimwear) that results in a delayed delivery during the low-season would prevent the Debtors from realizing the most value from the Merchandise.

2.      Unlike many retailers that buy finished products to sell, the Debtors are unique in that they design and produce the Merchandise from beginning to end through a multiphase operation that involves an integrated and interdependent system of suppliers, shippers, and other critical service providers:

---

[2]     The facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration (as defined herein) filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.



3. The Debtors' product development calendar necessarily requires that they begin designing Merchandise and placing orders for materials up to a year before a given season. And, as a result of this process, the Debtors unavoidably rely on Vendors (as defined below) at each stage to design, sample, manufacture, and take delivery of Merchandise during the period. Furthermore, the Debtors depend on Shippers and Warehousemen (as defined below) to distribute Merchandise from foreign locations to their United States distribution centers, which is then ultimately delivered to the Debtors' retail stores or to their customers. Each stage of the process is integral to the overall development of Merchandise and cannot be readily substituted or altered without cost and disruption. Maintaining each stage of the design, sourcing and shipping process is therefore necessary for the Debtors to produce and ultimately sell their Merchandise.

4. Like many other businesses, the Debtors' supply chain has been materially affected by COVID-19. As described in the First Day Declaration (as defined below), nearly 99% of the Debtors' Merchandise is sourced from Asia or Europe (86% in Asia and 12% in Europe), which have also been acutely affected by COVID-19. In addition, several of the Vendors rely on the Debtors' business as a primary source of revenue and, as a result, the commencement of the Debtors' chapter 11 cases will cause additional strain to their supply chain. There are material

risks, therefore, that Vendors – many of whom are located in foreign jurisdictions that may not enforce or otherwise adhere to the Bankruptcy Code – simply refuse to continue doing business with the Debtors without continued support, not only as a result of the negative perception from the Debtors' commencement of chapter 11 cases, but also because of the practical reality that in many instances the Debtors satisfying their outstanding obligations is necessary to ensure those Vendors can themselves continue operating.

5.      Before the date hereof (the "**Petition Date**"), the Debtors, in consultation with the DIP lenders, spent weeks conducting a top down review of their operations and their approximately $300 million of annual Merchandise trade payables and approximately $130 million of non-Merchandise trade payables to determine which Vendors and other service providers would cause irreparable harm to the Debtors upon a disruption. The comprehensive process resulted in a tailored DIP budget that balances the Debtors' ability to pay prepetition claims of critical vendors and suppliers with the Debtors' ability to maximize value for the benefit of all stakeholders.

6.      For the reasons set forth herein, the Debtors believe that this Motion should be granted.

## **Relief Requested**

7.      By this Motion, pursuant to sections 105(a), 363, and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request:

a.  upon entry of a <u>final</u> order, authority (but not direction) to pay amounts in full or partial satisfaction of non-priority, undisputed, and liquidated prepetition claims held by Vendors (as defined herein) critical to the Debtors' business in an aggregate amount not to exceed $20 million (the "**Vendor Cap**");

b.  upon entry of an <u>interim</u> order and <u>final</u> order, authority (but not direction) to pay undisputed, liquidated, prepetition amounts held by Lienholders (as defined herein) and 503(b)(9) Claimholders (as defined herein), in each case as and when they become due;

4

    c.    confirmation of administrative expense priority status of goods received and accepted postpetition on account of outstanding prepetition orders (the "**Prepetition Orders**") and authorizing, but not directing, the Debtors to pay for Prepetition Orders in the ordinary course of business;

    d.    approval of a formal trade agreement with the Debtors (a "**Trade Agreement**"), a form of which is attached to the Proposed Orders (as defined below) as **Exhibit 1**, and authorizing the Debtors in their sole discretion to condition payment of any amounts requested herein upon entry of such Trade Agreement; and

    e.    granting related relief.

8.    The Debtors further request that the Court (a) authorize all applicable financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with this Motion and to the extent the Debtors have sufficient funds on deposit in their accounts with such Bank, whether such checks were presented or electronic requests were submitted before or after the date hereof, and (b) authorize all Banks to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

9.    A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**"), and a proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**" and together with the Proposed Interim Order, the "**Proposed Orders**").

**Jurisdiction**

10.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157(b) and 1334, and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  This proceeding is core pursuant to 28 U.S.C.

§ 157(b) and may be determined by the Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

11.     On the Petition Date, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

12.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Bankruptcy Rules**").

13.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Nicholson in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## General Overview of Vendors, Lienholders, and 503(b)(9) Claimholders

14.     The Debtors' operations rely on a well-developed network consisting of, among other things, essential: (a) domestic and foreign vendors, including merchandisers, service providers, and others who are able to meet the Debtors' product and service requirements (collectively, the "**Merchandise Vendors**"); (b) third parties who assist with remodels and on-site construction and repairs at the corporate headquarters, warehouses, and retail stores or who assist

6

with daily functions throughout the Debtors' organization and distribution network, including

information and technology services, web marketing services, procurement, facilities, and other

services that are required for the Debtors to maintain their ordinary course operations (collectively,

the "**Non-Merchandise Vendors**" and together with the Merchandise Vendors, the "**Vendors**");

and (c) common carriers, expeditors, consolidators, transportation service providers, storage

facilities, logistics providers, warehouses, service providers, and other similar parties that are able

to assert liens under applicable law (collectively, the "**Lienholders**").  Several of the Vendors may

also hold claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9)**

**Claimholders**").   Below is a table summarizing the estimated prepetition amounts owing to

Vendors, Lienholders, and 503(b)(9) Claimholders:

|  | **Estimated Prepetition Amount within 21 Days from Petition Date** | **Estimated Prepetition Amount Outstanding (Inclusive of Interim Period)** |
|---|---|---|
| Critical Vendors (subject to $20 million Vendor Cap) | N/A (Relief Not Being Sought) | $240 million |
| Lienholders | $13 million | $16 million |
| 503(b)(9) | $24 million | $24 million |

### Overview of Vendors

**A.      Merchandise Vendors**

15.      Generally, the Debtors source their Merchandise in two ways: (a) by

purchasing Merchandise directly from Merchandise Vendors and (b) through the use of a select

few buying agents located overseas who liaise between the Debtors and the Merchandise Vendors

to assist with product development and sampling, order management, inspection of product, and

quality control.  The overwhelming majority of the Merchandise Vendors are located outside the

United States—primarily in Asia.  The Merchandise Vendors are selected after a rigorous financial

and operational vetting process to ensure the Debtors are able to offer customers quality Merchandise with the speed, reliability, and quality that the Debtors (and their customers) have come to expect on a consistent basis.

16.     The Debtors do business with over 250 Merchandise Vendors who, for the most part, conduct business with the Debtors on an invoice-by-invoice or purchase order basis — not pursuant to long-term contracts.  The Merchandise Vendors historically supply the Debtors' with Merchandise on trade terms based on their relationship with the Debtors.  Before the Petition Date, the Debtors and the Merchandise Vendors transacted on trade terms that provided the Debtors with the ability to pay for Merchandise 60 days after receipt.  In response to the financial challenges caused by the COVID-19 pandemic, the Debtors unilaterally extended trade payment terms with Merchandise Vendors to 75 days.  In addition, many Merchandise Vendors advance significant cash outlays to produce Merchandise in anticipation of the Debtors' expected purchase orders.  The Debtors' business model is effectively built on these trade terms and, because the Debtors do not have contracts with most of the Merchandise Vendors, these trade terms are subject to contraction at the Merchandise Vendors' discretion.

### B.     Non-Merchandise Vendors

17.     In addition to Merchandise Vendors, a key component of the Debtors' operations is the services provided by Non-Merchandise Vendors.  The Non-Merchandise Vendors supply the Debtors with goods and equipment that are critical to their day-to-day operations, including critical marketing support products and services for their business operations.  The Non-Merchandise Vendors are familiar with the Debtors' operations, and, in many instances, are the sole provider of their services or would otherwise be difficult to replace without significant disruption to the Debtors' business.

18.     In addition, the Debtors rely on the Non-Merchandise Vendors to provide services that are essential to maintaining the Debtors' ongoing e-commerce operations, which due to the COVID-19 pandemic is currently the Debtors' sole source for generating revenue.  Any disruption to the Debtors' online sale capabilities would cripple the Debtors' ability to conduct business.  The services provided by Non-Merchandise Vendors have allowed the Debtors' customers to seamlessly transition from purchasing Merchandise at the Debtors' retail stores (all of which are currently closed) to the Debtors' online websites.  Additionally, Non-Merchandise Vendors build and maintain the infrastructure that is essential to promoting the Debtors on social media platforms, building customer loyalty, and ultimately driving revenue for the benefit of the Debtors' estates and all stakeholders.  Although a significant portion of Non-Merchandise Vendors are subject to contractual arrangements, as discussed more fully below, the relief requested herein remains necessary, however, for Non-Merchandise Vendors that provide products and services to the Debtors on an informal basis, are difficult to replace, or may refuse to continue providing services such that even a temporary halt may cause irreparable harm to the Debtors' estates.

### Overview of Lienholders

A.     **Shippers and Warehousemen**

19.     With the vast majority of Merchandise being produced in Asia, the Debtors' ability to operate in the ordinary course depends on their concurrent ability to transport and take delivery of Merchandise in a timely fashion and on a worldwide basis.  The Debtors rely on their supply chain and distribution network for the purchase, import, warehousing, and shipment (by, among others, various freight forwarders, common or contract carriers, and customs brokers) of the Debtors' Merchandise (collectively, the "**Shippers and Warehousemen**").  Specifically, the Shippers and Warehousemen provide air and ocean transportation of Merchandise primarily from Asia to the United States, the coordination and processing of various import logistics at ports or

transportation centers, transportation of goods to the Debtors' distribution centers, and transportation from the distribution centers to the Debtors' approximately 500 store locations in the United States, Canada, and the United Kingdom, as well as the Debtors' e-commerce customers.

20.     In the ordinary course of meeting the Debtors' worldwide distribution needs, Shippers and Warehousemen are in possession of millions of dollars of Merchandise on a consistent basis.  If the Debtors fail to reimburse the Shippers and Warehousemen for charges incurred in connection with the storage and transport of Merchandise (collectively, the "**Distribution Charges**"), various laws and regulations (both foreign and domestic) permit the Shippers and Warehousemen to assert statutory liens against Merchandise in their possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtors' access to Merchandise.  While the Debtors reserve all rights to contest such actions, it is evident that if such actions were taken it would severely damage the Debtors' ability to operate their business for the benefit of all stakeholders.

21.     The Debtors believe that the cost of replacing or re-constructing their existing supply chain network far exceeds the aggregate amount of Distribution Charges.  With up to $70 million worth of Merchandise in transit at any given time, the cost of a disruption to the Debtors' estates as a result of the Shippers and Warehousemen's retention of Merchandise likely far outweighs the outstanding Distribution Charges.  Accordingly, to maintain access to Merchandise that is essential to the continued viability of the Debtors' retail operations and preserve the value of the Merchandise, the Debtors seek authority to honor outstanding invoices related to Distribution Charges.  The Debtors estimate that, as of the Petition Date, there are approximately $12 million of Distribution Charges outstanding.

### B.    Miscellaneous Lienholders

22.    The Debtors regularly make improvements and repairs to their retail store locations, distribution centers, and the equipment that the Debtors use in the operation of their business, including packaging machines, electrical systems, plumbing, elevator and escalator systems.  To do so, the Debtors contract with general contractors, subcontractors, and a number of other third parties (collectively, the "**Miscellaneous Lienholders**"). [3]  Absent payment of outstanding amounts owed to the Miscellaneous Lienholders, such parties could potentially assert liens under applicable law, including mechanic's liens, artisan's liens, and materialman's liens, against the Debtors' property for amounts owed (collectively, the "**Miscellaneous Lien Claims**" and together with the Distribution Charges, the "**Lien Claims**").[4]

23.    The services provided by the Miscellaneous Lienholders are vital to brand image, public health and safety, and the Debtors' ability to continue to operate.  If the Debtors are unable to pay the Miscellaneous Lien Claims, the Debtors risk losing access to valuable equipment, work product, and other property that is critical to the continued operation of their retail and distribution centers.  For example, even a short delay in repairs to equipment in the Debtors' distribution centers, the epicenter for the Debtors' strategic transportation and distribution of Merchandise through their multichannel supply chain, could result in lost product worth millions of dollars and significantly more in lost sales.  Moreover, when the Debtors determine it is appropriate to reopen retail locations, further delay caused by Miscellaneous Lienholders

---

[3]    Nothing contained herein is intended to be or shall be construed as an approval or assumption of the contracts between the Debtors and the Miscellaneous Lienholders, or any other agreement, contract, program, policy, or lease, under section 365 of the Bankruptcy Code.

[4]    By way of an example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(a) (2003).

demanding payment on past due balances, other third parties seeking to reclaim equipment or goods due to failure of payment, or attempts to replace such parties on short notice, will only further exacerbate the already existing financial challenges caused by the COVID-19 pandemic.

### Overview of 503(b)(9) Claims

24.    The Debtors received certain goods and other materials from various parties, including Vendors, within the 20 days before the Petition Date.  The Debtors estimate that the aggregate amount owed to 503(b)(9) Claimholders for goods provided within 20 days of the Petition Date is approximately $24 million.  The Debtors believe that payment of 503(b)(9) claims will not prejudice the Debtors' stakeholders given that such claims are entitled to administrative priority, and therefore the relief requested changes only the timing of payment and not the amount.

### Overview of Trade Agreement

25.    As noted above, the Debtors' relationships with their Vendors are for the most part not governed by long-term contracts.  Rather, the Debtors typically place orders on an order-by-order basis.  As a result, a Vendor may refuse to supply new orders without payment of its prepetition claims.  The Debtors believe certain Vendors could reduce the Debtors' existing trade credit—or demand payment on a "cash on delivery" or "cash in advance" basis—materially exacerbating the Debtors' liquidity position.

26.    Accordingly, the Debtors seek authority (but not direction) to condition any payment authorized by this Motion on the recipient Vendor, Lienholder, or 503(b)(9) Claimholder entering into the Trade Agreement.  The Trade Agreement generally requires the counterparty to continue providing the Debtors with  trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, product mix, availability, and other programs) as favorable as those trade terms, practices, and programs in place in the 12 months before the Petition Date (collectively, the "**Customary Trade Terms**").

27.    The Debtors also seek limited authority to pay claims even if no Trade Agreement has been executed, if the Debtors determine, in their business judgment, that a formal Trade Agreement is prohibitive or unnecessary to provide for the continued provision of goods or services on a postpetition basis; *provided that*, unless otherwise agreed by the Debtors, if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms (regardless of whether a Trade Agreement has been executed), and subject to any Trade Agreement that may be executed: (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore such payment will be immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party will be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, recoupments, claims, provisions for payment of any claims, or otherwise.

## Selection of Critical Vendors for Payment

28.    The Debtors intend on paying only those Vendors that are truly essential to the Debtors' operations and businesses, and that will benefit the Debtors' estates.  To mitigate the risks to the Debtors' business with failing to pay prepetition amounts owed to Vendors, the Debtors and their advisors engaged in a comprehensive process to (a) identify those Vendors that may be "critical" to the Debtors' businesses and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors at the outset of these chapter 11 cases as a result of nonpayment

of such Vendors' prepetition claims.  In this process, the Debtors, with the assistance of their restructuring professionals, assessed a variety of qualitative and quantitative factors, including:

- whether the Vendor was located in a jurisdiction that would be likely to honor the applicability of the Bankruptcy Code;

- the goods or services provided by a Vendor;

- whether goods or services are provided pursuant to a contract or on a purchase-order basis;

- whether failure to pay all or part of a particular Vendor's claim could cause the Vendor to refuse to ship inventory or provide critical services on a postpetition basis and, if so, whether the Vendor's refusal would cause the Debtors to lose significant sales or future revenue;

- whether failure to pay a particular Vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation or otherwise require the Debtors to incur higher costs for goods and services in the future;

- vendor exclusivity as to materials, patterns, tooling and labor;

- whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- whether the Vendor is a sole- or limited-source or high-volume supplier for branded and "in-demand" inventory, and the Vendor's overall brand importance; and

- whether the Debtors' inability to pay all or part of the Vendor's prepetition claim could trigger financial distress for the applicable Vendor, leading to future difficulty of that Vendor's ability to perform.

29.    After a thorough analysis involving an assessment that applies the above factors, the Debtors designated certain Vendors as necessary to continue operations and, thus, preserve value for the benefit of the estates and creditors.  The relief requested in this Motion seeks to pay prepetition amounts owed to the critical Vendors in an amount not to exceed the applicable Vendor Cap of $20 million, subject to entry of the Proposed Final Order and the Vendor's entry into a Trade Agreement (if applicable).

## Confirmation of Administrative Expense Status for Prepetition Orders

30.     Before the Petition Date, the Debtors placed various orders with Merchandise Vendors for Merchandise that will not be delivered until on or after the Petition Date, therefore constituting Prepetition Orders.  The Merchandise Vendors, over two-thirds of whom are foreign, may be concerned that because the Debtors' obligations under the Prepetition Orders arose before the Petition Date, such obligations will be treated as general unsecured claims in these chapter 11 cases.  Accordingly, certain Merchandise Vendors may refuse to provide necessary goods or services the Debtors ordered (or may recall shipments thereof) pursuant to the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code.

31.     To prevent the potential material disruption to the Debtors' retail operations, and given that Merchandise delivered on, within 20 days before, or after the Petition Date is afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors request entry of an order (a) confirming administrative expense priority under section 503(b) of the Bankruptcy Code for all undisputed obligations of the Debtors in connection with Merchandise that has been ordered but not yet received, and (b) authorizing, but not directing, the Debtors to satisfy such obligations in the ordinary course of business consistent with the parties' customary practices in effect before the Petition Date and subject to, in the Debtors' discretion, the 503(b)(9) Claimholders' entry into a Trade Agreement.

## Relief Requested Should Be Granted

32.     The Court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code.  11 U.S.C. § 363(b)(1).  Section 363(b)

provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve the use of assets outside the ordinary course of business, courts require only that the debtor show that a sound business purpose justifies such actions. *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (noting that 363(b) provides broad flexibility to honor prepetition claims and noting that the Court "follows the 'sound business purpose' test when examining § 363(b) sales."); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995). Courts in this and other districts have consistently been reluctant to interfere with corporate decisions "unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

33.     Furthermore, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). In a long line of well-established decisions, courts in this and other jurisdictions consistently permitted payment of prepetition obligations deemed necessary to preserve or enhance the value of a debtor's estate. *See, e.g.*, *In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging payment of select prepetition unsecured claims is a necessary deviation from equal treatment of creditors because "otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its prepetition claim"); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (noting a court may permit pre-plan payment of a prepetition obligation under section 105(a) of the Bankruptcy Code "when essential to the continued operation of the debtor") (citing *Ionosphere Clubs*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)

(holding that if a prepetition claim "is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945).

34.    Courts in the Fourth Circuit have applied this doctrine of necessity where payment of a prepetition claim (a) is "necessary for the successful reorganization of the debtor," (b) falls within "the sound business judgment of the debtor" and (c) will not "prejudice other unsecured creditors." *United Am.*, 327 B.R. at 782; *see also In re Universal Fin., Inc.*, 493 B.R. 735, 739–40 (Bankr. M.D. N.C. 2013) (applying the *United Am.* three-part test).

A.    **Payment of Vendor Claims Is Warranted under Sections 363(b)(1) and 105(a) of the Bankruptcy Code and Doctrine of Necessity**

35.    Failure to pay certain claims held by essential Vendors would jeopardize these chapter 11 cases from the outset, as interruptions to the Debtors' supply chain would likely have an immediate effect on the Debtors' operations.  Such disruption to the business would undoubtedly far exceed the Vendor Cap.  The relief requested herein is justified for several reasons:

- Although the Debtors' retail stores are presently closed, as discussed, the lengthy design and production process means that disruptions at this juncture would materially affect the Debtors' supply in the future and severely impact the Debtors' ability to generate revenue when stores reopen.

- Because the Debtors design and produce their own goods, there are limited Vendors that have the scale and quality of goods to meet the Debtors' production demands.  Simply stated, materials and goods are not fungible under these circumstances – the Debtors cannot simply, for example, replace fabric material with another fabric without affecting the price, quality, or other features that were each considered in designing the product to maximize value.

- A substantial portion of the Vendors are located in foreign jurisdictions that could take precipitous or adverse actions against the Debtors or their non-Debtor affiliates that would be both logistically difficult and cost-

prohibitive to defend, such as issuing "stop ship" orders or exercising self-help remedies in far-flung jurisdictions, notwithstanding the worldwide effect of the automatic stay.  While the Debtors would vigorously defend their rights in this regard, such a process would necessarily entail the time, delay, and expense required to pursue local law rights in jurisdictions tens of thousands of miles away where these foreign Vendors are primarily located or exclusively in jurisdictions outside of the United States.

- Certain essential Vendors might themselves suffer severe (if not terminal) financial distress if the Debtors are unable to continue conducting some business with them, resulting in long-term sourcing complications for the Debtors and significant harm to the Vendors.

- The Debtors' estates will benefit from the Trade Agreements, which will ensure the uninterrupted continuation of goods on Customary Trade Terms favorable to the estates.  The Customary Trade Terms will permit the Debtors' management and professionals to continue focusing on administration of the chapter 11 cases instead of the supply disruptions.

36.    Courts in this district regularly approve similar critical vendor relief.  *See, e.g., In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) [Docket No. 708] (Bankr. E.D. Va. Oct. 24, 2017) (approving a final cap of $325 million for critical vendor claims); *In re Gymboree Corp.*, No. 17-32986 (KLP) [Docket No. 382] (Bankr. E.D. Va. July 11, 2017) (approving service vendors, operating and retail vendors, and marketing support vendors as critical vendors); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) [Docket No. 236] (Bankr. E.D. Va. June 4, 2015) (allowing payments up to $22 million on final basis for critical vendors).

## B.    Payment of Lien Claims Is Warranted under Sections 363(b)(1) and 105(a) of the Bankruptcy Code and Doctrine of Necessity

37.    To the extent that payment of Lien Claims would be deemed to constitute a use of property outside the ordinary course of business, the basis for authorizing such payment is found under sections 363 and 105 of the Bankruptcy Code.  Failure to pay these obligations could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates.  Thus, payment of the Lien Claims represents a sound exercise of the Debtors' business judgment.

38.    If the Debtors fail to pay the Lien Claims, the Lienholders may exercise, among others, possessory liens and block the Debtors' access to Merchandise that is in transport. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection"). In addition, Miscellaneous Lienholders could assert liens against the Debtors' property for the amounts owed on account of the Lien Claims and may refuse to provide future services for the Debtors. Thus, the Debtors' failure to pay the Lien Claims could severely impair the Debtors' ability to operate their business on a go-forward basis.

39.    In addition, the relief requested herein should not impair unsecured creditor recoveries in these chapter 11 cases. If the amounts owed to the Lienholders is less than the value of the goods that could be held to secure a Lien Claim, such parties may be fully-secured creditors of the Debtors' estates. In such instances, payment now provides such parties with what they might be entitled to receive under a plan of reorganization but without any interest costs that might otherwise accrue during these chapter 11 cases.

40.    Courts in this district have relied on sections 363 and 105 of the Bankruptcy Code to authorize the payment of prepetition claims held by Lienholders. *See, e.g., In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) [Docket No. 377] (Bankr. E.D. Va. March 17, 2020) (approving payments to certain Lienholders); *In re Gemstone Solutions Group, Inc.*, No. 19-30258 (KLP) [Docket No. 380] (Bankr. E.D. Va. Feb. 20, 2019) (authorizing the payment of shippers); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) [Docket No. 723] (Bankr. E.D. Va. Oct. 25, 2017)

(approving payments to certain Lienholders); *In re Gymboree Corp.*, No. 17-32986 (KLP) [Docket No. 380] (Bankr. E.D. Va. July 11, 2017) (approving payment of prepetition claims of certain shippers, warehousemen, and other Lienholders); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) [Docket No. 249] (Bankr. E.D. Va. Jun. 9, 2016) (approving payments to certain Lienholders); *In re Alpha at. Res., Inc.*, No. 15-33896 (KRH) [Docket No. 350] (Bankr. E.D. Va. Sept. 3, 2015) (same); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) [Docket No. 236] (Bankr. E.D. Va. June 4, 2015) (same). *In re James River Coal Co.*, No. 14-31848 (KRH) [Docket No. 242] (Bankr. E.D. Va. May 9, 2014) (authorizing payment of shipper and warehouseman claims); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) [Docket No. 57] (Bankr. E.D. Va. Nov. 14, 2012) (authorizing payments up to $1.6 million for 503(b)(9) claims and materialman's lien claims).

## C.      503(b)(9) Claims are Entitled to Priority Pursuant to Section 503(b) of the Bankruptcy Code

41.     Section 503(b) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the Debtor within 20 days before the commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm a plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of the 503(b)(9) Claims now only provides 503(b)(9) Claimholders what they would otherwise be entitled to receive under a chapter 11 plan.

42.     The Bankruptcy Code does not prohibit a debtor from paying such claims before confirmation. As administrative claims incurred in the ordinary course of business, the Debtors may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See e.g.*, *In re Dura Auto. Sys. Inc.*, Ch. 11 Case No. 06-11202 (KJC), Hr'g Tr. 49:21-23 (Bankr. D. Del. Oct. 31, 2006) ("[A]rguably the debtor could pay its 503(b)(9) Claimholders without court approval."). The timing of such payments also lies squarely

within the Court's discretion.  *See In re Global Home Prods. LLC*, Ch. 11 Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with the parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

43.    The Debtors' ongoing ability to obtain goods as provided herein is essential to their ability to preserve and enhance value for all stakeholders.  Absent their authority to pay Section 503(b) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations.  Failure to honor these claims may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  Such Vendors could accelerate or eliminate favorable trade terms. Needless to say, such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

44.    For these reasons, courts in this district have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.  *See, e.g., In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) [Docket No. 377] (Bankr. E.D. Va. March 17, 2020) (authorizing debtors to pay claims arising under section 503(b)(9)); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) [Docket No. 723] (Bankr. E.D. Va. Oct. 25, 2017) (same); *In re Gymboree Corp.*, No. 17-32986 (KLP) [Docket No. 380] (Bankr. E.D. Va. July 11, 2017) (same); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) [Docket No. 248] (Bankr. E.D. Va. June 9, 2016) (same); *In re Alpha Nat. Res., Inc*., No. 15-33896 (KRH) [Docket No. 351] (Bankr. E.D. Va. Sept. 3, 2015) (same); *In re Patriot Coal Corp.*, No. 15- 32450 (KLP) [Docket No. 236] (Bankr. E.D. Va. June 4, 2015) (same); *In re James River Coal Company*, No. 14- 31848 (KRH) [Docket No. 243] (Bankr. E.D. Va. May 9, 2014) (same).

D.    **Prepetition Orders Are Entitled to Administrative Priority**

45.    Pursuant to section 503(b) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services—including goods ordered prepetition—are, in fact, administrative expense priority claims because they benefit the estate postpetition.  Thus, granting the relief sought herein with respect to the Prepetition Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.  Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Prepetition Orders to provide certain suppliers with assurance of such administrative priority.  Such a disruption to the continuous and timely flow of critical inventory and other goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Prepetition Orders and should authorize the Debtors to pay the Prepetition Orders in the ordinary course of business.

E.    **Cause Exists to Authorize Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

46.    The Debtors anticipate having sufficient funds to pay the amounts on account of the Lien Claims, claims held by 503(b)(9) Claimholders, claims held by Vendors designated as "critical", and Prepetition Orders in the ordinary course of business using expected cash flows from ongoing business operations and, subject to Court approval, cash collateral and proceeds from postpetition debtor-in-possession financing.  In addition, under the Debtors'

existing cash management system,[5] the Debtors can identify readily whether checks or wire transfer requests are payments authorized by the relief requested in this Motion.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize the Banks, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein, to the extent that the Debtors have sufficient funds on deposit in their accounts with such Banks, and such Banks may rely on the representations of the Debtors without any duty of further inquiry and without liability for following the Debtors' instructions.

### Debtors Have Satisfied Bankruptcy Rule 6003(b)

47.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  For the reasons described above and in the First Day Declaration, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors believe that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

---

[5]    A description of the Debtors' existing cash management systems is set forth in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System, and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extension of Time to Comply with Requirements of 11 U.S.C § 345(B), And (IV) Granting Related Relief,* filed contemporaneously herewith.

## Bankruptcy Rules 6004(a) and (h)

48.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).   As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Waiver of Separate Memorandum of Points and Authorities

49.    The Debtors respectfully request that the Court regard any argument and citations set forth herein as a written memorandum of facts, reasons, and authorities that has been combined with the relief requested herein, as permitted by Local Bankruptcy Rule 9013-1(G)(1). Alternatively, the Debtors respectfully request that the Court waive any requirement set forth in Local Bankruptcy Rule 9013-1(G)(1) that this Motion be accompanied by such a written memorandum.

## Reservation of Rights

50.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made

24

pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

51.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) counsel to the DIP Agent; (d) counsel to the Prepetition ABL Agent; (e) counsel to the Prepetition Term Loan Agent; (f) counsel to the IPCo Notes Trustees; (g) counsel to the Ad Hoc Committee; (h) counsel to the Sponsors; (i) the Internal Revenue Service; (j) the United States Attorney's Office for the Eastern District of Virginia; (k) the Securities and Exchange Commission; and (l) any other party that has requested service pursuant to Bankruptcy Rule 2002 as of the time of service (collectively, the "**Notice Parties**"). The Debtors believe that no further notice is required under the circumstances.

52.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

\* \* \* \* \*

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 4, 2020
      Richmond, Virginia

*/s/ Henry P. (Toby) Long, III*

HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

------------------------------------------------------------ x
                                                             :
In re                                                        :      **Chapter 11**
                                                             :
**CHINOS HOLDINGS, INC.,** *et al.,*                         :      **Case No. 20–_____**
                                                             :
                                    **Debtors.** [1]          :      **(Jointly Administered)**
                                                             :
------------------------------------------------------------ x

**INTERIM ORDER (I) AUTHORIZING
DEBTORS TO PAY CERTAIN PREPETITION LIEN CLAIMS AND
503(B)(9) CLAIMS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF
UNDISPUTED PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of Chinos Holdings, Inc. and its debtor affiliates,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

the "**Debtors**"), pursuant to sections 105(a), 363(b), and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), for an interim order (a) authorizing, but not directing, the Debtors to pay undisputed, liquidated, prepetition amounts held by Lienholders and 503(b)(9) Claimholders, in each case as and when they become due; (b) confirming the administrative expense priority status of Prepetition Orders and authorizing, but not directing, the Debtors to pay for Prepetition Orders in the ordinary course of business; (c) approving the form of Trade Agreement, attached to this Interim Order as **Exhibit 1**, and authorizing the Debtors in their sole discretion to condition payment of any amounts requested in the Motion upon entry of such Trade Agreement; and (d) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and §1334; and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis; and upon the First Day Declaration and the record of the hearing on the Motion; and all objections to the relief requested in the Motion on an interim basis having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Rule 6003 of the Federal Rules of Bankruptcy Procedure; and after due deliberation and sufficient cause appearing therefor,

2

**IT IS HEREBY ORDERED THAT**

1.       The Motion is granted on an interim basis to the extent set forth herein.

2.       The Debtors are authorized, but not directed, to pay outstanding, undisputed, liquidated, prepetition amounts outstanding in satisfaction of Lien Claims and 503(b)(9) Claims in the ordinary course of business.

3.       Any party who accepts payment from the Debtors pursuant to this Interim Order in satisfaction of a claim (regardless of whether a Trade Agreement has been executed) shall (a) upon satisfaction of a Lien Claim, take all actions necessary to remove any mechanics' liens, possessory liens, or similar state law trade liens on the Debtors' assets such party may have based upon such Lien Claim at such party's sole expense and (b) be deemed to have agreed to the terms and provisions of this Interim Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

4.       The Debtors are authorized, but not directed, to undertake all appropriate efforts to cause any Vendor, Lienholder, or 503(b)(9) Claimholder to enter into a Trade Agreement with the Debtors, substantially in the form annexed hereto as **Exhibit 1**, as a condition of payment under this Interim Order.  The form of Trade Agreement is hereby approved, and the Debtors are authorized to negotiate, modify, or amend the form of Trade Agreement in their reasonable business judgment.  The Debtors are authorized to make payments to Lienholder or 503(b)(9) Claimholder hereunder absent entry into a Trade Agreement if, in their business judgement, the Debtors determine that a formal Trade Agreement would prohibitive or unnecessary for the continued provision of goods or services on a postpetition basis.

5.       If any party accepts payment pursuant to the relief requested by this Interim Order and thereafter does not continue to provide goods or services on Customary Trade Terms

(regardless of whether a Trade Agreement has been executed), and subject to any Trade Agreement that may be executed or otherwise agreed by the Debtors: (a) such payment may be deemed by the Debtors to be an improper postpetition transfer on account of a prepetition claim, and therefore such payment will be immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made and the deadline for such party to file a reinstated claim will be the later of (i) the general bar date established by order of the Court or (ii) 30 days after the Debtors provide written notice to the party of the reinstatement of its claim; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, recoupments, claims, provisions for payment of any claims, or otherwise.

6.      All undisputed obligations of the Debtors arising from the postpetition delivery or shipment of goods under the Prepetition Orders where the delivery obligations (whether to a third party or the Debtors) were not completed prior to the Petition Date are confirmed to have administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in the ordinary course of business consistent with the parties' customary practices in effect prior to the Petition Date; *provided, that,* for the avoidance of doubt, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

7.      Each of the Banks at which the Debtors maintain their accounts are authorized to (a) receive, process, honor, and pay all checks presented for payment and to honor

all funds transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire otherwise.

8.      Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

9.      Notwithstanding anything to the contrary contained in the Motion or this Interim Order, any payment to be made and any relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and authorizing the use of cash collateral (any such order, a "**DIP Order**").  To the extent that there may be any inconsistency between the terms of this Interim Order and the terms of any DIP Order, the terms of the DIP Order will govern.

10.      Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims or liens

held by any Lienholder or 503(b)(9) Claimholder, and the Debtors' rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims are fully preserved.

11. Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

12. The requirements of Bankruptcy Rule 6003(b) have been satisfied.

13. Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules.

14. Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

15. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived to the extent necessary.

16. A hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2020, at _____ (Eastern Time) (the "**Final Hearing**") and any objections or responses to the Motion shall be in writing, filed with the Court, and served by no later than **4:00 p.m. (Eastern Time) on _____, 2020** (the "**Objection Deadline**") on the following:

    a. proposed counsel for the Debtors: Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com), Ryan Preston Dahl, Esq. (ryan.dahl@weil.com), Candace M. Arthur, Esq. (candace.arthur@weil.com), and Daniel Gwen, Esq. (daniel.gwen@weil.com));

    b. proposed co-counsel for the Debtors: Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn: Tyler P. Brown, Esq. (tpbrown@HuntonAK.com), Henry P. (Toby) Long, III, Esq. (hlong@HuntonAK.com), and Nathan Kramer, Esq. (nkramer@HuntonAK.com));

c.      counsel to the DIP Agent: Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004 (Attn: Gregg S. Bateman, Esq. (bateman@sewkis.com); and

d.      the U.S. Trustee:  701 East Broad Street, Suite 4304, Richmond, VA 23219 (Attn: Kenneth N. Whitehurst, III (USTPRegion4.RH.ECF@usdoj.gov)).

17.      If no objections or responses are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of the Final Order attached to the Motion, which Final Order may be entered with no further notice or need for the Final Hearing.

18.      The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

19.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

Dated: _____, 2020      _____
      Richmond, Virginia      UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

*/s/ Henry P. (Toby) Long, III*
HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Tel:  (804) 788-8200
Fax:  (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Henry P. (Toby) Long, III*

## <u>Exhibit 1</u>

**Form of Trade Agreement**

**THIS TRADE AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS TRADE AGREEMENT IS SUBJECT TO CHANGE. THIS TRADE AGREEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## TRADE AGREEMENT

[•] (the "**Company**"),[1] on the one hand, and the vendor identified in the signature block below ("**Vendor**"), on the other hand, hereby enter into the following trade agreement (this "**Trade Agreement**") dated [●].

## Recitals

A.      On May [___], 2020 (the "**Petition Date**"), Chinos Holdings, Inc. and certain affiliates (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**").

B.      On May [___], 2020, the Bankruptcy Court entered the *Final Order (I) Authorizing Company to Pay Certain Prepetition Critical Vendor Claims, Lienholder Claims, and 503(b)(9) Claims (II) Confirming Administrative Expense Priority of Undisputed Outstanding Orders, and (III) Granting Related Relief* (the "**Vendor Order**") (Docket No. [___])[2] authorizing the Company on a final basis to pay the prepetition claims of certain vendors, subject to the terms and conditions set forth therein.

C.      Before the Petition Date, Vendor delivered goods to or performed services for the Company, and the Company paid Vendor for such goods or services, according to Customary Trade Terms (as defined herein).

D.      The Company and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment by the Company to Vendor on account of certain prepetition claims Vendor may hold against the Company.

## Agreement

1.      Recitals.  The foregoing recitals are incorporated herein by reference as if fully set forth below.

---

[1]    Each entity is a debtor and debtor-in-possession in the chapter 11 cases currently pending before the Bankruptcy Court (as defined below) and jointly administered under case number 20-32181.

[2]    Capitalized terms used but not defined herein shall have the meanings set forth in the Vendor Order.

2.      Vendor Payment.  Vendor represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to Vendor is $[●] (the "**Agreed Claim**").  Following execution of this Trade Agreement, the Company shall pay Vendor $[●] on account of its prepetition claim (the "**Initial Payment**") (without interest, penalties, or other charges), pursuant to the Customary Trade Terms set forth below, and such amounts will be applied to any invoices previously received by the Company on account of the Agreed Claim.

3.      503(b)(9) Payment. The Parties hereby agree that Vendor delivered to the Company, and the Company received, goods valued at $[●] within 20 days before the Petition Date, for which Vendor did not receive payment (the "**Agreed 503(b)(9) Claim**").  $[●] of the Initial Payment will be applied toward the Agreed 503(b)(9) Claim (the "**503(b)(9) Payment**" and, together with the Initial Payment, the "**Vendor Payment**").

4.      Agreement to Supply.

a.      Vendor shall supply goods or perform services to or for the Company, and the Company shall accept and pay for goods or service from Vendor, for the Duration of the Cases (as defined below), on the trade terms (the "**Customary Trade Terms**") at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), availability, and other programs) in place in the 12 months before the Petition Date except for any partial payments or other payments (or assurances) Company made with respect to any unfinished product, or such other trade terms that are acceptable to the Company in their sole discretion.

b.      "**Duration of the Cases**" means the earlier of (i) the effective date of a chapter 11 plan in the Company's chapter 11 cases, and (ii) conversion of the Company's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

c.      The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.  For the avoidance of doubt, material provisions of the Customary Trade Terms include:

_____

_____

d.      Vendor shall continue to honor any existing allowances, credits, contractual obligations, or balances that accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

5.      Other Matters.

a.      Vendor agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims Vendor may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Vendor agrees that such claims

2

will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.

b.      Vendor will not separately seek payment from the Company on account of any prepetition claim (including any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code (other than the Agreed 503(b)(9) Claim)) other than pursuant to a plan confirmed in the Company's chapter 11 case, unless this Trade Agreement is terminated and any amounts paid on account of the Vendor Payment returned to the Company.

c.      Vendor will not file or otherwise assert against the Company, their assets, or any other affiliated person or entity, or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any prepetition amounts allegedly owed to Vendor by the Company's arising from prepetition agreements or transactions.  Furthermore, if Vendor has taken steps to file or assert such a lien prior to entering into this Trade Agreement, Vendor will promptly take all necessary actions to remove such liens.

6.      Breach.

a.      If the Company pays Vendor the Vendor Payment and Vendor is determined to have breached this Trade Agreement (a "**Vendor Breach**"), upon written notice to Vendor and without further order of the Bankruptcy Court, the Company (in its discretion) may (i) declare that any payment of the Vender Payment is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Company may recover in cash or in goods from Vendor (including by setoff against postpetition obligations); (ii) declare that Vendor must immediately return the Vendor Payment to the Company without giving effect to any allege setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and the Agreed Vendor Claim shall be reinstated as noted in 6(b) below; and (iii) if there exists an outstanding postpetition balance due from the Company to Vendor, the Company may elect to recharacterize and apply the Vendor Payment to such outstanding postpetition balance and Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

b.      If the Company recovers the Vendor Payment pursuant to Section 6(a) hereof or otherwise, the full Agreed Vendor Claim shall be reinstated as if the Vendor Payment had not been made.

c.      If Vendor fails to comply with the terms and provisions of this Trade Agreement, the Company may, in its discretion, declare that this Trade Agreement is terminated; *provided* that the Trade Agreement may be reinstated if: (i) after notice and a hearing (following a motion filed by the Vendor), the Bankruptcy Court reverses the Company's decision to terminate the Trade Agreement for good cause shown that the Company's determination was materially incorrect; (ii) the Vendor fully cures the underlying default of the Trade Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or (iii) the Company, in its sole discretion, reaches a commercially acceptable agreement with Vendor.

d.    Vendor agrees and acknowledges that irreparable damage would occur in the event of a Vendor Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Vendor agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  Vendor hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.  Notwithstanding the foregoing, in the event of a specific performance action by the Company, Vendor retains its right to seek adequate assurance of payment and other similar relief pursuant to applicable law.

e.    If the Company fails to pay for goods or services delivered postpetition in accordance with this Trade Agreement, and the Company fails to cure such default within [ten (10)] days after receiving notice of such default, Vendor shall have the right to terminate this Trade Agreement, in which event Vendor (i) shall have no obligation to continue to provide goods or services to the Company, and (ii) reserves its rights to file a timely proof of claim for any alleged unpaid amounts of the Vendor Payment.

7.    <u>Notice</u>.

If to Vendor, then to the person and address identified in the signature block hereto.

If to Company:

J. Crew Group Inc.
225 Liberty St.
New York, New York 10281
Attn: Joanna Shapiro and Maria DiLorenzo

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Olga Peshko, Esq. and Clifford Sonkin Esq.
E-mail: olga.peshko@weil.com
        cliff.sonkin@weil.com

-and-

Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

Attn: Tyler P. Brown, Esq., Henry P. (Toby) Long, III, Esq., and Nathan Kramer,
Esq.
E-mail: tpbrown@HuntonAK.com
         hlong@HuntonAK.com
         nkramer@HuntonAK.com

8.    <u>Representations and Acknowledgements</u>.  The Parties agree, acknowledge and
represent that:

a.    the Parties have reviewed the terms and provisions of the Vendor Order and
this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is
expressly subject to the procedures approved pursuant to the Vendor Order;

b.    any payments made on account of the Agreed Vendor Claim shall be subject
to the terms and conditions of the Vendor Order;

c.    if Vendor refuses to supply goods or services to the Company as provided
herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise
all rights and remedies available under the Vendor Order, the Bankruptcy Code, or applicable law;
and

d.    in the event of disagreement between the Parties regarding whether a breach
has occurred, either Party may apply to the Bankruptcy Court for a determination of their relative
rights, in which event, no action may be taken by either Party, including, but not limited to, the
discontinuing of shipment of goods from Vendor to the Company, until a ruling of the Bankruptcy
Court is obtained.

9.    <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between
Vendor and Company, Vendor agrees to hold in confidence and not disclose to any party: (a) this
Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade
Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms
(collectively, the "**Confidential Information**"); *provided* that if any party seeks to compel
Vendor's disclosure of any or all of the Confidential Information, through judicial action or
otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall
immediately provide the Company with prompt written notice so that the Company may seek an
injunction, protective order or any other available remedy to prevent such disclosure; provided,
further, that, if such remedy is not obtained, Vendor shall furnish only such information as Vendor
is legally required to provide.

10.    <u>Miscellaneous</u>.

a.    The Parties hereby represent and warrant that: (i) they have full authority to
execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have
full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized
to bind that Party to all of the terms and conditions of this Trade Agreement.

b.    This Trade Agreement sets forth the entire understanding of the Parties
regarding the subject matter hereof and supersedes all prior oral or written agreements between

them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

        c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

        d.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

        e.      The Parties hereby submit to the exclusive jurisdiction of the Bankruptcy Court to resolve any dispute with respect to or arising from this Trade Agreement.

        f.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[*Signature page follows*]

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**COMPANY**                                    **VENDOR**

_____        _____
By:                                              By:
Title:                                           Title:
                                                 E-mail:
                                                 Address:

**Exhibit B**

**Proposed Final Order**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Proposed Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

-------------------------------------------------------------- x
                :
**In re**                 :     **Chapter 11**
                :
**CHINOS HOLDINGS, INC.**, *et al.*,   :     **Case No. 20–_____**
                :
         **Debtors.** [1]   :     **(Jointly Administered)**
                :
-------------------------------------------------------------- x

## FINAL ORDER (I) AUTHORIZING DEBTORS TO
## PAY PREPETITION VENDOR CLAIMS, LIEN CLAIMS, AND
## 503(B)(9) CLAIMS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF
## UNDISPUTED PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Chinos Holdings, Inc. and its debtor affiliates,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), pursuant to sections 105(a), 363(b), and 503(b) of title 11 of the United States

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

Code (the "**Bankruptcy Code**"), for a final order (a) authorizing, but not directing, the Debtors to pay amounts in full or partial satisfaction of non-priority undisputed, liquidated, prepetition claims held by Vendors designated by the Debtors as "critical", in an amount not to exceed $20 million (the "**Vendor Cap**"); (b) authorizing, but not directing, the Debtors to pay undisputed, liquidated, prepetition amounts held by Lienholders and 503(b)(9) Claimholders, in each case as and when they become due; (c) confirming the administrative expense priority status of Prepetition Orders and authorizing, but not directing, the Debtors to pay for Prepetition Orders in the ordinary course of business; (d) approving the form of Trade Agreement, attached to this Final Order as **Exhibit 1**, and authorizing the Debtors in their sole discretion to condition payment of any amounts requested in the Motion upon entry of such Trade Agreement; and (e) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and §1334; and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having held one or more hearings to consider the relief requested in the Motion; and upon the First Day Declaration and the records of the hearings on the Motion and all of the proceedings had before this Court; and all objections to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

2

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, to pay amounts in full or partial satisfaction of non-priority, undisputed, liquidated prepetition claims held by critical Vendors, in an amount not to exceed $20 million in the aggregate.

3.      The Debtors are authorized, but not directed, to pay outstanding, undisputed, liquidated, prepetition amounts outstanding in satisfaction of Lien Claims and 503(b)(9) Claims in the ordinary course of business.

4.      Any party who accepts payment from the Debtors pursuant to this Final Order in satisfaction of a claim (regardless of whether a Trade Agreement has been executed) shall (a) upon satisfaction of a Lien Claim, take all actions necessary to remove any mechanics' liens, possessory liens, or similar state law trade liens on the Debtors' assets such party may have based upon such Lien Claim, at such party's sole expense and (b) be deemed to have agreed to the terms and provisions of this Final Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

5.      The Debtors are authorized, but not directed, to undertake all appropriate efforts to cause any Vendor, Lienholder, or 503(b)(9) Claimholder to enter into a Trade Agreement with the Debtors, substantially in the form annexed hereto as **<u>Exhibit 1</u>**, as a condition of payment. The form of Trade Agreement is hereby approved, and the Debtors are authorized to negotiate, modify, or amend the form of Trade Agreement in their reasonable business judgment. The Debtors are authorized to make payments hereunder absent a Trade Agreement if, in their business

3

judgement, they determine that a formal Trade Agreement would prohibitive or unnecessary for

the continued provision of goods or services on a postpetition basis.

6.    If any party accepts payment pursuant to the relief requested by this Final

Order and thereafter does not continue to provide goods or services on Customary Trade Terms

(regardless of whether a Trade Agreement has been executed), and subject to any Trade Agreement

that may be executed or otherwise agreed by the Debtors: (a) such payment may be deemed by the

Debtors to be an improper postpetition transfer on account of a prepetition claim, and therefore

such payment will be immediately recoverable by the Debtors in cash upon written request;

(b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the

payment had not been made and the deadline for such Vendor, Lienholder, or 503(b)(9)

Claimholder to file a reinstated claim will be the later of (i) the general bar date established by

order of the Court and  (ii) 30 days after the Debtors provide written notice to the Vendor,

Lienholder, or 503(b)(9) Claimholder of the reinstatement of its claim; and (c) if there exists an

outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to

recharacterize and apply any payment made pursuant to the relief requested by this Motion to such

outstanding postpetition balance and such supplier or vendor will be required to repay to the

Debtors such paid amounts that exceed the postpetition obligations then outstanding without the

right of any setoffs, recoupments, claims, provisions for payment of any claims, or otherwise.

7.    All undisputed obligations of the Debtors arising from the postpetition

delivery or shipment of goods under the Prepetition Orders where the delivery obligations (whether

to a third party or the Debtors) of the specific Vendor were not completed prior to the Petition Date

are confirmed to have administrative expense priority status pursuant to section 503(b)(1)(A) of

the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in

4

the ordinary course of business consistent with the parties' customary practices in effect prior to the Petition Date; *provided, that*¸ for the avoidance of doubt, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

8.      Each of the Banks at which the Debtors maintain their accounts are authorized to (a) receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire otherwise.

9.      Nothing contained in the Motion or this Final Order, nor any payment made pursuant to the authority granted by this Final Order, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

10.     Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment to be made and any relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and

authorizing the use of cash collateral (any such order, a "**DIP Order**").  To the extent that there may be any inconsistency between the terms of this Final Order and the terms of any DIP Order, the terms of the DIP Order will govern.

11.      Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims or liens held by any Vendor, Lienholder or 503(b)(9) Claimholder, and the Debtors' rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims are fully preserved.

12.      Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

13.      Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules.

14.      Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

15.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived to the extent necessary.

16.      The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order.

17.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated: _____, 2020
      Richmond, Virginia

_____
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

*/s/ Henry P. (Toby) Long, III*
HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Tel:  (804) 788-8200
Fax:  (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Daniel Gwen (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Henry P. (Toby) Long, III*

## __Exhibit 1__

**Form of Trade Agreement**

**THIS TRADE AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS TRADE AGREEMENT IS SUBJECT TO CHANGE. THIS TRADE AGREEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## TRADE AGREEMENT

[•] (the "**Company**"),[1] on the one hand, and the vendor identified in the signature block below ("**Vendor**"), on the other hand, hereby enter into the following trade agreement (this "**Trade Agreement**") dated [●].

### Recitals

A.      On May [____], 2020 (the "**Petition Date**"), Chinos Holdings, Inc. and certain affiliates (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**").

B.      On May [____], 2020, the Bankruptcy Court entered the *Final Order (I) Authorizing Company to Pay Certain Prepetition Critical Vendor Claims, Lienholder Claims, and 503(b)(9) Claims (II) Confirming Administrative Expense Priority of Undisputed Outstanding Orders, and (III) Granting Related Relief* (the "**Vendor Order**") (Docket No. [___])[2] authorizing the Company on a final basis to pay the prepetition claims of certain vendors, subject to the terms and conditions set forth therein.

C.      Before the Petition Date, Vendor delivered goods to or performed services for the Company, and the Company paid Vendor for such goods or services, according to Customary Trade Terms (as defined herein).

D.      The Company and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment by the Company to Vendor on account of certain prepetition claims Vendor may hold against the Company.

### Agreement

1.      <u>Recitals</u>.  The foregoing recitals are incorporated herein by reference as if fully set forth below.

---

[1]      Each entity is a debtor and debtor-in-possession in the chapter 11 cases currently pending before the Bankruptcy Court (as defined below) and jointly administered under case number 20-32181.

[2]      Capitalized terms used but not defined herein shall have the meanings set forth in the Vendor Order.

2.     <u>Vendor Payment</u>.  Vendor represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to Vendor is $[●] (the "**Agreed Claim**").  Following execution of this Trade Agreement, the Company shall pay Vendor $[●] on account of its prepetition claim (the "**Initial Payment**") (without interest, penalties, or other charges), pursuant to the Customary Trade Terms set forth below, and such amounts will be applied to any invoices previously received by the Company on account of the Agreed Claim.

3.     <u>503(b)(9) Payment</u>. The Parties hereby agree that Vendor delivered to the Company, and the Company received, goods valued at $[●] within 20 days before the Petition Date, for which Vendor did not receive payment (the "**Agreed 503(b)(9) Claim**").  $[●] of the Initial Payment will be applied toward the Agreed 503(b)(9) Claim (the "**503(b)(9) Payment**" and, together with the Initial Payment, the "**Vendor Payment**").

4.     <u>Agreement to Supply.</u>

a.     Vendor shall supply goods or perform services to or for the Company, and the Company shall accept and pay for goods or service from Vendor, for the Duration of the Cases (as defined below), on the trade terms (the "**Customary Trade Terms**") at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), availability, and other programs) in place in the 12 months before the Petition Date except for any partial payments or other payments (or assurances) Company made with respect to any unfinished product, or such other trade terms that are acceptable to the Company in their sole discretion.

b.     "**Duration of the Cases**" means the earlier of (i) the effective date of a chapter 11 plan in the Company's chapter 11 cases, and (ii) conversion of the Company's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

c.     The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.  For the avoidance of doubt, material provisions of the Customary Trade Terms include:

_____

_____

d.     Vendor shall continue to honor any existing allowances, credits, contractual obligations, or balances that accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

5.     <u>Other Matters</u>.

a.     Vendor agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims Vendor may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Vendor agrees that such claims

2

will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.

b.       Vendor will not separately seek payment from the Company on account of any prepetition claim (including any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code (other than the Agreed 503(b)(9) Claim)) other than pursuant to a plan confirmed in the Company's chapter 11 case, unless this Trade Agreement is terminated and any amounts paid on account of the Vendor Payment returned to the Company.

c.       Vendor will not file or otherwise assert against the Company, their assets, or any other affiliated person or entity, or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any prepetition amounts allegedly owed to Vendor by the Company's arising from prepetition agreements or transactions.  Furthermore, if Vendor has taken steps to file or assert such a lien prior to entering into this Trade Agreement, Vendor will promptly take all necessary actions to remove such liens.

6.       Breach.

a.       If the Company pays Vendor the Vendor Payment and Vendor is determined to have breached this Trade Agreement (a "**Vendor Breach**"), upon written notice to Vendor and without further order of the Bankruptcy Court, the Company (in its discretion) may (i) declare that any payment of the Vender Payment is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Company may recover in cash or in goods from Vendor (including by setoff against postpetition obligations); (ii) declare that Vendor must immediately return the Vendor Payment to the Company without giving effect to any allege setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and the Agreed Vendor Claim shall be reinstated as noted in 6(b) below; and (iii) if there exists an outstanding postpetition balance due from the Company to Vendor, the Company may elect to recharacterize and apply the Vendor Payment to such outstanding postpetition balance and Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

b.       If the Company recovers the Vendor Payment pursuant to Section 6(a) hereof or otherwise, the full Agreed Vendor Claim shall be reinstated as if the Vendor Payment had not been made.

c.       If Vendor fails to comply with the terms and provisions of this Trade Agreement, the Company may, in its discretion, declare that this Trade Agreement is terminated; *provided* that the Trade Agreement may be reinstated if: (i) after notice and a hearing (following a motion filed by the Vendor), the Bankruptcy Court reverses the Company's decision to terminate the Trade Agreement for good cause shown that the Company's determination was materially incorrect; (ii) the Vendor fully cures the underlying default of the Trade Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or (iii) the Company, in its sole discretion, reaches a commercially acceptable agreement with Vendor.

d.      Vendor agrees and acknowledges that irreparable damage would occur in the event of a Vendor Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Vendor agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  Vendor hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.  Notwithstanding the foregoing, in the event of a specific performance action by the Company, Vendor retains its right to seek adequate assurance of payment and other similar relief pursuant to applicable law.

e.      If the Company fails to pay for goods or services delivered postpetition in accordance with this Trade Agreement, and the Company fails to cure such default within [ten (10)] days after receiving notice of such default, Vendor shall have the right to terminate this Trade Agreement, in which event Vendor (i) shall have no obligation to continue to provide goods or services to the Company, and (ii) reserves its rights to file a timely proof of claim for any alleged unpaid amounts of the Vendor Payment.

7.      <u>Notice</u>.

If to Vendor, then to the person and address identified in the signature block hereto.

If to Company:

> J. Crew Group Inc.
> 225 Liberty St.
> New York, New York 10281
> Attn: Joanna Shapiro and Maria DiLorenzo
>
> -and-
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Olga Peshko, Esq. and Clifford Sonkin Esq.
> E-mail: olga.peshko@weil.com
>          cliff.sonkin@weil.com
>
> -and-
>
> Hunton Andrews Kurth LLP
> Riverfront Plaza, East Tower
> 951 East Byrd Street
> Richmond, Virginia 23219

Attn: Tyler P. Brown, Esq., Henry P. (Toby) Long, III, Esq., and Nathan Kramer, Esq.
E-mail: tpbrown@HuntonAK.com
hlong@HuntonAK.com
nkramer@HuntonAK.com

8.    <u>Representations and Acknowledgements</u>.  The Parties agree, acknowledge and represent that:

a.    the Parties have reviewed the terms and provisions of the Vendor Order and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Vendor Order;

b.    any payments made on account of the Agreed Vendor Claim shall be subject to the terms and conditions of the Vendor Order;

c.    if Vendor refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Vendor Order, the Bankruptcy Code, or applicable law; and

d.    in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Bankruptcy Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Vendor to the Company, until a ruling of the Bankruptcy Court is obtained.

9.    <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between Vendor and Company, Vendor agrees to hold in confidence and not disclose to any party: (a) this Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms (collectively, the "**Confidential Information**"); *provided* that if any party seeks to compel Vendor's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order or any other available remedy to prevent such disclosure; provided, further, that, if such remedy is not obtained, Vendor shall furnish only such information as Vendor is legally required to provide.

10.    <u>Miscellaneous</u>.

a.    The Parties hereby represent and warrant that: (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

b.    This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between

them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

        c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

        d.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

        e.      The Parties hereby submit to the exclusive jurisdiction of the Bankruptcy Court to resolve any dispute with respect to or arising from this Trade Agreement.

        f.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

*[Signature page follows]*

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**COMPANY**                                  **VENDOR**

_____                    _____
By:                                          By:
Title:                                       Title:
                                             E-mail:
                                             Address: