**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Attorneys and Proposed Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

------------------------------------------------------------ x
                                   :

In re                                :     **Chapter 11**
                                     :

**CHINOS HOLDINGS, INC., *et al.*,**     :     **Case No. 20–32181 (KLP)**
                                     :

                **Debtors.[1]**     :     **(Jointly Administered)**
                                     :
------------------------------------------------------------ x

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Chinos Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "**Debtors**") file this omnibus reply to the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

objections filed to the *Motion of Debtors for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 31] (the "**Motion**").[2]  The relief requested by the Motion is opposed on a limited basis by: (i) the official committee of unsecured creditors in these Chapter 11 Cases (the "**Committee**") (see Docket No. 358) (the "**Committee Objection**"); and (ii) certain of the Debtors' landlords (collectively, the "**Objecting Landlords**," and together with the Committee, the "**Objectors**")[3] (see Docket Nos. 288, 289, 294, 295, 296, 312, 334, 386, and 418) (such objections and joinders, the "**Landlord Objections,**" and together with the Committee Objection, the "**Objections**").

In response, the Debtors have implemented a number of revisions to their proposed form of Final Order, filed contemporaneously herewith (as modified, the "**Proposed Final**

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion and the DIP Credit Agreement, as applicable.

[3]  The Landlord Objections include responses submitted on behalf of the following entities: (i) BPP East Union LLC (Docket No. 288) ("**BPP Objection**"); (ii) Garden City Owner LLC, Legacy Place Properties LLC, Market Street Retail South LLC, W/S/M Hingham Properties LLC, W/S Peak Canton Properties LLC, Hilldale Shopping Center LLC, W/S Tampa Owner LLC, BP PruCenter Acquisition LLC, Reston Town Center Property LLC, and Wilson Canal Place II, LLC (Docket No. 289) ("**Garden City Objection**"); (iii) Grand Place LLC and STRS L3 ACQ1 LLC (Docket No. 294) ("**Grand Place Objection**"); (iv) Brookfield, Property REIT Inc., Hines Global REIT, Jones Lang LaSalle Americas, Inc., SITE Centers Corp., Tanger Management, LLC, and Turnberry Associates (Docket No. 295) ("**Brookfield Objection**"); (v) 5616 Bay Street Investors LLC, Brixmor Operating Partnership L.P., Centercal Properties, LLC, DDR Deer Park Town Center LLC, ERY Retail Podium LLC, Edens, Federal Realty Investment Trust, Pgim Real Estate, Related Companies, Retail Properties of America, Inc., Starwood Retail Partners LLC, The Forbes Company, The Macerich Company, Trademark Property Company, and Urban Edge Properties L.P. (Docket No. 296) ("**Bay Street Objection**"); (vi) Atlanta Outlet Shoppes, LLC, Bluegrass Outlet Shoppes CMBS, LLC, Westfield, LLC and certain of their landlord affiliates (Docket No. 312) ("**Atlanta Outlet Objection**"); (vii) Eastview Mall, LLC and Pittsford Plaza SPE, LLC. (Docket No. 334) ("**Eastview Objection**"); (viii) Simon Property Group, Inc. (Docket No. 386) ("**Simon Objection**"); and (ix) CBL & Associates Management, Inc. (Docket No. 418).

Order"), that resolve some, but not all of the Objections.[4]  The Debtors will also continue in their efforts to resolve the Objections if at all reasonably possible in advance of the Court's hearing on this matter.[5]  To the extent the Objections are not resolved by modifications set forth in the Proposed Final Order, the Debtors respectfully submit that such Objections should be overruled and that the Proposed Final Order should be entered by the Court.

### Preliminary Statement

1.      The Debtors commenced these chapter 11 cases approximately thirty (30) days ago in order to swiftly reorganize as a going concern.  All parties must agree that time is of the essence for any retailer in bankruptcy, but particularly amidst the unprecedented crises arising in the wake of COVID-19.  A retail debtor's successful reorganization is very much the exception, not the rule, even before taking into account the extraordinary impact of the pandemic facing our country.

2.      The Debtors firmly believe that all stakeholders will be better served by a reorganization versus the sort of liquidation suffered by so many retailers in chapter 11.  In this regard, the Debtors are the only parties tasked to serve as fiduciaries for all stakeholders; the Debtors do not serve the interests of any one constituency or client.  As fiduciaries, the Debtors believe that all suppliers, landlords, vendors, customers, and their more than 10,000 employees will benefit by having a healthy, viable, de-leveraged, and re-vitalized business partner for years to come in a manner consistent with chapter 11's more fundamental commitment to the

---

[4]     The Proposed Final Order is attached hereto as **Exhibit A**.  A redline of the Proposed Final Order to the Interim Order is attached hereto as **Exhibit B**.

[5]     In addition, the Debtors received informal responses from Comenity Bank and certain governmental authorities (collectively, the "**Informal Objections**").  Each of the Informal Objections has been resolved, and such resolutions are reflected in modifications to the Proposed Final Order.

preservation of going concerns. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. Partnership*, 526 U.S. 434, 453 (1999).

3.    To this end, the Debtors entered chapter 11 mindful of the track record for retail debtors, and the Debtors fought hard to enter chapter 11 with a clear path to emergence.  This effort was ultimately successful and memorialized in two fundamental ways:  (i) first, a transaction support agreement that provides for the full recapitalization of the Debtors' balance sheet and is supported by the overwhelming majority of the Debtors' funded debt holders (the "**TSA**");[6] and (ii) second, a $400 million financing package, secured on a junior basis, that provides necessary liquidity for these chapter 11 cases and automatically converts to an exit facility upon consummation of their chapter 11 plan.  In other words, the Debtors entered chapter 11 without shutting the door behind them.

4.    The Debtors have already made substantial progress in their reorganization. The Debtors have successfully transitioned into chapter 11 with the benefit of the relief granted by the Court.  The Debtors have built substantial support for their reorganization, as evidenced by the overwhelming number of creditors joining the TSA.  The Debtors have entered-into more than 80 trade agreements with critical vendors and business counterparties.  Further, the Debtors filed their Plan of Reorganization and Disclosure Statement on May 18, 2020, (Docket. Nos. 247, 248), a hearing to consider disclosure statement approval is scheduled for June 25, 2020 and, subject to approval, the Debtors will seek plan confirmation on or around August 25, 2020.

5.    During this time, the Debtors have continued to engage constructively with the Committee since its formation on May 13, 2020.  The Debtors readily acknowledge the

---

[6]    As of the date hereof, parties to the TSA include 95.7% of Prepetition Term Lenders, 95.2% of Prepetition IPCo Note Holders, 84.7% of the Series A Preferred Stock Holders, and 88.6% of Holders of Common Equity Shares.

WEIL:\97485855\13\54457.0008

substantial efforts by the Committee and its professionals to work constructively in their shared

goal to drive a successful and efficient reorganization here.  Nor should the mere fact that the

Debtors and the Committee may disagree on certain aspects of the Debtors' proposed DIP

Financing be taken to mean that the Debtors and the Committee will not be able to continue to

work constructively and collaboratively going forward.

6.    But much work remains to be done. The Debtors' survival, together with

the jobs of thousands and thousands of men and women, hang in the balance.

7.    The Debtors' proposed DIP financing is, without question, fundamental to

their ability to reorganize as a going concern.  As a baseline matter, the Debtors require access to

the liquidity provided by their DIP Facility to pay rent, to buy inventory, to pay vendors, to pay

employees, and to satisfy the costs of administering these chapter 11 cases.[7]  There is no real

dispute in this regard.  No objecting party seriously argues that the Debtors do <u>not</u> require DIP

Financing or that the Debtors should administer these chapter 11 cases on a "cash collateral only"

basis.  Rather, all parties (including Objectors) have effectively acknowledged that the Debtors'

proposed financing is essential for the survival and success of this reorganization.

8.    Nor has any party seriously argued that the necessary financing is either

available from alternative sources or could be incurred on an unsecured or "administrative priority

only" basis.  Rather, DIP financing in the amounts required here is available only because the

---

[7]    The Debtors' DIP Budget, as revised on June 2, 2020, and attached to the Proposed Final Order as <u>Schedule 2</u>, makes clear that the Debtors will have the ability to make rental payments in July 2020 on account of May, June and July rent.  In addition, the Debtors will pay more than 50% of all claims estimated to hold priority under section 503(b)(9) of the Bankruptcy Code (approximately $26 million out of an estimated total of approximately $46 million of such priority claims) by July 15, 2020 in accordance with trade agreements entered into by the Debtors.

Debtors' incumbent lenders are willing to "self-prime" their existing liens.[8]    Despite these

constraints, the Debtors still negotiated a highly attractive financing package with their existing

lender group and, notably, no Objector has argued that the Debtors' proposed DIP Financing is

either "too expensive" in terms of the interest rate and fees payable by the Debtors' estates or that

the Debtors have agreed to terms that are, on the whole, materially off-market or draconian.[9]    As

detailed below, the Debtors' proposed financing is materially consistent with terms regularly

approved in this District (even on a pre-pandemic basis), and, in any event, reflect a sound exercise

of business judgment in light of the extraordinary challenges facing these estates.

9.    Fundamentally, the matter before the Court is a question of business

judgment:  does the Debtors' proposed DIP Financing, viewed in terms of both its benefits and

concessions, reflect a reasonable business judgment under the particular facts and circumstances

of these chapter 11 cases?  *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011);

*In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have

generally deferred to a debtor's business judgment in granting section 364 financing.").    The

answer here is clearly "yes."  As a matter of process, the Debtors entered into their DIP Financing

package with the benefit of advice from experienced professionals, the supervision of disinterested

---

[8]    No party has asserted that the Debtors could have, or even should have, sought to incur financing secured only
by unencumbered assets—although such a step is of course required by the Bankruptcy Code before the Debtors
might incur priming financing.  *See* 11 U.S.C. § 364(c)(2).

[9]    The Debtors acknowledge that the Committee has objected to the portion of fees due payable in connection with
the DIP Facility in the form of reorganized equity upon consummation of the chapter 11 plan contemplated by
the TSA.  As noted at their first day hearing, the Debtors respectfully submit that, while these fees are certainly
appropriate, any objection with respect to such fees is properly addressed in the context of plan confirmation, and
the Committee's disputes in this regard are fully reserved.

directors, and only after vigorous, arm's length, and hard-fought negotiations.  This independent, disinterested process alone supports approval of the Debtors' business judgment here.[10]

10.    And, as a matter of substance, the Court's review should not occur in a vacuum or without regard to the broader circumstances at work in these chapter 11 cases.  *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past).  Such consideration should take into account the benefits provided under the DIP Facility and the give-and-take necessary for any successful commercial negotiation, all in the context of truly extraordinary circumstances arising from our present national pandemic.

11.    And, to be clear, the Debtors agree that their financing would be even more attractive for prepetition unsecured creditors if all of the concessions demanded by the Committee were accepted by their DIP Lenders and Prepetition Secured Parties.  But the perfect cannot be the enemy of the good, nor can the interest of any one constituency override the Debtors' informed, independent, and disinterested determination that this proposed DIP Financing fairly benefits all stakeholders (including general unsecured creditors) here.  As even the Objectors must acknowledge, all parties benefit from (and require) the liquidity—and path to emergence— provided by the DIP Facility.  To this end, the Debtors respectfully submit that the Objections that are not otherwise resolved should be overruled on the merits.

---

[10]    *See In re Adelphia Commc'ns Corp.*, Case No. 02-41729, 2004 WL 1634538, at *3 (Bankr. S.D.N.Y. June 22, 2004) ("Some predict that equally satisfactory terms could be obtained down the road. That may or may not be so.  Predictions of that character are, at best, educated guesses, and the Debtor's determination that this was a risk not worth taking, that this package would be difficult if not impossible to replicate in the future, and that advantageous terms should be locked in while they could be had, is exactly the kind of business decision that the business judgment rule respects. That decision was hardly an abuse of discretion or waste of corporate assets.").

WEIL:\97485855\13\54457.0008

## The Objections and the Debtors' Proposed DIP Modifications

12.     The Objections fall into two principal categories.  Underline{First}, the Objecting

Landlords primarily oppose the Debtors' undertaking to grant section 506(c) and 552(b) waivers

in favor of the Prepetition Secured Parties upon entry of the Final Order unless rental payments

are provided with priority payment status or are otherwise paid on a superpriority basis.[11]  Second,

the Committee opposes entry the Final DIP Order on three principal bases:  (i) the liens and claims

granted under the DIP Order, (whether to secure the DIP Facility or as adequate protection) should

not have recourse to unencumbered assets, such as avoidance action proceeds; (ii) the Committee

should be provided with a mechanism to assert derivative standing to assert claims that may exist

in favor of Debtors that are limited liability companies organized under Delaware law; and (iii) the

Committee largely joins in the Landlord Objectors' opposition to section 506(c) and 552(b)

waivers unless rental payments and certain administrative claims are granted superpriority status

and are paid in full outside consummation of a chapter 11 plan.[12]

13.     In response, the Debtors have made substantial efforts to negotiate further

with their DIP Lenders and Prepetition Secured Parties to reach a consensual resolution or, at the

very least, minimize the issues requiring adjudication by the Court.  To this end, the Debtors'

revised Proposed Final Order, among other things:

- requires the Prepetition Secured Parties to marshal their adequate protection liens and claims away from the proceeds of avoidance actions;

---

[11]    The Debtors note that certain landlords objected on the basis that the DIP Facility fails to provide such parties with "adequate protection."  *See, e.g.*, Atlanta Outlet Objection; Bay Street Objection.  To the extent any such parties seek adequate protection, they must do so by motion and on an appropriate record—not through an objection to the Debtors' proposed financing.

[12]    The balance of the Committee's objections are addressed at Underline{Part V}, below.

WEIL:\97485855\13\54457.0008

- In other words, such adequate protection will have recourse to avoidance action proceeds only if there are truly no other assets available to satisfy such claims.

- increases the Committee's investigation budget from $50,000 to $200,000;

- extends the Committee's Challenge Period to August 3, 2020;[13]

- provides a mechanism for the Committee to preserve claims it believes may exist that are held by the five "IPCo" Debtors that are limited liability companies organized under Delaware law—notwithstanding the fact that that substantially all creditors of those Debtors actually oppose the Committee's Objection;

- includes fees and expenses of Committee members incurred pursuant to Section 503(b)(3)(F) in the Carve Out;

- provides the Committee with enhanced reporting and information delivery on terms consistent with reporting delivered to other key stakeholders, including prior notice of any proposed DIP Amendment; and

- the Debtors' current DIP Budget provides that (i) the Debtors will have the ability to pay May, June, and July rent in July 2020; and (ii) more than 50% of all estimated 503(b)(9) claims will be paid in July 2020 (approximately $26 million out of an estimated total of approximately $46 million of such priority claims).

The Debtors believe these modifications materially improve the terms and conditions of their already-favorable financing package. The Debtors also remain committed to continuing to narrow or resolve various aspects of the Objections if possible ahead of the hearing.

14.    The Debtors further acknowledge the Committee is particularly focused on claims and causes of action the Committee believes may exist in connection with certain balance sheet transactions undertaken by the Debtors in 2016 and 2017, and which are subject to the stipulations and releases granted under the Final DIP Order—but that remain subject to a

---

[13]    For reference, and subject to Court approval, the Debtors anticipate completing solicitation with respect to their Plan by mid-August 2020. The extension demanded by the Committee by its Objection (i.e., 120 days from the Final Hearing), would cause the Challenge Period to run until October 2020, (Comm. Obj. ¶ 67), well past the point in time by which the Debtors intend to emerge from chapter 11.

WEIL:\97485855\13\54457.0008

customary challenge period in favor of the Committee and other parties.  As the Court is aware, these transactions have already been litigated prior to the commencement of these bankruptcy cases, and the Debtors' releases in this regard were further subject to an independent investigation undertaken by a disinterested estate fiduciary, namely the Review Committee of Debtor J. Crew Operating Corp.  In this process, the Review Committee separately engaged pre-eminent financial and legal advisors in the form of Goldin Associates, LLC and Quinn Emanuel Urquhart & Sullivan LLP, respectively.

15.    The Review Committee has independently determined to consent to the relevant stipulations contemplated by the Final DIP Order, stating that litigation on account of the transactions at issue would be "speculative and unlikely to lead to any value to the estate of [J. Crew Operating Corp.] or any of its subsidiaries."[14]  The Debtors appreciate that the Committee has its own investigation to undertake in this regard, and, as noted above, the Debtors have secured concessions to both increase funding for such investigation and extend the timeframe in which the Committee might complete that investigation.  But the Debtors are hopeful the Committee will not simply dispute the Review Committee's analysis and conclusions for its own sake.

16.    The Debtors further acknowledge that they may be unable to resolve all Objections in advance of the Court's hearing, particularly with respect to the section 506(c) and 552(b) waivers contemplated by the Proposed Final Order.  The Debtors respectfully submit that such waivers were fundamental components of the overall financing and adequate protection package negotiated here, and the Debtors would not have been able to incur their DIP Financing

---

[14]    *Response of the Review Committee of J. Crew Operating Corp. to Motion of Debtors for Entry of Orders  (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 414] (the "**Review Committee Response**") ¶ 25, filed on June 1, 2020.*

WEIL:\97485855\13\54457.0008

(which is being provided on a junior basis) or use Cash Collateral on a consensual basis absent this undertaking.  And, as detailed below such provisions are customarily negotiated on financings approved by this Court and others.  More fundamentally, no Prepetition Secured Creditor is obtaining a "windfall" on account of such waivers:  unlike other retail bankruptcies, these chapter 11 cases are not being run as a sort of global "GOB sale" by which secured creditors are simply liquidating collateral through piecemeal dispositions.  Rather, the Debtors are de-leveraging, recapitalizing, and reorganizing on the strength of this DIP Facility; secured lenders are also equitizing nearly $2 billion of debt in this process.   There can be no doubt that <u>all</u> stakeholders will benefit if and when the Debtors succeed in this regard.

17.    Similarly, the Debtors acknowledge that they may be unable to resolve the Committee's request that unencumbered assets, including avoidance action proceeds, be exempted from the liens or claims, including the Adequate Protection Obligations, granted by the Proposed Final Order.  In this regard, the Committee is presumably concerned that the relief granted here would unduly prejudice unsecured creditors.  But this argument overstates the case.  The Debtors' Plan provides for more than $50 million of aggregate cash distributions to general unsecured creditors.  *See* Plan §§ 4.6, 4.7.[15]  The Plan further provides for payment, in full, of statutory fees, administrative claims, priority claims, priority tax claims, and cure obligations.  *See* Plan §§ 2.1, 2.4, 2.5, 8.1.  Additionally, the Plan provides for the waiver of what would otherwise be substantial deficiency claims arising under the Debtors' $1.4 billion Prepetition Secured Term Loan and $350 million of secured IPCo Notes.  *See* Plan §§ 4.6, 4.7.  The Plan further provides for a waiver of any diminution in value claims that could arise in favor of Prepetition Secured Term Loan Lenders

---

[15]  "Plan" means the *Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors*, dated as of May 18, 2020 (Docket No. 248).  As noted above, a hearing to consider approval of the Disclosure Statement with respect to the Plan is scheduled for June 25, 2020—i.e., three (3) weeks from today.

WEIL:\97485855\13\54457.0008

and IPCo Noteholders—which waiver has been granted by the relevant parties pursuant to the Debtors' Proposed Final Order.  *See* Proposed Final Order ¶ 12(e), (g); Plan § 2.1(b).[16]  The Debtors submit that these facts should resolve any concerns that their proposed financing is somehow intended to unduly prejudice prepetition general unsecured creditors.

18.    Moreover, the granting of liens and claims with respect to unencumbered assets reflects the requirements imposed by the Bankruptcy Code with respect to postpetition financing.  The Debtors must first look to grant liens on unencumbered assets before they may incur senior or priming financing, which is precisely why the DIP Liens and claims have recourse to such assets, *see* 11 U.S.C. § 364(c)(2).  Nor can the Debtors incur priming financing without also granting administrative priority status to the DIP Lenders, *see* 11 U.S.C. § 364(c)(1).  And here, the Debtors could not have obtained such financing without granting such liens and claims: the DIP Lenders would not have agreed to commit $400 million of new capital without being able to secure that new capital by recourse to substantially all the Debtors' assets, including previously unencumbered assets—particularly since that new capital is already being provided on a junior basis to the Debtors' prepetition ABL Facility.

19.    With respect to adequate protection, section 507(b) of the Bankruptcy Code in fact requires that parties entitled to adequate protection "shall" receive superpriority administrative expense status for their claims.  *See* 11 U.S.C. 507(b) ("[S]uch creditor's claim under such subsection ***shall*** have priority over every other claim allowable under such subsection."

---

[16]    *See, e.g.* Proposed Amended Order ¶ 12(e):  "Notwithstanding their status as 507(b) Claims, the Prepetition ABL Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or liquidation confirmed in the Chapter 11 Cases in any manner set forth in such plan if the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement) consent to such treatment, which shall include any class including such Requisite Lenders voting to accept such plan of reorganization or plan of liquidation."; *see also* Plan § 2.1(b):  "[T]he holders of any adequate protection claims granted by the DIP Order will not receive any recovery on account of such claims, having waived such recovery solely for purposes of the Plan."

WEIL:\97485855\13\54457.0008

(emphasis added)).  Section 507(b) does not authorize, or even permit ("shall"), unencumbered assets to be exempted from claims entitled to this priority.  Rather, such claims are required to have recourse to <u>all</u> the Debtors' assets—there is no statutory exemption for unencumbered assets. That said, and as noted above, the Debtors have successfully negotiated that their Prepetition Secured Parties will marshal such adequate protection liens and claims away from avoidance action proceeds, thereby preserving such value for the benefit of other administrative, priority, and prepetition creditors absent a wholesale failure in adequate protection.

20.    In sum, the Debtors' proposed financing results from vigorous, arm's length negotiation, reflects fair and market terms, including with respect to the waivers and adequate protection contemplated by the Proposed Final Order, and has in fact improved since the Petition Date with the benefit of the Committee's input and engagement.  The Debtors therefore respectfully submit that the Objections should be overruled, and that their proposed DIP Financing should be approved on a final basis.

<strong><u>Reply</u></strong>

21.    The following Reply is organized in five (5) parts.  <u>First</u>, the Debtors further establish that the DIP Facility reflects a sound exercise of business judgment and benefits all stakeholders.  <u>Second</u>, the Debtors provide further support for the section 506(c) and 552(b) waivers provided by the Final Order.  <u>Third</u>, the Debtors further demonstrate why recourse to unencumbered assets in favor of the DIP Facility and adequate protection obligations is necessary and appropriate here.  <u>Fourth</u>, the Debtors' address the Committee's concerns with respect to the status of claims that may be held by limited liability companies organized under Delaware law. <u>Finally</u>, the Debtors address the balance of the Objections.

WEIL:\97485855\13\54457.0008

I.      **The DIP Facility Benefits the Debtors' Estates and All**
       **Stakeholders and Reflects a Sound Exercise of Business Judgment**

22.    There is no real dispute that all stakeholders benefit from the Debtors'

proposed DIP Facility.  The DIP Facility:

- provides vitally necessary liquidity to pay wages, vendors, suppliers, and landlords, and administer these chapter 11 cases;

- is attractively priced in terms of both its interest rate and minimal cash fees;

- provides for the waiver of any diminution in value claims, if any, held by the Prepetition Secured Parties where such parties vote in favor of a chapter 11 plan;

- provides a substantial investigation budget in favor of the Committee, as well as a customary challenge period in favor of third parties;

- provides junior financing with respect to the Prepetition ABL Facility, thereby obviating the need for a contested priming fight there; and

- provides a clear path to emergence by including a commitment to convert to an exit facility upon consummation of the Debtors' Plan;

The DIP Facility positions the Debtors' reorganization for success, and, on this record alone, the

DIP Facility can and should be approved as a sound exercise of business judgment.  Indeed, the

balance of Objections may be characterized as trying to "cherry pick" certain provisions required

to obtain the benefits arising from the DIP Facility as a whole.  Of course, such concessions reflect

the realities of commercial negotiations, and simply because the DIP Facility is imperfect is no

basis on which parties should ignore its clear benefit to these chapter 11 estates.

23.    Further, the DIP Facility results from an independent, arm's length

negotiation led by the disinterested fiduciaries.  *See* First Day Declaration ¶ 63 (describing Chinos

A Special Committee).  As noted above, the Debtors vigorously negotiated with their DIP Lenders

in a process where each side was represented by experienced professionals.  While this process

was hard fought, the Debtors submit that all parties acted in good faith and on a commercially reasonable basis.

24.     No party seriously argues otherwise.  Admittedly, the Committee asserts in passing that the DIP Facility may somehow have wrongly benefitted certain unidentified "Insiders."  This is not correct.  To the extent "insiders" may also be prepetition lenders, such parties should and will, of course, benefit from the stipulations granted pursuant to the Final DIP Order in that capacity—but only in that capacity.[17]  But the Committee's objection overstates the case and provides no basis to support their assertion that such parties be treated differently at this juncture.  Should any insiders hold debt such that they are subject to the releases and stipulations contemplated by the Final DIP Order, such releases and stipulations are, again, being granted solely in such parties' capacity as lenders.  Moreover, such releases and stipulations remain subject to the challenge period in favor of the Committee and third parties.  *See* Proposed Final Order ¶ F.  Thus, no parties are improperly or prematurely obtaining releases absent independent oversight and an opportunity for challenge—separate and apart from the conclusions already drawn by the Review Committee.

## II.     Section 506(c) and 552(b) Waivers Should Be Granted

25.     The Committee and Landlords assert that the Proposed Final Order should not include waivers of rights under sections 506(c) or 552(b) of the Bankruptcy Code.  At their core, these Objections are premised on the notion that the DIP Lenders must agree to fund rent expense, in full, ahead of all other unsecured claims before such waivers may be granted.  *See,*

---

[17]     *See, e.g.*, Proposed Final Order ¶ F(iv), which grants Releases to "DIP Secured Parties and the Prepetition Secured Parties (***in each case, solely in their capacities as such***) and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, ***each solely in their capacities as such*** . . . ." (emphasis added).

WEIL:\97485855\13\54457.0008

*e.g.*, Committee Objection at p.2; Grand Place Obj. ¶ 12 (arguing that because the "lenders will substantially benefit from the continued use and occupancy of Debtors' retail location . . . the lenders should be required to fund the expenses of that benefit rather than escape any responsibility for occupancy costs through attempted waivers of Sections 506(c) and 552"); Brookfield Obj. at ¶ 13 (same).

26.    There is no legal basis for such a demand.  As a starting point, a section 506(c) surcharge is itself an extraordinary remedy.  A surcharge may be applied only in "sharply limited" circumstances to avoid a windfall where expenses have been incurred solely and directly for the surcharged party's benefit.  *See In re Towne, Inc.*, 536 F. App'x 265, 268 (3d Cir. 2013). Conversely, courts consistently acknowledge that section 506(c) and 552(b) waivers may be granted within the totality of a financing package that provides material benefit to a chapter 11 estate.  Indeed, courts in this district and elsewhere have regularly authorized such waivers.  *See, e.g.*, *In re Craftworks Parent, LLC*, No. 20-10475 (BLS) (Bankr. D. Del. May 20, 2020); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. March 13, 2020); *In re Gymboree Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 15, 2019); *In re Gymboree Corp.*, No 17-32986 (KLP) (Bankr. E.D. Va. July 16, 2017); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 8, 2016); *In re Alpha Natural Resources, Inc.*, No. 16-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015); *In re Patriot Coal*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015).

27.    Nor do any cases require that rent expense be elevated to superpriority status, or require that 503(b)(9) claims must be paid in full ahead of plan consummation as a precondition for such waivers.  *Pier 1 Imports* makes clear that rent expense and similar obligations are entitled only to administrative priority—not an absolute guaranty of payment or accelerated payment outside a chapter 11 plan.  *In re Pier 1 Imps., Inc.*, Case No. 20-30805 (KRH), 2020

Bankr. LEXIS 1242, at *12 (Bankr. E.D. Va. May 10, 2020) ("[T]o the extent that the Debtors are obligated to pay rent and fail to timely pay such rent, the Lessors are entitled to an administrative expense claim."); *accord In re Circuit City Stores, Inc.*, 447 B.R. 475, 511 (Bankr. E.D. Va. 2009) ("If a debtor fails to perform its obligations under § 365(d)(3), all a Lessor has is an administrative expense claim under § 365(d)(3), not a claim entitled to superpriority.").  Indeed, Congress has made it clear that claims for rent are not entitled to the sort of superpriority demanded by the Objectors here by enacting sections 545(3) and (4) of the Bankruptcy Code, which avoids liens for "rent" and for a "lien for distress of rent."  As a result, the Objectors' assertion that section 506(c) and 552(b) waivers may be granted only if rental payments are either guaranteed in full or afforded superpriority status cannot be squared with the Bankruptcy Code and established case law.

28.     The Objectors' efforts to condition a section 506(c) waiver on the Debtors' absolute undertaking to pay rent further misunderstands the application of section 506(c) itself.  Section 506(c) does not permit an involuntary surcharge where the costs in question only indirectly or incidentally benefit a secured creditor.  *In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76 (2d Cir. 1984).  There can be no surcharge where expenses fail to provide a "clear benefit" to the secured creditor.  *In re Ware*, 2014 WL 2508731 Case No. 12-30566, 2014 WL 2508731, at *6 (Bankr. E.D. Va. June 3, 2014) (Phillips, J.).  Rather, "[t]he debtor in possession also must show that its funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (emphasis added).

29.     The Debtors' obligation to pay rent per section 365(d)(3) provides, at best, an indirect and unsolicited benefit to the Prepetition Secured Parties.  Here, the Debtors will still incur rental obligations per section 365(d)(3) whether or not the Prepetition Secured Parties derive

any benefit from the Debtors' retail footprint.  In fact, the Debtors could completely remove all inventory from store locations (assuming "shelter in place" or similar orders no longer apply), and the Debtors would still incur rental obligations unless or until leases are rejected.  Such expenses are therefore not 'necessary' such that surcharge is even available pursuant to section 506(c): "'Necessary' costs are those that are ***unavoidably*** incurred by a trustee in the preservation or disposal of the secured property." *Ware*, 2014 WL 2508731, at *6 (emphasis added).  Ongoing rent expense is not "unavoidably incurred" for the benefit of the Prepetition Secured Parties here; rather, the Debtors will continue to incur rent unless or until leases are rejected—regardless of whether the Prepetition Secured Parties derive any benefit whatsoever.

30.    Moreover, the Debtors' current budget provides them with the ability to make rental payments in the first three weeks of July, including 'catch up' payments for rent deferred pursuant to the relief granted by the *Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases, and (II) Granting Related Relief* [Docket No. 323], entered on May 26, 2020, and the Debtors will pay more than half of all estimated 503(b)(9) claims under that budget as well.  And, should landlords seek adequate protection, they are free to do so by motion, on an appropriate record, and with the Debtors having an opportunity to respond.[18]  In any event, a debtor's business judgment to grant 506(c) or 552(b) waivers are in no way contingent on also providing landlords with an absolute guaranty of timely payment.  Rather, such a waiver is entirely appropriate where, as a here, such a

---

[18]    To date, no such motions have been filed.  Furthermore, as already ruled by the Court with respect to the Debtors' rent deferral motion, "[a]s for the request for adequate protection. . . . Judge Huennekens found that the deferred payment of rent does not decrease the value of any lessor's interest in its property. . . . Moreover, under the proposed restructuring agreement and DIP facility, it's anticipated that the remainder of deferred rent will be paid within a few short months after the effect—and no later than the effective date of the plan.  Judge Huennekens found that this assurance of cure payment and continued payment of no-rent payments was sufficient to protect the landlords to the extent that adequate protection is required. I agree." *In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. May 26, 2020), Hr'g Tr. at 62.

WEIL:\97485855\13\54457.0008

waiver is granted within the context of a DIP financing that benefits all parties by providing a clear path to reorganization.

31.     The Committee's reliance on an oral ruling from the United States Bankruptcy Court for the District of Delaware in *In re Sports Authority Holdings*, No. 16-10527 (MFW) (Bankr. D. Del. Apr. 26, 2016), is similarly misplaced.  As a procedural matter, the *Sports Authority* court neither issued a precedential ruling, nor is a ruling of the Delaware bankruptcy court binding on courts in this jurisdiction.  More fundamentally, *Sports Authority* actually demonstrates precisely why a 506(c) waiver is entirely appropriate here.  The *Sports Authority* court denied a 506(c) waiver only after the debtors filed a GOB motion and informed the court that "it has become apparent that the debtors will not reorganize under a plan, but instead, will pursue a sale," and where the budget provided no certainty whatsoever with respect to payment of rental or other administrative expenses, other than limited provisions for GOB leases.  *See In re Sports Authority Holdings*, No. 16-10527 (MFW) (Bankr. D. Del. Apr. 26, 2016), Hr'g Tr. at 194-195.

32.     These cases are clearly on very different footing.  Here, the Debtors are pursuing a Plan with overwhelming levels of creditor support.  As noted above, that Plan already contemplates payment, in full, of all statutory fees, administrative claims, priority claims, priority tax claims, and cure obligations—and further incorporates waivers of potentially substantial deficiency claims and diminution in value claims.  By comparison, secured lenders in *Sports Authority* were using chapter 11 to liquidate collateral—nothing more.  Here, the Debtors' secured lenders have agreed to equitize almost $2 billion of debt; in *Sports Authority*, those secured lenders were simply conducting a wholesale GOB process.  Here, the Debtors' prearranged Plan is supported, as of the date of this Reply, by 95.7% of Prepetition Term Lenders, 95.2% of Prepetition

IPCo Note Holders, 84.7% of the Series A Preferred Stock Holders, and 88.6% of Holders of Common Equity Shares—and with more than 80 critical vendors having executed trade agreements to further support the Debtors.  In *Sports Authority*, no such support was in place. Further, the Debtors have a budget that provides the Debtors with the ability to pay for May, June and July rent in the first three weeks of July 2020, as well as more than half of their estimated 503(b)(9) claims; in *Sports Authority*, <u>no</u> comparable expenses were budgeted to be paid.  *See In re Sports Authority Holdings*, No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016), Hr'g Tr. at 10-11.  In short, the Debtors submit that the facts of these chapter 11 cases, especially in comparison to *Sports Authority*, clearly support their business judgment to waive surcharge rights as provided by the Proposed Final Order.

33.    A similar analysis applies to the Debtors' determination to provide a section 552(b) waiver here.  As with section 506(c) waivers, such section 552(b) waivers are customarily negotiated as part of DIP financing—regardless of whether or not a party objects. *See, e.g.*, *In re Craftworks Parent, LLC*, No. 20-10475 (BLS) (Bankr. D. Del. May 20, 2020); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. March 13, 2020); *In re Gymboree Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 15, 2019); *In re Gymboree Corp.*, No 17-32986 (KLP) (Bankr. E.D. Va. July 16, 2017); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 8, 2016); *In re Alpha Natural Resources, Inc.*, No. 16-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015); *In re In re Patriot Coal*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015).  Indeed, it would be an extraordinary case where such a waiver was <u>not</u> granted.  Furthermore, a section 552(b) waiver, being typical in cash collateral orders, was part of the negotiations for consensual use of the cash collateral in these chapter 11 cases.

WEIL:\97485855\13\54457.0008

34.    Such an approach recognizes, yet again, that invoking 552(b)'s limited 'equities of the case' exception is an extraordinary remedy—not the rule.  Here, the Debtors ultimately agreed to waive this limited right as part of the overall give and take in their DIP negotiations.  And, particularly given section 552(b)'s limited application, the Debtors respectfully submit that such a concession was a reasonable determination in light of their DIP Facilities' manifest benefits.

## III.    DIP Claims and Adequate Protection Claims Appropriately Have Recourse to Unencumbered Assets, Including Avoidance Action Proceeds

35.    The Committee argues that DIP Claims and adequate protection should not have recourse (whether through liens or administrative claims) to avoidance actions proceeds and certain other unencumbered assets.  *See* Committee Objection ¶¶ 49–51.  In this regard, the Committee argues, "[a]voidance powers are intended to allow the debtor in possession to gain recoveries for all unsecured creditors."  *Id.* ¶ 49.

36.    This position is not correct or it is, at best, incomplete.  The Bankruptcy Code does not reserve either avoidance actions in particular, or unencumbered assets in general, for the benefit of prepetition, unsecured creditors alone.  Quite the opposite.  Sections 364 and 507(b) require that the Debtors look first to unencumbered value when raising capital or providing adequate protection.  Section 550 of the Bankruptcy Code preserves avoided transfers for the benefit of the chapter 11 estate—including administrative and priority claimants.  *See In re Fleming Packaging Corp.*, No. 03-82408, 2007 WL 4556985, at *6 (Bankr. C.D. Ill. Dec. 20, 2007) ("This Court does not consider Section 550(a)'s 'for the benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit directly from the recovery of an avoided transfer, i.e., that the recovered funds end up in the pockets of the unsecured creditors.").  The disposition of such assets remains a question of the debtors' sound business judgment in terms

WEIL:\97485855\13\54457.0008

of how such disposition benefits the chapter 11 estate as a whole: "Section 550(a) speaks of benefit

to the *estate*—which in bankruptcy parlance denotes the set of all potentially interested parties—

rather than to any particular class of creditors."  *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290,

293 (7th Cir. 2003) (emphasis in original).

37.     The same rule applies here.  The Debtors' agreement to grant their DIP

Lenders' recourse to unencumbered assets, including avoidance action proceeds, reflects the

Debtors' determination that such a concession would benefit their estates as a whole, and only

after substantial negotiation.  In this regard, all parties (including the Objectors) agree that these

chapter 11 cases require a substantial amount of postpetition financing.  The Bankruptcy Code, in

turn, requires the Debtors to obtain financing on an administrative basis or secured by

unencumbered assets before they might otherwise incur financing secured by encumbered assets.

*See* 11 U.S.C. § 364(c)(1), (2).  Nor would the DIP Lenders agree to provide financing—which is

being provided on a junior basis with respect to approximately $375 million of obligations

outstanding under the Debtors' Prepetition ABL Facility—without recourse to such unencumbered

assets.  And, based on the independent determination reached by the Review Committee, these

estates have lost no material value by virtue of the recourse the DIP Lenders may have to claims

arising from the 2017 Transaction.  (Review Comm. Resp. ¶¶ 24–25.)

38.     This analysis applies with equal force to the Debtors' determination to

provide adequate protection with recourse to such unencumbered assets.  Section 507(b) is clear

that, where adequate protection fails, a secured creditor's adequate protection claim "***shall*** have

priority" over every other administrative claim.  11 U.S.C.  § 507(b) (emphasis added).  Section

507(b) does not contemplate, or even permit, assets to be excluded from such claims, absent

agreement.  Further, and as noted above, the Debtors have successfully negotiated with their

Prepetition Secured Parties such that those parties have agreed to marshal their adequate protection liens and claims away from avoidance action proceeds.  In other words, the Prepetition Secured Parties will seek recourse against avoidance action proceeds only in a scenario where their adequate protection completely fails to satisfy any diminution in value otherwise incurred by these parties.  Such an approach is thus entirely consistent with the requirements of Section 507(b)  The Debtors' business judgment in this regard is further supported by the Review Committee's independent determination that claims arising from the 2017 Transaction are "speculative and unlikely to lead to any value to the estate of [J. Crew Operating Corp.] or any of its subsidiaries." (Review Comm. Resp. ¶ 25.).

39.    Notably, courts in this district and others regularly approve liens on, and claims with recourse to, avoidance action proceeds in the same context and form as requested by the Debtors in the Proposed Final Order.  *See, e.g., In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (approving liens on proceeds of avoidance actions for the North American Debtors, as defined therein); *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017) (approving liens on proceeds of avoidance actions for the Taj Debtors, as defined therein); *In re Penn Virginia Corporation*, Case No. 16-32395 (Bankr. E.D. Va. June 8, 2016) (KLP); *In re Alpha Natural Resources, Inc.*, Case No. 15-33896 (Bankr. E.D. Va. Sept. 17, 2015) (KRH); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); *In re Int'l Shipholding Corp.*, No. 16-12220 (SMB) (Bankr. S.D.N.Y. Sept. 21, 2016); *In re Breitburn Energy Partners LP, et al.*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016).

**IV.    The Debtors Have Modified the DIP Order to
Provide the Committee with a Mechanism to Preserve
Claims of Limited Liability Companies Organized Under Delaware Law**

40.    As part of its Objection, the Committee has requested that the Debtors provide a mechanism by which the Committee can, in effect, obtain standing to prosecute derivative claims on behalf of limited liability companies organized under Delaware law.  The Debtors understand the Committee's focus in this regard arises from various provisions of the Delaware Limited Liability Company Act, which provide that a "proper plaintiff" may only be "a member or an assignee" of a limited liability company.  *See* 6 Del. Code § 18-1002 (2016).  In other words, creditors may be unable to obtain derivative standing on behalf of a limited liability company organized under Delaware law.  In particular, the Committee has identified J. Crew Domestic Brand, LLC as potentially holding valuable claims that may be otherwise released if the Company could be precluded from obtaining standing to assert claims on its behalf.  *See* Committee Objection ¶ 69.

41.    The Committee's demand in this regard is based on what may be a misunderstanding of the Debtors' corporate and capital structure.  As the Committee rightly notes, (*see* Comm. Obj. ¶ 69), five (5) Debtors are limited liability companies organized under Delaware law:  (i) J. Crew Brand Holdings, LLC; (ii) J. Crew Brand Intermediate, LLC; (iii) J. Crew Brand, LLC; (iv) J. Crew Domestic Brand, LLC; and (v) J. Crew International Brand, LLC (collectively, the "**IPCo Debtors**").  The IPCo Debtors are not engaged in an active trade or business; they do not have trade creditors; they are not parties to leases or contracts in the ordinary course; and they do not have employees.  The IPCo Debtors are either holding companies or otherwise exist solely for the purpose of having issued the approximately $350 million of secured IPCo Notes, servicing the IPCo Notes, and/or owning intellectual property that collateralizes the IPCo Notes.  In fact, those entities may not have any unsecured creditors at all.

42.    It must also be observed that the Committee's demand to pursue litigation on behalf of the IPCo Debtors is not supported by the IPCo Debtors' actual creditors—i.e., the IPCo Noteholders.  Holders of 95.2% IPCo Notes have executed the TSA and, as result, those parties have no interest in seeing the Committee pursue litigation that has been described as "speculative, and unlikely to lead to any value to the estate of [J. Crew Operating Corp.] or its subsidiaries" on behalf of the IPCo Debtors.  (Review. Comm. Resp. ¶ 25.)  On this record then, the Debtors respectfully submit that the Committee's demand for de facto standing with respect to the IPCo Debtors would, at most, foster unnecessary and speculative litigation for its own sake, and would disregard the views expressed by the IPCo Debtors' actual stakeholders.

43.    Further, the Committee's demand for de facto standing would conflict with a fundamental premise of American bankruptcy law under *Butner v. United States*, 440 U.S. 48 (1979).  Namely, the assets of a debtor's estate are determined by recourse to prevailing state law. The Delaware Limited Liability Company Act precisely identifies who may (and may not) have standing to pursue particular claims or causes of action on behalf of a Delaware limited liability company.  There is no basis on which the parties can simply override Delaware law by simply demanding that this Court ignore the terms and provisions lawfully enacted by the Delaware legislature.

44.    At the same time, the Debtors acknowledge the Committee's concern that claims in favor of the IPCo Debtors could be inadvertently released and that the Committee could therefore lose the opportunity to prosecute those claims for the benefit of the IPCo Debtors' creditors—regardless of whether the IPCo Noteholders actually support such litigation.  The Debtors therefore revised the Proposed Final Order to provide that releases granted under the Proposed Final Order solely with respect to IPCo Debtors will not be binding on those entities or

their estates if, upon a motion filed by the Committee (and no other party), the Court converts the case in question to chapter 7 of the Bankruptcy Code or appoints a chapter 11 trustee to administer such case prior expiration of the Challenge Period, and the Challenge Period shall be tolled while any such motion filed by the Committee remains pending.  The Debtors respectfully submit that this mechanism provides an appropriate mechanism by which the Committee can seek to cause such claims to be available for the benefit of the IPCo Debtors' creditors.[19]

45.    Despite this substantial modification, the Debtors anticipate that the Committee may still seek to compel a different approach—such as by demanding the right to appoint a separate fiduciary for one or more of the IPCo Debtors to commence causes of action on the Committee's behalf.  And the Debtors recognize that a trustee's appointment or conversion are severe remedies.  But they also reflect the Bankruptcy Code's more fundamental proposition that the debtor-in-possession must remain the locus of corporate decision making in chapter 11 absent extraordinary circumstances, and this bedrock principle should not be lightly disturbed—particularly where more than 95% of affected creditors have already expressed their opposition to the Committee's approach.

46.    The Debtors respectfully submit that the Committee should not be permitted to override the Debtors' corporate governance on the facts of these chapter 11 cases.  The Debtors do not believe it would be appropriate for a quasi-fiduciary to be appointed to serve the interests of unsecured creditors where the overwhelming majority of creditors have already expressed their views by joining the TSA—separate and apart from the fact that the IPCo Debtors may not have

---

[19]    It bears repeating that the Debtors believe that all or substantially all of the creditors at these entities consist of the IPCo Noteholders, and holders of more than 95% of the IPCo Notes are party to the TSA and support entry of the Final DIP Order.

WEIL:\97485855\13\54457.0008

any unsecured creditors at all.[20]  A debtor in possession, like a trustee, is tasked with balancing the interests of all parties, but the Committee, unlike the Debtors or a trustee, is not a fiduciary for <u>all</u> stakeholders—the Committee represents only one class among many.   But it must be acknowledged that the Committee's continued pursuit of any litigation on behalf of the IPCo Debtors would be disconnected from affected creditors' own preferences given that more than 95% of IPCo Noteholders are already party to the TSA, and, again, the IPCo Debtors may not actually have any unsecured creditors.

47.     So, should the Committee determine that the claims addressed by the Review Committee are <u>not</u> in fact "unlikely to lead to any value to the estate of OpCo or any of its subsidiaries," the proper remedy is for the Committee to displace the Debtors in the manner permitted by the Bankruptcy Code—not to appoint a quasi-fiduciary tasked with representing the interest of a single constituency.  At a certain point, the Committee must have the courage of its convictions in terms of being willing to disregard the views of the overwhelming majority of IPCo Noteholders and the independent Review Committee's own analysis.

## V.     <u>The Remaining Objections Should Be Overruled</u>

48.     As detailed below, the Debtors believe the balance of the Committee's or other parties' Objections should be overruled for the reasons set forth below, in the DIP Motion, and on the record of these chapter 11 cases:

| Objection | Response |
|---|---|
| Adequate Protection is not needed (Comm. Obj. ¶ 63.) | • The Debtors' proposed adequate protection is customary for financings of this type<br>• Adequate protection liens and claims are being granted only to the extent of diminution in value |

---

[20]   The Debtors also acknowledge that a different approach might be appropriate where, unlike here, more than 95% of affected creditors have <u>not</u> already stated their preferred approach, and where an independent investigation has not already been undertaken.

| Objection | Response |
|---|---|
| | • Additionally, parties' rights to seek the recharacterization of certain payments as on account of principal are reserved |
| Stipulations should not benefit insiders (Comm. Obj. ¶ 64–65) | • Releases are provided to lenders in such capacities only and, in any event, are subject to the Committee's challenge right |
| Carve-Out should include Committee Member Fees and Expenses and should be payable from Collateral (Comm. Obj. ¶¶ 72–76). | • Debtors have revised the Carve-Out to include such expenses to the extent incurred per section 503(b)(3)(F) of the Bankruptcy Code<br>• There is no basis to demand that Carve-Out be paid first from existing collateral, which will only work to increase diminution in value claims in any event |
| Determination of "Oversecured" Status should not be Subject to Challenge Limitations (Comm. Obj. ¶¶ 77–79) | • The Committee's Challenge Period, which has been extended to August 3, 2020, provides ample time for the Committee to investigate and, if necessary, challenge the "oversecured" status of the Prepetition ABL Secured Parties |
| Automatic Stay should continue in effect during Remedies Notice Period (Comm. Obj. ¶ 80) | • The Proposed Final Order already permits the Court to continue the stay in its discretion |
| Cross Defaults and certain Events of Default Should be Eliminated (Comm. Obj. ¶¶ 81, 84) | • Default provisions, including cross default to TSA, were a key aspect of adequate protection and the DIP Lenders' undertaking to provide $400 million of commitments on a junior basis |
| Reporting should include Committee (Comm. Obj. ¶ 82) | • Debtors have revised the order accordingly and believe they have addressed the Committee's concerns in this regard |
| Indemnification Is Overbroad (Comm. Obj. ¶ 83) | • Debtors respectfully submit that indemnification rights are customary and appropriate and, in any event, were negotiated as part of the overall benefits provided by the DIP Facility |

WEIL:\97485855\13\54457.0008

| Objection | Response |
|---|---|
| Restrictions on DIP Proceeds are Impermissible (Comm. Obj. ¶ 85) | • The use of proceeds contemplated by the DIP Facility are customary and appropriate here <br> • DIP Proceeds and Cash Collateral are also being used to fund, among other things, rental payments and 503(b)(9) claims |
| IPCo Intercreditor Agreement should only be approved if filed (Comm. Obj. ¶ 86) | • The Debtors have caused this document to be filed with the Court[21] |
| DIP Amendments should not be permitted without prior notice to the Committee (Comm. Obj. ¶ 87) | • The Debtors have revised the order to provide the Committee with prior notice of DIP Amendments where commercially practicable |
| Credit bidding rights are premature (Comm. Obj. ¶ 88) | • The proposed credit bidding rights are customary and preserve parties' rights under section 363(k) of the Bankruptcy Code |

## Conclusion

WHEREFORE, for the foregoing reasons and for the reasons set forth in the Motion, the Debtors respectfully request that (a) the Court overrule each of the Objections to the extent not withdrawn and (b) grant the relief requested in the Motion on a final basis as set forth in the Proposed Final Order.

---

[21] See *Notice of Filing of IPCO Intercreditor Agreement* (Docket No. 421).

WEIL:\97485855\13\54457.0008

Dated: June 3, 2020
        Richmond, Virginia

/s/  Henry P. (Toby) Long

HUNTON ANDREWS KURTH LLP
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys and Proposed Attorneys for Debtors
and Debtors in Possession*

## **Exhibit A**

Proposed Final Order

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

```
------------------------------------------------------------ x
                                          :
In re                                     :    Chapter 11
                                          :
CHINOS HOLDINGS, INC., et al.,            :    Case No. 20–32181 (KLP)
                                          :
             Debtors.¹                    :    (Jointly Administered)
                                          :
------------------------------------------------------------ x
```

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO
USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,
(V) MODIFYING AUTOMATIC STAY, AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated May 4, 2020 (the "**Motion**")[2] of Chinos Holdings, Inc. ("**Ultimate**

**Holdings**") and its debtor affiliates, as debtors and debtors in possession (collectively, the

"**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"),

seeking entry of an order (this "**Final Order**") pursuant to sections 105, 361, 362, 363, 364(c)(l),

364(c)(2), 364(c)(3), 364(d), 364(e), 503, and 507 of chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001(a)-1 of the Local Rules of

---

[1]   The Debtors  in these chapter 11 cases, along with the last four digits of each Debtor's  federal tax identification
      number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos
      Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew
      Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew
      International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC
      (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J.
      Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate
      headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
      Motion.

the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Rules**") *inter alia*:

(i)          authorizing (x) the Borrower (as defined below) to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $400,000,000 (the "**DIP Facility**" and, all amounts extended under the DIP Facility, the "**DIP Loans**"), pursuant to the terms and conditions of that certain *Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits and schedules attached thereto and the Loan Documents (as defined in the DIP Credit Agreement) the "**DIP Documents**"), by and among Chinos Intermediate Holdings A, Inc., a Delaware corporation (in such capacity, the "**Borrower**"), Ultimate Holdings, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Secured Parties (as defined below) (in such capacities, the "**DIP Agent**"), and the lenders party thereto from time to time (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), attached hereto as **<u>Schedule 1</u>** and (y) each of the Debtors other than the Borrower (collectively in such capacities, the "**DIP Guarantors**" and together with the Borrower, the "**DIP Obligors**"), to guaranty the Borrower's (and each other DIP Guarantor's) obligations under the DIP Facility and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as defined in the DIP Credit Agreement, the "**DIP Obligations**").

(ii)         authorizing the Debtors to execute and enter into the DIP Documents and to perform such other acts as may be necessary or appropriate in connection with the same;

- 2 -

(iii)        authorizing the Borrower to borrow up to $400,000,000 of term loans under the DIP Facility (the "**Final Loans**") upon entry of this Final Order on a final basis;

(iv)        granting the DIP Obligations the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases, which, for the avoidance of doubt, shall be subject to the Carve-Out in all respects;

(v)        granting to the DIP Agent, for the benefit of the DIP Secured Parties, to secure the DIP Obligations, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), which liens shall have the priorities set forth herein and shall be subject to the Carve-Out (as defined below); provided that in no event shall the "Cash Collateral" include Excluded Property (as defined in the DIP Documents) or funds held in the Professional Fees Account (other than the Debtors' reversionary interest, if any, therein, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash);

(vi)        authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become due and payable;

(vii)        authorizing the Debtors to use the Prepetition Collateral (as defined below) of the Prepetition Secured Parties and provide adequate protection to the Prepetition Secured Parties (as defined below) solely to the extent of the diminution in value, if any, of their respective interests in the Prepetition Collateral as of the Petition Date, including, as applicable, with respect to the

- 3 -

Cash Collateral ("**Diminution in Value**"), resulting from (a) the imposition of the automatic stay, (b) the Debtors' postpetition use, sale, or lease of the Prepetition Collateral, including Cash Collateral, (c) the priming of the Prepetition ABL Secured Parties' liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below) by the Carve-Out, or (d) the priming (including by the Carve-Out (as defined below)) of (i) the Prepetition ABL Secured Parties' liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below), the "**Term Priority Collateral**"), (ii) the Prepetition Term Secured Parties' (as defined below) liens on the Prepetition Term Collateral (as defined below), and (iii) the Prepetition IPCo Secured Parties' (as defined below) liens on the Prepetition IPCo Collateral (as defined below);

(viii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents; and

(ix)    scheduling a final hearing (the "**Final Hearing**") within thirty-five (35) days of the Petition Date to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the Cowan Declaration, the Zanna Declaration, and the First Day Declaration (collectively, the "**Declarations**"), and the evidence submitted and arguments made at the interim hearing held on May 5, 2020; and the Court having entered an order approving the relief requested in the Motion on an interim basis on May 5, 2020 [Docket No. 84] (the "**Interim Order**"); and the Court having

- 4 -

considered the Motion, the exhibits attached thereto, the Declarations, and the evidence submitted

and arguments made at the final hearing held on June 4, 2020 (the "**Final Hearing**"); and notice

of the Final Hearing having been given in accordance with the Interim Order, Bankruptcy Rules

2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Final Hearing having been held

and concluded; and all objections, if any, to the relief requested in the Motion having been

withdrawn, resolved, or overruled by the Court; and it appearing that approval of the relief

requested in the Motion, as granted hereby, is fair and reasonable and in the best interests of the

Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the

Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that

the Debtors' entry into the DIP Credit Agreement and the other DIP Documents as granted hereby

is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and

consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT**

**MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. **Petition Date**.  On May 4, 2020 (the "**Petition Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

B. **Debtors in Possession**.  The Debtors are authorized to continue operating their

businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\97486216\9\54457.0008

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C. **Jurisdiction and Venue**.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334, and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  This proceeding is core pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**.  On May 13, 2020, the United States Trustee for the Eastern District of Virginia appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code [Docket No. 188].

E. **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Final Hearing has been provided in accordance with the Interim Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Final Hearing or the entry of this Final Order shall be required.

F. **Debtors' Stipulations**.  Subject to the rights of parties in interest that are set forth and reserved in paragraph 44 herein (including with respect to a Challenge that may brought through or on behalf of a Debtors' estate upon obtaining proper standing and complying with the terms of paragraph 44 herein), and subject to the terms hereof and the rights reserved by the Debtors at paragraph F(v) hereof, the Debtors admit, stipulate, acknowledge, and agree as follows (paragraph F herein shall be referred to as the "**Debtors' Stipulations**"):

(i)      *Prepetition ABL Facility.*

- 6 -

(a)    Pursuant to that certain ABL Credit Agreement, dated as of March 7, 2011 (as amended by that certain First Amendment to Credit Agreement, dated as of October 11, 2012, that certain Second Amendment to Credit Agreement, dated as of March 5, 2014, that certain Third Amendment to Credit Agreement, dated as of December 10, 2014, that certain Fourth Amendment to Credit Agreement (Incremental Amendment), dated as of December 17, 2015, that certain Fifth Amendment to Credit Agreement and Consent to Release of Mortgages, dated as of November 17, 2016, that certain Sixth Amendment to Credit Agreement, dated as of September 19, 2018, and as further amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**" and, collectively with the Loan Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Documents**"), among, *inter alios*, (I) J. Crew Group, Inc., a Delaware corporation (in such capacity, the "**Prepetition ABL Borrower**") (II) Chinos Intermediate Holdings B, Inc., a Delaware corporation ("**Holdings**"), (III) Bank of America, N.A., as administrative agent and collateral agent for the Prepetition ABL Secured Parties (as defined below) (in such capacities, the "**Prepetition ABL Agent**"), and (IV) the lenders party thereto from time to time (the "**Prepetition ABL Lenders**" and, collectively with the Prepetition ABL Agent, and other "Secured Parties" as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Lenders and Issuing Banks (as defined in the Prepetition ABL Credit Agreement) provided revolving loans, swingline loans, and letters of credit to, or for the benefit of, the Prepetition ABL Borrower (collectively, the "**Prepetition ABL Facility**"). Pursuant to that certain Guaranty Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition ABL Guaranty**"), Holdings, J. Crew Operating Corp., a Delaware corporation ("**J. Crew OpCo**"), J. Crew Inc., a Delaware corporation ("**JCI**"), J. Crew International, Inc., a Delaware corporation ("**J. Crew International**"), Grace Holmes, Inc., a Delaware corporation ("**Grace Holmes**"), H. F. D. No. 55, Inc., a Delaware corporation ("**H.F.D.**"), Madewell Inc., a Delaware corporation ("**Madewell**"), and J. Crew Virginia, Inc., a Virginia corporation ("**J. Crew Virginia**") (in such capacities, the "**Prepetition ABL Guarantors**" and, together with the Prepetition ABL Borrower, the "**Prepetition ABL Obligors**" or the "**ABL Debtors**") guaranteed the Obligations (as defined in the Prepetition ABL Credit Agreement).

(b)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Obligors were indebted to the Prepetition ABL Secured Parties,

- 7 -

without defense, counterclaim, or offset of any kind, in respect of the outstanding loans and reimbursement obligations in respect of letters of credit incurred by the Prepetition ABL Borrower under the Prepetition ABL Facility (collectively, the "**Prepetition ABL Loans**"), in an aggregate principal amount, as of the Petition Date, not less than approximately \$309,093,952.11[4] (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), cash management obligations, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Obligors' obligations pursuant to the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Credit Agreement, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code, the "**Prepetition ABL Obligations**").

(c)    *Prepetition ABL Liens and Prepetition ABL Collateral.*  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Obligors granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien (the "**Prepetition ABL Liens**") on "Collateral," as such term is defined in the Prepetition ABL Credit Agreement (the "**Prepetition ABL Collateral**"), and the Prepetition ABL Obligations were fully secured as of the Petition Date by the Prepetition ABL Liens; provided that for the avoidance of doubt Prepetition ABL Collateral shall not include the "Excluded Property" as defined in that certain Security Agreement, dated March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**ABL Security Agreement**"), by and among the Prepetition ABL Obligors and the Prepetition ABL Agent in connection with the Prepetition ABL Obligations.

(d)    *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  As of the Petition Date, (I) the Prepetition ABL Liens on the Prepetition ABL Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition ABL Documents, or (y) or otherwise actually properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition ABL Collateral, subject only to the Prepetition Term

---

[4]    In addition, there are approximately \$65,906,047.89 million of outstanding but undrawn letters of credit issued under the Prepetition ABL Facility.

Liens on the Term Priority Collateral and certain liens permitted by the Prepetition ABL Documents (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**ABL Permitted Liens**");[5] (III) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Obligors, enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (IV) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition ABL Facility; and (VI) other than other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition ABL Liens.

(ii)    *Prepetition Term Facility.*

(a)    Pursuant to that certain Amended and Restated Credit Agreement, dated as of March 5, 2014 (as amended by that certain Amendment No. 1 to Amended and Restated Credit Agreement, dated as of July 13, 2017, and as further amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Credit Agreement**" and, collectively with the Loan Documents (as defined in the Prepetition Term Credit Agreement) and any other agreements and documents executed or delivered

---

[5]    For the avoidance of doubt, none of the Professional Fees Account, the Operating Account, or the Disbursement Account (each as defined herein or in the DIP Credit Agreement) constitute or be deemed to constitute ABL Priority Collateral, except to the extent such accounts contain proceeds of Prepetition ABL Collateral, but solely with respect to such proceeds.

- 9 -

in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Documents**"), among (I) J. Crew Group, Inc., a Delaware corporation (in such capacity, the "**Prepetition Term Borrower**"), (II) Holdings (III) Wilmington Savings Fund Society, FSB, as administrative agent (the "**Prepetition Term Administrative Agent**") and collateral agent (the "**Prepetition Term Collateral Agent**") for the Prepetition Term Secured Parties (in such capacities, as successor-in-interest to Bank of America, N.A., the "**Prepetition Term Agent**" and, together with the Prepetition ABL Agent, the "**Prepetition Agents**") and (IV) the lenders from time to time party thereto (the "**Prepetition Term Lenders**" and, collectively with the Prepetition Term Agent, the "**Prepetition Term Secured Parties**"), the Prepetition Term Lenders provided term loans to the Prepetition Term Borrower (the "**Prepetition Term Facility**" and, together with the Prepetition ABL Facility, the "**Prepetition Secured Facilities**"). Pursuant to that certain Guaranty Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition Term Guaranty**"), Holdings, J. Crew OpCo, JCI, J. Crew International, Grace Holmes, H.F.D., Madewell and J. Crew Virginia (in such capacities, the "**Prepetition Term Guarantors**" and, together with the Prepetition Term Borrower, the "**Prepetition Term Obligors**" or the "**Term Debtors**") guaranteed the Obligations (as defined in the Prepetition Term Credit Agreement).

(b)     *Prepetition Term Obligations*.  As of the Petition Date, the Prepetition Term Obligors were indebted to the Prepetition Term Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the loans incurred under the Prepetition Term Facility (collectively, the "**Prepetition Term Loans**"), in an aggregate outstanding principal amount, as of the Petition Date, exclusive of accrued but unpaid interest, costs, fees, and expenses, not less than $1,337,363,321.82 (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Obligors' obligations pursuant to the Prepetition Term Documents, including all "Obligations" as defined in the Prepetition Term Credit Agreement, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition Term Obligations**").

- 10 -

(c)    *Prepetition Term Liens and Prepetition Term Collateral.*  As more fully set forth in the Prepetition Term Documents, prior to the Petition Date, the Prepetition Term Obligors granted to the Prepetition Term Agent, for the benefit of the Prepetition Term Secured Parties, a security interest in and continuing lien (the "**Prepetition Term Liens**") on "Collateral," as such term is defined in the Prepetition Term Credit Agreement (the "**Prepetition Term Collateral**"); provided that for the avoidance of doubt Prepetition Term Collateral shall not include "**Excluded Collateral**" as defined in that certain Security Agreement, dated March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Security Agreement**"), by and among the Prepetition Term Obligors and the Prepetition Term Collateral Agent, in connection with the Prepetition Term Obligations.

(d)    *Validity, Perfection, and Priority of Prepetition Term Liens and Prepetition Term Obligations.*  As of the Petition Date, (I) the Prepetition Term Liens on the Prepetition Term Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition Term Loan Documents or (y) otherwise actually perfected, properly perfected and were granted to, or for the benefit of, the Prepetition Term Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition Term Liens were senior in priority over any and all other liens on the Prepetition Term Collateral, subject only to the Prepetition ABL Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (defined below), the "**ABL Priority Collateral**") and certain liens permitted by the Prepetition Term Documents (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Term Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**Term Permitted Liens**"); (III) the Prepetition Term Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Term Obligors, enforceable in accordance with the terms of the applicable Prepetition Term Documents; (IV) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Liens or Prepetition Term Obligations exist, and no portion of the Prepetition Term Liens or Prepetition Term Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for

- 11 -

recovery or disgorgement against any of the Prepetition Term Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition Term Facility; and (VI) other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition Term Liens.

(iii)    *Prepetition IPCo Notes.*

(a)    *Prepetition IPCo New Money Notes.*  Pursuant to that certain Indenture for certain 13.00% notes due 2021, dated as of July 13, 2017, (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo New Money Notes Indenture**" and, collectively with the Security Documents (as defined in the Prepetition IPCo New Money Notes Indenture) and any other agreements, documents, certificates and instruments executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo New Money Notes Documents**", among J. Crew Brand, LLC (in such capacity, the "**Prepetition LLC Issuer**"), J. Crew Brand Corp. (in such capacity, the "**Prepetition Corporate Issuer**" and, together with the Prepetition LLC Issuer, the "**Prepetition Issuers**"), U.S. Bank National Association, as trustee and collateral agent, (in such capacities, the "**Prepetition IPCo New Money Notes Indenture Trustee**"), the guarantors thereunder (the "**Prepetition IPCo New Money Notes Guarantors**" and, together with the Prepetition Issuers, the "**Prepetition IPCo New Money Notes Obligors**"), and the Holders (as defined in the Prepetition IPCo New Money Notes Indenture, the "**Prepetition IPCo New Money Notes Noteholders**" and, collectively with the Prepetition IPCo New Money Notes Indenture Trustee, the "**Prepetition IPCo New Money Notes Secured Parties**"), the Prepetition Issuers incurred indebtedness to the Prepetition IPCo New Money Noteholders of 13.00% Senior Secured New Money Notes due 2021 (collectively, the "**Prepetition IPCo New Money Notes**").

(b)    *Prepetition IPCo Exchange Notes.*  Pursuant to that certain Indenture for certain 13.00% notes due 2021, dated as of July 13, 2017 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo Exchange Notes Indenture**"[6] and, collectively with the Security Documents (as defined in the IPCo Exchange Notes Indenture) and any other agreements, documents, certificates and

---

[6]    The Prepetition IPCo New Money Notes Indenture and the Prepetition IPCo Exchange Notes Indenture are collectively referred to as the "**Prepetition IPCo Indentures**".

- 12 -

WEIL:\97486216\9\54457.0008

instruments executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo Exchange Notes Documents**" and, collectively with the Prepetition IPCo New Money Notes Documents, the "**Prepetition IPCo Notes Documents**" and, collectively with the Prepetition ABL Documents and the Prepetition Term Documents, the "**Prepetition Documents**"), among the Prepetition Issuers U.S. Bank National Association, as trustee and collateral agent, (in such capacities, the "**Prepetition IPCo Exchange Notes Indenture Trustee**" and, together with the Prepetition IPCo New Money Notes Indenture Trustee, the "**Prepetition IPCo Indenture Trustees**"), the guarantors thereunder (the "**Prepetition IPCo Exchange Notes Guarantors**"[7] and, collectively with the Prepetition Issuers, the "**Prepetition IPCo Exchange Notes Obligors**"[8]), and the Holders (as defined in the Prepetition IPCo Exchange Notes Indenture, the "**Prepetition IPCo Exchange Noteholders**"[9] and, collectively with the Prepetition IPCo Exchange Notes Indenture Trustee, the "**Prepetition IPCo Exchange Notes Secured Parties**" and, collectively with the Prepetition IPCo New Money Notes Secured Parties, the "**Prepetition IPCo Secured Parties**" and, collectively with the Prepetition ABL Secured Parties and the Prepetition Term Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Issuers incurred indebtedness to the Prepetition IPCo Exchange Noteholders of 13.00% Senior Secured Notes due 2021 (collectively, the "**Prepetition IPCo Exchange Notes**" and, collectively with the Prepetition IPCo New Money Notes, the "**Prepetition IPCo Notes**" and, collectively with the Prepetition Secured Facilities, the "**Prepetition Secured Debt**").

(c)    *Prepetition IPCo Notes Obligations*.    Pursuant to the Prepetition IPCo New Money Notes Indenture, the Prepetition IPCo New Money Notes were issued with a face value of $97,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition IPCo New Money Notes was $97,000,000 (collectively, together with accrued and unpaid interest, premiums, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition IPCo New Money Notes Obligors'

---

[7]    The Prepetition IPCo New Money Notes Guarantors and the Prepetition IPCo Exchange Notes Guarantors are collectively referred to as the "**Prepetition IPCo Notes Guarantors**".

[8]    The Prepetition IPCo New Money Notes Obligors and the Prepetition IPCo Exchange Notes Obligors are collectively referred to as the "**Prepetition IPCo Notes Obligors**" or the "**IPCo Debtors**".

[9]    The Prepetition IPCo New Money Noteholders and the Prepetition IPCo Exchange Noteholders are collectively referred to as the "**Prepetition IPCo Noteholders**".

WEIL:\97486216\9\54457.0008

obligations pursuant to the Prepetition IPCo New Money Notes Documents, including all "Notes Obligations" as defined in the Prepetition IPCo New Money Notes Indenture, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition IPCo New Money Notes Obligations**").  Pursuant to the Prepetition IPCo Exchange Notes Indenture, the Prepetition IPCo Exchange Notes were issued with a face value of $249,596,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition IPCo Exchange Notes was $250,599,000 (collectively, together with accrued and unpaid interest, premiums, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition IPCo Exchange Notes Obligors' obligations pursuant to the Prepetition IPCo Exchange Notes Documents, including all "Notes Obligations" as defined in the Prepetition IPCo Exchange Notes Indenture, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition IPCo Exchange Notes Obligations**" and, collectively with the Prepetition IPCo New Money Notes Obligations, the "**Prepetition IPCo Notes Obligations**" and, collectively with the Prepetition ABL Obligations and the Prepetition Term Obligations, the "**Prepetition Obligations**").

(d)      *Prepetition IPCo Liens and Prepetition IPCo Collateral*.  As more fully set forth in the Prepetition IPCo New Money Notes Documents, prior to the Petition Date, the Prepetition IPCo New Money Notes Obligors granted to the Prepetition IPCo New Money Notes Indenture Trustee, for the benefit of the Prepetition IPCo New Money Notes Secured Parties, a security interest in and continuing lien (the "**Prepetition IPCo New Money Notes Liens**") on "Collateral," as such term is defined in the Prepetition IPCo New Money Notes Indenture (the "**Prepetition IPCo New Money Notes Collateral**").  As more fully set forth in the Prepetition IPCo Exchange Notes Documents, prior to the Petition Date, the Prepetition IPCo Exchange Notes Obligors granted to the Prepetition IPCo Exchange Notes Indenture Trustee, for the benefit of the Prepetition IPCo Exchange Notes Secured Parties, a security interest in and continuing lien (the "**Prepetition IPCo Exchange Notes Liens**" and, together with the Prepetition IPCo New Money Notes Liens, the "**Prepetition IPCo Liens**" and, collectively with the Prepetition ABL Liens and the Prepetition Term Liens, the "**Prepetition Liens**") on "Collateral," as such term is defined in the Prepetition IPCo Exchange Notes Indenture (the "**Prepetition IPCo Exchange Notes Collateral**" and, together with the Prepetition IPCo New Money Notes Collateral, the "**Prepetition**

- 14 -

**IPCo Collateral**" and, collectively with the Prepetition ABL Collateral and the Prepetition Term Collateral, the "**Prepetition Collateral**").

(e) *Validity, Perfection, and Priority of Prepetition IPCo Liens and Prepetition IPCo Notes Obligations.*  As of the Petition Date, (I) the Prepetition IPCo Liens on the Prepetition IPCo Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition IPCo Notes Documents or (y) otherwise actually perfected, properly perfected and were granted to, or for the benefit of, the Prepetition IPCo Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition IPCo Liens were senior in priority over any and all other liens on the Prepetition IPCo Collateral, subject only to certain liens permitted by the Prepetition IPCo Notes Documents (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition IPCo Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**IPCo Permitted Liens**" and, collectively with the ABL Permitted Liens and the Term Permitted Liens, the "**Permitted Liens**")); (III) the Prepetition IPCo Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition IPCo Notes Obligors, enforceable in accordance with the terms of the applicable Prepetition IPCo Notes Documents; (IV) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition IPCo Liens or Prepetition IPCo Notes Obligations exist, and no portion of the Prepetition IPCo Liens or Prepetition IPCo Notes Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition IPCo Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition IPCo Notes; and (VI) other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition IPCo Notes Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition IPCo Liens.

(iv) *Releases.*  Subject to the Debtors' rights reserved with regard to the Debtor Reserved Claims, the Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Secured Parties and the Prepetition Secured Parties (in each

- 15 -

case, solely in their capacities as such) and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such (collectively, the "**Releasees**"), of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees) debts, liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Documents, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims and causes of action with respect to the Specified Liability Management Transactions (as defined in the Prepetition Term Credit Agreement), and (iv) any and all claims and causes of actions with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the DIP Obligations and the Prepetition Obligations that the Debtors may now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court's entry of the Interim Order; provided that the Debtors' Stipulations shall not release any claims, defenses or rights in favor of the Debtors with respect to certain litigation, captioned as *Eaton Vance Management, et al v. Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, et al*, pending in the Supreme Court of New York for New York County, Index No.: 654397/2017.

(v)      Debtors' Reserved Rights.

(a)      The Debtors make no stipulation, and, notwithstanding anything in the DIP Documents to the contrary, reserve all rights, with respect to (i) any liens (whether on account of a deposit account control agreement or otherwise) asserted with respect to that certain bank account maintained at Wells Fargo Bank, N.A., account number ending 1816, in the name of J. Crew Operating Corp. (the "**Concentration Account**"), and any cash held in or disbursed from the Concentration Account that is not otherwise proceeds of Prepetition Collateral, and the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Concentration Account, including cash held in or disbursed from such account (other than with respect to cash that is otherwise proceeds from Prepetition Collateral) are expressly preserved (the "**Concentration Account Claims**"); and (ii) any claims or causes of action relating to the obligations incurred and liens granted pursuant to the transaction among certain of the Debtors on December 5, 2016 and June 12, 2017 involving, among other things (A) the transfer of certain domestic intellectual property to J. Crew Domestic Brand, LLC, (B) an amendment to the Prepetition Term Credit Agreement to facilitate, among other

- 16 -

things, the repurchase of loans then-outstanding under the Prepetition Term Credit Agreement, and additional borrowings under the Prepetition Term Credit Agreement, and (C) to the extent not covered by (A) and (B), the exchange of 7.75%/8.50% Senior PIK Toggle Notes due 2019 issued by Chinos Intermediate Holdings A, Inc. for, among other things, notes issued by J. Crew Brand LLC and J. Crew Brand Corp., including, without limitation, the Specified Liability Management Transactions (as defined in the Prepetition Term Credit Agreement) (the "**2017 Transaction,**" and together with the Concentration Account Claims, the "**Debtor Reserved Claims**").

(b)    Any action prosecuted by the Debtors on account the Debtor Reserved Claims must be commenced, if at all, but subject to paragraph 44 herein, pursuant to an adversary proceeding filed in the Bankruptcy Court (i) with respect to Debtor Reserved Claims identified at Paragraph F(v)(a)(i), on or before the first Business Day that is seventy five (75) calendar days after the Petition Date and (ii) with respect to Debtor Reserved Claims identified at Paragraph F(v)(a)(ii), prior to entry of this Final Order, or in each case such claims shall otherwise be waived by the Debtors, and all defenses of the Prepetition Secured Parties with respect to any such Claim, Challenge or action are expressly preserved;  provided that, such dates may be extended by agreement of the Debtors, on the one hand and (w) with respect to the Prepetition ABL Facility, the Prepetition ABL Agent, (x) with respect to the Prepetition Term Facility, the Prepetition Term Agent (acting at the direction of the Required Term Lenders (as defined in the Prepetition Term Credit Agreement, the "**Required Term Lenders**")), (y) with respect to the Prepetition IPCo Exchange Notes, the Prepetition IPCo Exchange Notes Trustee, and (z) with respect to the Prepetition IPCo New Money Notes, the Prepetition New Money Notes Trustee, on the other hand.

Notwithstanding anything in this paragraph F or in the DIP Documents to the contrary, the Debtors' rights to seek a determination on the value of the Prepetition Collateral securing the Prepetition Obligations are fully preserved; provided that, with respect to the Prepetition ABL Collateral, the foregoing shall apply solely in order to determine the amount of the "equity cushion" with respect to the Prepetition ABL Claims as of the Petition Date.

G. **Cash Collateral**.  Subject to the Debtors' rights reserved with regard to the Debtor Reserved Claims, all of the Debtors' cash including any cash in their deposit accounts,

- 17 -

wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

H. **Intercreditor Agreements**.  Pursuant to section 510 of the Bankruptcy Code, (i) that certain Intercreditor Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**ABL Intercreditor Agreement**"), by and between the Prepetition ABL Agent and the Prepetition Term Agent and (ii) that certain Intercreditor Agreement, dated as of July 13, 2017 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**IPCo Intercreditor Agreement**" and, together with the ABL Intercreditor Agreement, the "**Intercreditor Agreements**"), by and between the Prepetition IPCo New Money Notes Indenture Trustee and the Prepetition IPCo Exchange Notes Indenture Trustee, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Documents, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens, administrative expense claims, and superpriority administrative expense claims granted or the amounts payable by the Debtors under the Interim Order, this Final Order or otherwise), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Final Order or the DIP Documents, unless expressly set forth herein or therein.

I. **Permitted Prior Liens; Continuation of Prepetition Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any lien other than (and subject to the

- 18 -

exceptions and qualifications regarding such liens contained herein) the Prepetition ABL Liens,

the Prepetition Term Liens, and the Prepetition IPCo Liens are (i) valid, enforceable, perfected, or

non-avoidable or (ii) senior to any of the Prepetition ABL Liens, the Prepetition Term Liens, and

the Prepetition IPCo Liens.  Moreover, and subject in all respects to the Intercreditor Agreements,

nothing shall prejudice the rights of any party in interest, including, but not limited to, the Debtors,

the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or the Committee, to challenge

the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any asserted

lien that is not the subject of the stipulations granted pursuant to paragraph F hereof.

J.  <strong><u>Findings Regarding Postpetition Financing and Use of Cash Collateral</u></strong>.

(i)      *Request for Postpetition Financing and Use of Cash Collateral*.  The

Debtors seek final approval of the DIP Facility, the incurrence of the DIP Obligations and the use

of Cash Collateral on a final basis on the terms described herein and in the DIP Documents, in

each case, to, among other things, administer their Chapter 11 Cases and fund their operations.

(ii)      *Priming of the Prepetition Liens*.  The priming of the Prepetition

Term Liens, Prepetition ABL Liens (except with respect to ABL Priority Collateral), and

Prepetition IPCo Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP

Documents and as provided herein, will enable the Debtors to obtain the DIP Facility and the

Debtors to continue to operate their business during the pendency of the Chapter 11 Cases, for the

benefit of their estates and creditors.  The Prepetition Secured Parties are entitled to receive

adequate protection as set forth in this Final Order pursuant to sections 361, 363, and 364 of the

Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in

- 19 -

the Prepetition Collateral (including Cash Collateral) as of the Petition Date.

        (iii)    *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have demonstrated the need to use Cash Collateral on a final basis and to obtain credit in the form of the Final Loans under the DIP Facility in order to, among other things, continue their ordinary course operations, administer these Chapter 11 Cases, and preserve the going-concern value of their estates.

        (iv)    *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing reasonably available to the Debtors at this time. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) adequate unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) adequate credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) adequate credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral (as defined below), with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Final Order.

- 20 -

(v)    *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral shall be used in a manner consistent with the terms and conditions of this Final Order and the DIP Documents and in accordance with the budget (including with respect to any variances as permitted in the DIP Documents,  as would not trigger a Budget Event (as defined in the DIP Documents), and as set forth in paragraph 15 hereof, the "**Budget**" and the requirement to use the proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral in a manner that does not trigger a Budget Event, the "**Budget Requirement**"),[10] solely for the purposes set forth in the DIP Credit Agreement and this Final Order, including (a) ongoing working capital, capital expenditures, other general corporate purposes of the Debtors and any other purpose not prohibited by the DIP Credit Agreement; (b) permitted payment of costs of administration of the Chapter 11 Cases; (c) payment of such prepetition expenses as consented to by the DIP Agent, acting at the direction of the Required DIP Lenders; (d) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, the fees and expenses of the DIP Agent and the legal and other professionals' fees and expenses of the DIP Agent and the DIP Lenders) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation,

---

[10]    A copy of the current Budget is attached hereto as **Schedule 2**.

- 21 -

documentation, and Court approval of the DIP Facility; (e) payment of certain adequate protection amounts to the Prepetition Secured Parties, as set forth in paragraph 12 hereof; and (f) payment of obligations benefitting from the Carve-Out (as defined below), and making disbursements therefrom, including by funding the Carve-Out Reserve Account (as defined below); provided that, for the avoidance of doubt, and notwithstanding anything herein or in the DIP Documents (including the DIP Credit Agreement) to the contrary, in no instance shall the Debtors' use of Collateral (including Cash Collateral) to pay obligations benefiting from the Carve-Out, including Professional Fees, be limited or deemed limited by any Budget.

(vi)    *Application of Proceeds of DIP Collateral*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and authorization to use Cash Collateral, the Debtors, the DIP Agent, the DIP Lenders, and the applicable Prepetition Secured Parties have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of the DIP Collateral as permitted by the DIP Documents and this Final Order.

(vii)    *DIP Election Procedures.*    The procedures governing the participation of the Prepetition Term Lenders and the Prepetition IPCo Noteholders in the DIP Facility (the "**DIP Election Procedures**"), as set forth in the DIP Credit Agreement, are fair and reasonable.

K. **Adequate Protection**.  (i) The Prepetition Term Agent, for the benefit of the Prepetition Term Secured Parties, (ii) the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, and (iii) the Prepetition IPCo Indenture Trustees, for the benefit of the

- 22 -

applicable Prepetition IPCo Secured Parties, are entitled to receive adequate protection solely to the extent of Diminution in Value, if any, of their respective interests as of the Petition Date in the Prepetition Collateral, including, without limitation, the Cash Collateral.  Pursuant to sections 361, 363, 503, and 507(b) of the Bankruptcy Code, as adequate protection, subject in all respects to the Carve-Out (as defined below), the Prepetition Secured Parties will receive, and subject to the Carve Out in all respects, (i) solely to the extent of any Diminution of Value, if any, of their interests in the Prepetition Collateral as of the Petition Date, Adequate Protection Liens (as defined below) and 507(b) Claims (as defined below); (ii) current payment of reasonable and documented fees and expenses and other disbursements as set forth in paragraph 12 herein; (iii) financial and other reporting in each case, as set forth in paragraph 12 herein; and (iv) solely with respect to the Prepetition ABL Secured Parties, current cash payments on a monthly basis in an amount equal to the postpetition interest and Letter of Credit Fees (as defined in the Prepetition ABL Credit Agreement) on the Prepetition ABL Facility at the non-default rate as set forth in the Prepetition ABL Credit Agreement and accrual of default interest as set forth in paragraph 12 herein. Notwithstanding the foregoing, subject to paragraph 44 herein, the Debtors' and any party in interest's rights are fully reserved to seek a determination that adequate protection payments should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the applicable Prepetition Secured Parties' claims as of the Petition Date.

L. **Sections 506(c) and 552(b)**.  In light of, among other things: (i) the superpriority of the Carve-Out with respect to the Prepetition Liens; (ii) the DIP Agent's and the DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve-Out (as defined

- 23 -

below); (iii) the Prepetition Secured Parties' agreement that their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out (as defined below) and subordinate to the DIP Liens (as defined below), except as otherwise set forth herein; (iv) the authority to use Cash Collateral as provided herein; and (v) the funding made available pursuant to the DIP Facility (a) the Prepetition Secured Parties are entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code as provided herein.

M. **Good Faith of the DIP Agent and DIP Lenders and the Prepetition Secured Parties**.

(i)      Based upon the pleadings and the record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors; (iii) the use of Cash Collateral, including, without limitation, pursuant to this Final Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (iv) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Secured

- 24 -

Parties and the Prepetition Secured Parties including, without limitation, pursuant to this Final

Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith"

within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the

Prepetition Secured Parties in express reliance upon the protections offered by section 364(e) of

the Bankruptcy Code; and (v) the DIP Facility, the DIP Liens (as defined below), the DIP

Superpriority Claims (as defined below), the Adequate Protection Liens, and the 507(b) Claims

(as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code

in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on

appeal or otherwise.

        (ii)     Absent an order of this Court and the provision of Adequate

Protection, (a) consent of the Prepetition ABL Secured Parties and Prepetition Term Secured

Parties is required for the Debtors' use of Cash Collateral and other Prepetition ABL Collateral

and Prepetition Term Collateral and (b) consent of the Prepetition IPCo Secured Parties is required

for the Debtors' use of the Prepetition IPCo Collateral.  The Prepetition ABL Secured Parties and

Prepetition Term Secured Parties have consented, or have not objected, to the Debtors' use of Cash

Collateral and other Prepetition ABL Collateral and Prepetition Term Collateral or to the Debtors'

entry into the DIP Documents in accordance with and subject to the terms and conditions in this

Final Order and the DIP Documents.  The Prepetition IPCo Secured Parties have consented, or

have not objected, to the Debtors' use of the Prepetition IPCo Collateral or to the Debtors' entry

into the DIP Documents in accordance with and subject to the terms and conditions in this Final

Order and the DIP Documents.

- 25 -

N. **Immediate Entry**.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion, the Declarations, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. <u>DIP Facility and Use of Cash Collateral Approved on Final Basis</u>.  The Motion is granted to the extent provided herein on a final basis.  The DIP Facility, the borrowing of the Final Loans thereunder, and the guaranty by the DIP Guarantors of such borrowing (and related obligations under the DIP Facility), is hereby authorized and approved, and the use of Cash Collateral on a final basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Final Order.  All objections to this Final Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

2. <u>Authorization of the DIP Facility</u>.  The DIP Facility is hereby approved.  The Debtors are expressly and immediately authorized and empowered to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and to deliver all instruments, certificates, agreements, and documents that may be required, desirable or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below).  The Debtors are hereby authorized and directed to pay, in accordance with this Final Order, the principal, interest, premiums, fees,

- 26 -

payments, expenses, and other amounts described in the DIP Documents as such amounts (including, without limitation, legal and other professional fees and expenses of the DIP Agent and the DIP Lenders) become due and payable in accordance with the terms and conditions of the DIP Documents, without need to obtain further Court approval, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other related actions that may be necessary, desirable or appropriate, all to the extent provided in this Final Order or the DIP Documents.  The DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  The Backstop Premium set forth in the Backstop Commitment Letter (as defined in the DIP Credit Agreement) (the "**Backstop Premium**") is fully earned, non-refundable, and non-avoidable and shall be payable in accordance with and at the times specified in the DIP Documents.

3. <u>Authorization to Borrow</u>.   From the entry of this Final Order through and including the DIP Termination Date (as defined below), and subject to the terms and conditions set forth in the DIP Documents and this Final Order, the Debtors are hereby authorized to request extensions of credit (in the form of the Final Loans) under the DIP Facility in an original principal amount equal to up to $400,000,000.

4. <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, restated, amended and restated, waived, modified, and/or supplemented by the parties thereto (or, to the extent provided for in the applicable DIP Document, a subset of such parties) in accordance with the terms and conditions of the applicable DIP Documents, provided that the

- 27 -

Debtors shall use commercially reasonable efforts to provide not less than three (3) business days' notice to the Committee in advance in writing, without further order of the Court if the amendment, restatement, amendment and restatement, waiver, modification or supplement does not (i) shorten the original stated maturity of the DIP Loans, (ii) increase the aggregate commitments or the rate of interest payable thereunder, or (iii) amend the Events of Default (as defined in the DIP Credit Agreement) or covenants in the DIP Documents to be materially more restrictive to the Debtors (taken as a whole) than those set forth in the DIP Documents as originally executed and delivered (any such amendment, restatement, amendment and restatement, waiver, modification or supplement, an "**Approved Modification**"); provided, that for the avoidance of doubt, other than as explicitly set forth in the DIP Credit Agreement, updates and supplements to the Budget required to be delivered by the Borrower under the DIP Documents shall not require further order of the Court.  Prior to or promptly after the effectiveness of any Approved Modification, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to the Committee, the U.S. Trustee, the DIP Agent, the Prepetition Agents, the Prepetition IPCo Indenture Trustees, and counsel to the Ad Hoc Committee and (ii) provide notice to the Court.  In the case of an amendment, restatement, amendment and restatement, waiver, supplement or other modification of the DIP Documents that is not an Approved Modification, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to the Committee, the U.S. Trustee, the DIP Agent, the Prepetition Agents, the Prepetition IPCo Indenture Trustees, and counsel to the Ad Hoc Committee, (ii) provide notice to the Court and (iii) obtain approval of the Court.

- 28 -

5. <u>DIP Obligations</u>.  The DIP Documents and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable in accordance with their terms against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon entry of this Final Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by any of the Debtors party to the DIP Documents to the DIP Agent or any of the DIP Lenders, in each case, under and in accordance with the terms and conditions of the DIP Documents or this Final Order or secured by the DIP Liens (as defined below), including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, and other amounts owing under and in accordance with the DIP Documents; <u>provided that</u>, for the avoidance of doubt the DIP Liens and the DIP Obligations shall be subject to the Carve-Out in all respects.  The Debtors shall be jointly and severally liable for the DIP Obligations as and to the extent provided in the DIP Documents, which shall be subject to the Carve-Out in all respects.  The DIP Obligations shall be due and payable without notice or demand on the DIP Termination Date (as defined below), and the Debtors' authority to use Cash Collateral under this Final Order shall automatically cease, in each case, without notice or demand on the Cash Collateral Termination Date (as defined below), in each case except as provided in paragraph 26 hereof and subject to the requirements of the Carve-Out (as defined below); <u>provided that</u> the Debtors' rights to seek the

- 29 -

use of Cash Collateral upon entry of a further order of the Court after the occurrence of the Cash

Collateral Termination Date are fully reserved, and nothing herein shall waive, limit, or modify or

be deemed to waive, limit or modify the Debtors' rights to seek the use of Cash Collateral upon

entry of a further order of the Court after the occurrence of the Cash Collateral Termination Date.

It shall be an event of default if any Order is entered that renders an obligation, payment, transfer,

or grant of collateral security hereunder or under the DIP Documents (including any DIP

Obligation or DIP Liens (as defined below) and including in connection with any adequate

protection provided to the Prepetition Secured Parties hereunder) stayed, restrained, voidable,

avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including,

without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy

Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or

applicable state law equivalents), is determined to constitute original issue discount, or is

determined to be subject to any avoidance, reduction, setoff, recoupment, offset,

recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim,

cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or

regulation by any person or entity.

      6. <u>DIP Liens</u>.  Subject and subordinate to the Carve-Out in all respects, as set forth

in this Final Order and effective immediately upon entry of this Final Order, pursuant to, as

applicable, sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP

Agent, for the benefit of itself and the DIP Lenders, is hereby granted, in order to secure the DIP

Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and

- 30 -

properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "**DIP Collateral**"), including, without limitation (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Debtor (other than Ultimate Holdings), other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, leases other than nonresidential real property leases, fee interests in real property owned by the Debtors, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other

- 31 -

avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "**Avoidance Action Proceeds**"), but not the actions themselves; (d) the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code; and (e) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; provided that the DIP Collateral shall not include (and the DIP Liens shall not extend to) (w) funds held in the Borrowing Base Account (if any), provided DIP Collateral shall include the Debtors' reversionary interest in such funds (x) any "Excluded Property" (as defined in the DIP Documents), (y) any nonresidential real property leases (although the DIP Collateral shall include the proceeds of any such leases) or (z) the Professional Fees Account (as defined herein) and all funds held therein, which shall constitute "Excluded Property" under this Final Order and the DIP Documents, except to the extent of the Debtors' reversionary interest, if any, in funds held in the Professional Fees Account, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash; provided further that neither the DIP Funding Account (as defined in the DIP Credit Agreement) nor the Operating Account (as defined in the DIP Credit Agreement) shall be subject to any lien in favor of the Prepetition Secured Parties, including with respect to any lien granted as adequate protection.

7. <u>DIP Lien Priority</u>.  The DIP Liens shall have the following priority with respect to assets of the Debtors' estates, and subject in all respects to the Carve-Out:

(a)      pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be first priority liens, as granted hereby, on all of the assets (now or hereafter acquired and all proceeds thereof) of the Debtors that are not otherwise subject to valid, perfected, and

- 32 -

unavoidable liens in existence immediately prior to the Petition Date or liens that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code; provided that in no instance shall the DIP Liens encumber the Excluded Property (as defined in the DIP Documents);

(b)    pursuant to Section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be junior priority liens, as granted hereby, upon all DIP Collateral constituting the ABL Priority Collateral (now owned or hereafter acquired and all proceeds thereof), subject and junior only to, in order of priority: (1) the Carve Out; (2) the ABL Permitted Liens; (3) ABL Adequate Protection Liens (as defined herein); and (4) Prepetition ABL Liens; provided that, for the avoidance of doubt, the DIP Liens shall be senior in priority to the Prepetition Term Liens and Prepetition IPCo Liens and any liens granted as adequate protection in favor of the Prepetition Term Secured Parties or Prepetition IPCo Secured Parties with respect to ABL Priority Collateral (now owned or hereafter acquired);

(c)    pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be priming first-priority liens, as granted hereby, on all DIP Collateral (now or hereafter acquired and all proceeds thereof) that is "Collateral" as defined by each of the Prepetition Term Credit Agreement, the Prepetition ABL Credit Agreement, and the Prepetition IPCo Indentures to the extent such Collateral is not ABL Priority Collateral; provided that such DIP Liens shall be junior to, in order of priority, to: (i) the Carve Out, and (ii) the Permitted Liens.  For the avoidance of doubt, the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition IPCo Liens shall be junior to the DIP Liens and the Carve Out in all respects with respect to DIP Collateral that is not ABL Priority Collateral (now owned or hereafter acquired).

- 33 -

(d)      Other than as set forth herein (including with respect to the Carve-Out) or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.      <u>Superpriority Claims</u>.  Subject and subordinate to the Carve-Out in all respects, upon entry of this Final Order, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of their Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The

- 34 -

DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof; provided, that, for the avoidance of doubt, the DIP Superpriority Claims shall not have recourse to (x) the amounts deposited in the Carve-Out Reserve Account (as defined below) in accordance with the Interim Order and this Final Order, or (y) the amounts held in the Professional Fees Account (as defined below), other than the Debtors' reversionary interest therein, if any, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash.

9. No Obligation to Extend Credit.  Except as required to fund the Carve-Out (as defined below) as set forth in this Final Order, the DIP Lenders shall have no obligation to make any loan or advance or to issue, amend, renew, or extend any letters of credit or bankers' acceptance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance under the DIP Documents and this Final Order have been satisfied in full or waived by the DIP Agent, acting at the direction of the Required Lenders (or the requisite consenting DIP Lenders, as applicable) in accordance with the terms of the DIP Credit Agreement.

10. Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility in accordance with the Budget Requirement and the terms and conditions in this Final Order and the DIP Documents; provided that, for the avoidance of doubt, the Debtors' use of borrowings under the DIP Facility and the

- 35 -

DIP Collateral (including Cash Collateral) to pay obligations benefiting from the Carve-Out shall not be limited or deemed limited by any Budget.

11.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Final Order and the DIP Documents, and in a manner that does not trigger a Budget Event, the Debtors are authorized to use Cash Collateral until the Cash Collateral Termination Date (as defined below); <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined below), the Debtors are authorized to use Cash Collateral (x) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget Requirement and (y) as otherwise agreed by the DIP Agent, acting at the direction of the Required Lenders; <u>provided that</u>, with respect to Cash Collateral from proceeds of ABL Priority Collateral, with the consent of the Prepetition ABL Agent.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors' estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Final Order (including with respect to the Carve-Out (as defined below)), the DIP Facility, or the DIP Documents, or, with respect to the ABL Priority Collateral, with consent of the Prepetition ABL Agent and "Required Lenders" as defined in the Prepetition ABL Credit Agreement.

12.    <u>Adequate Protection for the Prepetition Secured Parties</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral as of the Petition Date, including the Cash Collateral, solely to the extent of Diminution in Value, if any, of their interests in the Prepetition Collateral as of the Petition Date (the "**Adequate Protection**

- 36 -

**Claim**"); provided, that, for the avoidance of doubt, the Adequate Protection Obligations shall not have any recourse to the amounts deposited in accordance with the Interim Order or this Final Order in the Carve-Out Reserve Account or the Professional Fees Account (each as defined below) (in each case other than the Debtors' reversionary interest therein, if any, after all Professional Fees benefiting from the Carve-Out have been indefeasibly paid in full in cash).  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "**Adequate Protection Obligations**"):

(a)    ABL Adequate Protection Liens.  Subject to the Carve-Out in all respects, as security for the payment of the Prepetition ABL Secured Parties' Adequate Protection Claims, if any, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including Avoidance Action Proceeds, but not avoidance actions themselves) (the "**ABL Adequate Protection Liens**"), subject and subordinate only to (i) the Carve-Out (as defined below) in all respects; (ii) with respect to the Term Priority Collateral, in order of priority (1) the Term Permitted Liens; (2) the DIP Liens, (3) the Prepetition Term Liens, and (4) the Term Adequate Protection Liens (as defined below); (iii) with respect to ABL Priority Collateral, the ABL Permitted Liens; (iv) with respect to the DIP Collateral of the ABL Debtors that is neither ABL Priority Collateral nor Term Priority Collateral, the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens);

- 37 -

(v) with respect to the DIP Collateral of the IPCo Debtors, (1) the IPCo Permitted Liens, (2) the

DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens), (3) the

IPCo Adequate Protection Liens (as defined below), and (4) the Prepetition IPCo Liens; and (v)

with respect to the DIP Collateral of Debtors other than the ABL Debtors, the Term Debtors, or

the IPCo Debtors, the DIP Liens (and any liens permitted by the DIP Documents to be senior to

the DIP Liens).

(b)      ABL Section 507(b) Claims.    Subject to the Carve-Out in all

respects, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders)

is hereby granted an allowed superpriority claim against each of the Debtors as provided in sections

503 and 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claims**") in the amount of the

Prepetition ABL Secured Parties' Adequate Protection Claims, if any, with priority in payment

over any and all administrative expenses of the kinds specified or ordered pursuant to any provision

of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a),

503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject

and subordinate only to (i) (1) the Carve-Out (as defined below) in all respects, and (2) the DIP

Superpriority Claims granted in respect of the DIP Obligations and (ii) with respect to the ABL

507(b) Claims against the IPCo Debtors, the IPCo 507(b) Claims (as defined below).  Except to

the extent expressly set forth in this Final Order, the Prepetition ABL Secured Parties shall not

receive or retain any payments, property, or other amounts in respect of the ABL 507(b) Claims

unless and until (x) all obligations benefitting from the Carve-Out have been indefeasibly paid in

full, in cash, (y) all DIP Obligations shall have been indefeasibly paid in full in cash, and (z) with

- 38 -

respect to the ABL 507(b) Claims against the IPCo Debtors, all IPCo 507(b) Claims (as defined below) shall have been indefeasibly paid in full in cash. Only the Prepetition ABL Agent, acting at the direction of the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement), may assert the ABL 507(b) Claims against the Debtors. Notwithstanding their status as 507(b) Claims, the Prepetition ABL Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or liquidation confirmed in the Chapter 11 Cases in any manner set forth in such plan if the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement) consent to such treatment, which shall include any class including such Requisite Lenders voting to accept such plan of reorganization or plan of liquidation.

(c)    ABL Postpetition Interest Payments. From and after entry of the Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest and Letter of Credit Fees (as defined in the Prepetition ABL Credit Agreement) on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest and Letter of Credit Fees become due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement; provided that, the default rate as set forth in the Prepetition ABL Credit Agreement shall accrue from and after the Petition Date. The first such interest payment date shall be May 29, 2020, and thereafter, the last business day of every calendar month; provided that the Debtors' or any party in interest's rights are fully reserved to seek a determination that adequate protection payments (as set forth in this paragraph 12(c)) should be recharacterized under section 506(b) of the Bankruptcy

- 39 -

Code as payment on account of the secured portion of the Prepetition ABL Obligations as of the Petition Date.

(d)     Term Adequate Protection Liens.   Subject in all respects to the Carve-Out, as security for the payment of the Prepetition Term Secured Parties' Adequate Protection Claims, the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Secured Parties) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including Avoidance Action Proceeds) (the "**Term Adequate Protection Liens**"), subject and subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens); (ii) with respect to the ABL Priority Collateral, (1) the Prepetition ABL Liens and (2) the ABL Adequate Protection Liens; and (iii) with respect to the DIP Collateral of the IPCo Debtors, (1) the IPCo Adequate Protection Liens (as defined below) and (2) the Prepetition IPCo Liens.

(e)     Term Section 507(b) Claims.   Subject to the Carve-Out in all respects, the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Lenders) is hereby granted an allowed superpriority claim against each of the Debtors as provided in sections 503 and 507(b) of the Bankruptcy Code (the "**Term 507(b) Claims**") in the amount of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision

- 40 -

of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) with respect to the Term 507(b) Claims against the IPCo Debtors, the IPCo 507(b) Claims (as defined below).  Except to the extent expressly set forth in this Final Order, the Prepetition Term Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Term 507(b) Claims unless and until (x) the Carve-Out (as defined below) is funded, (y) all DIP Obligations shall have been indefeasibly paid in full in cash, and (z) with respect to the Term 507(b) Claims against the IPCo Debtors, all IPCo 507(b) Claims (as defined below) shall have been indefeasibly paid in full in cash.  Only the Prepetition Term Agent, acting at the direction of the Required Term Lenders, may assert the Term 507(b) Claims against the Debtors.  Notwithstanding their status as 507(b) Claims, the Prepetition Term Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or liquidation confirmed in the Chapter 11 Cases in any manner set forth in such plan if the Required Term Lenders consent to such treatment, which shall include the class including such Required Term Lenders voting to accept such plan of reorganization or liquidation.

(f)      IPCo Notes Adequate Protection Liens.  As security for the payment of the Prepetition IPCo Secured Parties' respective Adequate Protection Claims, the Prepetition IPCo Indenture Trustees (for themselves and for the benefit of the applicable Prepetition IPCo Noteholders) are each hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge

- 41 -

agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement

security interest in and lien on all of the DIP Collateral of each of the Debtors (including Avoidance

Action Proceeds) (the "**IPCo Adequate Protection Liens**"), subject and subordinate only to (i)

(1) the Carve-Out (as defined below) and (2) the DIP Liens (and any liens permitted by the DIP

Documents to be senior to the DIP Liens) and (ii) with respect to the DIP Collateral of the ABL

Debtors and the Term Debtors, (1) the ABL Adequate Protection Liens, (2) the Prepetition ABL

Liens, (3) the Term Adequate Protection Liens, and (4) the Prepetition Term Liens.

      (g)      IPCo Notes Section 507(b) Claims.  The Prepetition IPCo Indenture

Trustees (for themselves and for the benefit of the applicable Prepetition IPCo Noteholders) are

hereby granted an allowed superpriority claim against the Debtors as provided in sections 503 and

507(b) of the Bankruptcy Code (the "**IPCo 507(b) Claims**" and, collectively with the ABL 507(b)

Claims and the Term 507(b) Claims, the "**507(b) Claims**") in the amount of the Prepetition IPCo

Secured Parties' respective Adequate Protection Claims, with priority in payment over any and all

administrative expenses of the kinds specified or ordered pursuant to any provision of the

Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b),

507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and

subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Superiority Claims

granted in respect of the DIP Obligations and (ii) with respect to the IPCo 507(b) Claims against

the ABL Debtors and the Term Debtors, (1) the ABL 507(b) Claims and (2) the Term 507(b)

Claims.  Except to the extent expressly set forth in this Final Order, the Prepetition IPCo Secured

Parties shall not receive or retain any payments, property, or other amounts in respect of the IPCo

- 42 -

507(b) Claims unless and until (x) the Carve-Out (as defined below) is funded, (y) all DIP

Obligations shall have been indefeasibly paid in full in cash, and (z) with respect to the IPCo

507(b) Claims against the ABL Debtors and the Term Debtors, the ABL 507(b) Claims and the

Term 507(b) Claims shall have been indefeasibly paid in full in cash.  Only the Prepetition IPCo

Indenture Trustees, acting at the direction of Holders (as defined under the applicable Prepetition

IPCo Notes Indenture) of a majority in principal amount of the total Prepetition IPCo Notes then

outstanding under the applicable Prepetition IPCo Notes Indenture, may assert the IPCo 507(b)

Claims against the Debtors.  Notwithstanding their status as 507(b) Claims, the Prepetition IPCo

Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or plan

of liquidation confirmed in the Chapter 11 Cases, which shall include any class including holders

of more than 50% in amount of the Prepetition IPCo Secured Parties' Adequate Protection Claims

voting to accept such plan of reorganization or liquidation.

(h)     _Fees and Expenses_.  The Debtors are authorized and directed to pay,

as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements

(but not success fees, transaction fees, or similar fees) incurred, whether accrued before, on, or

after the Petition Date, by the legal and financial advisors to (i) the ad hoc committee of crossholder

creditors (the "**Ad Hoc Committee**") under the Prepetition Term Credit Agreement and

Prepetition IPCo Indentures, (ii) the Prepetition ABL Agent, (iii) the Prepetition Term Agent, and

(iv) the Prepetition IPCo Indenture Trustees; _provided_, _that_ such payments shall be subject to the

Debtors' or any other party's rights to seek a determination such payments should be

recharacterized under section 506(b) of the Bankruptcy Code as payments of the secured portion

- 43 -

of the applicable claims as of the Petition Date.  The legal and financial advisors to the Ad Hoc

Committee, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo

Indenture Trustees shall not be required to comply with the U.S. Trustee fee guidelines; however,

any time that such professionals seek payment of fees and expenses from the Debtors, each

professional shall provide summary copies of its fee and expense statements or invoices (which

shall not be required to contain time entries and which may be redacted or modified to the extent

necessary to delete any information subject to the attorney-client privilege, any information

constituting attorney work product, or any other confidential information, and the provision of

such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of

the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee,

contemporaneously with the delivery of such fee and expense statements to the Debtors.  After

delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the

Committee shall have ten (10) days to raise an objection thereto.  If an objection is timely raised,

such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed

portion of any such fee and expense statement or invoice shall be paid promptly by the Debtors.

Notwithstanding the foregoing, the Debtors are authorized and directed to pay all reasonable and

documented fees, costs, and out-of-pocket expenses (but not any "success", "transaction", or

similar fees) of the legal and financial advisors to (i) the Ad Hoc Committee, (ii) the Prepetition

ABL Agent, (iii) the Prepetition Term Agent, and (iv) the Prepetition IPCo Indenture Trustees

incurred on or prior to the date of the Interim Order without the need for any professional engaged

by such parties to first deliver a copy of its invoice as provided for herein.  No attorney or advisor

- 44 -

to the Ad Hoc Committee, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees shall be required to file an interim or final application seeking compensation for services or reimbursement of expenses with the Court.

(i)    Financial Reporting.  The Debtors shall concurrently deliver to the Prepetition Agents, the Prepetition IPCo Indenture Trustees, the legal and financial advisors to the Ad Hoc Committee, and the Committee, subject to customary confidentiality provisions, all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, and this Final Order, including Budgets.

13.    Adequate Protection Reservation.  Other than with respect to the priority of the Carve-Out (as defined below), nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value, if any, of their respective interests in the Prepetition Collateral as of the Petition Date during the Chapter 11 Cases or any Successor Cases, or the Debtors' or any party in interest's rights to challenge such an assertion.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected or that any of the Prepetition Secured Parties are entitled to other or different adequate protection.  Further, this Final Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, subject in all respects to the terms and limitations of the Intercreditor Agreements, or the Debtors' or any party in interest's rights to challenge such request

- 45 -

on any basis whatsoever.

14.    Effect of Order on Adequate Protection.  In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal, or vacatur, that (a) no Diminution in Value of any Prepetition Secured Party's respective interests in the Prepetition Collateral as of the Petition Date has occurred, (b) such Prepetition Secured Party is determined to be undersecured, or (c) the aggregate value of postpetition interest, fees, and expenses paid to or the benefit of the Prepetition ABL Secured Parties exceeds the extent permitted by section 506(b) of the Bankruptcy Code, then in each case a party in interest subject to paragraph 44 herein shall have the right to assert that payments of Adequate Protection shall be applied toward repayment of the secured portion of the applicable Prepetition Secured Debt as is owing to such Prepetition Secured Party as of the Petition Date.

15.    Budget Maintenance.  The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the Budget Requirement or as otherwise permitted by the DIP Documents and this Final Order; provided that, for the avoidance of doubt, the Debtors' authorization to use proceeds of the DIP Facility, DIP Collateral, and Cash Collateral to satisfy obligations benefitting from the Carve Out shall in no way be subject to the Budget.  The Budget annexed hereto as Schedule 2 shall constitute the current Budget.  On the first Tuesday that is four (4) full weeks after the Petition Date, and no later than the Tuesday of each fourth week thereafter (or more frequently as the Borrower may elect), the Borrower shall provide to the DIP Agent, the legal and financial advisors of the Ad Hoc Committee, and the Prepetition ABL Agent, an updated 13-week statement of the Debtors' anticipated cash receipts

- 46 -

and disbursements for the subsequent 13-week period (a "**Proposed Budget**"), which Proposed

Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders

in their reasonable discretion (such approval not to be unreasonably withheld), in consultation with

the Prepetition ABL Agent.  Until the Required Lenders approve the Proposed Budget in their

reasonable discretion (such approval not to be unreasonably withheld), the then-current Budget

shall remain the Budget, and the DIP Lenders shall have no obligation to fund such Proposed

Budget.  Each Budget delivered to the DIP Agent, the legal and financial advisors to the Ad Hoc

Committee  and  the  Prepetition  ABL  Agent  shall  be  accompanied  by  such  supporting

documentation as reasonably requested by such legal and financial advisors, and each Budget shall

be prepared in good faith based upon assumptions the Debtors believe to be reasonable.  A copy

of the Budget shall be delivered to the legal and financial advisors to the Committee and the U.S.

Trustee following such Budget's approval.  The Committee shall be provided concurrent drafts of

any proposed modifications to, or amendment or update to, the Budget, and the Debtors shall use

commercially reasonable efforts to provide the Committee with three (3) business days' prior

notice of any proposed amendment or modification.

       16.    <u>Budget and Reporting Compliance</u>.  The occurrence of a Budget Event or

the Debtors' failure to provide the reports and other information required in the DIP Credit

Agreement shall constitute an Event of Default under the DIP Credit Agreement and this Final

Order, following the expiration of any applicable grace period set forth in the DIP Credit

Agreement.  Contemporaneously with their delivery to the DIP Agent, all reports and information

- 47 -

required to be provided to the DIP Agent under the DIP Credit Agreement shall be provided to the Prepetition ABL Agent and the Committee.

17.  <u>Borrowing Base; Borrowing Base Reporting</u>.  The Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent, counsel to the Ad Hoc Committee, and counsel to the Committee, a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement), together with all back up reports and information, in each case in the format customarily provided prior to the Petition Date, delivered with such Borrowing Base Certificates prior to the Petition Date, setting forth the Borrowing Base (as defined in the Prepetition ABL Credit Agreement) (i) calculated as of the last day of the immediately preceding calendar week on Wednesday of each week commencing on June 3, 2020 for the week ending May 30, 2020 and each Wednesday thereafter; <u>provided</u> <u>that</u> in preparing such weekly Borrowing Base Certificate the Debtors shall only be required to roll forward the stock ledger inventory and the JCI Listing for In Transit Inventory, and the Prepetition ABL Agent may increase the "Store Closing Reserve", if any, in such weekly calculation and (ii) calculated as of the last business day of the immediately preceding fiscal month, promptly, but in no event later than May 15, 2020 with respect to the fiscal month ended April 2020 and ten (10) business days following the end of each subsequent fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards; <u>provided</u> <u>that</u> (x) none of the Prepetition ABL Secured Parties shall be permitted to take any Reserves (whether Availability Reserves (as defined in the Prepetition ABL Credit Agreement), Inventory Reserves (as defined in the Prepetition ABL Credit Agreement), or otherwise) against the Borrowing Base that were not in place as of May 2, 2020 <u>other</u> <u>than</u> (I) a

- 48 -

reserve in the amount of $6,000,000 on account of the Post Carve-Out Trigger Notice and (II) the Store Closing Reserve, (y) the appraisals used to calculate the Borrowing Base shall be the most recent appraisals delivered by the Debtors in accordance with the Prepetition ABL Credit Agreement as of May 2, 2020, and (z) no subsequent appraisals, valuations, or reserves (other than a Store Closing Reserve) shall be applied with respect to the Borrowing Base or any determination of Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement), although the Prepetition ABL Agent may obtain appraisals subsequent to the Petition Date solely for informational purposes and the Debtors shall use commercially reasonable efforts to cooperate with the Prepetition ABL Agent in obtaining such appraisals (and such appraisals shall not affect the Borrowing Base), and the Debtors shall pay the Prepetition ABL Agent's reasonable and documented expenses associated with obtaining such appraisals.

18.    **Store Closing Reserve**. The Prepetition ABL Agent may implement a Store Closing Reserve (as defined below) as an Availability Reserve against the Borrowing Base, which Store Closing Reserve may be taken by the Prepetition ABL Agent, on two (2) business days' written notice to the Debtors, the DIP Agent, and the Committee, in its Permitted Discretion (as defined in the Prepetition ABL Credit Agreement) solely on account of Eligible Inventory (as defined in the Prepetition ABL Credit Agreement) held in stores where "store closing sales" have been commenced after the Petition Date (each a "**Closing Store**"); provided that a Store Closing Reserve may not be taken:

(a)    before the first business day that is at least five (5) weeks after the Petition Date;

- 49 -

(b)      unless more than 10% of the Debtors' aggregate store count (excluding up to 25 stores in the aggregate that are closed after the Petition Date in connection with the termination of the lease term applicable thereto or otherwise in the ordinary course of business) as of the Petition Date shall have become Closing Store after the Petition Date;

(c)      more than once per week; and

(d)      for at least five (5) weeks after the commencement of a "store closing sale" at the applicable store location.

"Store Closing Reserve" means a reserve in an amount equal the results of reducing the Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement) by 1000 bps per week, commencing on week six and each week thereafter, multiplied by the Inventory Advance Rate multiplied by the Cost of Eligible Inventory located at all Closing Stores.

19.      To the extent the Borrowing Base set forth on the most recent Borrowing Base Certificate is less than the lesser of (a) $375,000,000 and (b) the aggregate amount of Revolving Credit Outstandings (as defined in the ABL Credit Agreement) (such difference, if any, the "**Borrowing Base Shortfall**"), the Debtors shall cause the lesser of (x) such Borrowing Base Shortfall and (y) $20,000,000 to be deposited in a segregated account (the "**Borrowing Base Account**") established by the Debtors at Bank of America, N.A. on or within two (2) business days of delivery of such Borrowing Base Certificate, as additional adequate protection for the Prepetition ABL Lenders, which Borrowing Base Account and all funds held in the Borrowing Base Account, if any, shall be ABL Priority Collateral but not DIP Collateral (but DIP Collateral shall include the Debtors' reversionary interest in such funds); provided, further, that (x) funds

- 50 -

held in the Borrowing Base Account shall be added to the Borrowing Base and (y) on two (2) Business Days' notice the Prepetition ABL Agent  the Debtors may withdraw funds held in the Borrowing Base Account  to the extent the Borrowing Base Shortfall is less than $20,000,000, as set forth by any subsequent Borrowing Base Certificate delivered as provided herein.

20.    Modification of Automatic Stay.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Final Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Final Order.

21.    Perfection of DIP Liens and Adequate Protection Liens.  This Final Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve Out, the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into

- 51 -

any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Adequate Protection Liens or to entitle the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees is authorized to file or record, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect its respective liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver, promptly upon demand to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, or the Prepetition IPCo Indenture Trustees, as applicable, may reasonably request.  Each of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, in its discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument, and all applicable officials are hereby directed to accept a photocopy of this Final Order for filing or recordation for such purpose.  To the extent the Prepetition ABL Agent, the Prepetition Term

- 52 -

Agent, the Prepetition IPCo New Money Notes Indenture Trustee, or the Prepetition IPCo

Exchange Notes Indenture Trustee is the secured party under any security agreement, mortgage,

landlord waiver, credit card processor notices or agreements, bailee letters, custom broker

agreements, financing statement, account control agreements, or any other Prepetition Documents

or is listed as loss payee or additional insured under any of the Debtors' insurance policies, the

DIP Agent shall also be deemed without any further action to be the secured party or the loss payee

or additional insured, as applicable, under such documents.  The Prepetition ABL Agent, the

Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, as applicable, shall serve as

agents for the DIP Agent for purposes of perfecting the DIP Liens on all DIP Collateral that is of

a type such that, without giving effect to the Bankruptcy Code and this Final Order, perfection of

a lien thereon may be accomplished only by possession or control by a secured party.

22.    <u>Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured

Parties</u>.

(a)    Unless the Required Lenders shall have provided their prior written

consent, or all DIP Obligations (excluding contingent indemnification obligations for which no

claim has been asserted) have been indefeasibly paid in full in cash and the lending commitments

under the DIP Facility  have terminated, the entry of any order in these Chapter 11 Cases shall be

an Event of Default for purposes of the DIP Credit Agreement if such order authorizes any of the

following (unless such order provides for the simultaneous satisfaction of such obligations): (i) the

obtaining of credit or the incurrence of indebtedness that is secured by a security, mortgage, or

collateral interest or other lien on all or a portion of the DIP Collateral or that is entitled to

- 53 -

administrative priority with a value in excess of $500,000 in the aggregate that are superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, or the 507(b) Claims except as expressly set forth in this Final Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than as permitted pursuant to the Budget Requirement, the DIP Documents, and this Final Order; provided that Debtors' rights to seek to use Cash Collateral on a non-consensual basis after the Cash Collateral Termination Date are fully reserved; or (iii) any modification of any of the DIP Agent's, any DIP Lender's, or any Prepetition Secured Party's rights under this Final Order, the DIP Documents, or the Prepetition Documents with respect any DIP Obligations or Prepetition Obligations except as specifically provided herein.

(b)      The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, (i) use commercially reasonable efforts to maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the DIP Agent (solely in its capacity as such) all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by the DIP Agent) to provide under the DIP Documents or the provisions of this Final Order;  and (iii) permit the DIP Agent and the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees and their advisors and appraisers to consult with the Debtors' management and

- 54 -

advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets in each case during regular business hours and commercially reasonable advance notice and otherwise use commercially reasonable efforts to cooperate with such advisors and appraisers. The Debtors shall use commercially reasonable efforts to cause the Committee to receive any financial reporting required to be provided by the Debtors contemporaneously with the provision of such reports to the DIP Agent, Prepetition ABL Agent, Prepetition Term Agent, or Prepetition IPCo Indenture Trustees.

23.    <u>Credit Bidding</u>.   In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Agent (or its designee) at the direction of the Required Lenders, the DIP Lenders, and the Prepetition Term Agent (or its designee), at the direction of the Required Term Lenders, and the Prepetition IPCo Indenture Trustees, may credit bid up to the full amount of the outstanding DIP Obligations or the relevant Prepetition Obligations, as applicable, in each case including any accrued and unpaid interest, expenses, fees, and other obligations for their respective priority collateral (each such bid, a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code, subject in each case to the Intercreditor Agreements.

24.    <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Final Order at any time prior to the indefeasible repayment in full of all DIP Obligations and the termination of the DIP Agent's

- 55 -

and DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Final Order and the DIP Documents.

25.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order entered by the Court.

26.    <u>Termination Dates</u>. Subject to the Carve-Out in all respects, (a) on the DIP Termination Date (as defined below), subject to the Carve-Out (as defined below), all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as required in paragraph 41 with respect to the Carve-Out (as defined below); and (b) on the Cash Collateral Termination Date (as defined below) all authority to use Cash Collateral shall cease, <u>provided</u>, <u>however</u>, that (x) during the Remedies Notice Period, the Debtors may use Cash Collateral (i) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget Requirement; (ii) to satisfy obligations benefitting from the Carve Out without regard to whether or not a Budget Event would be triggered, and (iii) as otherwise agreed by the DIP Agent, acting at the direction of the Required Lenders, and (y) the Debtors' rights to seek to use Cash Collateral on a non-consensual basis after

- 56 -

the Cash Collateral Termination Date are fully reserved; and (c) upon occurrence of a Termination Date, the Debtors may otherwise exercise rights and remedies under the DIP Documents in accordance with this Final Order.

27.     Events of Default.  The occurrence and continuation of any of the following events, unless waived by the Required Lenders in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute an event of default (collectively, the "**Events of Default**") under this Final Order: (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Final Order, subject to a three business day cure period following receipt of notice (if such failure is capable of being cured); (b) the occurrence of an "Event of Default" as defined in the DIP Credit Agreement; or (c) delivery of an ABL Cash Collateral Termination Declaration (as defined herein).

28.     DIP Case Milestones.  The occurrence an Event of Default  under Section 8.01(c) of the DIP Credit Agreement of the DIP Credit Agreement, unless waived by the Required Lenders in writing and in accordance with the terms of the DIP Credit Agreement, shall, (a) constitute an Event of Default under each of (i) the DIP Credit Agreement and (ii) this Final Order; (b) subject to the expiration of the Remedies Notice Period, result in the automatic termination of the Debtors' authority to use Cash Collateral under this Final Order except as otherwise provided herein; and (c) permit the DIP Agent, subject to the terms of paragraph 31, to exercise the rights and remedies provided for in this Final Order and the DIP Documents.

29.     Termination Date; Remedies.  (a) Subject to any applicable notice and cure period under the DIP Documents and/or this Final Order, while (x) any Event of Default (as

- 57 -

defined in the DIP Credit Agreement) (in the case of the subsequent subclause (a)) or (y) any Event of Default (in the case of the subsequent subclause (b)), in each case, has occurred and is continuing, following the Debtors' and Committee's receipt of notice, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order of the Court, but subject to the terms of this Final Order, (i) the DIP Agent, acting at the direction of the Required Lenders, may declare in accordance with Section 8.02 of the DIP Credit Agreement (w) the Commitments (as defined in the DIP Credit Agreement) of each DIP Lender to be terminated, (x) the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Documents to be immediately due and payable, (y) subject to the Carve-Out, termination of the DIP Facility and the DIP Documents as to any future obligation of the DIP Agent and the DIP Lenders, without affecting any of the DIP Liens or the DIP Obligations, or the post-petition administrative superpriority claim status of the DIP Obligations, and (z) that the application of the Carve-Out (as defined below) has occurred through the delivery of the Carve-Out Trigger Notice (as defined below) to the Debtors (any such declaration shall be referred to as a "**DIP Termination Declaration**" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "**DIP Termination Date**") and (ii) the DIP Agent, acting at the direction of the Required Lenders, may declare a termination, reduction or restriction of the Debtors' ability to use any Cash Collateral derived solely from the proceeds of DIP Collateral or that constitutes Cash Collateral as of the Petition Date (any such declaration shall be referred to as a "**DIP Cash Collateral Termination Declaration**" and the date on which either a DIP Cash Collateral Termination

- 58 -

Declaration or an ABL Cash Collateral Termination Declaration is delivered shall be referred to as the "**Cash Collateral Termination Date**"; the Cash Collateral Termination Declaration and the DIP Termination Declaration are each a "**Termination Declaration**"; the Cash Collateral Termination Date and the DIP Termination Date are each a "**Termination Date**"); and (b) upon the occurrence and during the continuation of an ABL Cash Collateral Termination Event, the Prepetition ABL Agent, may declare a termination, reduction, or restriction of the Debtors' ability to use Cash Collateral (any such declaration shall be referred to as an "**ABL Cash Collateral Termination Declaration**").

30.    A Termination Declaration or ABL Cash Collateral Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, counsel to the DIP Agent (solely with respect to an ABL Cash Collateral Termination Declaration) counsel to the Prepetition ABL Agent (other than with respect to an ABL Cash Collateral Termination Declaration), counsel to the Prepetition Term Agent, counsel to the Prepetition IPCo Indenture Trustees, counsel to the Ad Hoc Committee, and the U.S. Trustee.

31.    The automatic stay is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such five (5) business day period, the "**Remedies Notice Period**"), the DIP Agent, acting at the direction of the Required Lenders, shall be entitled to exercise its applicable rights and remedies in accordance with the DIP Documents and this Final Order, subject in all respects to the Carve-Out (as defined below) except as otherwise ordered by the Court. During the Remedies Notice Period, the Debtors and/or the Committee shall be entitled to seek an emergency hearing from the Court for the sole purpose of contesting whether an Event

- 59 -

of Default (hereunder and/or under the DIP Credit Agreement) or an ABL Cash Collateral Termination Event has occurred and/or is continuing, and/or seeking to use the Cash Collateral on a non-consensual basis, and upon and after delivery of the Termination Declaration, each of the DIP Agent, acting at the direction of the Required Lenders, and the Prepetition ABL Agent consent to such emergency hearing being heard on an expedited basis.

32.    Unless the Courts orders otherwise during the Remedies Notice Period, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order as to the DIP Agent and the DIP Lenders, subject to the Carve-Out (as defined below).  Upon expiration of the Remedies Notice Period, the DIP Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other intellectual property of the Debtors to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral, including pursuant to any Court-approved sale process.

33.    <u>ABL Cash Collateral Termination Event</u>.    An "**ABL Cash Collateral Termination Event**" shall mean:

(a)    the Final Order shall not have been entered on or within forty-five (45) days from the Petition Date;

(b)    an order confirming a plan of reorganization shall not have been entered on or within one hundred thirty (130) days from the Petition Date;

(c)    the effective date of a plan of reorganization shall not have occurred within one hundred fifty (150) days from the Petition Date;

- 60 -

WEIL:\97486216\9\54457.0008

(d)    an Event of Default (as defined herein) that occurred and is continuing and has not been waived under the DIP Credit Agreement within (5) days' of the occurrence thereof and for which a forbearance is not in place under the DIP Credit Agreement;

(e)    the termination of all Commitments (as defined in the DIP Credit Agreement) or the acceleration of the unpaid principal amount of all outstanding DIP Loans;

(f)    the delivery of a Termination Declaration by the DIP Agent;

(g)    the DIP Lenders have failed to fund the Final Loans in the Final Loan Amount on the Final Loan Date as each such term is defined in the DIP Credit Agreement as of the Petition Date, and such default has not been cured within seven (7) calendar days thereof;

(h)    the Debtors shall have failed to pay their monetary obligations under paragraph 12(c) within two (2) business days of its due dates or paragraph 19, or the Debtors shall otherwise failed to perform with respect to their adequate protection obligations in favor of the Prepetition Secured Parties to the extent required under this Final Order after two (2) business days from receipt of written notice from the Prepetition ABL Agent (also to be provided to the Committee) and an opportunity to cure, which cure shall occur within two (2) business days of such notice;

(i)    the Borrowing Base Shortfall at any time is greater than $20,000,000 and the Debtors have not funded such shortfall into the Borrowing Base Account within two (2) business days of delivery of  the Borrowing Base Certificate reflecting such Borrowing Base Shortfall;

- 61 -

(j)      the Debtors shall have filed a motion or pleading with the Court to (i) stay, vacate, or reverse this Final Order; or (ii) amend or modify this Final Order in a manner adverse to Prepetition ABL Secured Parties and such motion shall not have been withdrawn after two (2) business days written notice thereof;

(k)      other than with respect to the Debtor Reserved Claims set forth at Paragraph F(v)(a)(i), the Debtors shall attempt to invalidate, reduce, or otherwise impair the Prepetition ABL Liens or the Prepetition ABL Obligations, in each case pursuant to a pleading filed with the Court that is not withdrawn after two (2) business days' notice thereof;

(l)      the entry of an order (i) appointing a trustee, receiver, or examiner with expanded powers with respect to any of the Debtors; (ii) dismissing any of the Debtors' Chapter 11 Cases; or (iii) converting any of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, in each case where such order has become a final order not subject to appeal;

(m)      (i) the failure to deliver all Borrowing Base Certificates as and when required;  or (ii) the failure to deliver all other reports and certificates, (2) business days' after notice to the Debtor and opportunity to cure;

(n)      the breach of paragraphs 22(a) or 43 in each case after two (2) business days' notice and an opportunity to cure;

(o)      the failure to fund the Professional Fees Account as and when required pursuant to paragraph 38;

(p)      the effective date of a chapter 11 plan in any of the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court; and/or

- 62 -

(q)    any stay, reversal, vacatur, rescission or other modification of the terms of this Final Order in any matter that is adverse to the Prepetition ABL Secured Parties and that is not consented to by the Prepetition ABL Agent

34.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.  Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, the DIP Agent, the DIP Lenders, and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

35.    <u>Payment of Fees and Expenses</u>.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses (but not "success", "transaction", or similar fees), of the legal and financial advisors to the DIP Agent and the legal and financial advisors to the Ad Hoc Committee, the members of which constitute DIP Lenders, in connection with the DIP Facility, as provided in the DIP Documents. Professionals of the DIP Agent and the Ad Hoc Committee shall not be required to comply with the U.S. Trustee fee guidelines; however, any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may

- 63 -

be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee contemporaneously with the delivery of such fee and expense statements to the Debtors.  After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee shall have ten (10) days to raise an objection thereto.  If an objection is timely raised, such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such fee and expense statement or invoice shall be paid promptly by the Debtors.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay all reasonable and documented fees, costs, and out-of-pocket expenses of legal and financial advisors to the DIP Agent provided for in the DIP Credit Agreement incurred on or prior to entry of the Interim Order without the need for any professional engaged by the DIP Agent or the DIP Lenders to first deliver a copy of its invoice as provided for herein.  No attorney or advisor to the DIP Agent or Ad Hoc Committee shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) DIP Agent or DIP Lenders in connection with the DIP Facility, (ii) Prepetition Secured Parties in connection with the Chapter 11 Cases, and (iii) legal and financial advisors to the Ad Hoc Committee, the members of which constitute DIP Lenders, are hereby approved in full.  For the avoidance of doubt, the fees set forth in any engagement letter executed by any of the Debtors prior to the Petition Date with any of the legal

- 64 -

or financial advisors to the Ad Hoc Committee shall be deemed reasonable for all purposes under this Order, including, without limitation, under paragraph 12(h) hereof and this paragraph 35.

36.    <u>Indemnification</u>.  To the extent provided by the DIP Credit Agreement, the Debtors shall, jointly and severally, indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in the DIP Credit Agreement or the other DIP Documents.

37.    <u>Proofs of Claim</u>.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition IPCo New Money Notes Indenture Trustee and the Prepetition IPCo Exchange Notes Indenture Trustee is hereby authorized and entitled, in its sole discretion, to file a single consolidated master proof of claim on behalf of the Prepetition ABL Secured Parties, the Prepetition Term Secured Parties, the Prepetition IPCo New Money Notes Secured Parties, and the Prepetition IPCo Exchange Notes Secured Parties, as applicable, in each of the Chapter 11 Cases or Successor Cases, and such master proof of claim shall constitute the filing of a proof of claim.  Any proof of claim filed by Prepetition

- 65 -

ABL Agent, the Prepetition Term Agent, the Prepetition IPCo New Money Notes Indenture Trustee, or the Prepetition IPCo Exchange Notes Indenture Trustee shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Secured Parties, the Prepetition Term Secured Parties, the Prepetition IPCo New Money Notes Secured Parties, and the Prepetition IPCo Exchange Notes Secured Parties, respectively. The provisions of this paragraph 37 and each master proof of claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases or to assert that the amount of its claim is different from that set forth on the applicable master proof of claim. The master proofs of claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Secured Party.

38.    <u>Professional Fees Account.</u> The Debtors shall (i) contemporaneously with the initial funding of the Loans, transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Budget and (ii) thereafter on a weekly basis transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the total budgeted weekly Professional Fees for the next unfunded week set forth in the Budget, in each case into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "**Professional Fees Account**").

- 66 -

39.     The Debtors shall cause funds held in the Professional Fees Account to be used to pay Professional Fees solely as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court or otherwise; provided that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Professional Fees Account shall revert to the Debtors for use in accordance with the DIP Credit Agreement and this Final Order; provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.

40.     The Professional Fees Account, and all funds held in the Professional Fees Account, shall be held in trust exclusively for the benefit the Professional Persons (as defined below), including with respect to obligations arising out of the Carve-Out.  Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the DIP Lenders or to any other party pursuant to this Final Order (whether on account of adequate protection, Diminution in Value, or otherwise), shall not constitute Collateral, Cash Collateral, or DIP Collateral, and shall not be or be deemed to be property of any Debtor's estate; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account, after all Professional Fees have been indefeasibly paid in full in cash (regardless of when such Professional Fees are allowed by the Court.

41.     Carve-Out.

(a)     As used in this Final Order, the term "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the

- 67 -

United States Trustee under section 4001(c)(1)(B) 1930(a) of title 28 of the United States Code plus interest at the statutory rate and expenses of members of the Committee allowable under section 503(b)(3)(F) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (including transaction fees or success fees) incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Committee (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**" and such fees and expenses of the Professional Persons, the "**Professional Fees**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below) including success or transaction fees earned by or payable to a Professional Person, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are provided for in the Budget; and (iv) allowed Professional Fees incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, whether by interim order, procedural order or otherwise in an aggregate amount not to exceed $6,000,000 with respect to Professional Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").

(b)      For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall

- 68 -

mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at

the direction of the Required Lenders (or, following the satisfaction in full of all DIP Obligations,

the Prepetition Agents and Prepetition IPCo Trustees, upon appropriate direction in accordance

with the applicable underlying documents) to the Debtors, their lead restructuring counsel (Weil,

Gotshal & Manges LLP), counsel to the Ad Hoc Committee (Milbank LLP), the U.S. Trustee, and

lead counsel to the Committee, which notice may be delivered following the occurrence and during

the continuation of an Event of Default and acceleration of the obligations under the DIP Facility

(or, following a DIP Repayment, any occurrence that would constitute an Event of Default

hereunder) or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), stating

that the Post-Carve-Out Trigger Notice Cap has been invoked; provided that after the occurrence

of an ABL Cash Collateral Termination Event the Prepetition ABL Agent may deliver a Carve-

Out Trigger Notice in accordance with the notice requirements and upon the delivery of such notice

and to the extent that the Carve-Out Reserve Account (as defined below) has been fully funded in

the amounts required to be funded as of the date of the Carve-Out-Trigger Notice, the Prepetition

ABL Liens and Prepetition Adequate Protection Liens, in each case with respect to ABL Priority

Collateral including all proceeds thereof shall not be subject to the Carve-Out on account of

obligations benefitting from the Carve-Out, that arise after delivery of such notice.

(c)        On the day on which a Carve-Out Trigger Notice is received by the

Loan Parties, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all

cash on hand (including cash contained in the DIP Funding Account (as defined in the DIP Credit

Agreement)) to fund a cash reserve in an amount equal to all obligations benefitting from the

- 69 -

Carve-Out, to the extent not previously funded into the Professional Fees Account.  The Debtors will deposit and hold such amounts in a segregated account outside the control of any DIP Lender or any Prepetition Secured Party exclusively to pay such obligations (the "**Carve-Out Reserve Account**"), provided that the Carve-Out Reserve Account may be the Professional Fees Account.

(d)      For the avoidance of doubt, to the extent that Professional Fees and expenses of the Professional Persons have been incurred by the Debtors at any time before or on the first business day after delivery by the DIP Agent (or, following a DIP Repayment, the Prepetition Agents and Prepetition IPCo Indenture Trustees) of a Carve-Out Trigger Notice but have not yet been allowed by the Bankruptcy Court on the date that the DIP Agent (or, following a DIP Repayment, the Prepetition Agents and Prepetition IPCo Indenture Trustees) delivers a Carve-Out Trigger Notice, such Professional Fees and expenses of the Professional Persons shall benefit in all respects from the Carve-Out, regardless of whether such fees are allowed by the Bankruptcy Court pursuant to an interim order, final order, or otherwise entered before or after delivery of the Carve-Out Trigger Notice.

(e)      Following delivery of a Carve-Out Trigger Notice, the DIP Agent shall deposit into the Carve-Out Reserve Account any and all cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Reserve Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out regardless of whether such obligations have been allowed by the Bankruptcy Court (pursuant to an interim order, final order, or otherwise) as of such date.  Notwithstanding anything to the contrary herein or in the DIP Documents, following delivery of a Carve-Out Trigger Notice,

- 70 -

the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out. Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Carve-Out Reserve Account shall not constitute DIP Loans, (ii) the failure of the Carve-Out Reserve Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Carve-Out, the Professional Fees Account or the Budget Requirement, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees that may be allowed by the Bankruptcy Court and payable by the Debtors and their estates at any time (whether by interim order, final order, or otherwise).

(f)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims with respect to the Debtors' estates, including all liens securing and all claims on account of the DIP Facility, any adequate protection liens, and superpriority claims (whether granted on account of the DIP Facility, as adequate protection, or otherwise), and any and all other liens and claims. For the avoidance of doubt, if a DIP Repayment occurs or the DIP Facility is otherwise terminated, the DIP Order shall remain in full force and effect, including with respect to the Debtors' use of Cash Collateral, the Carve-Out, the Carve-Out Reserve Account, and all related provisions in respect thereof, and the Prepetition Agents and Prepetition IPCo Indenture Trustees shall assume any rights and obligations that the DIP Agent previously had with respect to the Carve-Out and the Carve-Out Reserve Account.

- 71 -

42.    <u>No Direct Responsibility for Fees or Disbursements</u>.  Subject to any of the DIP Agent's, DIP Lenders', or Prepetition Secured Parties' obligations with respect to the Carve-Out, none of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be (i) responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases, or (ii) obligated in any way to compensate, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

43.    <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, in each case, including Cash Collateral may be used in connection with (a) except to contest the occurrence of an Event of Default (hereunder or under the DIP Credit Agreement) or an ABL Cash Collateral Termination Event, or to seek the non-consensual use of Cash Collateral following the commencement of the Remedies Notice Period, preventing, hindering, or delaying any of the DIP Agent's or the DIP Lenders' realization upon any of the DIP Collateral or enforcement of any of their respective rights thereto in accordance with paragraph 31; (b) for any purpose that is prohibited under this Final Order, the DIP Documents, or the Bankruptcy Code; (c) to prosecute or finance in any way any adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, in their respective capacities as such, or their respective rights and remedies under DIP Documents, this Final Order, or the Prepetition

- 72 -

Documents, including, without limitation, any actions under chapter 5 of the Bankruptcy Code,

section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code

or applicable state law equivalents; (d) for the payment of fees, expenses, interest, or principal

under the Prepetition Documents (in each case, other than payments on account of the Adequate

Protection Obligations or required by this Final Order); (e) unless the Exit Conversion occurs, to

make any distribution under a plan of reorganization confirmed in the Chapter 11 Cases that does

not provide for the indefeasible payment of the DIP Loans in full and in cash; (f) except as

permitted by the Budget Requirement, to make any payment in settlement of any claim, action, or

proceeding in excess of $500,000 in the aggregate without the prior written consent of the DIP

Agent, acting at the direction of the Required Lenders; (g) [reserved]; (h) incurring Indebtedness

(as defined in the DIP Credit Agreement), except to the extent permitted under the DIP Credit

Agreement or this Final Order; (i) seeking to amend or modify any of the rights granted to the DIP

Agent, the DIP Lenders, or the Prepetition Secured Parties under this Final Order, the DIP

Documents, or the Prepetition Documents; (j) seeking to subordinate, recharacterize, disallow, or

avoid the DIP Obligations or the Prepetition Obligations, other than seeking a determination (i)

that payments provided on account of adequate protection should be recharacterized under section

506(b) of the Bankruptcy Code as payments on account of the secured portion of the Prepetition

Secured Facilities and (ii) as to the value of collateral securing the Prepetition Secured Facilities

as of the Petition Date; (k) reserved; or (l) to pay allowed fees and expenses, in an amount in excess

of $250,000 in the aggregate (the "**Investigation Budget Amount**"), incurred by Committee

Professionals, in investigating (but not prosecuting or challenging) the validity, enforceability,

- 73 -

perfection, priority, or extent of the Prepetition Liens (the "**Investigation**") before the Challenge

Deadline (as defined below); <u>provided</u> <u>that</u> the foregoing shall not limit or be deemed to limit in

any way the Debtors' authority to (x) seek a determination (i) that payments provided on account

of adequate protection should be recharacterized under section 506(b) of the Bankruptcy Code as

payments on account of the secured portion of the Prepetition Secured Facilities and (ii) as to the

value of collateral securing the Prepetition Secured Facilities as of the Petition Date; and (y) to

satisfy obligations benefitting from the Carve Out, in each case incurred by Professional Persons

retained by the Debtors.  Except with respect to the Committee's Investigation Budget Amount,

any Professional Fees incurred by or on behalf of Committee Professionals in connection with any

of the activities described in this paragraph 43 shall not constitute an allowed administrative

expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code..

44.     <u>Effect of Stipulations on Third Parties</u>.

(a)     *Generally*.  The Debtors' Stipulations set forth in paragraph F of this

Final Order shall be binding on the Debtors and any successor thereto (including, without

limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) upon

entry of this Final Order.  The Stipulations shall also be binding on all creditors and all other parties

in interest and all of their respective successors and assigns, including, without limitation, the

Committee, unless, and solely to the extent that, a party in interest with standing and requisite

authority (i) has timely commenced an appropriate proceeding or contested matter required under

the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to

Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph

- 74 -

44) (A) objecting to or challenging the amount, validity, or enforceability of the Prepetition

Obligations or the perfection or priority of the Prepetition Liens or (B) otherwise asserting or

prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or

any other claims, counterclaims or causes of action, objections, contests or defenses against the

Prepetition Secured Parties or any of such parties' affiliates, representatives, attorneys or advisors

in connection with matters related to the Prepetition Documents, the Prepetition Secured Debt, and

the Prepetition Collateral (each such proceeding or contested matter, a "**Challenge**") by no later

than (a) for the Committee, August 3, 2020 or (b) for all other parties in interest (excluding the

Debtors), seventy-five (75) days following the entry of the Interim Order (the "**Challenge**

**Deadline**"), as such deadline may be extended in writing from time to time in the sole discretion

of the Prepetition ABL Agent (with respect to the Prepetition ABL Liens and Prepetition ABL

Obligations), the Prepetition Term Agent, acting at the direction of the Required Term Lenders

(with respect to the Prepetition Term Liens and Prepetition Term Obligations), and the Prepetition

IPCo Indenture Trustees (with respect to the Prepetition IPCo Liens and Prepetition IPCo Notes

Obligations) or by this Court for good cause shown pursuant to an application filed by a party in

interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in

favor of the plaintiff or movant in any such timely and properly commenced Challenge and any

such judgment has become a final judgment that is not subject to any further review or appeal, and

then only to the extent of any such final judgment.

        (b)    *Binding Effect*.  To the extent no Challenge is timely and properly

commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final

- 75 -

and non-appealable judgment or order that is inconsistent with any of the Debtors' Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Debtors' Stipulations shall, pursuant to this Final Order, become irrevocably binding on any person, entity, or party in interest in the Chapter 11 Cases, as well as their successors and assigns, and in any Successor Case for all purposes and shall not be subject to further challenge or objection. Notwithstanding anything to the contrary herein, if any Challenge is properly and timely commenced by a party in interest, the Debtors' Stipulations shall nonetheless remain binding on all other parties in interest. To the extent any Challenge is timely and properly commenced, the Prepetition Secured Parties shall be entitled to, as adequate protection, payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves against any Challenge; provided that, any such fees shall be subject to recharacterization in the event a Challenge is granted pursuant to a final order not subject to appeal.

(c)    <u>Delaware LLCs</u>. Solely with respect to (i) J. Crew Brand Holdings, LLC, (ii) J. Crew Brand Intermediate, LLC, (iii) J. Crew Brand, LLC, (iv) J. Crew Domestic Brand, LLC, and (v) J. Crew International Brand, LLC, the Debtors' Stipulations and releases contained in paragraph F hereof will not be binding on a trustee appointed for such Debtors if, upon a motion filed by the Committee (and no other party) prior to expiration of the Challenge Period (a "**Committee Motion**") that specifically identifies the Debtors' Stipulations and releases opposed by the Committee, the Court (i) converts the chapter 11 case in question to chapter 7 of the Bankruptcy Code, or (ii) appoints a chapter 11 trustee to administer such case; <u>provided that</u> the

- 76 -

Challenge Period shall be tolled with respect to such Debtors' Stipulations and releases specifically identified in the Committee Motion, while it remains pending with respect to such Debtors' Stipulations or Releases; <u>provided further that</u>, the Debtors' Stipulations and releases will be reserved for a Court-appointed trustee solely to the extent they are specifically identified in the Committee Motion, if any, and are approved by the Court in any order appointing the chapter 7 or 11 trustee.

45.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

46.    <u>Section 506(c) Claims</u>.  Except to the extent of the Carve-Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Secured Parties; Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition IPCo Indenture Trustees, the Prepetition IPCo Noteholders, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders), the Prepetition Term Agent (acting at the direction of the Required Lenders), or the Prepetition IPCo Indenture Trustees, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

47.    <u>No Marshaling/Applications of Proceeds</u>.  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling"

- 77 -

or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral; provided, that the Prepetition ABL Agent, acting at the direction of the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement), shall first realize on the ABL Adequate Protection Liens and ABL 507(b) Claims from DIP Collateral that constitutes ABL Priority Collateral (now owned or hereafter acquired) before realizing on such liens and claims from DIP Collateral of any other Debtor; *provided*, *further*, that the Prepetition Term Agent, acting at the direction of the Required Term Lenders, shall first realize on the Term Adequate Protection Liens and Term 507(b) Claims from DIP Collateral of the Term Debtors before realizing on such liens and claims from DIP Collateral of any other Debtor; *provided*, *further*, *still* that the Prepetition IPCo Trustees, acting at the direction of Holders (as defined under the applicable Prepetition IPCo Notes Indenture) of a majority in principal amount of the total Prepetition IPCo Notes then outstanding under the applicable Prepetition IPCo Notes Indenture, shall first realize on the IPCo Adequate Protection Liens and IPCo 507(b) Claims from DIP Collateral of the IPCo Debtors before realizing on such liens and claims from DIP Collateral of any other Debtor. Notwithstanding anything herein or in the DIP Documents to the contrary, the Prepetition Secured Parties shall use commercially reasonable efforts to satisfy their applicable Adequate Protection Liens and 507(b) Claims, if any, from proceeds of the DIP Collateral other than Avoidance Action Proceeds before satisfying such liens and claims from Avoidance Action Proceeds.

48.    Section 552(b).  The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them.

- 78 -

49.     <u>Limits on Lender Liability</u>.  Nothing in this Final Order, any of the DIP

Documents, the Prepetition Documents, or any other documents related thereto, shall in any way

be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP

Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any activities

by the Debtors in the operation of their businesses or in connection with the administration of these

Chapter 11 Cases or any Successor Cases.  The DIP Agent, the DIP Lenders, and the Prepetition

Secured Parties shall not, solely by reason of having made loans under the DIP Facility or

authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to

be acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtors (as such terms, or any similar terms, are used in the United States

Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et

seq.*, as amended, or any similar federal or state statute).  Nothing in this Final Order or the DIP

Documents, shall in any way be construed or interpreted to impose or allow the imposition upon

the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any

claims arising from the prepetition or postpetition activities of any of the Debtors.

50.     <u>Insurance Proceeds and Policies</u>.  As of the date of the Interim Order, to the

fullest extent provided by applicable law, the DIP Agent (for itself and for the benefit of the DIP

Secured Parties), the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL

Lenders), the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Secured

Parties), and the Prepetition IPCo Indenture Trustees (for themselves and for the benefit of the

applicable Prepetition IPCo Noteholders), shall be, and shall be deemed to be, without any further

- 79 -

action or notice, named as additional insured and loss payee on each insurance policy maintained

by the Debtors that in any way relates to the DIP Collateral.

51.    <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed

to constitute a substantive consolidation of any of the Debtors' estates, it being understood,

however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all

DIP Obligations in accordance with the terms hereof and of the DIP Documents.

52.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the

entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly, subject to the Transaction Support Agreement, the DIP Documents, the Prepetition

Documents and the Intercreditor Agreements: (a) the DIP Agent's, DIP Lenders', and Prepetition

Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the

DIP Agent, DIP Lenders, and/or the Prepetition Secured Parties under the Bankruptcy Code or

applicable non-bankruptcy law, including, without limitation, the right to (i) request modification

of the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any

of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases

under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or

(iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan

or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of

any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.  Notwithstanding

anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not

constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party in

- 80 -

interest's right to oppose any of the relief requested in accordance with the immediately preceding

sentence except as expressly set forth in this Final Order.  Entry of this Final Order is without

prejudice to any and all rights of any party in interest with respect to any other position which any

party in interest deems appropriate to raise in these Chapter 11 Cases or any Successor Cases.  For

all adequate protection and stay relief purposes throughout the Chapter 11 Cases, the Prepetition

Secured Parties shall be deemed to have requested relief from the automatic stay and adequate

protection as of the Petition Date.

53.     No Waiver by Failure to Seek Relief.  The failure of the DIP Agent, the DIP

Lenders, or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and

remedies under this Final Order, the DIP Documents, the Prepetition Documents, or applicable

law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or

otherwise of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

54.     Binding Effect of Final Order.  Immediately upon entry on the docket of

this Court, the terms and provisions of this Final Order shall become binding upon the Debtors,

the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, all other creditors of any of the

Debtors, the Committee, and all other parties in interest and their respective successors and assigns,

including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any

Successor Cases, or upon dismissal of any Case or Successor Case.

55.     No Modification of Final Order.  A motion or pleading filed by any of the

Debtors to modify, stay, vacate, amend, or reverse this Order shall be an Event of Default: (a) as

to the DIP Obligations (other than contingent obligations with respect to then unasserted claims),

- 81 -

unless and until (i) they have been indefeasibly paid in full in cash (such payment being without

prejudice to any terms or provisions contained in the DIP Documents which survive such discharge

by their terms) or otherwise deemed satisfied or waived by the DIP Agent (acting at the direction

of the Required Lenders), and all commitments to extend credit under the DIP Facility have been

terminated or (ii) the DIP Agent (acting at the direction of the Required Lenders) consents to such

pleading or motion; or (b) as to the Prepetition Obligations (other than contingent obligations with

respect to then unasserted claims), unless and until (i) they have been indefeasibly paid in full in

cash or otherwise deemed satisfied or waived by, as applicable, the Prepetition ABL Agent, the

Prepetition Term Agent (acting at the direction of the Required Term Lenders), and/or the

Prepetition IPCo Indenture Trustees, or (ii) the Prepetition ABL Agent, the Prepetition Term Agent

(acting at the direction of the Required Term Lenders), or the Prepetition IPCo Indenture Trustees,

as applicable, consent to such motion or pleading.

56.     Continuing Effect of Intercreditor Agreements.   The Debtors, the DIP

Agent, the DIP Lenders, and the Prepetition Secured Parties each shall be bound by, and in all

respects of the DIP Facility shall be governed by, and be subject to all the terms, provisions, and

restrictions of the Intercreditor Agreements.

57.     Final Order Controls.  In the event of any inconsistency between the terms

and conditions of the DIP Documents and this Final Order, the provisions of this Final Order shall

control.

58.     Discharge.   The DIP Obligations and, except as otherwise provided in

Paragraphs 12(b), 12(e), and 12(g) hereof, the obligations of the Debtors with respect to the

- 82 -

adequate protection provided herein shall not be discharged by the entry of an order confirming

any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of

section 1141(d) of the Bankruptcy Code, unless (x) such obligations have been indefeasibly paid

in full in cash (other than contingent indemnification obligations for which no claim has been

asserted), on or before the effective date of such plan of reorganization, (y) each of the DIP Agent,

the DIP Lenders, the Prepetition Agents, and the Prepetition IPCo Indenture Trustees, as

applicable, has otherwise agreed in writing or as otherwise provided herein or (z) each of DIP

Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition IPCo Indenture Trustees have

accepted their treatment in a plan of reorganization or liquidation as provided herein; *provided*,

that the DIP Loans shall automatically and mandatorily convert into the Exit Term Loans upon the

occurrence of the Exit Conversion (as defined in the DIP Credit Agreement, the "**Exit

Conversion**") in accordance with the DIP Credit Agreement.  It shall be an Event of Default if the

Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the

Debtors' assets, or order confirming such plan or approving such sale, that is not (1) conditioned

upon the indefeasible payment in full in cash of the DIP Obligations (other than contingent

indemnification obligations for which no claim has been asserted), and the payment of the Debtors'

obligations with respect to the adequate protection provided for herein, in full in cash within a

commercially reasonable period of time (and in no event later than the effective date of such plan

of reorganization or sale) or (2) on such other terms as are set forth in the Transaction Support

Agreement (a "**Prohibited Plan or Sale**"), without the written consent of each of the DIP Agent

(acting at the direction of the Required Lenders), DIP Lenders, the Prepetition Term Agent (acting

- 83 -

at the direction of the Required Term Lenders), the Prepetition ABL Agents, and Prepetition IPCo

Indenture Trustees, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of

a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of

Default hereunder and under the DIP Documents.

59.    <u>Survival</u>.  The provisions of this Final Order, including with respect to the

priority of the Carve Out, and any actions taken pursuant hereto shall survive entry of any order

which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases;

(b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this

Court abstains from hearing any of the Chapter 11 Cases or any Successor Cases.  The terms and

provisions of this Final Order shall continue in the Chapter 11 Cases, in any Successor Cases, or

following dismissal of the Chapter 11 Cases or any Successor Cases notwithstanding the entry of

any orders described in clauses (a)-(d) above, and all claims, liens, security interests, and other

protections granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties

pursuant to this Final Order and/or the DIP Documents shall maintain their validity and priority as

provided by this Final Order until: (i) in respect of the DIP Facility, all the DIP Obligations have

been indefeasibly paid in full in cash (other than contingent indemnification obligations for which

no claim has been asserted) or the Exit Conversion shall have occurred; and (ii) in respect of the

Prepetition ABL Facility, all of the Prepetition ABL Obligations have been indefeasibly paid in

full in cash (other than contingent indemnification obligations for which no claim has been

asserted); (iii) in respect of the Prepetition Term Facility, all of the Prepetition Term Obligations

- 84 -

have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); (iv) in respect of the Prepetition IPCo New Money Notes, all of the Prepetition IPCo New Money Notes Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); and (v) in respect of the Prepetition IPCo Exchange Notes, all of the Prepetition IPCo Exchange Notes Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted).  The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

60.    <u>Payments Held in Trust</u>.  Except as expressly permitted in this Final Order or the DIP Credit Agreement, and subject to the Carve-Out in all respects, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to all DIP Obligations in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Credit Agreement and this Final Order.

61.    <u>Headings</u>. Section headings used herein are for convenience only and are

- 85 -

not to affect the construction of or to be taken into consideration in interpreting this Final Order.

62.   <u>Retention of Jurisdiction</u>.   The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the DIP Facility and/or this Final Order.

63.   <u>DIP Election Procedures</u>.   The DIP Election Procedures are hereby approved.  The DIP Agent may, in connection with allocations of the commitments under the DIP Facility or any other allocations contemplated to be made pursuant to, and in accordance with, the DIP Credit Agreement, conclusively rely on, and shall have no obligation to determine, investigate or confirm, and shall incur no liability whatsoever with respect to, any ownership information with respect to the Prepetition Term Obligations and Prepetition IPCo Notes Obligations as set forth on any election joinder (the form of which is attached as Exhibit M to the DIP Credit Agreement) submitted by an Electing DIP Term Lender (as defined in the DIP Credit Agreement). The DIP Agent may conclusively rely on any allocations of the commitments under the DIP Facility as provided to the DIP Agent by the advisors to the Debtors and/or Ad Hoc Committee without incurring liability therefor.

64.   <u>Exit Conversion</u>. It is understood and agreed that any provision in this Final Order requiring the indefeasible payment of the DIP Obligations in full in cash shall be deemed to be satisfied to the extent any such DIP Obligation is converted into an Exit Term Loan (as defined in the DIP Documents) pursuant to the Exit Conversion.

65.   During the Support Period (as defined in the Transaction Support Agreement), J. Crew Domestic, LLC agrees to forbear from collection or enforcement of the

- 86 -

"License Fees" as defined in and contemplated under the *Amended and Restated Intellectual Property License Agreement* and *2017 Intellectual Property License Agreement*, each dated July 13, 2017, provided that the accrued and unpaid License Fees will remain outstanding without interest, penalties, or other charges through the earlier of the Support Period, payment in full, or consummation of the Plan (as defined in the Transaction Support Agreement).

66.    Notwithstanding anything to the contrary herein, the rights of the DIP Agent and DIP Lenders to use or occupy any premises subject to a lease of non-residential real property shall be limited to (i) any such rights agreed to in writing by the applicable landlord, (ii) any rights of the DIP Agent or DIP Lenders that are valid and enforceable under applicable non-bankruptcy law, if any, and (iii) such rights as may be granted by this Court upon appropriate notice to the applicable landlord.

67.    Nothing in this Final Order shall affect the priority of ad valorem tax liens existing as of the Petition Date, if any, and which may arise during the pendency of these Chapter 11 Cases.  The Debtors shall provide notice to applicable ad valorem taxing authorities of sales out of the ordinary course of business during the course of these Chapter 11 Cases.

68.    <u>Comenity</u>.

(a)    Comenity Bank's, f/k/a World Financial Network National Bank, ("**Comenity**") rights with respect to the Amended and Restated Private Label Credit Card Program Agreement between Comenity and J. Crew Operating Corp., dated as of May 11, 2011, as amended from time to time (the "**Program Agreement**"): (i) shall not be affected, modified, waived, primed, subordinated, or impaired in any way by this Final Order, (ii) shall not be made subject

- 87 -

to, subordinated by, or pari passu with any new (x) secured financing, security interests, or liens, and/or (y) super priority, administrative, or adequate protection claims.

(b)      The Debtors and Comenity shall remain bound by the terms of the Program Agreement, including the confidentiality provisions therein; provided that nothing herein shall (i) expand Comenity's rights under the Program Agreement or the Bankruptcy Code, or (ii) be deemed to constitute an assumption of the Program Agreement or a waiver or modification of the Debtors' rights to assume, assume and assign, or reject the Program Agreement pursuant to section 365 of title 11 of the Bankruptcy Code in these Chapter 11 Cases. The Debtors hereby reserve all rights available to them in their Chapter 11 Cases.

(c)      All of Comenity's rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreement, including, but not limited to, those set forth in in this paragraph 68, are expressly preserved and reserved.

Dated: _____, 2020
     Richmond, Virginia

                                                  _____
                                                 UNITED STATES BANKRUPTCY JUDGE

- 88 -

## Schedule 1

**DIP Credit Agreement**

## **Schedule 2**

**Current DIP Budget**

SWDOCIDLOCATION

## J. Crew

**2nd DIP Budget**

($ in thousands)

| | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 5/31 6/6 | 6/7 6/13 | 6/14 6/20 | 6/21 6/27 | 6/28 7/4 | 7/5 7/11 | 7/12 7/18 | 7/19 7/25 | 7/26 8/1 | 8/2 8/8 | 8/9 8/15 | 8/16 8/22 | 8/23 8/29 |
| | | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| **Operating Cash Flow** | Total Receipts | 19,690 | 18,364 | 18,364 | 18,364 | 18,364 | 20,860 | 20,860 | 20,860 | 20,860 | 42,026 | 34,752 | 34,752 | 34,935 |
| | Payroll | 4,142 | 10,348 | 3,569 | 10,348 | 3,438 | 10,149 | 3,342 | 9,360 | 3,227 | 10,315 | 3,235 | 10,190 | 3,506 |
| | Operating Expenses | 13,266 | 51,229 | 41,353 | 22,297 | 31,374 | 87,710 | 36,004 | 25,145 | 25,358 | 38,911 | 26,737 | 31,607 | 30,308 |
| | **Total Operating Disbursements** | 17,409 | 61,577 | 44,922 | 32,645 | 34,812 | 97,859 | 39,346 | 34,505 | 28,585 | 49,226 | 29,972 | 41,797 | 33,814 |
| | **OPERATING CASH FLOW** | 2,281 | (43,213) | (26,558) | (14,281) | (16,448) | (76,999) | (18,486) | (13,645) | (7,725) | (7,200) | 4,780 | (7,045) | 1,121 |
| **Other Disbursements** | Professional Fees | - | - | 100 | - | 100 | 125 | - | 100 | 100 | - | 125 | 100 | - |
| | Restructuring Charges | 23,454 | 4,954 | 4,954 | 4,954 | - | - | - | (18,500) | - | - | - | - | - |
| | Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Professional Fees Account | 1,581 | 1,581 | 1,581 | 1,581 | 1,481 | 1,481 | 1,481 | 1,481 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 |
| | **Total** | 25,035 | 6,535 | 6,635 | 6,535 | 1,581 | 1,606 | 1,481 | (16,919) | 1,325 | 1,225 | 1,350 | 1,325 | 1,225 |
| **Financing Disbursements** | ABL Interest | - | - | - | - | 1,335 | - | - | - | 1,073 | - | - | - | - |
| | Adequate Protection Payments | - | 160 | 2,570 | - | - | 160 | - | 2,120 | - | - | 160 | 2,120 | - |
| | DIP TL Proceeds | - | - | - | - | - | (145,000) | - | - | - | - | - | - | - |
| | DIP TL Interest | - | - | - | - | 853 | - | - | - | 2,040 | - | - | - | - |
| | **Total** | - | 160 | 2,570 | - | 2,188 | (144,840) | - | 2,120 | 3,113 | - | 160 | 2,120 | - |
| | **NET CASH FLOW** | (22,754) | (49,908) | (35,763) | (20,816) | (20,217) | 66,235 | (19,967) | 1,154 | (12,162) | (8,425) | 3,270 | (10,490) | (104) |
| **Liquidity** | **ENDING LIQUIDITY** | 210,982 | 161,074 | 125,311 | 104,495 | 84,278 | 150,513 | 130,546 | 131,699 | 119,537 | 111,112 | 114,382 | 103,892 | 103,788 |
| | **ADDITIONAL DIP TL FUNDS AVAILABALE** | 290,000 | 290,000 | 290,000 | 290,000 | 290,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 | 145,000 |

## **Exhibit B**

Redline to Interim Order

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

```
--------------------------------------------------------- x
                                    :
In re                               :       Chapter 11
                                    :
CHINOS HOLDINGS, INC., et al.,      :       Case No. 20–32181 (KLP)
                                    :
                 Debtors.¹          :       (Jointly Administration ered
                                    :        Requested)
                                    :
--------------------------------------------------------- x
```

~~**INTERIM**~~**FINAL** ORDER (I) AUTHORIZING THE DEBTORS TO
OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO
USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,
(V) MODIFYING AUTOMATIC STAY, ~~(VI) SCHEDULING A FINAL HEARING,~~ AND
(VII) GRANTING RELATED RELIEF

Upon the motion, dated May 4, 2020 (the "**Motion**")² of Chinos Holdings, Inc. ("**Ultimate**

**Holdings**") and its debtor affiliates, as debtors and debtors in possession (collectively, the

"**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"),

seeking entry of an order (this "~~**Interim**~~**Final** **Order**") pursuant to sections 105, 361, 362, 363,

364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, and 507 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6003, 6004, and 9014 of

---

[1]    The Debtors  in these chapter 11 cases, along with the last four digits of each Debtor's   federal tax
identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc.
(3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc.
(4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc.
(6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand
Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand
Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The
Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

44670.00001
-44670.0000144670.00001

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001(a)-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Rules**") *inter alia*:

(i) authorizing (x) the Borrower (as defined below) to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $400,000,000 (the "**DIP Facility**" and, all amounts extended under the DIP Facility, the "**DIP Loans**"), pursuant to the terms and conditions of that certain *Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits and schedules attached thereto and the Loan Documents (as defined in the DIP Credit Agreement) the "**DIP Documents**"), by and among Chinos Intermediate Holdings A, Inc., a Delaware corporation (in such capacity, the "**Borrower**"), Ultimate Holdings, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Secured Parties (as defined below) (in such capacities, the "**DIP Agent**"), and the lenders party thereto from time to time (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), ~~substantially in the form~~ attached hereto as **Schedule 1** and (y) each of the Debtors other than the Borrower (collectively in such capacities, the "**DIP Guarantors**" and together with the Borrower, the "**DIP Obligors**"), to guaranty the Borrower's (and each other DIP Guarantor's) obligations under the DIP Facility and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as defined in the DIP Credit Agreement, the "**DIP**

- 2 -

**Obligations**”).

(ii)        authorizing the Debtors to execute and enter into the DIP Documents and to perform such other acts as may be necessary or appropriate in connection with the same;

(iii)        authorizing the Borrower to borrow up to $~~11~~400,000,000 of term loans under the DIP Facility (the “**~~Interim~~Final** **Loan~~s~~**”) upon entry of this ~~Interim Order to avoid immediate and irreparable harm to the Debtors’ estates~~Final Order on a final basis;

(iv)        granting the DIP Obligations the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases, which, for the avoidance of doubt, shall be subject to the Carve-Out in all respects;

(v)        granting to the DIP Agent, for the benefit of the DIP Secured Parties, to secure the DIP Obligations, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting “cash collateral” as defined in section 363(a) of the Bankruptcy Code (the “**Cash Collateral**”), which liens shall have the priorities set forth herein and shall be subject to the Carve-Out (as defined below); provided that in no event shall the “Cash Collateral” include Excluded Property (as defined in the DIP Documents) or funds held in the Professional Fees Account (other than the Debtors’ reversionary interest, if any, therein, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash);

(vi)        authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become due and

- 3 -

payable;

(vii)     authorizing the Debtors to use the Prepetition Collateral (as defined below) of the Prepetition Secured Parties and provide adequate protection to the Prepetition Secured Parties (as defined below) solely to the extent of the diminution in value, if any, of their respective interests in the Prepetition Collateral as of the Petition Date, including, as applicable, with respect to the Cash Collateral ("**Diminution in Value**"), resulting from (a) the imposition of the automatic stay, (b) the Debtors' postpetition use, sale, or lease of the Prepetition Collateral, including Cash Collateral, (c) the priming of the Prepetition ABL Secured Parties' liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below) by the Carve-Out, or (d) the priming (including by the Carve-Out (as defined below)) of (i) the Prepetition ABL Secured Parties' liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below), the "**Term Priority Collateral**"), (ii) the Prepetition Term Secured Parties' (as defined below) liens on the Prepetition Term Collateral (as defined below), and (iii) the Prepetition IPCo Secured Parties' (as defined below) liens on the Prepetition IPCo Collateral (as defined below);

(viii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents; and

(ix)     scheduling a final hearing (the "**Final Hearing**") within thirty-five (35) days of the Petition Date to consider the relief requested in the Motion on a final basis and approving

- 4 -

the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the Cowan Declaration, the Zanna Declaration, and the First Day Declaration (collectively, the "**Declarations**"), and the evidence submitted and arguments made at the interim hearing held on May 5, 2020 (the "**Interim** ; and the Court having entered an order approving the relief requested in the Motion on an interim basis on May 5, 2020 [Docket No. 84] (the "**Interim Order**"); and the Court having considered the Motion, the exhibits attached thereto, the Declarations, and the evidence submitted and arguments made at the final hearing held on June 4, 2020 (the "**Final Hearing**"); and notice of the InterimFinal Hearing having been given in accordance with the Interim Order, Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the InterimFinal Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise, as granted hereby, is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents as granted hereby is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

- 5 -

**BASED UPON THE RECORD ESTABLISHED AT THE ~~INTERIM~~FINAL HEARING,
THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS
OF LAW:**[3]

A. **Petition Date**.  On May 4, 2020 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

B. **Debtors in Possession**.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee~~,~~ or examiner~~, or statutory committee~~ has been appointed in these Chapter 11 Cases.

C. **Jurisdiction and Venue**.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334, and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  This proceeding is core pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**.  ~~As of the date hereof~~On May 13, 2020, the United States Trustee for the Eastern District of Virginia~~, Richmond Division (the "**U.S. Trustee**") has not yet~~ appointed an official committee of unsecured creditors in the~~se~~ Chapter 11 Cases (~~a~~the "**Committee**") pursuant to section 1102 of the Bankruptcy Code [Docket No. 188].

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

- 6 -

E. **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the

~~Interim~~Final Hearing has been provided in accordance with the Interim Order, the Bankruptcy

Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion

with respect to the relief requested at the ~~Interim~~Final Hearing or the entry of this ~~Interim~~Final

Order shall be required.

F. **Debtors' Stipulations**.  Subject to the rights of parties in interest that are set

forth and reserved in paragraph 44 herein (including with respect to a Challenge that may

brought through or on behalf of a Debtors' estate upon obtaining proper standing and complying

with the terms of paragraph 44 herein), and subject to the terms hereof and the rights reserved by

the Debtors at paragraph F(v) hereof, the Debtors admit, stipulate, acknowledge, and agree as

follows (paragraph F herein shall be referred to as the "**Debtors' Stipulations**"):

(i)    *Prepetition ABL Facility*.

(a)    Pursuant to that certain ABL Credit Agreement, dated as of March 7, 2011 (as amended by that certain First Amendment to Credit Agreement, dated as of October 11, 2012, that certain Second Amendment to Credit Agreement, dated as of March 5, 2014, that certain Third Amendment to Credit Agreement, dated as of December 10, 2014, that certain Fourth Amendment to Credit Agreement (Incremental Amendment), dated as of December 17, 2015, that certain Fifth Amendment to Credit Agreement and Consent to Release of Mortgages, dated as of November 17, 2016, that certain Sixth Amendment to Credit Agreement, dated as of September 19, 2018, and as further amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**" and, collectively with the Loan Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Documents**"), among, *inter alios*, (I) J. Crew Group, Inc., a Delaware corporation (in such capacity, the "**Prepetition ABL Borrower**") (II)

- 7 -

Chinos Intermediate Holdings B, Inc., a Delaware corporation ("**Holdings**"), (III) Bank of America, N.A., as administrative agent and collateral agent for the Prepetition ABL Secured Parties (as defined below) (in such capacities, the "**Prepetition ABL Agent**"), and (IV) the lenders party thereto from time to time (the "**Prepetition ABL Lenders**" and, collectively with the Prepetition ABL Agent, and other "Secured Parties" as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Lenders and Issuing Banks (as defined in the Prepetition ABL Credit Agreement) provided revolving loans, swingline loans, and letters of credit to, or for the benefit of, the Prepetition ABL Borrower (collectively, the "**Prepetition ABL Facility**").  Pursuant to that certain Guaranty Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition ABL Guaranty**"), Holdings, J. Crew Operating Corp., a Delaware corporation ("**J. Crew OpCo**"), J. Crew Inc., a Delaware corporation ("**JCI**"), J. Crew International, Inc., a Delaware corporation ("**J. Crew International**"), Grace Holmes, Inc., a Delaware corporation ("**Grace Holmes**"), H. F. D. No. 55, Inc., a Delaware corporation ("**H.F.D.**"), Madewell Inc., a Delaware corporation ("**Madewell**"), and J. Crew Virginia, Inc., a Virginia corporation ("**J. Crew Virginia**") (in such capacities, the "**Prepetition ABL Guarantors**" and, together with the Prepetition ABL Borrower, the "**Prepetition ABL Obligors**" or the "**ABL Debtors**") guaranteed the Obligations (as defined in the Prepetition ABL Credit Agreement).

(b)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Obligors were indebted to the Prepetition ABL Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the outstanding loans and reimbursement obligations in respect of letters of credit incurred by the Prepetition ABL Borrower under the Prepetition ABL Facility (collectively, the "**Prepetition ABL Loans**"), in an aggregate principal amount, as of the Petition Date, not less than approximately $309,093,952.11[4] (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), cash management obligations, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Obligors' obligations pursuant to the Prepetition ABL Documents, including all "Obligations" as defined in the

---

[4]  In addition, there are approximately $65,906,047.89 million of outstanding but undrawn letters of credit issued under the Prepetition ABL Facility.

- 8 -

Prepetition ABL Credit Agreement, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code, the "**Prepetition ABL Obligations**").

(c)     *Prepetition ABL Liens and Prepetition ABL Collateral.*  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Obligors granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien (the "**Prepetition ABL Liens**") on "Collateral," as such term is defined in the Prepetition ABL Credit Agreement (the "**Prepetition ABL Collateral**"), and the Prepetition ABL Obligations were fully secured as of the Petition Date by the Prepetition ABL Liens; provided that for the avoidance of doubt Prepetition ABL Collateral shall not include the "Excluded Property" as defined in that certain Security Agreement, dated March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**ABL Security Agreement**"), by and among the Prepetition ABL Obligors and the Prepetition ABL Agent in connection with the Prepetition ABL Obligations.

(d)     *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  As of the Petition Date, (I) the Prepetition ABL Liens on the Prepetition ABL Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition ABL Documents, or (y) or otherwise actually properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition ABL Collateral, subject only to the Prepetition Term Liens on the Term Priority Collateral and certain liens permitted by the Prepetition ABL Documents (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**ABL Permitted Liens**");[5] (III) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Obligors, enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (IV) no

---

[5]     For the avoidance of doubt, none of the Professional Fees Account, the Operating Account, or the Disbursement Account (each as defined herein or in the DIP Credit Agreement) constitute or be deemed to constitute ABL Priority Collateral, except to the extent such accounts contain proceeds of Prepetition ABL Collateral, but solely with respect to such proceeds.

offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition ABL Facility; and (VI) other than other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition ABL Liens.

(ii)    *Prepetition Term Facility.*

(a)    Pursuant to that certain Amended and Restated Credit Agreement, dated as of March 5, 2014 (as amended by that certain Amendment No. 1 to Amended and Restated Credit Agreement, dated as of July 13, 2017, and as further amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Credit Agreement**" and, collectively with the Loan Documents (as defined in the Prepetition Term Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Documents**"), among (I) J. Crew Group, Inc., a Delaware corporation (in such capacity, the "**Prepetition Term Borrower**"), (II) Holdings (III) Wilmington Savings Fund Society, FSB, as administrative agent (the "**Prepetition Term Administrative Agent**") and collateral agent (the "**Prepetition Term Collateral Agent**") for the Prepetition Term Secured Parties (in such capacities, as successor-in-interest to Bank of America, N.A., the "**Prepetition Term Agent**" and, together with the Prepetition ABL Agent, the "**Prepetition Agents**") and (IV) the lenders from time to time party thereto (the "**Prepetition Term Lenders**" and, collectively with the Prepetition Term Agent, the "**Prepetition Term Secured Parties**"), the Prepetition Term Lenders provided term loans to the Prepetition Term Borrower

- 10 -

(the "**Prepetition Term Facility**" and, together with the Prepetition ABL Facility, the "**Prepetition Secured Facilities**").  Pursuant to that certain Guaranty Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition Term Guaranty**"), Holdings, J. Crew OpCo, JCI, J. Crew International, Grace Holmes, H.F.D., Madewell and J. Crew Virginia (in such capacities, the "**Prepetition Term Guarantors**" and, together with the Prepetition Term Borrower, the "**Prepetition Term Obligors**" or the "**Term Debtors**") guaranteed the Obligations (as defined in the Prepetition Term Credit Agreement).

(b)      *Prepetition Term Obligations*.  As of the Petition Date, the Prepetition Term Obligors were indebted to the Prepetition Term Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the loans incurred under the Prepetition Term Facility (collectively, the "**Prepetition Term Loans**"), in an aggregate outstanding principal amount, as of the Petition Date, exclusive of accrued but unpaid interest, costs, fees, and expenses, not less than $1,337,363,321.82 (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Obligors' obligations pursuant to the Prepetition Term Documents, including all "Obligations" as defined in the Prepetition Term Credit Agreement, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition Term Obligations**").

(c)      *Prepetition Term Liens and Prepetition Term Collateral*.  As more fully set forth in the Prepetition Term Documents, prior to the Petition Date, the Prepetition Term Obligors granted to the Prepetition Term Agent, for the benefit of the Prepetition Term Secured Parties, a security interest in and continuing lien (the "**Prepetition Term Liens**") on "Collateral," as such term is defined in the Prepetition Term Credit Agreement (the "**Prepetition Term Collateral**"); provided that for the avoidance of doubt Prepetition Term Collateral shall not include **"Excluded Collateral"** as defined in that certain Security Agreement, dated March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Security Agreement**"), by and among the Prepetition Term

- 11 -

Obligors and the Prepetition Term Collateral Agent, in connection with the Prepetition Term Obligations.

(d)     *Validity, Perfection, and Priority of Prepetition Term Liens and Prepetition Term Obligations.*  As of the Petition Date, (I) the Prepetition Term Liens on the Prepetition Term Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition Term Loan Documents or (y) otherwise actually perfected, properly perfected and were granted to, or for the benefit of, the Prepetition Term Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition Term Liens were senior in priority over any and all other liens on the Prepetition Term Collateral, subject only to the Prepetition ABL Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (defined below), the "**ABL Priority Collateral**") and certain liens permitted by the Prepetition Term Documents (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Term Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**Term Permitted Liens**"); (III) the Prepetition Term Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Term Obligors, enforceable in accordance with the terms of the applicable Prepetition Term Documents; (IV) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Liens or Prepetition Term Obligations exist, and no portion of the Prepetition Term Liens or Prepetition Term Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition Term Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition Term Facility; and (VI) other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition Term Liens.

(iii)     *Prepetition IPCo Notes*.

- 12 -

(a)    *Prepetition IPCo New Money Notes.*  Pursuant to that certain Indenture for certain 13.00% notes due 2021, dated as of July 13, 2017, (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo New Money Notes Indenture**" and, collectively with the Security Documents (as defined in the Prepetition IPCo New Money Notes Indenture) and any other agreements, documents, certificates and instruments executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo New Money Notes Documents**", among J. Crew Brand, LLC (in such capacity, the "**Prepetition LLC Issuer**"), J. Crew Brand Corp. (in such capacity, the "**Prepetition Corporate Issuer**" and, together with the Prepetition LLC Issuer, the "**Prepetition Issuers**"), U.S. Bank National Association, as trustee and collateral agent, (in such capacities, the "**Prepetition IPCo New Money Notes Indenture Trustee**"), the guarantors thereunder (the "**Prepetition IPCo New Money Notes Guarantors**" and, together with the Prepetition Issuers, the "**Prepetition IPCo New Money Notes Obligors**"), and the Holders (as defined in the Prepetition IPCo New Money Notes Indenture, the "**Prepetition IPCo New Money Notes Noteholders**" and, collectively with the Prepetition IPCo New Money Notes Indenture Trustee, the "**Prepetition IPCo New Money Notes Secured Parties**"), the Prepetition Issuers incurred indebtedness to the Prepetition IPCo New Money Noteholders of 13.00% Senior Secured New Money Notes due 2021 (collectively, the "**Prepetition IPCo New Money Notes**").

(b)    *Prepetition IPCo Exchange Notes.*  Pursuant to that certain Indenture for certain 13.00% notes due 2021, dated as of July 13, 2017 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo Exchange Notes Indenture**"[6] and, collectively with the Security Documents (as defined in the IPCo Exchange Notes Indenture) and any other agreements, documents, certificates and instruments executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition IPCo Exchange Notes Documents**" and, collectively with the Prepetition IPCo New Money Notes Documents, the "**Prepetition IPCo Notes Documents**" and, collectively with the Prepetition ABL Documents and the Prepetition Term Documents, the "**Prepetition Documents**"), among the Prepetition Issuers U.S. Bank National Association, as trustee and collateral agent, (in such capacities, the "**Prepetition IPCo Exchange Notes Indenture Trustee**" and, together with the Prepetition IPCo New Money

---

[6]   The Prepetition IPCo New Money Notes Indenture and the Prepetition IPCo Exchange Notes Indenture are collectively referred to as the "**Prepetition IPCo Indentures**".

Notes Indenture Trustee, the "**Prepetition IPCo Indenture Trustees**"), the guarantors thereunder (the "**Prepetition IPCo Exchange Notes Guarantors**"[7] and, collectively with the Prepetition Issuers, the "**Prepetition IPCo Exchange Notes Obligors**"[8]), and the Holders (as defined in the Prepetition IPCo Exchange Notes Indenture, the "**Prepetition IPCo Exchange Noteholders**"[9] and, collectively with the Prepetition IPCo Exchange Notes Indenture Trustee, the "**Prepetition IPCo Exchange Notes Secured Parties**" and, collectively with the Prepetition IPCo New Money Notes Secured Parties, the "**Prepetition IPCo Secured Parties**" and, collectively with the Prepetition ABL Secured Parties and the Prepetition Term Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Issuers incurred indebtedness to the Prepetition IPCo Exchange Noteholders of 13.00% Senior Secured Notes due 2021 (collectively, the "**Prepetition IPCo Exchange Notes**" and, collectively with the Prepetition IPCo New Money Notes, the "**Prepetition IPCo Notes**" and, collectively with the Prepetition Secured Facilities, the "**Prepetition Secured Debt**").

(c)     *Prepetition IPCo Notes Obligations*.   Pursuant to the Prepetition IPCo New Money Notes Indenture, the Prepetition IPCo New Money Notes were issued with a face value of $97,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition IPCo New Money Notes was $97,000,000 (collectively, together with accrued and unpaid interest, premiums, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition IPCo New Money Notes Obligors' obligations pursuant to the Prepetition IPCo New Money Notes Documents, including all "Notes Obligations" as defined in the Prepetition IPCo New Money Notes Indenture, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition IPCo New Money Notes Obligations**").    Pursuant to the Prepetition IPCo Exchange Notes Indenture, the Prepetition IPCo Exchange Notes were issued with a face value of $249,596,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition IPCo Exchange

---

[7]   The Prepetition IPCo New Money Notes Guarantors and the Prepetition IPCo Exchange Notes Guarantors are collectively referred to as the "**Prepetition IPCo Notes Guarantors**".

[8]   The Prepetition IPCo New Money Notes Obligors and the Prepetition IPCo Exchange Notes Obligors are collectively referred to as the "**Prepetition IPCo Notes Obligors**" or the "**IPCo Debtors**".

[9]   The Prepetition IPCo New Money Noteholders and the Prepetition IPCo Exchange Noteholders are collectively referred to as the "**Prepetition IPCo Noteholders**".

Notes was $250,599,000 (collectively, together with accrued and unpaid interest, premiums, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition IPCo Exchange Notes Obligors' obligations pursuant to the Prepetition IPCo Exchange Notes Documents, including all "Notes Obligations" as defined in the Prepetition IPCo Exchange Notes Indenture, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition IPCo Exchange Notes Obligations**" and, collectively with the Prepetition IPCo New Money Notes Obligations, the "**Prepetition IPCo Notes Obligations**" and, collectively with the Prepetition ABL Obligations and the Prepetition Term Obligations, the "**Prepetition Obligations**").

(d)     *Prepetition IPCo Liens and Prepetition IPCo Collateral.* As more fully set forth in the Prepetition IPCo New Money Notes Documents, prior to the Petition Date, the Prepetition IPCo New Money Notes Obligors granted to the Prepetition IPCo New Money Notes Indenture Trustee, for the benefit of the Prepetition IPCo New Money Notes Secured Parties, a security interest in and continuing lien (the "**Prepetition IPCo New Money Notes Liens**") on "Collateral," as such term is defined in the Prepetition IPCo New Money Notes Indenture (the "**Prepetition IPCo New Money Notes Collateral**"). As more fully set forth in the Prepetition IPCo Exchange Notes Documents, prior to the Petition Date, the Prepetition IPCo Exchange Notes Obligors granted to the Prepetition IPCo Exchange Notes Indenture Trustee, for the benefit of the Prepetition IPCo Exchange Notes Secured Parties, a security interest in and continuing lien (the "**Prepetition IPCo Exchange Notes Liens**" and, together with the Prepetition IPCo New Money Notes Liens, the "**Prepetition IPCo Liens**" and, collectively with the Prepetition ABL Liens and the Prepetition Term Liens, the "**Prepetition Liens**") on "Collateral," as such term is defined in the Prepetition IPCo Exchange Notes Indenture (the "**Prepetition IPCo Exchange Notes Collateral**" and, together with the Prepetition IPCo New Money Notes Collateral, the "**Prepetition IPCo Collateral**" and, collectively with the Prepetition ABL Collateral and the Prepetition Term Collateral, the "**Prepetition Collateral**").

(e)     *Validity, Perfection, and Priority of Prepetition IPCo Liens and Prepetition IPCo Notes Obligations.*  As of the Petition Date, (I) the Prepetition IPCo Liens on the Prepetition IPCo Collateral were valid, binding, enforceable, non-avoidable, and, to the extent (x) required by the Prepetition

- 15 -

IPCo Notes Documents or (y) otherwise actually perfected, properly perfected and were granted to, or for the benefit of, the Prepetition IPCo Secured Parties for fair consideration and reasonably equivalent value; (II) the Prepetition IPCo Liens were senior in priority over any and all other liens on the Prepetition IPCo Collateral, subject only to certain liens permitted by the Prepetition IPCo Notes Documents (in each case, to the extent that such liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition IPCo Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "**IPCo Permitted Liens**" and, collectively with the ABL Permitted Liens and the Term Permitted Liens, the "**Permitted Liens**"); (III) the Prepetition IPCo Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition IPCo Notes Obligors, enforceable in accordance with the terms of the applicable Prepetition IPCo Notes Documents; (IV) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition IPCo Liens or Prepetition IPCo Notes Obligations exist, and no portion of the Prepetition IPCo Liens or Prepetition IPCo Notes Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) other than with respect to the Debtor Reserved Claims, the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition IPCo Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition IPCo Notes; and (VI) other than with respect to the Debtor Reserved Claims, the Debtors have waived, discharged, and released any right to challenge any of the Prepetition IPCo Notes Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition IPCo Liens.

(iv) *Releases.* Subject to the Debtors' rights reserved with regard to the Debtor Reserved Claims, the Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Secured Parties and the Prepetition Secured Parties (in each case, solely in their capacities as such) and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such (collectively, the "**Releasees**"), of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses

- 16 -

(including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Documents, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims and causes of action with respect to the Specified Liability Management Transactions (as defined in the Prepetition Term Credit Agreement), and (iv) any and all claims and causes of actions with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the DIP Obligations and the Prepetition Obligations that the Debtors may now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court's entry of ~~this~~the Interim Order; provided that the Debtors' Stipulations shall not release any claims, defenses or rights in favor of the Debtors with respect to certain litigation, captioned as *Eaton Vance Management, et al v. Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, et al*, pending in the Supreme Court of New York for New York County, Index No.: 654397/2017.

(v)     Debtors' Reserved Rights.

(a)     The Debtors make no stipulation, and, notwithstanding anything in the DIP Documents to the contrary, reserve all rights, with respect to (i) any liens (whether on account of a deposit account control agreement or otherwise) asserted with respect to that certain bank account maintained at Wells Fargo Bank, N.A., account number ending 1816, in the name of J. Crew Operating Corp. (the "**Concentration Account**"), and any cash held in or disbursed from the Concentration Account that is not otherwise proceeds of Prepetition Collateral, and the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Concentration Account, including cash held in or disbursed from such account (other than with respect to cash that is otherwise proceeds from Prepetition Collateral) are expressly preserved (the "**Concentration Account Claims**"); and (ii) any claims or causes of action relating to the obligations incurred and liens granted pursuant to the transaction among certain of the Debtors on December 5, 2016 and June 12, 2017 involving, among other things (A) the transfer of certain domestic intellectual property to J. Crew Domestic Brand, LLC, (B) an amendment to the Prepetition Term Credit Agreement to facilitate, among other things, the repurchase of loans then-outstanding under the Prepetition Term Credit Agreement, and additional borrowings under the Prepetition Term Credit Agreement, and (C) to the extent

- 17 -

not covered by (A) and (B), the exchange of 7.75%/8.50% Senior PIK Toggle Notes due 2019 issued by Chinos Intermediate Holdings A, Inc. for, among other things, notes issued by J. Crew Brand LLC and J. Crew Brand Corp. (, including, without limitation, the Specified Liability Management Transactions (as defined in the Prepetition Term Credit Agreement) (the "**2017 Transaction,**") (collectively and together with the Concentration Account Claims, the "**Debtor Reserved Claims**").

(b) Any action prosecuted by the Debtors on account the Debtor Reserved Claims must be commenced, if at all, but subject to paragraph 44 herein, pursuant to an adversary proceeding filed in the Bankruptcy Court (i) with respect to Debtor Reserved Claims identified at Paragraph F(v)(a)(i), on or before the first Business Day that is seventy five (75) calendar days after the Petition Date and (ii) with respect to Debtor Reserved Claims identified at Paragraph F(v)(a)(ii), prior to entry of thethis Final DIP Order, or in each case such claims shall otherwise be waived by the Debtors, and all defenses of the Prepetition Secured Parties with respect to any such Claim, Challenge or action are expressly preserved; provided that, such dates may be extended by agreement of the Debtors, on the one hand and (w) with respect to the Prepetition ABL Facility, the Prepetition ABL Agent, (x) with respect to the Prepetition Term Facility, the Prepetition Term Agent (acting at the direction of the Required Term Lenders (as defined in the Prepetition Term Credit Agreement, the "**Required Term Lenders**")), (y) with respect to the Prepetition IPCo Exchange Notes, the Prepetition IPCo Exchange Notes Trustee, and (z) with respect to the Prepetition IPCo New Money Notes, the Prepetition New Money Notes Trustee, on the other hand.

Notwithstanding anything in this paragraph F or in the DIP Documents to the contrary, the Debtors' rights to seek a determination on the value of the Prepetition Collateral securing the Prepetition Obligations are fully preserved; provided that, with respect to the Prepetition ABL Collateral, the foregoing shall apply solely in order to determine the amount of the "equity cushion" with respect to the Prepetition ABL Claims as of the Petition Date.

G. **Cash Collateral**. Subject to the Debtors' rights reserved with regard to the Debtor Reserved Claims, all of the Debtors' cash including any cash in their deposit accounts,

- 18 -

wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

H. **Intercreditor Agreements**.  Pursuant to section 510 of the Bankruptcy Code, (i) that certain Intercreditor Agreement, dated as of March 7, 2011 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**ABL Intercreditor Agreement**"), by and between the Prepetition ABL Agent and the Prepetition Term Agent and (ii) that certain Intercreditor Agreement, dated as of July 13, 2017 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**IPCo Intercreditor Agreement**" and, together with the ABL Intercreditor Agreement, the "**Intercreditor Agreements**"), by and between the Prepetition IPCo New Money Notes Indenture Trustee and the Prepetition IPCo Exchange Notes Indenture Trustee, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Documents, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens, administrative expense claims, and superpriority administrative expense claims granted or the amounts payable by the Debtors under ~~this~~the Interim Order, this Final Order or otherwise), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this ~~Interim~~Final Order or the DIP Documents, unless expressly set forth herein or therein.

- 19 -

I.  **Permitted Prior Liens; Continuation of Prepetition Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any lien other than (and subject to the exceptions and qualifications regarding such liens contained herein) the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition IPCo Liens are (i) valid, enforceable, perfected, or non-avoidable or (ii) senior to any of the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition IPCo Liens.  Moreover, and subject in all respects to the Intercreditor Agreements, nothing shall prejudice the rights of any party in interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or a~~the~~ Committee ~~(if appointed)~~, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any asserted lien that is not the subject of the stipulations granted pursuant to paragraph F hereof.

J.  **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)  *Request for Postpetition Financing and Use of Cash Collateral*.

The Debtors seek ~~authority (a) for the Debtors to enter into~~final approval of the DIP Facility ~~and~~, the incur~~rence~~ ~~of~~ the DIP Obligations and the use of Cash Collateral on a final basis on the terms described herein and in the DIP Documents ~~and (b) for the Debtors to use Cash Collateral on the terms described herein~~, in each case, to, among other things, administer their Chapter 11 Cases and fund their operations. ~~At the Final Hearing, the Debtors will seek final approval of the DIP Facility and the use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), which (i) shall be substantially the same as the Interim Order except that (x) those provisions in~~

- 20 -

~~the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (y) where appropriate, references to this Interim Order shall be changed to references to the Final Order and (ii) with respect to any other modifications to the Interim Order, shall be consistent with the DIP Credit Agreement and shall otherwise be in form and substance acceptable to the Required Lenders (as defined in the DIP Credit Agreement, the "**Required Lenders**", the DIP Agent and with respect to the use of Cash Collateral from proceeds of ABL Priority Collateral, the Prepetition ABL Agent.  Notice of the Final Hearing and the proposed Final Order will be provided in accordance with this Interim Order.~~

(ii)  *Priming of the Prepetition Liens*.  The priming of the Prepetition Term Liens, Prepetition ABL Liens (except with respect to ABL Priority Collateral), and Prepetition IPCo Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the Debtors to obtain the DIP Facility and the Debtors to continue to operate their business during the pendency of the Chapter 11 Cases, for the benefit of their estates and creditors.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this ~~Interim~~Final Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) as of the Petition Date.

(iii)  *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have demonstrated ~~an immediate~~the need to use Cash Collateral on ~~an interim~~a final

- 21 -

basis and to obtain credit in the form of the ~~Interim~~Final Loans under the DIP Facility in order to, among other things, continue their ordinary course operations, administer these Chapter 11 Cases, and preserve the going-concern value of their estates.

(iv) *No Credit Available on More Favorable Terms*. The DIP Facility is the best source of debtor-in-possession financing reasonably available to the Debtors at this time. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain: (a) adequate unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) adequate credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) adequate credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral (as defined below), with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this ~~Interim~~Final Order.

(v) *Use of Cash Collateral and Proceeds of the DIP Facility*. As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility

- 22 -

and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral shall be used in a manner consistent with the terms and conditions of this ~~Interim~~Final Order and the DIP Documents and in accordance with the budget (including with respect to any variances as permitted in the DIP Documents,  as would not trigger a Budget Event (as defined in the DIP Documents), and as set forth in paragraph 15 hereof, the "**Budget**" and the requirement to use the proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral in a manner that does not trigger a Budget Event, the "**Budget Requirement**"),[10] solely for the purposes set forth in the DIP Credit Agreement and this ~~Interim~~Final Order, including (a) ongoing working capital, capital expenditures, other general corporate purposes of the Debtors and any other purpose not prohibited by the DIP Credit Agreement; (b) permitted payment of costs of administration of the Chapter 11 Cases; (c) payment of  such prepetition expenses as consented to by the DIP Agent, acting at the direction of the Required DIP Lenders; (d) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, the fees and expenses of the DIP Agent and the legal and other professionals' fees and expenses of the DIP Agent and the DIP Lenders) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation, documentation, and Court approval of the DIP Facility; (e) payment of certain adequate protection amounts to the Prepetition Secured Parties,

---

[10] A copy of the ~~initial~~current Budget is attached hereto as **~~Exhibit~~Schedule 2**.

- 23 -

as set forth in paragraph 12 hereof; and (f) payment of obligations benefitting from the Carve-Out (as defined below), and making disbursements therefrom, including by funding the Carve-Out Reserve Account (as defined below); provided that, for the avoidance of doubt, and notwithstanding anything herein or in the DIP Documents (including the DIP Credit Agreement) to the contrary, in no instance shall the Debtors' use of Collateral (including Cash Collateral) to pay obligations benefiting from the Carve-Out, including Professional Fees, be limited or deemed limited by any ~~Approved~~ Budget.

(vi)     *Application of Proceeds of DIP Collateral*.   As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and authorization to use Cash Collateral, the Debtors, the DIP Agent, the DIP Lenders, and the applicable Prepetition Secured Parties have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of the DIP Collateral as permitted by the DIP Documents and this ~~Interim~~Final Order.

(vii)    *DIP Election Procedures.*    The procedures governing the participation of the Prepetition Term Lenders and the Prepetition IPCo Noteholders in the DIP Facility (the "**DIP Election Procedures**"), as set forth in the DIP Credit Agreement, are fair and reasonable.

K. **Adequate Protection**.   (i) The Prepetition Term Agent, for the benefit of the Prepetition Term Secured Parties, (ii) the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, and (iii) the Prepetition IPCo Indenture Trustees, for the

- 24 -

benefit of the applicable Prepetition IPCo Secured Parties, are entitled to receive adequate protection solely to the extent of Diminution in Value, if any, of their respective interests as of the Petition Date in the Prepetition Collateral, including, without limitation, the Cash Collateral. Pursuant to sections 361, 363, 503, and 507(b) of the Bankruptcy Code, as adequate protection, subject in all respects to the Carve-Out (as defined below), the Prepetition Secured Parties will receive, and subject to the Carve Out in all respects, (i) solely to the extent of any Diminution of Value, if any, of their interests in the Prepetition Collateral as of the Petition Date, Adequate Protection Liens (as defined below) and 507(b) Claims (as defined below); (ii) current payment of reasonable and documented fees and expenses and other disbursements as set forth in paragraph 12 herein; (iii) financial and other reporting in each case, as set forth in paragraph 12 herein; and (iv) solely with respect to the Prepetition ABL Secured Parties, current cash payments on a monthly basis in an amount equal to the postpetition interest and Letter of Credit Fees (as defined in the Prepetition ABL Credit Agreement) on the Prepetition ABL Facility at the non-default rate as set forth in the Prepetition ABL Credit Agreement and accrual of default interest as set forth in paragraph 12 herein. Notwithstanding the foregoing, subject to paragraph 44 herein, the Debtors' and any party in interest's rights are fully reserved to seek a determination that adequate protection payments should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the applicable Prepetition Secured Parties' claims as of the Petition Date.

- 25 -

L. **Sections 506(c) and 552(b)**.   In light of, among other things: (i) the superpriority of the Carve-Out with respect to the Prepetition Liens; (ii) the DIP Agent's and the DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve-Out (as defined below); (iii) the Prepetition Secured Parties' agreement that their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out (as defined below) and subordinate to the DIP Liens (as defined below), except as otherwise set forth herein; (iv) the authority to use Cash Collateral as provided herein; and (v) the funding made available pursuant to the DIP Facility (a) ~~subject to entry of the Final Order,~~ the Prepetition Secured Parties are entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) the DIP Agent, the DIP Lenders, and~~, subject to entry of the Final Order,~~ the Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code as provided herein.

M. **Good Faith of the DIP Agent and DIP Lenders and the Prepetition Secured Parties**.

(i)      Based upon the pleadings and the record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated

- 26 -

in good faith and at arm's length among the Debtors, and the DIP Secured Parties, and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors; (iii) the use of Cash Collateral, including, without limitation, pursuant to this InterimFinal Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (iv) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Secured Parties and the Prepetition Secured Parties, including, without limitation, pursuant to this InterimFinal Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (v) the DIP Facility, the DIP Liens (as defined below), the DIP Superpriority Claims (as defined below), the Adequate Protection Liens, and the 507(b) Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this InterimFinal Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(ii)     Absent an order of this Court and the provision of Adequate Protection, (a) consent of the Prepetition ABL Secured Parties and Prepetition Term Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition ABL Collateral and Prepetition Term Collateral and (b) consent of the Prepetition IPCo Secured Parties is required for the Debtors' use of the Prepetition IPCo Collateral. The Prepetition ABL Secured Parties and Prepetition Term Secured Parties have consented, or have not objected, to the

- 27 -

Debtors' use of Cash Collateral and other Prepetition ABL Collateral and Prepetition Term

Collateral or to the Debtors' entry into the DIP Documents in accordance with and subject to the

terms and conditions in this ~~Interim~~Final Order and the DIP Documents.  The Prepetition IPCo

Secured Parties have consented, or have not objected, to the Debtors' use of the Prepetition IPCo

Collateral or to the Debtors' entry into the DIP Documents in accordance with and subject to the

terms and conditions in this ~~Interim~~Final Order and the DIP Documents.

N. **Immediate Entry**.    Sufficient cause exists for immediate entry of this

~~Interim~~Final Order pursuant to Bankruptcy Rule 4001(c)(2).

O. **Interim Hearing**.  ~~Notice of the Interim Hearing and the relief requested in~~

~~the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight~~

~~courier, or hand delivery to certain parties in interest, including the Notice Parties.  The Debtors~~

~~have made reasonable efforts to afford the best notice possible under the circumstances, and no~~

~~other notice is required in connection with the relief set forth in this Interim Order.~~

Based upon the foregoing findings and conclusions, the Motion, the Declarations, and the

record before the Court with respect to the Motion, and after due consideration and good and

sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. DIP Facility and Use of Cash Collateral Approved on ~~Interim~~Final Basis.  The

Motion is granted to the extent provided herein on ~~an interim~~a final basis.  The DIP Facility, the

borrowing of the ~~Interim~~Final Loans thereunder, and the guaranty by the DIP Guarantors of such

- 28 -

borrowing (and related obligations under the DIP Facility), is hereby authorized and approved, and the use of Cash Collateral on ~~an interim~~a final basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this ~~Interim~~Final Order.  All objections to this ~~Interim~~Final Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.  This ~~Interim~~Final Order shall become effective immediately upon its entry.

2. <u>Authorization of the DIP Facility</u>.  The DIP Facility is hereby approved.  The Debtors are expressly and immediately authorized and empowered to ~~execute and deliver the DIP Documents and to~~ incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this ~~Interim~~Final Order and the DIP Documents and to deliver all instruments, certificates, agreements, and documents that may be required, desirable or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below).  The Debtors are hereby authorized and directed to pay, in accordance with this ~~Interim~~Final Order, the principal, interest, premiums, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts (including, without limitation, legal and other professional fees and expenses of the DIP Agent and the DIP Lenders) become due and payable in accordance with the terms and conditions of the DIP Documents, without need to obtain further Court approval, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other related actions that may be necessary, desirable or appropriate, all to the extent provided in

- 29 -

this ~~Interim~~Final Order or the DIP Documents.  ~~Upon execution and delivery, t~~The DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  ~~Upon entry of this Interim Order, t~~The Backstop Premium set forth in the Backstop Commitment Letter (as defined in the DIP Credit Agreement) (the "**Backstop Premium**") ~~shall be~~is fully earned, non-refundable, and non-avoidable and shall be payable in accordance with and at the times specified in the DIP Documents.

3. <u>Authorization to Borrow</u>.  ~~To prevent immediate and irreparable harm to the Debtors' estates, f~~From the entry of this ~~Interim~~Final Order through and including ~~the earliest to occur of (i) entry of the Final Order or (ii)~~ the DIP Termination Date (as defined below), and subject to the terms and conditions set forth in the DIP Documents and this ~~Interim~~Final Order, the Debtors are hereby authorized to request extensions of credit (in the form of the ~~Interim~~Final Loans) under the DIP Facility in an original principal amount equal to up to $~~11~~400,000,000.

4. <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, restated, amended and restated, waived, modified, and/or supplemented by the parties thereto (or, to the extent provided for in the applicable DIP Document, a subset of such parties) in accordance with the terms and conditions of the applicable DIP Documents, provided that the Debtors shall use commercially reasonable efforts to provide not less than three (3) business days' notice to the Committee in advance in writing, without further order of the Court if the amendment, restatement, amendment and restatement, waiver, modification or supplement

- 30 -

does not (i) shorten the original stated maturity of the DIP Loans, (ii) increase the aggregate commitments or the rate of interest payable thereunder, or (iii) amend the Events of Default (as defined in the DIP Credit Agreement) or covenants in the DIP Documents to be materially more restrictive to the Debtors (taken as a whole) than those set forth in the DIP Documents as originally executed and delivered (any such amendment, restatement, amendment and restatement, waiver, modification or supplement, an "**Approved Modification**"); provided, that for the avoidance of doubt, other than as explicitly set forth in the DIP Credit Agreement, updates and supplements to the Budget required to be delivered by the Borrower under the DIP Documents shall not require further order of the Court.   Prior to or promptly after the effectiveness of any Approved Modification, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to ~~any~~the Committee ~~(if appointed)~~, the U.S. Trustee, the DIP Agent, the Prepetition Agents, the Prepetition IPCo Indenture Trustees, and counsel to the Ad Hoc Committee and (ii) provide notice to the Court.   In the case of an amendment, restatement, amendment and restatement, waiver, supplement or other modification of the DIP Documents that is not an Approved Modification, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to ~~any~~the Committee ~~(if appointed)~~, the U.S. Trustee, the DIP Agent, the Prepetition Agents, the Prepetition IPCo Indenture Trustees, and counsel to the Ad Hoc Committee, (ii) provide notice to the Court and (iii) obtain approval of the Court.

5. DIP Obligations.   The DIP Documents and this ~~Interim~~Final Order shall

- 31 -

constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable in accordance with their terms against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon entry of this ~~Interim~~Final Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by any of the Debtors party to the DIP Documents to the DIP Agent or any of the DIP Lenders, in each case, under and in accordance with the terms and conditions of the DIP Documents or this ~~Interim~~Final Order or secured by the DIP Liens (as defined below), including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, and other amounts owing under and in accordance with the DIP Documents; provided that, for the avoidance of doubt the DIP Liens and the DIP Obligations shall be subject to the Carve-Out in all respects. The Debtors shall be jointly and severally liable for the DIP Obligations as and to the extent provided in the DIP Documents, which shall be subject to the Carve-Out in all respects. The DIP Obligations shall be due and payable without notice or demand on the DIP Termination Date (as defined below), and the Debtors' authority to use Cash Collateral under this ~~Interim~~Final Order shall automatically cease, in each case, without notice or demand on the Cash Collateral Termination Date (as defined below), in each case except as provided in paragraph 26 hereof and subject to the requirements of the Carve-Out

- 32 -

(as defined below); provided that the Debtors' rights to seek the use of Cash Collateral upon entry of a further order of the Court after the occurrence of the Cash Collateral Termination Date are fully reserved, and nothing herein shall waive, limit, or modify or be deemed to waive, limit or modify the Debtors' rights to seek the use of Cash Collateral upon entry of a further order of the Court after the occurrence of the Cash Collateral Termination Date. ~~No~~It shall be an event of default if any Order is entered that renders an obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below) and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) ~~shall be~~ stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable state law equivalents), ~~shall~~is determined to constitute original issue discount, or ~~shall~~is determined to be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6. DIP Liens.  Subject and subordinate to the Carve-Out in all respects, as set forth in this ~~Interim~~Final Order and effective immediately upon entry of this ~~Interim~~Final Order, pursuant to, as applicable, sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy

- 33 -

Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "**DIP Collateral**"), including, without limitation (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Debtor (other than Ultimate Holdings), other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, leases other than nonresidential real property leases, fee interests in real property owned by the Debtors, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all

- 34 -

owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "**Avoidance Action Proceeds**"), but not the actions themselves; (d) the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code; and (e) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; provided that the DIP Collateral shall not include (and the DIP Liens shall not extend to) (w) funds held in the Borrowing Base Account (if any), provided DIP Collateral shall include the Debtors' reversionary interest in such funds (x) any "Excluded Property" (as defined in the DIP Documents), (y) any nonresidential real property leases (although the DIP Collateral shall include the proceeds of any such leases) or (z) the Professional Fees Account (as defined herein) and all funds held therein, which shall constitute "Excluded Property" under this ~~Interim~~Final Order and the DIP Documents, except to the extent of the Debtors' reversionary interest, if any, in funds held in the Professional Fees Account, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash; provided further that neither the DIP Funding Account (as defined in the DIP Credit Agreement) nor the Operating Account (as defined in the DIP Credit Agreement) shall be subject to any lien in favor of the Prepetition Secured Parties, including with respect to any lien granted as adequate protection.

- 35 -

7. <u>DIP Lien Priority</u>.   The DIP Liens shall have the following priority with respect to assets of the Debtors' estates, and subject in all respects to the Carve-Out:

(a)   pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be first priority liens, as granted hereby, on all of the assets (now or hereafter acquired and all proceeds thereof) of the Debtors that are not otherwise subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or liens that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code; <u>provided</u> <u>that</u> in no instance shall the DIP Liens encumber the Excluded Property (as defined in the DIP Documents);

(b)   pursuant to Section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be junior priority liens, as granted hereby, upon all DIP Collateral constituting the ABL Priority Collateral (now owned or hereafter acquired and all proceeds thereof), subject and junior only to, in order of priority: (1) the Carve Out; (2) the ABL Permitted Liens; (3) ABL Adequate Protection Liens (as defined herein); and (4) Prepetition ABL Liens; <u>provided</u> <u>that</u>, for the avoidance of doubt, the DIP Liens shall be senior in priority to the Prepetition Term Liens and Prepetition IPCo Liens and any liens granted as adequate protection in favor of the Prepetition Term Secured Parties or Prepetition IPCo Secured Parties with respect to ABL Priority Collateral (now owned or hereafter acquired);

(c)   pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be priming first-priority liens, as granted hereby, on all DIP Collateral (now or hereafter

- 36 -

acquired and all proceeds thereof) that is "Collateral" as defined by each of the Prepetition Term Credit Agreement, the Prepetition ABL Credit Agreement, and the Prepetition IPCo Indentures to the extent such Collateral is not ABL Priority Collateral; provided that such DIP Liens shall be junior to, in order of priority, to:  (i) the Carve Out, and (ii) the Permitted Liens.  For the avoidance of doubt, the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition IPCo Liens shall be junior to the DIP Liens and the Carve Out in all respects with respect to DIP Collateral that is not ABL Priority Collateral (now owned or hereafter acquired).

(d)     Other than as set forth herein (including with respect to the Carve-Out) or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to any of sections 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8. Superpriority Claims.   Subject and subordinate to the Carve-Out in all respects, upon entry of this InterimFinal Order, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor

- 37 -

Cases (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of their Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof; provided, that, for the avoidance of doubt, the DIP Superpriority Claims shall not have recourse to (x) the amounts deposited in the Carve-Out Reserve Account (as defined below) in accordance with ~~this~~the Interim Order and this Final Order, or (y) the amounts held in the Professional Fees Account (as defined below), other than the Debtors' reversionary interest therein, if any, after all Professional Fees benefitting from the Carve-Out have been indefeasibly paid in full, in cash.

9.  No Obligation to Extend Credit.  Except as required to fund the Carve-Out (as defined below) as set forth in this ~~Interim~~Final Order, the DIP Lenders shall have no obligation to make any loan or advance or to issue, amend, renew, or extend any letters of credit or bankers' acceptance under the DIP Documents unless ~~(and subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement))~~ all of the conditions precedent to the

- 38 -

making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance under the DIP Documents and this InterimFinal Order have been satisfied in full or waived by the DIP Agent, acting at the direction of the Required Lenders (or the requisite consenting DIP Lenders, as applicable) in accordance with the terms of the DIP Credit Agreement.

10. <u>Use of Proceeds of DIP Facility</u>. From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility in accordance with the Budget Requirement and the terms and conditions in this InterimFinal Order and the DIP Documents; provided that, for the avoidance of doubt, the Debtors' use of borrowings under the DIP Facility and the DIP Collateral (including Cash Collateral) to pay obligations benefiting from the Carve-Out shall not be limited or deemed limited by any Budget.

11. <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions of this InterimFinal Order and the DIP Documents, and in a manner that does not trigger a Budget Event a "**Budget Event**"), the Debtors are authorized to use Cash Collateral until the Cash Collateral Termination Date (as defined below); provided, however, that during the Remedies Notice Period (as defined below), the Debtors are authorized to use Cash Collateral (x) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget Requirement and (y) as otherwise agreed by the DIP Agent, acting at the direction of the Required Lenders; provided that, with respect to Cash Collateral from proceeds of ABL Priority Collateral, with the consent of the Prepetition ABL

- 39 -

Agent.  Nothing in this ~~Interim~~Final Order shall authorize the disposition of any assets of the Debtors' estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this ~~Interim~~Final Order (including with respect to the Carve-Out (as defined below)), the DIP Facility, or the DIP Documents, or, with respect to the ABL Priority Collateral, with consent of the Prepetition ABL Agent and "Required Lenders" as defined in the Prepetition ABL Credit Agreement.

12.     <u>Adequate Protection for the Prepetition Secured Parties</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral as of the Petition Date, including the Cash Collateral, solely to the extent of Diminution in Value, if any, of their interests in the Prepetition Collateral as of the Petition Date (the "**Adequate Protection Claim**"); <u>provided</u>, <u>that</u>, for the avoidance of doubt, the Adequate Protection Obligations shall not have any recourse to the amounts deposited in accordance with ~~this~~the Interim Order <u>or this Final Order</u> in the Carve-Out Reserve Account or the Professional Fees Account (each as defined below) (in each case other than the Debtors' reversionary interest therein, if any, after all Professional Fees benefiting from the Carve-Out have been indefeasibly paid in full in cash).  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "**Adequate Protection Obligations**"):

(a)     <u>ABL Adequate Protection Liens</u>.  Subject to the Carve-Out in all respects, as security for the payment of the Prepetition ABL Secured Parties' Adequate

- 40 -

Protection Claims, if any, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of ~~this~~the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including~~, subject to entry of the Final Order,~~ Avoidance Action Proceeds, but not avoidance actions themselves) (the "**ABL Adequate Protection Liens**"), subject and subordinate only to (i) the Carve-Out (as defined below) in all respects; (ii) with respect to the Term Priority Collateral, in order of priority (1) the Term Permitted Liens; (2) the DIP Liens, (3) the Prepetition Term Liens, and (4) the Term Adequate Protection Liens (as defined below); (iii) with respect to ABL Priority Collateral, the ABL Permitted Liens; (iv) with respect to the DIP Collateral of the ABL Debtors that is neither ABL Priority Collateral nor Term Priority Collateral, the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens); (v) with respect to the DIP Collateral of the IPCo Debtors, (1) the IPCo Permitted Liens, (2) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens), (3) the IPCo Adequate Protection Liens (as defined below), and (4) the Prepetition IPCo Liens; and (v) with respect to the DIP Collateral of Debtors other than the ABL Debtors, the Term Debtors, or the IPCo Debtors, the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens).

(b)     <u>ABL Section 507(b) Claims</u>.     Subject to the Carve-Out in all

- 41 -

respects, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted an allowed superpriority claim against each of the Debtors as provided in sections 503 and 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claims**") in the amount of the Prepetition ABL Secured Parties' Adequate Protection Claims, if any, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) (1) the Carve-Out (as defined below) in all respects, and (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) with respect to the ABL 507(b) Claims against the IPCo Debtors, the IPCo 507(b) Claims (as defined below). Except to the extent expressly set forth in this InterimFinal Order, the Prepetition ABL Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the ABL 507(b) Claims unless and until (x) all obligations benefitting from the Carve-Out have been indefeasibly paid in full, in cash, (y) all DIP Obligations shall have been indefeasibly paid in full in cash, and (z) with respect to the ABL 507(b) Claims against the IPCo Debtors, all IPCo 507(b) Claims (as defined below) shall have been indefeasibly paid in full in cash. Only the Prepetition ABL Agent, acting at the direction of the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement), may assert the ABL 507(b) Claims against the Debtors. Notwithstanding their status as 507(b) Claims, the Prepetition ABL Secured Parties' Adequate Protection Claims may be satisfied in a plan of

- 42 -

reorganization or liquidation confirmed in the Chapter 11 Cases in any manner set forth in such plan if the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement) consent to such treatment, which shall include any class including such Requisite Lenders voting to accept such plan of reorganization or plan of liquidation.

(c)     ABL Postpetition Interest Payments.     From and after entry of thisthe Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest and Letter of Credit Fees (as defined in the Prepetition ABL Credit Agreement) on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest and Letter of Credit Fees become due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement; provided that, the default rate as set forth in the Prepetition ABL Credit Agreement shall accrue from and after the Petition Date.  The first such interest payment date shall be May 29, 2020, and thereafter, the last business day of every calendar month; provided that the Debtors' or any party in interest's rights are fully reserved to seek a determination that adequate protection payments (as set forth in this paragraph 12(c)) should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the Prepetition ABL Obligations as of the Petition Date.

(d)     Term Adequate Protection Liens.     Subject in all respects to the Carve-Out, as security for the payment of the Prepetition Term Secured Parties' Adequate

- 43 -

Protection Claims, the Prepetition Term Agent (for itself and for the benefit of the Prepetition

Term Secured Parties) is hereby granted (effective and perfected upon the date of ~~this~~the Interim

Order and without the necessity of the execution by the Debtors of security agreements, pledge

agreements, mortgages, financing statements, or other agreements) a valid, perfected

replacement security interest in and lien on all of the DIP Collateral of each of the Debtors

(including~~, subject to entry of the Final Order,~~ Avoidance Action Proceeds) (the "**Term**

**Adequate Protection Liens**"), subject and subordinate only to (i) (1) the Carve-Out (as defined

below) and (2) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the

DIP Liens); (ii) with respect to the ABL Priority Collateral, (1) the Prepetition ABL Liens and

(2) the ABL Adequate Protection Liens; and (iii) with respect to the DIP Collateral of the IPCo

Debtors, (1) the IPCo Adequate Protection Liens (as defined below) and (2) the Prepetition IPCo

Liens.

(e)      Term Section 507(b) Claims.   Subject to the Carve-Out in all

respects, the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term

Lenders) is hereby granted an allowed superpriority claim against each of the Debtors as

provided in sections 503 and 507(b) of the Bankruptcy Code (the "**Term 507(b) Claims**") in the

amount of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, with

priority in payment over any and all administrative expenses of the kinds specified or ordered

pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105,

326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of

- 44 -

the Bankruptcy Code, subject and subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) with respect to the Term 507(b) Claims against the IPCo Debtors, the IPCo 507(b) Claims (as defined below).  Except to the extent expressly set forth in this InterimFinal Order, the Prepetition Term Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Term 507(b) Claims unless and until (x) the Carve-Out (as defined below) is funded, (y) all DIP Obligations shall have been indefeasibly paid in full in cash, and (z) with respect to the Term 507(b) Claims against the IPCo Debtors, all IPCo 507(b) Claims (as defined below) shall have been indefeasibly paid in full in cash.  Only the Prepetition Term Agent, acting at the direction of the Required Term Lenders, may assert the Term 507(b) Claims against the Debtors. Notwithstanding their status as 507(b) Claims, the Prepetition Term Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or liquidation confirmed in the Chapter 11 Cases in any manner set forth in such plan if the Required Term Lenders consent to such treatment, which shall include the class including such Required Term Lenders voting to accept such plan of reorganization or liquidation.

(f)      IPCo Notes Adequate Protection Liens.    As security for the payment of the Prepetition IPCo Secured Parties' respective Adequate Protection Claims, the Prepetition IPCo Indenture Trustees (for themselves and for the benefit of the applicable Prepetition IPCo Noteholders) are each hereby granted (effective and perfected upon the date of thisthe Interim Order and without the necessity of the execution by the Debtors of security

- 45 -

agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including, ~~subject to entry of the Final Order,~~ Avoidance Action Proceeds) (the "**IPCo Adequate Protection Liens**"), subject and subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens) and (ii) with respect to the DIP Collateral of the ABL Debtors and the Term Debtors, (1) the ABL Adequate Protection Liens, (2) the Prepetition ABL Liens, (3) the Term Adequate Protection Liens, and (4) the Prepetition Term Liens.

(g)     IPCo Notes Section 507(b) Claims.     The Prepetition IPCo Indenture Trustees (for themselves and for the benefit of the applicable Prepetition IPCo Noteholders) are hereby granted an allowed superpriority claim against the Debtors as provided in sections 503 and 507(b) of the Bankruptcy Code (the "**IPCo 507(b) Claims**" and, collectively with the ABL 507(b) Claims and the Term 507(b) Claims, the "**507(b) Claims**") in the amount of the Prepetition IPCo Secured Parties' respective Adequate Protection Claims, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) (1) the Carve-Out (as defined below) and (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) with respect to the IPCo 507(b) Claims against the ABL Debtors and the Term Debtors, (1) the ABL 507(b)

- 46 -

Claims and (2) the Term 507(b) Claims.  Except to the extent expressly set forth in this ~~Interim~~Final Order, the Prepetition IPCo Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the IPCo 507(b) Claims unless and until (x) the Carve-Out (as defined below) is funded, (y) all DIP Obligations shall have been indefeasibly paid in full in cash, and (z) with respect to the IPCo 507(b) Claims against the ABL Debtors and the Term Debtors, the ABL 507(b) Claims and the Term 507(b) Claims shall have been indefeasibly paid in full in cash.  Only the Prepetition IPCo Indenture Trustees, acting at the direction of Holders (as defined under the applicable Prepetition IPCo Notes Indenture) of a majority in principal amount of the total Prepetition IPCo Notes then outstanding under the applicable Prepetition IPCo Notes Indenture, may assert the IPCo 507(b) Claims against the Debtors.  Notwithstanding their status as 507(b) Claims, the Prepetition IPCo Secured Parties' Adequate Protection Claims may be satisfied in a plan of reorganization or plan of liquidation confirmed in the Chapter 11 Cases, which shall include any class including holders of more than 50% in amount of the Prepetition IPCo Secured Parties' Adequate Protection Claims voting to accept such plan of reorganization or liquidation.

(h)      Fees and Expenses.  The Debtors are authorized and directed to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements (but not success fees, transaction fees, or similar fees) incurred, whether accrued before, on, or after the Petition Date, by the legal and financial advisors to (i) the ad hoc committee of crossholder creditors (the "**Ad Hoc Committee**") under the Prepetition Term

- 47 -

Credit Agreement and Prepetition IPCo Indentures, (ii) the Prepetition ABL Agent, (iii) the Prepetition Term Agent, and (iv) the Prepetition IPCo Indenture Trustees; provided, that such payments shall be subject to the Debtors' or any other party's rights to seek a determination such payments should be recharacterized under section 506(b) of the Bankruptcy Code as payments of the secured portion of the applicable claims as of the Petition Date.  The legal and financial advisors to the Ad Hoc Committee, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees shall not be required to comply with the U.S. Trustee fee guidelines; however, any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee (if appointed), contemporaneously with the delivery of such fee and expense statements to the Debtors.  After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) days to raise an objection thereto.  If an objection is timely raised, such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such fee and expense statement or invoice shall be paid promptly by the Debtors.  Notwithstanding the foregoing, the

- 48 -

Debtors are authorized and directed to pay ~~upon entry of this Interim Order~~ all reasonable and documented fees, costs, and out-of-pocket expenses (but not any "success", "transaction", or similar fees) of the legal and financial advisors to (i) the Ad Hoc Committee, (ii) the Prepetition ABL Agent, (iii) the Prepetition Term Agent, and (iv) the Prepetition IPCo Indenture Trustees incurred on or prior to ~~such~~the date of the Interim Order without the need for any professional engaged by such parties to first deliver a copy of its invoice as provided for herein.  No attorney or advisor to the Ad Hoc Committee, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees shall be required to file an interim or final application seeking compensation for services or reimbursement of expenses with the Court.

(i)      Financial Reporting.  The Debtors shall concurrently deliver to the Prepetition Agents, the Prepetition IPCo Indenture Trustees, the legal and financial advisors to the Ad Hoc Committee, and the Committee ~~(if appointed)~~, subject to customary confidentiality provisions, all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, and this ~~Interim Order, and the~~ Final Order, including Budgets.

13.      Adequate Protection Reservation.  Other than with respect to the priority of the Carve-Out (as defined below), ~~N~~nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value, if any, of their respective interests in the Prepetition Collateral as of the Petition Date during the

- 49 -

Chapter 11 Cases or any Successor Cases, or the Debtors' or any party in interest's rights to challenge such an assertion. The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected or that any of the Prepetition Secured Parties are entitled to other or different adequate protection. Further, this ~~Interim~~Final Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, subject in all respects to the terms and limitations of the Intercreditor Agreements, or the Debtors' or any party in interest's rights to challenge such request on any basis whatsoever.

14. <u>Effect of Order on Adequate Protection</u>. In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal, or vacatur, that (a) no Diminution in Value of any Prepetition Secured Party's respective interests in the Prepetition Collateral as of the Petition Date has occurred, (b) such Prepetition Secured Party is determined to be undersecured, or (c) the aggregate value of postpetition interest, fees, and expenses paid to or the benefit of the Prepetition ABL Secured Parties exceeds the extent permitted by section 506(b) of the Bankruptcy Code, then in each case a party in interest subject to paragraph 44 herein shall have the right to assert that payments of Adequate Protection shall be applied toward repayment of the secured portion of the applicable Prepetition Secured Debt as is owing to such Prepetition Secured Party as of the Petition Date.

- 50 -

15.   <u>Budget Maintenance</u>.   The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the Budget Requirement or as otherwise permitted by the DIP Documents and this ~~Interim~~Final Order; <u>provided</u> <u>that</u>, for the avoidance of doubt, the Debtors' authorization to use proceeds of the DIP Facility, DIP Collateral, and Cash Collateral to satisfy obligations benefitting from the Carve Out shall in no way be subject to the Budget.  The Budget annexed hereto as <u>Schedule 2</u> shall constitute the ~~initial~~current Budget.  On the first Tuesday that is four (4) full weeks after the Petition Date, and no later than the Tuesday of each fourth week thereafter (or more frequently as the Borrower may elect), the Borrower shall provide to the DIP Agent, the legal and financial advisors of the Ad Hoc Committee, and the Prepetition ABL Agent, an updated 13-week statement of the Debtors' anticipated cash receipts and disbursements for the subsequent 13-week period (a "**Proposed Budget**"), which Proposed Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders in their reasonable discretion (such approval not to be unreasonably withheld), in consultation with the Prepetition ABL Agent.  Until the Required Lenders approve the Proposed Budget in their reasonable discretion (such approval not to be unreasonably withheld), the then-current Budget shall remain the Budget, and the DIP Lenders shall have no obligation to fund such Proposed Budget.  Each Budget delivered to the DIP Agent, the legal and financial advisors to the Ad Hoc Committee and the Prepetition ABL Agent shall be accompanied by such supporting documentation as reasonably requested by such legal and financial advisors, and each Budget shall be prepared in good faith based upon

- 51 -

assumptions the Debtors believe to be reasonable.  A copy of the Budget shall be delivered to the legal and financial advisors to the Committee (if appointed) and the U.S. Trustee following such Budget's approval.  The Committee shall be provided concurrent drafts of any proposed modifications to, or amendment or update to, the Budget, and the Debtors shall use commercially reasonable efforts to provide the Committee with three (3) business days' prior notice of any proposed amendment or modification.

16.    Budget and Reporting Compliance.  The occurrence of a Budget Event or the Debtors' failure to provide the reports and other information required in the DIP Credit Agreement shall constitute an Event of Default under the DIP Credit Agreement and this InterimFinal Order, following the expiration of any applicable grace period set forth in the DIP Credit Agreement.  Contemporaneously with their delivery to the DIP Agent, all reports and information required to be provided to the DIP Agent under the DIP Credit Agreement shall be provided to the Prepetition ABL Agent and the Committee.

17.    Borrowing Base; Borrowing Base Reporting.  The Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent, counsel to the Ad Hoc Committee, and counsel to the Committee (if appointed), a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement), together with all back up reports and information, in each case in the format customarily provided prior to the Petition Date, delivered with such Borrowing Base Certificates prior to the Petition Date, setting forth the Borrowing Base (as defined in the Prepetition ABL Credit Agreement) (i) calculated as of the last day of the

- 52 -

immediately preceding calendar week on Wednesday of each week commencing on June 3, 2020 for the week ending May 30, 2020 and each Wednesday thereafter; provided that in preparing such weekly Borrowing Base Certificate the Debtors shall only be required to roll forward the stock ledger inventory and the JCI Listing for In Transit Inventory, and the Prepetition ABL Agent may increase the "Store Closing Reserve", if any, in such weekly calculation and (ii) calculated as of the last business day of the immediately preceding fiscal month, promptly, but in no event later than May 15, 2020 with respect to the fiscal month ended April 2020 and ten (10) business days following the end of each subsequent fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards; provided that (x) none of the Prepetition ABL Secured Parties shall be permitted to take any Reserves (whether Availability Reserves (as defined in the Prepetition ABL Credit Agreement), Inventory Reserves (as defined in the Prepetition ABL Credit Agreement), or otherwise) against the Borrowing Base that were not in place as of May 2, 2020 other than (I) a reserve in the amount of $6,000,000 on account of the Post Carve-Out Trigger Notice and (II) the Store Closing Reserve, (y) the appraisals used to calculate the Borrowing Base shall be the most recent appraisals delivered by the Debtors in accordance with the Prepetition ABL Credit Agreement as of May 2, 2020, and (z) no subsequent appraisals, valuations, or reserves (other than a Store Closing Reserve) shall be applied with respect to the Borrowing Base or any determination of Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement), although the Prepetition ABL Agent may obtain appraisals subsequent to the Petition Date solely for informational purposes and the

- 53 -

Debtors shall use commercially reasonable efforts to cooperate with the Prepetition ABL Agent in obtaining such appraisals (and such appraisals shall not affect the Borrowing Base), and the Debtors shall pay the Prepetition ABL Agent's reasonable and documented expenses associated with obtaining such appraisals. ~~The Debtors shall deliver the first Borrowing Base Certificate as provided herein not later than May 15, 2020.~~

18.    **Store Closing Reserve**. The Prepetition ABL Agent may implement a Store Closing Reserve (as defined below) as an Availability Reserve against the Borrowing Base, which Store Closing Reserve may be taken by the Prepetition ABL Agent, on two (2) business days' written notice to the Debtors, the DIP Agent, and the Committee ~~(if appointed)~~, in its Permitted Discretion (as defined in the Prepetition ABL Credit Agreement) solely on account of Eligible Inventory (as defined in the Prepetition ABL Credit Agreement) held in stores where "store closing sales" have been commenced after the Petition Date (each a "**Closing Store**"); provided that a Store Closing Reserve may not be taken:

(a)    before the first business day that is at least five (5) weeks after the Petition Date;

(b)    unless more than 10% of the Debtors' aggregate store count (excluding up to 25 stores in the aggregate that are closed after the Petition Date in connection with the termination of the lease term applicable thereto or otherwise in the ordinary course of business) as of the Petition Date shall have become Closing Store after the Petition Date;

(c)    more than once per week; and

- 54 -

(d)     for at least five (5) weeks after the commencement of a "store closing sale" at the applicable store location.

"Store Closing Reserve" means a reserve in an amount equal the results of reducing the Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement) by 1000 bps per week, commencing on week six and each week thereafter, multiplied by the Inventory Advance Rate multiplied by the Cost of Eligible Inventory located at all Closing Stores.

19.     To the extent the Borrowing Base set forth on the most recent Borrowing Base Certificate is less than the lesser of (a) $375,000,000 and (b) the aggregate ~~principal~~ amount of Revolving Credit Outstandings (as defined in the ABL Credit Agreement) (such difference, if any, the "**Borrowing Base Shortfall**"), the Debtors shall cause the lesser of (x) such Borrowing Base Shortfall and (y) $20,000,000 to be deposited in a segregated account (the "**Borrowing Base Account**") established by the Debtors at Bank of America, N.A. on or within two (2) business days of delivery of such Borrowing Base Certificate, as additional adequate protection for the Prepetition ABL Lenders, which Borrowing Base Account and all funds held in the Borrowing Base Account, if any, shall be ABL Priority Collateral but not DIP Collateral (but DIP Collateral shall include the Debtors' reversionary interest in such funds); provided, further, that (x) funds held in the Borrowing Base Account shall be added to the Borrowing Base and (y) on two (2) Business Days' notice the Prepetition ABL Agent  the Debtors may withdraw funds held in the Borrowing Base Account  to the extent the Borrowing Base Shortfall is less

- 55 -

than $20,000,000, as set forth by any subsequent Borrowing Base Certificate delivered as provided herein.

20. <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this ~~Interim~~Final Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this ~~Interim~~Final Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this ~~Interim~~Final Order.

21. <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This ~~Interim~~Final Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve Out, the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of

- 56 -

doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Adequate Protection Liens or to entitle the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees is authorized to file or record, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect its respective liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver, promptly upon demand to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, or the Prepetition IPCo Indenture Trustees, as applicable, may reasonably request.  Each of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, in its discretion, may file a photocopy of this ~~Interim~~Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument, and all

- 57 -

applicable officials are hereby directed to accept a photocopy of this ~~Interim~~Final Order for

filing or recordation for such purpose.  To the extent the Prepetition ABL Agent, the Prepetition

Term Agent, the Prepetition IPCo New Money Notes Indenture Trustee, or the Prepetition IPCo

Exchange Notes Indenture Trustee is the secured party under any security agreement, mortgage,

landlord waiver, credit card processor notices or agreements, bailee letters, custom broker

agreements, financing statement, account control agreements, or any other Prepetition

Documents or is listed as loss payee or additional insured under any of the Debtors' insurance

policies, the DIP Agent shall also be deemed without any further action to be the secured party

or the loss payee or additional insured, as applicable, under such documents.  The Prepetition

ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees, as

applicable, shall serve as agents for the DIP Agent for purposes of perfecting the DIP Liens on

all DIP Collateral that is of a type such that, without giving effect to the Bankruptcy Code and

this ~~Interim~~Final Order, perfection of a lien thereon may be accomplished only by possession or

control by a secured party.

> 22.    <u>Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured

Parties</u>.

> (a)    Unless the Required Lenders shall have provided their prior

written consent, or all DIP Obligations (excluding contingent indemnification obligations for

which no claim has been asserted) have been indefeasibly paid in full in cash and the lending

commitments under the DIP Facility  have terminated, the entry of any order in these Chapter 11

Cases shall be an Event of Default for purposes of the DIP Credit Agreement if such order authorizes any of the following (unless such order provides for the simultaneous satisfaction of such obligations): (i) the obtaining of credit or the incurrence of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or a portion of the DIP Collateral or that is entitled to administrative priority with a value in excess of $500,000 in the aggregate that are superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, or the 507(b) Claims except as expressly set forth in this InterimFinal Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than as permitted pursuant to the Budget Requirement, the DIP Documents, and this InterimFinal Order; provided that Debtors' rights to seek to use Cash Collateral on a non-consensual basis after the Cash Collateral Termination Date are fully reserved; or (iii) any modification of any of the DIP Agent's, any DIP Lender's, or any Prepetition Secured Party's rights under this InterimFinal Order, the DIP Documents, or the Prepetition Documents with respect any DIP Obligations or Prepetition Obligations except as specifically provided herein.

(b)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, (i) use commercially reasonable efforts to maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and

- 59 -

provide to the DIP Agent (solely in its capacity as such) all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by the DIP Agent) to provide under the DIP Documents or the provisions of this InterimFinal Order;  and (iii) permit the DIP Agent and the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition IPCo Indenture Trustees and their advisors and appraisers to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets in each case during regular business hours and commercially reasonable advance notice and otherwise use commercially reasonable efforts to cooperate with such advisors and appraisers.  The Debtors shall use commercially reasonable efforts to cause the Committee to receive any financial reporting required to be provided by the Debtors contemporaneously with the provision of such reports to the DIP Agent, Prepetition ABL Agent, Prepetition Term Agent, or Prepetition IPCo Indenture Trustees.

23.     Credit Bidding.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Agent (or its designee) at the direction of the Required Lenders, the DIP Lenders, and, subject to entry of the Final Order, the Prepetition Term Agent (or its designee), at the direction of the Required Term Lenders, and the Prepetition IPCo Indenture Trustees, may credit bid up to the full amount of the outstanding DIP Obligations or the relevant Prepetition Obligations, as applicable, in each case including any accrued and unpaid interest, expenses, fees, and other

- 60 -

obligations for their respective priority collateral (each such bid, a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code, subject in each case to the Intercreditor Agreements.

24.     Proceeds of Subsequent Financing.   If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this InterimFinal Order at any time prior to the indefeasible repayment in full of all DIP Obligations and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this InterimFinal Order and the DIP Documents.

25.     Maintenance of DIP Collateral.   Until the indefeasible payment in full of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order entered by the Court.

26.     Termination Dates. Subject to the Carve-Out in all respects, (a) on the DIP Termination Date (as defined below), subject to the Carve-Out (as defined below), all DIP

- 61 -

Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as required in paragraph 41 with respect to the Carve-Out (as defined below); and (b) on the Cash Collateral Termination Date (as defined below) all authority to use Cash Collateral shall cease, provided, however, that (x) during the Remedies Notice Period, the Debtors may use Cash Collateral (i) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget Requirement; (ii) to satisfy obligations benefitting from the Carve Out without regard to whether or not a Budget Event would be triggered, and (iii) as otherwise agreed by the DIP Agent, acting at the direction of the Required Lenders, and (y) the Debtors' rights to seek to use Cash Collateral on a non-consensual basis after the Cash Collateral Termination Date are fully reserved; and (c) upon occurrence of a Termination Date, the Debtors may otherwise exercise rights and remedies under the DIP Documents in accordance with this ~~Interim~~Final Order.

27.     Events of Default.     The occurrence and continuation of any of the following events, unless waived by the Required Lenders in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute an event of default (collectively, the "**Events of Default**") under this ~~Interim~~Final Order: (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this ~~Interim~~Final Order, subject to a three business day cure period following receipt of notice (if such failure is capable of being cured); (b) the occurrence of an "Event of Default" as defined in the DIP Credit Agreement; or (c) delivery of an ABL Cash Collateral Termination Declaration

- 62 -

(as defined herein).

28. <u>DIP Case Milestones</u>. The occurrence an Event of Default under Section 8.01(c) of the DIP Credit Agreement of the DIP Credit Agreement, unless waived by the Required Lenders in writing and in accordance with the terms of the DIP Credit Agreement, shall, (a) constitute an Event of Default under each of (i) the DIP Credit Agreement and (ii) this ~~Interim~~Final Order; (b) subject to the expiration of the Remedies Notice Period, result in the automatic termination of the Debtors' authority to use Cash Collateral under this ~~Interim~~Final Order except as otherwise provided herein; and (c) permit the DIP Agent, subject to the terms of paragraph 31, to exercise the rights and remedies provided for in this ~~Interim~~Final Order and the DIP Documents.

29. <u>Termination Date; Remedies</u>. (a) Subject to any applicable notice and cure period under the DIP Documents and/or this ~~Interim~~Final Order, while (x) any Event of Default (as defined in the DIP Credit Agreement) (in the case of the subsequent subclause (a)) or (y) any Event of Default (in the case of the subsequent subclause (b)), in each case, has occurred and is continuing, following the Debtors' <u>and Committee's</u> receipt of notice, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order of the Court, but subject to the terms of this ~~Interim~~Final Order, (i) the DIP Agent, —acting at the direction of the Required Lenders, may declare in accordance with Section 8.02 of the DIP Credit Agreement (w) the Commitments (as defined in the DIP Credit Agreement) of each DIP Lender to be terminated, (x) the unpaid principal amount of all

- 63 -

outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Documents to be immediately due and payable, (y) subject to the Carve-Out, termination of the DIP Facility and the DIP Documents as to any future obligation of the DIP Agent and the DIP Lenders, without affecting any of the DIP Liens or the DIP Obligations, or the post-petition administrative superpriority claim status of the DIP Obligations, and (z) that the application of the Carve-Out (as defined below) has occurred through the delivery of the Carve-Out Trigger Notice (as defined below) to the Debtors (any such declaration shall be referred to as a "**DIP Termination Declaration**" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "**DIP Termination Date**") and (ii) the DIP Agent, acting at the direction of the Required Lenders, may declare a termination, reduction or restriction of the Debtors' ability to use any Cash Collateral derived solely from the proceeds of DIP Collateral or that constitutes Cash Collateral as of the Petition Date (any such declaration shall be referred to as a "**DIP Cash Collateral Termination Declaration**" and the date on which either a DIP Cash Collateral Termination Declaration or an ABL Cash Collateral Termination Declaration is delivered shall be referred to as the "**Cash Collateral Termination Date**"; the Cash Collateral Termination Declaration and the DIP Termination Declaration are each a "**Termination Declaration**"; the Cash Collateral Termination Date and the DIP Termination Date are each a "**Termination Date**"); and (b) upon the occurrence and during the continuation of an ABL Cash Collateral Termination Event, the Prepetition ABL Agent, may declare a termination, reduction, or restriction of the Debtors'

- 64 -

ability to use Cash Collateral (any such declaration shall be referred to as an "**ABL Cash Collateral Termination Declaration**").

30. A Termination Declaration or ABL Cash Collateral Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a~~the~~ Committee ~~(if appointed)~~, counsel to the DIP Agent (solely with respect to an ABL Cash Collateral Termination Declaration) counsel to the Prepetition ABL Agent (other than with respect to an ABL Cash Collateral Termination Declaration), counsel to the Prepetition Term Agent, counsel to the Prepetition IPCo Indenture Trustees, counsel to the Ad Hoc Committee, and the U.S. Trustee.

31. The automatic stay is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such five (5) business day period, the "**Remedies Notice Period**"), the DIP Agent, acting at the direction of the Required Lenders, shall be entitled to exercise its applicable rights and remedies in accordance with the DIP Documents and this ~~Interim~~Final Order, subject in all respects to the Carve-Out (as defined below) except as otherwise ordered by the Court. During the Remedies Notice Period, the Debtors and/or a~~the~~ Committee ~~(if appointed)~~ shall be entitled to seek an emergency hearing from the Court for the sole purpose of contesting whether an Event of Default (hereunder and/or under the DIP Credit Agreement) or an ABL Cash Collateral Termination Event has occurred and/or is continuing, and ~~/or~~ seeking to use the Cash Collateral on a non-consensual basis, and upon and after delivery of the Termination ~~Notice~~Declaration, each of the DIP Agent, acting at

- 65 -

the direction of the Required Lenders, and the Prepetition ABL Agent consent to such emergency hearing being heard on an expedited basis.

32.     Unless the Courts orders otherwise during the Remedies Notice Period, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order as to the DIP Agent and the DIP Lenders, subject to the Carve-Out (as defined below).  Upon expiration of the Remedies Notice Period, the DIP Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other intellectual property of the Debtors to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral, including pursuant to any Court-approved sale process.

33.     ABL Cash Collateral Termination Event.   An "**ABL Cash Collateral Termination Event**" shall mean:

(a)     the Final Order shall not have been entered on or within forty-five (45) days from the Petition Date;

(b)     an order confirming a plan of reorganization shall not have been entered on or within one hundred thirty (130) days from the Petition Date;

(c)     the effective date of a plan of reorganization shall not have occurred within one hundred fifty (150) days from the Petition Date;

- 66 -

(d)      an Event of Default (as defined herein) that occurred and is continuing and has not been waived under the DIP Credit Agreement within (5) days' of the occurrence thereof and for which a forbearance is not in place under the DIP Credit Agreement;

(e)      the termination of all Commitments (as defined in the DIP Credit Agreement) or the acceleration of the unpaid principal amount of all outstanding DIP Loans;

(f)      the delivery of a Termination Declaration by the DIP Agent;

(g)      the DIP Lenders have failed to fund the ~~(i) Interim Loans on the Closing Date in the Interim Loan Amount; or (ii) the~~ Final Loans in the Final Loan Amount on the Final Loan Date as each such term is defined in the DIP Credit Agreement as of the Petition Date, and such default has not been cured within seven (7) calendar days thereof;

(h)      the Debtors shall have failed to pay their monetary obligations under paragraph 12(c) within two (2) business days of its due dates or paragraph 19, or the Debtors shall otherwise failed to perform with respect to their adequate protection obligations in favor of the Prepetition Secured Parties to the extent required under this ~~Interim~~Final Order after two (2) business days from receipt of written notice from the Prepetition ABL Agent (also to be provided to the Committee) and an opportunity to cure, which cure shall occur within two (2) business days of such notice;

(i)      the Borrowing Base Shortfall at any time is greater than $20,000,000 and the Debtors have not funded such shortfall into the Borrowing Base Account

- 67 -

within two (2) business days of delivery of  the Borrowing Base Certificate reflecting such Borrowing Base Shortfall;

(j)      the Debtors shall have filed a motion or pleading with the Court to (i) stay, vacate, or reverse this ~~Interim~~Final Order; or (ii) amend or modify this ~~Interim~~Final Order in a manner adverse to Prepetition ABL Secured Parties and such motion shall not have been withdrawn after two (2) business days written notice thereof;

(k)      other than with respect to the Debtor Reserved Claims set forth at Paragraph F(v)(a)(i), the Debtors shall attempt to invalidate, reduce, or otherwise impair the Prepetition ABL Liens or the Prepetition ABL Obligations, in each case pursuant to a pleading filed with the Court that is not withdrawn after two (2) business days' notice thereof;

(l)      the entry of an order (i) appointing a trustee, receiver, or examiner with expanded powers with respect to any of the Debtors; (ii) dismissing any of the Debtors' ~~c~~Chapter 11 ~~c~~Cases; or (iii) converting any of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, in each case where such order has become a final order not subject to appeal;

(m)      (i) the failure to deliver all Borrowing Base Certificates as and when required;  or (ii) the failure to deliver all other reports and certificates, (2) business days' after notice to the Debtor and opportunity to cure;

(n)      the breach of paragraphs 22(a) or 43 in each case after two (2) business days' notice and an opportunity to cure;

- 68 -

(o)    the failure to fund the Professional Fees Account as and when required pursuant to paragraph 38;

(p)    the effective date of a chapter 11 plan in any of the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court; and/or

(q)    any stay, reversal, vacatur, rescission or other modification of the terms of this ~~Interim~~Final Order in any matter that is adverse to the Prepetition ABL Secured Parties and that is not consented to by the Prepetition ABL Agent

34.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this ~~Interim~~Final Order.  Based on the findings set forth in this ~~Interim~~Final Order and the record made during the ~~Interim~~Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this ~~Interim~~Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, the DIP Agent, the DIP Lenders, and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

35.    Payment of Fees and Expenses.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses (but not "success", "transaction", or similar fees), of the legal and financial advisors to

- 69 -

the DIP Agent and the legal and financial advisors to the Ad Hoc Committee, the members of
which constitute DIP Lenders, in connection with the DIP Facility, as provided in the DIP
Documents.  Professionals of the DIP Agent and the Ad Hoc Committee shall not be required to
comply with the U.S. Trustee fee guidelines; however, any time that such professionals seek
payment of fees and expenses from the Debtors, each professional shall provide summary copies
of its fee and expense statements or invoices (which shall not be required to contain time entries
and which may be redacted or modified to the extent necessary to delete any information subject
to the attorney-client privilege, any information constituting attorney work product, or any other
confidential information, and the provision of such invoices shall not constitute any waiver of
the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S.
Trustee and counsel to the Committee (if appointed) contemporaneously with the delivery of
such fee and expense statements to the Debtors.  After delivery of a fee and expense statement or
invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) days
to raise an objection thereto.  If an objection is timely raised, such objection shall be subject to
resolution by the Court.  Pending such resolution, the undisputed portion of any such fee and
expense statement or invoice shall be paid promptly by the Debtors.  Notwithstanding the
foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all
reasonable and documented fees, costs, and out-of-pocket expenses of legal and financial
advisors to the DIP Agent provided for in the DIP Credit Agreement incurred on or prior to such
dateentry of the Interim Order without the need for any professional engaged by the DIP Agent

- 70 -

or the DIP Lenders to first deliver a copy of its invoice as provided for herein. No attorney or advisor to the DIP Agent or Ad Hoc Committee shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) DIP Agent or DIP Lenders in connection with the DIP Facility, (ii) Prepetition Secured Parties in connection with the Chapter 11 Cases, and (iii) legal and financial advisors to the Ad Hoc Committee, the members of which constitute DIP Lenders, are hereby approved in full. For the avoidance of doubt, the fees set forth in any engagement letter executed by any of the Debtors prior to the Petition Date with any of the legal or financial advisors to the Ad Hoc Committee shall be deemed reasonable for all purposes under this Order, including, without limitation, under paragraph 12(h) hereof and this paragraph 35.

36. <u>Indemnification</u>. To the extent provided by the DIP Credit Agreement, the Debtors shall, jointly and severally, indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in the DIP Credit Agreement or the other DIP Documents.

37. <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, and the Prepetition

- 71 -

Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition IPCo New Money Notes Indenture Trustee and the Prepetition IPCo Exchange Notes Indenture Trustee is hereby authorized and entitled, in its sole discretion, to file a single consolidated master proof of claim on behalf of the Prepetition ABL Secured Parties, the Prepetition Term Secured Parties, the Prepetition IPCo New Money Notes Secured Parties, and the Prepetition IPCo Exchange Notes Secured Parties, as applicable, in each of the Chapter 11 Cases or Successor Cases, and such master proof of claim shall constitute the filing of a proof of claim. Any proof of claim filed by Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition IPCo New Money Notes Indenture Trustee, or the Prepetition IPCo Exchange Notes Indenture Trustee shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Secured Parties, the Prepetition Term Secured Parties, the Prepetition IPCo New Money Notes Secured Parties, and the Prepetition IPCo Exchange Notes Secured Parties, respectively.   The provisions of this paragraph 37 and each master proof of claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases or to assert that the amount of its claim is different from that set forth on the applicable master proof of claim. The master proofs of claim shall not be

- 72 -

required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Secured Party.

38.     Professional Fees Account. The Debtors shall (i) contemporaneously with the initial funding of the Loans, transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Budget and (ii) thereafter on a weekly basis transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the total budgeted weekly Professional Fees for the next unfunded week set forth in the Budget, in each case into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "**Professional Fees Account**").

39.     The Debtors shall cause funds held in the Professional Fees Account to be used to pay Professional Fees solely as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court or otherwise; provided that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Professional Fees Account shall revert to the Debtors for use in accordance with the DIP Credit Agreement and this InterimFinal Order; provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.

- 73 -

40.     The Professional Fees Account, and all funds held in the Professional Fees Account, shall be held in trust exclusively for the benefit the Professional Persons (as defined below), including with respect to obligations arising out of the Carve-Out.  Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the DIP Lenders or to any other party pursuant to this InterimFinal Order (whether on account of adequate protection, Diminution in Value, or otherwise), shall not constitute Collateral, Cash Collateral, or DIP Collateral, and shall not be or be deemed to be property of any Debtor's estate; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account, after all Professional Fees have been indefeasibly paid in full in cash (regardless of when such Professional Fees are allowed by the Court.

41.     Carve-Out.

(a)     As used in this InterimFinal Order, the term "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 4001(c)(1)(B) 1930(a) of title 28 of the United States Code plus interest at the statutory rate and expenses of members of the Committee allowable under section 503(b)(3)(F) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (including transaction fees or success fees) incurred by persons or firms retained by the Debtors

- 74 -

pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and ~~any official~~the ~~c~~Committee ~~of unsecured creditors~~ (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**" and such fees and expenses of the Professional Persons, the "**Professional Fees**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below) including success or transaction fees earned by or payable to a Professional Person, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are provided for in the Budget; and (iv) allowed Professional Fees incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, whether by interim order, procedural order or otherwise in an aggregate amount not to exceed $6,000,000 with respect to Professional Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").

(b)     For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at the direction of the Required Lenders (or, following the satisfaction in full of all DIP Obligations, the Prepetition Agents and Prepetition IPCo Trustees, upon appropriate direction in accordance with the applicable underlying documents) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), counsel to the Ad Hoc Committee (Milbank LLP), the

- 75 -

U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility (or, following a DIP Repayment, any occurrence that would constitute an Event of Default hereunder) or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), stating that the Post-Carve-Out Trigger Notice Cap has been invoked; provided that after the occurrence of an ABL Cash Collateral Termination Event the Prepetition ABL Agent may deliver a Carve-Out Trigger Notice in accordance with the notice requirements and upon the delivery of such notice and to the extent that the Carve-Out Reserve Account (as defined below) has been fully funded in the amounts required to be funded as of the date of the Carve-Out-Trigger Notice, the Prepetition ABL Liens and Prepetition Adequate Protection Liens, in each case with respect to ABL Priority Collateral including all proceeds thereof shall not be subject to the Carve-Out on account of obligations benefitting from the Carve-Out, that arise after delivery of such notice.

(c)      On the day on which a Carve-Out Trigger Notice is received by the Loan Parties, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including cash contained in the DIP Funding Account (as defined in the DIP Credit Agreement)) to fund a cash reserve in an amount equal to all obligations benefitting from the Carve-Out, to the extent not previously funded into the Professional Fees Account. The Debtors will deposit and hold such amounts in a segregated account outside the control of any DIP Lender or any Prepetition Secured Party exclusively to pay such obligations (the "**Carve-**

- 76 -

**Out Reserve Account**"), provided that the Carve-Out Reserve Account may be the Professional Fees Account.

(d)      For the avoidance of doubt, to the extent that Professional Fees and expenses of the Professional Persons have been incurred by the Debtors at any time before or on the first business day after delivery by the DIP Agent (or, following a DIP Repayment, the Prepetition Agents and Prepetition IPCo Indenture Trustees) of a Carve-Out Trigger Notice but have not yet been allowed by the Bankruptcy Court on the date that the DIP Agent (or, following a DIP Repayment, the Prepetition Agents and Prepetition IPCo Indenture Trustees) delivers a Carve-Out Trigger Notice, such Professional Fees and expenses of the Professional Persons shall benefit in all respects from the Carve-Out, regardless of whether such fees are allowed by the Bankruptcy Court pursuant to an interim order, final order, or otherwise entered before or after delivery of the Carve-Out Trigger Notice.

(e)      Following delivery of a Carve-Out Trigger Notice, the DIP Agent shall deposit into the Carve-Out Reserve Account any and all cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Reserve Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out regardless of whether such obligations have been allowed by the Bankruptcy Court (pursuant to an interim order, final order, or otherwise) as of such date.  Notwithstanding anything to the contrary herein or in the DIP Documents, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a

- 77 -

result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve
Account has been fully funded in an amount equal to all obligations benefiting from the Carve-
Out. Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors
from the Carve-Out Reserve Account shall not constitute DIP Loans, (ii) the failure of the
Carve-Out Reserve Account to satisfy in full the Professional Fees shall not affect the priority of
the Carve-Out, and (iii) in no way shall the Carve-Out, the Professional Fees Account or the
Budget Requirement, or any of the foregoing be construed as a cap or limitation on the amount
of the Professional Fees that may be allowed by the Bankruptcy Court and payable by the
Debtors and their estates at any time (whether by interim order, final order, or otherwise).

(f)     For the avoidance of doubt and notwithstanding anything to the
contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims
with respect to the Debtors' estates, including all liens securing and all claims on account of the
DIP Facility, any adequate protection liens, and superpriority claims (whether granted on
account of the DIP Facility, as adequate protection, or otherwise), and any and all other liens and
claims. For the avoidance of doubt, if a DIP Repayment occurs or the DIP Facility is otherwise
terminated, the DIP Order shall remain in full force and effect, including with respect to the
Debtors' use of Cash Collateral, the Carve-Out, the Carve-Out Reserve Account, and all related
provisions in respect thereof, and the Prepetition Agents and Prepetition IPCo Indenture Trustees
shall assume any rights and obligations that the DIP Agent previously had with respect to the
Carve-Out and the Carve-Out Reserve Account.

- 78 -

42.     <u>No Direct Responsibility for Fees or Disbursements</u>.  Subject to any of the DIP Agent's, DIP Lenders', or Prepetition Secured Parties' obligations with respect to the Carve-Out, none of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be (i) responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases, or (ii) obligated in any way to compensate, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

43.     <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, in each case, including Cash Collateral may be used in connection with (a) except to contest the occurrence of an Event of Default (hereunder or under the DIP Credit Agreement) or an ABL Cash Collateral Termination Event, or to seek the non-consensual use of Cash Collateral following the commencement of the Remedies Notice Period, preventing, hindering, or delaying any of the DIP Agent's or the DIP Lenders' realization upon any of the DIP Collateral or enforcement of any of their respective rights thereto in accordance with paragraph 31; (b) for any purpose that is prohibited under this ~~Interim Order, the~~ Final Order ~~(when entered)~~, the DIP Documents, or the Bankruptcy Code; (c) to prosecute or finance in any way any adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, any of their respective

- 79 -

affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, in their respective capacities as such, or their respective rights and remedies under DIP Documents, the Interim Order, thethis Final Order (when entered), or the Prepetition Documents, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents; (d) for the payment of fees, expenses, interest, or principal under the Prepetition Documents (in each case, other than payments on account of the Adequate Protection Obligations or required by this InterimFinal Order); (e) unless the Exit Conversion occurs, to make any distribution under a plan of reorganization confirmed in the Chapter 11 Cases that does not provide for the indefeasible payment of the DIP Loans in full and in cash; (f) except as permitted by the Budget Requirement, to make any payment in settlement of any claim, action, or proceeding in excess of $500,000 in the aggregate without the prior written consent of the DIP Agent, acting at the direction of the Required Lenders; (g) [reserved]; (h) incurring Indebtedness (as defined in the DIP Credit Agreement), except to the extent permitted under the DIP Credit Agreement or this InterimFinal Order; (i) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under this InterimFinal Order, the DIP Documents, or the Prepetition Documents; (j) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Obligations, other than seeking a determination (i) that payments provided on account of adequate protection should be recharacterized under section 506(b) of the Bankruptcy Code as payments on account of the

- 80 -

secured portion of the Prepetition Secured Facilities and (ii) as to the value of collateral securing the Prepetition Secured Facilities as of the Petition Date; (k) reserved; or (l) to pay allowed fees and expenses, in an amount in excess of $250,000 in the aggregate (the "**Investigation Budget Amount**"), incurred by Committee Professionals (if a Committee is appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority, or extent of the Prepetition Liens (the "**Investigation**") before the Challenge Deadline (as defined below); provided that the foregoing shall not limit or be deemed to limit in any way the Debtors' authority to (x) seek a determination (i) that payments provided on account of adequate protection should be recharacterized under section 506(b) of the Bankruptcy Code as payments on account of the secured portion of the Prepetition Secured Facilities and (ii) as to the value of collateral securing the Prepetition Secured Facilities as of the Petition Date; and (y) to satisfy obligations benefitting from the Carve Out, in each case incurred by Professional Persons retained by the Debtors.  Except with respect to the Committee's Investigation Budget Amount, any Professional Fees incurred by or on behalf of Committee Professionals in connection with any of the activities described in this paragraph 43 shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

44.     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The Debtors' Stipulations set forth in paragraph F of this InterimFinal Order shall be binding on the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the

- 81 -

Debtors) upon entry of this ~~Interim~~Final Order.  The Stipulations shall also be binding on all creditors and all other parties in interest and all of their respective successors and assigns, including, without limitation, ~~a~~the Committee ~~(if appointed)~~, unless, and solely to the extent that, a party in interest with standing and requisite authority (i) has timely commenced an appropriate proceeding or contested matter required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 44) (A) objecting to or challenging the amount, validity, or enforceability of the Prepetition Obligations or the perfection or priority of the Prepetition Liens or (B) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Secured Parties or any of such parties' affiliates, representatives, attorneys or advisors in connection with matters related to the Prepetition Documents, the Prepetition Secured Debt, and the Prepetition Collateral (each such proceeding or contested matter, a "**Challenge**") by no later than (a) for ~~a~~the Committee ~~(if appointed), sixty (60) days from its formation~~, August 3, 2020 or (b) for all other parties in interest (excluding the Debtors), seventy-five (75) days following the entry of the Interim Order (the "**Challenge Deadline**"), as such deadline may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Liens and Prepetition ABL Obligations), the Prepetition Term Agent, acting at the direction of the Required Term Lenders (with respect to the Prepetition Term Liens and

- 82 -

Prepetition Term Obligations), and the Prepetition IPCo Indenture Trustees (with respect to the Prepetition IPCo Liens and Prepetition IPCo Notes Obligations) or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge and any such judgment has become a final judgment that is not subject to any further review or appeal, and then only to the extent of any such final judgment.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final and non-appealable judgment or order that is inconsistent with any of the Debtors' Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Debtors' Stipulations shall, pursuant to this InterimFinal Order, become irrevocably binding on any person, entity, or party in interest in the Chapter 11 Cases, as well as their successors and assigns, and in any Successor Case for all purposes and shall not be subject to further challenge or objection.  Notwithstanding anything to the contrary herein, if any Challenge is properly and timely commenced by a party in interest, the Debtors' Stipulations shall nonetheless remain binding on all other parties in interest.   To the extent any Challenge is timely and properly commenced, the Prepetition Secured Parties shall be entitled to, as adequate protection, payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending

- 83 -

themselves against any Challenge; provided that, any such fees shall be subject to recharacterization in the event a Challenge is granted pursuant to a final order not subject to appeal.

(c)      Delaware LLCs.   Solely with respect to (i) J. Crew Brand Holdings, LLC, (ii) J. Crew Brand Intermediate, LLC, (iii) J. Crew Brand, LLC, (iv) J. Crew Domestic Brand, LLC, and (v) J. Crew International Brand, LLC, the Debtors' Stipulations and releases contained in paragraph F hereof will not be binding on a trustee appointed for such Debtors if, upon a motion filed by the Committee (and no other party) prior to expiration of the Challenge Period (a "**Committee Motion**") that specifically identifies the Debtors' Stipulations and releases opposed by the Committee, the Court (i) converts the chapter 11 case in question to chapter 7 of the Bankruptcy Code, or (ii) appoints a chapter 11 trustee to administer such case; provided that the Challenge Period shall be tolled with respect to such Debtors' Stipulations and releases specifically identified in the Committee Motion, while it remains pending with respect to such Debtors' Stipulations or Releases; provided further that, the Debtors' Stipulations and releases will be reserved for a Court-appointed trustee solely to the extent they are specifically identified in the Committee Motion, if any, and are approved by the Court in any order appointing the chapter 7 or 11 trustee.

45.      No Third-Party Rights.   Except as explicitly provided for herein, this InterimFinal Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

WEIL:\97486216\1\54457.0008WEIL:\97486216\9\54457.0008

eased

46.    Section 506(c) Claims. ~~Subject to entry of the Final Order with respect to parties other than the DIP Agent and the DIP Lenders, and e~~Except to the extent of the Carve-Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Secured Parties; Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition IPCo Indenture Trustees, the Prepetition IPCo Noteholders, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders), the Prepetition Term Agent (acting at the direction of the Required Lenders), or the Prepetition IPCo Indenture Trustees, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

47.    No Marshaling/Applications of Proceeds.   The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral; provided, that the Prepetition ABL Agent, acting at the direction of the Requisite Lenders (as defined in the Prepetition ABL Credit Agreement), shall first realize on the ABL Adequate Protection Liens and ABL 507(b) Claims from DIP Collateral that constitutes ABL Priority Collateral (now owned or hereafter acquired) before realizing on such liens and claims from DIP Collateral of any other Debtor; *provided*, *further*, that the Prepetition Term Agent, acting at the direction of the Required Term Lenders, shall first realize on the Term

- 85 -

Adequate Protection Liens and Term 507(b) Claims from DIP Collateral of the Term Debtors before realizing on such liens and claims from DIP Collateral of any other Debtor; *provided*, *further*, *still* that the Prepetition IPCo Trustees, acting at the direction of Holders (as defined under the applicable Prepetition IPCo Notes Indenture) of a majority in principal amount of the total Prepetition IPCo Notes then outstanding under the applicable Prepetition IPCo Notes Indenture, shall first realize on the IPCo Adequate Protection Liens and IPCo 507(b) Claims from DIP Collateral of the IPCo Debtors before realizing on such liens and claims from DIP Collateral of any other Debtor. Notwithstanding anything herein or in the DIP Documents to the contrary, the Prepetition Secured Parties shall use commercially reasonable efforts to satisfy their applicable Adequate Protection Liens and 507(b) Claims, if any, from proceeds of the DIP Collateral other than Avoidance Action Proceeds before satisfying such liens and claims from Avoidance Action Proceeds.

48.     Section 552(b).  ~~Subject to entry of the Final Order, the~~The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them.

49.     Limits on Lender Liability.  Nothing in this ~~Interim~~Final Order, any of the DIP Documents, the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any

- 86 -

activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this ~~Interim~~Final Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

50.     Insurance Proceeds and Policies.  ~~Upon entry of this~~As of the date of the Interim Order ~~and~~, to the fullest extent provided by applicable law, the DIP Agent (for itself and for the benefit of the DIP Secured Parties), the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders), the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Secured Parties), and the Prepetition IPCo Indenture Trustees (for themselves and for the benefit of the applicable Prepetition IPCo Noteholders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP

- 87 -

Collateral.

51.     Joint and Several Liability.  Nothing in this InterimFinal Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

52.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this InterimFinal Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Transaction Support Agreement, the DIP Documents, the Prepetition Documents and the Intercreditor Agreements: (a) the DIP Agent's, DIP Lenders', and Prepetition Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the DIP Agent, DIP Lenders, and/or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this

- 88 -

InterimFinal Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', athe Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this InterimFinal Order. Entry of this InterimFinal Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in these Chapter 11 Cases or any Successor Cases. For all adequate protection and stay relief purposes throughout the Chapter 11 Cases, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date. For the avoidance of doubt, such request will survive termination of this Interim Order.

53.     No Waiver by Failure to Seek Relief. The failure of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this InterimFinal Order, the DIP Documents, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

54.     Binding Effect of InterimFinal Order. Immediately upon entry on the docket of this Court, the terms and provisions of this InterimFinal Order shall become binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, all other creditors of any of the Debtors, anythe Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in

- 89 -

any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

55.     No Modification of ~~Interim~~Final Order.  A motion or pleading filed by any of the Debtors to modify, stay, vacate, amend, or reverse this Order shall be an Event of Default ~~unless and until~~: (a) as to the DIP ~~Obligations and the Prepetition~~ Obligations (other than contingent obligations with respect to then unasserted claims), unless and until (i) they have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP ~~Facility~~Documents which survive such discharge by their terms) or otherwise deemed satisfied or waived by the DIP Agent (acting at the direction of the Required Lenders), and all commitments to extend credit under the DIP Facility have been terminated; or (~~b~~ii) the DIP Agent (acting at the direction of the Required Lenders) consents to such pleading or motion; or (b) as to the Prepetition Obligations (other than contingent obligations with respect to then unasserted claims), unless and until (i) they have been indefeasibly paid in full in cash or otherwise deemed satisfied or waived by, as applicable, the Prepetition ABL Agent, the Prepetition Term Agent (acting at the direction of the Required Term Lenders), and/or the Prepetition IPCo Indenture Trustees, or (ii) the Prepetition ABL Agent, the Prepetition Term Agent (acting at the direction of the Required Term Lenders), or the Prepetition IPCo Indenture Trustees, as applicable, consent to such motion or pleading.

56.     Continuing Effect of Intercreditor Agreements.  The Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties each shall be bound by, and in all

- 90 -

respects of the DIP Facility shall be governed by, and be subject to all the terms, provisions, and restrictions of the Intercreditor Agreements.

57.    ~~Interim~~Final Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this ~~Interim~~Final Order, the provisions of this ~~Interim~~Final Order shall control.

58.    Discharge.  The DIP Obligations and, except as otherwise provided in Paragraphs 12(b), 12(e), and 12(g) hereof, the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless (x) such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such plan of reorganization, (y) each of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition IPCo Indenture Trustees, as applicable, has otherwise agreed in writing or as otherwise provided herein or (z) each of DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition IPCo Indenture Trustees have accepted their treatment in a plan of reorganization or liquidation as provided herein; *provided*, that the DIP Loans shall automatically and mandatorily convert into the Exit Term Loans upon the occurrence of the Exit Conversion (as defined in the DIP Credit Agreement, the "**Exit Conversion**") in accordance with the DIP Credit Agreement.  It shall be an Event of Default if the Debtors shall propose or support any plan of reorganization or sale of all or

- 91 -

substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not (1) conditioned upon the indefeasible payment in full in cash of the DIP Obligations (other than contingent indemnification obligations for which no claim has been asserted), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) or (2) on such other terms as are set forth in the Transaction Support Agreement (a "**Prohibited Plan or Sale**"), without the written consent of each of the DIP Agent (acting at the direction of the Required Lenders), DIP Lenders, the Prepetition Term Agent (acting at the direction of the Required Term Lenders), the Prepetition ABL Agents, and Prepetition IPCo Indenture Trustees, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

59.     Survival.    The provisions of this InterimFinal Order, including with respect to the priority of the Carve Out, and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or any Successor Cases.  The terms and provisions of this InterimFinal Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor

- 92 -

Cases notwithstanding the entry of any orders described in clauses (a)-(d) above, and all claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties pursuant to this ~~Interim~~Final Order and/or the DIP Documents shall maintain their validity and priority as provided by this ~~Interim~~Final Order until: (i) in respect of the DIP Facility, all the DIP Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) or the Exit Conversion shall have occurred; and (ii) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); (iii) in respect of the Prepetition Term Facility, all of the Prepetition Term Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); (iv) in respect of the Prepetition IPCo New Money Notes, all of the Prepetition IPCo New Money Notes Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); and (v) in respect of the Prepetition IPCo Exchange Notes, all of the Prepetition IPCo Exchange Notes Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted).  The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

- 93 -

60.     Payments Held in Trust.    Except as expressly permitted in this InterimFinal Order or the DIP Credit Agreement, and subject to the Carve-Out in all respects, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to all DIP Obligations in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Credit Agreement and this InterimFinal Order.

61.     Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this InterimFinal Order.

62. Final Hearing.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for **May 28, 2020, at 11:00 a.m. (ET)** before the Honorable Keith L. Phillips, United States Bankruptcy Judge at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.  On or before May 7, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order and the Motion, on the Notice Parties.  The Final Hearing Notice shall state

- 94 -

that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **May 21, 2020, at 4:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (attn: Ray C. Schrock, P.C. and Ryan Preston Dahl) and Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (attn: Tyler P. Brown, Henry P. (Toby) Long, III, and Nathan Kramer; (ii) counsel to the Ad Hoc Committee, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (attn: Samuel Khalil and Matthew Brod) and Tavenner & Beran, PLC, 20 North Eighth Street, Second Floor, Richmond, Virginia 23219 (attn: Lynn Tavenner, Esq. and Paula Beran, Esq.); (iii) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004 (attn: John R. Ashmead and Gregg S. Bateman); and (iv) counsel to the Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (attn.: Kevin J. Simard) and McGuireWoods LLP, Gateway Plaza, 800 East Canal Street, Richmond, VA 23219-3916 (attn. Douglas Foley).

62.     63. Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the DIP Facility and/or this InterimFinal Order.

63.     64. DIP Election Procedures.  The DIP Election Procedures are hereby approved.  The DIP Agent may, in connection with allocations of the commitments under the DIP Facility or any other allocations contemplated to be made pursuant to, and in accordance

- 95 -

with, the DIP Credit Agreement, conclusively rely on, and shall have no obligation to determine, investigate or confirm, and shall incur no liability whatsoever with respect to, any ownership information with respect to the Prepetition Term Obligations and Prepetition IPCo Notes Obligations as set forth on any election joinder (the form of which is attached as Exhibit M to the DIP Credit Agreement) submitted by an Electing DIP Term Lender (as defined in the DIP Credit Agreement). The DIP Agent may conclusively rely on any allocations of the commitments under the DIP Facility as provided to the DIP Agent by the advisors to the Debtors and/or Ad Hoc Committee without incurring liability therefor.

64.     65. Exit Conversion. It is understood and agreed that any provision in this InterimFinal Order requiring the indefeasible payment of the DIP Obligations in full in cash shall be deemed to be satisfied to the extent any such DIP Obligation is converted into an Exit Term Loan (as defined in the DIP Documents) pursuant to the Exit Conversion.

65.     66. During the Support Period (as defined in the Transaction Support Agreement), J. Crew Domestic, LLC agrees to forbear from collection or enforcement of the "License Fees" as defined in and contemplated under the *Amended and Restated Intellectual Property License Agreement* and *2017 Intellectual Property License Agreement*, each dated July 13, 2017, provided that the accrued and unpaid License Fees will remain outstanding without interest, penalties, or other charges through the earlier of the Support Period, payment in full, or consummation of the Plan (as defined in the Transaction Support Agreement).

66.     67. Notwithstanding anything to the contrary herein, the rights of the DIP

- 96 -

Agent and DIP Lenders to use or occupy any premises subject to a lease of non-residential real property shall be limited to (i) any such rights agreed to in writing by the applicable landlord, (ii) any rights of the DIP Agent or DIP Lenders that are valid and enforceable under applicable non-bankruptcy law, if any, and (iii) such rights as may be granted by this Court upon appropriate notice to the applicable landlord.

67.     Nothing in this Final Order shall affect the priority of ad valorem tax liens existing as of the Petition Date, if any, and which may arise during the pendency of these Chapter 11 Cases.  The Debtors shall provide notice to applicable ad valorem taxing authorities of sales out of the ordinary course of business during the course of these Chapter 11 Cases.

68.     Comenity.

(a)     Comenity Bank's, f/k/a World Financial Network National Bank, ("**Comenity**") rights with respect to the Amended and Restated Private Label Credit Card Program Agreement between Comenity and J. Crew Operating Corp., dated as of May 11, 2011, as amended from time to time (the "**Program Agreement**"): (i) shall not be affected, modified, waived, primed, subordinated, or impaired in any way by this Final Order, (ii) shall not be made subject to, subordinated by, or pari passu with any new (x) secured financing, security interests, or liens, and/or (y) super priority, administrative, or adequate protection claims.

(b)     The Debtors and Comenity shall remain bound by the terms of the Program Agreement, including the confidentiality provisions therein; provided that nothing herein shall (i) expand Comenity's rights under the Program Agreement or the Bankruptcy Code,

- 97 -

or (ii) be deemed to constitute an assumption of the Program Agreement or a waiver or

modification of the Debtors' rights to assume, assume and assign, or reject the Program

Agreement pursuant to section 365 of title 11 of the Bankruptcy Code in these Chapter 11 Cases.

The Debtors hereby reserve all rights available to them in their Chapter 11 Cases.

(c)     All of Comenity's rights, remedies, claims, defenses, and other

relief arising from or related to the Program Agreement, including, but not limited to, those set

forth in in this paragraph 68, are expressly preserved and reserved.

Dated: _____, 2020
       Richmond, Virginia

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97486216\1\54457.0008WEIL:\97486216\9\54457.0008

**~~Exhibit~~Schedule 1**

**DIP Credit Agreement**

**~~Exhibit~~Schedule 2**

**~~Initial~~Current DIP Budget**