## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In re

CHINOS HOLDINGS, INC., *et al.*,

                              Debtors.

Case No. 20-32181-KLP
Chapter 11

**OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR
ENTRY OF AN ORDER (I) APPROVING THE PROPOSED DISCLOSURE
STATEMENT AND THE FORM AND MANNER OF THE NOTICE OF THE
DISCLOSURE STATEMENT HEARING, (II) ESTABLISHING SOLICITATION AND
VOTING PROCEDURES, (III) SCHEDULING CONFIRMATION HEARING, (IV)
ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION
OF THE DEBTORS' PLAN, AND (V) GRANTING RELATED RELIEF**

John P. Fitzgerald, III, Acting United States Trustee for Region Four (the "UST"),[1]

through his counsel, in furtherance of the duties and responsibilities set forth in 28 U.S.C.

§ 586(a)(3) and (5) and pursuant to 11 U.S.C. §§ 307, the Federal Rules of Bankruptcy

Procedure, and the Local Bankruptcy Rules for this District, hereby files his objection to the

Debtors' Motion for Entry of an Order (I) Approving the Proposed Disclosure Statement (as

defined herein) and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II)

Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV)

---

[1] Unless otherwise defined herein, capitalized terms shall have the definition assigned to them in the Disclosure Statement or the Plan.

Kathryn R. Montgomery, Esq., AUST (VSB No. 42380)
Shannon Pecoraro, Esq. (VSB No. 46864)
Office of the United States Trustee
701 East Broad St., Suite 4304
Richmond, VA 23219
Phone (804) 771-2310
Fax: (804) 771-2330

Kenneth N. Whitehurst, III, Esq., AUST (VSB No. 48919)
Nicholas S. Herron, Esq., (NJSB No. 03007-2008, PASB No. 208988)
Office of the United States Trustee
200 Granby Street, Room 625
Norfolk, VA 23510
(757) 441-6012

Establishing Notice and Objection Procedures for Confirmation of Debtors' Plan, and (V)

Granting Related Relief (the "Solicitation Procedures Motion").[2]  *See* ECF Doc. Nos. 469 and

471.  In support of his objection, the UST states:

## PRELIMINARY STATEMENT

These cases were filed less than two months ago, and the Debtors are already seeking the

approval of a Disclosure Statement that, in its current form, does not provide adequate information

and proposes a plan that is not confirmable.  The UST objects to the Solicitations Procedures

Motion and Disclosure Statement on the following grounds:

- The Solicitation Procedures Motion and Plan should not provide that a failure to cast a vote is deemed to have accepted the plan.

- The Debtors contemplate filing information necessary for creditors to decide whether to vote to accept or reject the Plan five days before the voting and confirmation objection deadline.

- The proposed treatment of Intercompany Claims and Intercompany Interests is unclear and may violate the absolute priority rule.

- The release of non-debtor third parties and exculpation provisions are overly broad and do not satisfy the *Behrmann* factors.

- The Plan is not confirmable.

## JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.      The Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and

1334. This is a core proceeding under 28 U.S.C. § 157(b)(1).  Venue is proper in this district

under 28 U.S.C. § 1408.  The Court has constitutional authority to enter a final order in this

matter.  If it is determined that the bankruptcy judge does not have the constitutional authority to

---

[2] To the extent not defined herein, capitalized terms shall have the meaning assigned to them in the Disclosure Statement or Plan.

enter a final order or judgment in this matter, the UST consents to the entry of a final order or judgment by this Court in this matter.

2. John P. Fitzgerald, III is the acting UST for Region 4, which includes Richmond, under 28 U.S.C. § 581(a)(7). Pursuant to 11 U.S.C. § 307, the UST has standing to appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.

3. Pursuant to 28 U.S.C. § 586(a)(3), the UST is statutorily obligated to monitor the administration of cases commenced under the Bankruptcy Code, 11 U.S.C. § 101 *et seq*. Specifically, he is charged with a number of supervisory responsibilities in reorganization bankruptcy cases under chapter 11 of the Bankruptcy Code, including monitoring plans and disclosure statements filed in Chapter 11 cases. 28 U.S.C. § 586(a)(3)(B).

## FACTUAL BACKGROUND

### A. General Background

1. On May 4, 2020 (the "Petition Date"), Chinos Holdings, Inc. and 17 of its affiliates (collectively, the "Debtors") each filed voluntary chapter 11 petitions

2. On May 14, 2020, the UST appointed the Official Committee of Unsecured Creditors. *See* ECF Doc. No. 188.

3. The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

### B. Capital Structure

4. As of the Petition Date, the Debtors' prepetition capital structure included approximately $2 billion in funded debt, including:

| Debt Instrument | Principal Amount |
|---|---|
| ABL Credit Facility | $311 million |
| Term Loans | $1,337.4 million |
| IPCo Notes | $347.6 million |

*See* Declaration of Michael Nicholson in Support of Debtors Chapter 11 Petitions and First Day Relief (the "Nicholson Declaration") at ¶ 31.

5. On March 7, 2011, certain of the Debtors entered into a credit agreement among J. Crew Group, Inc. ("Group, Inc.") as borrower, Chinos Intermediate Holdings B, Inc. ("Chinos B"), Bank of America, N.A., as administrative agent, collateral agent, lender and issuer, and the other lenders and issuers from time to time party thereto (collectively, the "ABL Lenders"), pursuant to which, among other things, the ABL Lenders agreed to provide the Debtors with an asset-based revolving credit facility (the "ABL Credit Facility"). *See Id.* at ¶ 32. As of the Petition Date, approximately $311 million in principal amount was outstanding under the ABL Credit Facility, along with approximately $64 million of outstanding but undrawn letters of credit. *Id.*

6. On March 5, 2014, certain of the Debtors entered into an amended and restated credit agreement among Group, Inc. as borrower, Chinos B., Wilmington Savings Fund Society, FSB ("Term Loan Agent"), as administrative agent and collateral agent, and the other lenders from time to time party thereto (collectively, the "Term Lenders"), pursuant to which, among other things, the Term Lenders agreed to provide Group, Inc. with a term loan in the initial principal amount (on the original closing date) of approximately $1.57 billion (the "Term

Loans"). *See Id.* at ¶ 34. As of the Petition Date, approximately $1.34 billion in principal amount of Term Loans remained outstanding. *Id.*

7.      As part of the Debtors' prepetition balance sheet restructuring initiatives, in mid-to late 2016, the Debtors began exploring options to address the maturity of approximately $543 million of 7.75%/8.50% senior PIK toggle notes due in May 2019 (the "PIK Notes"). *See Id.* at ¶ 56. In an effort to reduce the indebtedness and address their obligations under the PIK Notes, the Debtors entered into a two-step liability management transaction (the "2017 Transaction").

8.      As the first step to the 2017 Transaction (the "Step 1 Transaction"), in late 2016, the Debtors transferred the domestic J. Crew Brand intellectual property (the "Licensed Marks," and such transfer, the "IP Transfer") into an unrestricted subsidiary, J. Crew Domestic Brand, LLC ("Domestic Brand"). *Id.* The IP Transfer allowed the IPCo Issuers (as defined below) to issue IPCo Notes (as defined below) secured by the Licensed Marks.[3] *Id.*

9.      Then, as part of the second step to the transaction (the "Step 2 Transaction"), in June 2017, with the support of an *ad hoc group* of PIK noteholders, the Debtors executed a debt-for-debt exchange (the "2017 Exchange Offer"), whereby approximately 99.85% of the PIK

---

[3]      Pursuant to the *Indenture* dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "IPCo New Money Notes Indenture"), among J. Crew Brand, LLC ("Brand"), J. Crew Brand Corp. (and together with Brand, the "IPCo Issuers"), the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, the IPCo Issuers issued 13.00% Senior Secured Notes due 2021 (collectively, the "IPCo New Money Notes") in the aggregate principal amount of $97,000,000. *See Id.* at ¶ 36.
Pursuant to the *Indenture*, dated July 13, 2017 among the IPCo Issuers, the guarantors party thereto and U.S. Bank National Association, as trustee and collateral agent, the IPCo Issuers issued 13.00% Senior Secured Notes due 2021 (and together with the IPCo New Money Notes, the "IPCo Notes") in the aggregate principal amount of approximately $250 million. The IPCo Notes mature on September 15, 2021. *See Id.* at ¶ 37.

Notes were consensually exchanged through a public offer for a *pro rata* share of (a) IPCo

Notes, (b) $190 million of Series A Preferred Stock, and (c) 15% of the Common Stock.   The

2017 Exchange Offer functionally extended the Debtors' runway by exchanging PIK Notes

maturing May  2019 with IPCo Notes maturing 2021.  *Id.*

10.     All obligations under the IPCo Notes and IPCo Indentures are guaranteed on (a) a

secured basis by substantially all of the assets of the IPCo Issuers and also J. Crew Brand

Intermediate, LLC, J. Crew International Brand, LLC, and Domestic Brand, and (b) an

unsecured basis by Chinos Intermediate Holdings A, Inc., as supplemental guarantor. *See Id.* at ¶

38.

11.     Prior to the Petition Date, the Debtors reached a restructuring support agreement

(the "TSA") with an *ad hoc* committee of prepetition lenders and noteholders and the Debtors'

prepetition equity  sponsors composed of funds managed or affiliated with TPG Capital ("TPG")

and Leonard Green & Partners LP ("LGP" and together with TPG, the "Sponsors") that

collectively own or control approximately 71% of the Term Loans, 78% of the IPCo Notes, 66%

of the Series A Preferred Stock, 92% of the Series B Preferred Stock, and 85% of the Common

Stock.  *See* Nicholson Declaration at ¶ 6.  The TSA contemplated a debt-for-equity swap

whereby the Term Loan claimants would receive their pro rata share of approximately 76.5% of

new common stock after various distributions, while the IPCo Notes claimants would receive

their pro rata share of approximately 23.5% of new common stock, after various other

distributions are made.  *Id.*

12.     On or about May 18, 2020, the Debtors filed the Proposed Disclosure Statement

for Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its

Affiliated Debtors (as amended on June 11, 2020 by the Disclosure Statement for Joint

Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtor

(With Technical Changes), the "Disclosure Statement") and the Joint Prearranged Chapter 11

Plan of Reorganization of Chinos Holdings, Inc. and its Affiliated Debtors (as amended on June

11, 2020 by the Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc.

and its Affiliated Debtors, the "Plan"). *See* ECF Doc. Nos. 247 and 248, and 468 and 469.  The

Disclosure Statement and Plan contemplate classifying claims into ten classes, as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Priority Non-Tax Claims (All Debtors) | Unimpaired | Presumed to Accept[4] |
| 2 | Other Secured Claims (All Debtors) | Unimpaired | Presumed to Accept |
| 3 | ABL Facility Claims (Only Loan Debtors) | Unimpaired | Presumed to Accept |
| 4 | Term Loan Secured Claims (Only Loan Debtors) | Impaired | Entitled to Vote |
| 5 | IPCo Notes Claims (Only IPCo Debtors) | Impaired | Entitled to Vote |
| 6-A | Ongoing Trade Claims (All Debtors) | Impaired | Entitled to Vote |
| 6-B | Other General Unsecured Claims (All Debtors) | Impaired | Entitled to Vote |
| 7 | Intercompany Claims (for each Debtor) | Unimpaired | Presumed to Accept |
| 8 | Section 510(b) Claims (All Debtors) | Impaired | Deemed to Reject |
| 9 | Intercompany Interests (All Debtors) | Unimpaired | Presumed to Accept |
| 10-A | Existing Holdings Preferred Equity (Only Chinos Holdings) | Impaired | Deemed to Reject |
| 10-B | Existing Holdings Equity (Only Chinos Holdings) | Impaired | Deemed to Reject |

*See* Disclosure Statement at Art. I, pp. 4-7.

---

[4] The classes listed as "presumed to accept" will not be entitled to vote.

13.    More specifically, under the terms of the proposed Plan, holders of claims and interests will receive the following treatment:

- Each holder of an Allowed Ongoing Trade Claim will receive, on the Effective Date, its Pro Rata share of a cash pool in an aggregate amount equal to $71,000,000; provided that the aggregate amount of cash distributed on account of any Allowed Ongoing Trade Claim will not exceed 50% of the Allowed amount of such Claim.

- Holders of Other General Unsecured Claims, which include rejection damages Claims and the Term Loan Deficiency Claims, will, on the Effective Date, receive their Pro Rata share of cash allocable to the applicable Debtor from a cash pool that will aggregate (a) $3 million if the class votes to accept the Plan and (b) $1 million if the class votes to reject the Plan; provided, that the aggregate amount of cash distributed on account of any Other General Unsecured Claim will not exceed 50% of the allowed amount of such Claim.

- As to Intercompany Claim, from and after the Effective Date, all Intercompany Claims, including the PIK Notes, shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion.

*See Id.; see also* Plan at Art. IV.

## OBJECTION

### I.    Legal Framework

"The Bankruptcy Code provides that a chapter 11 reorganization may be voted upon by holders of claims and interests, based on a disclosure statement approved by the court after notice, hearing and a determination that the statement contains adequate information." *In re Public Service Co. of New Hampshire*, 43 F.3d 763, 766 (1st Cir. 1995). The purpose of the disclosure statement is to provide creditors with information about the debtor, the plan, and their treatment thereunder necessary for creditors to make an informed and reasoned vote. *See, e.g.*, *In re Monnier Bros*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("[t]he primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan"); *In re Forest Grove, LLC*, 448 B.R. 729, 737 (Bankr. D.S.C. 2011) ("[t]he purpose of a disclosure statement is to clearly provide creditors with information regarding the debtor's plan

and their treatment under that plan"); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001).

Accordingly, approval of a disclosure statement is appropriate only if it provides "adequate information" so that "a hypothetical investor typical of the holders of claims or interests" in the case can make an informed decision on whether they should support a proposed chapter 11 plan. 11 U.S.C. § 1125(a), (b); *see also In re Mohammad*, 596 B.R. 34, 39 (Bankr. E.D.Va. 2019). "The determination of whether the disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court." *Menard–Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 696 (4th Cir. 1989).

"Adequate information" for disclosure statement purposes has been described as "all information that is reasonably necessary to permit creditors and parties-in-interest to fairly and effectively evaluate the plan." *In re Robert's Plumbing & Heating, LLC*, No. 10-23221, 2011 WL 2972092, at * 2 (Bankr. D. Md., July 20, 2011); *see also In re A.H. Robbins Co., Inc.*, No. 98-1080, 1998 WL 637401, at * 3 (4th Cir. 1998) (adequate information means "sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan").

The debtors bear the burden of "proving the adequacy of its disclosure statement." *In re Bellows*, 554 B.R. 219, 225 (Bankr. D.Alaska 2016); *see also In re American Capital Equipment, LLC*, 688 F.3d 145, 155 (3d Cir. 2012) (citations omitted). The Solicitation Procedure Motion proposes procedures that do not comply with the Bankruptcy Code or the Bankruptcy Rules. Additionally, the Disclosure Statement fails to provide sufficient disclosures appropriate to the circumstances of these cases.

II.    **Classes Where Creditors Fail to Cast Any Vote Should Not Be Deemed to Have Accepted the Plan**

While the Solicitation Procedures Motion does not appear to contemplate this tabulation procedure, the Plan provides:

> **Voting Classes; Presumed Acceptance by Non-Voting Classes.**  If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by such Class.

*See* Plan at Art. 3.6.

This provision runs afoul of section 1126(c), which provides that a class of claims has accepted the plan if the plan has been accepted by creditors "that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . *that have accepted or rejected the plan*."  11 U.S.C. § 1126(c) (Emphasis added).  Similarly, it runs afoul of the requirement in section 1129(a)(10) that for a plan to be confirmed, "at least one class of claims that is impaired under the plan has accepted the plan."  11 U.S.C. § 1126(a)(10). *See In re Bennett,* 2008 WL 1869308, at *1 (Bankr. E.D. Va. April 23, 2008) (finding that classes where creditors had failed to return ballots were <u>not</u> deemed to have accepted the plan); *In re Jim Beck, Inc.*, 207 B.R. 1010 (Bankr. W.D. Va. 1997) (analyzing two lines of cases and holding that the line of cases which holds that failure of a creditor or class to cast ballot does not result in a default acceptance of the plan is better reasoned and more persuasive than the [line of cases following *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988)]); *See also In re Vita Corp.*, 80 B.R. 525 (Bankr. C.D. Ill. 2008); *In re Smith*, 357 B.R. 60, 69 (Bankr. M.D.N.C. 2006); *In re Higgins Slacks Co.*, 178 B.R. 853 (Bankr. N.D. Ala. 1995); *In re Townco Realty, Inc.* , 81 B.R. 707 (Bankr. S.D. Fla. 1987).  *But see In re Adelphia Comm. Corp.*, 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007); *In re Tribune Co.*, 464 B.R. 126, 184 (Bankr. D. Del. 2011).

Accordingly, the United States Trustee objects to the Plan and Solicitation Procedures

Motion to the extent that they seek approval of the voting and tabulation procedure whereby, to

the extent no votes to accept or reject the Plan, the Class is deemed to have accepted the Plan.

**III.    Provisions Which Require Amendments, Clarifications, or That Raise Objections to the Disclosure Statement.**

The UST also objects to the following provisions and requests that they be amended or

that the Debtors provide justification for them:

    a.  **Plan Supplement:**  The Plan and the Disclosure Statement contemplate that the Plan

Supplement, which will include many key documents and other crucial information,

will be filed with the Court 10 days before the deadline to object to Confirmation.

*See* Plan at Art. I.A.1.106.  The Solicitation Procedures Motion, however, proposes to

set the deadline to file the Plan Supplement as August 12, 2020 and the voting and

plan confirmation objection deadline as August 17, 2020 – only five days following

the filing of the Plan Supplement.  The Plan Supplement will contain documents with

important information for parties in interest to determine whether they have

objections to the Plan and for creditors to determine whether to vote in favor of the

Plan.  *See In re GAC Storage Lansing, LLC*, 485 B.R. 174, 194 (Bankr. N.D.Ill.

2013); *see also Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.,* 157 B.R.

100, 104 (S.D.Tex. 1993) ("The code requires that the debtor adequately, not

selectively, disclose fully and precisely all information a creditor would reasonably

want before voting on the plan."). Moreover, many of the people who may be

receiving this are overseas or their access to internet or mail may be delayed given the

current situation with the Coronavirus.  Accordingly, the UST requests that the Plan

Supplement should be filed with the Court and provided to all parties in interest by at
least 14 days prior to the deadline to vote on or object to the Plan.

b. **Reporting Requirements:** The Disclosure Statement and Plan shall clarify what
entity will be responsible for filing the necessary reports post-confirmation.

c. **Treatment of Various Classes:** With respect to Class 6-B, the Plan currently
provides: "The cash pool may be reallocated among the Debtors after the occurrence
of the Claims bar date, in their reasonable business judgment, to recalibrate for,
among other things, the Claims asserted against each Debtor." *Id.* By Order of the
Court entered on May 28, 2020, the general bar date is currently scheduled for July
15, 2020; accordingly, the Plan provision appears to imply that the available cash
pool for creditors for each Debtor may vary even after the Disclosure Statement has
been approved, thus allowing the creditors' recovery to be modified after the
dissemination of the approved Disclosure Statement. *See* ECF Doc. No. 390. Absent
clarification, the Disclosure Statement lacks sufficient information for creditors to
determine whether to vote to accept or reject the Plan.

IV. **The Treatment of Intercompany Claims and Intercompany Interests is Not
Clearly defined and May Violate the Absolute Priority Rule.**

According to Article 1.76, an "Intercompany Claim" means "any Claim held by a Debtor
against another Debtor as of the Petition Date." Article 1.77, in turn, defines "Intercompany
Interest" as "any Interest held in a Debtor held by another Debtor as of the Petition Date". In the
Plan and Disclosure Statement, the Intercompany Claims are classified in Class 7 and the
Intercompany Interests in Class 9. The treatment of the Intercompany Claims is not well
defined. The Plan provides that "[f]rom and after the Effective Date, all Intercompany Claims,
including the PIK Toggle Notes Claim, shall be adjusted, continued, settled, Reinstated,

discharged, contributed to capital, or eliminated, in each case to the extent determined to be

appropriate by the Reorganized Debtors in their sole discretion" *See* Plan at Art. 4.8.  Similarly,

for Class 9, the Plan provides that "[f]rom and after the Effective Date, all Intercompany

Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be

appropriate by the Reorganized Debtors in their sole discretion."  *See* Plan at Art. 4.10.

Both Classes 7 and 9 are deemed unimpaired and presumed to have accepted the Plan.

It is not clear, however, how they can be unimpaired to the extent the Intercompany

Claims or Interests are eliminated or cancelled.  Based on the unimpaired classification,

however, it seems like these Intercompany Claims and Interests will not be cancelled or

eliminated, which may violate the absolute priority rule.  The Disclosure Statement should be

amended to provide clarity as to the proposed treatment of Classes 7 and 9. *See Oneida Motor*

*Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full

disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and

the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide

sufficient data to satisfy the Code standard of "adequate information.").

### V.     The Disclosure Statement Does Not Give Adequate Information Regarding the Third-Party Release and Exculpation Clauses.

Both the Disclosure Statement and the Plan contain provisions for the release and

exculpation of various non-debtor parties by other non-debtor parties from all sorts of liability.

*See* Disclosure Statement at Art. VI.E.6(b); Plan at Art. 10.7(b). The Debtors have failed to

demonstrate that these provisions are appropriate.

Without reciting the release clauses in their entirety, the provisions contemplated for in

the Plan cause all of Debtors' creditors to release and hold harmless non-debtor parties (the

"Released Parties") from any liability for anything occurring prior to the Effective Date unless

(a) they are deemed to accept the Plan and opt-out of the releases; (b) they abstain from voting

on the Plan and opt-out of the releases, and/or (c) they vote to reject the Plan or are deemed to

reject the plan and opt-out of the releases.  It is not clear if creditors or interest holders that are

deemed to have rejected the plan would be subject to the third-party releases.  The Released

Parties include:

      (a)  The Debtors and the Reorganized Debtors
      (b)  The ABL Agent and ABL Lenders
      (c)  The Term Loan Agent and Term Lenders
      (d)  The IPCo Trustee and IPCO Noteholders
      (e)  The Consenting Support Parties
      (f)  The Sponsors
      (g)  The DIP Agent and DIP Lenders
      (h)  The Exit ABL Agent and Exit ABL Lenders
      (i)  The New Term Agent and New Term Lenders
      (j)  The Backstop Parties
      (k)  Each of such entities' current and former affiliates; equity holders, subsidiaries, officers, directors, managers, principals, employees, agents, advisors, and professionals

*See* Plan, Art. 1.113 (definition of "Released Parties").

The exculpation clause provides that more or less the same parties, in addition to the

Creditors' Committee, are free from any claims related to, or arising out of, the Chapter 11

Cases, unless the act or omission constituted fraud or willful misconduct.  *See* Plan, Art. 10.8.

Although there is no *per se* prohibition against imposing releases of non-debtors by other

non-debtors, those releases are not appropriate in every case, or even in most cases.  *See In re*

*A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989).  Whether such releases and exculpatory

clauses are appropriate is dependent upon the facts and circumstances of each case.  *Behrmann v.*

*National Heritage Foundation*, 663 F.3d 704, 711 (4th Cir. 2011).  Approval of non-debtor

releases and exculpatory clauses "should be granted cautiously and infrequently."  *Id.* at 712.

- 14 -

In *Behrmann*, the Fourth Circuit enumerated several factors that should be considered in determining whether third-party releases are appropriate, including but not limited to the following:

> (a)   There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
> (b)   The non-debtor has contributed substantial assets to the reorganization;
> (c)   The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
> (d)   The impacted class, or classes, has overwhelmingly voted to accept the plan;
> (e)   The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
> (f)   The plan provides an opportunity for those claimants who choose not to settle to recover in full;
> (g)   The bankruptcy court made a record of specific factual findings that support its conclusions;
> (h)   A close connection between the causes of action against the third party and the causes of action against the debtor; and
> (i)   The plan of reorganization provides for payment of substantially all of the claims affected by the injunction.[5]

In *Behrmann*, the Court also made clear that in order to support these types of releases, the Bankruptcy Court must "find facts sufficient to support its legal conclusion that a particular debtor's circumstances entitle it to such relief." *Behrmann*, 663 F.3d at 706-07.  Indeed, in *Behrmann*, the Fourth Circuit reversed the bankruptcy court's legal conclusion that the releases at issue there were "essential" and "integral" to the transactions contemplated in the Plan because the Court failed to support its conclusions with concrete factual findings.  *Id.* at 708, 712-13

---

[5] The Fourth Circuit compiled this non-exhaustive list from *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 649, 658 (6th Cir. 2002), and *In re Railworks Corp.*, 345 B.R. 529, 536 (Bankr. D. Md. 2006).  The Fourth Circuit described these factors as "instructive."  *Behrmann*, 663 F.3d at 712.

(record citations omitted).[6]  On remand, the Bankruptcy Court, applying the factors set forth in

the *Behrmann* opinion, determined that the facts did not support allowing the releases.  That

finding was affirmed by both the District Court and the Fourth Circuit.  *National Heritage*

*Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347, 352 (4th Cir. 2014).  Thus, a

plan containing such release provisions cannot be confirmed in the absence of a significant

evidentiary presentation demonstrating facts supporting such relief.  *Behrmann*, 663 F.3d at 713.

### A.    The Proposed "Opt-Out" Procedure Regarding the Releases is Insufficient to Demonstrate Consent

The Debtors appear to be taking the position that the third-party releases described in the

Disclosure Statement and Plan are consensual under the circumstances.  Under the Plan, the

Disclosure Statement, and the Solicitation Procedures Motion, the third-party releases would be

effective against any creditor or interest holder that, among other things:

1. Votes in favor of the Plan;
2. Is deemed to have accepted the Plan and does not opt-out of the releases;
3. Abstains from voting on the Plan and does not "opt out" of the Third-Party Release Provisions.
4. Voted to reject the plan or is deemed to have rejected the Plan but does not "opt out" of the Third-Party Release Provisions.

*See* Plan at Art.10.7(b).

Although some courts have permitted third-party releases in a Chapter 11 plan based

upon consent alone, the Fourth Circuit does not appear to be one of those courts.  In *Behrmann*,

the Fourth Circuit stated that consent is one fact that the Court should consider in determining

whether to permit third party releases.  *Behrmann*, 663 F.3d at 712 ("No case has tolerated

nondebtor release absent the finding of circumstances that may be characterized as unique.").

---

[6] According to the Fourth Circuit, the Bankruptcy Court's conclusions were "meaningless in the absence of specific factual findings explaining" them.  *Behrmann*, 663 F.3d at 713.  Thus, among the Fourth Circuit's instructions to the Bankruptcy Court on remand was, "to set forth specific factual findings supporting its conclusions."  *Id.*

Even those cases that have allowed third-party releases based upon consent alone have varied on what is required to demonstrate consent. What courts have made clear, however, is that releases of non-debtors must be accompanied by the releasing creditors' "unambiguous" consent. *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D. N.J. 2007) (quoting *In re Arrowmill Dev. Corp.*, 211 B.R. 297, 507 (Bankr. D. N.J. 1997) (for a release to be consensual, the creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt.")); s*ee also In re SunEdison*, 576 B.R. 453 (Bankr. S.D. N.Y. 2017); *In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015). In other words, silence is not consent when a party has no duty to speak. *See SunEdison*, 576 B.R. at 458.

In *In re Arrowmill Dev. Corp.,* one of the first to find consent as a stand-alone basis for allowing third-party releases, the court held that merely failing to vote or even merely voting for the plan was insufficient to demonstrate consent. Rather, the affected creditor must unambiguously manifest assent to the release:

> [I]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote "yes" as to the plan. Rather the "validity of the release ... hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order. Thus, the court must ascertain whether the creditor unambiguously manifested asset to the release of the nondebtor from liability on its debt.
>
> In this case, creditor Delliturri did not vote for the plan and clearly did not manifest any asset to have his claim against John Caglianone released. Accordingly [the release provisions of the plan] do not release Mr. Caglianone from any liability he may have had to Mr. Delliturri.

211 B.R. at 507 (citations omitted).

Similarly, in *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011), the court held that mere "opt out" procedures were insufficient, particularly with respect to creditors who did not return ballots:

> [T]he Court concludes that the opt out mechanism is not sufficient to
> support the third party releases anyway, particularly with respect to
> parties who do not return a ballot (or are not entitled to vote in the first
> place).  Failing to return a ballot is not a sufficient manifestation of
> consent to a third party release.  Therefore, the Court concludes that any
> third party release is effective only with respect to those who
> affirmatively consent to it by voting in favor of the Plan and not opting
> out of the third party releases.

*Id.* at 355 (citations omitted); *see also In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir.

1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not

inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of

reorganization.  Consequently, a creditor who votes to reject the Plan or abstains from voting

may still pursue any claims against third-party nondebtors."); *In re Oneida Ltd.*, 351 B.R. 79, 94

(Bankr. S.D.N.Y. 2006) (holding that the third-party release in the Plan was consensual and

passed muster because it provided for releases by "checking a box" on the plan solicitation

ballot); *In re Zenith Elec. Corp.*, 341 B.R. 92, 111 (Bankr. D. Del. 1999) (holding a release of a

third party's claims "cannot be accomplished without the affirmative agreement of the creditor

affected.").  *But see In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013).

More recently, the court in *In re Chassix Holdings, Inc.* was faced with a similar issue

and ultimately held that the releases would only apply to (a) any holder of a claim who voted to

accept the plan and (b) any holder of a claim who voted to reject the plan but who affirmatively

elected to provide the releases by checking the appropriate box on the ballot form – or, in other

words, "opted in" the releases.  553 B.R. 64, 82 (Bankr. S.D.N.Y. 2015). With respect to

creditors who were entitled to vote but abstained, the court noted:

> [U]nder the circumstances of this case it would be inappropriate to treat
> such inaction as a "consent" to third party releases. . . .  The relatively
> small recoveries that were initially proposed, and the widely-publicized
> fact that other creditor groups had endorsed the proposed Plan, could
> easily have prompted an even higher-than-usual degree of

inattentiveness or inaction among affected creditors in these cases. Furthermore, many creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to the dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inactions, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

*Id*. at 80-81; *see also In re Emerge Energy Services LP,* 2019 WL 7634308, at 23 (Bankr. D. Del. Dec. 5, 2019) ("[T]he Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations.").

"Opt out" procedures are problematic in that creditors may be "caught asleep at the switch." If a creditor is truly consenting to the release provisions, then that creditor will have no problem "opting in" to the provision. As discussed above, *Behrmann* makes clear that third-party releases are to be approved only in extraordinary circumstances. Such releases are the exception, not the rule. Indeed, if the Court allows confirmation of plans including such provisions based solely on the failure to affirmatively "opt out," there is no reason for a debtor to ever leave such a provision out of the plan since that debtor is likely to get at least a few creditors to unknowingly "consent" to the releases.

True consent by Class 6-B is even more questionable given the "death-trap" provision embedded in the proposed treatment. As set forth above, in fact, the Plan contemplates that for Other General Unsecured Claims in Class 6-B, to the extent the Class accepts the Plan, the creditors within that class with share pro rata $3,000,000. That amount, however, would decrease to $1,000,000 to the extent that the Class rejects the Plan. Accordingly, the Plan contains an *in terrorem* provision intended to prevent creditors within that Class from exercising

their right to reject the Plan, because if a class rejects the Plan, any possibly recovery would

decrease substantially by $2,000,000.  Such conditional treatment cannot be deemed to constitute

consent to the releases that are contingent on the acceptance of the Plan.

If the Court is inclined to allow releases by consent alone, the Court should follow those

courts that require strict evidence of actual consent by the affected parties.  Said differently, the

UST requests that the following changes be made to the Disclosure Statement, ballots, or Plan:

- The Disclosure Statement and the Plan should specify that any creditor or interest holder who abstains from voting or fails to return a ballot should not be deemed to have consented to the third-party releases.

- The Disclosure Statement and the Plan should be amended to provide that creditors who are deemed to have rejected the plan should be deemed to have rejected the third-party releases without having to object to the Plan or opt-out of the releases.

- The Disclosure Statement, the Plan, and the ballots should be amended to provide that creditors classified as "unimpaired" should be given an option to "opt in" of the third-party releases.

- The Disclosure Statement, the Plan, and the ballots should be amended to provide that creditors who reject the plan do not have to opt-out of the releases; but rather should be deemed to have rejected the third-party releases as well.

*See In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015).

### B. The Exculpation Clauses are Impermissibly Broad and Lack the Required Exception for Court Approved Suits.

The exculpation clause here is impermissibly broad on its face because, *inter alia*, (i) it is

too broad in respect to who is exculpated (for example, it exculpates entities such as the

Consenting Support Parties and the Sponsors); (ii) it does not provide an exception allowing for

suits against the exculpated parties where prior court approval is obtained; (iii) it does not

contain a carve-out for acts or omissions that constitute breach of fiduciary duty; and (iv) it does

not include protection from the breaches or violations of their professional responsibilities.

In *In re National Heritage Foundation, Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd,*

*National Heritage Foundation v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014), the

court addressed exculpation clauses such as the one in this Plan.  There, the court recognized that

exculpation provision are permissible only if they are "properly limited and not over broad."  *Id.*

at 234.

> To avoid over-breadth, exculpation clauses must be:
>
> (a) narrowly tailored to meet the needs of the bankruptcy estate;
> (b) limited to parties who have performed necessary and valuable duties
> in connection with the case;
> (c) limited to acts and omissions taken in connection with the bankruptcy
> case; and
> (d) must not purport to release any pre-petition claims.

*Id.*

Additionally, courts that have approved exculpation and release provisions have done so

when the relief sought "is solely limited to fiduciaries who have served a debtor through a

chapter 11 proceeding."  *In re Health Diagnostic Laboratory, Inc*., 551 B.R. 218, 232-33 (Bank

E.D.Va. 2016) (citations omitted).

Here, the clause is not narrowly tailored to meet the needs of the bankruptcy estates and

is not limited to parties who have performed necessary and valuable duties in connection with

the cases.  The exculpation is with respect to any act taken or omitted to be taken even relating to

prepetition transactions such as the formulation or preparation of the Transaction Support

Agreement which occurred pre-petition.  Furthermore, the term "Exculpated Parties" is so broad

that it extends to parties that may be neither creditors nor professionals and may involve people

who had no direct involvement with any action taken during the pendency of the bankruptcy

proceedings.  Similarly, the Plan proposes to exculpate the "Reorganized Debtors", which

technically will not even be in existence until after the effective date of the Plan.  These entities

have no place in an exculpation clause. *See Washington Mutual, Inc*., 442 B.R. at 348 (Bankr. D.

Del. 2011) ("[These parties] have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed."); *see also In re Fraser's Boiler Service, Inc.*, 593 B.R. 636, 642 (Bankr. W.D.Wash. 2018).

Finally, to be permissible, an exculpation clause must contain a "gatekeeper function by which the Court may, in its discretion, permit an action to go forward against the exculpated parties." *National Heritage*, 478 B.R. at 234.  The exculpation clause here contains no such exception.  "[T]he Debtors [have] failed to demonstrate why it is necessary to release such a wide spectrum of individuals and/or entities who may or may not be critical to the success of the [plan]." *In re Draiman*, 450 B.R. 777, 799 (Bankr. N.D.Ill. 2011). The exculpation provision in its current form is overly broad and should be stricken.

### C.   The Release and Exculpation Clauses Contain no Carve-Out for Governmental Claims.

To the extent that the Court allows for any releases or exculpation to the Debtors, the UST requests that the following language carving out Governmental claims from the proposed releases be included:

> Nothing in this Plan discharges, releases, precludes, or enjoins: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Plan divests any tribunal of any jurisdiction it may have law to adjudicate any defense based on this paragraph of the Plan.

### D.   Conclusion Regarding Release and Exculpation Provisions for the Purpose of the Hearing on the Disclosure Statement.

While consideration of the release and exculpation provisions is, arguably, a matter for a confirmation hearing rather than a hearing on approval of a proposed disclosure statement, the

absence of a discussion of the facts and factors germane to the appropriateness of the provisions

deprives creditors of a meaningful understanding of the rationale, justification, and effect of the

releases, and the likelihood that they will be approved.  Those are the heart of the issue in

disclosure.  Moreover, because approval for the form of the ballots is being sought, the UST

objects to their current form and requests that the Court deny the Solicitation Procedures Motion

unless the ballots are amended as set forth above.

## VI.     The Plan Violates Section 503(c) of the Bankruptcy Code

The Plan and Disclosure Statement include a provision regarding the implementation of a

"Management Incentive Plan" defined as " the form, terms, allocation and vesting of awards under

any management incentive plan adopted after the Effective Date by the New Board in its sole

discretion."  *See* Plan at Art. 1.89.  The Plan further provides:

Employee Compensation and Benefits

Except as listed in the Schedule of Rejected Contracts and Leases, all Benefit Plans[7]
and Employee Arrangements[8] shall be treated as Executory Contracts under the
plan and deemed assumed on the Effective Date pursuant to the provisions of
sections 365 and 1123 of the Bankruptcy Code.  . . . No participants shall have
rights under the Benefit Plans and Employee Arrangements assumed pursuant to
the Plan other than those existing immediately before such assumption.

*See* Plan at Art. 8.9.

New Common Shares May be Subject to Further Dilution

The New Common Shares to be issues on the Effective Date are subject to dilution
for (a) New Common Shares issued upon the exercise of the New Warrants, (ii)
New Common Shares issued pursuant to the Management Incentive Plan, and (iii)

---

[7] The term "Benefit Plans" means, among other things, "(b) any other pension, retirement, *bonus, incentive,*
health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract or arrangement
(whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the
benefit of any of its current or former employees or independent contracts . . ."  *See* Plan at Art. 1.21 (Emphasis
added).

[8] The term "Employee Arrangements" is defined as "all employee compensation plans, Benefit Plans,
employment agreements, offer letters, or award letters to which any Debtor is a party."  *See* Plan at Art. 1.52.

other New Common Shares issued by the Reorganized Debtors after the Effective
Date.

*See* Disclosure Statement, Art. X.D.4.

If this Court confirms the Plan, then on or right before the Effective Date, the

Debtors/Reorganized Debtors could (a) assume the existing agreements with senior management

– *i.e*. "insiders"; (b) enter into new employment contracts or modification of existing ones;

and/or (c) adopt a Management Incentive Plan ("MIP").

As to the MIP, the Plan here requires that the New Board adopt and implement the MIP,

following the Effective Date.  *See* Plan at Art. 1.86.  While a reorganized debtor's board may

normally offer bonuses to employees after bankruptcy for future work without implicating

section 503(c), the critical difference here is there is no clarity as to whether the New Board is

constituted by the members of the present Board or whether the present Board is really the one

proposing and implementing the MIP which will only go into effect upon the "Effective Date".

The Debtors bear the burden of establishing that any of the Benefit Plans and Employee

Arrangements they seek to assume or modify or the MIP to be implemented satisfy the

Bankruptcy Code's requirements.  *See GT Advanced Tech., Inc. v. Harrington*, 2015 WL

4459502, *5 (Bankr. D.N.H. July 21, 2015) (*citing In re Hawker Beechcraft, Inc*., 489 B.R. 308,

313 (Bankr. S.D.N.Y. 2012)).  The plain text of section 503(c) does not draw a distinction

between awards made to insiders pre-confirmation versus post-confirmation.  *See* 11 U.S.C. §

503(c)(1).  Notably, because section 503(c) speaks to the allowance as well as the payment of

obligations, it applies with equal force regardless of whether the payment is to be made by the

debtor prior to plan confirmation, or whether the successor of the debtor is directed to make such

a payment after emergence from bankruptcy.  *See In re AMR Corp.*, 490 B.R. 158, 167-68

(Bankr. S.D.N.Y. 2013); *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (applying

11 U.S.C. § 503(c) to bonus and severance payments that were to be made to debtor's insider upon emergence from bankruptcy); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 171-72 (Bankr. D.N.J. 2010) (holding severance provision invalid under section 503(c)(2) notwithstanding fact that severance was to be paid after plan effective date by reorganized debtor).

The Disclosure Statement and Plan fails to provide information as to the (i) Benefit Plans and Employee Arrangements that the Debtors intend to assume, (b) the identity, titles, and "insider" status of the management employees whose agreements will be assumed or who will receive the MIP equity, (c) the bonus or severance payments contemplated under the Benefit Plans and Employee Arrangements, (d) the value of the MIP equity, (e) the time-based vesting criteria, and (f) the performance-based vesting criteria.  The current language in the documents essentially gives the Debtors or Reorganized Debtors the right to assume and possibly modify any Benefit Plans and Employee Arrangements (which possibly contains incentives, bonuses, or severance payments).  In short, it is a blank check which can be used to compensate unknown individuals with unknown amounts based on unknown performance metrics.  Given the vague nature of the provision, it cannot be determined if the provision regarding the Benefit Plans, the Employee Arrangements, or the MIP, as described, implicates or is subject to 11 U.S.C. § 503(c).

Accordingly, the Disclosure Statement should be amended to provide additional information regarding (a) what Benefit Plans or Employee Arrangements the Debtors seek to assume, (b) ensure that any such Benefit Plans or Employee Arrangements be included in the Plan Supplement, and (c) the MIP, including, without limitation, whether a management incentive plan is currently in place, whether the New Board has an obligation to issue awards under the incentive plan, how the decision to allocate the stock will be made, whether it is discretionary, and what will happen to the stock allocated to the MIP if they are not awarded to management.

## CONCLUSION AND RESERVATION OF RIGHTS

The Plan cannot be confirmed as it fails to comply with Sections 11129(a)(2) and (a)(9) of the Bankruptcy Code.  The Court should not approve the Disclosure Statement.  *See In re GSC, Inc.,* 453 BR. 132. 1577 n.27 (Bankr. S.D.N.Y. 2011) (citing *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its fact should not be approved.")); s*ee also In re Robert's Plumbing and Heating, LLC*, No. 10-23221, 2011 WL 2972092, at *2 (Bankr. D. Md. July 20, 2011); *In re Pecht*, 53 B.R. 768, 769 (Bankr. E.D.Va. 1985).

The UST reserves his rights to object to other deficiencies at the hearing on the approval on the Disclosure Statement.  The UST also submits that, if applicable, the foregoing objections constitute objections to the confirmation of the Plan.

Respectfully Submitted,

John P. Fitzgerald III, Acting United States
Trustee for Region Four

By: /s/ Nicholas S. Herron

Kenneth N. Whitehurst, III, Esq.
Assistant U.S. Trustee

Nicholas S. Herron, Esq.
Trial Attorney

## **CERTIFICATE OF SERVICE**

I, Nicholas S. Herron, hereby certify that, on **June 18, 2020**, a true copy of the foregoing was delivered via electronic mail pursuant to the Administrative Procedures of the CM/ECF System for the United States Bankruptcy Court for the Eastern District of Virginia to all necessary parties.

 /s/ Nicholas S. Herron
Nicholas S. Herron