Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Debra I. Grassgreen, Esq. (admitted *pro hac vice*)
Shirley S. Cho, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700 /Fax:  (212) 561-7777
Email:  rfeinstein@pszjlaw.com
        bsandler@pszjlaw.com
        dgrassgreen@pszjlaw.com
        scho@pszjlaw.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

Robert S. Westermann (VSB No. 43294)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Telephone: (804) 771-9500
Facsimile: (804) 644-0957
Email:  rwestermann@hf-law.com

*Proposed Local Counsel to the Official
Committee of Unsecured Creditors*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **CHINOS HOLDINGS, INC., et al.,** | : | **Case No. 20-32181 (KLP)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION AND RELATED SOLICITATION PROCEDURES

The Official Committee of Unsecured Creditors (the "Committee") of Chinos Holdings,

Inc., et al. (the "Debtors"), by and through its proposed counsel, respectfully submits this

objection (the "Objection") to the *Motion of Debtors for Entry of an Order (I) Approving the*

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

*Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Plan, and (V) Granting Related Relief* [Docket No. 471] (the "Motion") and the *Proposed Disclosure Statement for Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors* [Docket No. 469] (the "Disclosure Statement").[2] In support of the Objection, the Committee respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT

The Disclosure Statement (i) fails to provide creditors and parties in interest with adequate information to evaluate the Plan; and (ii) describes a Plan that cannot be confirmed under section 1129 of the Bankruptcy Code. For these reasons, the Motion must be denied.

Prepetition, on May 3, 2020, the Debtors executed the Transaction Support Agreement (the "TSA") with (i) certain of the "Consenting Support Parties" (as defined in the TSA) and (ii) their private equity owners, a/k/a the Sponsors.[3] Pursuant to the TSA, the Consenting Support Parties and the Sponsors agreed to support a restructuring transaction as set forth in the proposed Plan. The TSA provides that the Debtors have until July 13, 2020 to obtain approval of the Disclosure Statement.

Although the Debtors have never sought Court authority to assume or perform the prepetition TSA, the Debtors have proceeded in accordance with it and filed the Plan, which as described in the TSA is the conversion of $1.6 billion of prepetition secured debt held principally by the Consenting Support Parties into 100% of the Debtors' post emergence equity as follows: (i) on account of a secured claim allowed in the amount of $716.6 million against the J. Crew

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, the Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors (With Technical Changes) [Docket No. 468] (as may be amended, the "Plan") and the Motion, as applicable.

[3] The "Sponsors" are defined in the Plan as "collectively, TPG Chinos, L.P., TPG Chinos Co-Invest, L.P., Green Equity Investors V, L.P., Green Equity Investors Side V, L.P., and LGP Chino Coinvest LLC."

Opco Debtors under the Plan, holders of Class 4 Term Loan Secured Claims will receive 76.5% of the New Common Shares; and (ii) on account of a secured claim of $411.6 million allowed against the IPCo Debtors under the Plan, holders of Class 5 IPCo Notes Claims will receive 23.5% of New Common Shares.[4] The proposed equity splits under the Plan are based on a presumed enterprise value of $1.75 billion. In support of this valuation, the Debtors have attached the Valuation Analysis of Lazard to the proposed Disclosure Statement, wherein it states that "Lazard estimates that the potential range of Enterprise Value of Reorganized Chinos Holdings is approximately $1.66 to $2.03 billion." Disclosure Stmt. Ex. D.

The Lazard Valuation Analysis raises more questions than it answers. Although it is based on a "sum-of-the-parts approach," the value of the parts (i.e., the discrete J. Crew and Madewell business) is not disclosed nor are the assumptions underlying the Debtors' business projections upon which it also relies. The Committee is conducting its own independent investigation of the enterprise value of the Debtors and the value of the reorganized entity to determine that in fact the putative secured lenders are not being overpaid, and that value is not being given away to them at the expense of unsecured creditors due to an artificially low plan valuation. But, from the perspective of whether the Disclosure Statement contains "adequate information," given that the Valuation Analysis is the crux of the Plan structure, it is materially deficient and lacking in key information.

Nor does the Disclosure Statement provide any information regarding the discrete value of the J. Crew domestic intellectual property, which together with an intercompany license agreement, is the only collateral allegedly securing the IPCo Notes that are proposed to be granted an allowed claim of $411.6 million, including a $58 million "make whole premium." It is also unclear why the IPCo Notes Claims, which only have recourse to limited intellectual property assets held by a few Debtors as a result of the 2017 Transaction and that have no recourse whatsoever to any of the assets or value of any of the other Debtors, are now being

---

[4] In both cases, subject to distribution of the Backstop Premium, the New Equity Allocation, and the New Common Shares payable to the DIP Lenders.

provided a proposed recovery higher than those general unsecured claims under the Plan by sharing in the equity value attributable to all Debtors as a consolidated enterprise. The Committee is actively investigating whether they are being overpaid, a fact which cannot be discerned from the Disclosure Statement given the lack of any valuation of their intellectual property collateral.

The Disclosure Statement fails to contain adequate information to determine the propriety of the de facto substantive consolidation of the estates under the Plan, an important predicate for the Plan and the two secured lender groups' conversion of debt to equity. Although the Term Lenders and IPCo Noteholders have different Debtor obligors and different collateral packages, the Plan essentially consolidates all of the Debtor entities' assets and allocates the value thereof to them, in the form of the New Common Shares of the reorganized ultimate Debtor parent, notwithstanding those creditor groups have discrete interests in liens upon the discrete assets of only certain, not all, of the Debtors. By comingling all assets and liabilities of the Debtors together and distributing the reorganized equity in the manner proposed, the Plan implements substantive consolidation without any showing in the Disclosure Statement that creditors are not harmed by such comingling and/or that the standards for substantive consolidation have been met.[5] The Plan lacks adequate information in other material regards as well as discussed further below and the belatedly-filed modified Disclosure Statement does not remedy these information deficiencies.[6]

Second, the Disclosure Statement describes a Plan that appears to violate many basic

---

[5] In the absence of true substantive consolidation, the Plan violates the absolute priority rule, transferring value to structurally junior creditors and, on this independent ground, fails to meet the "best interest of creditors test" on a Debtor-by-Debtor basis.

[6] Only one week before the deadline to object to the Disclosure Statement, the Debtors filed a modified Disclosure Statement, a modified Plan, and for the first time, the critical and complex financial exhibits of the Debtors' valuation analysis, go-forward business projections, and liquidation analysis. The foregoing timing is unreasonable and substantially prejudices the Committee's right and all creditors' rights to review and consider the information. Bankruptcy Rule 3017 requires that a plan proponent provide at least 28 days' notice of the hearing to approve a proposed disclosure statement. Implicit in that requirement is that the filed disclosure statement is more than a skeleton devoid of essential information to be supplied on the eve of the hearing, as parties in interest will not have had anything close to 28 days to review, and if appropriate object, to the information the plan proponent proposes to include in the Disclosure Statement. Under Rule 3017, due solely to the Debtors' failure to give adequate notice, the Motion should be denied.

tenets of section 1129 of the Bankruptcy Code:

- ***Improper Classification – 11 U.S.C. §§ 1129(a)(1); 1122; 1129(b)(1).*** In a
  transparent attempt to manufacture affirmative votes in an impaired class that
  otherwise might be expected to reject the plan, Class 6-B (Other General
  Unsecured Claims), the Plan classifies the Term Lenders' unsecured deficiency
  claim, which is estimated to be $625.4 million, together with the Other General
  Unsecured Claims (Class 6-B), who are holders of lease rejection claims, unpaid
  vendor claims, etc., solely and expressly for voting purposes insofar as the Plan
  provides that the Term Lenders will not receive their pro rata distribution of the
  funds provided to holders of Class 6-B claims on account of their unsecured
  deficiency claim. This gerrymandering raises confirmation objections, including
  that the classification scheme causes the Plan to fail the confirmation requirement
  of section 1129(a)(1), and that in a cramdown scenario, the Plan would not be
  "fair and equitable" under section 1129(b). As the Fourth Circuit Court of
  Appeals has explained: "If the plan unfairly creates too many or too few classes,
  if the classifications are designed to manipulate class voting, or if the
  classification scheme violates basic priority rights, the plan cannot be confirmed."
  *In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (*quoting In re
  Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).

- ***Best Interest of Creditors Test - 11 U.S.C. § 1129(a)(7).*** The Liquidation
  analysis fails to include a comprehensive schedule of the value of the Debtors'
  assets, including avoidance actions, under-encumbered assets, and unencumbered
  assets. Instead, the Debtors ascribe $0.00 value to avoidance actions under the
  Liquidation Analysis relying on the independent director's brief review of the
  2017 transactions. The Committee is conducting a thorough independent
  investigation of these transactions and does not subscribe to this view at present, a
  fact which is not noted in the Disclosure Statement. The Committee is continuing

its investigation into these and all other potential unencumbered assets that, along with any recovery from the Committee's lien challenges, could provide value for unsecured creditors at one or more Debtor entities.

- ***Improper Third Party Releases.*** The Plan contains inappropriate blanket direct and third-party releases of the Debtors' current and former insiders and others devoid of any discussion of (i) what claims (and the value thereof) are being proposed to be released by the Debtors through the Debtors' release of the Released Parties and (ii) what value and consideration, if any, is being provided by the Released Parties to justify the releases in favor of the Released Parties.

In short, while the Term Lenders and IPCo Noteholders, the proposed new owners of the reorganized business, will conceivably receive more under the Plan than what they are entitled to otherwise under their operative contracts and documents and applicable law, the vast majority of non go-forward general unsecured creditors – comprised mostly of rejection claims and smaller trade claims – will receive only a pittance (a 1.6% recovery for Class 6-B) which may be well less than that to which they are entitled.  Unless the Debtors can provide a more complete disclosure of the foundation for the relative treatment of creditors under the Plan, including, without limitation, that substantive consolidation is appropriate and that Class 6-B unsecured creditors are entitled to no more than de minimis consideration, the Disclosure Statement should not be approved and, as drafted and presented, Plan is unconfirmable on its face.

Finally, as discussed below, the Debtors have also proposed plan balloting and solicitation procedures that are unreasonable, deficient, or otherwise inappropriate in various respects as set forth below.  For the foregoing reasons and those discussed below, the Court should not approve the Disclosure Statement, and the Debtors' Motion should be denied.

## II.

## <u>BACKGROUND</u>

1.      On May 4, 2020 (the "Petition Date"), each of the Debtors commenced a case under Chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

2.      On May 13, 2020, the United States Trustee for Region 4 (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of all unsecured creditors in these Cases. The members appointed to the Committee are: (i) Simon Properties, Inc.; (ii) First Glory Limited; (iii) United Parcel Service, Inc.; (iv) Pan Pacific Co. Ltd.; and (v) Brookfield Property REIT, Inc. The *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188] was filed on May 13, 2020.

3.      The Committee is in the process of conducting its investigation into potential claims and causes of action arising out of the 2017 Transaction and the enterprise and equity valuations relevant to the proposed distributions under the Plan. As set forth in the final DIP financing order [Docket No. 447], with respect to claims against the Term Lenders and IPCo Noteholders arising out of the 2017 Transaction or otherwise, pursuant to the Challenge Deadline set forth therein, those claims must be brought by August 3, 2020 or such other date as may be upon agreed by the parties or ordered by the Court. There is no challenge deadline applicable to the Debtors' equity owners, who are potential targets of claims arising out of the 2017 Transaction, but they along with many others are to receive a blanket release (for no consideration) under the Plan.

4.      On May 18, 2020, the Debtors filed their initial Disclosure Statement and the Plan [Docket Nos. 247 and 248, respectively]. The Disclosure Statement was a skeleton in many respects as it was missing critical information and many key documents.

5.      On June 11, 2020, one week before the June 18, 2020 deadline for filing objections to the Disclosure Statement, the Debtors filed their modified Disclosure Statement, together with, for the first time, the Debtors' post-confirmation business projections (Exhibit B to the modified Disclosure Statement), liquidation analysis (Exhibit C to the modified Disclosure

7

Statement), and valuation of the reorganized company (Exhibit D to the modified Disclosure Statement) (collectively, the "Financial Exhibits") [Docket No. 469], along with a modified Plan [Docket No. 468], the Motion [Docket No. 471] and blacklines of the Plan and Disclosure Statement [Docket No. 470].

6.        By delaying the filing of the modified Disclosure Statement and key exhibits to only a week ago, the Debtors effectively cut short the 28 day notice requirement of Bankruptcy Rule 2002(b)(1), as the Debtors afforded the Committee and other parties in interest only seven days to review the most critical information and documents.

III.

**OVERVIEW OF CERTAIN KEY ELEMENTS OF THE PLAN**

**A.        Specific Class Treatment Under the Plan**

7.        The Plan separately classifies general unsecured creditors into several classes as noted below.  Those unsecured creditors who are trade creditors who enter into new trade agreements with the Debtors covering the post-confirmation period are placed in Class 6-A as Ongoing Trade Claims.  The Term Loan Deficiency Claims are placed into Class 6-B along with Other General Unsecured Claims, while the IPCo Noteholders' deficiency claim is placed into Class 5 along with the IPCo Notes Claims.

8.        Class 4 – Term Loan Secured Claims:  On account of its $716,645,605 Allowed Term Loan Secured Claim, the Term Lenders are estimated to receive 76.5% of the New Common Shares on the Effective Date subject to dilution.  While the Debtors state that the estimated recovery on account of Class 4 claims is 100%, this estimate does not take into account the $625,475,614[7] of Term Loan Deficiency Claims separately classified in Class 6-B. The actual recovery to the Term Loan Secured Claims appears to be 53% on account of its total prepetition secured claim.

9.        Class 5 – IPCO Notes Claims:  The Plan provides that the "The IPCo Notes Claims are Allowed against each IPCO Debtor in the aggregate principal amount of

---

[7] See p. 6 summary chart in the Disclosure Statement describing Class 6-B recoveries.

8

$347,599,000, plus (i) a make-whole premium equal to $58,044,927, (ii) accrued and unpaid interest through the Petition Date equal to $6,025,049, and (iii) any other prepetition obligations payable under the IPCo Indentures and IPCo Notes." The IPCo Notes Claims are defined to include "the IPCo Indentures and the IPCo Notes, *including any deficiency claims* and all accrued but unpaid interest, costs, fees, and indemnities." *See* Plan at § 1.85 (emphasis added). On account of the IPCo Notes Claims, the IPCo Notes are to receive 23.5% of New Common Shares of the Reorganized Debtors on the Effective Date, subject to dilution.

10.     The Disclosure Statement does not contain any information about the susceptibility of the make-whole premium to legal challenge, or the basis upon which the Debtors propose to simply allow that claim in full under the Plan.

11.     <u>Class 6-A – Ongoing Trade Claims:</u>  The Plan provides that each holder of an Allowed Ongoing Trade Claim[8] will receive, on the Effective Date, its Pro Rata share of a $71 million cash pool.  The aggregate amount of cash distributed on account of any Allowed Ongoing Trade Claim is capped at 50% of the Allowed amount of such Claim although the Disclosure Statement does not reveal why that cap is imposed.

12.     <u>Class 6-B – Other General Unsecured Claims:</u>  The Plan provides that each holder of an Allowed Other General Unsecured Claim will receive its Pro Rata share of either a $1 million or $3 million cash pool allocated to each Debtor as set forth below; provided that the aggregate amount of cash distributed on account of any Allowed Other General Unsecured Claim will not exceed 50% of the Allowed amount of such Claim:

| **Debtor** | **Cash Pool[9]** | |
| --- | --- | --- |
| | **If Class 6-B Accepts** | **If Class 6-B Rejects** |

---

[8] "<u>Ongoing Trade Claim</u> means any General Unsecured Claim held by a party that, within 30 days of the Petition Date, has executed a trade agreement that expressly designates such party as a holder of an Ongoing Trade Claim and that provides for continuity of goods and services to be provided to the Reorganized Debtors for a period of at least 180 days on terms no less favorable to the Debtors than those in place for the year before the Petition Date, except as otherwise agreed by the Debtors with the consent of the Requisite Consenting Support Parties (such consent not to be unreasonably withheld." (Plan, at p. 9).

[9] "The cash pool may be reallocated among the Debtors after the occurrence of the Claims bar date, in their reasonable business judgement, to recalibrate for, among other things, the Claims asserted against each Debtor." (Plan, at p. 20).

| J. Crew Inc. | $69,000 | $23,000 |
| J. Crew Operating Corp. | $1,877,000 | $625,900 |
| Grace Holmes, Inc. | $399,000 | $133,00 |
| H.F.D. No. 55, Inc. | $165,000 | $55,000 |
| Madewell, Inc. | $489,700 | $163,000 |
| J. Crew Group, Inc. | $300 | $100 |
| Total | $3,000,000 | $1,000,000 |

13.    "Other General Unsecured Claims" are defined to expressly include the Term Loan Deficiency Claims. *See* Plan at § 1.01. But, as made clear by treatment afforded to Class 6-B Other General Unsecured Claims: "Subject to occurrence of the Effective Date and solely for purposes of the Plan, holders of the Term Loan Deficiency Claims agree to forgo any distribution under the Plan on account of such Term Loan Deficiency Claims." *Id.* at § 4.7(b) (Plan, at p. 20).

14.    Class 7 – Intercompany Claims:  The Plan provides that "all Intercompany Claims, including the 7.75%/8.50% Senior PIK Toggle Notes due 2022, shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion." (Plan, at p. 20).

15.    Class 9 – Intercompany Interests:  Finally, the Plan provides that "all Intercompany Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors in their sole discretion." (Plan, at pp. 21).

**B.     Debtor and Consensual Third Party Releases**

16.    The Plan contains an extremely broad release by the Debtors (Plan, at pp. 43-44) and an ostensibly consensual third-party release (Plan, at pp. 44-45) for the benefit of numerous non-Debtor parties including current and former equity holders,[10] and which also

---

[10] "Released Parties means each of, and solely in their capacity as such, (a) the Debtors and the Reorganized Debtors, (b) the ABL Agent and ABL Lenders, (c) the Term Agent and Term Lenders, (d) the Indenture Trustees and IPCo Noteholders, (e) the Consenting Support Parties, (f) the Sponsors [which as of the Petition Date held 76%

cover any potential avoidance actions relating to the 2016/2017 Transactions. Yet the Disclosure Statement contains no information about the nature of those claims, the consideration being provided in exchange therefor, or any other information regarding the propriety of these releases.

**C.    Exculpation**

17.    The Plan includes broad exculpation provisions against claims and causes of action relating to the bankruptcy cases covering numerous non-fiduciary parties including the Term Lenders and IPCo Noteholders.[11] The exculpation is also not limited to the post-petition period (Plan, at p. 45).

**D.    Plan Injunction**

18.    The Plan includes a broad Plan injunction protecting numerous non-Debtor parties including all of the Released Parties (Plan, at p. 42-43).

## IV.    ARGUMENT

**A.    The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code**

19.    Section 1125(b) of the Code requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a). This standard is purposefully malleable "so as to permit a case-by-

---

of the common stock], (g) the DIP Agent and DIP Lenders, (h) the Exit ABL Agent and Exit ABL Lenders, (i) the New Term Agent and New Term Lenders, (j) the Backstop Parties, and (k) the Related Parties for each of the foregoing; provided that a holder of a Claim or Interest that objects to or opts-out of the releases set forth in Section 10.7(b) of the Plan shall not be a 'Released Party.'" (Plan, at p. 11) "Related Parties means individually or collectively, and each in their capacity as such: with respect to a given Entity, all present and former officers (including chief restructuring officers), directors (including independent directors), stockholders, general or limited partners, managers, managing directors, managing members, members, principals, employees, attorneys, agents, trustees, financial advisors, restructuring advisors, accountants, investment bankers, consultants, managed accounts, managed funds and other representatives and agents of such Entity." [our emphases added] (Plan, at pp. 10-11)

[11] Under the Plan (at p. 6), "Exculpated Parties" means, collectively and, in each case, in their capacities as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Creditors' Committee, (iv) the Consenting Support Parties, (v) the ABL Agent and the ABL Lenders, (vi) the Term Agent and the Term Lenders, (vi) the Indenture Trustees and the IPCo Trustee Noteholders, (vii) the Backstop Parties, (viii) the DIP Lenders, (ix) the DIP Agent, (x) the New Term Lenders, (xi) the New Term Agent, (xii) the Sponsors, and (xiii) the Related Parties for each of the foregoing.

case determination based on the prevailing facts and circumstances." *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

20.    In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).  For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution.").  Even after the Debtors filed a modified Disclosure Statement and the Financial Exhibits a week ago, it continues to have deficiencies, including the below.

21.    <u>Inadequacy of the Financial Exhibits:</u>  As discussed above, in allocating equity to the two tranches of secured debt, notwithstanding that the obligors and the collateral packages for these loans were different, the Debtors assume a de-facto substantive consolidation of all the Debtors' assets and liabilities in the Valuation Analysis.[12]  Nowhere in the Disclosure Statement is there a clear discussion of the valuations of the two lender groups' respective collateral positions.  Without this disclosure, creditors are unable to determine whether either or both tranches of secured debt are being overpaid under the Plan to the detriment of all other general unsecured creditors. The Debtors should disclose valuations on a Debtor-by-Debtor basis

---

[12] In the Fourth Circuit, the bankruptcy court has authority to substantively consolidate separate bankruptcy estates into a single estate pursuant to its general equitable powers under section 105. *Munford, Inc. v. TOC Retail, Inc. (In re Munford, Inc.)*, 115 B.R. 390, 397 (Bankr. N.D. Ga. 1990).  Further, "[s]ubstantive consolidation should be used sparingly to prevent injustice." *In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 594 (Bankr. E.D. Va. 2004).

or, at a minimum, break-down the lender groups into the Loan Debtors and the IPCo Debtors sub-groups.

22.    <u>GUC Recovery Estimates:</u>  In the modified Disclosure Statement, with respect to Class 6-B, the Debtors allocate specific dollar amounts by Debtor as the cash pool available for creditors of each such Debtor.  The Debtors estimate that each sub-group of Class 6-B, broken down by Debtor entity, will receive a 1.6% recovery.  The Debtors should disclose the basis upon which the cash pool was allocated among the various Debtors' estates.

23.    <u>Disclosures Relating to the Term Lenders/ IPCo Noteholders:</u>  The Term Lenders and IPCo Noteholders hold multiple and overlapping interests in or relating to the Debtors, including, as applicable, as Term Lenders, IPCo Noteholders, Sponsors, Common Stock holders, and DIP Lenders.  The Disclosure Statement fails to specifically and comprehensively disclose all such interests and positions and the identities of the major holders of these positions.

24.    <u>IPCo Noteholders Make-Whole Premium:</u>  The Committee and other parties in interest may object to the allowance of a significant make-whole premium (a prepayment penalty) asserted by the IPCo Noteholders under the IPCo Notes (purportedly to be accounted for in the debt-for-equity conversion under the Plan).  The Debtors should provide disclosures related to the make-whole premium and the potential disallowance thereof, given the material amount thereof and the increase in the amount of the new common stock allocation to the IPCo Noteholders due to such additional claim amount.

25.    <u>Inadequate Disclosures Relating to the 2017 Transaction:</u>[13]  The Disclosure Statements fails to include as it should a much more robust discussion of the 2017 Transaction and the potential claims arising from those transactions.  The Debtors arranged for a

---

[13] The Debtors engaged in a series of complex, interrelated transactions in 2016 and 2017 (collectively, the "2017 Transaction") that were orchestrated to enrich the Debtors' lenders and private equity sponsors at the expense of J. Crew Operating Corp. ("<u>J. Crew OPCo</u>") and certain other Debtors, and by extension, their unsecured creditor constituencies.  Among other actions and events, certain Debtors gratuitously transferred intellectual property assets worth hundreds of millions of dollars to IPCo—which granted liens on those assets to secure new debt that was issued to certain term lenders and to previously unsecured, structurally subordinated creditors.  J. Crew OPCo then agreed to pay IPCo $59 million annually to license back the same assets and J. Crew OPCo further assumed additional liabilities in connection with the transactions, including directly to the Sponsors.

newly-appointed director to engage counsel to conduct an investigation but was given an unreasonably short period of time to do so, drawing into question the validity of that investigation. The Committee is conducting a more thorough investigation which is ongoing.

26.    <u>Justifications for Facially Suspect Classification Structure</u>:  By placing the Term Loan Deficiency Claims into the same voting class with other non-trade unsecured claims (such as rejection and litigation claims), the Debtors and other settling creditors are trying to ensure that Class 6-B votes for the Plan – that is, <u>to gerrymander an accepting impaired class (Class 6-B)</u>.  The deficiency claims of the Term Lenders will likely overwhelm any votes against the Plan by the holders of the non-trade unsecured claims, all in Class 6-B.  The Plan provides that the Term Lenders will vote their deficiency claim in the same class as other unsecured claims but not share in the distribution going to class members.  The Disclosure Statement should contain a full and candid explanation as to why it is appropriate to classify deficiency claims with trade and other unsecured claims and why members of the same class are to receive different treatment under the Plan.

27.    <u>Intercompany Claims:</u>  The Plan provides that "all Intercompany Claims, including the 7.75%/8.50% Senior PIK Toggle Notes due 2022, shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion."  There is no description in the Disclosure Statement concerning how the treatment alternatives of Intercompany Claims will or could affect creditor recoveries.  In certain instances and in the absence of substantive consolidation, the effects will likely be significant, including with regard to the $120 million Intercompany Note (maturing in September 2021) and the $500 million PIK Toggle Notes (maturing in March 2022).

28.    <u>Ambiguous References to "Alternative Transaction"</u>:  The modified Disclosure Statement refers to an unspecified, potential "Alternative Transaction" (*see, e.g.,* Disclosure Statement Blackline, p. 43).  The Disclosure Statement must explain what the

potential alternative is and its implication for recoveries to creditors. The Debtors, by speaking

of a possible "Alternative Transaction" without any details, raise material questions.

29.    Releases: First, the third-party release provision (Plan, at pp. 43-44)

should be revised in order for creditors to be able to reasonably understand that they can opt out

of or otherwise be bound by the third-party release. Further, the third-party release provision

should be modified to expressly include a carveout for fraudulent and intentional misconduct

claims that should not be subject to release (generally, Chapter 11 release provisions importantly

include a carveout for any claims related to any act or omission that is determined in a final order

to have constituted willful misconduct, gross negligence, or actual fraud).

30.    The Committee is aware, for example, of hundreds of millions of dollars

of dividends being paid over the years to the Debtors' Sponsors, Leonard Green and TPG

Capital, including in recent years, potential management fees of $8 million per year. There is no

discussion in the Disclosure Statement regarding these potential insider claims or the $9.3

million paid in 2020 to the Debtors' executives in the form of "signing bonuses," "special

bonuses", "Annual Incentive Plans", and "Transformation Incentive Plans" or additional

amounts that may have been paid to these insiders in prior years.

31.    Aside from the claims arising from the 2016/2017 Transactions which are

only briefly discussed, the Disclosure Statement fails to identify or describe any other potential

claims and causes of action of the Estates against a litany of individuals and entities to be

released under the Plan, the availability of insurance coverage for such potential claims, and the

specific consideration for the releases provided to the Released Parties (the beneficiaries of both

the Debtor release and third-party release). The Debtors do not disclose what, if any specific

review or investigation, they have conducted regarding potential claims to be released under the

Plan (other than the apparently rushed investigation of the 2016/2017 Transactions). In short, the

Disclosure Statement does not provide adequate information on what is being released and why

as to each Released Party.

32.    <u>Exculpation:</u>  The Plan exculpation covers more than estate fiduciaries, and thus, the Debtors must explain the justification for covering all of the non-fiduciary exculpated parties.  Further, a clarification should also be added that the exculpation is only with respect to postpetition actions, assuming that is the Debtors' intent.  If the intent was to also exculpate as to prepetition matters, this should be rejected by the Court, in order to be consistent with Code section 1125(e).  *See In re Hygea Holdings Corp.*, Case No. 20-10361 (KBO) (Bankr. D. Del. 2020) (certification of counsel regarding changes made to the plan and confirmation order by the court at the confirmation hearing, including court's limiting of exculpation provision to cover only estate fiduciaries and only postpetition actions, not prepetition (Dkt. No. 575); confirmation order including court's changes to plan definitions of "Released Parties" and "Released Claims" (Dkt. No. 576)); *In re Washington Mutual*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (same; "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.").  Lastly, the Debtors should explain why the Committee members were not included in the long list of exculpated parties.

33.    <u>New Management Disclosures:</u>  The Debtors need to disclose the proposed members of new post-confirmation management reasonably prior to the Voting Deadline.  The Plan proposes that the new board of directors, managers, and officers be disclosed "at or before the Confirmation Hearing" (Plan, at p. 27).  Among other potential issues and problems, assuming that the Estates' claims relating to the 2016/2017 Transactions are not waived and released under the confirmed plan (as should be the case in the Committee's view), creditors should be assured that the future decision-makers of the reorganized company will not be conflicted and will appropriately fulfill their fiduciary duties in relation to the prosecution of such claims and other causes of action.

1.    **Solicitation/Procedures Related Objections**

34.     There are various problems with the solicitation and confirmation related procedures and processes proposed by the Debtors, which must be addressed.

35.     <u>Plan Supplement</u>:  The Debtors propose that the Plan Supplement be filed ten days before the deadline for filing objections to the Plan.  However, given the number, complexity, and materiality (as to feasibility, *etc.*) of Plan related documents to be provided in the Plan Supplement (including the Exit ABL Credit Agreement, the New Term Credit Agreement, and the Schedule of Rejected Contracts and Leases), substantially more, reasonable time and opportunity for review of the Plan Supplement documents (at least two weeks prior to the Voting Deadline) should be given to the Committee, creditors, and other parties in interest.

36.     <u>Rejection Claims</u>:  As noted, the list of the Debtors' leases and contracts to be rejected as of the Effective Date is proposed to be provided as part of the Plan Supplement ten days before the Plan objection deadline.  This timing is unfair and unreasonable.  The Debtors have approximately 500 real property leases with approximately 140 lessors and another 600 unexpired executory contracts.  The Debtors' landlords and other affected contract third parties (the "<u>Lease/Contract Parties</u>") must be provided reasonable advance notice of the proposed rejection of the applicable leases and contracts to be able to appropriately vote on the Plan as Class 6-B members.  The Lease/Contract Parties, whose leases/contracts will be rejected by the Debtors, must be allowed to vote on the Plan, although these leases/contracts may not technically be deemed rejected until the Effective Date.  The Debtors must provide some provisional voting mechanism in order for the numerous affected Lease/Contract Parties to be able to review the Plan and Disclosure Statement and submit their respective votes on the Plan.  As currently proposed, counterparties to leases and contracts will need to filed and prepare objections to proposed cure amounts without the benefit of knowing until the day prior to the cure response deadline whether or not their contracts are on the rejected list.  This timing does not work and will cause additional and unnecessary costs for unsecured creditors.

37.     <u>Consultation with the Committee</u>:  The Disclosure Statement (at p. 60) provides: "Waivers of Defects, Irregularities, etc.  Unless otherwise directed by the Bankruptcy

Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots and Master Ballots will be determined by the Voting Agent or the Debtors, as applicable, which determination will be final and binding." The Committee should be consulted and/or be provided with reasonable notice of purported ballot irregularities and the like.

**B.**    **The Disclosure Statement Should Not Be Approved Because the Plan is Facially Unconfirmable**

38.    "If the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). A disclosure statement for a facially defective plan cannot be approved as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (bankruptcy court can determine at the disclosure statement stage that a chapter 11 plan is unconfirmable); *see also Eastern Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("notwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed."); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (analysis of such issues at this stage of the confirmation process has become a "standard Chapter 11 practice").

39.    Evaluating confirmability at the disclosure statement stage avoids "engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the Plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

1.    **The Plan Improperly Places the Term Lenders' Unsecured Deficiency Claims and Other General Unsecured Claims into the Same Class 6-B in Order to Gerrymander an Accepting Class and in Doing So, Unfairly Discriminates against Other General Unsecured Claims**

40.    In order to confirm the Plan, the Debtors must demonstrate that the Plan complies with all applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Governing the classification of claims and interests under a Chapter 11 plan, section 1122(a) of the Bankruptcy Code provides, in relevant part, that "a plan may place a claim or an interest in a particular class *only if* such claim or interest is *substantially similar* to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphases added). In order to confirm the Plan over the rejection, or deemed rejection, of a class of creditors, the Debtors must also demonstrate that the Plan "does not discriminate unfairly," as required by Bankruptcy Code § 1129(b)(1). A plan proponent "may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986*), aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville* Corp. 843 F.2d 636 (2d Cir. 1988).

41.    As explained by one court, the facts and circumstances of the particular case should be examined to determine whether unfair discrimination exists. *In re Idearc, Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) (citing cases). "At a minimum, however, the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving *materially different treatment* under a proposed plan without *compelling*

*justifications* for doing so." *Id.* (emphasis added). *See also In re Cypresswood Land Partners, I,* 409 B.R. 396 (Bankr. S.D. Tex. 2009) ("'The concept of unfair discrimination was designed to maintain equity among creditors of equal priority.'") (quoting *In re Orawsky,* 387 B.R. 128, 141 (Bankr. E.D. Pa. 2008)).

42.    In determining whether the proposed discrimination is fair, courts in the Fourth Circuit analyze a number of factors, including "(1) whether there is a reasonable basis for the discrimination; (2) whether the plan can be confirmed and consummated without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *See In re Jim Beck, Inc.,* 214 B.R. 305, 307 (W.D. Va. 1997), *aff'd per curiam,* 162 F.3d 1155, 1998 U.S. App. LEXIS 20736 (4th Cir. Aug. 24, 1998) (unpublished table decision); *In re Sutton,* 2012 Bankr. LEXIS 752, at *6-*7 (Bankr. E.D. N.C. 2012); *In re Sea Trail Corp.,* 2012 Bankr. LEXIS 4985, *25 (Bankr. E.D. N.C. Oct. 23, 2012). "Consistent with the Code's requirement for fairness, courts often conclude that a plan is unfairly discriminatory when there is a large discrepancy in the percentage recovery between similarly situated creditors." *Sea Trail Corp.,* 2012 Bankr. LEXIS 4985, at *26 (citations omitted).

43.    The Plan improperly classifies together in Class 6-B, the Term Loan Deficiency Claims (estimated to be over $625 million) and the Other General Unsecured Claims (estimated to be $207.6 million), although the nature of these categories of claims is vastly dissimilar. The Term Lenders are influenced by totally different considerations from those motivating the holders of the Other General Unsecured Claims. Nearly all of the Term Lenders (or 96% of them) have settled or otherwise agreed to their treatment under the Plan, under which the Term Lenders are receiving the vast majority of the equity in the reorganized enterprise. *See* Disclosure Statement Blackline [Docket No. 470], p. 2 ("As of June 11, 2020, *Consenting Support Parties and Sponsors holding approximately 96% of the Term Loans,* 100% of the IPCo Notes, 85% of Series A Preferred Stock, and 89% of the Common Stock are party to the

Transaction Support Agreement." (emphasis added).[14] The Term Lenders have also agreed to waive or receive no recovery on account of the Term Loan Deficiency Claims. In this context, it is irrational to classify together two such conspicuously different kinds of creditors, which separate groups will receive materially different consideration under the Plan and which different treatments will drive their voting on the Plan.

44. Like the Class 5 IPCo Noteholders' Claims, which classifies the IPCo Noteholders' significant deficiency claim together with their secured claim in Class 5, so too should the Term Loan Deficiency Claims be classified in Class 4 with their secured claim. Both the IPCo Noteholders and Term Lenders are recovering at approximately 53% on account of their outstanding prepetition indebtedness, but that is not readily apparent from the Plan given the currently proposed bifurcation of the Term Lenders' secured claim from its deficiency claim.

45. The purpose of the Debtors' classification scheme is readily apparent from the circumstances. The Term Lenders are proposed to receive the controlling equity stake in the reorganized enterprise. By placing the Term Loan Deficiency Claims into the same voting class with the Other Unsecured Claims, the Term Lenders' votes in Class 6-B will overwhelm any votes against the Plan by a ratio of 3 to 1, thereby controlling the vote of this impaired class.[15] *See generally In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (classification structure "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims" (*quoting In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)). The Plan structure itself is compelling evidence of the Debtors and Term Lenders' gerrymandering goal – while the Term Lenders will not receive any distribution on account of the Term Loan Deficiency Claims under the Plan, the Term Lenders

---

[14] Logically, the underlying facts and circumstances related to the claim, and not just the claim itself, are important in determining whether a claim is substantially similar to other claims in order to be placed in the same class. *See In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir. 2012); *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 587 (6th Cir. 1986) (a non-creditor interest can justify separate classification).

[15] Under the Plan, the only other impaired classes of claims entitled to vote on the Plan in relation to all of the Debtors are Class 6-A (Ongoing Trade Claims) and Class 8 (Section 510(b) Claims), which may be an empty class. Class 4 (Term Loan Secured Claims) is impaired and entitled to vote, but said class only applies to the Loan Debtors. Class 5 (IPCo Notes Claims) is impaired and entitled to vote, but this class is applicable only as to the IPCo Debtors.

nonetheless retain the right to vote such claims and do not waive any such claims in order to be able to vote in favor of the Plan.

46.    The Debtors' gerrymandering is also a way for the Debtors to improperly sidestep the cramdown requirements of section 1129(b).  If the Other General Unsecured Claims were separately classified from the Term Loan Deficiency Claims, the Other General Unsecured Claims class would very likely vote against the Plan, and the Debtors would be required to seek confirmation with respect to such class pursuant to section 1129(b).  Under a cramdown, subject to the Court's valuation and related determinations, the Plan distributions to holders of existing equity interests that are Term Lenders in Class 4 and/or IPCo Noteholders in Class 5 would violate the absolute priority rule, given that the higher-priority Other General Unsecured Claims would receive nowhere close to a full recovery under the Plan.[16]

47.    Lastly, based on the foregoing facts and circumstances, the votes of the Term Lenders on the Plan (whichever class or classes at issue) are subject to being designated under section 1126(e),[17] as the Term Lenders are not casting their votes legitimately as unsecured creditors trying to get their due share of the available recovery, but rather they are classified with Other General Unsecured Claims so they can put their thumb on the scale for different strategic reasons. *See, e.g., In re DBSD N. Am., Inc.*, 634 F.3d 79, 103-04 (2d Cir. 2011) ("Modern cases have fund 'ulterior motives' in a variety of situations.") (citing cases including purchasing claims to establish blocking positions); *In re Adelphia Commns. Corp.*, 359 B.R. 54, 63 (Bankr. S.D.N.Y. 2006) ("the kinds of motives that have so far been held to

---

[16] As the Supreme Court has held numerous times, interest holders may not retain their equity unless and until general unsecured creditors are paid in full. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 209 (1988) (holding that the "interest respondents would retain under any reorganization must be considered 'property' under § 1129(b)(2)(B)(ii), and therefore can only be retained pursuant to a plan accepted by their creditors or formulated in compliance with the absolute priority rule."); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (acknowledging "the pre-Code judicial response known as the absolute priority rule, that fairness and equity required that "the creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever."") (quoting *Northern P. R. Co. v. Boyd*, 228 U.S. 482, 508 (1913).

[17] Section 1126(e) provides that "[o]n request of a party in interest, … the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."  As discussed herein, the Debtors are not soliciting the Term Lenders' votes in good faith or in compliance with the applicable provisions of the Bankruptcy Code including section 1122(a). *See also* 11 U.S.C. § 1125(e).

warrant vote designation have been to assume control of the debtor" and other improper

purposes); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 (Bankr. S.D.N.Y. 1995) ("the

Code's legislative history makes clear that the Court can designate the vote of a creditor who has

a conflict of interest with the class in which it votes.").

48.     The Court should reject the Plan's improper classification and unjustified

unfair discrimination against the Other General Unsecured Claims who are not Term Lenders.

### 2. The Plan's Treatment of Intercompany Claims and Intercompany Interests Is Impermissible

49.     The Plan provides for the reinstatement and payment of Intercompany

Claims and the preservation of the Intercompany Interests (in Classes 7 and 9, respectively) in

the Debtors' sole discretion.

50.     First, by allowing for at least some Intercompany Claims to be reinstated

and unimpaired and essentially be satisfied in full, the Plan unfairly discriminates against the

*pari passu* unsecured claims which will only share limited pools of cash under the Plan.

51.     Second, by allowing for the potential preservation and reinstatement of

some or all Intercompany Interests, the Plan violates the absolute priority rule (in the event there

is a dissenting class of general unsecured claims) in that the senior general unsecured claims will

receive substantially less than full payment while the lower priority equity interests will be

preserved and retained.

52.     The foregoing Plan provisions are contrary to black letter law and should

be promptly rejected by the Court.

### 3. The Plan Contains Improper Third-Party Releases

53.     As discussed above, the Plan contains extremely broad third-party releases

in favor of the Released Parties, which should be rejected by the Court unless the Debtors

provide sufficient information and basis for the releases.  The Debtors portray the third-party

releases – by unimpaired creditors and creditors who do not expressly opt-out of the third-party

release – as consensual and thus permissible.[18]   However, a number of circumstances and factors

raise questions as to whether such releases would truly be consensual,[19] and the Debtors have

provided no information or basis to find that adequate consideration will be given by each

Released Party.   Courts in the Fourth Circuit have held that consensual third-party releases may

be permissible under the Bankruptcy Code, but that the approval of third-party releases in the

absence of an express affirmation of consent should be allowed "cautiously and infrequently"

and only under "unusual circumstances."   *See, e.g.*, *In re Neogenix Oncology, Inc.*, 2015 Bankr.

LEXIS, at *13 (Bankr. D. Md. 2015).   Based on the foregoing, the Court should establish certain

procedures as to how the Debtors and balloting agent construe creditors' opt-outs, contrary to

what is proposed in the Plan (at p. 43):

- Creditors who vote to reject the Plan should automatically not be bound by the third-party releases and should not be required to check the opt-out box on the ballot.

- Creditors who vote to accept the Plan and check the opt-out box should not be bound by the third-party releases.

- Creditors who submit a ballot that abstain from voting to accept or reject the Plan but check the opt-out box should not be bound by the third-party releases.

---

[18] The Fourth Circuit has held that nonconsensual third-party releases are only permissible after the court's consideration of numerous relevant factors and if the court makes a record of specific factual findings that support its conclusions. The relevant factors include, among others, (i) whether the nondebtor has contributed substantial assets to the reorganization; (ii) whether the release is absolutely essential to reorganization; and (iii) whether the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the release.  *See Behrmann v. Nat'l Heritage Foundation, Inc.*, 663 F.3d 704 (4th Cir. 2011).

[19] The practice of inferring consent to plan provisions from unresponsive creditors has been the subject of criticism in recent decisions, including *In re Emerge Energy Services L.P.*.  In refusing to confirm the terms of a plan containing third-party releases subject to a negative notice opt-out process, the *Emerge Energy* court discussing the issues in the context of basic contract principles, held as follows:

> The Court must respectfully disagree with its colleagues who have held differently as it has concluded that a waiver cannot be discerned from a party's silence or inaction unless specific circumstances are present. A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify.

*In re Emerge Energy Services LP.*, 2019 Bankr. LEXIS 3717, at *53-55 (Bankr. D. Del. December 5, 2019).  *See also In re SunEdison, Inc.*, 576 B.R. 453, 458-61 (Bankr. S.D.N.Y. 2017); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).

4. **The Exculpation Clause Does Not Cover Committee Members and Is Overly Broad By Exculpating Non-Estate Fiduciaries and Extending to Prepetition Actions**

54.     The Exculpation Clause is overly broad insofar as it applies to liability for actions taken prior to and after the Petition Date.  Pursuant to 1125(e) of the Bankruptcy Code, the good faith protections for solicitation of acceptance of a plan are limited to postpetition actions.  Further, the Debtors must justify the exculpation in favor of non-estate fiduciaries.

5. **The Plan Injunction Is Overly Broad**

55.     The Plan injunction is overly broad, enjoining actions by not only creditors and interest holders but also "along with their respective present or former employees, agents, officers, directors, principals, and affiliates."  Further, the Plan injunction covers the Released Parties and their property; the Plan injunction should only cover said entities if and to the extent that they are approved by the Court as Released Parties and not vis-à-vis creditors who opted out of the third-party releases.

## IV.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, the Committee requests that the Court deny approval of the Motion and the Disclosure Statement, and grant such other and further relief as is appropriate and just.

Dated:   June 18, 2020

By:   /s/   Robert S. Westermann
Counsel
Robert S. Westermann (VSB No. 43294)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Telephone: (804) 771-9500
Facsimile: (804) 644-0957

Email: rwestermann@hf-law.com

*Proposed Local Counsel to the Official Committee of Unsecured Creditors*

-and-

Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Debra I. Grassgreen, Esq. (admitted *pro hac vice*)
Shirley S. Cho, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:  rfeinstein@pszjlaw.com
          bsandler@pszjlaw.com
          dgrassgreen@pszjlaw.com
          scho@pszjlaw.com

*Proposed Lead Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 18, 2020, the foregoing Objection was filed using the Court's CM/ECF System, which thereby served the Objection on all registered ECF participants who have appeared in this case.  I further certify that, on June 18, 2020, a true and complete copy of the Objection was served by email on the Service List attached hereto, to the extent an email address was provided, and to the parties where only a mailing address was provided, a true and complete copy of the Objection was mailed by first class mail.

/s/:   *Robert S. Westermann*
Counsel