| | |
|---|---|
| **LOEB & LOEB LLP** | **LOEB & LOEB LLP** |
| 901 New York Avenue NW | 345 Park Avenue |
| Suite 300 East | New York, New York 10154 |
| Washington, DC 20001 | (212) 407-4000 |
| (202) 618-5000 | P. Gregory Schwed (*pro hac vice* pending) |
| John D. Taliaferro | Daniel B. Besikof (*pro hac vice* pending) |
| | Noah Weingarten (*pro hac vice* pending) |
| *Counsel for Deloitte Consulting LLP and* | |
| *Deloitte Tax LLP* | |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

------------------------------------------------------------- X
                                                              :
In re                                                         :   Chapter 11
                                                              :
CHINOS HOLDINGS, INC., et al.,                                :   Case No. 20-32181-KLP
                                                              :
          Debtors.[1]                                         :   (Jointly Administered)
                                                              :
------------------------------------------------------------- X

**OBJECTION OF DELOITTE CONSULTING LLP AND DELOITTE TAX
LLP TO APPROVAL OF PROPOSED DISCLOSURE STATEMENT FOR
JOINT PREARRANGED CHAPTER 11 PLAN OF REORGANIZATION OF
CHINOS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

19171180.1
018000-10184

Deloitte Consulting LLP ("Deloitte Consulting") and Deloitte Tax LLP ("Deloitte Tax" and together with Deloitte Consulting, "Deloitte"), by and through their undersigned counsel, hereby submit this objection (this "Objection") to approval of the disclosure statement (the "Disclosure Statement") filed by the above-captioned debtors and debtors-in-possession (the "Debtors") in connection with their *Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and its Affiliated Debtors* (the "Plan").[2]  In support of this Objection, Deloitte respectfully states as follows:

## PRELIMINARY STATEMENT

1. While Deloitte supports the Debtors' goal of reorganization and preservation of the Debtors' businesses, Deloitte Consulting, as by far the Debtors' largest unsecured creditor (owed more than $22 million), and Deloitte Tax (owed more than $4 million), oppose the Plan in its current form and assert that, on its face, it cannot be confirmed.  For that reason, and because the Disclosure Statement lacks substantial disclosures necessary to provide creditors with "adequate information" to make an informed vote on whether to accept or reject the Plan, approval of the Disclosure Statement should be denied.

2. The Plan's classification structure violates the letter and spirit of the Bankruptcy Code.  It places the purported in excess of $600 million of deficiency claims of the Term Lenders – prepetition secured lenders of the Debtors who are contractually obligated to vote in favor of the Plan – in the same class as the Other Secured Creditors, consisting primarily of vendors, landlords and service providers.  This structure enables the Term Lenders, who would benefit

---

[2] Except as otherwise provided herein, capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Plan.

from having the Plan provide for as little payment as possible to unsecured creditors, largely to control the voting on Class 6-B – a class in which they have no economic stake. The effect is that the right of the holders of Class 6-B claims to control their own destiny would be severely limited.

3. This limitation on the voting power of Class 6-B creditors is significant, because to the extent Class 6-B were to reject the Plan, which would be likely absent the Term Lenders' overwhelming, artificially-created voting power, the Debtors would have to satisfy the burden of "cramming down" such creditors under Section 1129(b). Deloitte Consulting and Deloitte Tax assert that creditors should have a full and fair opportunity to investigate those issues and, if appropriate, challenge whether the Debtors have met that burden – based on valuation issues and the substantial difference in treatment afforded to holders of Class 6-A and Class 6-B claims. But the Debtors likely will be able to circumvent all cram down-related creditor protections if the Term Lenders are able to control Class 6-B in this artificial manner.

4. Where, as here, a plan of reorganization is unconfirmable on its face, the law is clear that any disclosure statement filed in connection with that plan should not be approved. This rule is based on common sense. If the underlying plan cannot be approved, it would be a waste of judicial, estate and creditor time and resources to engage in an unnecessary and expensive solicitation and approval process, particularly where, as here, that process is likely to be hotly contested.

5. Second, to the extent the Court does not agree that the Plan is incapable of being confirmed and determines that the above-referenced (and other) Plan infirmities should be considered in the confirmation process, the Disclosure Statement will, in any case, need to be supplemented to afford the Debtors' stakeholders "adequate information," as that term is

contemplated in Section 1125 of the Bankruptcy Code. Disclosure is lacking on numerous significant issues, all of which need to be remedied before the Disclosure Statement can be approved.

6. Below is a list of the most important and glaring deficiencies in the Disclosure Statement:

- There is no disclosure regarding how the proposed recoveries for Classes 6-A and 6-B were formulated. Further, disclosure should be provided as to how, as noted in the Disclosure Statement, Classes 6-A and 6-B "are receiving comparable treatment" and how "such treatment is fair under the circumstances." The small amount of funding afforded to Class 6-B does not appear to be "comparable" to the consideration being proposed for Class 6-A.

- Disclosure is also required regarding the classification of the Term Loan Deficiency Claims in Class 6-B. The Term Loan Deficiency Claims are not substantially similar to the other claims in Class 6-B and ultimately are being effectively waived in any event. The Debtors should disclose, among other things, (i) why this classification is appropriate and (ii) the anticipated impact to that class of permitting the Term Lenders to vote those claims.

- The Plan is premised on a valuation indicating that the Debtors' unsecured creditors are out of the money. The valuation disclosures lack key information that would enable creditors to test the valuation. For example, while the Disclosure Statement indicates that Lazard employed a "sum-of-the-parts approach" in the valuation, no disclosure is provided of the values of each of those parts, and no standalone projections are proposed for each of those parts.

- Logic dictates that the valuation underlying the Plan would appear to be highly influenced by COVID-19, but there is no disclosure as to how much impact COVID-19 has had on the valuation. Such disclosure should be made, along with disclosure of a comparison of this valuation to pre-COVID-19 valuations. Likewise, the Debtors have had the benefit of several weeks in the COVID-19 environment, and disclosure is appropriate as to how the business has tracked against the Debtors' projections, particularly as the Debtors' stores have begun to reopen.

- Additional disclosure is required regarding the Debtors' restructuring efforts and alternatives to the Plan, particularly since the outbreak of COVID-19. The Disclosure Statement references that the Debtors are exploring an "Alternative Transaction" – described in terms that make it look like a potential sale – but there is no disclosure regarding that potential alternative. Additional disclosure should be provided.

- There is insufficient discussion as to why the Plan needs to be considered on such an expedited basis. This company has been engaged in highly publicized restructuring

discussions and transactions for years. Disclosure should be made of why only now, at a time when the asserted valuation is presumably as low as possible, is there a desire to rush through this Plan with its harsh consequences for the Debtors' unsecured creditors.

7. As a result of these and other omissions discussed in greater detail below, it is impossible for a hypothetical reasonable investor to make an informed judgment about the Plan. Accordingly, the Disclosure Statement should not be approved.

## BACKGROUND

**A.    Procedural Background.**

8. On May 4, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and management of their respective businesses since the Petition Date under Sections 1107 and 1108 of the Bankruptcy Code.

9. On March 11, 2010, the Debtors filed the Plan [Docket No. 19] and the related Disclosure Statement [Docket No. 20]. The Debtors filed modified versions of the Plan [Docket No. 468] and the Disclosure Statement [Docket No. 469] on June 11, 2020. Under the Plan, the holders of the Debtors' approximately $2 billion in prepetition secured debt (the "Lenders") will receive all of the New Common Shares issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation, and any other New Common Shares distributed pursuant to the Plan, subject to certain dilution. Disclosure Statement, p. 5. In addition, the Debtors' $400 million secured DIP Facility will be converted to an exit facility of that amount, and the DIP Lenders will also receive additional New Common Shares in the form of the Backstop Premium and the New Equity Allocation. *Id.* As a result, the Lenders will own nearly all of the New Common Stock if the Plan is confirmed and goes effective.

10. Unsecured creditors fare much worse under the Plan, particularly those in Class 6-B. Unsecured claims are broken into two classes: (i) Ongoing Trade Claims of Class 6-A and

(ii) Other General Unsecured Claims of Class 6-B. Although all of these claims are general unsecured claims, the treatment of the claimants in these classes is quite different. Ongoing Trade Claims are to be paid a *pro rata* share of $71 million, for a projected recovery of approximately 50%. Other General Unsecured Claims are to be paid a *pro rata* share of just either $1 million or $3 million, depending on whether the class votes to accept or reject the Plan, for a recovery of just 0.53-1.6%. This is true even though, the Other General Unsecured Claims rank *pari passu* with the holders of Ongoing Trade Claims and, with the exception of the Term Lender Deficiency Claim, are similar in nature. Because Deloitte has not, as of the date hereof, entered into (or been invited to enter into) a trade agreement with the Debtors, Deloitte assumes that its claims will be Other General Unsecured Claims. However, Deloitte Consulting and Deloitte Tax stand willing to perform services for the Debtors on a going forward basis and would be willing to explore entry into a trade agreement on appropriate terms.

11. The Plan also lumps together in one class the Other General Unsecured Claims and the purported Term Loan Deficiency Claims. Although the Term Lenders, which are obligated to vote in favor of the Plan under the TSA, are entitled to vote, the Plan provides that the Term Lenders will waive recoveries on those claims.

**OBJECTIONS**

**A.  The Plan cannot be confirmed, because it improperly classifies the Term Loan Deficiency Claims in Class 6-B in violation of Section 1122 of the Bankruptcy Code. Accordingly the Disclosure Statement should not be approved.**[3]

12.  For the reasons set forth below, the Plan is unconfirmable.  As a result, the law is clear that the Disclosure Statement should not be approved.  It is well-settled that, when a proposed chapter 11 plan cannot be confirmed, the Court should refuse to approve a disclosure statement based on that plan.  *See*, *e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (where "it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (quotations omitted); *In re Mkt. Square Inn*, 163 B.R. 64, 67-68 (Bankr. W.D. Pa. 1994) (denying approval of disclosure statement where illegal releases rendered plan unconfirmable); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate.").

13.  This rule is based on the notion that it would be imprudent to undertake the burden and expense of distributing and soliciting votes on a plan that legally cannot be confirmed, since this "exercise in futility" would only lead to further delays and unnecessary expense in the Debtors' attempts to reorganize.  *See In re Filcas of America, Inc.*, 147 B.R. 297,

---

[3] Deloitte raises certain confirmation issues in this Objection in the context of the patent unconfirmability of the Plan, but reserves all rights with respect to raising these and all other confirmation-related issues, should the Plan nevertheless proceed to a confirmation hearing.

298 (Bankr. D.N.H. 1992); *In re Eastern Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991). The Court should decline to engage in an "exercise in futility" here and deny approval of the Disclosure Statement.

14. Classification of claims in conformity with the requirements of Section 1122 is a prerequisite to confirmation of a plan in chapter 11. 7 Collier on Bankruptcy P. 1122.02 (16th ed. 2020). Section 1122 requires that a plan "place a claim or interest in a particular class only if such claim or interest is *substantially similar to the other claims or interests in such class*." 11 U.S.C. § 1122 (emphasis added).

15. The Plan impermissibly classifies the Term Loan Deficiency Claims as part of the Other General Unsecured Claims in Class 6-B. Far from being "substantially similar," the Lenders' Term Loan Deficiency Claims and the remaining Other General Unsecured Claims are completely different from one another. First, with the exception of the Term Loan Deficiency Claims, the Other Unsecured Claims generally arose from the operation of the Debtors' business and are held by vendors, service providers and landlords. By contrast, the Term Loan Deficiency Claims represented funded secured debt – part of the Debtors' Term Loan.

16. Moreover, the motivations of the Term Loan Lenders in respect of the Term Loan Deficiency Claims, and the actual treatment of those claims, are entirely different from the other holders of Other Unsecured Claims. The Term Lenders hold substantial sums of secured debt, which will be equitized under the Plan as the cornerstone of their "deal" with the Debtors and are contractually obligated to support the Plan in order to realize that deal under the TSA. The other holders of Other Unsecured Claims, however, are relying solely on the recoveries in Class 6-B for their compensation under the Plan.

17. The Term Lenders' clear motivation is to have the Plan confirmed to cement their

broader deal. By agreeing to waive recoveries on account of the Term Loan Deficiency Claims, the Term Lenders make clear they have no economic interest in Class 6-B at all. They certainly have no incentive to maximize recoveries for holders of Class 6-B claims, unlike the other holders of Class 6-B claims, which seek the highest recoveries possible. On the contrary, the Term Lenders' incentive is to minimize recoveries to unsecured creditors since they, as the new owners of the Debtors, would indirectly benefit from the Debtors' cash savings.

18. Although the nature of the claims and motivations of the parties are nothing alike, because of the apparent size of the Term Loan Deficiency Claims, the Term Lenders would largely control the voting destiny of the class of Other General Unsecured Claims – a perverse result. This unfair structure can have no purpose other than to manipulate voting to ensure the approval of the Plan by Class 6-B and to disenfranchise the rank and file holders of the Other Unsecured Claims. The Fourth Circuit has clearly spoken out against this kind of structure. In *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 (4th Cir. 1992), the Fourth Circuit remanded confirmation of a plan for improper claims classification, holding that the classification of claims "clearly for the purpose of manipulating voting . . . may not stand." *See also In re Manchester Oaks Homeowners Ass'n*, No. 11-10179-BFK, 2014 Bankr. LEXIS 951, at *17-19 (Bankr. E.D. Va. Mar. 12, 2014) (denying confirmation on grounds that classification of claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims").

19. "The ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case." *In re Adelphia Communs. Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006). The Plan seeks to seriously undermine that right for the holders of Class 6-B claims and thus cannot be confirmed.

20.     The need to reject this structure is particularly acute because disenfranchisement of the holders of Class 6-B claims could have the serious consequence of depriving them of the rights afforded to dissenting creditors under the "cram down" provisions of Section 1129(b).  If the holders of Class 6-B claims were to vote to reject the Plan, the Debtors would need to satisfy the "cram down" provisions of Section 1129(b) of the Bankruptcy Code in order to confirm the Plan.  Under Section 1129(b)(1) of the Bankruptcy Code, a chapter 11 plan can only be confirmed by "cram down" if the plan, among other things, "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted the plan."  11 U.S.C. § 1129(b)(1); *see also Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 442 (1999) ("[T]he objection of an impaired creditor class may be overriden only if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.") (quotations omitted).

21.     In order to establish that the Plan is "fair and equitable" with respect to a class of unsecured creditors, the Debtors must establish, among other things, that no senior class may be paid more than in full.  *See*, *e.g.*, *In re Mcorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (to be fair and equitable "the court need only determine that no class senior to the dissenting class will receive more than full compensation for its claims or interests").  Where, as here, a class of unsecured creditors is being paid less than in full, "a valuation is required to make sure that the senior classes of claims are not being provided for more than in full."  *Id.*  The Debtors have provided a short-form valuation, which as discussed below requires substantial additional disclosure.  Creditors should be given a fair opportunity challenge the Debtors' proposed valuation, which opportunity could be undermined significantly if the classification

structure were permitted to stand.

22. The Debtors would also bear the burden in a cram down context to establish that the Plan does not discriminate unfairly as between Class 6-A and 6-B Creditors. Courts in the Fourth Circuit have applied a four-part test for determining whether a plan "unfairly discriminates": (i) whether there is a reasonable basis for the discrimination; (ii) whether the plan can be confirmed and consummated without the discrimination; (iii) whether the discrimination is proposed in good faith; and (iv) the treatment of the classes discriminated against. *In re Sutton*, No. 10-10539-8-RDD, 2012 Bankr. LEXIS 752, at *7-8 (Bankr. E.D.N.C. Feb. 9, 2012) (denying confirmation because debtor failed to prove that the plan "does not unfairly discriminate") (citing *Ownby v. Jim Beck, Inc. (In re Jim Beck, Inc.)*, 214 B.R. 305, 307 (W.D. Va. 1997) (applying same four-part test), *aff'd*, 162 F.3d 1155 (Table) (4th Cir. 1998)). If voting on Class 6-B is allowed to be skewed by the overwhelming vote of the Term Loan Deficiency Claims, the Debtors will not need to establish that the Plan satisfies any of these factors, potentially to the detriment of holders of Class 6-B claims.

23. For the foregoing reasons, the Plan's misclassification of the Term Loan Deficiency Claims – seemingly designed specifically to put a thumb heavily on the scale for purposes of Class 6-B voting – violates Section 1122 and thus renders the Plan unconfirmable under section 1129(a)(1). Accordingly, the Disclosure Statement should be denied.

24. In addition to the classification and potential cram down issues described above, the Plan contains a variety of other objectionable provisions. Deloitte reserves all rights to raise any objection of any type or nature to confirmation of the Plan, whether or not raised herein in the context of whether the Plan is patently unconfirmable.

**B.    The Disclosure Statement does not contain adequate information and fails to satisfy the requirements of Section 1125 of the Bankruptcy Code.**

25.    Even if the Court were to determine that it is premature to find that the Plan is unconfirmable and that the Disclosure Statement therefore should not be approved on that basis, the Court nevertheless should not approve the Disclosure Statement as currently proposed, because it does not contain "adequate information" within the meaning of Section 1125 of the Bankruptcy Code.

26.    Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains "adequate information."  The Bankruptcy Code defines "adequate information" as

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of claims or interest in the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement 'that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan.'") (quotations omitted).  "Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).  The disclosure statement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can

make their own decisions on the plan's acceptability." *In re A.H. Robbins Co., Inc.*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997).

27. The Disclosure Statement cannot be approved, because it fails adequately to disclose significant material information, described in greater detail below, which is critical to the ability of the Debtors' stakeholders to make an informed decision regarding the Plan.

### i. *Additional disclosure is required regarding proposed recoveries to creditors and the disparate recoveries afforded to Classes 6-A and 6-B.*

28. The Debtors should be required to disclose, among other things, the process the Debtors undertook in determining how much to allocate to unsecured creditors and how to allocate those amounts between classes 6-A and 6-B. As it stands, that process is opaque and contrary to the transparent nature of bankruptcy proceedings. *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006) ("During a chapter 11 reorganization, a debtor's affairs are an open book and the debtor operates in a fish bowl.")

29. The Debtors should further be required to disclose the basis for their representation in the Disclosure Statement that Classes 6-A and 6-B "are receiving comparable treatment" and that "such treatment is fair under the circumstances." The holders in Class 6-A are receiving dozens of times the consideration than is being offered to the holders in Class 6-B. For the Disclosure Statement to assist creditors in properly evaluating the Plan, the Debtors must disclose how those numbers were formulated.

30. Finally, the Debtors should be made to provide additional disclosure regarding the decision to classify the Term Loan Deficiency Claims in Class 6-B. More specifically, additional disclosure is appropriate regarding, among other things, (i) how the decision was made to implement this classification, (ii) what legitimate bankruptcy purpose this classification serves, and (iii) the impact on voting (*i.e.*, it appears to be impossible, before voting begins, for

Class 6-B holders to reject the Plan on the basis of the "amount" element of Section 1126 of the Bankruptcy Code).

> *ii.    The Debtors' disclosures regarding the valuation, including the effects of COVID-19 on the valuation, are insufficient.*

31.    A critical component in the ultimate success or failure of the Plan will be the value ascribed to the Reorganized Debtors by the Court.  As drafted, the Disclosure Statement contains wholly inadequate disclosures regarding the Debtors' valuation.  This lack of disclosure is especially troubling and improper here, because the Debtors seek essentially to wipe out holders of Other Unsecured Claims based on the notion that the Debtors' equity value – asserted to be $1.06 to $1.43 billion – is less than the amount of the Debtors' prepetition secured indebtedness.

32.    Whether that is true or not is impossible to evaluate based on the information provided in the Disclosure Statement and the attached valuation.  Indeed, the valuation is devoid of many inputs that would enable a creditor to evaluate the merits of the valuation.

33.    While the Debtors have attached projections that apparently were used in formulating the valuation, additional disclosure is needed regarding the assumptions and inputs used to prepare those projections as well.  For example, the Debtors state that the projections are based on "numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters" and that in "deciding whether to vote to accept or reject the Plan, holders of Claims . . . must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections."  Disclosure Statement, Ex. B, p. 1.  Yet, little specific disclosures, other than as relating to going-forward indebtedness and related costs, is set forth in the valuation.

34. In addition, the Debtors disclose that Lazard "employed a sum-of-the-parts approach that values the Debtors' two operating segments separately." Disclosure Statement, Ex. D, p. 2. However, there is no disclosure as to the value of each of the Debtors' operating segments on a standalone basis. Nor are there separate projections for the Debtors' operating segments on a standalone basis. Disclosure should be made of the Debtors' standalone valuations and of the standalone projections supporting those valuations. The need for this disclosure is especially clear in light of the fact that the Debtors had intended to conduct an IPO of the Madewell segment just weeks prior to the Petition Date and that the long term growth rates for the two segments are likely significantly different.

35. Importantly, as noted above, the projections (and thus the valuation as a whole) are presumably affected by COVID-19 and the surrounding economic uncertainty. While the Debtors spill much ink in discussing COVID-19 in the Disclosure Statement, some critical disclosures are missing. For example, there is no discussion in the valuation or the projections about the effects of COVID-19 on the Debtors' business prospects or valuation. Indeed, the word "COVID-19" does not even appear in the presentation on the Debtors' projections or the explanatory notes. Moreover, the valuation contains a disclosure that Lazard made no assessment "regarding impact or the economic effects of the COVID-19 Virus."

36. Likewise, in assessing the current valuation, and the impact of COVID-19 on that valuation, it is critically important to understand the Debtors' belief regarding their value – both consolidated and for each of the business units on a standalone basis – prior to the COVID-19 pandemic and how that value has purportedly changed. Disclosure on this topic should be made. The Debtors' assumptions regarding the effects on the Debtors' business resulting from the COVID-19 pandemic should also be disclosed.

37. Finally, the Debtors have now been operating, at least in a limited way, for nearly four months in a COVID-19 environment. In recent weeks, each of the states has permitted some degree of reopening to occur, with more liberal degrees of openness occurring each day. Such reopenings must impact current business activity as well as expectations for future business activity. Disclosure should be made as to how (i) the Debtors' actual results have compared to the Debtors' assumptions surrounding COVID-19 embedded in the projections, (ii) how those projections have changed as the effects of COVID-19 become better understood and (iii) the effects of any such changes on the valuation.

### iii.    *There is not adequate disclosure regarding alternatives to the Plan.*

38. Additional disclosure regarding potential alternatives to the Plan should also be required. The Disclosure Statement currently contains almost no such disclosure, other than brief references to the assertion that holders of allowed claims fare at least as well under the Plan as they would under chapter 7, and a reference to a mysterious potential "Alternative Transaction." *See* Disclosure Statement at p. 40. Such disclosure is insufficient.

39. In considering the Plan, creditors are being asked, in essence, to decide whether the Plan maximizes their recoveries and is the best way forward for the Debtors. Information regarding potential alternatives to the Plan is thus critical for creditors to make an informed decision. For example, creditors should, at a minimum, be told whether other plan structures or restructuring alternatives are being or were contemplated, either in discussion with the Lenders or other parties, and the general contours of any alternate structure should be described. Of particular interest to creditors would be whether other plan structures were discussed since the onset of the COVID-19 pandemic and the contours of those plans structures.

40. The amended version of the Disclosure Statement does reference, in the section on taxes, a potential "Alternative Transaction" that the Debtors are considering. *Id.* Based on

the cryptic description of that potential Alternative Transaction, it appears that the Debtors are contemplating a potential sale. Yet, there is no description of the potential terms of such transaction, the timing of such transaction or any other information that would enable a creditor to determine whether the Plan is the best way forward for the Debtors and their stakeholders.

41. The Disclosure Statement also contains insufficient disclosure as to why the Plan needs to be considered on such an expedited basis. The Debtors' desire generally to exit chapter 11 as quickly as possible is insufficient. All parties want the Debtors to exit bankruptcy as soon as possible – provided that creditor recoveries are maximized. And there are no disclosures as to what the specific risks of harm resulting from a brief delay may be, and on what timetable they are anticipated to arise. Nor, even if such concerns are legitimate, is any reason given why other alternatives could not have been explored (to the extent they were not) on an expedited basis. In fact, there may be benefits to the bankruptcy case moving at a slower pace. Capital markets and valuations may improve as the economy reopens, thus affording all of the Debtors' stakeholders – not just the Lenders – a more favorable recovery.

42. These and other disclosures regarding potential alternatives to the Plan should be added to the Disclosure Statement in order to provide the Debtors' creditors with "adequate information" as contemplated under Section 1125 of the Bankruptcy Code.

## CONCLUSION

43. The Disclosure Statement supports a plan that is facially flawed and should not be confirmed. Accordingly, the Disclosure Statement should not be approved. However, even if the Court is not prepared to determine, based on the record as it current exists, that the Plan cannot be confirmed, the Debtors should be ordered to modify the Disclosure Statement to include additional disclosures on the items discussed above.

WHEREFORE, Deloitte Consulting and Deloitte Tax respectfully request that the Court (i) deny approval of the Disclosure Statement or, in the alternative, order the modification of the Disclosure Statement in a manner consistent with this Objection; and (ii) grant such other and further relief as is just and proper.

Dated:  Washington D.C.  
June 18, 2020

By: */s/ John D. Taliaferro*  
John D. Taliaferro (Va. Bar No. 71502)  
LOEB & LOEB LLP  
901 New York Avenue NW  
Washington D.C. 20001  
Telephone: (202) 618-5000  
jtaliaferro@loeb.com  

and  

P. Gregory Schwed (*pro hac vice* pending)  
Daniel B. Besikof (*pro hac vice* pending)  
Noah Weingarten (*pro hac vice* pending)  
LOEB & LOEB LLP  
345 Park Avenue  
New York, New York 10154  
Telephone: (212) 407-4000  
gschwed@loeb.com  
dbesikof@loeb.com  
nweingarten@loeb.com  

*Counsel to Deloitte Consulting LLP and Deloitte Tax LLP*

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June 2020, a copy of the foregoing was served through the Court's EM/ECF system on all parties receiving notices in these cases. I also certify that a copy of the foregoing was served by email on the Parties identified in the Notice Of Hearing To Consider Approval Of Disclosure Statement For Joint Prearranged Chapter 11 Plan Of Reorganization Of Chinos Holdings, Inc. And Its Affiliated Debtors (Dkt No. 312).

By: /s/ *John D. Taliaferro*
John D. Taliaferro (Va. Bar No. 71502)
LOEB & LOEB LLP
901 New York Avenue NW
Washington D.C. 20001
Telephone: (202) 618-5000
jtaliaferro@loeb.com

*Counsel to Deloitte Consulting LLP and Deloitte Tax LLP*