Leslie C. Heilman, Esquire*
Laurel D. Roglen, Esquire
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com
　　　　roglenl@ballardspahr.com
*Admitted Pro Hac Vice

Dennis T. Lewandowski, Esquire (VSB #22232)
Lisa Hudson Kim, Esquire (VSB #45484)
Clark J. Belote, Esquire (VSB #87310)
KAUFMAN & CANOLES, P.C.
4101 Parks Avenue, Suite 700
Virginia Beach, Virginia 23451
Telephone:  (757) 491-4017
Facsimile: (888)360-9092
Email: lhkim@kaufcan.com;
dtlewand@kaufcan.com; cjbelote@kaufcan.com

and

Dustin P. Branch, Esquire
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: (424) 204-4354
Facsimile: (424) 204-4350
E-mail: branchd@ballardspahr.com

**Hearing Date: June 25, 2020 at 11:00 a.m. (ET)**
**Objection Deadline: June 18, 2020 at 4:00 p.m. (ET)**
**Related to Docket No. 247, 469, and 471**

*Counsel to 5616 Bay Street Investors LLC, Brixmor Operating Partnership LP, CenterCal Properties, LLC, DDR Deer Park Town Center LLC, ERY Retail Podium LLC, EDENS, Federal Realty Investment Trust, PGIM Real Estate, Related Companies, Retail Properties of America, Inc., Starwood Retail Partners LLC, The Forbes Company, The Macerich Company, Trademark Property Company, Gateway Knollwood, LLC, and Urban Edge Properties L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re:<br><br>CHINOS HOLDINGS, INC., *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-32181 (KLP)<br><br>(Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

**LIMITED OBJECTION OF 5616 BAY STREET INVESTORS LLC, BRIXMOR OPERATING PARTNERSHIP LP, CENTERCAL PROPERTIES, LLC, DDR DEER PARK TOWN CENTER LLC, EDENS, ERY RETAIL PODIUM LLC, FEDERAL REALTY INVESTMENT TRUST, GATEWAY KNOLLWOOD, LLC, PGIM REAL ESTATE, RELATED COMPANIES, RETAIL PROPERTIES OF AMERICA, INC., STARWOOD RETAIL PARTNERS LLC, THE FORBES COMPANY, THE MACERICH COMPANY, TRADEMARK PROPERTY COMPANY, AND URBAN EDGE PROPERTIES L.P. TO THE PROPOSED DISCLOSURE STATEMENT FOR JOINT PREARRANGED CHAPTER 11 PLAN OF REORGANIZATION OF CHINOS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS (WITH TECHNICAL CHANGES)**

5616 Bay Street Investors LLC, Brixmor Operating Partnership LP, CenterCal Properties, LLC, DDR Deer Park Town Center LLC, EDENS, ERY Retail Podium LLC, Federal Realty Investment Trust, Gateway Knollwood, LLC, PGIM Real Estate, Related Companies, Retail Properties of America, Inc., Starwood Retail Partners LLC, The Forbes Company, The Macerich Company, Trademark Property Company, and Urban Edge Properties L.P. (the "Landlords") hereby file this limited objection (the "Objection"), by and through their undersigned counsel, to the *Proposed Disclosure Statement for Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors (with Technical Changes)* [Docket No. 469] (the "Disclosure Statement"),[2] and respectfully represent as follows:

### I. BACKGROUND FACTS

1. On May 4, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court"), which cases have been jointly consolidated for administrative purposes only (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3] No trustee or examiner has been appointed in the Chapter 11 Cases.

---

[2] Terms not otherwise defined here shall have the meanings ascribed to them in the Disclosure Statement and Plan, and accompanying documents.

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

2

2. The Debtors lease retail space (the "Premises") from the Landlords pursuant to unexpired leases of nonresidential real property (individually, a "Lease," and collectively, the "Leases") at the shopping center locations (the "Centers") set forth in detail on **Schedule A** to this Limited Objection.

3. The Leases are leases "of real property in a shopping center" as that term is used in Section 365(b)(3). In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

4. On May 18, 2020, the Debtors filed the original Disclosure Statement [Docket No. 247] and the *Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and its Affiliated Debtors* [Docket No. 248] (the "Plan"). On June 11, 2020, the Disclosure Statement [Docket No. 469] and Plan [Docket No. 468] were amended. On the same date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Plan, and (V) Granting Related Relief* [Docket No 471] (the "Solicitation Procedures Motion"). The Landlords do not object to the Debtors' efforts to confirm a plan of reorganization, but as drafted, the Disclosure Statement and Plan fail to provide adequate information for Landlords or other creditors to make an informed decision with respect to the Plan, and the Plan itself improperly seeks to modify the Landlords' rights under their Leases and the Bankruptcy Code.

## II.    ARGUMENT

**A.    The Disclosure Statement fails to provide adequate information upon which creditors can rely to make an informed judgment regarding the Plan.**

5. Section 1125 requires that a disclosure statement contain "adequate information." 11 U.S.C. § 1125(a). Disclosure is the "pivotal" concept in a chapter 11 reorganization. Westland Oil Development Corp. v. MCorp Management, 157 B.R. 100, 102 (Bankr. S.D. Tex., 1993); *citing* 5 Collier on Bankruptcy, ¶ 1125.03 (15th ed. 1992); see also Oneida Motor Freight, Inc. v. United Jersey

3

Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance upon the disclosure statement by creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"). The purpose behind the disclosure requirement is to prevent a debtor from seeking acceptance of its reorganization plan until it provides its creditors and other parties-in-interest with a disclosure statement that contains "adequate information" about the details of the debtor's plan and its prospects of success. 11 U.S.C. § 1125(b).

6. Section 1125(a)(1) defines adequate information as "[i]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1). Congress intended that the disclosure statement serve as the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization. See In re Scioto Valley Mortgage Co., 88 B.R. 168 (Bankr. S.D. Ohio 1988).

7. The Disclosure Statement does not satisfy the disclosure standards set forth in Section 1125 of the Bankruptcy Code. The Disclosure Statement and Plan also rely, in part, on a Plan Supplement including schedules of assumed and rejected Leases that need not be filed until August 12, 2020—a mere five (5) calendar days before the Plan Objection Deadline. The Plan Supplement should be provided no less than fourteen (14) days before any applicable objection deadline or the voting deadline to prevent disenfranchisement of claimants and give parties in interest sufficient time to review and formulate any necessary objections.

8. Moreover, the Plan provides for the rejection of executory contracts and leases beyond the Effective Date of the Plan. This is contrary to the Bankruptcy Code and makes it impossible for creditors to make an informed decision on the Plan. "If, on the face of the plan, the plan could not be confirmed, then the Court [should] not subject the estate to the expense of soliciting votes and seeking confirmation. Not only would allowing an unconfirmable plan to accompany a disclosure statement,

4

and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate." In re Pecht, 57 B R. 137, 139 (Bankr. E.D. Va. 1986); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("approval should be withheld if, . . . it is apparent that the plan will not comply with Code § 1129(a)"); In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation); see also In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved."). As a result, the Court should require the Debtors to amend the Disclosure Statement and Plan to provide creditors with adequate information and conform provisions to be consistent with the Bankruptcy Code (which cannot be modified post-confirmation) before allowing the Debtors to proceed to plan confirmation.

**B.    The Disclosure Statement Fails Because the Plan's Disparate Treatment of Unsecured Creditors Renders It Unconfirmable**

9. Where it is clear that a plan of reorganization cannot be confirmed, it is appropriate for a court to refuse to approve the disclosure statement. See In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (where plan is so fatally flowed that confirmation is not possible, the court should refuse to consider the adequacy of disclosure); In re Market Square Inn, Inc., 163 B.R. 64, 67-68 (Bankr. W.D. Pa. 1994) ("we conclude that [the creditor] cannot be compelled to voluntarily release his claim" and since it is clear that the plan is not capable of confirmation, it is appropriate to refuse approval of the disclosure statement"); In re Atlanta West VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) ("A court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies the disclosure statement is not confirmable."); In re Cardinal Congregate I, 121 B.R. 760. 764 (Bankr. S.D. Ohio 1990); In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("court will not approve disclosure statement for an admittedly unconfirmable plan").

10. In order for a plan to be confirmed, it must satisfy Section 1129(a)(1), which requires a plan to comply with all applicable provisions of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(1).

5

11. Section 1122 of the Bankruptcy Code, which provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

12. As *Colliers* explains (7 L. King, *Collier on Bankruptcy*, ¶ 1129.03[1]) (15th ed. rev.):

Section 1129(a)(1) states that a court can confirm a plan only if "[t]he plan complies with the applicable provisions of this title." This requires that the plan conform to the "applicable" provisions of title 11. The legislative history suggests that the applicable provisions are those governing the plan's internal structure and drafting: "Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as Section 1122 and 1123, governing classification and contents of plan."

* * *

Section 1129(a)(1) can also be used as the grounds for denial of confirmation when the plan is contrary to provisions of title 11 not found in chapter 11, such as impermissible releases of third parties which violate Section 524(e), or if the plan selectively rides roughshod over and attempts to nullify important provisions of the Bankruptcy Code. At some level, however, the courts have recognized that the complexity of plan confirmation permits notions of "harmless error," so that technical noncompliance with a provision that does not significantly affect creditor rights will not block confirmation.

13. Section 1129(a)(1) provides that "a plan may not be confirmed unless the plan complies with the applicable provisions of Title 11 . . . ." Mabey v. Southwestern Elec. Power Co. (In the Matter of Cajun Elec. Power Cooperative, Inc.), 150 F. 3d 503, 513, n.3 (5th Cir. 1998), citing Mickey's Enters., Inc. v. Saturday Sales, Inc. (In re Mickey's Enters., Inc.),165 B.R. 188, 193 (Bankr. W.D. Tex. 1994) ("In order to confirm a plan the court must find that the plan and its proponent have complied with the applicable provisions of Title 11."). Moreover, a plan cannot be confirmed if it

6

violates the provisions of Title 11.  See Resorts Int'l., Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394 (9th Cir. 1995) (holding chapter 11 plan could not be confirmed where it violated Section 524(e) by providing releases to non-debtors).

14. In In re: Beyond.com Corporation, 289 B.R. 138; (Bankr. N.D. CA, 2003), the Bankruptcy Court denied confirmation for various reasons, including the failure of the Plan to comply with the requirements of Section 1129(a)(1), and in conclusion stated:

> Beyond.com filed this case because it needed the special provisions available only to bankruptcy debtors. Having sought bankruptcy's protections, it cannot now rewrite the Bankruptcy Code to suit its purposes

15. While Section 1122 requires any claims classified together to be substantially similar, it does not require that all substantially similar claims be placed in the same class.  Debtors have "some flexibility in classification of unsecured claims," but "there is a limit on the debtor's power to classify claims."  In re Bryson Props., XVIII, 961 F.2d 496, 502 (4th Cir. 1991).  "Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors. . . . The potential for abuse would be significant otherwise. . . . If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed."  In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990) (citations omitted).

16. The Fourth Circuit has favorably cited In re Greystone III Joint Venture, 948 F.2d 134 (5th Cir. 1992), in which the Fifth Circuit found that there is no basis to separately classify code-created claims from other non-code-created claims of the same priority.  See In re Bryson, 961 F.2d at 502 ("A fair reading of both subsections [of Section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class.").

17. A chapter 11 plan also may not unfairly discriminate against an impaired, non-accepting class of claims in order for such plan to be confirmable pursuant to Section 1129(b). "Courts

7

Case 20-32181-KLP    Doc 511    Filed 06/18/20    Entered 06/18/20 16:01:18    Desc Main
Document    Page 8 of 20

have struggled to give the unfair discrimination test an objective standard." 7 Collier on Bankruptcy ¶ 1129.03(3)(a) (Alan N. Resnick & Henry J. Sommer eds., 16th ed., 2011). The Fourth Circuit has joined other courts in affirming a test borrowed from the chapter 13 unfair discrimination rule provided in Section 1322(b)(1), which considers the following four factors:

> (1) whether there is a reasonable basis for the discrimination; (2) whether the plan can be confirmed and consummated without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against.

Ownby v. Jim Beck, Inc. (In re Jim Beck, Inc.), 214 B.R. 305, 307 (W.D. Va. 1997), aff'd, 162 F.3d 1155 (4th Cir. 1998); In re Sutton, Case No. 10-10539-8-RDD, 2012 Bankr. LEXIS 752, at *6-10 (Bankr. E.D.N.C. Feb. 9, 2012). Other courts have found that there is a rebuttable presumption of unfair discrimination where there is (1) a dissenting class, (2) another class of the same priority, and (3) a difference in the plan's treatment of the two classes resulting in either (a) a materially lower recovery to the dissenting class or (b) a recovery for the dissenting class that is at materially greater risk. See In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999), aff'd in relevant part 255 B.R. 445 (E.D. Mich. 2000), aff'd in part and remanded Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).

18.    Here, the Plan is patently unconfirmable because it fails to satisfy Sections 1122. The Plan divides general unsecured claims into "Ongoing Trade Claims" and "Other General Unsecured Claims." Ongoing Trade Claims are defined as "any General Unsecured Claim held by a party that, within 30 days of the Petition Date, has executed a trade agreement" and agreed to provide trade terms for no less than 180 days. Plan, at § 1.100. Other General Unsecured Claims are defined as "any General Unsecured Claim other than an Ongoing Trade Claim, including, for the avoidance of doubt . . . all Claims arising from rejection of an Executory Contract or Unexpired Lease pursuant to Sections 365 or 1123 of the Bankruptcy Code." Plan, at § 1.101. This classification improperly separates general unsecured claims for the purpose of disparate treatment, as discussed below. The

Debtors specifically classify rejection damages claims, which will no doubt be significant in these cases, from other prepetition claims of certain trade vendors.

19. Moreover, the gerrymandering of the general unsecured claims results in unfair discrimination against Holders of Other General Unsecured Claims in the form of a substantially lower projected recovery. Ongoing Trade Claims in Class 6-A will share in a $71,000,000 recovery pool with an estimated percentage recovery of 50%. Meanwhile, Other General Unsecured Claims in Class 6-B will share in $3 million if they accept the Plan or $1 million if they reject the Plan, resulting in at best, a 1.6% projected recovery on such Claims. This disparate treatment reveals the true purpose behind the separate classification—minimizing recoveries to counterparties on account of rejected contracts and leases and to those trade creditors who have chosen not to enter into a trade agreement with the Debtors. As the Fifth Circuit made clear, the genesis of a general unsecured claim is not a valid basis for separate classification. See Greystone, 948 F.2d 134, and Courts must look beyond pretextual justifications for disparate treatment of claims of the same priority. The Debtors attempt to conceal their efforts to single-out those parties who have decided not to partner with the Debtors for lesser treatment by including other types of general unsecured claims in the Other General Unsecured Claims category, such as the Term Loan Deficiency Claims. But Article 4.7 of the Plan states that the Term Loan Deficiency Claims have agreed to forego any distribution pursuant to the Plan anyway, so they are not forced to accept any such discriminatory treatment.

20. For these reasons, the Plan as currently proposed is unconfirmable and approval of the Disclosure Statement should be denied.

**C.    The Plan and Disclosure Statement seek to improperly extend the time to assume or reject leases.**

21. The Disclosure Statement provides that the Debtors may reject leases after confirmation by providing for the possibility of motions to assume leases remaining pending after the Effective Date (see Plan, Article 8.1(b)), as well as by the Plan providing that the Debtors can reject leases post-confirmation if an allowed cure claim is determined to be greater than the amount asserted by Debtors (see Plan, Article 8.2(c)). This violates Section 365(d)(4), and as a result, the Plan is not

confirmable under Section 1129(a)(1).

22. The Debtors cannot pick and choose which Code provisions to follow and which to ignore. Section 365(d)(4) requires the assumption or rejection of leases no later than the entry of the order confirmation a plan of reorganization, and the Debtors must abide by this provision to confirm their Plan. Section 365(d)(4) provides that "an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected . . . if the trustee does not assume or reject the unexpired lease by the earlier of (i) the date that is 120 days after the date of the order for relief [or within such additional time as set by the Court and authorized by Section 365(d)(4)]; or (ii) the date of the entry of an order confirming a plan."

23. As noted above, the Disclosure Statement and Plan propose to give the Debtors the ability to reject leases after entry of the confirmation order on various grounds, including if they are dissatisfied with a cure resolution. This potentially disenfranchises Landlords by permitting the Debtors to reject leases after the voting deadline, depriving Landlords with potentially significant rejection claims from having the ability to vote those claims to accept or reject the Plan. In addition, this may be used as an attempt to force Landlords to reduce their legitimate cure claims, even though there may be no legal basis to do so. This is unsupported by either statutory authority or case law, and the Bankruptcy Code requires that all leases of non-residential real estate will be assumed or rejected no later than the date of entry of the confirmation order. The Debtors must either finalize its list of assumed and rejected leases such that landlords with rejected leases have time to vote on the Plan, or they must provide some mechanism to make sure that these landlords are not improperly disenfranchised by the plan process.

24. Prior to the 1984 amendments to the Bankruptcy Code, the final date when a Chapter 11 debtor could assume or reject an unexpired lease was the date of confirmation of its plan of reorganization. Specifically, Section 365(d)(2) provided that in Chapter 11, the trustee could assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to the agreement, could shorten the time to assume or reject. See 11 U.S.C. § 365(d)(2) (1978). Soon after the enactment of the 1978 Bankruptcy Code, Congress realized that major deficiencies existed in Section 365. The delay built into Section 365(d)(2), without a

10

mechanism for earlier assumption or rejection, worked a hardship on lessors, particularly shopping center lessors. This ultimately culminated in the 1984 enactment of Section 365(d)(4), which made the 60-day time limit imposed by Section 365(d)(1) in liquidation proceedings applicable to nonresidential leases of real property in reorganization cases.

25. Section 365(d)(4) was created as part of the statutory provisions known as the Shopping Center Amendments of 1984. Initially, it provided that a nonresidential real property lease is deemed rejected if the trustee does not assume or reject it within 60 days after the order for relief, or within such additional time as the court fixes, for cause, within such 60-day period. The legislation's purpose was to compel debtors to make prompt and effective assumptions and rejections of nonresidential real property leases, and it was not to extend this time. That notwithstanding, debtors made various attempts to extend the time to assume or reject leases multiple times during bankruptcy cases, including requests to extend the time to assume or reject leases after confirmation. While these requests were generally denied as contrary to legislative intent, further changes were necessary to clarify the law in this area.

26. In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act, which included explicit language regarding the outside date for assumption or rejection of nonresidential real property leases. This is the current version of Section 365(d)(4), and it provides that the deadline to assume or reject leases is the *earlier* of the time set by the statute (as may have been extended by the Court) or the date of entry of the confirmation order. As a result, Congress has specifically stated that debtors cannot extend the time to assume or reject there nonresidential real property leases beyond the date of confirmation. The Disclosure Statement and Plan must be modified to provide that all determinations as to which Leases are to be assumed or rejected under the Plan by the Debtors shall be made no later than the entry of the confirmation order.

**D.     The Debtors should pay all undisputed cure amounts not later than the Effective Date.**

27. Consistent with the above, the Debtors should pay all undisputed cure amounts for assumed Leases on the Effective Date of the Plan along with other administrative claims. Section 365(b)(1)(A) requires that the Debtors promptly cure outstanding balances due under the Leases upon

11

assumption. To the extent there is a dispute over the total cure obligation for any Lease, all undisputed cure amounts should be paid immediately. Debtors should escrow disputed amounts, and the Court should set a status conference within thirty (30) days of the assumption or assumption and assignment of the Leases to deal with any disputes that remain unresolved after such period.

**E.    The Debtors Must Provide Landlords With Adequate Assurance Information and Cure Amounts with Sufficient Time to Object.**

28.    The Debtors may not assume or assume and assign leases unless they demonstrate adequate assurance of future performance. 11 U.S.C. § 365(b)(1)(C); see also 11 U.S.C. § 365(f)(2). Providing adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365. See In re Rachels Indus., Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985). The obligation to comply with Section 365(b) and Section 365(f) is unaffected by maneuvering the assumption and assignment process through a Plan. Courts require a specific factual showing through competent evidence to determine whether a debtor demonstrates adequate assurance of future performance. See, e.g., Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, the court found that insufficient documentary evidence had been presented). To determine whether a party provides adequate assurance of future performance under Section 365(b), courts have looked to sufficient economic backing, economic conditions, certificates, credit reports, escrow deposits or other similar forms of security or guarantee. In re Lafayette Radio Elecs. Corp., 9 B.R. 993 (Bankr. E.D.N.Y. 1981); In re Belize Airways, 5 B.R. 152 (Bankr. S.D. Fla. 1980).

29.    The Disclosure Statement and Plan do not provide any information on what Adequate Assurance information the Debtors intend to provide to the Landlords. Moreover, the documents specify no deadline whatsoever by which Adequate Assurance information will be provided. Absent sufficient Adequate Assurance information and a reasonable period of time to review such information, Landlords that have leases that are being assumed by the Plan cannot properly assess the tenant that will take over the those leases post-confirmation.

30. The Debtors should be required to provide Landlords with Adequate Assurance information and the Cure Notice no less than fourteen (14) days before any objection is due to be filed. There is more than enough time for the Debtors to provide the Landlords with this meaningful opportunity to review this crucial information and prepare objections.

**F.    The Plan improperly seeks to modify rights under the Leases.**

31. The Plan provides that the assumption of leases shall serve as a full release of any monetary and non-monetary defaults. See Plan, Article 8.2(d). A debtor assumes its leases cum onere, or subject to existing burdens. In re Washington Capital Aviation & Leasing, 156 B.R. 167,172 (Bankr. E.D. Va. 1993). While the Debtors must pay all outstanding balances due under the Lease as cure at the time of assumption, the Debtors assume, and must honor, other obligations under the Leases, regardless of when they arise. The Debtors cannot avoid these obligations through releases or waivers in their Plan.

32. In addition to rent and related monthly charges, the Debtors bear responsibility for other charges under the Leases that may not yet be known or which may not yet have been reconciled and/or adjusted from the pre-assumption periods. For instance, the Debtors occupy retail space at the Centers pursuant to triple-net leases, where they typically pay rent and related lease charges in advance for each month. In addition to a base minimum rent, the Debtors pay a pro-rata share of other charges and expenses, such as real property taxes, insurance, common area maintenance ("CAM") fees, and percentage rent. Certain charges, such as CAM and property taxes are estimated prospectively, billed to and paid by the tenant during the year based upon such estimate, and then reconciled after year-end. Year-end reconciliations and adjustments for previous years may not yet be complete (i.e. – year-end reconciliations and adjustments that accrued through 2019 have not been billed for many locations, and such charges for 2020 will not be billed until 2021). Moreover, certain charges may be paid in arrears, and cannot be calculated (in some cases) until a year or more after year-end. These accrued but unbilled charges are not yet due under the Leases, and they do not create a current default or payment obligation that is part of the cure payment required to assume the Leases. Nevertheless, Debtors remain responsible for all accrued or accruing charges under the Leases, and must pay such charges when they

13

come due under the Leases. The Debtors cannot assume the Leases pursuant to the Plan, and then try to use the Plan or confirmation order to release their obligation to pay these accrued or accruing, but unbilled, charges that come due under the Leases in the ordinary course.

33. The Leases also contain provisions that require the Debtors to indemnify Landlords with respect to various claims, which claims may not become known until after the assumption of the Leases (i.e., personal injury claims at the Premises and damage to property by the Debtors or their agents). Any assumption of the Leases must be subject to the terms of the Leases, including the continuation of all indemnification obligations, regardless of when they arose.[4] Nothing in the Plan or confirmation order should act as a waiver or release of any indemnity or other rights that exist under the Leases.

**G.    The Plan improperly seeks to deprive creditors of their setoff and recoupment rights.**

34. Through the injunction provisions, the Debtors improperly seek to deprive Landlords of their rights to setoff and recoupment. See Disclosure Statement, at Article VI.E.5. To the extent any claim objections or preference actions are prosecuted against the Landlords following Plan confirmation, the Landlords should not be deprived of their defensive right to assert setoffs or exercise recoupment, or limited in their ability to enforce these rights pursuant to applicable law and against any security deposits they may hold under the Leases. The Debtors fail to provide any authority for seeking to void Landlords' ability to exercise their setoff and recoupment rights, and Debtors should not be permitted to deprive Landlords of these rights. See Carolco Television Inc. v. Nat'l Broadcasting Co. (In re De Laurentiis Entm't Grp. Inc.), 963 F.2d 1269 (9th Cir. 1992), cert denied 506 U.S. 918 (1992) (setoff rights survive plan confirmation); see also In re Luongo, 259 F.3d 323, 333 (5th Cir. 2001); Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 257-61 (3d Cir. 2000) (recoupment defense survives free and clear sale of debtor's assets). This is especially true where, as here, the Plan seems to preserve all of the Debtors' rights to such setoff and recoupment.

---

[4] Any ability to assume the Leases is subject to the protections provided by Section 365(b) and (f). Therefore, any assumption must be in accordance with all provisions of the Leases.

**H.     The injunction provisions of the Plan as described in the Disclosure Statement are overbroad and ambiguous.**

35.     The releases and injunction provisions referenced in the Disclosure Statement and Plan are overbroad and require revision.  See Disclosure Statement, at Article VI.E.5 & 6.  The language does not adequately address the fact that various claims and rights under the Leases must survive confirmation of the Plan for the continuing obligations that exist under the Leases.  The Debtors (or successor) assume the Leases subject to their terms, and must assume all obligations owing under the Leases, including obligations that have accrued but may not yet have been billed under each Lease and indemnity obligations under the Leases.

36.     Landlords may have claims for year-end reconciliation payments that have accrued (or are accruing) prior to confirmation, which have not yet been billed under the Leases.  These legitimate lease obligations must survive plan confirmation.  The Debtors occupy space at shopping centers pursuant to triple-net leases, where they pay rent and related lease charges in advance for each month.  The Debtors may pay fixed minimum rent, along with a pro-rata share of expenses such as real property taxes, insurance, common area maintenance ("CAM") fees, and the like. Certain charges, such as CAM and property taxes, are estimated prospectively, billed to and paid by the tenant during the year, and then reconciled after year-end. The reconciliation compares the amounts estimated and paid against actual charges incurred by the property. To the extent the estimated payments exceed actual charges, the result is a credit to the tenant. To the extent the estimated payments do not cover actual charges incurred by the Center, the result is an additional amount (or debit) for which the tenant is liable.  Year-end reconciliations and adjustments for the Debtors for 2019 may not be completed prior to Plan confirmation for many locations.  In other instances, certain charges (such as property taxes) may be paid in arrears or only billed annually.

37.     In addition, the Leases require the Debtors to indemnify and hold the Landlords harmless with respect to claims at the Premises.  Such claims may not become known until after the effective date of the Plan, examples of which may include such claims as personal injuries at the Premises and damage to the Premises or Centers by the Debtors or their agents.  The Plan cannot cut off these indemnification obligations, regardless of when they arose.  Nothing in any Plan or confirmation

15

order should preclude the Landlords from pursuing the Debtors or Reorganized Debtors for any indemnification obligation that Landlords have under the Leases, and the Plan and any order should specifically preserve all rights of the parties with respect to assumed Leases.

**H.     The Plan Cannot Constitute an Objection to Claims.**

38.     Article 4.7 of the Plan states that "[t]he Plan shall be deemed a filed objection for purposes of Section 502 of the Bankruptcy Code to any Claim arising out of or relating to the rejection of an Executory Contract or Unexpired Lease whose holder is seeking the allowance of such Claim in excess of the amounts allowable under Section 502(b) of the Bankruptcy Code."

39.     Rule 3007(a) of the Federal Rules of Bankruptcy Procedure requires that "[a]objection to the allowance of a claim and a notice of objection that substantially conforms to the appropriate Official Form shall be filed and served at least 30 days before any scheduled hearing on the objection or any deadline for the claimant to request a hearing." Fed. R. Bankr. P. 3007(a)(1). Rule 3007(e) enumerates additional requirements that must be met for filing an omnibus objection to more than one claim, including that such an objection state in a conspicuous place that claimants receiving the objection should locate their names and claims in the objection, list claimants alphabetically and provide a cross-reference to claim numbers, state the grounds of the objection to each claim, state in the title the identity of the objector and the grounds for the objections, and contain objections to no more than 100 claims.

40.     The Plan fails to satisfy any of these requirements to constitute a valid claim objection and provide affected claimants with sufficient notice and an opportunity to respond. As an initial matter, many Landlords do not yet know whether their Leases will be assumed or rejected, so they do not know if this language will even apply to their claims. The Plan does not comport with the Official Form for a claim objection, nor does it meet the requirements to constitute an omnibus objection to claims.

41.     For these reasons, this provision is inappropriate and should be removed from the Plan.

16

### III. RESERVATION OF RIGHTS

42. Landlords reserve their rights to raise further objections to the Disclosure Statement and Plan and in response to any amended Disclosure Statement or Plan filed by the Debtors.

### IV. JOINDER IN OBJECTIONS

43. Landlords also join in any objection of the Official Committee of Unsecured Creditors, as well as the objections of other landlords, to the extent not inconsistent with this Objection.

### V. CONCLUSION

Based on the foregoing, Landlords request that the Court not approve the Disclosure Statement unless and until the Debtors provide adequate information as required by Section 1125, amend the Disclosure Statement and Plan so that the Disclosure Statement describes a Plan that is confirmable under Section 1129, including the modifications requested herein, and grant such further relief as the Court deems proper.

Respectfully submitted

By:     /s/ Lisa Hudson Kim
Dennis T. Lewandowski, Esquire (VSB #22232)
Lisa Hudson Kim, Esquire (VSB #45484)
Clark J. Belote, Esquire (VSB #87310)
KAUFMAN & CANOLES, P.C.
4101 Parks Avenue, Suite 700
Virginia Beach, Virginia 23451
Telephone: (757) 491-4017
Facsimile: (888)360-9092
Email: lhkim@kaufcan.com
     dtlewand@kaufcan.com
     cjbelote@kaufcan.com
and

Dustin P. Branch admitted *pro hac vice*
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-3012
Telephone: (424) 204-4354
Facsimile: (424) 204-4350
E-mail: branchd@ballardspahr.com

and

Leslie C. Heilman admitted *pro hac vice*
Leslie Heilman, Esquire (No. 4716)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
Email: heilmanl@ballardspahr.com

*Counsel to 5616 Bay Street Investors LLC, Brixmor Operating Partnership LP, CenterCal Properties, LLC, DDR Deer Park Town Center LLC, ERY Retail Podium LLC, EDENS, Federal Realty Investment Trust, Gateway Knollwood, LLC, PGIM Real Estate, Related Companies, Retail Properties of America, Inc., Starwood Retail Partners LLC, The Forbes Company, The Macerich Company, Trademark Property Company, and Urban Edge Properties L.P.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 18, 2020, she caused the foregoing to be electronically filed and served via the Court's CM/ECF system upon all parties registered to receive such notice and upon the Service List as indicated therein.

/s/ *Lisa Hudson Kim*
Lisa Hudson Kim

**SCHEDULE A**

| | | |
|---|---|---|
| **5616 BAY STREET INVESTORS LLC** | | |
| Store No. Unknown | Bay Street | Emeryville, CA |
| **BRIXMOR OPERATING PARTNERSHIP LP** | | |
| Store No. Unknown | The Center at Preston Ridge | Frisco, TX |
| **CENTERCAL PROPERTIES, LLC** | | |
| Store No. Unknown | 2nd & PCH | Long Beach, CA |
| Store No. Unknown | Bridgeport Village | Tualatin, OR |
| Store No. Unknown | The Village at Meridian | Meridian, ID |
| **DDR DEER PARK TOWN CENTER LLC** | | |
| Store No. Unknown | Deer Park Town Center | Deer Park, IL |
| **EDENS** | | |
| Store No. Unknown | Atherton Mill | Charlotte, NC |
| Store No. Unknown | Mosaic | Fairfax, VA |
| Store No. Unknown | Park Road Shopping Center | Charlotte, NC |
| Store No. Unknown | Trenholm Plaza | Columbus, SC |
| **ERY RETAIL PODIUM LLC** | | |
| Store No. Unknown | Hudson Yards | New York, NY |
| **FEDERAL REALTY INVESTMENT TRUST** | | |
| Store No. Unknown | Assembly Row | Somerville, MA |
| Store No. Unknown | Plaza El Segundo | El Segundo, CA |
| Store No. Unknown | Third Street Promenade | Santa Monica, CA |
| Store No. Unknown | The Grove | Shrewsbury, NJ |
| Store No. Unknown | Mercantile Westgate Center | San Jose, CA |
| Store No. Unknown | Santana Row | San Jose, CA |
| Store No. Unknown | Barracks Road | Charlottesville, VA |
| Store No. Unknown | The Point | El Segundo, CA |
| Store No. Unknown | The Grove | Shrewsbury, NJ |
| Store No. Unknown | Third Street Promenade | Santa Monica, CA |
| **GATEWAY KNOLLWOOD, LLC** | | |
| Store No. Unknown | Shoppes at Knollwood | St. Louis Park, MN |
| **PGIM REAL ESTATE** | | |
| Store No. Unknown | The Mercato | Naples, FL |
| **RELATED COMPANIES** | | |
| Store No. Unknown | The Shops at Columbus Circle | New York, NY |
| **RETAIL PROPERTIES OF AMERICA** | | |
| Store No. Unknown | Southlake Town Square – Grande Avenue (J. Crew) | Southlake, TX |
| Store No. Unknown | Southlake Town Square – Grande Avenue (Madewell) | Southlake, TX |

| STARWOOD RETAIL PARTNERS LLC | | |
|---|---|---|
| Store No. Unknown | Franklin Park | Toledo, OH |
| **THE FORBES COMPANY** | | |
| Store No. Unknown | Somerset Collection North | Troy, MI |
| Store No. Unknown | Somerset Collection South | Troy, MI |
| Store No. Unknown | The Gardens | Palm Beach Gardens, FL |
| Store No. Unknown | The Mall at Millenia | Orlando, FL |
| **THE MACERICH COMPANY** | | |
| Store No. Unknown | Arden Fair Mall (J. Crew) | Sacramento, CA |
| Store No. Unknown | Arden Fair Mall (Madewell) | Sacramento, CA |
| Store No. Unknown | Biltmore Fashion Park | Phoenix, AZ |
| Store No. Unknown | Broadway Plaza (J. Crew) | Walnut Creek, CA |
| Store No. Unknown | Broadway Plaza (Madewell) | Walnut Creek, CA |
| Store No. Unknown | The Village at Corte Madeira (J. Crew) | Corte Madera, CA |
| Store No. Unknown | The Village at Corte Madeira (Madewell) | Corte Madera, CA |
| Store No. Unknown | Fashion Outlets of Chicago | Rosemont, IL |
| Store No. Unknown | Fashion Outlets of Niagara Falls USA | Niagara Falls, NY |
| Store No. Unknown | FlatIron Crossing | Broomfield, CO |
| Store No. Unknown | Kierland Commons | Scottsdale, AZ |
| Store No. Unknown | Scottsdale Fashion Square | Scottsdale, AZ |
| Store No. Unknown | The Oaks | Thousand Oaks, CA |
| Store No. Unknown | Twenty Ninth Street (J. Crew Factory) | Boulder, CO |
| Store No. Unknown | Twenty Ninth Street (Madewell) | Boulder, CO |
| Store No. Unknown | Tysons Corner Center | McLean, VA |
| Store No. Unknown | Washington Square | Portland, OR |
| **TRADEMARK PROPERTY COMPANY** | | |
| Store No. Unknown | Bridgewater Commons (J. Crew) | Bridgewater Township, NJ |
| Store No. Unknown | Bridgewater Commons (Madewell) | Bridgewater Township, NJ |
| **URBAN EDGE PROPERLIES L.P.** | | |
| Store No. Unknown | J. Crew at Bergen Town Center | Paramus, NJ |
| Store No. Unknown | The Men's Shop at Bergen Town Center | Paramus, NJ |

2

18536915v1