**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CHINOS HOLDINGS, INC., *et al.*[1] | Case No. 20-32181 (KLP) |
| Debtors. | (Jointly Administered) |

**PROOF OF PUBLICATION**

Attached hereto as **Exhibit A** is the Proof of Publication for the Notice of Deadlines to file Proofs of Claim[2] that was published in The New York Times National Edition on June 17, 2020.

Attached hereto as **Exhibit B** is the Proof of Publication for the Notice of Deadlines to file Proofs of Claim that was published in The New York Times International Edition on June 22, 2020.

Dated: June 23, 2020

/s/ Darleen Sahagun
Darleen Sahagun
Omni Agent Solutions
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300

*Claims, Noticing, and Administrative Agent for the Debtor*

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

2 A copy of the Notice is attached as **Exhibit C**.

# **EXHIBIT A**



The New York Times
620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

Jun-17, 2020

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

June 17, 2020 NYT & Natl, pg B 3

Sworn before me the

17 day of June, 2020.

Notary Public

JAMES W. SAPP
Notary Public, State of New York
No. 01SA6190150
Qualified in New York County
Term Expires July 14, 2020

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION

| | |
|---|---|
| In re CHINOS HOLDINGS, INC., *et al.*, Debtors. | Chapter 11 Case Nos.: 20-32180 (KLP) Through 20-32197 (KLP) (Jointly Administered) |

NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM

TO: ALL PERSONS AND ENTITIES WHO MAY HAVE CLAIMS AGAINST ANY OF THE FOLLOWING DEBTOR ENTITIES:

**TECHNOLOGY**

# *After Rivals Like Spotify Cry Foul, Apple's App Store Draws Scrutiny in Europe*

By ADAM SATARIANO and JACK NICAS

LONDON — Apple's App Store helped usher in the smartphone economy, leading to the birth of now-ubiquitous services such as Instagram, Uber and Candy Crush, and providing a transformative new way for people to shop from their phones.

But for companies that wanted to offer their products through Apple's digital store, there has always been a catch: To reach customers, they had to agree to Apple's terms and conditions, including sharing certain data with the company and giving it a percentage of any future sales made through the iPhone or iPad app.

Now European regulators are questioning whether Apple's terms go too far.

On Tuesday, the European Commission, the executive body of the European Union, said it had opened a formal antitrust investigation to determine if the terms that Apple imposes on app developers violate competition rules. The commission said it had also started a separate investigation to see whether Apple was boxing out rivals to its mobile payments system, Apple Pay.

In both Brussels and Washington, officials have been scrutinizing the power of the world's largest technology platforms. Apple, Amazon, Facebook and Google are being investigated by antitrust authorities over their growing power, particularly their position as gatekeepers upon which other companies depend on to reach customers.

"Apple obtained a 'gatekeeper' role when it comes to the distribution of apps and content to users of Apple's popular devices," said Margrethe Vestager, the European Commission executive vice president in charge of competition policy. "We need to ensure that Apple's rules do not distort competition in markets where Apple is competing with other app developers."

The case against Apple arises from a complaint made last year by Spotify, whose music-streaming service competes with Apple Music. Spotify and others have criticized Apple for imposing rules and charging a fee of up to 30 percent on digital services sold through its App Store. Spotify argued that the fee constituted a tax that violated competition laws and merited an investigation. In March, the European Commission said an e-book and audiobook distributor, which it didn't identify, had filed a similar complaint.

"At the heart of our case is the fact that Apple acts as the stadium owner, referee and player, and tilts the playing field in favor of its own services," Horacio Gutierrez, Spotify's chief legal officer, told reporters on Tuesday. "This case is not just about Spotify. The commission's decision to take on this case against Apple is an important first step toward developing new rules of the road that will govern the conduct of online platforms for years to come."

On Tuesday, European authorities said a preliminary investigation showed the complaints had merit.

Josh Rosenstock, a spokesman for Apple, said the company disagreed with the European Commission's decision to start the investigations, describing the complaints that it is breaking antitrust laws as "baseless." The company has defended its tight control of the App Store as a means to preserve quality, privacy and security.

"Throughout our history, Apple has created groundbreaking new products and services in some of the most fiercely competitive markets in the world," he said. "We follow the law in everything we do, and we embrace competition at every stage because we believe it pushes us to deliver even better results."

American investigations of Big Tech's power, including those by the Justice Department, Federal Trade Commission and state attorneys general, have tended to lump Apple in with Google, Facebook and Amazon. But Apple was thought to be at the least risk of punishment there because its business practices appeared to be less problematic than its closest peers.

But now Europe's formal investigations show Apple still faces at least one big regulatory fight.

In Europe, the world's largest technology companies have long been viewed with suspicion as they have consolidated power over the digital economy. In 2016, the European Commission ordered Ireland to collect 13 billion euros in unpaid taxes from Apple, worth about $14.7 billion today. The antitrust authorities have also issued billions of dollars in fines against Google for antitrust violations in recent years, while Amazon and Facebook are also facing fresh scrutiny.

Spotify has been discussing Apple's practices with European regulators for about five years, according to a person involved in the talks, who spoke on the condition of anonymity because they were private. Tuesday's announcement is a major milestone, yet the commission could still spend a year or more investigating the company's practices before determining whether to bring charges.

Since Spotify made its formal complaint in Europe in March 2019, regulators have been considering how to show harm from Apple's actions, according to the person involved. They eventually concluded that Apple's 30 percent share of some revenues collected via the App Store raised competitors' costs, eventually leading to higher prices for consumers, this person said.

Spotify said it had raised its monthly subscription price to $13 from $10 in 2014 to make up for Apple's cut. A year later, Apple introduced its streaming-music competitor, Apple Music, priced at $10 a month. Spotify then decided to pull out of the App Store payment system, restricting Apple from taking a share and prompting Spotify to drop its price back to $10 a month. It then became more complicated to sign up for Spotify's paid service; customers now have to go to a website instead of simply tapping a button in the app.

Apple has faced other scrutiny of how it uses its influence over the App Store. For years it has packed the top of many App Store search results with its own apps, even when they were less popular or relevant than competitors' offerings, according to an investigation by The New York Times. In 2018, Apple also began restricting or removing many popular apps that helped people limit the time they and their children spent on their iPhones, just after Apple released competing tools. After the makers of two parental-control apps complained to European regulators and The Times reported on Apple's moves, Apple quietly reversed its policy and let the apps back into the App Store.

> ***'Apple acts as the stadium owner, referee and player.'***
> Horacio Gutierrez, chief legal officer for the music app Spotify.

In addition to App Store policies, European authorities are investigating Apple Pay, which allows people to make purchases within apps or in shops with an iPhone or Apple Watch. The questions surround requirements companies must agree to when integrating Apple Pay into apps or websites. The commission said it would review how the company controlled access to "tap and go" technology for rival payment systems on Apple devices.

"It is important that Apple's measures do not deny consumers the benefits of new payment technologies, including better choice, quality, innovation and competitive prices," Ms. Vestager said.

The Apple investigations are part of a multifront challenge that the biggest tech companies are grappling with around the world.

In Germany and Britain, lawmakers are debating changes to antitrust laws that would make it easier for the authorities to bring tech cases. European Union officials are exploring a digital services law with wide-ranging implications, including potential liability rules for harmful content spread on social media, as well as expanded powers for regulators to quickly step in against what they conclude are unfair business practices. Australia, India and Brazil are also cracking down.

Spotify said that federal and state regulators in the United States had approached the company about Apple and that it had provided information, but that it expects real action to come in Europe.

Gene Kimmelman, a former chief counsel of the Justice Department's antitrust division, said Europe continued to lead on enforcement.

"Europe is moving much more quickly and much more aggressively with both antitrust and regulation," said Mr. Kimmelman, now a senior fellow at the German Marshall Fund. "I think the U.S. will respond to that."

Adam Satariano reported from London, and Jack Nicas from Centerville, Mass.

ANDREW CABALLERO-REYNOLDS/AGENCE FRANCE-PRESSE — GETTY IMAGES

Mark Zuckerberg has long said that Facebook would not police political ads. Now, it will let users in the United States decide whether to hide them or not.

# *Hate Political Ads? Opt Out, Facebook Says*

By MIKE ISAAC

SAN FRANCISCO — For months, Facebook has weathered criticism for its willingness to show all types of political advertising to its billions of users, even if those ads contained lies.

Now the company is changing tack — sort of.

On Tuesday, the social network said it would allow people in the United States to opt out of seeing social issue, electoral or political ads from candidates or political action committees in their Facebook or Instagram feeds. The ability to hide those ads will begin with a small group of users in the coming weeks, before rolling out to the rest of the United States and later to several other countries.

"Everyone wants to see politicians held accountable for what they say — and I know many people want us to moderate and remove more of their content," Mark Zuckerberg, chief executive of Facebook, wrote in an op-ed piece in USA Today on Tuesday. "For those of you who've already made up your minds and just want the election to be over, we hear you — so we're also introducing the ability to turn off seeing political ads. We'll still remind you to vote."

The move allows Facebook to play both sides of a complicated debate about the role of political advertising on social media ahead of the November presidential election. With the change, Facebook can continue allowing political ads to flow across its network, while also finding a way to reduce the reach of those ads and to offer a concession to critics who have said the company should do more to moderate noxious speech on its platform.

Mr. Zuckerberg has long said that Facebook would not police and moderate political ads. That's because the company does not want to limit the speech of candidates, he has said, especially in smaller elections and those candidates who do not have the deep pockets of the major campaigns.

But critics, including the Biden presidential campaign, have argued that Facebook's laissez-faire approach has dangerous consequences, with untruthful political ads leading to the spreading of disinformation and potential voter disenfranchisement. Some Republicans have argued that Facebook should not act as an arbiter of what can and cannot be posted in ads, and that the company's intervention amounts to censorship.

The Biden presidential campaign lashed out at Facebook over its hands-off policy on political ads last October after the Trump campaign released ads on the social network that falsely claimed that Mr. Biden had offered to bribe Ukrainian officials to drop an investigation into his son. Since then, the Biden campaign has called for the company to fact-check ads from candidates and their campaigns.

Last week, Mr. Biden's campaign also began an online petition and letter to Mr. Zuckerberg to demand changes to its speech policies ahead of the 2020 presidential contest. At the same time, the Biden campaign also spent $5 million in advertising on Facebook, surging past political ad spending by Mr. Trump on the platform.

> ***Playing to both sides of a charged debate ahead of an election.***

Facebook has previously modified what some users can see with political ads. In January, the company said it would allow people the option to see fewer such ads. The update announced on Tuesday will let them opt out entirely.

Other social media companies have taken a far harder line on political ads. Last year, Jack Dorsey, Twitter's chief executive, said Twitter would ban all political ads because they presented challenges to civic discourse.

"We believe political message reach should be earned, not bought," Mr. Dorsey said.

Both Facebook and Twitter publish libraries of political ads that have run on their sites, allowing people to research specific advertisers while tracking their messages and spending habits. The companies also regularly take down coordinated disinformation campaigns, and are monitoring attempts at election interference from foreign operatives.

Still, critics said that Facebook wasn't being transparent enough. "There are significant problems with the Facebook ad library, which makes it really difficult to keep on top of what is circulating to even monitor for disinformation in ads, let alone to judge what the impact is with audiences," said Claire Wardle of First Draft, a nonprofit that researches the impact of misinformation in the media.

Facebook also unveiled a voting information center on Tuesday, a feature that aims to give people more data on elections. That includes details on how and when to vote, information about voter registration, voting by mail and early voting.

"Covid is going to make it really difficult for people to understand what's going on and how to vote," Emily Dalton Smith, a director of social impact products at Facebook, said in an interview. She said the voting information center would help people get necessary and accurate information for the fall elections.

The feature will roll out at the top of the news feeds for American users of Facebook and Instagram. Facebook has pledged a goal of helping more than four million people register to vote through its initiative. It estimated that roughly half of the U.S. population would see information on how to vote in the November elections.

Kate Conger contributed reporting from Oakland, Calif., and Cecilia Kang from Washington.

The New York Times

Encourage student discovery.

Learn how you can sponsor classroom subscriptions at **nytimes.com/sponsor.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

| | |
|---|---|
| **In re** | **Chapter 11 Case Nos.:** |
| **CHINOS HOLDINGS, INC., *et al.*,** | **20-32180 (KLP) Through 20-32197 (KLP)** |
| **Debtors.** | **(Jointly Administered)** |

**NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM**

**TO: ALL PERSONS AND ENTITIES WHO MAY HAVE CLAIMS AGAINST ANY OF THE FOLLOWING DEBTOR ENTITIES:**

Name of Debtor, Case Number, Tax Identification Number: J. Crew Virginia, Inc., 20-32180 (KLP), 03-0375626; Chinos Holdings, Inc., 20-32181 (KLP), 27-4173834; Chinos Intermediate Holdings A, Inc., 20-32182 (KLP), 27-4553301; Chinos Intermediate, Inc., 20-32183 (KLP), 37-1873871; Chinos Intermediate Holdings B, Inc., 20-32184 (KLP), 27-4553244; J. Crew Group, Inc., 20-32185 (KLP), 22-2894486; J. Crew Operating Corp., 20-32186 (KLP), 22-3540930; Grace Holmes, Inc., 20-32187 (KLP), 22-1691409; H.F.D. No. 55, Inc., 20-32188 (KLP), 22-1869438; J. Crew Inc., 20-32189 (KLP), 22-2516360; J. Crew International, Inc., 20-32190 (KLP), 51-0342712; Madewell Inc., 20-32191 (KLP), 20-4928609; J. Crew Brand Holdings, LLC, 20-32192 (KLP), 82-1807625; J. Crew Brand Intermediate, LLC, 20-32193 (KLP), 82-1793860; J. Crew Brand, LLC, 20-32194 (KLP), 82-1761647; J. Crew Brand Corp., 20-32195 (KLP), 82-1751616; J. Crew Domestic Brand, LLC, 20-32196 (KLP), 82-1778962; J. Crew International Brand, LLC, 20-32197 (KLP), 82-1807471

**OTHER NAMES USED BY THE DEBTORS IN THE PAST 8 YEARS: J. Crew; J.Crew Retail; J. Crew Retail Stores; J. Crew Factory; J. Crew Corp.; J.Crew Factory Stores; J. Crew Mercantile; Madewell Retail Stores; Madewell Retail; J. Crew Outfitters, Inc.**

**Attorneys for Debtors:** Ray C. Schrock, P.C., Ryan Preston Dahl, Esq., Candace M. Arthur, Esq., Daniel Gwen, Esq., WEIL, GOTSHAL & MANGES LLP, 767 Fifth Avenue, New York, New York 10153-0119, Telephone: (212) 310-8000, Facsimile: (212) 310-8007; **Attorneys for Debtors:** Tyler P. Brown (VSB No. 28072), Henry P. (Toby) Long, III (VSB No. 75134), Nathan Kramer (VSB No. 87720), HUNTON ANDREWS KURTH LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Telephone: (804) 788-8200, Facsimile: (804) 788-8218

Address of the Clerk of the Bankruptcy Court: Clerk of the Bankruptcy Court for the Eastern District of Virginia (Richmond Division), 701 East Broad Street, Suite 4000, Richmond, Virginia 23219-1888, Telephone: 804-916-2400, Hours Open: 8:00 a.m. – 4:00 p.m. Monday-Friday

**PLEASE TAKE NOTICE THAT:**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY HAVE A CLAIM AGAINST THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES. THEREFORE, YOU SHOULD READ THIS NOTICE CAREFULLY AND CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

On May 4, 2020 (the "**Petition Date**"), Chinos Holdings, Inc., and certain of its debtor affiliates, as debtors and debtors in possession, (collectively, the "**Debtors**"), filed voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**").

On May 28, 2020, the Bankruptcy Court, having jurisdiction over the chapter 11 cases of the Debtors, entered an order (the "**Bar Date Order**") establishing the following Bar Dates:

a. **July 15, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for each person or entity (as defined in section 101(27) of the Bankruptcy Code) other than governmental units (as defined in section 101(27) of the Bankruptcy Code) ("**Governmental Units**"), to file a proof of claim in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including secured claims, unsecured priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code against any of the Debtors (the "**General Bar Date**"), unless otherwise provided herein;

b. **November 2, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**");

c. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined herein)** as the deadline by which claimants holding claims affected by such filing, amendment, or supplement must file proofs of claim with respect to such claim (the "**Amended Schedules Bar Date**"); and

d. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date of entry of an order approving rejection of any executory contract or unexpired lease of the Debtors (the "Rejection Order")** as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file proofs of claim for damages arising from such rejection[1] (the "**Rejection Damages Bar Date**," and, together with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, the "**Bar Dates**").

**If you have any questions relating to this notice, please feel free to contact Omni Agent Solutions ("Omni") at (866) 991-8218 (toll free) or (818) 924-2298 (international) or by e-mail at chinosinquiries@omniagnt.com.**

NOTE: The staff of the Bankruptcy Clerk's Office, the Office of the United States Trustee, and the Debtors' Claims and Noticing Agent cannot give legal advice.

**INSTRUCTIONS:**

**1. WHO MUST FILE A PROOF OF CLAIM.** Except as otherwise set forth herein, the following persons or entities holding claims against the Debtors arising before the Petition Date **MUST** file proofs of claim on or before the applicable Bar Date:

a. any person or entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules, or is listed as "contingent," "unliquidated," or "disputed" and if such entity desires to participate in any of these chapter 11 cases or share in any distribution in any of these chapter 11 cases;

b. any person or entity who believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and who desires to have its claim allowed in a different classification or amount other than that identified in the Schedules;

c. any person or entity who believes that any prepetition claim as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and who desires to have its claim allowed against a Debtor other than identified in the Schedules; and

d. any entity who believes that its claim against a Debtor is or may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "**claim**" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, and priority claims.

Pursuant to section 101(15) of the Bankruptcy Code and as used in this notice, the term "entity" has the meaning given to it in section 101(15) of the Bankruptcy Code, and includes all persons, estates, trusts, and governmental units. In addition, the terms "persons" and "governmental units" are defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively.

**2. WHO NEED NOT FILE A PROOF OF CLAIM.** The following persons or entities whose claims would otherwise be subject to a Bar Date need not file any proofs of claim:

a. any person or entity whose claim is listed on the Schedules; *provided that* (i) the claim is not listed on the Schedules as "disputed," "contingent," or "unliquidated," (ii) the person or entity does not dispute the amount, nature, and priority of the claim as set forth in the Schedules, and (iii) the person or entity does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

b. any person or entity who already has filed a signed proof of claim with Omni or the Clerk of the Bankruptcy Court for the Eastern District of Virginia against the respective Debtors with respect to the claim being asserted, utilizing a claim form that substantially conforms to the Proof of Claim Form;

c. any person or entity who holds a claim that has been allowed by an order of the Court entered on or before the applicable Bar Date;

d. any person or entity whose claim has been paid in full in accordance with the Bankruptcy Code or an order of the Court;

e. any person or entity who holds a claim for which a separate deadline has been fixed by an order of the Court entered on or before the applicable Bar Date;

f. any person or entity who holds any equity interest in the Debtors, which interest exclusively is based upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; provided, that if any such holder asserts a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a Proof of Claim, as applicable, must be filed on or before the applicable Bar Date pursuant to the Procedures set forth herein;

g. any current officer, director, or employee for claims based on indemnification, contribution, or reimbursement;

h. any entity whose claim is solely against any of the Debtors' non-Debtor affiliates;

i. any Debtor or non-debtor subsidiary or affiliate having a claim against another Debtor;

j. any counterparty to a lease of nonresidential real property that asserted a claim for a cure amount in connection with a timely filed objection to the assumption or assumption and assignment of such lease by the Debtors;

k. any holder of a claim allowable under section 503(b) and 507(a)(2) of the Bankruptcy Code, other than a claim asserting priority pursuant to section 503 of the Bankruptcy Code; and

l. (i) the prepetition lenders party to that certain *Credit Agreement*, dated March 7, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**," and such lenders, the "**ABL Lenders**") on account of claims arising thereunder; (ii) the prepetition lenders party to that certain *Amended and Restated Credit Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Agreement**," and such lenders, the "**Term Lenders**") on account of claims arising thereunder; and (iii) the prepetition holders of notes issued pursuant to those certain *Indentures*, dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "**IPCo Indentures**," and such holders, the "**IPCo Noteholders**") on account of claims arising thereunder; *provided that* the administrative agent under the ABL Credit Agreement and the Term Loan Agreement, respectively, and trustees under the IPCo Indentures may file a single consolidated Proof of Claim on behalf of the ABL Lenders, Term Lenders, and IPCo Noteholders, as applicable.

**The fact that you have received this notice does not mean that you have a claim or that the Debtors or the Court believe that you have a claim against the Debtors. You should not file a proof of claim if you do not have a claim against any of the Debtors.**

**3. INSTRUCTIONS FOR FILING PROOFS OF CLAIM.** Except as otherwise set forth herein, each entity that asserts a claim against the Debtors that arose before the Petition Date **MUST** file a proof of claim.

**The following procedures with respect to preparing and filing of proofs of claim will apply; *provided, however*, the Debtors in their discretion may waive any defects in a proof of claim:**

a. Proofs of claim must substantially conform to the attached Proof of Claim Form or Official Bankruptcy Form No. 410;

b. Proofs of claim must (i) be written in the English language; (ii) be denominated in lawful currency of the United States as of the Petition Date (using the exchange rate, if applicable, as of the Petition Date); (iii) specify by name and case number the Debtor against which the claim is filed; (iv) set forth with specificity the legal and factual basis for the alleged claim; (v) include supporting documentation for the claim or an explanation as to why such documentation is not available; and (vi) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant under penalty of perjury;

c. Except as otherwise set forth herein, if a claimant asserts a claim against more than one Debtor or has claims against different Debtors, the claimant must file a separate proof of claim, as applicable, against each Debtor;

d. Except as otherwise provided herein, each proof of claim must include supporting documentation or an explanation as to why such documentation is not available in accordance with Bankruptcy Rules 3001(c) and 3001(d). If such documentation is voluminous, such proof of claim may include a summary of such documentation, subject to receiving prior written consent from the Debtors' counsel and submitting the documentation in connection with such request;

e. Proofs of claim must be filed (i) electronically through the website of the Debtors' claims and noticing agent, Omni, using the interface available on such website located at https://www.omniagentsolutions.com/chinosclaims under the link entitled "Submit a Claim" (the "**Electronic Filing System**") or (ii) by delivering the original proof of claim form by hand, or mailing the original proof of claim form on or before the applicable Bar Date as follows: **If by overnight courier, hand delivery, or first class mail: Chinos Holdings, Inc. Claims Processing,** c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

f. A proof of claim shall be deemed timely filed only if it **actually is received** by Omni as set forth in subparagraph (e) above, in each case, on or before the applicable Bar Date; and

g. Proofs of claim sent by facsimile, telecopy, or electronic mail transmission (other than proofs of claim filed electronically through the Electronic Filing System) **will not** be accepted.

**4. CONSEQUENCES OF FAILURE TO TIMELY FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE. Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a Proof of Claim as provided herein, but fails to do so:**

**(a) shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution in these chapter 11 cases on account of such claim; and**

**(b) forever shall be barred, estopped, and enjoined from asserting such claim against each of the Debtors and their property (or filing a proof of claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim.**

**5. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF.** You may be listed as the holder of a claim against the Debtors in the Debtors' Schedules of Assets and Liabilities or Schedules of Executory Contracts and Unexpired Leases (collectively, the "**Schedules**"). To determine if and how you are listed in the Schedules, please refer to the descriptions set forth on the enclosed Proof of Claim Form regarding the nature, amount, and status of your claim(s). If you received postpetition payments from the Debtors (as authorized by the Court) on account of your claim, the enclosed Proof of Claim Form will reflect the net amount of your claims. If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple Proof of Claim Forms, each of which will reflect the nature and amount of your claim against each Debtor, as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Schedules and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted (i) on the website established by Omni for the Debtors' cases at https://www.omniagentsolutions.com/chinosclaims and (ii) on the Court's website at https://www.vaeb.uscourts.gov/. A login and password to the Court's Public Access to Electronic Court Records ("**PACER**") are required to access the information on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. Copies of the Schedules also may be examined between the hours of 8:00 a.m. and 5:00 p.m. (Eastern Time) Monday through Friday at the U.S. Bankruptcy Court, 701 East Broad Street, Suite 4000, Richmond, VA 23219-1888. Copies of the Debtors' Schedules also may be obtained by written request to the Debtors' claims agent, Omni, at the address and telephone number set forth below: **Chinos Holdings, Inc. Claims Processing,** c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367, Toll Free: (866) 991-8218, International: (818) 924-2298.

If the Debtors amend or supplement their Schedules after the date of entry of the Bar Date Order, the Debtors shall give notice of any amendment or supplement to the holders of claims affected by such amendment or supplement within 10 days after filing such amendment or supplement, and such holders must file a Proof of Claim **by the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules**, or be forever barred from so doing, and such deadline shall be contained in any notice of such amendment or supplement of the Schedules provided to the holders of claims affected thereby.

**6. RESERVATION OF RIGHTS.** Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to the nature, amount, liability, or classification thereof; (b) subsequently designate any scheduled claim as disputed, contingent, or unliquidated; and (c) otherwise amend or supplement the Schedules.

**If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' Claims and Noticing Agent directly at: Omni, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; telephone: (866) 991-8218 (toll-free) or (818) 924-2298 (international); or by e-mail at chinosinquiries@omniagnt.com.**

**A holder of a possible claim against the Debtors should consult an attorney if such holder has any questions regarding this notice, including whether the holder should file a proof of claim.**

Dated: Richmond, Virginia, June 15, 2020, **BY ORDER OF THE COURT,** WEIL, GOTSHAL & MANGES LLP, Ray C. Schrock, P.C., Ryan Preston Dahl, Esq., Candace M. Arthur, Esq., Daniel Gwen, Esq., 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007 -and- HUNTON ANDREWS KURTH LLP, Tyler P. Brown (VSB No. 28072), Henry P. (Toby) Long, III (VSB No. 75134), Nathan Kramer (VSB No. 87720), Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, Tel: (804) 788-8200, Fax: (804) 788-8218, ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

[1] Provided that notwithstanding the foregoing, a party to an executory contract or unexpired lease who asserts a claim on account of unpaid amounts accrued and outstanding as of the Petition Date pursuant to such executory contract or unexpired lease (other than a rejection damages claim) must file a proof of claim for such amounts on or before the applicable Bar Date, unless an exception identified in the Bar Date Order applies.

# EXHIBIT B

The New York Times

INTERNATIONAL EDITION

620 Eighth Ave, New York, NY 10018 USA

# PROOF OF PUBLICATION

Jun-22 **20** 20

I, *Edgar Noblesala*, am over the age of 18 years and a citizen of the United States. In my capacity as a Principal Clerk of the Publisher of The New York Times **INTERNATIONAL EDITION,** a daily newspaper printed in Paris, France and circulated in major cities in Europe, North Africa, the Middle East, Far East and the Americas. I hereby certify that the advertisement annexed hereto was published in the editions of The New York Times **INTERNATIONAL EDITION** on the following date or dates, to wit on

June 22, 2020, iNYT, pg 7

Sworn before me the

22 day of June , 2020.

Notary Public

JAMES W. SAPP
Notary Public, State of New York
No. 01SA6190150
Qualified in New York County
Term Expires July 14, 2020

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION

In re: CHINOS HOLDINGS, INC., et al., Debtors. | Chapter 11 Case Nos.: 20-32180 (KLP) Through 20-32197 (KLP) (Jointly Administered)

NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM

[illegible]

# Business

## Denouncing the racism they unleash

**The Shift**

KEVIN ROOSE

Several weeks ago, as protests erupted across the United States in response to the police killing of George Floyd, Mark Zuckerberg wrote a long and heartfelt post on his Facebook page, denouncing racial bias and proclaiming that "black lives matter." Mr. Zuckerberg, Facebook's chief executive, also announced that the company would donate $10 million to racial justice organizations.

A similar show of support unfolded at Twitter, where the company changed its official Twitter bio to a Black Lives Matter tribute, and Jack Dorsey, the chief executive, pledged $3 million to an anti-racism organization started by Colin Kaepernick, the former N.F.L. quarterback.

YouTube joined the protests, too. Susan Wojcicki, its chief executive, wrote in a blog post that "we believe Black lives matter and we all need to do more to dismantle systemic racism." YouTube also announced it would start a $100 million fund for black creators.

Pretty good for a bunch of supposedly heartless tech executives, right?

Well, sort of. The problem is that while these shows of support were well intentioned, they didn't address the way that these companies' own products — Facebook, Twitter and YouTube — have been successfully weaponized by racists and partisan provocateurs, and are being used to undermine Black Lives Matter and other social justice movements.

It's as if the heads of McDonald's, Burger King and Taco Bell all got together to fight obesity by donating to a vegan food co-op, rather than by lowering their calorie counts.

It's hard to remember sometimes, but social media once functioned as a tool for the oppressed and marginalized. In Tahrir Square in Cairo, Ferguson, Mo., and Baltimore, activists used Twitter and Facebook to organize demonstrations and get their messages out.

But in recent years, a right-wing reactionary movement has turned the tide. Now, some of the loudest and most established voices on these platforms belong to conservative commentators and paid provocateurs whose aim is mocking and subverting social justice movements, rather than supporting them.

The result is a distorted view of the world that is at odds with actual public sentiment. A majority of Americans support Black Lives Matter, but you wouldn't necessarily know it by scrolling through your social media feeds.

On Facebook, for example, the most popular post on the day of Mr. Zuckerberg's Black Lives Matter pronouncement was an 18-minute video posted by the right-wing activist Candace Owens.

In the video, Ms. Owens, who is black, railed against the protests, calling the idea of racially biased policing a "fake narrative" and deriding Mr. Floyd as a "horrible human being." Her monologue, which was shared by right-wing media outlets — and which several people told me they had seen because Facebook's algorithm recommended it to them — racked up nearly 100 million views.

Ms. Owens is a serial offender, known for spreading misinformation and stirring up partisan rancor. (Her Twitter account was suspended this year after she encouraged her followers to violate stay-at-home orders, and Facebook has applied fact-checking labels to several of her posts.) But she can still insult the victims of police killings with impunity and with an audience of nearly four million followers on Facebook. So can other high-profile conservative commentators like Terrence K. Williams, Ben Shapiro and the Hodgetwins: Anti-Black Lives Matter posts from each of them have gone viral over the past several weeks.

In all, seven of the 10 most-shared Facebook posts containing the phrase "Black Lives Matter" over the past month were critical of the movement, according to data from CrowdTangle, a Facebook-owned data platform. (The sentiment on Instagram, which Facebook owns, has been more favorable, perhaps because its users skew younger and more liberal.)

MATT CHASE

Facebook declined to comment. On Thursday, it announced it would spend $200 million to support black-owned businesses and organizations, and add a "Lift Black Voices" section to its app to highlight stories from black people and share educational resources.

Twitter has been a supporter of Black Lives Matter for years — remember Mr. Dorsey's trip to Ferguson? — but it, too, has a problem with racists and bigots who use the platform to stir up unrest. Last month, the company discovered that a Twitter account claiming to represent a national antifa group was run by a group of white nationalists posing as left-wing radicals. (The account was suspended, but not before its tweets calling for violence had been widely shared.) Twitter's trending topics sidebar, which is often gamed by trolls looking to hijack online conversations, has filled up with inflammatory hashtags like #whitelivesmatter and #whiteoutwednesday, often as a result of coordinated campaigns by far-right extremists.

A Twitter spokesman, Brandon Borrman, said: "We've taken down hundreds of groups under our violent extremist group policy and continue to enforce our policies against hateful conduct every day across the world. From #BlackLivesMatter to #MeToo and #BringBackOurGirls, our company is motivated by the power of social movements to usher in meaningful societal change."

YouTube, too, has struggled to square its corporate values with the way its products actually operate. The company has made strides in recent years to remove conspiracy theories and misinformation from its search results and recommendations, but it has yet to grapple fully with the way its boundary-pushing culture and laissez-faire policies contributed to racial division for years.

In some ways, social media has helped Black Lives Matter simply by making it possible for victims of vio-

*PLATFORMS, PAGE 8*

## Evicted for Covid patients

### Lower-paying residents, often the most vulnerable, forced from nursing homes

BY JESSICA SILVER-GREENBERG AND AMY JULIA HARRIS

ANDREW CULLEN FOR THE NEW YORK TIMES

**Lakeview Terrace, a nursing home in Los Angeles, evicted an 88-year-old with dementia at a time when employees were being urged to make room for Covid-19 patients.**

On a chilly afternoon in April, the Los Angeles police found an old, disoriented man crumpled on a Koreatown sidewalk.

Several days earlier, RC Kendrick, an 88-year-old with dementia, had been living at Lakeview Terrace, a nursing home with a history of regulatory problems. His family had placed him there to make sure he got round-the-clock care after his condition deteriorated and he began disappearing for days at a time.

But on April 6, the nursing home deposited Mr. Kendrick at an unregulated boardinghouse — without bothering to inform his family. Less than 24 hours later, Mr. Kendrick was wandering the city alone.

According to three Lakeview employees, Mr. Kendrick's ouster came as the nursing home was telling staff members to try to clear out less-profitable residents to make room for a new class of customers who would generate more revenue: patients with Covid-19, the disease caused by the coronavirus.

More than any other institution in America, nursing homes have come to symbolize the deadly destruction of the coronavirus crisis. More than 51,000 residents and employees of nursing homes and long-term care facilities have died, representing more than 40 percent of the total death toll in the United States.

But even as they have been ravaged, nursing homes have also been enlisted in the response to the outbreak. They are taking on coronavirus-stricken patients to ease the burden on overwhelmed hospitals — and, at times, to bolster their bottom lines.

A Lakeview official said the company's evictions were appropriate and weren't an attempt to free space for Covid-19 patients. But similar scenes are playing out at nursing homes nationwide. They are kicking out old and disabled residents — among the people most susceptible to the coronavirus — and shunting them into shelters for the homeless, rundown motels and other unsafe facilities, according to 22 watchdogs in 16 states, as well as dozens of elder-care lawyers, social workers and former nursing home executives.

Many of the evictions, known as involuntary discharges, appear to violate federal rules that require nursing homes to place residents in safe locations and to provide them with at least 30 days' notice before forcing them to leave.

While the popular conception of nursing homes is of places where elderly people live, much of their business is caring for patients of all ages and income levels who are recovering from surgery or acute illnesses like strokes. Medicare often pays for short-term rehabilitation stints; Medicaid covers longer-term stays for poor people.

Nursing homes have long had a financial incentive to evict Medicaid patients in favor of those who pay through private insurance or Medicare, which reimburses nursing homes at a much higher rate than Medicaid. More than 10,000 residents and their families complained to watchdogs about being discharged in 2018, the most recent year for which figures are available.

> **"Some homes were basically seizing the moment when everyone is looking the other way to move people out."**

The pandemic has intensified the situation. With nursing homes not allowing visitors, they receive less outside scrutiny. Fifteen state-funded ombudsmen said in interviews that some homes appeared to be taking advantage of that void to evict vulnerable residents.

Many nursing homes are struggling in part because one of their most profitable businesses — postsurgery rehab — has withered as states have barred hospitals from performing nonessential services.

Treating Covid-19 patients quickly became a popular way to fill that financial void.

Last fall, the Centers for Medicare and Medicaid changed the formula for reimbursing nursing homes, making it more profitable to take in sicker patients for a short period of time. Covid-19 patients can bring in at least $600 more a day in Medicare dollars than people with relatively mild health issues, according to nursing home executives and state officials.

It is not always about the money. Several states, including New York, New Jersey and California, urged nursing homes to accept Covid-19 patients to help relieve pressure on hospitals. Some nursing home employees worried that would endanger vulnerable residents.

There are no national figures on the number of nursing home residents who have been moved into shelters for the homeless, motels and other facilities. The New York Times contacted more than 80 state-funded nursing-home ombudsmen in 46 states for a tally of involuntary discharges during the pandemic at facilities they monitor. Twenty-six ombudsmen, from 18 states, provided figures to The Times: a total of more than 6,400 discharges, many to shelters.

Traditionally, ombudsmen would regularly go to nursing homes. In March, though, ombudsmen — and residents' families — were required to stop visiting. Evictions followed.

"It felt opportunistic, where some homes were basically seizing the moment when everyone is looking the other way to move people out," said Laurie Facciarossa Brewer, a long-term care ombudsman in New Jersey.

Nursing homes are allowed to evict residents if they aren't able to pay for their care, are endangering others in the facility or have sufficiently recovered. Under federal law, before discharging patients against their will, nursing homes are required to give formal notice to the resident and to the ombudsman's office. They must also find a safe alter-

*EVICTIONS, PAGE 8*

ADVERTISEMENT ADVERTISEMENT

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11 Case Nos.:** |
| **CHINOS HOLDINGS, INC., *et al.*,** | ) | **20-32180 (KLP) Through 20-32197 (KLP)** |
| **Debtors.** | ) | **(Jointly Administered)** |

**NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM**

**TO: ALL PERSONS AND ENTITIES WHO MAY HAVE CLAIMS AGAINST ANY OF THE FOLLOWING DEBTOR ENTITIES:**

**Name of Debtor, Case Number, Tax Identification Number**: J. Crew Virginia, Inc., 20-32180 (KLP), 03-0375626; Chinos Holdings, Inc., 20-32181 (KLP), 27-4173834; Chinos Intermediate Holdings A, Inc., 20-32182 (KLP), 27-4553301; Chinos Intermediate, Inc., 20-32183 (KLP), 37-1873871; Chinos Intermediate Holdings B, Inc., 20-32184 (KLP), 27-4553244; J. Crew Group, Inc., 20-32185 (KLP), 22-2894486; J. Crew Operating Corp., 20-32186 (KLP), 22-3540930; Grace Holmes, Inc., 20-32187 (KLP), 22-1691409; H.F.D. No. 55, Inc., 20-32188 (KLP), 22-1869438; J. Crew Inc., 20-32189 (KLP), 22-2516360; J. Crew International, Inc., 20-32190 (KLP), 51-0342712; Madewell Inc., 20-32191 (KLP), 20-4928609; J. Crew Brand Holdings, LLC, 20-32192 (KLP), 82-1807625; J. Crew Brand Intermediate, LLC, 20-32193 (KLP), 82-1793860; J. Crew Brand, LLC, 20-32194 (KLP), 82-1761647; J. Crew Brand Corp., 20-32195 (KLP), 82-1751616; J. Crew Domestic Brand, LLC, 20-32196 (KLP), 82-1778962; J. Crew International Brand, LLC, 20-32197 (KLP), 82-1807471

**OTHER NAMES USED BY THE DEBTORS IN THE PAST 8 YEARS: J. Crew; J.Crew Retail; J. Crew Retail Stores; J. Crew Factory; J. Crew Corp.; J. Crew Factory Stores; J. Crew Mercantile; Madewell Retail Stores; Madewell Retail; J. Crew Outfitters, Inc.**

**Attorneys for Debtors:** Ray C. Schrock, P.C., Ryan Preston Dahl, Esq., Candace M. Arthur, Esq., Daniel Gwen, Esq., WEIL, GOTSHAL & MANGES LLP, 767 Fifth Avenue, New York, New York 10153-0119, Telephone: (212) 310-8000, Facsimile: (212) 310-8007; **Attorneys for Debtors:** Tyler P. Brown (VSB No. 28072), Henry P. (Toby) Long, III (VSB No. 75134), Nathan Kramer (VSB No. 87720), HUNTON ANDREWS KURTH LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Telephone: (804) 788-8200, Facsimile: (804) 788-8218

Address of the Clerk of the Bankruptcy Court: Clerk of the Bankruptcy Court for the Eastern District of Virginia (Richmond Division), 701 East Broad Street, Suite 4000, Richmond, Virginia 23219-1888, Telephone: 804-916-2400, Hours Open: 8:00 a.m. – 4:00 p.m. Monday-Friday

**PLEASE TAKE NOTICE THAT:**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY HAVE A CLAIM AGAINST THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES. THEREFORE, YOU SHOULD READ THIS NOTICE CAREFULLY AND CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

On May 4, 2020 (the "**Petition Date**"), Chinos Holdings, Inc., and certain of its debtor affiliates, as debtors and debtors in possession, (collectively, the "**Debtors**"), filed voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**").

On May 28, 2020, the Bankruptcy Court, having jurisdiction over the chapter 11 cases of the Debtors, entered an order (the "**Bar Date Order**") establishing the following Bar Dates:

a. **July 15, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for each person or entity (as defined in section 101(27) of the Bankruptcy Code) other than governmental units (as defined in section 101(27) of the Bankruptcy Code) ("**Governmental Units**"), to file a proof of claim in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including secured claims, unsecured priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code against any of the Debtors (the "**General Bar Date**"), unless otherwise provided herein;

b. **November 2, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**");

c. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined herein)** as the deadline by which claimants holding claims affected by such filing, amendment, or supplement must file proofs of claim with respect to such claim (the "**Amended Schedules Bar Date**"); and

d. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date of entry of an order approving rejection of any executory contract or unexpired lease of the Debtors (the "Rejection Order")** as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file proofs of claim for damages arising from such rejection[1] (the "**Rejection Damages Bar Date**," and, together with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, the "**Bar Dates**").

**If you have any questions relating to this notice, please feel free to contact Omni Agent Solutions ("Omni") at (866) 991-8218 (toll free) or (818) 924-2298 (international) or by e-mail at chinosinquiries@omniagnt.com.**

NOTE: The staff of the Bankruptcy Clerk's Office, the Office of the United States Trustee, and the Debtors' Claims and Noticing Agent cannot give legal advice.

**INSTRUCTIONS:**

**1. WHO MUST FILE A PROOF OF CLAIM.** Except as otherwise set forth herein, the following persons or entities holding claims against the Debtors arising before the Petition Date **MUST** file proofs of claim on or before the applicable Bar Date:

a. any person or entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules, or is listed as "contingent," "unliquidated," or "disputed" and if such entity desires to participate in any of these chapter 11 cases or share in any distribution in any of these chapter 11 cases;

b. any person or entity who believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and who desires to have its claim allowed in a different classification or amount other than that identified in the Schedules;

c. any person or entity who believes that any prepetition claim as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and who desires to have its claim allowed against a Debtor other than identified in the Schedules; and

d. any entity who believes that its claim against a Debtor is or may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "**claim**" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, and priority claims.

Pursuant to section 101(15) of the Bankruptcy Code and as used in this notice, the term "entity" has the meaning given to it in section 101(15) of the Bankruptcy Code, and includes all persons, estates, trusts, and governmental units. In addition, the terms "persons" and "governmental units" are defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively.

**2. WHO NEED NOT FILE A PROOF OF CLAIM.** The following persons or entities whose claims would otherwise be subject to a Bar Date need not file any proofs of claim:

a. any person or entity whose claim is listed on the Schedules; *provided that* (i) the claim is not listed on the Schedules as "disputed," "contingent," or "unliquidated," (ii) the person or entity does not dispute the amount, nature, and priority of the claim as set forth in the Schedules, and (iii) the person or entity does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

b. any person or entity who already has filed a signed proof of claim with Omni or the Clerk of the Bankruptcy Court for the Eastern District of Virginia against the respective Debtors with respect to the claim being asserted, utilizing a claim form that substantially conforms to the Proof of Claim Form;

c. any person or entity who holds a claim that has been allowed by order of the Court entered on or before the applicable Bar Date;

d. any person or entity whose claim has been paid in full in accordance with the Bankruptcy Code or an order of the Court;

e. any person or entity who holds a claim for which a separate deadline has been fixed by an order of the Court entered on or before the applicable Bar Date;

f. any person or entity who holds an equity interest in the Debtors, which interest exclusively is based upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; provided, that if any such holder asserts a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a Proof of Claim, as applicable, must be filed on or before the applicable Bar Date pursuant to the Procedures set for the herein;

g. any current officer, director, or employee for claims based on indemnification, contribution, or reimbursement;

h. any entity whose claim is solely against any of the Debtors' non-Debtor affiliates;

i. any Debtor or non-debtor subsidiary or affiliate having a claim against another Debtor;

j. any counterparty to a lease of nonresidential real property that asserted a claim for a cure amount in connection with a timely filed objection to the assumption or assumption and assignment of such lease by the Debtors;

k. any holder of a claim allowable under section 503(b) and 507(a)(2) of the Bankruptcy Code, other than a claim asserting priority pursuant to section 503 of the Bankruptcy Code; and

l. (i) the prepetition lenders party to that certain *Credit Agreement*, dated March 7, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**," and such lenders, the "**ABL Lenders**") on account of claims arising thereunder; (ii) the prepetition lenders party to that certain *Amended and Restated Credit Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Agreement**," and such lenders, the "**Term Lenders**") on account of claims arising thereunder; and (iii) the prepetition holders of notes issued pursuant to those certain *Indentures*, dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "**IPCo Indentures**," and such holders, the "**IPCo Noteholders**") on account of claims arising thereunder; *provided that* the administrative agent under the ABL Credit Agreement and the Term Loan Agreement, respectively, and trustees under the IPCo Indentures may file a single consolidated Proof of Claim on behalf of the ABL Lenders, Term Lenders, and IPCo Noteholders, as applicable.

**The fact that you have received this notice does not mean that you have claim or that the Debtors or the Court believe that you have a claim against the Debtors. You should not file a proof of claim if you do not have a claim against any of the Debtors.**

**3. INSTRUCTIONS FOR FILING PROOFS OF CLAIM.** Except as otherwise set forth herein, each entity that asserts a claim against the Debtors that arose before the Petition Date **MUST** file a proof of claim.

**The following procedures with respect to preparing and filing of proofs of claim will apply; *provided, however,* the Debtors in their discretion may waive any defects in a proof of claim:**

a. Proofs of claim must substantially conform to the attached Proof of Claim Form or Official Bankruptcy Form No. 410;

b. Proofs of claim must (i) be written in the English language; (ii) be denominated in lawful currency of the United States as of the Petition Date (using the exchange rate, if applicable, as of the Petition Date); (iii) specify by name and case number the Debtor against which the claim is filed; (iv) set forth with specificity the legal and factual basis for the alleged claim; (v) include supporting documentation for the claim or an explanation as to why such documentation is not available; and (vi) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant under penalty of perjury;

c. Except as otherwise set forth herein, if a claimant asserts a claim against more than one Debtor or has claims against different Debtors, the claimant must file a separate proof of claim, as applicable, against each Debtor;

d. Except as otherwise provided herein, each proof of claim must include supporting documentation or an explanation as to why such documentation is not available in accordance with Bankruptcy Rules 3001(c) and 3001(d). If such documentation is voluminous, such proof of claim may include a summary of such documentation, subject to receiving prior written consent from the Debtors' counsel and submitting the documentation in connection with such request;

e. Proofs of claim must be filed (i) electronically through the website of the Debtors' claims and noticing agent, Omni, using the interface available on such website located at https://www.omniagentsolutions.com/chinosclaims under the link entitled "Submit a Claim" (the "**Electronic Filing System**") or (ii) by delivering the original proof of claim form by hand, or mailing the original proof of claim form on or before the applicable Bar Date as follows: **If by overnight courier, hand delivery, or first class mail: Chinos Holdings, Inc. Claims Processing,** c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

f. A proof of claim shall be deemed timely filed only if it **actually is received** by Omni as set forth in subparagraph (e) above, in each case, on or before the applicable Bar Date; and

g. Proofs of claim sent by facsimile, telecopy, or electronic mail transmission (other than proofs of claim filed electronically through the Electronic Filing System) **will not** be accepted.

**4. CONSEQUENCES OF FAILURE TO TIMELY FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE. Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a Proof of Claim on or before the applicable Bar Date as provided herein, but fails to do so:**

**(a) shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution in these chapter 11 cases on account of such claim; and**

**(b) forever shall be barred, estopped, and enjoined from asserting such claim against each of the Debtors and their property (or filing a proof of claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim.**

**5. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF.** You may be listed as the holder of a claim against the Debtors in the Debtors' Schedules of Assets and Liabilities or Schedules of Executory Contracts and Unexpired Leases (collectively, the "**Schedules**"). To determine if and how you are listed in the Schedules, please refer to the descriptions set forth on the enclosed Proof of Claim Form regarding the nature, amount, and status of your claims. If you received postpetition payments from the Debtors (as authorized by the Court) on account of your claim, the enclosed Proof of Claim Form will reflect the net amount of your claims. If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple Proof of Claim Forms, each of which will reflect the nature and amount of your claim against each Debtor, as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Schedules and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted (i) on the website established by Omni for the Debtors' cases at https://www.omniagentsolutions.com/chinosclaims and (ii) on the Court's website at https://www.vaeb.uscourts.gov/. A login and password to the Court's Public Access to Electronic Court Records ("**PACER**") are required to access the information on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. Copies of the Schedules also may be examined between the hours of 8:00 a.m. and 5:00 p.m. (Eastern Time) Monday through Friday at the U.S. Bankruptcy Court, 701 East Broad Street, Suite 4000, Richmond, VA 23219-1888. Copies of the Debtors' Schedules also may be obtained by written request to the Debtors' claims agent, Omni, at the address and telephone number set forth below: **Chinos Holdings, Inc. Claims Processing,** c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367, Toll Free: (866) 991-8218, International: (818) 924-2298.

If the Debtors amend or supplement their Schedules after the date of entry of the Bar Date Order, the Debtors shall give notice of any amendment or supplement to the holders of claims affected by such amendment or supplement within 10 days after filing such amendment or supplement, and such holders must file a Proof of Claim by **the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules**, or be forever barred from so doing, and such deadline shall be contained in any notice of such amendment or supplement of the Schedules provided to the holders of claims affected thereby.

**6. RESERVATION OF RIGHTS.** Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to the nature, amount, liability, or classification thereof; (b) subsequently designate any scheduled claim as disputed, contingent, or unliquidated; and (c) otherwise amend or supplement the Schedules.

**If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' Claims and Noticing Agent directly at: Omni, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; telephone: (866) 991-8218 (toll-free) or (818) 924-2298 (international); or e-mail at chinosinquiries@omniagnt.com.**

**A holder of a possible claim against the Debtors should consult an attorney if such holder has any questions regarding this notice, including whether the holder should file a proof of claim.**

Dated: Richmond, Virginia, June 15, 2020, **BY ORDER OF THE COURT**, WEIL, GOTSHAL & MANGES LLP, Ray C. Schrock, P.C., Ryan Preston Dahl, Esq., Candace M. Arthur, Esq., Daniel Gwen, Esq., 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007 -and- HUNTON ANDREWS KURTH LLP, Tyler P. Brown (VSB No. 28072), Henry P. (Toby) Long, III (VSB No. 75134), Nathan Kramer (VSB No. 87720), Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, Tel: (804) 788-8200, Fax: (804) 788-8218, ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

[1] Provided that notwithstanding the foregoing, a party to an executory contract or unexpired lease who asserts a claim on account of unpaid amounts accrued and outstanding as of the Petition Date pursuant to such executory contract or unexpired lease (other than a rejection damages claim) must file a proof of claim for such amounts on or before the applicable Bar Date, unless an exception identified in the Bar Date Order applies.

**EXHIBIT C**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

| | |
|---|---|
| **In re**<br><br>**CHINOS HOLDINGS, INC., *et al.*,**<br><br>**Debtors.** | **Chapter 11 Case Nos.: 20-32180 (KLP) Through 20-32197 (KLP)**<br>**(Jointly Administered)** |

# NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM

**TO: ALL PERSONS AND ENTITIES WHO MAY HAVE CLAIMS AGAINST ANY OF THE FOLLOWING DEBTOR ENTITIES:**

| Name of Debtor | Case Number | Tax Identification Number |
|---|---|---|
| J. Crew Virginia, Inc. | 20-32180 (KLP) | 03-0375626 |
| Chinos Holdings, Inc. | 20-32181 (KLP) | 27-4173834 |
| Chinos Intermediate Holdings A, Inc. | 20-32182 (KLP) | 27-4553301 |
| Chinos Intermediate, Inc. | 20-32183 (KLP) | 37-1873871 |
| Chinos Intermediate Holdings B, Inc. | 20-32184 (KLP) | 27-4553244 |
| J. Crew Group, Inc. | 20-32185 (KLP) | 22-2894486 |
| J. Crew Operating Corp. | 20-32186 (KLP) | 22-3540930 |
| Grace Holmes, Inc. | 20-32187 (KLP) | 22-1691409 |
| H.F.D. No. 55, Inc. | 20-32188 (KLP) | 22-1869438 |
| J. Crew Inc. | 20-32189 (KLP) | 22-2516360 |
| J. Crew International, Inc. | 20-32190 (KLP) | 51-0342712 |
| Madewell Inc. | 20-32191 (KLP) | 20-4928609 |
| J. Crew Brand Holdings, LLC | 20-32192 (KLP) | 82-1807625 |
| J. Crew Brand Intermediate, LLC | 20-32193 (KLP) | 82-1793860 |
| J. Crew Brand, LLC | 20-32194 (KLP) | 82-1761647 |
| J. Crew Brand Corp. | 20-32195 (KLP) | 82-1751616 |

| J. Crew Domestic Brand, LLC | 20-32196 (KLP) | 82-1778962 |
|---|---|---|
| J. Crew International Brand, LLC | 20-32197 (KLP) | 82-1807471 |

**OTHER NAMES USED BY THE DEBTORS IN THE PAST 8 YEARS**:

| | |
|---|---|
| **J. Crew**<br>**J.Crew Retail**<br>**J. Crew Retail Stores**<br>**J. Crew Factory**<br>**J. Crew Corp.** | **J. Crew Factory Stores**<br>**J. Crew Mercantile**<br>**Madewell Retail Stores**<br>**Madewell Retail**<br>**J. Crew Outfitters, Inc.** |
| **Attorneys for Debtors**<br>Ray C. Schrock, P.C.<br>Ryan Preston Dahl, Esq.<br>Candace M. Arthur, Esq.<br>Daniel Gwen, Esq.<br><br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153-0119<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007 | **Attorneys for Debtors**<br>Tyler P. Brown (VSB No. 28072)<br>Henry P. (Toby) Long, III (VSB No. 75134)<br>Nathan Kramer (VSB No. 87720)<br><br>HUNTON ANDREWS KURTH LLP<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219<br>Telephone: (804) 788-8200<br>Facsimile: (804) 788-8218 |

Address of the Clerk of the Bankruptcy Court
Clerk of the Bankruptcy Court for the Eastern District of Virginia (Richmond Division)
701 East Broad Street, Suite 4000, Richmond, Virginia 23219-1888
Telephone: 804-916-2400
Hours Open: 8:00 a.m. – 4:00 p.m. Monday-Friday

## PLEASE TAKE NOTICE THAT:

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY HAVE A CLAIM AGAINST THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES. THEREFORE, YOU SHOULD READ THIS NOTICE CAREFULLY AND CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

On May 4, 2020 (the "**Petition Date**"), Chinos Holdings, Inc., and certain of its debtor affiliates, as debtors and debtors in possession, (collectively, the "**Debtors**"), filed voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**").

On May 28, 2020, the Bankruptcy Court, having jurisdiction over the chapter 11 cases of the Debtors, entered an order (the "**Bar Date Order**") establishing the following Bar Dates:

a. **July 15, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for each person or entity (as defined in section 101(27) of the Bankruptcy Code) other than governmental units (as defined in section 101(27) of the Bankruptcy Code) ("**Governmental Units**"), to file a proof of claim in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including secured claims, unsecured priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code against any of the Debtors (the "**General Bar Date**"), unless otherwise provided herein;

b. **November 2, 2020** at **5:00 p.m. (Eastern Time)** as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**");

    c. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined herein)** as the deadline by which claimants holding claims affected by such filing, amendment, or supplement must file proofs of claim with respect to such claim (the "**Amended Schedules Bar Date**"); and

d. **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date of entry of an order approving rejection of any executory contract or unexpired lease of the Debtors (the "Rejection Order")** as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file proofs of claim for damages arising from such rejection[1] (the "**Rejection Damages Bar Date,"** and, together with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, the "**Bar Dates**").

**If you have any questions relating to this notice, please feel free to contact Omni Agent Solutions ("Omni") at (866) 991-8218 (toll free) or (818) 924-2298 (international) or by e-mail at chinosinquiries@omniagnt.com.**

NOTE: The staff of the Bankruptcy Clerk's Office, the Office of the United States Trustee, and the Debtors' Claims and Noticing Agent cannot give legal advice.

## INSTRUCTIONS:

### 1. WHO MUST FILE A PROOF OF CLAIM

Except as otherwise set forth herein, the following persons or entities holding claims against the Debtors arising before the Petition Date **MUST** file proofs of claim on or before the applicable Bar Date:

a. any person or entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules, or is listed as "contingent," "unliquidated," or "disputed" and if such entity desires to participate in any of these chapter 11 cases or share in any distribution in any of these chapter 11 cases;

b. any person or entity who believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and who desires to have its claim allowed in a different classification or amount other than that identified in the Schedules;

c. any person or entity who believes that any prepetition claim as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and who desires to have its claim allowed against a Debtor other than identified in the Schedules; and

d. any entity who believes that its claim against a Debtor is or may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "**claim**" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable

[1] Provided that notwithstanding the foregoing, a party to an executory contract or unexpired lease who asserts a claim on account of unpaid amounts accrued and outstanding as of the Petition Date pursuant to such executory contract or unexpired lease (other than a rejection damages claim) must file a proof of claim for such amounts on or before the applicable Bar Date, unless an exception identified in the Bar Date Order applies.

remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, and priority claims.

Pursuant to section 101(15) of the Bankruptcy Code and as used in this notice, the term "entity" has the meaning given to it in section 101(15) of the Bankruptcy Code, and includes all persons, estates, trusts, and governmental units. In addition, the terms "persons" and "governmental units" are defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively.

**2.     WHO NEED NOT FILE A PROOF OF CLAIM**

The following persons or entities whose claims would otherwise be subject to a Bar Date need not file any proofs of claim:

a.  any person or entity whose claim is listed on the Schedules; *provided that* (i) the claim is not listed on the Schedules as "disputed," "contingent," or "unliquidated," (ii) the person or entity does not dispute the amount, nature, and priority of the claim as set forth in the Schedules, and (iii) the person or entity does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

b.  any person or entity who already has filed a signed proof of claim with Omni or the Clerk of the Bankruptcy Court for the Eastern District of Virginia against the respective Debtors with respect to the claim being asserted, utilizing a claim form that substantially conforms to the Proof of Claim Form;

c.  any person or entity who holds a claim that has been allowed by order of the Court entered on or before the applicable Bar Date;

d.  any person or entity whose claim has been paid in full in accordance with the Bankruptcy Code or an order of the Court;

e.  any person or entity who holds a claim for which a separate deadline has been fixed by an order of the Court entered on or before the applicable Bar Date;

f.  any person or entity who holds an equity interest in the Debtors, which interest exclusively is based upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; provided, that if any such holder asserts a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a Proof of Claim, as applicable, must be filed on or before the applicable Bar Date pursuant to the Procedures set for the herein;

g.  any current officer, director, or employee for claims based on indemnification, contribution, or reimbursement;

h.  any entity whose claim is solely against any of the Debtors' non-Debtor affiliates;

i.  any Debtor or non-debtor subsidiary or affiliate having a claim against another Debtor;

j.  any counterparty to a lease of nonresidential real property that asserted a claim for a cure amount in connection with a timely filed objection to the assumption or assumption and assignment of such lease by the Debtors;

k.  any holder of a claim allowable under section 503(b) and 507(a)(2) of the Bankruptcy Code, other than a claim asserting priority pursuant to section 503 of the Bankruptcy Code; and

l. (i) the prepetition lenders party to that certain *Credit Agreement*, dated March 7, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**," and such lenders, the "**ABL Lenders**") on account of claims arising thereunder; (ii) the prepetition lenders party to that certain *Amended and Restated Credit Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Agreement**," and such lenders, the "**Term Lenders**") on account of claims arising thereunder; and (iii) the prepetition holders of notes issued pursuant to those certain *Indentures*, dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "**IPCo Indentures**," and such holders, the "**IPCo Noteholders**") on account of claims arising thereunder; *provided that* the administrative agent under the ABL Credit Agreement and the Term Loan Agreement, respectively, and trustees under the IPCo Indentures may file a single consolidated Proof of Claim on behalf of the ABL Lenders, Term Lenders, and IPCo Noteholders, as applicable.

**The fact that you have received this notice does not mean that you have claim or that the Debtors or the Court believe that you have a claim against the Debtors. You should not file a proof of claim if you do not have a claim against any of the Debtors.**

**3. INSTRUCTIONS FOR FILING PROOFS OF CLAIM**

Except as otherwise set forth herein, each entity that asserts a claim against the Debtors that arose before the Petition Date **MUST** file a proof of claim.

**The following procedures with respect to preparing and filing of proofs of claim will apply; *provided, however,* the Debtors in their discretion may waive any defects in a proof of claim:**

a. Proofs of claim must substantially conform to the attached Proof of Claim Form or Official Bankruptcy Form No. 410;

b. Proofs of claim must (i) be written in the English language; (ii) be denominated in lawful currency of the United States as of the Petition Date (using the exchange rate, if applicable, as of the Petition Date); (iii) specify by name and case number the Debtor against which the claim is filed; (iv) set forth with specificity the legal and factual basis for the alleged claim; (v) include supporting documentation for the claim or an explanation as to why such documentation is not available; and (vi) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant under penalty of perjury;

c. Except as otherwise set forth herein, if a claimant asserts a claim against more than one Debtor or has claims against different Debtors, the claimant must file a separate proof of claim, as applicable, against each Debtor;

d. Except as otherwise provided herein, each proof of claim must include supporting documentation or an explanation as to why such documentation is not available in accordance with Bankruptcy Rules 3001(c) and 3001(d). If such documentation is voluminous, such proof of claim may include a summary of such documentation, subject to receiving prior written consent from the Debtors' counsel and submitting the documentation in connection with such request;

e. Proofs of claim must be filed (i) electronically through the website of the Debtors' claims and noticing agent, Omni, using the interface available on such website located at https://www.omniagentsolutions.com/chinosclaims under the link entitled "Submit a Claim" (the "**Electronic Filing System**") or (ii) by delivering the original proof of claim form by hand, or mailing the original proof of claim form on or before the applicable Bar Date as follows:

**If by overnight courier, hand delivery, or first class mail:**

**Chinos Holdings, Inc. Claims Processing**
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

f. A proof of claim shall be deemed timely filed only if it **actually is received** by Omni as set forth in subparagraph (e) above, in each case, on or before the applicable Bar Date; and

g. Proofs of claim sent by facsimile, telecopy, or electronic mail transmission (other than proofs of claim filed electronically through the Electronic Filing System) **will not** be accepted.

**4. CONSEQUENCES OF FAILURE TO TIMELY FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE**

**Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a Proof of Claim on or before the applicable Bar Date as provided herein, but fails to do so:**

**(a) shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution in these chapter 11 cases on account of such claim; and**

**(b) forever shall be barred, estopped, and enjoined from asserting such claim against each of the Debtors and their property (or filing a proof of claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim.**

**5. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF**

You may be listed as the holder of a claim against the Debtors in the Debtors' Schedules of Assets and Liabilities or Schedules of Executory Contracts and Unexpired Leases (collectively, the "**Schedules**"). To determine if and how you are listed in the Schedules, please refer to the descriptions set forth on the enclosed Proof of Claim Form regarding the nature, amount, and status of your claims. If you received postpetition payments from the Debtors (as authorized by the Court) on account of your claim, the enclosed Proof of Claim Form will reflect the net amount of your claims. If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple Proof of Claim Forms, each of which will reflect the nature and amount of your claim against each Debtor, as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Schedules and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted (i) on the website established by Omni for the Debtors' cases at https://www.omniagentsolutions.com/chinosclaims and (ii) on the Court's website at https://www.vaeb.uscourts.gov/. A login and password to the Court's Public Access to Electronic Court Records ("**PACER**") are required to access the information on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. Copies of the Schedules also may be examined between the hours of 8:00 a.m. and 5:00 p.m. (Eastern Time) Monday through Friday at the U.S. Bankruptcy Court, 701 East Broad Street, Suite 4000, Richmond, VA 23219-1888. Copies of the Debtors' Schedules also may be obtained by written request to the Debtors' claims agent, Omni, at the address and telephone number set forth below:

**Chinos Holdings, Inc. Claims Processing**
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367
Toll Free: (866) 991-8218
International: (818) 924-2298

If the Debtors amend or supplement their Schedules after the date of entry of the Bar Date Order, the Debtors shall give notice of any amendment or supplement to the holders of claims affected by such amendment or supplement within 10 days after filing such amendment or supplement, and such holders must file a Proof of Claim by **the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules**, or be forever barred from so doing, and such deadline shall be contained in any notice of such amendment or supplement of the Schedules provided to the holders of claims affected thereby.

## 6. RESERVATION OF RIGHTS

Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to the nature, amount, liability, or classification thereof; (b) subsequently designate any scheduled claim as disputed, contingent, or unliquidated; and (c) otherwise amend or supplement the Schedules.

**If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' Claims and Noticing Agent directly at: Omni, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; telephone: (866) 991-8218 (toll-free) or (818) 924-2298 (international); or by e-mail at chinosinquiries@omniagnt.com.**

**A holder of a possible claim against the Debtors should consult an attorney if such holder has any questions regarding this notice, including whether the holder should file a proof of claim.**

Dated: Richmond, Virginia
June 15, 2020

**BY ORDER OF THE COURT**

| WEIL, GOTSHAL & MANGES LLP | HUNTON ANDREWS KURTH LLP |
|---|---|
| Ray C. Schrock, P.C. | Tyler P. Brown (VSB No. 28072) |
| Ryan Preston Dahl, Esq. | Henry P. (Toby) Long, III (VSB No. 75134) |
| Candace M. Arthur, Esq. | Nathan Kramer (VSB No. 87720) |
| Daniel Gwen, Esq. | Riverfront Plaza, East Tower |
| 767 Fifth Avenue | 951 East Byrd Street |
| New York, New York 10153 | Richmond, VA 23219 |
| Telephone: (212) 310-8000 | Tel: (804) 788-8200 |
| Facsimile: (212) 310-8007 | Fax: (804) 788-8218 |
| ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION | |