# EXHIBIT A

**SUBLEASE**

between

**CAASTLE INC.,**

**Sublandlord,**

and

**MADEWELL INC.**

**Subtenant,**

**For premises at:**

**a portion of the rentable area of the fourth (4th) and fifth (5th) floors**

**30-30 47th Avenue
Long Island City, New York**

Dated: September 19, 2019

**SUBLEASE**

SUBLEASE (this "Sublease") dated as of September ____, 2019, between CAASTLE INC., a Delaware corporation (formerly known as Gwynnie Bee Inc.) having an office at 5 Penn Plaza, Floor 4, New York, NY 11101  ("Sublandlord"), and MADEWELL INC., a Delaware corporation having an office at 225 Liberty Street, 17th Floor, New York, New York 10281 ("Subtenant").

1.    DEMISE AND TERM; CONDITIONS OF SUBLEASE.

A.    Sublandlord hereby leases to Subtenant, and Subtenant hereby hires from Sublandlord, a portion of the fourth (4th) floor, consisting of approximately 6,306 rentable square feet, known as Suite 460 ("Suite 460") and a portion of the fifth (5th) floor, consisting of approximately 12,702 rentable square feet, known as Suite 540 ("Suite 540"), as further indicated and/or described on the floor plan in Exhibit A annexed hereto and made a part hereof (collectively, the "Subleased Premises") of the building located at 30-30 47th Avenue, Long Island City, New York (the "Building").  The Subleased Premises is a portion of the same premises leased to Sublandlord under the Prime Lease (as hereinafter defined).

B.    The term of this Sublease ("Term") for the Subleased Premises shall commence on the latest of: (i) the date upon which this Sublease is fully executed and delivered to Subtenant; (ii) the date on which Sublandlord has received the consent of the Prime Landlord (as defined below) to this Sublease, and (iii) the date Sublandlord has delivered physical possession of the Subleased Premises to Subtenant in the condition required herein (the "Commencement Date").  Sublandlord anticipates delivering possession of the Subleased Premises to Subtenant on September 15, 2019. The Term shall end on May 30, 2020 (the "Expiration Date").

2.    PRIME LEASE.  Pursuant to a certain Agreement of Lease dated as of May 15, 2015 (the "Original Lease"), as such Original Lease was amended by: (i) a certain First Amendment to Lease dated  March 15, 2016 (the "First Amendment"); and (ii) a certain Second Amendment to Lease dated as of June 28, 2017 (the "Second Amendment"); the Original Lease, as so amended by the First Amendment and Second Amendment, collectively referred to herein as the "Prime Lease"), by and between Factory Lessor LLC (successor in interest to Factory Owner LLC), as landlord ("Prime Landlord"), and Sublandlord, as tenant, Sublandlord leased the Subleased Premises from Prime Landlord for a term set to expire on May 31, 2020.

3.    SUBORDINATE TO PRIME LEASE.  This Sublease is subject and subordinate to: (a) the Prime Lease and (b) the matters to which the Prime Lease is or shall be subject and subordinate. A true and complete copy of the Prime Lease is annexed hereto and made a part hereof as Exhibit B.   Subtenant shall not do or permit to be done any act or thing that will constitute a breach or violation of any term, covenant or condition of the Prime Lease by the tenant thereunder, whether or not such act or thing is permitted under the provisions of this Sublease.  If for any reason the term of the Prime Lease shall terminate prior to the expiration of this Sublease, this Sublease shall thereupon be terminated and Sublandlord shall not be liable to Subtenant by reason thereof, provided Sublandlord shall not exercise any unilateral termination rights it may have under the Sublease, if any, without Subtenant's prior written consent, which may be withheld in Subtenant's sole discretion.

4.    INCORPORATION BY REFERENCE.

A.  The terms, covenants and conditions of the Prime Lease are incorporated herein by reference so that, except as set forth in <u>Section 3</u> or <u>Paragraph B</u> of this <u>Section 4</u>, and except to the extent that such incorporated provisions are inapplicable to or modified by the provisions of this Sublease, all of the terms, covenants and conditions of the Prime Lease that bind or inure to the benefit of the Prime Landlord thereunder shall, in respect of this Sublease, bind or inure to the benefit of Sublandlord, and all of the terms, covenants and conditions of the Prime Lease that bind or inure to the benefit of the Tenant thereunder shall, in respect of this Sublease, bind or inure to the benefit of Subtenant, with the same force and effect as if such incorporated terms, covenants and conditions were completely set forth in this Sublease.  The words "Landlord," "owner" and "Tenant" or words of similar import, wherever the same appear in the Prime Lease, shall be construed to mean, respectively, "Sublandlord" and "Subtenant" in this Sublease.  The words "premises," "leased premises" and "demised premises" or words of similar import, wherever the same appear in the Prime Lease, shall be construed to mean "Subleased Premises" in this Sublease.  The word "lease" or words of similar import, wherever the same appear in the Prime Lease, shall be construed to mean this "Sublease." The words "Fixed Rent" in the Prime Lease shall be construed to mean "Base Rent" in this Sublease. Notwithstanding the foregoing, with respect to Section 17.1(g) of the Prime Lease, same is incorporated herein as between Sublandlord and Subtenant except that each mention of "twenty (20)" is replaced with "fifteen (15)".

B.      The following provisions and Exhibits of the Prime Lease shall not be incorporated herein by reference and shall not apply to this Sublease: The following definitions before Article 1:  Base Tax Year, Base Taxes, Commencement Date, Expiration Date, Fixed Rent, Initial Expiration Date, Landlord's Work, Permitted Uses (references to use as a showroom and the lawful uses ancillary thereto described in Article 2 of the Prime Lease), Premises, Rent Commencement Date and Term, Sections 1.1, 1.2, 3.1, 5.1, Article 7, 9.4, 10.2(c) (4th sentence, which begins with "On the Commencement Date…"),the last sentence of Section 10.3(b), 26, 28, 30, 33, 34.1(a) (third sentence), 34.1(b) (except the first sentence starting with the thirteenth word, "no recourse…"), 34.4, 34.9, 34.19, Exh. C, Exh. D, Exh. E, Exh. F, Exh. G; First Amendment (except Sections 6, 7, and 8); and entire Second Amendment. With respect to rent abatement referenced in Section 6.4 of the Prime Lease (or any other section of the Prime Lease incorporated herein), Subtenant shall only be entitled to its proportionate share of abated rent and only if Sublandlord actually receives such rent abatement from Prime Landlord.

C.  Any obligation of Sublandlord that is contained in this Sublease by incorporating the provisions of the Prime Lease may be observed or performed by Sublandlord using reasonable efforts (which reasonable efforts specifically shall not include litigation or the expenditure of money unless reimbursed by Subtenant), after notice from Subtenant, to cause the Prime Landlord to observe and/or perform the same.  Sublandlord shall have a reasonable period of time to enforce its rights to cause such observance or performance.  Sublandlord shall not be required to perform any obligation of the Prime Landlord under the Prime Lease, and Sublandlord shall have no liability to Subtenant for the failure of the Prime Landlord to perform any obligation, provided, Subtenant shall be entitled to all of the remedies available to Sublandlord under the Prime Lease as tenant in connection with same. Sublandlord shall not be responsible for any failure or interruption, for any reason whatsoever, of the services or facilities that are appurtenant to, or supplied at or to, the Subleased Premises, including, without limitation, electricity, heat, air conditioning, water, elevator service and cleaning service, if any, except to the extent due to the negligence or willful misconduct of Sublandlord, its agents, employees or contractors, and if in connection with same, Subtenant does not operate in the Subleased Premised for 48 hours or more following such failure or interruption, all rental payable under this

Sublease shall abate on a day for day basis until such failure or interruption is cured such that Subtenant may again operate within the Subleased Premises. Except as otherwise set forth herein, no failure to furnish, or interruption of, any such services or facilities shall give rise to any (a) abatement or reduction of Subtenant's obligations under this Sublease, (b) constructive eviction, whether in whole or in part, or (c) liability on the part of Sublandlord.

D.    Nothing contained in this Sublease shall be construed to create privity of estate or contract between Subtenant and Prime Landlord.  Subtenant hereby releases Prime Landlord or anyone claiming through or under the Prime Landlord, and Sublandlord or anyone claiming through or under Sublandlord, by way of subrogation or otherwise, to the extent that Sublandlord released the Prime Landlord under the Prime Lease and/or the Prime Landlord was relieved of liability or responsibility pursuant to the provisions of the Prime Lease. Subtenant will cause its insurance carriers to include any waiver of subrogation clauses or endorsements in favor of Prime Landlord and Sublandlord that Sublandlord is required to obtain under the Prime Lease. Subtenant shall be entitled to all of the waivers and releases as against Prime Landlord and the Sublandlord which Sublandlord is entitled to or receives as the tenant under the Prime Lease.

E.    Subtenant shall be entitled to and shall receive, and Sublandlord shall reasonably cooperate with Subtenant at its request, and at Subtenant's sole but reasonable expense, in securing for Subtenant all of the rights, privileges, elections, benefits and services available to Sublandlord under the Prime Lease, insofar as the same relate to the Subleased Premises and Subtenant's use and occupancy thereof, other than any renewal, expansion, termination or other similar rights under the Prime Lease, and/or as otherwise provided herein. However, Sublandlord will not be liable to Subtenant for any failure of Prime Landlord in providing such rights, privileges, elections, benefits and services, provided, Subtenant shall be entitled to all of the same remedies Sublandlord is entitled to under the Prime Lease in connection with any such failure of Prime Landlord.

F.    Sublandlord reserves its right to amend or modify the Prime Lease, provided that such amendment does not adversely affect Subtenant to more than a de minimis extent.

5.    RENT; ADDITIONAL RENT; SECURITY DEPOSIT.

A.    Base Rent.

(i)    Commencing on the fifteenth (15th) day following the Commencement Date, Subtenant shall pay to Sublandlord fixed annual rent ("Base Rent") at the following rate during the Term:

| Period | Monthly Installment |
|---|---|
| From the Commencement Date through and including the Expiration Date | $47,520.00 |

If the Commencement Date does not fall on the first day of the month, then the first monthly installment of Base Rent due shall be pro-rated for the partial month in which such Commencement Date occurs.   Base Rent shall be paid monthly in advance on the fifth day of each month during the Term, except that one (1) full monthly installment of Base Rent due

hereunder shall be due within ten (10) business days following Subtenant's receipt of a fully executed copy of this Sublease.

        B.      <u>Electricity</u>. Subtenant shall pay for electricity in accordance with Section 10.1 of the Prime Lease, which is incorporated herein.

        C.      <u>Other Charges</u>.  If Prime Landlord provides additional services to the Subleased Premises at Subtenant's request, Subtenant shall pay all charges payable to Prime Landlord therefor pursuant to the Prime Lease, within the time period required under the Prime Lease. Subtenant shall also be responsible to pay for charges for (A) additional services and other utilities rendered or provided to or in respect of the Subleased Premises by or at the request of Subtenant or any other fees, charges or other sums due under the Prime Lease as a result of an action taken by Subtenant or in connection with work being performed by Subtenant (for example, if review fees are due to Prime Landlord under the Prime Lease in connection with work performed by Subtenant, Subtenant shall be responsible for same), including, without limitation: (i) excess or after-hours use of air-conditioning, heating, water, passenger elevators and freight elevators; (ii) services or benefits supplied to the Subleased Premises at Subtenant's request for which Prime Landlord reserves any right to impose a fee or charge; (iii) freight elevators during Subtenant's move in or move out of the Building (provided Sublandlord will reimburse Subtenant for up to ten (10) hours of freight elevator usage, and (B) any other fees, charges or other sums due under the Prime Lease in connection with (i) any physical damage to the Subleased Premises and/or Building caused by Subtenant, its agents, employees, contractors or invitees, and any restoration obligations for alterations performed by or on behalf of Subtenant (if and as required under the Prime Lease), and (ii) damages or other sums recoverable under the Prime Lease which are the result of any default or failure of performance by Subtenant under this Sublease beyond any applicable notice and cure period.  Notwithstanding the foregoing, Subtenant shall not be required to pay for Tenant's Share of Taxes under the Prime Lease.

        D.      <u>Payment</u>.  Base Rent and all other amounts payable by Subtenant to Sublandlord under the provisions of this Sublease ("<u>Additional Rent</u>"; and together with Base Rent, the "<u>Rent</u>") shall be paid promptly when due, without notice or demand therefor, and without deduction, abatement, counterclaim or setoff of any amount for any reason whatsoever, except as otherwise set forth herein.  Base Rent and Additional Rent shall be paid to Sublandlord in lawful money of the United States at the address of Sublandlord set forth at the beginning of this Sublease, or to such other person and/or at such other address as Sublandlord may from time to time designate by notice to Subtenant.  No payment by Subtenant or receipt by Sublandlord of any lesser amount than the amount stipulated to be paid hereunder shall be deemed other than on account of the earliest stipulated Base Rent or Additional Rent; nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction, and Sublandlord may accept any check or payment without prejudice to Sublandlord's right to recover the balance due or to pursue any other remedy available to Sublandlord.  The term "<u>Rent</u>" as used in this Lease shall mean Base Rent and Additional Rent. Any provisions of the Prime Lease incorporated herein by reference referring to "fixed rent," "additional rent," "base rent," "rent," "expense escalation," "payments," "impositions" or "charges" or words of similar import shall be deemed to refer to Base Rent and Additional Rent due under this Sublease, provided Subtenant shall not be responsible for any payments other than those expressly set forth herein.

        E.      <u>Security Deposit</u>.
Subtenant shall, within ten (10) business days following Subtenant's receipt of a fully executed copy of this Sublease, deliver to Sublandlord a security deposit (the "<u>Security Deposit</u>") in the amount of Ninety-Five Thousand Forty and 00/100 Dollars ($95,040.00) as security for the faithful performance and observance by Subtenant of the terms, conditions and provisions of this

Sublease, including without limitation, the surrender of possession of the Subleased Premises to Sublandlord as herein provided, if the term hereof terminates prior to the Expiration Date set forth in this Sublease and Prime Landlord does not consent in writing to Subtenant occupying the Subleased Premises thereafter.  If Subtenant defaults in respect of any of the terms of this Sublease including, but not limited to, the payment of Base Rent and Additional Rent, in any case, beyond the expiration of applicable notice and cure periods, Sublandlord may draw upon the Security Deposit to the extent required for the payment of any sum as to which Subtenant is in default or for any sum which Sublandlord may have expended by reason of Subtenant's default, including any damages or deficiency accrued before or after summary proceedings or other re-entry by Sublandlord. In the event Sublandlord draws upon the Security Deposit and applies or retains any portion or all of the sum received upon such draw, Subtenant shall forthwith take such action as is necessary to restore the Security Deposit. Any remaining portion of the Security Deposit shall be returned to Subtenant within thirty (30) days after the Expiration Date or sooner termination of this Sublease.

6.    LATE CHARGES.  If payment of any Base Rent or Additional Rent shall not have been made on the date on which such amount is due and payable, Subtenant shall pay to Sublandlord as charges for Sublandlord's costs of handling the late payment (and not a penalty): (i) on account of Sublandlord's additional administrative, accounting, and overhead costs attributable to Subtenant's delinquency, five (5) cents for each dollar that is not timely paid; and (ii) interest on the late Base Rent, Additional Rent or other charges, at the Applicable Rate (as defined in the Prime Lease), from the date such amount was due until paid.  If Subtenant accrues a late fee pursuant to the foregoing sentence, such late fee and interest shall be payable within fifteen (15) days following written demand for same, and in default of payment of any such amounts, Sublandlord shall have (in addition to all other rights and remedies) the same rights and remedies as Prime Landlord has for the nonpayment of Base Rent by Sublandlord under the Prime Lease.  Notwithstanding the foregoing, Sublandlord shall waive the first such late charge during the Term, provided Subtenant pays any past due amount within five (5) business days following receipt of written notice that the same was past due.  Nothing contained herein shall be deemed to extend the date on which Base Rent and Additional Rent are due.

7.    UTILITY CHARGES AND SERVICES.  If Subtenant requires any utilities or services that are not provided by Prime Landlord under the Prime Lease, Subtenant shall make all arrangements therefor directly with the utility provider and pay all costs thereof. Sublandlord shall not provide any services to the Subleased Premises. Subtenant, at its sole cost and expense, shall be responsible for obtaining its own (to the extent not provided by Prime Landlord under the Prime Lease): (i) cleaning services; (ii) janitorial services; (iii) reception services; (iv) telephone system, lines and connections; and (v) telecommunication services and systems; (vi) refuse and rubbish; and (vii) any other services Subtenant may require.

8.    USE.  Subtenant shall use and occupy the Subleased Premises only for administrative, executive and general office purposes, and for no other purpose, and shall not violate the prohibitions on use contained in the Prime Lease.  No representation or warranty is made by Sublandlord, and nothing contained in this paragraph or elsewhere in this Sublease and/or the Prime Lease shall be deemed to be a representation or warranty by Sublandlord, that the Subleased Premises may be lawfully used for Subtenant's intended purposes.  Subtenant shall comply with: (i) any certificate of occupancy relating to the Subleased Premises; and (ii) all present and future laws, statutes, ordinances, orders, rules, regulations and requirements of all Federal, state and municipal governments asserting jurisdiction over the Subleased Premises, provided Subtenant shall not be required to perform any work to comply with same unless and to

the extent the need for such work is caused by Tenant's particular use of the Leased Premises (as opposed to office use generally) or alterations performed by Subtenant.

9.     CONDITION OF SUBLEASED PREMISES.

A.     Subtenant agrees to accept the Subleased Premises on the Commencement Date in its then "AS IS," vacant, broom clean condition, and Subtenant acknowledges and agrees that Sublandlord shall have no obligation to perform any work in or to the Subleased Premises to make the Subleased Premises ready or suitable for Subtenant's occupancy. Subtenant acknowledges that it has had full opportunity to inspect the condition of the Subleased Premises, and Subtenant, by acceptance of possession of the Subleased Premises, conclusively acknowledges the Subleased Premises to be in good order and repair and in a tenantable condition and acceptable for its intended use.

B.     In consideration of $1.00 and Subtenant's performance of its obligations under this Sublease, as of the Commencement Date, all of Sublandlord's right, title and interest in and to the furniture listed on Exhibit C attached hereto and made a part hereof (the "Existing Furniture") as the same presently exist in the Subleased Premises, shall automatically be transferred to Subtenant. The Existing Furniture shall be transferred to Subtenant in its "as-is, where-is and with all faults" condition and Sublandlord represents that Sublandlord has title to and rightful ownership of the Existing Furniture and may transfer same to Subtenant as described herein.  Thereafter, Subtenant shall be solely responsible for the removal of the Existing Furniture from the Subleased Premises and the Building in accordance with the terms and provisions of this Sublease at the expiration of the Term, at Subtenant's expense. Subject to the Existing Furniture remaining in the Subleased Premises upon possession, Subtenant shall have the right to require Sublandlord remove all other furniture or personal property from the Subleased Premises prior to the Commencement Date.

10.     DELAY OF POSSESSION.  If Sublandlord is delayed in giving, or is unable to deliver, possession of the Subleased Premises for any reason, Sublandlord shall not be subject to any liability for failure to deliver possession of the Subleased Premises or the entirety of the Subleased Premises to Subtenant and the validity of this Sublease as to the remaining Subleased Premises shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of the Sublease beyond the Expiration Date.  Subtenant expressly waives any right to rescind this Sublease under Section 223-a of the New York Real Property Law or under any present or future statute of similar import then in force and further expressly waives the right to recover any damages, direct or indirect, that may result from Sublandlord's failure to deliver possession of the Subleased Premises on the anticipated delivery date.  Subtenant agrees that the provisions of this Paragraph are intended to constitute "an express provision to the contrary" within the meaning of said Section 223-a.  Notwithstanding the foregoing or anything to the contrary which may be contained herein, if Sublandlord does not deliver possession of the Subleased Premises to Subtenant within ten (10) days following the date Prime Landlord approves of this Sublease, Subtenant shall have the ongoing right to terminate this Sublease, exercisable until such time as Sublandlord actually delivers possession of the Subleased Premises to Subtenant; provided, however, that Sublandlord's delay in delivery of possession of the Subleased Premises is not due to any action or inaction by Subtenant, including failure to deliver insurance certificates. If Subtenant terminates this Sublease pursuant to this Paragraph 10 due to Sublandlord's failure to timely deliver possession of the Subleased Premises as described herein, then, then Sublandlord shall reimburse Subtenant for its costs in

connection with this Sublease, including, without limitation, reasonable legal fees, not to exceed $5,000.

11.   <u>CONSENTS AND APPROVALS</u>.   In any instance when Sublandlord's consent or approval is required under this Sublease, Sublandlord's refusal to consent to or approve any matter or thing shall be deemed reasonable if, <u>inter alia</u>, such consent or approval is required to be obtained and has not been obtained from Prime Landlord under the Prime Lease, provided Sublandlord actually submitted same to Sublandlord for approval. Sublandlord shall diligently and in good faith cooperate with Subtenant in obtaining Sublandlord's consent if and when required under the Prime Lease. If Subtenant shall seek the approval or consent of Sublandlord and Sublandlord shall fail or refuse to give such consent or approval, Subtenant shall not be entitled to any damages for any withholding or delay of such approval or consent by Sublandlord, it being intended that Subtenant's sole remedy shall be an action for injunction or specific performance and that such remedy shall be available only in those instances where Sublandlord shall have expressly agreed in writing not to withhold or delay its consent unreasonably.

12.   <u>ASSIGNMENT AND SUBLETTING</u>.   Except as permitted under the Prime Lease, Subtenant shall not assign this Sublease or further sublet the Subleased Premises or any portion thereof or permit the Subleased Premises to be used, occupied or utilized for any purpose by any person or entity other than Subtenant, without the express written consent of Sublandlord and Prime Landlord in each instance, such approval to be given or withheld in accordance with the Prime Lease.

13.   <u>CONSENT OF LANDLORD UNDER PRIME LEASE</u>.   This Sublease shall convey no rights to Subtenant until the Prime Landlord shall have given its written consent hereto in accordance with the terms of the Prime Lease.  If the Prime Landlord requests Subtenant to execute a written consent agreement with respect to this Sublease, Subtenant shall promptly comply provided such consent is on terms reasonably acceptable to Subtenant.  The Prime Landlord shall not be deemed to have consented if it conditions its consent on the imposition of new obligations on or the removal of rights from Sublandlord unless Sublandlord agrees thereto in its sole discretion.  If Prime Landlord rejects or disapproves of this Sublease, or elects to terminate the Prime Lease in respect of the Subleased Premises, or does not give its consent to this Sublease for any reason whatsoever within thirty (30) days after the date hereof: (i) Sublandlord shall not be obligated to take any action to obtain such consent; (ii) Sublandlord and Subtenant may each elect to terminate this Sublease on written notice given to the other, whereupon this Sublease shall be deemed null and void and of no effect (except for those provisions expressly stated herein to survive a termination); and (iii) if this Sublease is so terminated and if Subtenant is then in possession of all or any part of the Subleased Premises, Subtenant shall immediately quit and surrender to Sublandlord the Subleased Premises, remove all of its property and repair all damage caused by such removal, and restore the Subleased Premises to the condition it was in prior to such occupancy.   If this Sublease is terminated pursuant to this Paragraph 13 or Paragraph 10, all monies prepaid to Sublandlord shall be promptly refunded to Subtenant, but in no event later than ten (10) business days following such termination, failing which, Sublandlord shall be required to pay interest on such outstanding amount at the Applicable Rate on a per diem basis for each day Sublandlord fails to refund same until fully refunded as required herein.

14.   <u>SIGNAGE</u>.   Subject to Prime Landlord's consent (if required), Subtenant shall be entitled to one (1) Building-standard sign identifying Subtenant on the exterior door of

Suite 460 and Suite 540 of the Subleased Premises to be installed in accordance with Section 35.2 of the Prime Lease, at Subtenant's expense.  Subtenant shall be permitted to install its logo on or next to the entry door to the Subleased Premises subject to the Building Rules and Regulations (as defined in the Prime Lease) and Prime Landlord's consent (if required).

15.    ALTERATIONS.

A.    Notwithstanding any provision of this Sublease or the Prime Lease to the contrary, Subtenant shall not make, cause, suffer or permit the making of any alterations, installations, improvements, additions or other changes (each an "Alteration") in or to the Subleased Premises without obtaining the prior written consent of Sublandlord and Prime Landlord in each instance, which consent may be withheld in Sublandlord's and Prime Landlord's absolute and sole discretion.  Notwithstanding the foregoing, Subtenant shall be permitted to make those alterations which do not require Prime Landlord's consent under the Prime Lease without Sublandlord's consent. Sublandlord hereby approves the work attached hereto as Exhibit D ("Approved Subtenant Initial Work") to be performed by Subtenant following the Commencement Date, subject to receipt of consent by Prime Landlord. Prime Landlord's consent to this Sublease shall be deemed Prime Landlord's consent to the Approved Subtenant Initial Work.

B.    All Alterations shall be made and performed in accordance with the terms of Article 4 of the Prime Lease, as the same has been incorporated herein by reference, at Subtenant's sole cost and expense, and at such time and in such manner as Sublandlord may, from time to time, reasonably designate.  Alterations shall be made only by contractors that are bonded and licensed if required under the Prime Lease. Subtenant shall submit to Sublandlord and Prime Landlord the names of any such contractors, engineers or architects and shall not commence any Alteration without first obtaining Sublandlord's and Prime Landlord's approval of such contractor, engineer or architect, such approval to be given or withheld in accordance with the Prime Lease.

C.    Prior to the commencement of each proposed Alteration, Subtenant shall furnish to Sublandlord certificates of insurance evidencing coverage required under the Prime Lease (in which Sublandlord and Prime Landlord shall be included as an additional named insured), including certificates of insurance evidencing coverage required of all contractors and subcontractors. All permits, approvals and certificates required by all governmental authorities shall be timely obtained by Subtenant and submitted to Sublandlord.

D.    Any mechanic's lien filed against the Subleased Premises or the Building and/or the land on which it stands for work claimed to have been done for, or materials claimed to have been furnished to, Subtenant shall be discharged by Subtenant, at Subtenant's sole cost and expense, within twenty (20) days after the filing of such mechanic's lien.

E.    Subtenant shall indemnify, defend and hold harmless Sublandlord and Prime Landlord against liability, loss, cost, damage, liens and expense imposed on Sublandlord and/or Prime Landlord arising out of any Alteration constructed or made by or for Subtenant, except to the extent caused by the negligence or willful misconduct of Sublandlord and/or Prime Landlord, as the case may be.

16.    HAZARDOUS MATERIALS.    Subtenant shall use no Hazardous Substances (as defined in the Prime Lease) in, on, under or about the Subleased Premises or any

part of the Building and surrounding areas in accordance with the terms and conditions of the Master Lease.

17.    HEATING, VENTILATION AND AIR CONDITIONING.    Subtenant shall be permitted to use the air conditioning system supplying air-conditioning service to the Subleased Premises, at Subtenant's sole cost and expense, during the Term in accordance with Section 10.2 of the Prime Lease and Section 5(B) of this Sublease.

18.    BROKERAGE.    Subtenant is not responsible for brokerage fees to the Broker (defined below) in connection with this Sublease, such fees to be paid by Sublandlord. Subtenant and Sublandlord each represents to the other that it has not dealt with any finder, broker or other person in connection with this Sublease other than Newmark Knight Frank (Sublandlord's broker) and JLL (Subtenant's broker) (collectively, "Broker").    Subtenant and Sublandlord each agree to indemnify, defend and hold the other harmless from and against any costs and expenses (including, without limitation, reasonable attorneys' fees) resulting from any breach of the foregoing representation.    The provisions of this paragraph shall survive the expiration or earlier termination of this Sublease.

19.    INDEMNITY; INSURANCE.

A.    Except to the extent caused by the negligence or willful misconduct of Sublandlord or any of the Sublandlord Parties (as hereinafter defined), Subtenant shall indemnify, hold harmless and, at Sublandlord's request, defend, Sublandlord and its affiliates, parents, subsidiaries, managers, directors, officers, members, shareholders, agents, and employees (collectively, the "Sublandlord Parties"), from and against all claims, actions, losses, costs, damages, expenses, awards, penalties, judgments, interest and liabilities of any kind, including, without limitation, reasonable attorneys' and expert witness fees and expenses (collectively, "Losses"), that Sublandlord may incur or pay by reason of: (a) any accidents, damages or injuries to persons or property occurring in the Subleased Premises; (b) any breach or default hereunder on Subtenant's part; (c) any work done in or to the Subleased Premises by Subtenant and/or Subtenant's employees, agents, contractors, invitees or any other person claiming through or under Subtenant; (d) any negligence on the part of Subtenant and/or Subtenant's employees, agents, contractors, invitees or any other person claiming through or under Subtenant or (e) any Losses caused by Subtenant and/or Subtenant's employees, agents, contractors, or invitees for which Sublandlord is required to indemnify the Prime Landlord under the Prime Lease.    The provisions of this subparagraph shall survive the expiration or earlier termination of this Sublease.    Except to the extent caused by the negligence or willful misconduct of Subtenant or any of the Subtenant Parties, Sublandlord shall indemnify, hold harmless and, at Subtenant's request, defend, Subtenant and its affiliates, parents, subsidiaries, managers, directors, officers, members, shareholders, agents, and employees (collectively, the "Subtenant Parties"), from and against all Losses that Subtenant may incur or pay by reason of (a) Sublandlord's breach of this Sublease and/or the Prime Lease, (b)  any negligence on the part of Sublandlord and/or Sublandlord's employees, agents, contractors, invitees or any other person claiming through or under Sublandlord.

B.    Subtenant shall maintain all insurance that Sublandlord is required to maintain under the Prime Lease, including Sublandlord and Prime Landlord as additional insureds.    Subtenant shall supply certificates of insurance evidencing that such insurance requirements have been met on or before the date on which Subtenant first enters any portion of the Subleased Premises.

C.      Under no circumstances shall either party hereto be liable to the other for consequential or punitive damages in connection with this Sublease or the Subleased Premises, except as permitted under Section 20 herein.

20.    <u>WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM</u>. Subtenant and Sublandlord hereby waive all rights to trial by jury in any summary or other action, proceeding or counterclaim arising out of or in any way connected with this Sublease, the relationship of Sublandlord and Subtenant, the Subleased Premises (including the use and/or occupancy thereof) and any claim of injury or damages with respect thereto.  Subtenant also hereby waives all right to assert or interpose a counterclaim (but not the right to assert valid defenses) in any summary proceeding or other action or proceeding to recover or obtain possession of the Subleased Premises or for nonpayment of Rent, other than compulsory claims.

21.    <u>HOLDOVER</u>.

A.      Supplementing Section 21.2 of the Prime Lease, if Subtenant remains in possession of any portion of the Subleased Premises after the expiration or sooner termination of the Term (unless permitted expressly by Prime Landlord pursuant to a direct lease with Subtenant or other written agreement): (i) Subtenant shall be deemed a tenant at will; (ii) Subtenant shall continue to pay the Base Rent and Additional Rent provided in this Sublease for the Subleased Premises, except that during any such period the Base Rent and Additional Rent payable under this Sublease shall be the greater of (a) the rental rate of the Subleased Premises as of the expiration or sooner termination of the Term, as set forth in Section 21.2 of the Prime Lease, and (b) one hundred and fifty percent (150%) of the Base Rent and Additional Rent payable immediately preceding the Expiration Date; (iii) there shall be no renewal or extension of this Sublease by operation of law; (iv) notwithstanding any law, regulation, ordinance or governmental order to the contrary, such tenancy at will may be terminated upon thirty (30) days' notice from Sublandlord; and (v) Subtenant shall be liable to Sublandlord for all damages suffered and reasonable expenses incurred by Sublandlord on account of such holdover.

B.      Notwithstanding anything in the preceding subsection (A) to the contrary, the acceptance of any rent paid by Subtenant hereunder shall not preclude Sublandlord from commencing and prosecuting a holdover or summary eviction proceeding, and the preceding subsection (A) shall be deemed to be an "agreement expressly providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York and any successor law of like import.  Moreover, Subtenant expressly waives, for itself and any Person claiming through or under Subtenant, any rights under the provisions of Section 2201 of the New York Civil Practice Law and Rules or any successor law of like import then in force in connection with any holdover summary proceedings that Sublandlord may institute to enforce the foregoing provisions of this <u>Section 20</u>.

22.    <u>SURRENDER</u>.  Subtenant shall, on the expiration or earlier termination of this Sublease, comply as to the Subleased Premises with all of the provisions of the Prime Lease relating to the surrender of the Subleased Premises at the expiration or earlier termination of the Prime Lease. Subtenant agrees to reimburse Sublandlord for all costs and expenses incurred in removing and storing Subtenant's property, or repairing any damage to the Subleased Premises caused by or resulting from Subtenant's failure to comply with the provisions of this Section.  Notwithstanding the foregoing, Subtenant shall not be obligated to remove any alterations performed in or to the Subleased Premises by or on behalf of Sublandlord or which otherwise existed prior to Subtenant taking possession of the Subleased Premises. Further,

Subtenant's obligations shall be limited to the removal of its own property and the Existing Furniture and repairing any damage which may be caused by Subtenant in connection with same.   The provisions of this Section shall survive the expiration or earlier termination of this Sublease.

23.    NO WAIVER.  Either party's receipt and acceptance of any amount, or either party's acceptance of performance of any other obligation by the other, with or without knowledge of the other's breach of any provision of this Sublease, shall not be deemed a waiver of such breach.  No waiver by Sublandlord or Subtenant of any term, covenant or condition of this Sublease shall be deemed to have been made unless expressed in writing and signed by the waiving party.   The provisions of this paragraph shall survive the expiration or earlier termination of this Sublease.

24.    SUCCESSORS AND ASSIGNS.   The provisions of this Sublease, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  In the event of any assignment or transfer of the leasehold estate under the Prime Lease, the transferor or assignor, as the case may be, shall be and hereby is entirely relieved and freed of all obligations under this Sublease arising after the effective date of the assignment, provided such assignee assumes all such obligations following the effective date of the assignment.

25.    INTERPRETATION.   Irrespective of the place of execution or performance, this Sublease shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed within the State of New York.  The captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation.  This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease to be drafted.  Each covenant, agreement, obligation or other provision of this Sublease binding upon Subtenant shall be deemed and construed as a separate and independent covenant of Subtenant, not dependent on any other provision of this Sublease unless otherwise expressly provided.

26.    NOTICES.   All communications given under this Agreement (each, a "Notice") must be in writing and provided to each party at the address set forth below (or to such other address that may be designated by the other party from time to time).   Notices must be delivered by certified mail (return receipt requested); Federal Express or other recognized overnight courier service, in each case, effective upon receipt or refusal; to the parties as follows:

Sublandlord:    CaaStle Inc.
5 Penn Plaza, Fl 4
New York, NY  10001
Attention: General Counsel

With a facsimile copy to:

Valence Law Group, PC
Facsimile #: (415) 358-4570
Attention: Krista M. Kim, Esq.

Subtenant:    Madewell Inc.

c/o J. Crew
225 Liberty Street, 17th Floor
New York, New York 10281
Attn: General Counsel

with copies to:

Madewell Inc.
c/o J. Crew
225 Liberty Street, 17th Floor
New York, New York 10281
Attn: Director of Leasing Services

27.    <u>LIABILITY OF SUBLANDLORD</u>.    Neither Sublandlord nor its affiliates, nor any of its and their former, current and future parents, subsidiaries, managers, directors, officers, members, shareholders, agents, employees, predecessors, successors or assigns shall have any personal liability under this Sublease.

28.    <u>QUIET ENJOYMENT.</u>    Sublandlord agrees that Subtenant, unless in default under this Sublease beyond applicable notice and cure periods, shall peaceably and quietly enjoy the Subleased Premises, subject, nevertheless, to the terms and conditions hereof and of the Prime Lease.

29.    <u>PARKING</u>.    Subject to the terms of Prime Lease and Prime Landlord's consent, so long as Subtenant is not in default under this Sublease beyond applicable notice and cure periods and complies with the Building Rules and Regulations as they pertain to parking, Subtenant is permitted to use the same number of parking spaces that Sublandlord is entitled to use under Section 34.16 of the Prime Lease provided Subtenant shall pay the same rate that Sublandlord is required to pay for parking.

30.    <u>MISCELLANEOUS</u>.

A.    This Sublease shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its choice of law principles or those of any other state.  Any dispute, claim or controversy arising out of or relating to this Sublease or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by the federal and state courts in New York, located in New York and/or Queens County.

B.    If any of the provisions of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Sublease shall be valid and enforceable to the fullest extent permitted by law.

C.    Sublandlord has made no representations, warranties or covenants to or with Subtenant with respect to the subject matter of this Sublease except as expressly provided herein and all prior negotiations and agreements relating thereto are merged into this Sublease.  This Sublease may not be amended or terminated, in whole or in part, nor may

any of the provisions be waived, except by a written instrument executed by the party against whom enforcement of such amendment, termination or waiver is sought and unless the same is permitted under the terms and provisions of the Prime Lease.

D.    Unless specifically provided herein, all capitalized terms used in this Sublease which are defined in the Prime Lease shall be deemed to have the respective meanings set forth therein.

E.    As between the parties hereto only, in the event of a conflict between the terms of the Prime Lease and the terms of this Sublease, the terms of this Sublease shall control only to the extent they are inconsistent with the terms of the Prime Lease and their respective counterpart provisions in the Prime Lease shall be excluded only to such extent.

F.    Subtenant represents and warrants to Sublandlord that: (a) Subtenant is familiar with the provisions of the Prime Lease insofar as they pertain to the Subleased Premises and Subtenant's use and occupation thereof under this Sublease; (b) Subtenant has the right and power to execute and deliver this Sublease and to perform its obligations hereunder; (c) the person or persons executing this Sublease for Subtenant are fully authorized to so act and no other action is required to bind Subtenant to this Sublease; and (d) Subtenant is duly organized and in good standing in its state of formation and is authorized to conduct business in the state where the Subleased Premises are located. Sublandlord hereby makes all of the same foregoing representations and warrants the same to Subtenant as it relates to Sublandlord.

G.    This Sublease is subject to amendment only by a writing that makes reference to this Sublease and is signed by all parties hereto.

H.    If there is any legal or arbitration action or proceeding between Sublandlord and Subtenant to enforce any provision of this Sublease or to protect or establish any right or remedy of either Sublandlord or Subtenant hereunder, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorneys' fees incurred by such prevailing party in such action or proceeding and in any appearance in connection therewith, and if such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorneys' fees shall be determined by the court or arbitration panel handling the proceeding and shall be included in and as part of such judgment.

I.    The submission of this Sublease to Subtenant does not constitute an offer to lease. This Sublease shall become effective only upon the execution and delivery thereof by both Sublandlord and Subtenant. Sublandlord shall have no liability or obligation to Subtenant by reason of Sublandlord's rejection of this Sublease or a failure to execute, acknowledge and deliver same to Subtenant.

J.    This Sublease may be executed in multiple counterparts, each of which shall constitute an original, and all of which when taken together shall constitute one original.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**                    **CAASTLE INC.**

By:_____

    Name:  Timothy Hirsch
    Title:   General Counsel


**SUBTENANT:**                    **MADEWELL INC.**

By:_____

    Name:
    Title:

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**                              **CAASTLE INC.**

                                              By:_____
                                                  Name:
                                                  Title:

**SUBTENANT:**                                **MADEWELL INC.**

                                              By:_____
                                                  Name: Vincent Zanna
                                                  Title: CFO & Treasurer

**EXHIBIT A**

**<u>The Subleased Premises</u>**

Suite  540: See Exhibit D to Original Lease

Suite  460: See Exhibit A to the First Amendment

**EXHIBIT B**

**The Prime Lease**

[See Attached]

--------

## AGREEMENT OF LEASE

--------

### FACTORY OWNER LLC
LANDLORD

AND

### GWYNNIE BEE INC.
TENANT

PREMISES AT:
**30-30 47TH AVENUE**
LONG ISLAND CITY, NEW YORK

DATED: MAY 15th, 2015

{Client/007989/RE3423/00921369.DOCX;7 }

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEMISE, PREMISES, RENT ...................................................................................5

ARTICLE 2 USE AND OCCUPANCY ......................................................................................6

ARTICLE 3 TERM......................................................................................................................8

ARTICLE 4 ALTERATIONS; NON-INTERFERING USES ....................................................9

ARTICLE 5 CONDITION OF THE PREMISES; LANDLORD'S WORK.............................14

ARTICLE 6 REPAIRS; FLOOR LOAD ..................................................................................14

ARTICLE 7 REAL ESTATE TAXES AND ADDITIONAL RENT.........................................16

ARTICLE 8 LEGAL REQUIREMENTS..................................................................................22

ARTICLE 9 SUBORDINATION AND NON-DISTURBANCE; ESTOPPEL CERTIFICATES.............23

ARTICLE 10 SERVICES..........................................................................................................25

ARTICLE 11 INSURANCE......................................................................................................29

ARTICLE 12 DESTRUCTION OF THE PREMISES; PROPERTY LOSS OR DAMAGE.....................33

ARTICLE 13 EMINENT DOMAIN ........................................................................................34

ARTICLE 14 ASSIGNMENT, SUBLETTING, MORTGAGE, ETC. ....................................36

ARTICLE 15 ACCESS TO PREMISES; BASE BUILDING UPGRADE WORK .................45

ARTICLE 16 CERTIFICATE OF OCCUPANCY ..................................................................47

ARTICLE 17 DEFAULT...........................................................................................................47

ARTICLE 18 REMEDIES AND DAMAGES .........................................................................49

ARTICLE 19 FEES AND EXPENSES ....................................................................................52

ARTICLE 20 NO REPRESENTATIONS BY LANDLORD ...................................................53

ARTICLE 21 END OF TERM ..................................................................................................53

ARTICLE 22 QUIET ENJOYMENT.......................................................................................54

ARTICLE 23 NO WAIVER; NON-LIABILITY .....................................................................54

ARTICLE 24 WAIVERS...........................................................................................................55

ARTICLE 25 INABILITY TO PERFORM .................................................................................................56

ARTICLE 26 BILLS AND NOTICES ....................................................................................................57

ARTICLE 27 RULES AND REGULATIONS ............................................................................................58

ARTICLE 28 BROKER ...........................................................................................................................58

ARTICLE 29 INDEMNITY ....................................................................................................................58

ARTICLE 30 SECURITY DEPOSIT .....................................................................................................61

ARTICLE 31 INTENTIONALLY OMITTED ............................................................................................62

ARTICLE 32 REIT REPRESENTATION .............................................................................................62

ARTICLE 33 TENANT'S EXPANSION/TERMINATION OPTION ......................................................63

ARTICLE 34 MISCELLANEOUS .........................................................................................................66

ARTICLE 35 BUILDING NAME AND SIGNAGE ................................................................................72

Exhibits

| Exhibit A-1 | Land |
| Exhibit B: | Building Rules and Regulations |
| Exhibit C: | Tenant's Pre-Approved Alterations |
| Exhibit D: | Premises |
| Exhibit E: | Fixed Rent |
| Exhibit F: | Calculation of Lease Costs |
| Exhibit G: | Commercial Expansion Program Application Certification |

AGREEMENT OF LEASE (this "Lease"), made as of the _____ day of May, 2015, between **FACTORY OWNER LLC** ("Landlord"), a Delaware limited liability company, having an address at c/o Atlas Capital Group, LLC, 505 5th Avenue, 28th Floor, New York, New York 10017, as landlord, or its designated assignee from time to time, and **GWYNNIE BEE INC.** ("Tenant"), a Delaware corporation, having an address at 30-30 47th Avenue, Long Island City, New York 11101, as tenant.

## W I T N E S S E T H:

The parties hereto, for themselves, their legal representatives, successors and assigns, hereby covenant and agree as follows:

The following terms shall, wherever used in this Lease (unless the context requires otherwise), shall have the respective meanings set forth below (or as specified in the Sections of this Lease set forth below) after such terms:

Additional Rent:  Tenant's Tax Payment and any and all other sums, other than Fixed Rent, payable by Tenant under this Lease or otherwise in connection with the use and occupancy of the Premises, including, without limitation, sums payable under work orders issued by Landlord's managing agent.

Affiliate:  with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

Alterations:  alterations, installations, improvements, additions and other physical changes made by or on behalf of Tenant or a Tenant Party in or about the Premises, including, without limitation, Material Alterations, or Decorative Alterations.

Applicable Rate:  a rate equal to the lesser of (i) 1.25% per month, and (ii) the maximum applicable legal rate, if any.

Approved Architects and Engineers:  all architects and engineers approved by Landlord in accordance with the terms of Section 4.3.

Approved Contractors:  all contractors approved by Landlord in accordance with the terms of Section 4.3.

Base Tax Year: the 2015 calendar year.

Base Taxes:  the actual Taxes for the 2015 calendar year, which shall mean the sum of (i) fifty percent (50%) of the actual Taxes for the Tax Year commencing on July 1, 2014 and ending on June 30, 2015, plus (ii) fifty percent (50%) of the actual Taxes for the Tax Year commencing on July 1, 2015 and ending on June 30, 2016.

Building:  all the buildings, equipment and other improvements and appurtenances of every kind and description (but excluding Tenant's Property) hereafter erected, constructed or placed upon the Land and any and all alterations, renewals, replacements, additions and substitutions thereto.

Building Systems:  the mechanical, electrical, and gas systems and the AC System and the elevator, plumbing, sanitary, fire protection, sprinkler and life-safety systems of the Building (but shall not include the portions of such systems, or the distribution facilities appurtenant thereto, located within and exclusively serving the Premises) from the point of connection in each floor of the Premises.

Business Days: all days, excluding Saturdays, Sundays and Holidays.

Business Hours: Business Days from 8:00 A.M. to 6:00 P.M.

Capital Improvement: any alteration, addition, change, repair or replacement (whether structural or non-structural) made by Landlord in or to the Building or the Common Areas or equipment or systems thereof, which under GAAP, is properly classified as a capital expenditure. The aggregate costs of any Capital Improvement shall be deemed to include, without limitation, architectural, engineering and expediting fees, legal, consulting, inspection and commissioning fees actually incurred in connection therewith, but shall be deemed to exclude actual or imputed financing costs in connection therewith.

Commencement Date: the date that is seven (7) days following execution of this Lease and delivery of possession of the Premises to Tenant.

Common Areas: the core and shell of the Building, including, without limitation, the Lobby, the roof of the Building other than portions of the roof used exclusively by Landlord, Tenant, or other tenants of the Building, elevators, mechanical rooms, electrical closets, janitorial and telecommunication closets, elevator lobbies and corridors on multi-tenant floors, the Building Systems and the public portions of the Building.

Comparable Office Buildings: comparable office buildings located in the vicinity of the Building.

Control: both (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, and (b) in the case of any Person, irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

CPI: the Consumer Price Index for All Urban Consumers, New York, N.Y. — Northern New Jersey — Long Island, 1982-84=100; provided, however, that if the CPI or any successor index shall cease to be published, Landlord and Tenant shall agree, in writing, on a substitute therefor.

CPI Fraction: as of each January 1st during the Term (an "Adjustment Date"), a fraction (a) the numerator of which is the CPI for the CPI Month immediately preceding such Adjustment Date and (b) the denominator of which is the CPI for the CPI Month immediately preceding the Effective Date.

CPI Month: a particular calendar month for the determination of the CPI Fraction.

Environmental Law: any present or future federal, state or local law, statute, regulation, or ordinance, and any judicial or administrative order or judgment thereunder, and judicial opinions or orders, pertaining to health, industrial hygiene, Hazardous Substances, the environment or natural resources, including, but not limited to, each of the following, as enacted as of the date hereof or as hereafter amended: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.; the Toxic Substance Control Act, 15 U.S.C. §§ 2601 et seq.; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and the Oil Pollution Control Act 33 U.S.C.A. § 2701 et seq.

Expiration Date: the Initial Expiration Date or such earlier date upon which the Term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to law.

Federal Bankruptcy Code: Title 11 of the United States Code, as amended or superseded from time to time.

Fixed Rent: as defined in Section 1.1(a) and Exhibit E attached hereto.

Force Majeure: any delays resulting from any causes beyond Landlord's or Tenant's reasonable control, as the case may be, including, without limitation, (i) strikes or labor troubles, (ii) governmental preemption in connection with a national emergency, (iii) any rule, order or regulation of any government agency or any department or subdivision thereof, whether in connection with a drought, energy shortage or other like event or otherwise, (iv) any fact, condition or circumstance related to war, terrorism or other emergency, (v) fire, casualty or other acts of God (including the time necessary to repair any damage caused thereby) or (vi) other like circumstances. Under no circumstances shall the non-payment of money or a failure attributable to a lack of funds be deemed to be (or to have caused) an event of Force Majeure.

GAAP: generally accepted accounting principles consistently applied.

Governmental Authority: any of The United States of America, The State of New York and The City of New York and any political subdivision thereof and any agency, department, commission, board, bureau or instrumentality of any of the foregoing, now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof or the curbs, sidewalks, and areas adjacent thereto.

Hazardous Substances: any material, waste or substance which is: (i) included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in or pursuant to any Environmental Law, or subject to regulation under any Environmental Law; (ii) listed in the United States Department of Transportation Optional Hazardous Materials Table, 49 C.F.R. § 172.101, as enacted as of the date hereof or as hereafter amended, or in the United States Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 302, as enacted as of the date hereof or as hereafter amended; or (iii) explosive, flammable, radioactive, friable asbestos, a polychlorinated biphenyl, petroleum or a petroleum product or waste oil.

Holidays: the days celebrated as New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day or Christmas Day, or such other days as may now or hereafter be celebrated as holidays under the contract from time to time in effect between Locals 32B and 32J of the Building Service Employees Union AFL-CIO (or any successor thereto) and the Real Estate Advisory Board of New York, Inc. (or any successor thereto) or on which Comparable Office Buildings are now or hereafter closed.

HVAC: heat, ventilation and air-conditioning.

Initial Expiration Date: the last day of the month in which occurs the fifth (5th) anniversary of the Commencement Date, or such earlier date upon which the Term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to law.

Landlord: Factory Owner LLC, a Delaware limited liability company, or its applicable successors and/or assigns.

Landlord Party: any of Landlord, any Affiliate of Landlord, Landlord's managing and leasing agents for the Building, each Mortgagee and Superior Lessor, and each of their respective direct and indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, agents and representatives.

Landlord's Work: None.

Lease Year: any calendar year during the Term.

Legal Requirements: all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes, executive orders, and any judicial interpretations thereof, extraordinary as well as ordinary, of all Governmental Authorities, including the provisions of the Americans with Disabilities Act (42 U.S.C. § 12, 101 et seq.), New York City Local Law 58 of 1987, and all rules, regulations and government orders with respect thereto and any of the foregoing relating to environmental matters, Hazardous Substances, public health and safety matters, and of the New York Board of Underwriters, the New York Fire Insurance Rating Organization or any other fire rating organizations or insurance entities performing similar functions, in each case, affecting the Real Property or the Premises or the maintenance, use or occupation thereof, or any street or sidewalk comprising a part of or in front thereof or any vault in or under the Real Property.

Lobby: the ground floor lobby of the Building.

Mortgage: any mortgage or trust indenture which may now or hereafter affect all or any portion of the Real Property, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

Mortgagee: any mortgagee, trustee or other holder of the mortgagee's interest under a Mortgage, and any interest in the loan evidenced thereby.

Permitted Uses: the use of the Premises as executive, administrative and general offices and showroom, and the lawful uses ancillary thereto described in Article 2 and for no other use or purpose.

Person: any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other entity or any Governmental Authority.

Premises: a portion of the fifth (5th) floor of the Building known as Suite 540 substantially as depicted on Exhibit D attached hereto consisting of approximately twelve thousand seven hundred two (12,702) RSF (the "Premises Area").

Premises Area: the Rentable Square Feet area of the Premises or any portion thereof (as such Premises Area may be increased or decreased from time to time pursuant to this Lease. The Premises Area shall not be increased or decreased during the Term, other than to reflect the incorporation of additional space into the Premises Area, or the removal of any space from the Premises Area, whether pursuant to the rights of Landlord or Tenant hereunder.

Real Property: collectively, the Building and the Land.

Register's Office: the Office of the New York City Register, Queens County.

Rent:  collectively, Fixed Rent and Additional Rent.

Rent Commencement Date:  the date that is ▓▓▓▓▓▓ following the Commencement Date.

Rentable Square Feet or RSF:  the rentable area of the Building or the applicable portion thereof.

Special Use Area:  any portion of the Premises which is used for any purpose permitted hereunder which is ancillary to the executive, administrative and general office usage hereunder, including, without limitation, a pantry or library.

Special Use Area Property:  any items of personal property or fixtures, including any equipment, used by Tenant in connection with a Special Use Area.

Superior Lease:  any ground or underlying lease of the Real Property or any part thereof heretofore or hereafter made by Landlord, as tenant, and all renewals, extensions, supplements, amendments and modifications thereof.

Superior Lessor:  a lessor under a Superior Lease.

Tenant:  Gwynnie Bee, Inc. or its Permitted Transferees.

Tenant Delay:  Any delay beyond specific periods set forth in the Lease which results from any act or omission of any Tenant Party, including delays due to changes in or additions to, or interference with, any work to be done by Landlord, or delays beyond specific periods set forth in the Lease by Tenant in submission of information, or selecting construction materials to be installed by Landlord as part of Landlord's Work, if any (e.g., color of paint and carpet), or approving working drawings or estimates or giving authorizations or approvals.

Tenant Party:  any of Tenant, any Affiliate of Tenant, any subtenant or any other occupant of the Premises, and each of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, agents, guests and invitees and representatives.

Term:  the term of this Lease, which shall commence on the Commencement Date and shall expire on the Expiration Date.

## ARTICLE 1

## DEMISE, PREMISES, RENT

Section 1.1    (a)    Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the Premises, as set forth on Exhibit D attached hereto, for the Term, at an annual rent ("Fixed Rent") as set forth on Exhibit E attached hereto and made a part hereof together with all Additional Rent provided for herein.  Subject to Section 1.1(c) hereof, Tenant shall commence paying to Landlord Fixed Rent commencing on the Rent Commencement Date, as set forth on Exhibit E attached hereto.

(b)    Tenant agrees to pay to Landlord Fixed Rent and Additional Rent, without offset, notice, demand, abatement, or deduction whatsoever (except as permitted or otherwise provided for in this Lease), in lawful money of the United States, and all Fixed Rent shall be payable in equal monthly installments in advance (but shall not be paid more than one (1) month in advance), from and after the Commencement Date and on the first (1st) day of each calendar month thereafter during the Term, at the

office of Landlord or such other place as Landlord may designate. Fixed Rent and Additional Rent shall be payable by check drawn upon a bank which is a member of the Clearing House (f/k/a The New York Clearing House), or upon any other bank with an office in New York City which is reasonably acceptable to Landlord, or, at Tenant's election, by wire transfer of immediately available funds to such account as Landlord shall direct.

(c)     Notwithstanding anything contained in this Article to the contrary, so long as no Event of Default has occurred, Landlord hereby waives payment of Fixed Rent for the period from and including the Commencement Date until the Rent Commencement Date.

(d)     Tenant shall, on the Effective Date, pay to Landlord an amount equal to one-twelfth ($1/12^{th}$) of the annual Fixed Rent, to be applied to the first monthly installment of Fixed Rent due hereunder. Landlord shall hold the amount paid by Tenant hereunder in trust until the same is applied pursuant to this Lease.

Section 1.2     Notwithstanding anything to the contrary contained herein, if the Commencement Date and/or the Rent Commencement Date (as applicable) shall occur on a date other than the first (1st) day of any calendar month, then the first monthly installment of Fixed Rent that becomes due on the Commencement Date and/or the Rent Commencement Date (as applicable), prorated to the end of said calendar month, shall be payable on the Commencement Date and/or the Rent Commencement Date (as applicable), and the payment made by Tenant upon the Effective Date shall be applied to the second (2nd) monthly installment of Fixed Rent.

ARTICLE 2

USE AND OCCUPANCY

Section 2.1     (a)     The Premises shall be used and occupied for the Permitted Uses and for no other use or purpose whatsoever.

(b)     In connection with and ancillary to the primary use of the Premises for the Permitted Uses, Tenant may, subject to the provisions of this Lease (including, but not limited to, Article 4) and applicable Legal Requirements, use certain portions of the Premises for the following purposes, but only to the extent used solely by Tenant (and Tenant's clients, invitees and employees in conjunction with such use by Tenant) solely in connection with such Tenant's own business requirements: (i) a messenger and mail room facility, (ii) a reproduction and copying facility, (iii) a computer and communication system center, (iv) employee lounges, and (v) file rooms, pantries (as provided in Section 2.1(c)), meeting, training and conference centers and rooms and provided the same complies with the uses permitted by the Building's certificate of occupancy.

(c)     Tenant, incidental to its general office use, shall, subject to the provisions of this Lease (including the provisions of Article 4), applicable Legal Requirements and such other reasonable, nondiscriminatory regulations as Landlord may adopt from time to time in accordance with Article 27, have the right, at Tenant's sole cost and expense, to use a portion or portions of the Premises as a pantry or pantries for use solely by Tenant and its respective clients and invitees, which may contain reheating but not cooking equipment, including items such as a microwave, coffee maker, sink, ice maker, soda machine, vending machines, tables and chairs, dishwasher, hot water heater and refrigerator; provided that: (i) no cooking or other preparation of food (other than the reheating of food by a microwave and the preparation of beverages) shall be done in any such pantry, (ii) no food or beverages will be kept or served in the Premises in a manner or under any conditions which result in fumes or odors being emitted from, or detectable outside of, the Premises such that same may unreasonably affect other tenants or

occupants of the Building, and (iii) such portion or portions of the Premises shall be at all times maintained by Tenant in a clean and sanitary condition and free of refuse, insects and rodents (including required use of extermination services).

(d)     If any governmental license or permit (other than a Building certificate of occupancy that permits general office use) shall be required for the proper and lawful conduct of Tenant's business in the Premises or any part thereof (including specifically, but without limitation, any place of assembly permit or any amendment to the Building certificate of occupancy), then Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit the same to inspection by Landlord.  Tenant's application for and procurement of any such license, permit or amendment shall be subject to Landlord's review and approval, which shall not be unreasonably withheld, conditioned or delayed.  Tenant shall at all times comply with the terms and conditions of each such license or permit, but in no event shall failure to procure and maintain same by Tenant affect Tenant's obligations hereunder and Tenant shall not at any time use or occupy, or suffer or permit anyone to use or occupy, the Premises, or do or permit anything to be done in the Premises, in violation of the certificate of occupancy for the Building.

Section 2.2     (a)     Tenant shall not use or permit the Premises or any part thereof to be used:  (i) for the business of printing or other manufacturing of any kind, except for the use of office equipment in connection with the normal operation of the Premises for a Permitted Use, (ii) as a retail branch of a bank or savings and loan association, or as a retail loan company, (iii) as a retail stock broker's or dealer's office, (iv) for the retail sale of merchandise (not including the sale of merchandise by mail-order or the Internet), (v) for the distribution, by mail-order or otherwise, of merchandise, (vi) as a restaurant or bar or for the sale of food or beverages, (vii) as a news or cigar stand, (viii) as an employment agency, labor union office, school, physician's or dentist's office, dance or music studio, (ix) as a barber shop or beauty salon, (x) for the sale, at retail of any goods (not including the sale of merchandise by mail-order or the Internet), (xi) by the United States Government, the City or State of New York, any other Governmental Authority, any foreign government, the United Nations or any agency or department of any of the foregoing, any Person having sovereign or diplomatic immunity or any Person not subject to the jurisdiction of the state and Federal courts located in the State of New York, (xii) by any charitable, religious, union or other not-for-profit or any tax exempt entity within the meaning of Section 168(j)(4)(A) of the Internal Revenue Code of 1986, as amended, or any successor statute, or rule or regulation applicable thereto, (xiii) for the rendition of medical, dental or other therapeutic services (it being understood that Tenant may use or may permit the use of the Premises for certain diagnostic services in connection with health programs conducted from time to time for the benefit of Tenant's employees) or (xiv) for the conduct of an auction.

(b)     Tenant shall not suffer or permit the Premises or any part thereof to be used in any manner, or anything to be done therein, or suffer or permit anything to be brought into or kept therein, that would in any way (i) violate any of the provisions of any grant, lease or mortgage to which this Lease is subordinate of which Tenant has been advised, (ii) violate any Legal Requirements (subject to the right to contest such Legal Requirements as provided in Section 8.2 hereof), (iii) make unobtainable from reputable insurance companies authorized to do business in New York State at standard rates any fire insurance with extended coverage, or liability, elevator or boiler or other insurance carried by Landlord, (iv) cause, or in Landlord's reasonable opinion be likely to cause, physical damage to the Building or any part thereof, (v) constitute a public or private nuisance, (vi) impair, in the reasonable opinion of Landlord, the appearance, character or reputation of the Building, (vii) discharge objectionable fumes, vapors or odors into the Building's air-conditioning system or into the Building's flues or vents not designated to receive such fumes, vapors, or odors, or otherwise discharge same, in such manner as may adversely affect other tenants or occupants of the Building or as may adversely affect space outside of the Premises, (viii) impair or interfere with any of the Building services or the proper and economic heating, cleaning,

air-conditioning or other servicing of the Building or the Premises, or impair or interfere with or tend to impair or interfere with, the use of any of the other areas of the Building by any other tenants or occupants of the Building, the determination of any such impairment or interference to be in the reasonable judgment of Landlord, (ix) result in the leakage of fluid or the growth of mold or the creation of any other condition which causes, or in Landlord's reasonable opinion would be likely to cause, an internal air quality problem in the Premises or the Building, (x) cause Tenant to default in any of its other obligations under this Lease, or (xi) occasion annoyance or discomfort to any tenants or occupants of the Building or interfere with the use or occupancy of other portions of the Building.  The provisions of this Section 2.2(b), and the application thereof, shall not be deemed to be limited in any way to or by the provisions of Rules and Regulations referred to in Article 27.

Section 2.3    Tenant shall have, as appurtenant to the Premises, the non-exclusive right to use in common with others, subject to the Building Rules and Regulations set forth on Exhibit B hereto and the other applicable provisions of this Lease: (i) the public areas of the Building, including, without limitation, the common lobbies, corridors, stairways and public elevators of the Building for their intended uses and (ii) if the Premises includes less than the entire RSF of any floor, the common toilets, corridors and elevator lobby of such floor for their intended uses.

## ARTICLE 3

## TERM

Section 3.1    The Term shall commence on the Commencement Date and shall, unless sooner terminated, expire on the Expiration Date.  If Landlord fails to deliver possession of the Premises on the Commencement Date, the Commencement Date shall be deemed to be the first (1st) day thereafter that actual possession is so delivered.  If the Commencement Date does not occur by July 1, 2015, for any reason whatsoever, through no fault of Tenant, then the date Tenant is otherwise obligated to commence payment of Fixed Rent (after any free rent periods) shall be delayed by one (1) day for each day that delivery of possession of the Premises in the required condition is delayed beyond July 1. 2015.  If the Commencement Date does not occur by September 1, 2015, for any reason whatsoever, through no fault of Tenant, then the date Tenant is otherwise obligated to commence payment of Fixed Rent (after any free rent periods) shall be delayed by two (2) days for each day that delivery of possession of the Premises in the required condition is delayed beyond September 1, 2015.  If the Commencement Date does not occur by October 1, 2015, for any reason whatsoever, through no fault of Tenant, Tenant may terminate this Lease by written notice to Landlord, whereupon any monies previously paid by Tenant to Landlord shall be reimbursed to Tenant.  Landlord shall provide Tenant with access to the Premises seven (7) days prior to the Commencement Date (the "Early Access Period") to permit Tenant to install in the Premises its (i) furniture, fixtures and equipment and (ii) data and telecommunications cabling, wiring and equipment. Tenant shall have no obligation to pay to Fixed Rent during the Early Access Period.  Tenant shall not be permitted to conduct business in the Premises during the Early Access Period.

Section 3.2    The provisions of this Article 3 are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law or any successor law or ordinance, and Tenant hereby waives any right to rescind this Lease which Tenant might otherwise have thereunder.

ARTICLE 4

ALTERATIONS; NON-INTERFERING USES

Section 4.1    (a)    Except as otherwise provided in this Article 4 and except for "Tenant's Pre-Approved Alterations" described in Exhibit C, Tenant shall not make any Alterations without Landlord's prior consent in each instance. Landlord's consent shall not be required for any Alterations that are (i) decorative or cosmetic Alterations (and which are not Material Alterations) such as painting, wall coverings and floor coverings, window treatments, or the installation of movable fixtures and business equipment customarily used for the Permitted Uses (collectively, "Decorative Alterations") or (ii) not Material Alterations and do not for any one project cost in excess of $150,000 (the "Alteration Threshold"). For purposes of this Article 4, "Material Alterations" means Alterations that (i) affect the outside appearance of the Building or the structural integrity of the Building, including the structural elements of the walls, floors, ceiling or columns of the Building, (ii) would physically affect any components of the exterior of the Building, (iii) affect and/or tie into the Building Systems or Building services, (iv) would affect the provision of services to other Building tenants, (v) would include work that requires the removal of a portion of the floor slab in any portion of the Premises, or access to, or penetration of the floor slab adjacent to, any space occupied by any other tenant or occupant of the Building (other than Tenant's subtenants) or (vi) require that a governmental permit be filed in connection therewith. Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to Material Alterations or Alterations that do not constitute Material Alterations, the cost of which exceeds the Alteration Threshold.

(b)    If Tenant intends to perform Alterations for which Tenant believes Landlord's consent is not required hereunder, Tenant shall be required to give Landlord prior written notice of such intention and belief and reasonable information concerning the nature of such proposed Alterations, and Tenant shall be permitted to perform such Alterations so long as (i) such Alterations shall be performed only by contractors and subcontractors approved by Landlord to the extent approval of such contractor or subcontractor is required by Section 4.3, (ii) the performance of such Alterations do not affect areas outside of the Premises, (iii) such Alterations do not violate the certificate of occupancy then in effect for the Building, (iv) Tenant shall have provided Landlord with plans and specifications for such Alterations as required by Section 4.2, and (v) Tenant otherwise complies with the requirements of this Article 4.

(c)    At any and all times during the period of construction of any Alterations, Landlord shall be entitled to have a representative or representatives on the site to inspect such Alterations, and such representative or representatives shall have free and unrestricted access to any and every part of the Premises except as otherwise provided in Section 15.1. Tenant shall keep full and accurate records of the cost of any Alterations in and to the Premises and shall, if requested by Landlord, make the same available to Landlord for use in connection with any proceeding to review the assessed valuation of the Building or any proceedings to acquire the Land and Building for public or quasi-public use.

Section 4.2    Prior to making any Alterations (other than Decorative Alterations), Tenant shall (a) submit to Landlord detailed plans and specifications therefor in form reasonably satisfactory to Landlord which shall comply with all Legal Requirements (which detailed plans and specifications shall be subject to Landlord's approval only with respect to Alterations which are subject to Landlord's consent as provided herein) ("Tenant's Plans"), and if such Alterations require a filing with Governmental Authority or require the consent of such Governmental Authority, then such plans and specifications shall be prepared and certified by a registered architect or licensed engineer, to the extent necessary for such governmental filing or consent, (b)  at its expense, obtain and deliver to Landlord true copies of all required permits, approvals and certificates (including permits, approvals and certificates required or

contemplated by any Governmental Authority), and (c) demonstrate that Tenant carries all required insurance as well as (i) worker's compensation insurance (covering all persons to be employed by Tenant and all contractors and subcontractors supplying materials or performing work in connection with such Alterations), (ii) comprehensive public liability (including property damage coverage), and (iii) Builder's Risk coverage (issued on a completed value basis). All insurance under the preceding clause (c) shall be in such form, with such companies, for such periods and in such amounts and types of coverage as would be required by prudent landlords of Comparable Office Buildings, or as required by any Superior Lease or any Mortgage, naming Landlord and its employees and agents, and any Superior Lessor and any Mortgagee as additional insureds. In connection with Alterations (including, but not limited to, Tenant's Initial Alterations). All Alterations including, but not limited to, Decorative Alterations, shall be performed by Tenant, at Tenant's sole cost and expense, (A) in a good and workerlike manner, (B) in compliance with all Legal Requirements and with the all reasonable rules and regulations prescribed by Landlord with respect to the performance of Alterations in the Building, as may be amended from time to time (the "Alteration Rules and Regulations"), (C) except for Decorative Alterations, in accordance in all material respects with the plans and specifications previously approved by Landlord (as such plans and specifications may be revised from time to time in accordance herewith), and (D) if such Alterations are projected by Tenant to cost in excess of the Alteration Threshold, or if such Alterations constitute Material Alterations, under the supervision of a licensed architect or engineer. Tenant shall promptly commence all Alterations after receipt of all consents and permits required hereunder and shall diligently prosecute same to completion. Tenant shall promptly reimburse Landlord, as Additional Rent within thirty (30) days after written demand together with appropriate back-up, for any and all reasonable, actual out-of-pocket costs and expenses incurred by Landlord in connection with the review of Tenant's plans and specifications for any such Alteration by any third-party architect, engineer or other consultant retained by Landlord or the review by any Superior Lessor or Mortgagee or any third party architect, engineer or other consultant retained by any of them.

Section 4.3    Except as otherwise provided herein, Tenant shall not make any Alterations employing, hiring or retaining Persons other than Approved Contractors and Approved Architects and Engineers. Landlord will not unreasonably withhold, condition or delay its approval of contractors, architects or engineers proposed to be employed by Tenant for the performance of Alterations, except with respect to contractors or engineers in the life safety system, elevators, fire alarm system, building management system trades and other contractors providing proprietary technical services to the Building, as to which Landlord may designate the contractor and engineer to be used by Tenant, provided that the charges of such contractors, architects and engineers shall be reasonable and competitive with the charges of contractors, architects and engineers providing similar services to other Comparable Office Buildings.

Section 4.4    (a)    Except as otherwise provided in this Section 4.4, all work, construction, repairs, Alterations, other improvements or installations made to or upon the Premises, whether or not at the expense of Tenant, shall become part of the Premises and, upon the Expiration Date, shall become the property of Landlord and remain upon and be surrendered with the Premises as a part thereof upon the Expiration Date. Landlord may condition its approval of any Alterations which differ materially from ordinary office installations, such as vaults, raised floors, conveyors and slab penetrations (other than minor slab penetrations for cable and conduit) by requiring Tenant to agree in writing to remove such Alterations at the end of the Term as set forth in this Section 4.4 (any such Alterations which Landlord so requires Tenant to agree to remove, "Non-Standard Alterations"). On the Expiration Date, (i) Tenant shall have removed Tenant's Property from the Premises, and (ii) if Landlord had notified Tenant at the time it approved the Non-Standard Alterations that such Non-Standard Alterations must be removed from the Premises (unless an Expiration Date is earlier than the anticipated or expected Expiration Date as a result of an Event of Default, condemnation or casualty, then within a reasonable time), Tenant shall have removed the Non-Standard Alterations from the Premises, at Tenant's sole cost and expense in accordance with the provisions of this Article 4. Tenant shall repair and restore in a good and workerlike

manner any damage to the Premises and the Building caused by such removal of Tenant's Property and the Non-Standard Alterations in accordance with the provisions of this Article 4. Any of the Non-Standard Alterations which are to be removed or Tenant's Property not so removed by Tenant at or prior to the Expiration Date shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or be removed from the Premises by Landlord, and Tenant shall (unless Landlord shall have directed Tenant not to remove such items) reimburse Landlord, as Additional Rent within thirty (30) days after written demand, for Landlord's reasonable, actual out-of-pocket costs incurred in connection with such removal and restoration. The covenants and agreements set forth in this Section 4.4 shall survive the expiration or earlier termination of this Lease.

(b)      Landlord agrees to respond to any request for approval of Tenant's Plans for any Alterations for which Landlord's approval is herein required within ten (10) Business Days after request, provided Tenant's Plans comply in all material respects with the requirements of Section 4.2. In addition, Landlord agrees to respond to any resubmission of Tenant's Plans within five (5) Business Days after written resubmission of Tenant's Plans rejected by Landlord. If Landlord does not respond to Tenant's request for approval of Tenant's Plans for any Alterations within ten (10) Business Days of Tenant's written request along with all required submissions of Tenant required pursuant to this Article 4, or if Landlord does not respond to Tenant's request for approval of the resubmission of Tenant's Plans within five (5) Business Days of Tenant's written request along with all required submissions of Tenant required pursuant to this Article 4, then Tenant shall have the right to give Landlord a second notice requesting Landlord to approve or disapprove of Tenant's Plans, and such second notice shall set forth in bold capital letters the following statement:

"IF LANDLORD FAILS TO RESPOND FIVE (5) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE, THEN LANDLORD SHALL BE DEEMED TO HAVE APPROVED THE TENANT'S PLANS FOR ALTERATIONS OUTLINED IN THE LETTER DATED _____, 20___."

In the event that Landlord fails to respond to such second notice within five (5) Business Days after receipt by Landlord, then such Tenant's Plans shall be deemed to be approved by Landlord, except that all Material Alterations are only subject to Landlord's sole approval and shall in no way be available for deemed approval as provided herein.

In the event that Landlord shall not approve any such request, the notice of such non-approval shall specifically indicate the reasons for such non-approval, in sufficient detail as to reasonably permit Tenant to make changes. Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, as is reasonably necessary for Tenant to obtain all permits and approvals required to be issued by any Governmental Authority in connection with Tenant's Alterations, and Landlord shall execute necessary consents and applications and perform other reasonable ministerial and non-ministerial requirements as and to the extent required.

(c)      Upon completion of any Alterations, Tenant, at its expense, shall promptly obtain certificates of final approval of such Alterations as may be required by any Governmental Authority (including any new or amended certificate of occupancy required by any Governmental Authority), and shall furnish Landlord with copies thereof, together with copies of the final plans and specifications (other than for Decorative Alterations) prepared by or on behalf of Tenant in connection with such Alterations (which plans and specifications must include final, marked record drawings which incorporate all bulletins and field changes issued from each of Tenant's HVAC, electrical, plumbing, fire safety and sprinkler subcontractors, as applicable) prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium as Landlord may reasonably specify or accept at its request) using the latest naming conventions issued by the American Institute of Architects (or such other naming

conventions as Landlord may reasonably accept) and computer media of such record drawings and specifications, translated into in a format compatible with the latest version of AutoCAD or another format reasonably acceptable to Landlord. Without limiting the generality of the foregoing, with reasonable promptness but in no event later than thirty (30) days following the completion of any Alterations, Tenant shall deliver to Landlord (i) proof of the issuance of any required approvals, permits and sign-offs for the Alterations by all Governmental Authorities having jurisdiction thereover and (ii) final lien waivers issued by all contractors, subcontractors and material suppliers covering all of the Alterations.

Section 4.5 (a) If, because of any act or omission of a Tenant Party, its suppliers or subcontractors, any mechanic's lien, U.C.C. financing statement or other lien, charge or order for the payment of money shall be filed against Landlord, or against all or any portion of the Premises, the Building or the Real Property, Tenant shall, at its own cost and expense, cause the same to be discharged of record, by bonding or otherwise, within twenty (20) days after Tenant has received notice thereof, and Tenant shall, in accordance with Article 29, indemnify, defend and save Landlord harmless against and from all costs, expenses, liabilities, suits, penalties, claims and demands (including reasonable attorneys' fees and disbursements) resulting therefrom.

(b) Notice is hereby given that Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the reversion or other estate or interest of Landlord in and to the Premises.

Section 4.6 Tenant shall not, directly or indirectly, engage any third-party contractor, mechanic or laborer in the Premises, even if such Person is an Approved Contractor in connection with any Alteration or otherwise that would, disturb harmony with any trade engaged in performing any other work in the Building (including, without limitation, the creation of any work slowdown, sabotage, strike, picket or jurisdictional dispute) or create any interference with the operation of the Building or performance of Landlord's work or the work or operations of any other tenant or occupant or increase the cost of any of the foregoing. Tenant shall promptly stop the performance of any Alteration or the conduct of such business or use of any third party contractor, mechanic or laborer if Landlord notifies Tenant that continuing such Alteration, the employing such third party contractor, mechanic or laborer would so disturb harmony with any trade engaged in performing any other work in the Building or create any actual or perceived interference with the operation of the Building or performance of Landlord's work or the work or operations of any other tenant or occupant or increase the cost of any of the foregoing. Landlord and Tenant shall cooperate with one another in all reasonable respects to avoid any such labor disharmony.

Section 4.7 All work to be performed by Tenant shall be done in a manner which will not unreasonably interfere with or disturb other tenants or occupants of the Building.

Section 4.8 All fees, costs and expenses reasonably incurred by Landlord in obtaining approvals or reviews required or contemplated by any Mortgagee in connection with any Alterations shall be payable by Tenant as Additional Rent, within thirty (30) days after written demand therefor.

Section 4.9 None of the Special Use Areas or Special Use Area Property shall, without Landlord's consent (such consent to be in Landlord's sole discretion), interfere with the occupancy of any other tenant or occupant in the Building or delay the construction, maintenance, cleaning, repair, safety, management, security or operation of the Building or the Building Systems. If Landlord incurs any additional operating expense as a result of Tenant's Special Use Areas or Special Use Area Property,

Tenant shall pay such additional operating expense as Additional Rent within thirty (30) days after demand.

Section 4.10    (a)    Tenant shall not solicit, suffer or permit other tenants or occupants to use any communications service, including, without limitation, any wired or wireless Internet service that passes through, is transmitted through or emanates from the Premises.   Tenant acknowledges that Landlord has granted and may grant licenses and other rights to various parties to provide communications services to the tenants or other occupants of the Building.

(b)    Tenant agrees that Tenant's communications equipment and the communications equipment of Tenant's service providers and contractors located in the Premises or installed in the Building to service the Premises including, without limitation, any antennas, switches, or other equipment (collectively, "Tenant's Communications Equipment") shall be of a type and, if applicable, a frequency which will not cause radio frequency, electromagnetic or other interference to any other party or any equipment of any other party including, without limitation, Landlord, other tenants or occupants of the Building or any other party.  In the event that Tenant's Communications Equipment causes or is believed to cause any such interference, upon receipt of notice from Landlord of such interference, Tenant will take all steps necessary to correct and eliminate the interference.  If the interference is not eliminated within twenty four (24) hours (or a shorter period if Landlord believes a shorter period to be appropriate), then, upon request from Landlord, Tenant shall shut down the Tenant's Communications Equipment pending resolution of the interference, with the exception of intermittent testing upon prior notice to and with the approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 4.11    Landlord's review and approval of Tenant's plans and specifications and consent to the performance of the work described therein shall not be deemed an agreement by Landlord that such plans, specifications and work conform with applicable Legal Requirements and insurance requirements, nor shall it be deemed a waiver by Landlord of compliance by Tenant with any provisions of this Lease, nor shall it impose upon Landlord any liability or obligation with respect to such work, including, without limitation, its completeness, design sufficiency or the performance thereof.

Section 4.12    Upon the request of Tenant, but subject to the terms of Section 2.1(d) hereof, Landlord, at Tenant's sole cost and expense, shall execute any applications for any permits, approvals or certificate from any Governmental Authority required to be obtained by Tenant, including any special permits, public assembly permits or changes to the certificate of occupancy for the Building required in connection with any Alterations, and shall sign such applications within five (5) Business Days after request by Tenant; provided that (i) the provisions of the applicable Legal Requirement shall require or Tenant deems it reasonably advisable that Landlord join in such application, (ii) such application relates to the performance by Tenant of Alterations in accordance with the terms of this Lease, or is otherwise reasonably acceptable to Landlord and shall otherwise cooperate with Tenant in connection therewith, (iii) Tenant shall reimburse Landlord for any out-of-pocket cost or expense incurred by Landlord in connection therewith (other than in connection with matters for which Landlord is expressly responsible pursuant to the provisions of this Lease), including reasonable attorneys' fees and disbursements, and any fees or expenses paid by Landlord to any Governmental Authority and (iv) Tenant shall indemnify Landlord, in accordance with Article 29, against any liability in connection therewith (other than in connection with matters for which Landlord is expressly responsible pursuant to the provisions of this Lease).

ARTICLE 5

CONDITION OF THE PREMISES

Section 5.1    Tenant agrees to accept possession of the Premises in its "as is" condition on the Commencement Date so delivered to Tenant, provided however that a new Tenant controlled air cooled air conditioner unit shall be delivered in good working order will all applicable warranties, if any. Landlord shall have no obligation to perform any work, supply any materials, incur any expenses or make any installations in order to prepare the Premises for Tenant's occupancy. Notwithstanding the foregoing, Landlord represents and warrants that the Building systems servicing the Premises shall be in good working order as of the Commencement Date.

ARTICLE 6

REPAIRS; FLOOR LOAD

Section 6.1    (a)    Landlord, at Landlord's expense, shall diligently maintain, replace and repair the Common Areas and the Building Systems (except as otherwise set forth herein and other than any supplementary or accessory HVAC or telecommunication/computer systems and/or any item of such equipment exclusively serving the Premises) (collectively, "Landlord Repairs"). Tenant, at Tenant's expense, shall keep the Premises and the fixtures, systems, equipment and appurtenances in good condition, except for reasonable wear and tear, fire or other casualty, obsolescence and damage for which Tenant is not responsible pursuant to the provisions of Articles 12 and 13 hereof.

(b)    From and after the date that possession of the Premises is delivered to Tenant and until the end of the Term, Tenant, at its expense, will keep neat and clean and maintain in good order, condition and repair the Premises, all Alterations and all fixtures or facilities contained in the Premises that do not constitute part of the Common Areas or the Building Systems, including, without limitation, any distribution conduits for the HVAC system serving the Premises, any supplemental air conditioning units, any private lavatory and any public lavatories located on floors leased entirely to Tenant, shower, toilet, washbasin and kitchen facilities, and all plumbing serving or connected to such systems or facilities, and will make all required repairs thereto and/or replacements of portions thereof, excepting only for those repairs or replacements for which Landlord is responsible under the terms of Section 6.1(a). Tenant shall not permit or commit any waste, and, notwithstanding anything to the contrary contained herein, Tenant shall be responsible for the cost of all repairs and replacements to the Premises, the Building and the facilities of the Building, whether ordinary or extraordinary, structural or, non-structural, when necessitated by Tenant's, or its subtenant's or assignee's, moving property in or out of the Building or installation or removal of furniture, fixtures or other property or by the performance by Tenant, or its subtenant or assignee, of any alterations or other work in the Premises, or when necessitated by the acts, omission, misuse, neglect or improper conduct of Tenant, its assignee or subtenant, or its or their agents, employees, contractors or invitees or the use or occupancy or manner of use or occupancy of the Premises other than in accordance with the terms of this Lease. All of said repairs and any restorations or replacements required in connection therewith shall be of a quality and class at least equal to the original work or installations and shall be done in a good and workmanlike manner to the satisfaction of Landlord. By way of example only, Tenant shall be responsible for the maintenance and repair of (i) the electrical system serving the Premises from (but not including) the buss duct disconnect switch on each floor, (ii) the plumbing and sanitary systems and installations serving the Premises from the points of connection to (but not including) the main vertical risers and stacks of the Building, including any private bathroom facilities, but excluding the core bathrooms (including all fixtures therein) which shall be maintained and repaired by Landlord, at Landlord's expense, and (iii) the sprinkler system

serving the Premises from the point of connection to (but not including) the tamper and flow valves. In no event may Tenant have access to or the right to use, modify or repair telephone or electrical closets.

(c)    Notwithstanding anything to the contrary set forth in Section 6.1 all damage or injury to the Building Systems, the Building, or the Premises caused by or resulting from the negligence, willful misconduct, breach of contract or violation of Legal Requirements of, or from Alterations made by, Tenant or any Tenant Party, shall be repaired at Tenant's expense, (i) by Tenant, subject to Article 4 hereof, to the reasonable satisfaction of Landlord (if the required repairs are non-structural and do not affect any Building System), or (ii) by Landlord at Tenant's sole cost and expense (if the required repairs are structural or affect any Building System). All of such repairs shall be of quality or class equal to the original work or construction.

(d)    If repairs or replacements are required to be made by Tenant pursuant to the terms hereof, Landlord may demand that Tenant make the same forthwith, and (except in cases of emergency, where no notice or demand shall be required) if Tenant refuses or neglects to commence such repairs or replacements within ten (10) days after such written demand or to complete the same with reasonable diligence thereafter, Landlord may (but shall not be required to do so) make or cause such repairs or replacements to be made and shall not be responsible to Tenant for any loss or damage that may accrue to Tenant's stock or business by reason thereof. If Landlord makes or causes such repairs or replacements to be made, Tenant agrees that Tenant will forthwith, on demand, pay to Landlord as Additional Rent the cost thereof, together with interest thereon at the Applicable Rate.

Section 6.2    Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot which such floor was designed to carry (unless Tenant has installed suitable reinforcement, subject to the provisions of Article 4). If any safe, heavy equipment, business machines, freight, bulky matter or fixtures to be moved into or out of the Building requires special handling, Tenant shall give Landlord reasonable prior notice thereof and shall employ only persons holding a Master Rigger's license to do such work.

Section 6.3    Except as may be expressly provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in or to fixtures, appurtenances or equipment thereof. Landlord shall use reasonable efforts (which shall not include the use of overtime or premium labor other than in the case of imminent danger to life or property) to minimize interference with Tenant's access to and use and occupancy of the Premises in making any repairs, alterations, additions or improvements and shall perform all work and repairs diligently and in a workerlike manner and in compliance with Legal Requirements.

Section 6.4    Except as otherwise provided herein, in the event that (a) Tenant is unable to use 10% or more contiguous Rentable Square Feet of the Premises for the ordinary conduct of Tenant's business due to Landlord's breach of an obligation under this Lease to provide services or perform repairs in each case other than as a result of Unavoidable Delays or Tenant Delay (each, an "Interruption") and such condition continues for a period in excess of fifteen (15) consecutive days, subject to Tenant Delay or Unavoidable Delays, after Tenant gives a notice to Landlord (the "Abatement Notice") stating that Tenant's inability to use the Premises or such portion thereof is solely due to such Interruption, (b) Tenant does not actually use or occupy the Premises or such portion thereof during such period, and (c) such condition has not resulted from the negligence, willful misconduct, breach of contract, violation of the provisions of this Lease beyond any applicable notice and cure period or violation of law of Tenant or any Tenant Party, then, unless Landlord shall have either (i) advised Tenant that it disputes the matters set forth in the Abatement Notice in which case no abatement of Fixed Rent, Tenant's Tax Payment shall

occur until such dispute is resolved or (ii) commenced to cure such Interruption within such fifteen (15) day period (subject to any Tenant Delay or Unavoidable Delays) after delivery of the Abatement Notice and thereafter proceeds with due diligence to cure such Interruption, Fixed Rent, Tenant's Tax Payment shall be abated as to the Premises or such affected portion of the Premises on a per diem basis for the period commencing on the sixteenth (16th) day (subject to any Tenant Delay and Unavoidable Delays) after Tenant gives the Abatement Notice, and ending on the earlier of (x) the date Tenant reoccupies the Premises or such portion thereof for the ordinary conduct of its business, or (y) the date on which such Interruption is substantially remedied and Landlord has notified Tenant in writing thereof. The abatement set forth in this Section 6.4 shall be Tenant's sole and exclusive remedy in the event of any Interruption, and Tenant hereby expressly waives any claims that Tenant may otherwise have in law or equity with respect to any Interruption.

Section 6.5    Tenant shall clean the windows in the Premises on a commercially reasonable basis, provided that Tenant shall not require, permit, suffer or allow the cleaning of any window in the Premises from the outside in violation of Section 202 of the New York Labor Law or any successor statute thereto, or of any other Legal Requirement.

Section 6.6    In order for Landlord and Tenant to (a) identify any wiring or cabling installed by or on behalf of Tenant in any portion of the Premises or in any other portions of the Building and/or (b) trace the starting and terminating points of such wiring and cabling, Tenant shall cause such wiring and cabling to be labeled and tagged, when installed, with appropriate identification marks and shall maintain, during the Term for all then existing wiring and cabling, "as installed" drawings containing a guide or key to such marks and showing the routing of such wiring and cabling. Upon Landlord's request, Tenant shall provide to Landlord and Landlord's representatives and contractors reasonable access to such "as installed" drawings for inspection and copying.

ARTICLE 7

REAL ESTATE TAXES AND ADDITIONAL RENT

Section 7.1    For the purposes of this Article 7, the following terms shall have the meanings set forth below:

(a)    "Taxes" shall mean the aggregate amount of (i) all real estate taxes, assessments (special or otherwise), sewer and water rents, rates and charges and any other governmental levies, impositions or charges, whether general, special, ordinary, extraordinary, or foreseen or unforeseen, which may be assessed, levied or imposed upon all or any part of the Real Property, giving effect to any and all abatements, refunds, reductions, credits and the like, including payments in lieu of taxes pursuant to any agreement between Landlord and any Governmental Authority and (ii) any reasonable expenses (including reasonable attorneys' fees and disbursements and experts' and other witnesses' fees) incurred in contesting any of the foregoing or the Assessed Valuation of all or any part of the Real Property. If at any time after the date hereof the methods of taxation prevailing at the date hereof shall be altered so that in lieu of or as an addition to or as a substitute for the whole or any part of the taxes, assessments, rents, rates, charges, levies or impositions now assessed, levied or imposed upon all or any part of the Real Property, there shall be assessed, levied or imposed (A) a tax, assessment, levy, imposition or charge based on the rents received therefrom whether or not wholly or partially as a capital levy or otherwise, (B) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon all or any part of the Real Property and imposed upon Landlord, (C) a license fee measured by the rentals from the Real Property, or (D) any other tax, assessment, levy, imposition, charges or license fees imposed on the Real Property or the rentals therefrom, then all such taxes, assessments, levies, impositions, charges or license fees or the part thereof so measured or based shall be deemed to be Taxes; provided, however, that any

such taxes, assessments, levies, impositions, fees, charges or like amounts which are in "addition to" taxes otherwise payable under this Article 7 shall only be deemed Taxes if such amounts shall generally be treated in other Comparable Office Buildings as constituting real estate taxes for the purpose of calculating similar lease tax escalation provisions. The amount of any new tax, fee or charge which is includable as Taxes, as aforesaid, shall be calculated on the basis that the Real Property is the only asset of Landlord. Taxes shall in no event include (1) any income, franchise, transfer, estate, succession, excise, occupancy, capital gains, mortgage recording or transfer taxes or (2) any penalties or late charges imposed against Landlord or any Mortgagee or Superior Lessor with respect to Taxes; provided that to the extent that such penalties or late charges are incurred by Landlord as a result of a failure by Tenant to pay any installment of any Tenant's Tax Payment in a timely manner in accordance with Section 7.2(a), Tenant shall pay to Landlord the amount of such penalties or late charges for which Tenant is responsible within thirty (30) days after written demand therefor by Landlord with interest at the Applicable Rate from the date such penalty or late charges were incurred by Landlord until reimbursed by Tenant. If pursuant to any Legal Requirement, any amount that is included in Taxes may be divided and paid in installments (whether or not interest shall be due thereon), then (x) such amount shall be deemed to have been so divided and to be payable in the maximum number of installments permitted by Legal Requirements to be paid, and (y) there shall be deemed included in Taxes for each Tax Year only the installments of such amount deemed to be payable during such Tax Year.

(b)    "Tenant's Share of Taxes" means one and 15/100 percent (1.15%). Tenant's Share of Taxes shall not be increased or decreased during the Term, other than to reflect the incorporation of additional space into the Premises or the Building, or the removal of any space from the Premises or the Building, whether pursuant to any exercise of any of Landlord's or Tenant's rights expressly provided herein or otherwise.

(c)    "Assessed Valuation" means the amount for which the Real Property is or will become assessed when applicable pursuant to applicable provisions of the New York City Charter and of the Administrative Code of The City of New York for the purpose of imposition of Taxes.

(d)    "Tax Year" shall mean each period from July 1 through June 30 (or such other fiscal period as may hereafter be adopted by The City of New York as the fiscal year for any tax, levy or charge included in Taxes), any part or all of which occurs during the Term.

(e)    "Landlord's Statement" shall mean a written notice from Landlord to Tenant containing (i) any other amounts paid or payable for any calendar year by Tenant to Landlord as Additional Rent or otherwise, and (ii) Taxes and Tenant's Tax Payment.

Section 7.2    (a)    Tenant shall pay, in accordance with this paragraph, as Additional Rent, for each Tax Year (all or any part of which falls within the Term), an amount ("Tenant's Tax Payment") equal to the product of (i) the amount, if any, by which Taxes for such Tax Year exceed the Base Taxes multiplied by (ii) Tenant's Share of Taxes. Estimated payments by Tenant on account of Taxes shall be made on the first (1st) day of each and every calendar month during the Term, and otherwise in the same fashion herein provided for the payment of Fixed Rent. The monthly amount so to be paid to Landlord shall be sufficient to provide Landlord by the time Taxes are due a sum equal to Tenant's required payments, as estimated by Landlord from time to time, on account of Taxes for the then current Tax Year. Promptly after receipt by Landlord of bills for such Taxes (a "Tax Bill"), Landlord shall advise Tenant of the amount thereof and the computation of Tenant's payment on account thereof. Tenant's Tax Payment for each Tax Year shall, at Landlord's option, be payable on a monthly basis as provided above, or at such other time as Landlord shall render a statement therefor. If upon issuance of a Tax Bill for the Real Property for any calendar year, the estimated amount resulted in (i) an underpayment by Tenant, Tenant shall pay to Landlord the amount of the underpayment within thirty (30) days after written notice from

Landlord or (ii) an overpayment by Tenant, Landlord shall, at its option, either pay to Tenant or apply a credit against the next installments of Additional Rent under this Lease in the amount of the overpayment within thirty (30) days after receipt of the Tax Bill, and if any such credit remains outstanding as of the Expiration Date, Landlord will pay the amount thereof to Tenant within thirty (30) days thereafter. Each of the parties' respective obligations hereunder in the case of overpayment or underpayment shall survive the Expiration Date. Landlord's Statement with respect to Taxes to be rendered by Landlord shall set forth in reasonable detail the computation of Tenant's Tax Payment for the particular installment(s) being billed, and, if Landlord shall have received the relevant Tax Bill rendered with respect to the Real Property at such time, shall accurately reflect such Tax Bill or, if Landlord shall not have received such Tax Bill at such time, shall reflect Landlord's reasonable and good faith estimate of such installment(s) being rendered. A copy of the relevant Tax Bill shall accompany each Landlord's Statement in respect of Taxes (if Landlord shall have received such Tax Bill at the time such Landlord's Statement in respect of Taxes is delivered to Tenant). If Landlord shall not have received the relevant Tax Bill at the time any Landlord's Statement in respect of Taxes is delivered to Tenant, Landlord shall deliver to Tenant, reasonably promptly after receipt thereof by Landlord, a copy of such Tax Bill, together with a statement setting forth the amount (if any) of any overpayment or underpayment by Tenant with respect to Tenant's Tax Payment paid by Tenant in accordance with such Landlord's Statement in respect of Taxes and the appropriate party shall pay to the other party the amount of such overpayment or underpayment as set forth in this Section 7.2(a).

(b)     If the Taxes payable for the Base Tax Year are at any time reduced by final determination of legal proceedings, settlement or otherwise, then the Base Taxes shall be correspondingly reduced. In such event, the Additional Rent theretofore paid or payable on account of Tenant's Tax Payment under this Lease for all calendar years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord any deficiency between the amount of such Additional Rent theretofore computed and paid by Tenant to Landlord and the amount thereof due as a result of such recomputations. Any such deficiency shall be deemed Additional Rent and shall be payable by Tenant to Landlord within thirty (30) days after being billed therefor.

(c)     If at any time during the Term, Taxes, or any other component of Additional Rent hereunder is required to be paid to the appropriate taxing authorities or other payees on any other date or dates than as presently required, or if any Mortgagee or Superior Lessor requires that such payments be paid to it on another date or dates than set forth herein, then upon notice from Landlord of such revised payment dates, Tenant's payments for such amounts shall be correspondingly accelerated or revised so that such payments are due at least fifteen (15) days prior to the date payments are due to the taxing authorities, Mortgagee, Superior Lessor or other payees.

(d)     Only Landlord shall be eligible to institute Tax reduction or other proceedings to reduce the Assessed Valuation of the Real Property (any such proceeding, a "Tax Proceeding"), and the filing of any Tax Proceeding by Tenant without Landlord's prior consent shall constitute a default hereunder. At Tenant's request from time to time (but not more often than twice in any calendar year), Landlord will inform Tenant within ten (10) Business Days whether or not Landlord has instituted a Tax Proceeding, or whether Landlord then agrees to do so. If Landlord shall receive a refund or reduction of Taxes for any calendar year for which Tenant pays Taxes, Landlord at Landlord's option, shall, within thirty (30) days after such refund is actually received or such credit is actually applied against Taxes then due and payable, either pay to Tenant or credit against the next installments of Additional Rent an amount equal to Tenant's share of the net refund or reduction (after giving effect to any fee or contingency payment owed by Landlord to any Person as a result of such refund or reduction to the extent not already paid by Tenant pursuant to Section 7.1(a)), provided that such amount shall not exceed Tenant's Tax Payment paid for such calendar year. Except as set forth in this Section 7.2(d), nothing herein contained

shall obligate Landlord to file any application or institute any proceeding seeking a reduction in Taxes or Assessed Valuation.

(e)     Tenant's Tax Payment shall be made as provided in this Section 7.2 regardless of the fact that Tenant may be exempt, in whole or in part, from the payment of any Taxes by reason of Tenant's diplomatic or other tax exempt status or for any other reason whatsoever.

(f)     If after the Effective Date, The City of New York shall enact a tax in substitution for the New York City Commercial Rent or Occupancy Tax in effect on the date of this Lease, and such substitute tax shall be payable in the first instance by Landlord, then Tenant shall reimburse Landlord, as Additional Rent within thirty (30) days after demand, for the amount of such tax payable by Landlord in respect of this Lease.

(g)     In the case of a calendar year or a Tax Year, as applicable, only a fraction of which falls within the Term (the fractional representation that the portion of the Term in such calendar year or Tax Year, as applicable, bears to such calendar year or Tax Year, as applicable, being hereinafter referred to as the "Partial Year Fraction"), Tenant's Tax Payment shall be equal to that amount by which (i) Taxes for such calendar year or Tax Year, as applicable, multiplied by the Partial Year Fraction exceeds (ii) Base Taxes multiplied by the Partial Year Fraction. In the event of a termination of this Lease, any Additional Rent under this Section 7.2 shall be paid or adjusted within thirty (30) days after submission of Landlord's Statement, provided that Tenant shall not be required to pay to Landlord the portion of any Taxes which are allocable to the period following the Expiration Date. Landlord agrees to render a Landlord's Statement with respect to Taxes as soon as reasonably practicable following the termination of this Lease, but in no event later than thirty (30) days after the Expiration Date. In no event shall Fixed Rent ever be reduced by operation of this Section 7.2 and the rights and obligations of Landlord and Tenant under the provisions of this Section 7.2 with respect to any Additional Rent shall survive the Expiration Date.

Section 7.3     The provisions related to ICAP, ICIP and/or any other Incentive Programs set forth in Section 7.7 hereof shall not be included in and shall not affect Tenant's Tax Payment and/or the Base Taxes, including, without limitation, the amount of any refund, abatement or exemption of Taxes, if any, received by or credited to Landlord pursuant to the ICAP, ICIP and/or any other Incentive Programs.

Section 7.4     The computations of Additional Rent under this Article 7 are intended to constitute an actual reimbursement to Landlord for increases over a base amount of Taxes, and other costs and expenses paid by Landlord with respect to the Real Property as to which Tenant has agreed to reimburse Landlord under this Lease.

Section 7.5     (a)     Landlord's failure to render a Landlord's Statement with respect to any payment period shall not prejudice Landlord's right to thereafter render a Landlord's Statement with respect thereto or with respect to any subsequent payment period, nor shall the rendering of a Landlord's Statement prejudice Landlord's right to thereafter render a corrected Landlord's Statement for that payment period. Nothing herein contained shall restrict Landlord from issuing a Landlord's Statement at any time there is an increase in Taxes during any payment period or any time thereafter.

(b)     Each Landlord's Statement (including any corrected Landlord's Statement) sent to Tenant shall be conclusively binding upon Tenant unless Tenant shall within one hundred eighty (180) days after such Landlord's Statement is sent, send a notice to Landlord stating that Tenant desires to examine Landlord's books and records relating to Taxes and/or other Additional Rent; provided, however, that in the event that Tenant examines Landlord's books and records, Tenant shall comply with any confidentiality requirements reasonably imposed by Landlord. Tenant covenants and agrees that

Tenant will not employ, in connection with such examination, any Person who is to be compensated, in whole or in part, on a contingency fee basis. If Tenant sends such notice, Tenant may elect to have Tenant's certified public accountant examine, at Landlord's office or at such other location in the Borough of Manhattan and/or Queens as Landlord may reasonably designate, such of Landlord's books and records as are relevant to the Landlord's Statement in question (the "Operating Records"), which shall include the books and records relating to Taxes and/or other Additional Rent for the calendar year preceding the calendar year in question and the calendar year in question but not with respect to any prior years.

(c)     In the event that Tenant, after examining the Operating Records (but in no case more than one hundred eighty (180) days after the date on which Landlord shall have delivered the Landlord's Statement to Tenant, disputes the Landlord's Statement, then Tenant may send a notice ("Tenant's Statement") to Landlord specifying in reasonable detail the basis for Tenant's disagreement and the amount of Tenant's Tax Payment and/or Additional Rent, as applicable, Tenant claims is properly due to Landlord. If Tenant shall not give such Tenant's Statement within such one hundred eighty (180) day period, then Landlord's Statement shall be conclusive and binding upon Tenant and Tenant shall be deemed to have waived any further rights to pursue such dispute. Notwithstanding the foregoing provisions of this Section 7.5(c), Tenant, pending the resolution of any contest pursuant to the terms hereof shall continue to pay all sums as determined to be due in the first instance by Landlord's Statement. Upon the resolution of such contest, suitable adjustment shall be made in accordance therewith within thirty (30) days of such resolution, and the amount of the overpayment shall be paid by Landlord to Tenant (or credit allowed Tenant against Fixed Rent and Additional Rent becoming due); provided, however, if after Tenant's review, the examination shows that Landlord overstated the Tax Payment or Additional Rent for the subject year by more than five percent (5%), then Landlord shall pay all costs and expenses of Tenant's Review. Tenant's payment of any Tenant's Tax Payment and/or Additional Rent, as applicable, shall not preclude Tenant from later disputing the correctness of any Landlord's Statement if done in accordance with and within the time frames so set forth in this Section 7.5.

Section 7.6     Notwithstanding anything to the contrary contained in this Lease, it is not the intention of Landlord or Tenant to obligate Tenant to make the same payment more than once, and accordingly, if the provisions of this Lease require any duplicative payments to be made by Tenant to Landlord, then Tenant shall only have the obligation to make such payment once.

Section 7.7     If Landlord has and/or should Landlord, in its sole discretion, elect to apply for benefits under the Industrial & Commercial Abatement Program (the "ICAP"), Industrial & Commercial Incentive Program (the "ICIP"), and/or any other incentive programs in which Landlord shall, in its discretion, elect to participate (collectively, the "Incentive Programs"), the parties hereto agree that:

(a)     Tenant shall, in order to assist Landlord in obtaining any incentives, abatements, exemptions, subsidies, energy discounts, refunds or payments that may be available to Landlord in connection with the Incentive Programs with respect to the entire Building or any portion thereof, including, without limitation, the Premises, (i) promptly execute and file any necessary applications, certifications or other documents, and (ii) follow all required procedures within any applicable time limitations, and Tenant shall provide Landlord with such further cooperation as may reasonably be requested by Landlord.

(b)     Tenant and Landlord hereby acknowledge that, notwithstanding anything to the contrary contained herein, all or any portion of the benefit from any such Incentive Programs actually received by or credited to Landlord in connection with this Lease and any amounts that shall be required

to be forwarded to Tenant pursuant to such Incentive Programs shall be the property of Landlord (regardless of whether or not such benefits are larger or smaller than anticipated).

(c)    Notwithstanding anything to the contrary contained herein or in the Incentive Programs, Landlord has made no representations to Tenant with respect to the Incentive Programs, and Landlord shall have no liability or responsibility to Tenant if all or any portion of any benefits from any Incentive Programs are not received by or credited to Landlord or are received by or credited to Landlord and are thereafter revoked for any reason.

(d)    With respect to any Alterations, and in connection with Landlord's ICAP application, Tenant, at its sole cost and expense, shall be obligated to timely and fully comply with the requirements of (i) Executive Order No. 159; (ii) Executive Order No. 108 of 1986; (iii) Section 11-260 of the Administrative Code of the City of New York; (iv) [reserved]; (v) the New York City Charter; and (vi) any amendments or modifications thereto or other additional or successor executive orders, statutes, rules or regulations bearing on Landlord's ICAP application.  Such compliance shall include the filing with the Department of Labor Services ("DLS") of Construction Employment Reports, Supply and Service Construction Employment Reports, Less Than $750,000 Subcontract Certificates, and certified payroll records.  Tenant shall also be solely responsible for the compliance of any contractor, subcontractor, consultant, agent or party employed by Tenant in connection with Alterations.  Copies of all such filings shall be sent by Tenant to Landlord.  Tenant, as well as any contractor, subcontractor, construction manager, general contractor, consultant, agent or any party employed by Tenant in connection with any Alterations, shall cooperate with Landlord and shall supply such information and comply with such reporting requirements as Landlord indicates to Tenant are reasonably necessary to comply with the ICAP, and Tenant shall assist Landlord in connection with maintaining its eligibility under the ICAP.  Tenant also agrees that at the commencement of any Alterations, and as such Alterations progress, Tenant (or its agent) shall provide Landlord with the names of all contractors or subcontractors retained by Tenant with respect to the Alterations, as well as the dollar value of each contract or subcontract.  Tenant further agrees that with respect to any contractors performing work pursuant to a contract with a value of $1,000,000 or more or subcontractors performing work pursuant to a subcontract with a value of $750,000 or more, a retainage in the amount of ten percent (10%) of the value of said contract or subcontract shall be withheld until DLS gives written approval that final payment may be released to said contractor or subcontractor.

(e)    It is further understood and agreed that (in order to enable Landlord to comply with certain requirements of the ICAP and/or ICIP, as applicable, which may currently be in effect):

(1)    Landlord is seeking or has obtained benefits under the ICAP and/or ICIP, as applicable;

(2)    Tenant agrees to report to Landlord the number of workers permanently engaged in employment in the Premises, the nature of each worker's employment and the New York City residency of each worker; and

(3)    Tenant agrees to provide access to the Premises by employees and agents of the New York City Department of Finance at all reasonable times as may be requested by Landlord.

(f)    Landlord shall, at Tenant's expense, (i) cooperate with the Tenant, in filing an application(s) for the Commercial Expansion Program, the Commercial Revitalization Program, the Relocation Employee Assistance Program ("REAP") and any other similar benefit program(s) applied for or with the City of New York or its agencies which programs are intended to be for the benefit of tenants and not landlords (but explicitly excluding the ICAP, ICIP and similar programs); (ii)  certify as to the

statements set forth in Exhibit G attached hereto in connection with such applications and other forms, and (iii) provide copies of other documents and other forms that Tenant may reasonably require in order to complete such applications.

## ARTICLE 8

## LEGAL REQUIREMENTS

Section 8.1    (a)    Tenant, at its sole expense, shall comply with all Legal Requirements applicable to (i) the Premises, or (ii) the use and occupancy thereof by Tenant to the extent in each case arising from (A) Tenant's particular manner of use or the manner of conduct of Tenant's business in the Premises or the operation by Tenant of its installations, equipment or other property therein, where such manner of use, conduct or operation shall be reasonably distinguishable from the ordinary use, conduct or operation of a business using the Premises for ordinary office purposes other than the ancillary uses permitted hereunder (it being agreed that to the extent any Legal Requirement becomes applicable to any Special Use Area or to any ancillary use, then the obligation to comply with such Legal Requirements shall be deemed to have arisen by reason of Tenant's particular manner of use of the Premises), or (B) any Alterations performed by or on behalf of Tenant; and Tenant shall make all repairs or Alterations required thereby, whether structural (in which event all such repairs or Alterations shall be performed by Landlord and the reasonable cost thereof shall be paid by Tenant) or nonstructural, ordinary or extraordinary.

(b)    Tenant may not occupy any Special Use Area unless and until Tenant shall have obtained any and all licenses and permits required for such use.  Tenant shall not do or permit to be done any act or thing upon the Premises or the Building by any Tenant Party which will invalidate or be in conflict with any reasonable requirements of Landlord's insurance policies and shall not do or permit anything to be done in or upon the Premises, or use the Premises in a manner, or bring or keep anything therein, which shall increase the rates for casualty or liability insurance applicable to the Building. If, as a result of any act or omission by Tenant or by reason of Tenant's failure to comply with the provisions of this Article 8, the insurance rates for the Building shall be increased, then Tenant shall, after notice from Landlord, desist from doing or permitting to be done any such act or thing and shall reimburse Landlord, as Additional Rent, for that part of all insurance premiums thereafter paid by Landlord which shall have been charged because of such act, omission or failure by Tenant, and shall make such reimbursement within thirty (30) days after written demand by Landlord.

Section 8.2    Tenant, at its expense, after notice to Landlord, may contest by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Premises or Tenant, of any Legal Requirement, provided that: (a) Landlord shall not be subject to criminal penalty or to prosecution for a crime, or any other fine or charge (unless Tenant pays such fine or charge and any interest accrued thereon, in each case, on or prior to the due date therefor), nor shall the Premises or any part thereof or the Real Property or any part thereof be subject to being condemned, forfeited, defeased, encumbered or vacated by reason of non-compliance or otherwise by reason of such contest; (b) no unsafe or hazardous condition, relating to such contest, then exists in the Premises which remains unremedied; (c) such non-compliance or contest shall not constitute or result in any default under any Superior Lease or Mortgage, or if any such Superior Lease and/or Mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by Landlord, and the applicable Mortgagee or Superior Lessor shall so require, then such action shall be taken and such security shall be furnished at the expense of Tenant; (d) such non-compliance or contest shall not prevent Landlord from obtaining any and all permits and licenses then required under applicable Legal Requirements in connection with the operation of the Building; (e) no insurance policy carried in respect of the Building by Landlord is cancelled and no premium for any such policy is increased by reason of such non-compliance or such contest; (f) intentionally omitted; and (g) Tenant shall keep Landlord advised as to the status of such

proceedings, including any settlement thereof. Tenant agrees to indemnify, defend and save Landlord harmless, in accordance with the provisions of Article 29, from and against any loss, liability, damage or expense arising out of any such deferral of compliance or contest, including, without limitation, reasonable attorneys' fees and disbursements and other expenses reasonably incurred by Landlord. Landlord agrees to execute any documents reasonably required by Tenant in order to permit Tenant effectively to carry on any such contest, provided Landlord is not thereby subjected to any cost or expense not reimbursed by Tenant or exposed to any material liability or material obligation on account thereof.

Section 8.3    Landlord shall, at its expense, comply with all Legal Requirements with respect to the Common Areas, but may defer compliance so long as Landlord shall be contesting the validity or applicability thereof in good faith so long as such contest does not unreasonably interfere with Tenant's access to or use of the Premises and Landlord shall indemnify Tenant for actual damages sustained by Tenant as a result of Landlord's gross negligence or willful misconduct in Landlord's delayed complying with Legal Requirements with respect to the Common Areas.

Section 8.4    (a)    Neither Landlord nor Tenant shall cause or permit any Hazardous Substances to be used, transported, stored, released, handled, produced or installed in, on or from the Premises or the Building other than in connection with (i) materials and supplies typically and lawfully used in connection with the performance of Alterations and by Landlord as part of Landlord's Work and (ii) the use, operation, and maintenance of the Premises for the Permitted Uses, provided in each case that the same are used, handled and stored in compliance with all applicable Environmental Laws and all other Legal Requirements. In the event of a violation of any of the foregoing provisions of this Section 8.4, Landlord may, without notice and without regard to any grace or cure period contained elsewhere in this Lease, take all remedial action deemed necessary to correct such condition, and Tenant shall reimburse Landlord for the cost thereof, within thirty (30) days after demand therefor.

(b)    Each party, in accordance with Article 29 of this Lease, shall indemnify and hold the other party harmless from and against any loss, liability, damages and costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) that the other party may at any time suffer by reason of the indemnifying party's using, transporting, storing, releasing, handling, producing or installing any Hazardous Substances in, on or from the Premises, the Building or the Land. Further, neither Tenant nor any of Tenant's employees, agents, officers, contractors, directors and shareholders shall be liable or responsible for any (i) Hazardous Substances existing in, on, under or about the Premises, the Building or the Land prior to the date on which Landlord tenders possession of the Premises to Tenant unless directly or indirectly caused by Tenant, including disturbance or exacerbation of any Hazardous Substances, or (ii) migration of Hazardous Substances in, under or about the Building or the Land at any time from any source unless directly or indirectly caused by Tenant, its employees, agents, contractors and Parties.

## ARTICLE 9

## SUBORDINATION AND NON-DISTURBANCE; ESTOPPEL CERTIFICATES

Section 9.1    This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all Mortgages and Superior Leases and to any amendments, modifications and renewals thereof, and no further instrument of subordination shall be required. Tenant shall promptly execute and deliver any instrument that Landlord or any Superior Lessor or Mortgagee or Governmental Authority may request to evidence such subordination.

Section 9.2    (a)    In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease (other than

pursuant to Sections 12.1, 12.2(b) or 13.2), or to claim a partial or total eviction, Tenant shall give each Mortgagee and Superior Lessor whose name and address shall previously have been furnished to Tenant in writing, notice of such act or omission.  If Landlord fails to cure such act or omission within the time provided for in this Lease, then each such Mortgagee or Superior Lessor shall have an additional sixty (60) days after receipt of such notice within which to cure such act or omission or if such act or omission cannot be cured within that time, then such additional time as may be necessary if, within such sixty (60) days, any such Mortgagee or Superior Lessor has notified Tenant of its intention to cure such act or omission and has commenced and is diligently pursuing the remedies necessary to cure such default (including, without limitation, commencement of foreclosure proceedings or eviction proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated and Tenant shall not exercise any other rights or remedies under this Lease or otherwise while such remedies are being so diligently pursued.

　　　　(b)　　Tenant shall not withhold its consent to any reasonably requested modifications to this Lease, requested by any Mortgagee, provided that such Lease modification shall not decrease Landlord's obligations under this Lease (except to a *de minimis* extent) or increase Tenant's obligations under this Lease (except to a *de minimis* extent).

　　Section 9.3　　If a Mortgagee or Superior Lessor shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, then at the request of such party so succeeding to Landlord's rights ("Successor Landlord"), Tenant shall attorn to and recognize Successor Landlord as Tenant's landlord under this Lease, and shall promptly execute and deliver any instrument that Successor Landlord may reasonably request to evidence such attornment. Upon such attornment this Lease shall continue in full force and effect as, or as if it were, a direct lease between Successor Landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this Lease and shall be applicable after such attornment except that, subject to the terms of any Non-Disturbance Agreement, Successor Landlord (unless such Successor Landlord shall be an Affiliate of Landlord) shall not:

　　　　(i)　　be liable for any previous act or omission of Landlord under this Lease (it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of Landlord);

　　　　(ii)　　be subject to any offset or defenses that Tenant may have against Landlord, which shall have theretofore accrued to Tenant against Landlord;

　　　　(iii)　　be bound by any previous material modification of this Lease entered into after Tenant has been notified of the existence and identity of such Mortgagee or Superior Lessor and of its address for notices, not expressly provided for in this Lease, or by any previous prepayment of more than one month's Fixed Rent, unless such material modification or prepayment shall have been expressly approved in writing by such Mortgagee or Superior Lessor; or

　　　　(iv)　　be bound by any obligation to perform any work or to make improvements to the Premises.

Section 9.4        Landlord agrees to request, and use commercially reasonable efforts to obtain, an agreement from any Superior Lessor or Mortgagee in recordable form and in substance then customarily adopted by such Superior Lessor or Mortgagee, to the effect that, in the event of any termination or foreclosure by such Superior Lessor or Mortgagee, so long as Tenant is not in default in the payment of any Rent and so long as no Event of Default shall be continuing, (i) its rights as Tenant under this Lease shall not be affected or terminated, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) unless otherwise required by applicable Legal Requirements, no action or proceeding shall be commenced against Tenant and (iv) the Lease shall continue in full force and effect, all notwithstanding the foreclosure or termination of any Superior Lease or Mortgage. Tenant hereby agrees that making one request to such Superior Lessor or Mortgagee in writing (and one follow up request in writing if such Superior Lessor or Mortgagee fails to respond to the initial request) shall be deemed "commercially reasonable efforts" for purposes of this Section 9.4.

Section 9.5        Each party agrees, at any time and from time to time, as reasonably requested by the other party, upon not less than fifteen (15) days' prior notice, to execute and deliver to the other a written statement executed and acknowledged by an appropriate individual representing such party (a) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (b) setting forth the then Fixed Rent and Additional Rent, (c) setting forth the date to which the Fixed Rent and Additional Rent have been paid, (d) stating whether or not, to the best knowledge of the signatory, the other party is in default under this Lease, and if so, setting forth the specific nature of all such defaults, (e) stating the amount of the Security Deposit, if any, held by Landlord under this Lease, (f) stating whether there are any subleases affecting the Premises, (g) stating the address of the person to which all notices and communication under this Lease shall be sent, (h) stating the Commencement Date, the Rent Commencement Date and the Expiration Date, (i) [omitted], (j) [omitted], (k) stating what portion of the Premises Tenant is in possession and occupancy of pursuant to this Lease, (l) stating whether any construction or similar milestones set forth in this Lease have been met, and (m) as to any other matters reasonably requested by the party requesting such certificate. The parties acknowledge that any statement delivered pursuant to this Section 9.5 may be relied upon by any purchaser or owner of all or any portion of the Real Property or the Building, or of Landlord's interest (directly or indirectly) in the Real Property or the Building or any Superior Lease, or by any Mortgagee or Superior Lessor, or by any purchaser of the interest of any Mortgagee or Superior Lessor (directly or indirectly) in all or any portion of the Real Property or the Building, or by any prospective or actual sublessee of the Premises or assignee of this Lease, or permitted transferee of or successor to Tenant.

ARTICLE 10

SERVICES

Section 10.1        Electricity.

(a)        Landlord shall make electricity available to the Premises. Tenant acknowledges that electricity shall be furnished to the Premises on a "submetering" basis, which may be effectuated by Landlord through one or more submeters servicing at the Premises and currently installed, or shall be installed, therein at Landlord's sole cost. Tenant shall pay to Landlord, as Additional Rent, on demand, from time to time, but no more frequently than monthly, for its use of electrical energy in the Premises, based upon both consumption and demand factors, at the seasonally adjusted rate then payable by Landlord to the utility company plus seven percent (7%) of the bill for such electricity services as Landlord's charge for (i) a reimbursement for out-of-pocket expenses incurred by Landlord in connection with the retention of a submetering company or other professionals to monitor and measure Tenant's submeters, and (ii) Landlord's overhead, administration and supervision in connection therewith. In the event more than one (1) meter measures the electric service to Tenant, the electric service rendered

through each meter shall be computed and billed as if one (1) meter measured such electric service. For the purpose of this Section 10.1, the rate to be paid by Tenant in the event of submetering shall include any taxes, energy charges, demand charges, fuel adjustment charges, rate adjustment charges, or other charges imposed in connection therewith. If any tax shall be imposed upon Landlord's receipts from the sale or resale of electrical energy to Tenant by any federal, state, city or local authority, the pro rata share of such tax allocable to the electrical energy service received by Tenant shall be passed on to, included in the bill of and paid by Tenant.

(b)     Except as provided in Section 6.4 above, Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur as a result of the unavailability of or interruption in the supply of electricity to the Premises or a change in the quantity or character or nature of such current and such change, interruption or unavailability shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or any Landlord Party, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

Section 10.2     Heat, Ventilation and Air Conditioning.

(a)     Tenant shall be permitted to use the air conditioning system supplying air-conditioning service to the Premises (the "AC System"), which shall be controlled by Tenant and Tenant shall pay all electric costs associated with the operation of the AC System as part of the charges set forth in Section 10.1(a).

(b)     Landlord shall provide heat to the Premises on Business Days during Business Hours for the period from October 15 – May 1.

(c)     Tenant acknowledges and agrees that the air-conditioning service to the Premises shall be supplied from the AC System to equipment operated, maintained and repaired by Tenant and that Landlord has no obligation to operate, maintain or repair such equipment and/or the AC System. Without limiting the foregoing, except as otherwise expressly set forth herein, throughout the Term, the AC System and all other equipment and facilities related thereto, including, without limitation, the ducts, dampers, grills, ductwork, registers and appurtenances utilized in connection with the supplying air-conditioning to the Premises and other components of the AC System servicing the Premises, shall be maintained and repaired by Tenant in compliance with all Legal Requirements relating thereto at Tenant's sole cost and expense. Landlord shall only be responsible for repairs or replacement of major components of the AC System (other than repairs necessitated by Tenant's negligence or misuse thereof and repairs covered by the service maintenance contract covering the AC System). On the Commencement Date, the existing AC System shall be new and delivered in good working order. Tenant shall pay for all electricity consumed in the operation of the AC System as part of the charges set forth in Section 10.1(a). Tenant shall pay for all parts and supplies necessary for the proper operation of the AC System (except for Landlord's responsibility for repairs or replacement of major components of the AC System) and the restoration or replacement by Tenant of all or any part thereof shall be in quality and class at least equal to the original work and installations; provided, however, that Tenant shall not alter, modify remove or replace the AC System, or any part thereof, without the prior written consent of Landlord. At Tenant's request, Landlord will either assign any available warranties of the AC System to Tenant and/or provide the benefit thereof to Tenant.

(d)     Without limiting the foregoing, Tenant shall, at its own cost and expense, (i) cause all maintenance to be performed to the AC System, (except as otherwise expressly provided in the preceding paragraph (c)) and which are not covered by the warranty on the AC System or which are the

responsibility of Landlord, and (ii) commencing on the Commencement Date, and thereafter throughout the Term, maintain in full force and provide a copy of same to Landlord, an air-conditioning service repair and full service maintenance contract covering the AC System in form reasonably satisfactory to Landlord with an air conditioning contractor or servicing organization reasonably approved by Landlord. All such contracts shall provide for the thorough overhauling of the AC System at least once each year during the Term and shall expressly state that (A) it shall be an automatically renewing contract terminable upon not less than thirty (30) days written notice to Landlord, and (B) the contractor providing such service shall maintain a log at the Premises detailing the service provided during each visit pursuant to the contract. Tenant shall keep such log at the Premises and permit Landlord to review same promptly after Landlord's request. The AC System is and shall at all times remain the property of Landlord, and at the expiration or sooner termination of the Lease, Tenant shall surrender the AC System to Landlord in good working order and condition, subject to normal wear and tear and shall deliver to Landlord a copy of the service log. In the event that Tenant fails to obtain the service contract or perform the maintenance or repairs required hereunder, Landlord shall have the right, but not the obligation, to procure such contract and/or perform such maintenance or repairs and charge the reasonable third party costs thereof to Tenant as Additional Rent plus an administrative fee equal to seven percent (7%) of such costs which shall be payable by Tenant within thirty (30) days after written demand accompanied by appropriate back-up.

Section 10.3    Elevators.

(a)    Landlord shall provide reasonable levels of passenger elevator service to the Premises. Such elevator service shall be subject to such reasonable rules and regulations as Landlord may promulgate from time to time with respect thereto in accordance with Article 27. Landlord shall have the right to temporarily change the operation or manner of operation of any of the elevators in the Building and/or to temporarily discontinue the use of any one or more cars in any of the banks for the purpose of repairing, cleaning, renovating and/or maintaining such cars, provided that one car in every bank will remain in service at all times.

(b)    Landlord shall provide freight elevator facilities to the Premises on a non-exclusive, first-come, first-served basis, on Business Days during Business Hours at no charge to Tenant. Tenant shall only move-in or move-out of the Premises during Overtime Periods. Tenant shall pay, as Additional Rent within thirty (30) days after written demand therefor, all costs reasonably incurred by Landlord to operate the freight elevator and supervise any such move-in or move-out of the Premises in accordance with Landlord's then current rates for the Building, which are currently $90 per hour, subject to increase. Tenant may only use the freight elevator for a minimum of four-hour intervals. Notwithstanding anything to the contrary contained herein, in connection with Tenant's initial move-in to the Premises, upon not less than forty-eight (48) hours' notice to Landlord, Tenant shall be entitled to sixteen (16) hours of freight elevator time at no charge, which must be used in two consecutive 8-hour blocks.

Section 10.4    After Hours Services. The Fixed Rent does not reflect or include any charge to Tenant for the furnishing or distributing of any necessary freight elevator facilities or heat to the Premises during periods other than the hours and days set forth above in this Article 10 for the furnishing and distributing of such services (such other periods being referred to as "Overtime Periods"); provided, however, the foregoing shall not apply to passenger elevator facilities as provided in Section 10.3(a) for use by Tenant for appropriate business purposes as provided in this Lease. Accordingly, if Landlord shall furnish any such freight elevator facilities (other than as required pursuant to Section 10.3(a) hereof) or heat to the Premises at the request of Tenant during Overtime Periods, Tenant shall pay Landlord, as Additional Rent, the costs for such services at the standard rates then fixed by Landlord for the Building. Landlord shall not be required to furnish any such services during any Overtime Periods unless Landlord has received advance notice from Tenant requesting such services at least twelve (12) hours (if requested

by Tenant on Business Days during Business Hours) or at least twenty-four (24) hours (if requested on non-Business Days or outside of Business Hours) prior to the time when such services shall be required and such services shall be subject to reasonable Building requirements and any prior reservations made by other tenants and occupants of the Building.  If Tenant fails to give Landlord such advance notice requesting such services during any Overtime Periods, then, whether or not the Premises are inhabitable during such Overtime Periods, failure by Landlord to furnish or distribute any such services during such Overtime Periods shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business or otherwise.

Section 10.5   Cleaning.

(a)   Tenant, at Tenant's cost and expense, shall keep the Premises clean and in good order to the reasonable satisfaction of Landlord and remove its own refuse and rubbish. Tenant agrees, at Tenant's sole cost and expense, to employ any contractor (including Landlord's personnel or a division of Landlord or affiliates of Landlord), as Landlord may from time to time designate to remove Tenant's refuse and rubbish from the Building, and for cleaning of the Premises, including, without limitation, any waxing, polishing and other maintenance work in the Premises and of Tenant's furniture, fixtures and equipment, provided that the prices charged by said contractor are comparable to the prices charged by other contractors for the same work.  Tenant agrees that it shall not employ any other cleaning and maintenance contractor, nor any individual, firm or organization for such purpose without Landlord's prior written consent.

(b)   If Tenant requires services in excess of those contained in the cleaning contract described above, Tenant shall request same through the cleaning contractor engaged by Landlord and shall be responsible for paying the cost thereof.

(c)   Landlord shall clean the public halls and public portions of the Building that are used as common areas by all tenants.

Section 10.6   Water.  Landlord shall furnish cold water in reasonable quantities for ordinary drinking, lavatory, pantry and cleaning purposes to the Premises.  If Tenant requires, uses or consumes water for any purpose in addition to ordinary lavatory, cleaning and drinking purposes or in amounts materially in excess of normal office usage (it being expressly understood that, without limitation, water required for use in connection with any kitchen, private bathroom or shower is in excess of normal office usage), Landlord may install, at its sole cost, a water meter or meters and thereby measure Tenant's consumption of water for such purposes.  Tenant shall (i) at Tenant's sole cost and expense, keep any such meters and any such installation equipment in good working order and repair, and (ii) pay to Landlord, as Additional Rent, within thirty (30) days after written demand therefor for the water consumed (such charge to be based upon Landlord's then standard rate for such usage).  If Tenant requires any potable water other than for normal office usage and water for use in connection with any kitchen, pantry, private bathroom or shower, then Tenant, subject to and in accordance with the provisions of Article 4 and Article 8 of this Lease, shall provide and install in the Premises, at its sole cost and expense, hot water heating devices necessary to meet such requirements.

Section 10.7   No Warranty of Landlord.  Landlord does not warrant that any of the services to be provided by Landlord to Tenant hereunder, or any other services which Landlord may supply (a) will be adequate for Tenant's particular purposes or as to any other particular need of Tenant or (b) will be free from interruption, and Tenant acknowledges that any one or more such services may be interrupted or suspended by reason of Tenant Delays or Unavoidable Delays.  In addition, Landlord reserves the right

to stop, interrupt or reduce service of the Building Systems by reason of Tenant Delays or Unavoidable Delays, or for repairs, additions, alterations, replacements, decorations or improvements which are, in the judgment of Landlord, necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed.  Landlord shall provide Tenant with such advance written notice as is reasonable under the circumstances of any such stoppage, reduction or interruption.  Landlord shall use commercially reasonable efforts to begin and diligently prosecute to completion such repairs as may be required to machinery or equipment within the Building to provide restoration of any service provided by Landlord hereunder as promptly as reasonably possible and in a manner so as to minimize interference with Tenant's ordinary use and enjoyment of the Premises, and, where the cessation or interruption of such service has occurred due to circumstances or conditions beyond the Real Property boundaries, to cause the same to be restored by diligent application or request to the relevant party or parties.  To the extent reasonably possible, Landlord shall confine all such stoppages (other than a stoppage which would have an insubstantial effect on Tenant's ordinary use and enjoyment of the Premises) within Landlord's reasonable control to times that are not ordinary Business Hours.   Any such interruption or discontinuance of service, or the exercise of such right by Landlord to suspend or interrupt such service shall not entitle Tenant to any compensation or to any abatement or diminution of Fixed Rent or Additional Rent except as provided in Section 6.4 above.  Landlord shall use reasonable efforts to minimize interference with Tenant's access to and use and occupancy of the Premises in making any repairs, alterations, additions, replacements, decorations or improvements; provided, however, that Landlord shall have no obligation to employ contractors or labor at "overtime" or other premium pay rates or to incur any other "overtime" costs or additional expenses whatsoever, unless requested to do so by Tenant.  Tenant will reimburse Landlord, as Additional Rent within thirty (30) days of written demand, for any such overtime or similar costs incurred by Landlord at Tenant's request.  Landlord shall not be required to furnish any services except as expressly provided in this Lease.

    Section 10.8    [Reserved].

    Section 10.9    Access.  Subject to casualty and applicable Legal Requirements, Tenant shall have access to the Premises 24 hours per day, 7 days per week.

    Section 10.10    Security.  Landlord shall employ a security guard to man the Lobby of the Building twenty-four (24) hours per day, seven (7) days per week, subject to Article 12, Article 13 and Legal Requirements.

ARTICLE 11

INSURANCE

    Section 11.1    Commercial General Liability Insurance.  Tenant agrees to maintain in full force on or before the earlier of (i) the date on which any Tenant Party first enters the Premises for any reason or (ii) the Commencement Date throughout the Term, and thereafter, so long as Tenant is in occupancy of any part of the Premises, a policy of commercial general liability insurance with exclusions and exceptions which are commercially reasonable, on an occurrence basis, issued on a form at least as broad as Insurance Services Office ("ISO") Commercial General Liability Coverage "occurrence" form CG 00 01 10 01 or another ISO Commercial General Liability "occurrence" form providing equivalent coverage.  Such insurance shall include coverage for personal injury, bodily injury, death and property damage, products and completed operations (in an amount not less than $2,000,000), personal and advertising injury, operations hazard, broad form contractual liability coverage, specifically covering, but not limited to, the indemnification obligations undertaken by Tenant in this Lease.  The minimum limits of such insurance shall be $5,000,000 per occurrence.  Such insurance will be written as primary policies, not contributing with and not supplemental to the coverage that Landlord may carry.  In addition, in the event

Tenant hosts a function in the Premises, Tenant agrees to obtain, and cause any persons or parties providing services for such function to obtain, the appropriate insurance coverages as determined by Landlord (including liquor liability coverage, if applicable) and provide Landlord with evidence of the same.

Section 11.2   Tenant's Property Insurance. Tenant shall maintain at all times during the Term, and during such earlier time as Tenant may be performing work in or to the Premises or have property, fixtures, furniture, equipment, machinery, goods, supplies, wares or merchandise in the Premises, and containing thereafter so long as Tenant is in occupancy of any part of the Premises, business interruption insurance and insurance against loss or damage covered by property insurance written on an all-risk" form or its equivalent with respect to Tenant's property, fixtures, furniture, equipment, machinery, goods, supplies, wares and merchandise, and all alterations, improvements and other modifications made by or on behalf of the Tenant in the Premises, and other property of Tenant located at the Premises, except to the extent paid for by Landlord (collectively "Tenant's Property"). The business interruption insurance required by this Section 11.2 shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than the Fixed Rent then in effect during any Lease Year, plus any Additional Rent due and payable for the immediately preceding Lease Year. The "all risk" or "special form" insurance required by this Section 11.2 shall be in an amount equal to 100% of the replacement cost value of Tenant's Property. In addition, during such time as Tenant is performing work in or to the Premises, Tenant, at Tenant's expense, shall also maintain, or shall cause its contractor(s) to maintain, builder's risk insurance on an "all-risk" or "special form" basis (including collapse) on a completed value (non-reporting) form for full replacement value of such work incorporated in the Building and all materials and equipment in or about the Premises. Landlord and such additional persons or entities as Landlord may reasonably request, shall be named as loss payees, as their interests may appear, on the policy or policies required by this Section 11.2. In the event of loss or damage covered by the "all risk" or "special form" insurance required by this Section 11.2, the responsibilities for repairing or restoring the loss or damage shall be determined in accordance with Article 12 hereof. If the loss or damage is not repaired or restored (for example, if the Lease is terminated pursuant to Article 12 hereof), the insurance proceeds shall be paid to Landlord and Tenant in the pro rata proportion of their relative contributions to the cost of the leasehold improvements covered by the policy. Landlord shall not be obligated to insure, and shall not assume any liability of risk of loss for, Tenant's Property, Tenant's Work or Alterations, including any such property or work of Tenant's subtenants or occupants. Landlord will also have no obligation to carry insurance against, nor be responsible for, any loss suffered by Tenant, subtenants or other occupants due to interruption of Tenant's or any subtenant's or occupant's business.

Section 11.3   Tenant's Other Insurance. Throughout the Term, Tenant shall obtain and maintain: (1) comprehensive automobile liability insurance (covering any automobiles owned or hired or non-owned vehicles operated by Tenant) issued on a form at least as broad as ISO Business Auto Coverage form CA 00 01 07 97 or other form providing equivalent coverage in an amount not less than $1,000,000 per occurrence and an aggregate limit of at least $1,000,000 and written on an occurrence basis; (2) worker's compensation insurance (or participation in a monopolistic state workers' compensation fund) with statutory limits and shall include a waiver of subrogation in favor of Landlord; and (3) employer's liability insurance or (in a monopolistic state) Stop Gap Liability insurance. Such worker's compensation insurance shall carry minimum limits as defined by the law of the jurisdiction in which the Premises is located (as the same may be amended from time to time). Such employer's liability insurance shall be in an amount not less than $1,000,000 for each accident, $1,000,000 disease-policy limit, and $1,000,000 disease-each employee.

Section 11.4   Requirements for Insurance. All insurance required to be maintained by Tenant pursuant to this Lease shall be maintained with responsible companies that are admitted to do business,

and are in good standing, in the jurisdiction in which the Premises is located and that have a rating of at least "A-" and are within a financial size category of not less than "Class VII" in the most current Best's Key Rating Guide or such similar rating as may be reasonably selected by Landlord if Best's Key Rating Guide is no longer published. All such insurance shall: (1) be reasonably acceptable in form and content to Landlord; and (2) be primary and noncontributory. No such policy shall contain any deductible or self-insured retention greater than $10,000 for liability insurance and $100,000 for property insurance. Such deductibles and self-insured retentions shall be deemed to be "insurance" for purposes of the waiver in Section 11.9 below. Landlord reserves the right from time to time to require Tenant to obtain higher minimum amounts of insurance based on such limits as are customarily carried with respect to similar properties in the area in which the Premises is located. The minimum amounts of insurance required by this Lease shall not be reduced by the payment of claims or for any other reason. In the event Tenant shall fail to obtain or maintain any insurance meeting the requirements of this Article 11, or to deliver such policies or certificates as required by this Article 11, Landlord may, at its option, on five (5) business days' notice to Tenant, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord within thirty (30) days after delivery to Tenant of bills therefor.

Section 11.5    Tenant's Work. During such times as Tenant is performing work or having work or services performed in or to the Premises, Tenant shall require its contractors, and their subcontractors of all tiers, to obtain and maintain commercial general liability, automobile, workers compensation, employer's liability, builder's risk, and equipment/property insurance in such amounts and on such terms as are customarily required of such contractors and subcontractors on similar projects. The amounts and terms of all such insurance are subject to Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed. The commercial general liability and auto insurance carried by Tenant's contractors and their subcontractors of all tiers pursuant to this Section 11.5 shall name Landlord, Landlord's managing agent, and the Additional Insureds as additional insureds. Such insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Landlord, Landlord's managing agent, or the other Additional Insureds. Such insurance shall also waive any right of subrogation against each Additional Insured. Tenant shall obtain and submit to Landlord, prior to the earlier of (i) the entry onto the Premises by such contractors or subcontractors or (ii) commencement of the work or services, certificates of insurance evidencing compliance with the requirements of this Section 11.5.

Section 11.6    Certificates of Insurance. On or before the earlier of (i) the date on which any Tenant Party first enters the Premises for any reason or (ii) the Commencement Date, Tenant shall furnish Landlord with certificates evidencing the insurance coverage required by this Lease, and renewal certificates shall be furnished to Landlord at least annually thereafter, and at least seven (7) days prior to the expiration date of each policy for which a certificate was furnished. Such certificates shall be on ACCORD Forms 25 and 27. In jurisdictions requiring mandatory participation in a monopolistic state workers' compensation fund, the insurance certificate requirements for the coverage required for workers' compensation will be satisfied by a letter from the appropriate state agency confirming participation in accordance with statutory requirements. Such current participation letters required by this Section 11.6 shall be provided every six (6) months for the duration of this Lease. Failure by the Tenant to provide the certificates or letters required by this Section 11.6 shall not be deemed to be a waiver of the requirements in this Section 11.6. If there is an insurance claim involving Tenant, upon request by Landlord, a true and complete copy of any insurance policy required by this Lease shall be delivered to Landlord within ten (10) days following Landlord's request.

Section 11.7    No Violation of Building Policies. Tenant shall not commit or permit any violation of the policies of fire, boiler, sprinkler, water damage or other insurance covering the Building and/or the fixtures, equipment and property therein carried by Landlord, or do or permit anything to be done, or keep or permit anything to be kept, in the Premises, which in case of any of the foregoing, (i)

would result in termination of any such policies, (ii) would adversely affect Landlord's right of recovery under any of such policies or (iii) would result in reputable and independent insurance companies refusing to insure the Building or the property of Landlord in amounts reasonably satisfactory to Landlord.

Section 11.8    Tenant to Pay Premium Increases.   .  If, as the direct result of anything done, caused or permitted to be done, or omitted by Tenant which is required by Tenant pursuant to this Lease, the rates for liability, fire, boiler, sprinkler, water damage or other insurance (with all extended coverage) on the Building or on the property and equipment of Landlord shall be higher than they otherwise would be, Tenant shall reimburse Landlord for the additional insurance premiums thereafter paid by Landlord which shall have been charged because of the aforesaid reasons, such reimbursement to be made from time to time within thirty (30) days after Landlord's written demand.

Section 11.9    Waiver of Subrogation.  The parties hereto waive and release any and all rights of recovery against the other, and agree not to seek to recover from the other or to make any claim against the other, and in the case of Landlord, against any Tenant Party, and in the case of Tenant, against any Landlord Party, for any loss or damage incurred by the waiving/releasing party to the extent such loss or damage is insured under any insurance policy required by this Lease or which would have been so insured had the party carried the insurance it was required to carry hereunder.  Tenant shall obtain from its subtenants and other occupants of the Premises a similar waiver and release of claims against Tenant and/or Landlord.  In addition, the parties hereto (and in the case of Tenant, its subtenants and other occupants of the Premises) shall procure an appropriate clause in, or endorsement on, any insurance policy required by this Lease pursuant to which the insurance company waives subrogation.  The insurance policies required by this Lease shall contain no provision that would invalidate or restrict the parties' waiver and release of the rights of recovery in this Section 11.9.  Landlord and Tenant covenant that no insurer shall hold any right of subrogation against Landlord or Tenant by virtue of such insurance policy.

Section 11.10    Subtenants and Other Occupants.  Tenant shall require its subtenants and other occupants of the Premises to provide written documentation evidencing the obligation of such subtenant or other occupant to indemnify any Landlord Party to the same extent that Tenant is required to indemnify any Landlord Party pursuant to Section 11.9 above, and to maintain insurance that meets the requirements of this Article 11, and otherwise to comply with the requirements of this Article 11.  Tenant shall require all such subtenants and occupants to supply certificates of insurance evidencing that the insurance requirements of this Article 11 have been met and shall forward such certificates to Landlord on or before the earlier of (i) the date on which the subtenant or other occupant or any of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, servants, employees, principals, contractors, licensees, agents, invitees or representatives first enters the Premises or (ii) the commencement of the sublease.  Tenant shall be responsible for identifying and remedying any deficiencies in such certificates or policy provisions.

Section 11.11    Additional Insureds.  The commercial general liability and auto insurance carried by Tenant pursuant to this Lease, and any additional liability insurance carried by Tenant pursuant to Section 11.1 of this Lease, shall name Landlord, Landlord's managing agent, and such other Persons as Landlord may reasonably request from time to time as additional insureds with respect to liability arising out of or related to this Lease or the operations of Tenant (collectively "Additional Insureds").  Such insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Landlord, Landlord's managing agent, or any other Additional Insureds.  Such insurance shall also waive any right of subrogation against each Additional Insured.

ARTICLE 12

DESTRUCTION OF THE PREMISES; PROPERTY LOSS OR DAMAGE

Section 12.1    Tenant shall give prompt notice to Landlord in case of fire or other casualty in the Premises.  If (i) more than twenty-five percent (25%) of the Building is damaged or rendered untenantable (whether or not the Premises or a portion thereof shall be damaged) by fire or other casualty that Landlord shall determine not to restore the same or to demolish the remainder thereof, (ii) a fire or other casualty shall occur and Landlord shall reasonably determine that the net proceeds of Landlord's insurance are insufficient to complete the restoration of the Building or (iii) a fire or other casualty shall occur and any Superior Lessor or Mortgagee will not permit Landlord to apply the net proceeds of Landlord's insurance to the restoration of the Building, then and in any such event Landlord shall notify Tenant of such determination and shall have the right to terminate this Lease by notice to Tenant given within sixty (60) days of the occurrence of such fire or other casualty.  If either (y) the Premises shall be totally or substantially damaged or rendered wholly or substantially untenantable (whether or not any other portions of the Building shall be damaged) or (z) the Building shall be substantially damaged, so that Tenant's access to and use and enjoyment of the Premises shall be rendered substantially impossible, whether or not the Premises shall be damaged, and in case of either (y) or (z) Landlord determines that the same cannot reasonably be expected to be restored or rendered tenantable under a normal working schedule within a period of twelve (12) months after the occurrence of such damage or destruction, then Landlord shall promptly notify Tenant of such fact, and within thirty (30) days thereafter either Landlord or Tenant may terminate this Lease by notice to the other party.  If during the last two (2) years of the Term, the Building or the Premises shall be damaged by fire or casualty, and if such fire or casualty damage, whether to the Premises or the Building, cannot, in Landlord's reasonable determination, be expected to be repaired or restored within ninety (90) days from the time that repair or restoration work would commence or prior to the Expiration Date, whichever first occurs, then Landlord shall have the right to terminate this Lease on written notice delivered to Tenant within sixty (60) days after the occurrence of such fire or other casualty.  If either Landlord or Tenant shall give notice of termination pursuant to this Section 12.1, the Term shall expire by lapse of time upon the date which is the earlier to occur of (x) the date on which the then current Expiration Date had been scheduled to occur or (y) the last Business Day in the thirty (30) day period after notice of termination is given and Tenant shall vacate the Premises and surrender the same to Landlord.  Upon the termination of this Lease under the conditions provided for in this Section 12.1, Tenant's liability for Rent and all other obligations hereunder (except to the extent expressly stated to survive) shall cease as of the date of such termination, subject, however, to abatement thereof between the date of such casualty and the date of such termination pursuant to Section 12.3 below.  Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law or any like law which may hereafter be enacted and agrees that the foregoing provisions of this Article 12 shall govern and control in lieu thereof, this Article 12 being an express agreement governing any case of damage or destruction of the Premises by fire or other casualty.

Section 12.2    (a)    If the Premises or the Building shall be damaged by fire or other casualty and this Lease is not terminated pursuant to Section 12.1, the damage (i) to the Building shall be repaired by and at the expense of Landlord so that (x) access to the Premises and (y) the Common Areas shall be substantially the same as prior to the damage to the extent practicable, (ii) to the Premises shall be repaired (A) by Landlord as to the core, shell, floors, roof, curtain wall, windows, Building Systems and other structural elements of the Building located in the Premises, and (B) by Tenant as to all other elements of the Premises, including Tenant's Alterations and Tenant's Property, and (iii) to the Building Systems shall be repaired by Landlord up to and including the point of delivery to each floor of the Premises.  Notwithstanding the foregoing, Landlord shall not be obligated to expend for such repairs and restoration any amount in excess of the net insurance proceeds made available to Landlord after deduction therefrom of Landlord's expenses in obtaining such proceeds and any amounts applied by any Superior

Lessor or Mortgagee to obligations other than restoration of the Building. In no event shall Landlord be obligated to repair or restore Tenant's Work, other Alterations, Tenant's Property or paneling or other finishes, carpeting or wall coverings.

(b)    Where Landlord is obligated or otherwise elects to effect restoration of the Premises, unless such restoration is completed within twelve (12) months from the date of the casualty (such period to be subject, however, to extension by one day for each day of Unavoidable Delay), Tenant shall have the right to terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period (as such period may be extended) but prior to the time that the restoration is substantially completed, such termination to take effect as of the thirtieth (30th) day after such notice is given, with the same force and effect as if such date were the date originally established as the Expiration Date unless, within such thirty (30) day period such restoration is substantially completed, in which case Tenant's notice of termination shall be of no force and effect and this Lease and the Term shall continue in full force and effect. If Tenant shall not have exercised Tenant's termination right within the time periods aforesaid, Tenant shall have no further right to exercise such termination right thereafter.

Section 12.3    If the Premises or the Building shall be damaged by fire or other casualty such that Tenant is unable to and does not conduct its business in the Premises, until this Lease is terminated pursuant to Section 12.1 or Section 12.4 or, if this Lease is not so terminated, until Landlord's restoration work has been completed pursuant to Section 12.2, Fixed Rent and Tenant's Tax Payment shall be equitably abated. No damages, compensation or claims shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or of the Building. If Rent abates in respect of all or any portion of the Premises and Tenant reoccupies the Premises or such portion thereof, or any part thereof, for the conduct of Tenant's business operations during the period in which restoration work is taking place and prior to the date that the same is made completely tenantable, Fixed Rent allocated to the space so reoccupied shall be payable, and Tenant's Tax Payment shall increase by the portion thereof allocable to such space. Nothing contained in this Section is intended to contravene the provisions of Section 11.9 hereof.

Section 12.4    Notwithstanding anything to the contrary contained in this Lease, if (a) the Building or the Premises shall be substantially damaged by fire or casualty as the result of a risk not covered by casualty insurance maintained by Landlord, (b) such fire or casualty damage cannot, in the ordinary course, reasonably be expected to be repaired within ninety (90) days from the time that repair work would commence and (c) such repair would require Landlord to incur a material expenditure to complete as reasonably determined by Landlord, Landlord may, at its election, terminate this Lease by notice to Tenant given within sixty (60) days after such loss. If Landlord shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the Expiration Date.

ARTICLE 13

EMINENT DOMAIN

Section 13.1    If the whole of the Building or of the Premises shall be taken by condemnation or in any other manner for any public or quasi-public use or purpose (other than for temporary use or occupancy), the Term shall forthwith cease and terminate as of the date of vesting of title by reason of such taking (which date is hereinafter referred to as the "date of the taking"), and Rent shall be apportioned as of such date. If such portion of the Building shall be so taken so that substantial structural alterations or reconstruction of the Building shall be necessary as a result of such taking (whether or not the Premises be affected), which alterations or reconstruction Landlord determines will take at least one hundred eighty (180) days to complete, Landlord may, at its option, terminate this Lease and the Term

and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within sixty (60) days following the date of the taking.

Section 13.2    If any part, but less than all, of the Premises shall be so taken and this Lease shall not be terminated pursuant to Section 13.1, then the part so taken shall no longer constitute part of the Premises but this Lease shall otherwise remain unaffected by such taking; provided, however, that Tenant may elect to terminate the Term in the event of:

(a)    a taking of more than twenty percent (20%) of the total RSF of the Premises; or

(b)    a taking that has a material adverse effect on Tenant's access to the Building or the Premises, if Landlord determines that it will be unable to provide or in fact fails to provide adequate alternative access to the Building and the Premises within one hundred eighty (180) days thereafter,

by giving notice of such election to Landlord not later than sixty (60) days after Tenant's receipt from Landlord of notice of such taking (describing the nature and extent of such taking) or the date of such taking, whichever first occurs, or not later than thirty (30) days after such one hundred eightieth (180th) day, as the case may be. If notice of termination of this Lease shall be given pursuant to this Section 13.2, then upon such date as may be specified by Tenant by notice to Landlord, which date shall be not earlier than thirty (30) and not later than sixty (60) days after the date of Tenant's notice, the Term shall terminate as of the date specified in such notice and Rent shall be apportioned as of such date of termination. Upon a partial taking and this Lease continuing in force as to any part of the Premises,

(i)    Fixed Rent and Tenant's Tax Payment shall be equitably reduced for the remainder of the Term, according to the nature and extent of the loss of use of the Premises suffered by Tenant; and

(ii)    Landlord shall, at its expense, restore with reasonable diligence the remaining portions of the Premises as nearly as practicable to the same condition as it was in prior to such condemnation or taking; provided, however, that Landlord shall not be obligated to expend for such restoration and for restoration of the remainder of the Building any amount in excess of the net condemnation proceeds actually received by Landlord. Proceeds of any award applied by any Mortgagee to reduction of the indebtedness secured thereby or retained by any Superior Lessor as compensation for the taking shall not be deemed to have been received by Landlord.

Section 13.3    In the event of any condemnation or taking hereinabove mentioned of all or a part of the Building (whether or not the Premises be affected) Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant shall be entitled to receive no part of such award. The foregoing, however, shall not be deemed to preclude Tenant from recovering a separate award for Tenant's moving expenses and Tenant's Property, but only provided that such award does not reduce and is not payable out of the amount for the Land and the Building.

Section 13.4    If all or any part of the Premises shall be taken for a limited period, Tenant shall be entitled, except as hereinafter set forth, to that portion of the award for such taking which represents compensation for the use and occupancy of the Premises, for the taking of Tenant's Property and for

moving expenses, and Landlord shall be entitled to that portion which represents reimbursement for the cost of restoration of the Premises. This Lease shall remain unaffected by such taking and Tenant shall continue to be responsible for all of its obligations under this Lease and shall continue to pay in full all Rent when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award that represents compensation for the use and occupancy of the Premises shall be apportioned between Landlord and Tenant as of the Expiration Date.

ARTICLE 14

ASSIGNMENT, SUBLETTING, MORTGAGE, ETC.

Section 14.1    Except as otherwise expressly provided herein, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors, subtenants and assigns, expressly covenants that it shall not assign, mortgage, pledge, encumber, or otherwise transfer this Lease, nor sublet (nor underlet), nor suffer, nor permit, nor license the Premises or any part thereof to be used or occupied by others (whether for desk space, mailing privileges or otherwise), without the prior written consent of Landlord in each instance, and any such assignment, mortgage, pledge, encumbrance, transfer, sublet, underlet, license or use, whether occurring voluntarily, by operation of law or otherwise, shall be and hereby is expressly prohibited. For the purpose of this Article 14, an "assignment" shall include, without limitation, (x) a sale of all or substantially all of Tenant's assets, (y) a transfer of the Premises for the remainder of or substantially all of the remainder of the Term and (z) the merger or consolidation of Tenant into or with any other entity. If and so long as Tenant is a corporation with fewer than five hundred (500) shareholders or a partnership (whether general, limited or limited liability) or other legal entity, an assignment, within the meaning of this Article 14, shall be deemed to include, without limitation, whether by one or more transactions or by operation of law or otherwise or the issuance of new stock, partnership or other ownership interests, a change in Control of Tenant. For the purpose of this Section 14.1, ownership of stock or partnership interests shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any subsequent law. If, whether by operation of law or otherwise this Lease is assigned, or the Premises or any part thereof are sublet or occupied by any Person other than Tenant, or this Lease or the Premises are encumbered, then Landlord may, after default by Tenant beyond applicable grace or notice periods, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to Fixed Rent and Additional Rent, but no assignment, subletting, occupancy or collection shall be deemed a waiver by Landlord of the provisions hereof, the acceptance by Landlord of the assignee, subtenant or occupant as a tenant, or a release by Landlord of Tenant from the further performance by Tenant of its obligations under this Lease, and Tenant shall remain fully liable therefor. The consent by Landlord to any assignment or subletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or subletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others. Any assignment, sublease, mortgage, pledge, encumbrance, underlet, license or transfer in contravention of the provisions of this Article 14 shall be void and shall constitute a default hereunder. The limitations set forth in this Section 14.1 shall be deemed to apply to subtenant(s), assignee(s) and guarantor(s) of this Lease.

Section 14.2    (a)    Anything in the foregoing Section 14.1 to the contrary notwithstanding, transactions with an entity (i) into or with which Tenant is merged or consolidated, or (ii) to which substantially all of Tenant's assets are transferred as a going concern ("Permitted Transferees"), shall not require the consent of Landlord; provided that, in the event of any of such transfers (whether effectuated through a single transaction or a series of transactions): (A) such successor shall have a tangible net worth, determined in accordance with GAAP consistently applied, equal to or greater than the greater of

the tangible net worth of Tenant (i) at the time of the Commencement Date, or (ii) immediately prior to such transaction, and proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction (unless such prior notice is prohibited by securities law, and if required, Landlord shall sign a reasonably acceptable confidentiality agreement); (B) [intentionally omitted]; (C) such successor to Tenant shall be of good reputation, and engaged in a business or activity which is in keeping with the standards of the Building for office tenants and which is a Permitted Use in accordance with the provisions of Article 2 hereof; (D) such successor to Tenant is reasonably acceptable to any Mortgagee and/or any Superior Lessor; (E) such successor to Tenant agrees directly with Landlord, by written instrument in form satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder including, without limitation, the covenant against further assignment and subletting, (F) in no event shall Tenant be released from its obligations under this Lease; (G) any such transfer or transaction is for a legitimate, regular business purpose of Tenant other than a transfer of Tenant's interest in this Lease or avoiding the obligations under this Lease, including Section 14.9; (H) a duplicate original of such assignment or sublease shall be delivered to Landlord; and (I) Tenant shall reimburse Landlord on demand for any costs including, without limitation, reasonable legal costs (not to exceed $7,500), incurred by Landlord in connection with such transaction. Notwithstanding the foregoing, a sale of all or substantially all of Tenant's assets that does not include this Lease or Tenant's operations in the Premises, shall be an assignment for purposes of this Article 14 and shall be subject to Section 14.1(a).

       (b)      Anything in the foregoing Section 14.1(a) to the contrary notwithstanding, an assignment or subletting to an Affiliate shall not require the consent of Landlord; provided that (i) the assignee or subtenant agrees directly with the Landlord, by written instrument in form satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder (except that in case of a sublease, such obligations shall be limited to the rent and additional rent payable thereunder and to those obligations under this Lease that apply to the portion of the Premises being sublet), (ii) in no event shall Tenant be released from its obligations under this Lease, (iii) any such transfer or transaction is for a legitimate, business purpose of Tenant and not principally for the purpose of effectuating a transfer of Tenant's interest in this Lease, (iv) appropriate evidence that such Person is an Affiliate is delivered to Landlord, (v) the successor to Tenant shall be of good reputation, and engaged in a business or activity which is in keeping with the standards of the Building for office tenants and which is a Permitted Use in accordance with the provisions of Article 2 hereof, (vi) such successor shall have a tangible net worth, determined in accordance with GAAP consistently applied, equal to or greater than the greater of the tangible net worth of Tenant (1) at the time of this Lease or (2) immediately prior to such transaction, and proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, and (vii) Tenant shall reimburse Landlord on demand for any costs including, without limitation, reasonable legal costs (not to exceed $7,500), incurred by Landlord in connection with such transaction.

       (c)      If any Person to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises pursuant to and in accordance with this Section 14.2 shall thereafter cease to be an Affiliate of Tenant, then the continuation of such Person's tenancy or subtenancy, as applicable, after the date such Person shall cease to be an Affiliate of Tenant, shall be subject to Landlord's consent pursuant to Section 14.6. In the event Tenant shall assign this Lease or sublet all or any part of the Premises to an Affiliate of Tenant in accordance with this Section 14.2, the parties agree that if such Affiliate desires to assign this Lease or sublet all or any part of the Premises to a Person other than an Affiliate of Tenant, then the provisions of this Article 14 shall apply with respect thereto and for purposes of calculating profits Sections 14.9(a)(i) and (ii) shall apply, but the sums to be paid to Landlord shall be calculated as if the sublet or assignment to an Affiliate of Tenant had not occurred and the sublease and assignment were made directly by Tenant.

(d)    Anything in the foregoing Section 14.1 to the contrary notwithstanding, Landlord's consent shall not be required (and Sections 14.3, 14.4, 14.5 and 14.6 shall not apply) to the occupancy of offices within any portion of the Premises, by any individual or business entity who or which is a client, service provider or otherwise has a bona fide business relationship with Tenant (any such individual or entity being hereinafter referred to as a "Space Occupant"), provided that (i) each Space Occupant shall be engaged in a business or activity that is reasonably determined by Landlord to be in keeping with the first-class nature of the Building and that is a Permitted Use, (ii) each Space Occupant's use of the applicable portion of the Premises is primarily for general office uses and ancillary uses permitted hereunder in connection with Tenant's Permitted Uses of the Premises, (iii) the Space Occupants shall not occupy, in the aggregate, more than 25% of the RSF of the Premises of which Tenant is in Actual Occupancy, (iv) the portions of the Premises occupied by the Space Occupants shall be physically part of, and not separated from, the remainder of the Premises occupied by Tenant, (v) no Space Occupant shall have a separate entrance, (vi) no such Space Occupant shall have any signage outside of the Premises and (vii) Tenant shall give Landlord a notice (a "Space Occupant Notice") with respect to each such Space Occupant at least fifteen (15) Business Days prior to the commencement of such Space Occupant's occupancy in the Premises. Each such occupancy shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and in the event of the termination of this Lease, such occupancy shall immediately terminate. Occupancy by a Space Occupant shall not be deemed to vest in such Space Occupant any right or interest in this Lease nor shall it relieve, release, impair or discharge any of Tenant's obligations hereunder. Any occupancy agreement that provides for the subtenant an entrance and reception area separate from those used by Tenant, shall be deemed to be "ordinary subletting" which ordinary subletting shall be governed by the remaining provisions of Article 14 hereof. Each Space Occupant Notice shall include (A) the name and the nature of the business or occupation of such Space Occupant and (B) the material terms of such Space Occupant's occupancy. Each such occupancy shall be terminable "for cause" on not more than thirty (30) days' notice from Tenant. The rights granted by this Section 14.2(d) are personal to the Original Tenant.

Section 14.3    (a)    Offer Notice. Prior to subletting all or any part of the Premises or assigning this Lease within the meaning of this Article 14 (other than to Permitted Transferees or Affiliates), Tenant shall submit to Landlord a notice (any such notice being hereinafter called an "Offer Notice"), which may or may not be based upon a bona fide written offer from an independent third party or such third party's broker. If Tenant shall have received and negotiated a bona fide written offer from an independent third party or such third party's broker, the Offer Notice shall contain the information set forth in clauses (i), (ii) and (iii) below. If Tenant shall not have received and negotiated a bona fide written offer from an independent third party or such third party's broker, the Offer Notice shall contain the information set forth in clause (ii) below.

(i)    the name and address of the proposed subtenant or assignee and a brief description of such Person's business, such Person's proposed use of the Premises or applicable portion thereof, current financial information in respect of such Person (including, without limitation, its balance sheets and income statements for the most recent two (2) years certified by its chief financial officer or a certified public accountant, Landlord agreeing to hold any such financial information in confidence and make no disclosure thereof except to Landlord's accountants and attorneys, a Mortgagee or Superior Lessor, and otherwise as required by law), the identity of any broker entitled to a commission in respect of such subletting or assignment and the commission, if any, payable to such broker, and any other information reasonably requested by Landlord;

(ii)     a description of all of the material economic terms and conditions of the proposed subletting or assignment (including, without limitation, with respect to a subletting, a description of the portion of the Premises to be sublet, the proposed fixed rent, additional rent, base amounts or years, if any, free rent and other concessions, if any, the term, the party responsible for the cost of physical separation and end of term restoration, and other similar, material proposed terms and conditions) setting forth all consideration to be received by Tenant for or in connection with such subletting or assignment (including, without limitation, any payment to be made for Tenant's Property or leasehold improvements) and the terms of payment therefor. A writing containing all of the information required by this clause (ii) submitted by an independent third party (or such party's authorized real estate broker) shall be deemed to be a bona fide offer for purposes hereof even if it shall state in substance that no legally binding agreement will in any event be deemed to exist unless and until Tenant and such third party shall have executed a sublease or assignment instrument, as the case may be. The effective date of the proposed sublease or assignment shall be at least thirty (30) days but not more than one hundred eighty (180) days after the date of the giving of such notice, and the offer shall be conditioned on Landlord's consent thereto and shall comply with the provisions of Section 14.6; and

(iii)     executed copies of all other agreements, if any, relating to the proposed assignment or sublease and, if not fully disclosed by such agreements, a statement of all consideration to be received by Tenant for or in connection with such assignment or sublease (including, without limitation, any payment to be made for Tenant's Property or leasehold improvements) and the terms of payment therefor.

(b)     Preliminary Approval. Subject to Landlord's recapture rights under Sections 14.4 and 14.5 hereof, and subject to Landlord's final approval under Section 14.6 hereof, as applicable, if the Offer Notice is based upon a bona fide written offer from an independent third party or such third party's broker and contains the information required by Section 14.3(a) above, Landlord shall, within thirty (30) days after receipt of such Offer Notice, approve or disapprove the identity of the proposed subtenant or assignee, which approval shall not be unreasonably withheld provided that the conditions of Section 14.6 shall be satisfied.

Section 14.4     Intentionally omitted.

Section 14.5     Landlord's Right to Terminate. Upon receipt of any Offer Notice in which Tenant proposes to assign this Lease, or in which Tenant proposes to sublet all or any portion of the Premises for the entire or substantially the entire remaining Term (provided that Tenant is permitted to assign or sublet such space pursuant to the terms hereof), then and in such events Landlord shall have the right, exercisable by notice to Tenant given within thirty (30) days after Landlord receives Tenant's Offer Notice if such Offer Notice is based on a bona fide written offer from an independent third party or such third party's broker, or within thirty (30) days after receipt of such Offer Notice if such Offer Notice is not based on a bona fide written offer from an independent third party or such third party's broker and in addition to the other rights granted Landlord under this Article 14, (i) in the case of an assignment, to terminate this Lease, in which event this Lease shall terminate on the date fixed in Landlord's notice, which shall not be less than thirty (30) days nor more than ninety (90) days after the giving of such notice,

with the same force and effect as if the termination date fixed in Landlord's notice were the date originally fixed in this Lease as the Expiration Date, or (ii) in the case of a subletting of all or any portion of the Premises for the entire or substantially the entire remaining Term, to terminate this Lease with respect to the space proposed by Tenant to be sublet, in which event on the date fixed in Landlord's notice, which shall not be less than thirty (30) days nor more than one hundred eighty (180) days after the giving of such notice, such space shall no longer be part of the Premises or covered by this Lease and the rentable area of the Premises, the Fixed Rent and Tenant's Share of Taxes shall be appropriately reduced. For purposes of this Section 14.5, "all or substantially all of the Premises" shall mean ninety percent (90%) or more of the rentable area of the Premises; and "the entire or substantially the entire remaining Term" shall mean ninety percent (90%) or more of the remaining Term as of the date of the proposed commencement of the sublease or the proposed effective date of the assignment.

Section 14.6   (a)   If Landlord does not exercise any option granted to Landlord by this Article 14 and provided that no Event of Default shall have occurred and be continuing under this Lease as of the time Landlord's consent is requested by Tenant or at the time of any such subletting or assignment, Tenant may request Landlord's approval to assign or sublease its rights under this Lease. Landlord agrees not to unreasonably withhold, condition or delay its consent (which must be in writing) to the proposed assignment or sublease; provided, however, that the terms of the assignment or sublease, as the case may be, substantially conform to the terms of the Offer Notice and that, as a condition to the effectiveness of any such assignment or sublease:

> (i)   Tenant shall have complied with the provisions of Section 14.3 hereof, and Landlord shall not have exercised any of its options thereunder within the time permitted therefor;

> (ii)   The proposed assignee or subtenant is engaged in a business or activity, and the Premises, or the relevant part thereof, will be used in a manner, which (A) is in keeping with the then standards of the Building, and (B) is limited to executive, administrative and general offices and such incidental ancillary uses reasonably approved by Landlord in connection therewith;

> (iii)   The proposed assignee or subtenant is of good reputation with sufficient financial worth considering the responsibility involved, and Landlord has been furnished with reasonable evidence of such financial worth, and Landlord has been furnished with reasonable evidence of such financial worth and any sublease shall provide that, upon Landlord's request from time to time, subtenant shall deliver to Landlord a copy of subtenant's most recent financial statements certified by an officer of subtenant;

> (iv)   In the event Landlord has space in the Building available for lease for a substantially equivalent (or longer) term and which is reasonably comparable to the space which is the subject of such proposed assignment or subletting, (A) the proposed assignee or subtenant is not then an occupant or an Affiliate of an occupant of any part of the Building, or (B) the proposed assignee or subtenant is not a Person (or Affiliate of a Person) with whom Landlord or Landlord's agent is then actively negotiating, or has, within the past six (6) months negotiated, in connection with rental of comparable space in the Building;

(v)     The form of the proposed sublease or instrument of assignment shall be reasonably satisfactory to Landlord and shall comply with the applicable provisions of this Article 14, and Tenant has delivered a true and complete original, fully executed counterpart of such sublease or other instrument to Landlord promptly after the execution and delivery thereof;

(vi)    The economic and other material terms of any sublease or assignment shall substantially conform to those set forth in the applicable Offer Notice (within the meaning of Section 14.6(c) or (d) hereof);

(vii)   Tenant and its proposed subtenant or assignee, as the case may be, shall execute and deliver to Landlord an agreement, substantially to Landlord's then current form of consent agreement, setting forth the terms and conditions upon which Landlord shall have granted its consent to such assignment or subletting, and the agreement of Tenant and such subtenant or assignee, as the case may be, to be bound by the provisions of this Article 14;

(viii)  omitted;

(ix)    Tenant shall reimburse Landlord, as Additional Rent within thirty (30) days after demand, for (A) the reasonable, actual out-of-pocket costs and expenses incurred by Landlord in connection with the assignment or sublease, including the costs of making investigations as to the acceptability of the proposed assignee or subtenant and the cost of reviewing plans and specifications proposed to be made in connection therewith and (B) Landlord's reasonable legal fees (not to exceed $7,500) and disbursements incurred in connection with the granting of any requested consent and the preparation of Landlord's consent to the sublease or assignment;

(x)     Tenant shall not have (A) advertised or publicized the availability of the Premises (other than to brokers and through customary brokers' flyers) without prior notice of and approval by Landlord, or (B) publicly advertised in any way the availability of the Premises at a rental rate less than the fixed rent and additional rent at which Landlord is then offering to lease comparable space in the Building for a comparable term;

(xi)    The proposed occupancy shall not impose an extra burden upon services to be supplied by Landlord to Tenant, increase the burden on the elevators which service the Premises with respect to the Premises;

(xii)   The proposed subtenant or assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of, New York State, or shall agree to consent thereto; and

(xiii)  Intentionally omitted.

(b)     Each sublease and assignment pursuant to this Section 14.6 shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease. Notwithstanding

any such sublease or assignment or any acceptance of Fixed Rent or Additional Rent by Landlord from any subtenant or assignee, Tenant will remain fully liable for the payment of the Fixed Rent and Additional Rent due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on Tenant's part to be observed and performed, and for all acts and omissions of any assignee, licensee or subtenant or anyone claiming under or through any subtenant or assignee which shall be in violation of any of the obligations of this Lease, and any such violation shall be deemed to be a violation by Tenant. If Landlord shall decline to give its consent, pursuant to the provisions of this Lease, to any proposed assignment or sublease, or if Landlord shall exercise its options under Sections 14.4 or 14.5 hereof, Tenant shall indemnify, defend and hold harmless Landlord against and from any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees and disbursements) resulting from any claims that may be made against Landlord by the proposed assignee or subtenant arising from or in connection with such proposed assignment or subletting, or by any brokers or other Persons (with whom Tenant or its proposed assignee or subtenant may have dealt) claiming a commission or similar compensation in connection with the proposed assignment or sublease.

(c)    For purposes of this Section 14.6, a sublease shall be deemed to conform to the Offer Notice if (i) with respect to an Offer Notice which is based on a bona fide written offer from an independent third party or such third party's broker, the identity of the subtenant is the same as set forth in the Offer Notice and (ii) in any event, the sublease is for substantially the same term proposed in such Offer Notice and for a Net Effective Rental (as hereinafter defined) of not less than ninety percent (90%) of the Net Effective Rental of the proposed sublease set forth in such Offer Notice, and on such other terms and conditions as are substantially the same as, but not substantially more favorable to the proposed sublessee than, those contained in such Offer Notice. The term "Net Effective Rental" shall mean for purposes of this Section 14.6, with respect to any proposed sublease of the space which was the subject of such Offer Notice, the net present value, determined as of the effective date of the proposed sublease, using a discount rate of ten percent (10%), of the aggregate of all rent and additional rent of any nature payable under the proposed sublease, discounted from the date such payment would have been made under the proposed sublease to the commencement date of the proposed sublease, after deducting therefrom the amount of all inducements (such as, by way of example only, work allowances, work letters or rent abatements) that are (or will be) granted by Tenant to such subtenant in respect thereof, discounted, using a discount rate of ten percent (10%), from the date that such inducements were to have been given under the proposed sublease to the commencement date of the proposed sublease.

(d)    For purposes of this Section 14.6, an assignment shall be deemed to conform to the Offer Notice if (i) the identity of the assignee is the same as set forth in the Offer Notice and (ii) the assignment is for a Net Effective Rental (as hereinafter defined) of not less than ninety percent (90%) of the Net Effective Rental of the proposed assignment set forth in such Offer Notice, and on such other terms and conditions as are substantially the same as, but not substantially more favorable to the proposed assignee than, those contained in such Offer Notice. The term "Net Effective Rental" shall mean for purposes of this Section 14.6, with respect to any proposed assignment of this Lease as provided in such Offer Notice, the net present value, determined as of the effective date of the proposed assignment, using a discount rate of ten percent (10%), of the aggregate of all payments of any nature, discounted from the date such payment would have been made under the proposed assignment to the effective date of such assignment, after deducting therefrom the amount of all inducements (such as, by way of example only, work allowances, work letters or rent abatements) that are (or will be) granted by Tenant to such assignee in respect thereof, discounted, using a discount rate of ten percent (10%), from the date that such inducements were to have been given to the effective date of such assignment.

Section 14.7    If Landlord grants its preliminary consent to a proposed assignment or subletting under Section 14.3(b) and such assignment or sublease does not become effective for any reason not

caused by a default by Landlord under this Lease within two hundred forty (240) days after the granting of such preliminary consent, or if Landlord grants its final consent to a proposed assignment or subletting under Section 14.6 and such assignment or sublease does not become effective for any reason not caused by a default by Landlord under this Lease within one hundred eighty (180) days after the granting of such consent, or if such assignment or sublease is materially modified or amended prior to its becoming effective, then and in any such event Landlord's consent shall be deemed to have been withdrawn and Tenant shall not have the right to assign this Lease or to sublease all or any portion of the Premises without once again complying with all of the provisions and conditions of this Article 14. In no event shall Tenant materially modify or amend the economic terms of any assignment or sublease or materially modify or amend any other terms of any assignment or sublease to which Landlord has finally consented under Section 14.6 without Landlord's prior written consent.

Section 14.8    With respect to each and every sublease authorized by Landlord under the provisions of this Lease:

(a)    No sublease shall be for a term ending later than one day prior to the Expiration Date of this Lease;

(b)    No sublease shall be delivered, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord;

(c)    Each sublease shall contain the condition and restriction that the sublease shall not be assigned, encumbered or otherwise transferred or the subleased premises further sublet by the sublessee in whole or in part, or any part thereof suffered or permitted by the sublessee to be used or occupied by others, without the prior written consent of Landlord in each instance; and

(d)    Each sublease shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord as sublandlord under such sublease for the balance of the term and on all of the then executory provisions of such sublease, except that Landlord shall not (i) be liable for any previous act or omission of Tenant under such sublease, (ii) be subject to or liable for any credit, counterclaim, offset or defense, which theretofore accrued to such subtenant against Tenant, (iii) be bound by any rent which such subtenant might have paid for more than the current month to Tenant, (iv) be required to account for any security deposit other than the security deposit actually delivered to Landlord, (v) be liable for any brokerage commission payable in connection with such sublease or any renewal thereof, (vi) be bound by any amendment, modification or surrender of such sublease made without Landlord's prior written consent other than modifications which do not increase Landlord's obligations, decrease Tenant's obligations or increase Tenant's rights, (vii) be liable for any claim for damages of any kind whatsoever as the result of any breach by Tenant that occurred before the date of attornment, (viii) be bound by any obligation to restore the Building, such subtenant's premises or property located therein in the event of a casualty or condemnation of the Building or such subtenant's premises or any portion thereof except as required by this Lease, or (ix) be obligated to perform, or be liable for any payment to such subtenant of any sums or the granting to such subtenant of any credit in the nature of a contribution toward the cost of, any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by

the terms and conditions set forth in this Article 14. The provisions of this Article 14 shall be self-operative and no further instrument shall be required to give effect to this provision.

Section 14.9    (a)    If Landlord shall consent to any assignment of this Lease or to any sublease, or if Tenant shall enter into any other assignment or sublease permitted hereunder, Tenant shall, in consideration therefor, pay to Landlord, as Additional Rent the following amounts ("Transaction Profits"), after first deducting therefrom (but not below zero) Transaction Expenses incurred by Tenant in connection with such assignment or subletting:

> (i)    in the case of an assignment, an amount equal to fifty percent (50%) of all sums and other consideration payable to or for the benefit of Tenant by the assignee for or by reason of such assignment (including sums paid for Tenant's Property, fixtures or leasehold improvements calculated as if such items were sold in an arm's-length transaction and for services provided or to be provided to such assignee or to the space assigned); and.

> (ii)    in the case of a sublease, an amount equal to fifty percent (50%) of all rents, additional charges or other consideration payable to or for the benefit of Tenant under or by reason of the sublease in excess of the Fixed Rent and Additional Rent payable during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including sums paid for the sale or rental of Tenant's Property, fixtures or leasehold improvements calculated as if such items were sold in an arm's-length transaction).

(b)    "Transaction Expenses" shall mean, collectively, to the extent actually paid by Tenant to unrelated third parties, (i) the reasonable out-of-pocket costs and expenses of Tenant in entering into the sublease or assignment, such as customary real estate brokerage commissions, legal and architectural fees, and advertising fees paid to unrelated third parties, (ii) free rent, rent concessions or rent abatements solely to the extent of any Rent payable by Tenant to Landlord for the portion of the Term during which the free rent or rent abatement period under the sublease occurs, (iii) the cost of improvements, construction contributions or alterations made by Tenant expressly and solely for the purpose of preparing the space for such tenancy and in no event to include costs expended for Tenant's Initial Alterations, and (iv) any work allowance or other monetary concession actually paid to the assignee or subtenant as the case may be. Notwithstanding anything contained herein to the contrary, in the event Tenant shall assign this Lease or sublet the Premises or any portion thereof prior to Tenant's occupying the Premises, construction allowances and other out-of-pocket concessions shall only be includable as Transaction Expenses to the extent that such concessions exceed, on an RSF basis, the amount of construction allowances and concessions provided by Landlord to Tenant under this Lease.

(c)    The sums payable under this Section 14.9 shall be paid by Tenant to Landlord as Additional Rent as and when paid by the subtenant or assignee to Tenant. In the case of a sublease, Transaction Expenses shall be amortized on a straight line basis over the term of the sublease, and may be deducted as provided in Section 14.9(a) hereof, without interest.

(d)    Notwithstanding anything to the contrary set forth in subsection (a) above, Tenant shall not be obligated to pay Transaction Profits to Landlord with respect to transactions for which Landlord's consent is not required under Section 14.2(a) or Section 14.2(b) hereof.

Section 14.10   (a)       Each permitted assignee or transferee shall assume and be deemed to have assumed the obligations of Tenant under this Lease to be performed, or arising or accruing, on and after the effective date of such assignment or transfer and shall be and remain liable jointly and severally with Tenant for the payment of Fixed Rent and Additional Rent, and for the due performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the remainder of the Term. Any assignment or transfer, whether made with Landlord's consent pursuant to Section 14.1 hereof or without Landlord's consent to the extent permitted under Sections 14.2 hereof, shall be made only if, and shall not be effective until, the assignee shall execute and deliver to Landlord an agreement in Landlord's then current form of consent agreement whereby the assignee shall assume the obligations of this Lease on the part of Tenant to be performed or observed from and after the effective date of such assignment or transfer, and whereby the assignee shall agree that the provisions in Article 14 hereof shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers.

(b)       The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant and the due performance of the obligations of this Lease on Tenant's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord, or any grantee or assignee of Landlord by way of mortgage or otherwise, extending the time, or modifying any of the obligations of this Lease, or by any waiver or failure of Landlord, or any grantee or assignee of Landlord by way of mortgage or otherwise, to enforce any of the obligations of this Lease.

(c)       The listing of any name other than that of Tenant, whether on the doors of the Premises or the Building directory, or otherwise, shall not operate to vest any right or interest in this Lease or in the Premises, nor shall it be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of Premises or to the use or occupancy thereof by others.

Section 14.11   Tenant covenants and agrees that no security agreement, whether by way of conditional bill of sale, chattel mortgage or instrument of similar import, shall be placed upon any improvement at the Premises which is affixed to the Real Property.

ARTICLE 15

ACCESS TO PREMISES; BASE BUILDING UPGRADE WORK

Section 15.1   Tenant shall permit Landlord, Landlord's agents and public utilities servicing the Building to erect, use and maintain concealed ducts, concealed pipes and concealed conduits in and through the Premises. The foregoing installations shall be concealed behind then existing walls and ceilings of the Premises if reasonably feasible and permitted under applicable Legal Requirements, provided that any pipes that are not so concealed shall be boxed in a manner reasonably consistent with the decor of the Premises; and any such installations shall not cause a reduction of the usable floor space of the Premises (other than to a *de minimis* extent). Landlord or Landlord's agents shall have the right to enter the Premises on not less than one (1) business day's prior written notice and during Tenant's normal business hours (except no such prior notice shall be required in case of emergency):

(a)       to examine the Premises;

(b)       to show the Premises to prospective purchasers, Mortgagees, Superior Lessors or ground lessees of the Building and their respective agents and representatives;

(c)     to exhibit the Premises or any portion thereof to prospective tenants or occupants (i) during the last twenty-four (24) months of the Term, (ii) at any time during the Term while there exists a default of Tenant hereunder or (iii) during any period in which Landlord may exercise a right to terminate this Lease;

(d)     for the purpose of photographing the Premises for use by Landlord and/or Landlord's Affiliates in connection with promotional and marketing materials; and/or

(e)     In addition, Landlord or Landlord's agents will have the right to enter the Premises on not less than one (1) business day's prior written notice at all reasonable times (except no such prior notice shall be required in case of emergency) to make such repairs, alterations, improvements or additions that (i) constitute Landlord Repairs, or (ii) Landlord may elect to perform following Tenant's failure (after the expiration of all applicable notice and grace periods) to make repairs or perform any work that Tenant is obligated to make or perform under this Lease. Landlord shall be allowed to take all material into and upon the Premises that may be required therefor without the same constituting an eviction or constructive eviction of Tenant in whole or in part, and Fixed Rent and Additional Rent will not be abated while such repairs, alterations, improvements or additions are being made, by reason of loss or interruption of the business of Tenant, or otherwise. Landlord shall use reasonable efforts (but not including the use of overtime or premium labor) to perform such work in such a manner so as to minimize interference that might be occasioned to Tenant's business operations and to minimize any damage that might result to the appearance or function of the affected areas of the Premises. Landlord shall promptly repair any damage caused by Landlord or Landlord's agents in the Premises during such entry, including any repair or replacement required to any finishes in the Premises as a result of such entry.

Section 15.2     If Tenant shall not be present when for any reason entry into the Premises shall be necessary because of an emergency or if otherwise permissible under this Lease, Landlord or Landlord's agents may enter the same without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's Property and notify Tenant immediately thereafter), and without in any manner affecting this Lease. Tenant agrees to make a representative available for such entry upon at least one (1) Business Day's prior written notice.

Section 15.3     Landlord shall have the right from time to time to alter the Building and, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the arrangement or location of entrances or passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Building, provided that such alterations or changes do not materially interfere with Tenant's layout, use or enjoyment of the Premises, or access to the Building or Premises. All parts (except surfaces facing the interior of the Premises) of all walls, windows and doors bounding the Premises (including exterior Building walls, exterior core corridor walls, exterior doors and entrances other than doors and entrances solely servicing the Premises), all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, heating, air cooling, plumbing and other mechanical facilities, mechanical rooms, service closets (including electrical and janitorial closets) and other Building facilities may not be used by Tenant, and Landlord shall have the use thereof, as well as access thereto through the Premises for the purposes of operation, maintenance, alteration and repair, subject to the provisions of Sections 15.1 and 15.2.

ARTICLE 16

CERTIFICATE OF OCCUPANCY

Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy at such time issued for the Premises or for the Building and in the event that any Governmental Authority shall hereafter contend or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, then, Tenant shall, upon five (5) days' written notice (or such shorter period if required by law) from Landlord or any Governmental Authority, immediately discontinue such use of the Premises; provided, however, that Tenant shall have the right to contest the decision by the Governmental Authority, and if successful, Tenant shall be able to resume its use of the Premises. Landlord shall maintain such certificate of occupancy (or an equivalent replacement thereof) in effect and shall not amend or modify the certificate of occupancy for the Building so as to eliminate any currently permitted use of the Premises or to prevent the use of the Premises for the Permitted Uses. Notwithstanding the foregoing, Landlord shall not be obligated to obtain or maintain a certificate of occupancy for any Special Use Area.

ARTICLE 17

DEFAULT

Section 17.1    Each of the following events shall be an "Event of Default" hereunder:

(a)    if Tenant shall default in the payment when due of any installment of Fixed Rent or in the payment when due of any Additional Rent and such default shall not be cured within five (5) Business Days following written notice to Tenant of such default; or

(b)    if the Premises or a substantial portion thereof shall become abandoned (and the fact that any of Tenant's Property remains in the Premises shall not be evidence that Tenant has not abandoned the Premises); or

(c)    (i)    if Tenant admits in writing its inability to pay its debts as they become due; or

(ii)    if Tenant commences or institutes any case, proceeding or other action (A) seeking relief as a debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(iii)    if Tenant makes a general assignment for the benefit of creditors; or

(iv)    if any case, proceeding or other action is commenced or instituted against Tenant (A) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution,

composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which remains undismissed for a period of ninety (90) days; or

(v)    if any case, proceeding or other action is commenced or instituted against Tenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or

(vi)    if Tenant takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (ii), (iii), (iv) or (v) of this Section 17.1(c); or

(vii)    if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant or any guarantor, which appointment is not vacated or effectively stayed within seven (7) Business Days, or if any such vacating or stay does not thereafter remain in effect; or

(d)    if Tenant fails to maintain any of the insurance required to be maintained by Tenant hereunder or to deliver certificates thereof when required hereunder and Tenant fails to remedy such default within fifteen (15) days after notice by Landlord to Tenant specifying such default; or

(e)    if an assignment or subletting shall occur or if Tenant's interest in this Lease or the Premises shall devolve upon or pass to any Person, whether by operation of law or otherwise, and whether directly or indirectly, except as expressly permitted by Article 14 hereof; or

(f)    if Tenant shall fail to perform or observe some term or condition of this Lease which, because of its character, would immediately (i) jeopardize Landlord's interest in the Real Property or the health or safety of any person, (ii) have a material and adverse effect on the operation of the Building or any Building System, or (iii) have a material and adverse effect on the business operations of any occupant, and such failure continues for two (2) Business Days after notice from Landlord to Tenant specifying such default; or

(g)    if Tenant defaults in the observance or performance of any other term, covenant or condition of this Lease on Tenant's part to be observed or performed and Tenant fails to remedy such default within twenty (20) days after notice by Landlord to Tenant specifying such default, or, if such default is of such a nature that it cannot be completely remedied within said period of twenty (20) days, if Tenant fails to commence to remedy such default within such twenty (20) day period, or fails thereafter to diligently prosecute to completion all steps necessary to remedy such default, which such remedy in all events will be completed within ninety (90) days after notice by Landlord to Tenant of such default; provided, however, if any Governmental Authority having jurisdiction or Mortgagee requires that such default be remedied in less than ninety (90) days, then Tenant's time to remedy such default shall be shortened so that such default must be remedied at least five (5) days before the last date of the shorter period of time to remedy such default provided by such Governmental Authority or Mortgagee; or

(h)     if Tenant fails to timely deliver a Replacement Letter in accordance with the terms of Section 30.1(a) hereof or to restore the Letter to the face amount required under Section 30.1(a) hereof after Landlord has drawn upon the Letter; or

(i)     if any material representation or warranty made by Tenant herein or in any report, certificate, financial statement or other instrument, agreement or document furnished to Landlord shall have been false or misleading as of the date the representation or warranty was made.

If, at any time, (i) Tenant shall comprise two (2) or more Persons, or (ii) Tenant's obligations under this Lease shall have been guaranteed by any Person other than Tenant, or (iii) Tenant's interest in this Lease shall have been assigned, the word "Tenant", as used in clause (c) of this Section 17.1, shall be deemed to mean any one or more of the Persons primarily or secondarily liable for Tenant's obligations under this Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in said clause (c) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed an acceptance of rent or a waiver on the part of Landlord of any rights hereunder.

Section 17.2    Conditions of Limitation.   If an Event of Default occurs, Landlord may serve a written five (5) day notice of termination of this Lease upon Tenant, and, upon the expiration of said five (5) day period, this Lease and the Term and all rights of Tenant under this Lease shall end, expire and terminate as fully and completely as if the expiration of said five (5) day period were the date set forth herein as the Expiration Date and Tenant immediately shall quit and surrender the Premises, but Tenant shall remain liable as hereinafter provided. If the notice provided for in this Section 17.2 shall have been given and the Term shall expire as aforesaid, then Landlord may, without notice, re-enter the Premises and dispossess Tenant and recover possession of the Premises by summary proceedings or otherwise, but in accordance with applicable law, and in such manner as set forth in Article 18 and the legal representative of Tenant or other occupant of the Premises and remove their effects and hold the Premises as if this Lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end. Anything contained herein to the contrary notwithstanding, (a) if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in Section 17.1(c), or by federal or state statute, then, following the expiration of any such stay, or (b) if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or (c) if said trustee, Tenant or Tenant as debtor-in-possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, may serve a written three (3) day notice of the termination of this Lease upon Tenant, Tenant as debtor-in-possession or said trustee and upon the expiration of said three (3) day period this Lease shall cease and expire as set forth above and Tenant, Tenant as debtor-in-possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

ARTICLE 18

REMEDIES AND DAMAGES

Section 18.1    (a)     If an Event of Default shall occur, and this Lease and the Term shall expire and come to an end as provided in Article 17 and in accordance with applicable New York law:

     (i)     Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord and its agents may at any time after the date upon which this Lease and the Term shall expire and come to an end, re-enter the Premises or any part thereof, without further notice, either by summary proceedings, or by any other applicable action or proceeding, and may repossess the Premises and dispossess Tenant and any other Persons from the Premises and remove any and all of their property and effects from the Premises; and

     (ii)     Landlord, at Landlord's option, may relet the whole or any part or parts of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine; provided, however, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

     (b)     Tenant, on its own behalf and on behalf of all Persons claiming through or under Tenant, including all creditors, hereby waives any and all rights which Tenant and all such Persons might otherwise have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (i) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (ii) any expiration or termination of this Lease and the Term, whether such dispossession, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

     Section 18.2     (a)     If this Lease and the Term shall expire and come to an end as provided in Article 17, or if Landlord shall re-enter by or under any summary proceeding or any other action or proceeding, then, in any of such events:

     (i)     Tenant shall pay to Landlord all Fixed Rent (including, without limitation, an amount equal to all Fixed Rent that would have been payable during the period commencing on the Commencement Date and expiring on the Rent Commencement Date but for the application of the provisions of Section 1.1(c) hereof) and Additional Rent payable under this Lease by Tenant to Landlord to the date upon which (A) this Lease and the Term shall have expired and come to an end or (B) Landlord shall have re-entered or taken possession of the Premises;

(ii)     Tenant also shall be liable for and shall pay to Landlord, as liquidated damages, any deficiency (the "Deficiency") between (A) Fixed Rent and Additional Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding such termination or re-entry increased by an amount to take into account an increase in the CPI), and (B) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of Section 18.1(a)(ii) for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, Landlord's re-entry upon the Premises and with such reletting including all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs and other expenses of keeping the Premises in good order or for preparing the Premises for such reletting); provided that if the Premises or any part thereof should be relet in combination with other space or for a term which extends beyond the Expiration Date, then proper apportionment (on a per Rentable Square Foot basis in the case of a reletting in combination with other space) shall be made of the rent received from such reletting and of the expenses of reletting.   Tenant shall pay the Deficiency in monthly installments on the days specified in this Lease for payment of installments of Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise.  No suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

(iii)    whether or not Landlord shall have collected any monthly Deficiency as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiency as and for liquidated and agreed final damages, a sum equal to (A) the amount by which the Fixed Rent and Additional Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding increased each year by the CPI Fraction) exceeds (B) the then fair and reasonable rental value of the Premises, including Additional Rent for the same period, both discounted to present value at six percent (6%), less (C) the aggregate amount of Deficiencies previously collected by Landlord pursuant to the provisions of Section 18.2(a)(ii) for the same period.  If, before presentation of proof of such liquidated damages to any court, commission or tribunal, Landlord shall have relet the Premises or any part thereof on an arm's length basis for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of net rents collected in connection with such reletting shall be deemed, *prima facie*, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting.

(b)     If Landlord shall relet the Premises, or any part thereof, together with other space in the Building, the net rents collected under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section 18.2. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Nothing contained in Article 17 or this Article 18 shall be deemed to limit or preclude the recovery by Landlord from Tenant of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 18.2 (it being agreed, however, that the only damages that Landlord is entitled to in respect of Tenant's failure to pay Rent for the remainder of the Term in the event of the termination of this Lease by reason of Tenant's default are as set forth in this Section 18.2).

ARTICLE 19

FEES AND EXPENSES

Section 19.1     (a)     If an Event of Default shall occur under this Lease or if Tenant shall do or permit to be done any act or thing upon the Premises which would cause Landlord to be in default under any Superior Lease or Mortgage with respect to provisions as to which Tenant has or, for reasons other than Landlord's breach or omission in so notifying Tenant, should have notice of, or if Tenant shall fail to comply with its obligations under this Lease and the preservation of property or the safety of any tenant, occupant or other person is threatened, Landlord may, after reasonable prior notice to Tenant except in an emergency (in which event Landlord shall provide Tenant with such notice as is reasonably practicable under the circumstances), perform the same for the account of Tenant or make any expenditure or incur any obligation for the payment of money for the account of Tenant. All amounts expended by Landlord in connection with the foregoing, including attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding or recovering possession of the Premises, and the cost thereof, with interest thereon at the Applicable Rate, shall be deemed to be Additional Rent hereunder and shall be paid by Tenant to Landlord within thirty (30) days of rendition of any bill or statement to Tenant therefor.

(b)     Tenant shall pay on demand as Additional Rent, regardless of whether any default or Event of Default has occurred or whether any proceeding to enforce this Lease has been commenced, all costs and expenses, attorneys' fees and disbursements and other fees incurred by Landlord in connection with (i) the enforcement by Landlord of any obligation of Tenant under this Lease; (ii) the preservation and enforcement of Landlord's rights and remedies in connection with this Lease; (iii) any unsuccessful attempt by Tenant to enforce any obligation or purported obligation of Landlord under this Lease; (iv) any unsuccessful action or proceeding brought by Tenant against Landlord related to this Lease; and (v) any voluntary or involuntary bankruptcy case, proceeding or action by or on behalf of Tenant, including, without limiting the generality of the foregoing, any and all expenses and attorneys' fees incurred by Landlord related to (A) the assumption or rejection of this Lease, including attempts by Tenant to extend any deadlines related to such assumptions or rejections; (B) the filing of proof(s) of claim by Landlord, and any defense of such proof(s) of claim; (C) the assignment of this Lease; and (D) the reorganization or liquidation of Tenant.

Section 19.2     If Tenant shall fail to pay all or any part of any installment of Fixed Rent and/or Additional Rent when due (each, a "Late Payment"), Tenant shall pay to Landlord, in addition to such installment of Fixed Rent and/or Additional Rent, as the case may be, as a late charge and as Additional Rent, a sum equal to $0.05 for each dollar of the amount unpaid, together with interest on the Late Payment unpaid at the Applicable Rate, computed from the date the Late Payment was due to and including the date of payment.

Section 19.3    The provisions of this Article 19 shall survive the expiration or earlier termination of this Lease.

ARTICLE 20

NO REPRESENTATIONS BY LANDLORD

Except as expressly set forth in this Lease, neither Landlord nor any Landlord Party has made any warranties, representations, statements or promises with respect to (a) the rentable and usable areas of the Premises or the Building, (b) the amount of any current or future Additional Rent and/or Taxes, (c) the compliance with applicable Legal Requirements of the Premises or the Building or (d) the suitability of the Premises for any particular use or purpose. Except as expressly set forth herein, no rights, easements or licenses are acquired by Tenant under this Lease, by implication or otherwise. This Lease (including any Exhibits and Schedules referred to herein and all supplementary agreements provided for herein) contains the entire agreement between the parties and all understandings and agreements previously made between Landlord and Tenant are merged in this Lease, which alone fully and completely expresses their agreement. Tenant is entering into this Lease after full investigation, and is not relying upon any statement or representation made by Landlord or Landlord Party not embodied in this Lease.

ARTICLE 21

END OF TERM

Section 21.1    All of Tenant's Property shall remain the property of Tenant and may be removed by Tenant at any time during the Term. Upon the expiration or other termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, vacant, broom-clean and in good condition, ordinary wear and tear and damage by fire or other casualty or damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all of Tenant's Property and the Non-Standard Alterations (except as otherwise expressly set forth in this Lease) from the Premises to the extent required under Section 4.4. Tenant shall repair any damage to the Premises occasioned by the removal by Tenant or any Person claiming under Tenant of any of Tenant's Property and all Non-Standard Alterations from the Premises. At Landlord's option, Tenant shall also remove all low voltage, internet and telecom wiring and cabling installed by or on behalf of Tenant (except for such wiring and cabling installed by Landlord), located in the Premises including, without limitation, those located in the ceiling plenums. Tenant's obligations pursuant to this Article 21 shall survive the expiration or earlier termination of this Lease. If the last day of the Term falls on Saturday or Sunday, this Lease shall expire on the Business Day next preceding such day. Tenant expressly waives, for itself and for any Person claiming through or under Tenant, any rights which Tenant or any such Person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Article 21.

Section 21.2    (a)    Tenant agrees that if for any reason Tenant or any Tenant Party shall fail to vacate and surrender possession of the Premises or any part thereof on or before the expiration or earlier termination of this Lease and the Term, then Tenant's continued possession of the Premises shall be as a month-to-month tenancy, during which time, without prejudice and in addition to any other rights and remedies Landlord may have hereunder or at law, Tenant shall (i) pay to Landlord an amount (the "Holdover Amount") equal to the Applicable Percentage times the Fixed Rent plus 100% of the regularly recurring Additional Rent and (ii) comply with all other terms and conditions of this Lease. The "Applicable Percentage" shall mean one hundred fifty percent (150%) for the first sixty (60) days of such holdover and two hundred percent (200%) thereafter. The provisions of this Section 21.2 shall not in any

way be deemed to (1) permit Tenant to remain in possession of the Premises after the Expiration Date or (2) imply any right of Tenant to use or occupy the Premises upon expiration or termination of this Lease and the Term, and no acceptance by Landlord of payments from Tenant after the Expiration Date shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Article 21. Landlord waives no rights against Tenant by reason of accepting any holding over by Tenant, including, without limitation, the right to terminate such month-to-month tenancy as provided by law at any time after the expiration of the Term and any right to damages in the event that Tenant's holding over causes Landlord to suffer any loss. Tenant's obligations under this Article 21 shall survive the expiration or earlier termination of this Lease.

(b)    Notwithstanding anything herein to the contrary, if Tenant or any Tenant Party shall fail to vacate and surrender possession of the Premises or any part thereof in excess of ten (10) days following the expiration or earlier termination of this Lease and the Term, Tenant agrees it shall indemnify and save Landlord harmless against all costs, claims, loss or liability resulting from delay by Tenant in surrendering the Premises upon expiration or sooner termination of the Term, including, without limitation, any claims made by any succeeding tenant founded on such delay or any lost profits, losses, costs, expenses or liability as a result thereof.

ARTICLE 22

QUIET ENJOYMENT

So long as Tenant pays all of the Fixed Rent and Additional Rent due hereunder, and keeps and performs each and every covenant, agreement, term, provision and condition herein contained on the part and on behalf of Tenant to be kept and performed, Tenant shall quietly enjoy the Premises without hindrance or molestation by Landlord or by any other person lawfully claiming the same, subject to the covenants, agreements, terms, provisions and conditions of this Lease and to any Mortgages to which this Lease is subject and subordinate, as hereinbefore set forth.

ARTICLE 23

NO WAIVER; NON-LIABILITY

Section 23.1    No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises. Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its agents shall be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft or otherwise.

Section 23.2    The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations set forth or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation, from having all of the force and effect of an original violation. The failure of Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, shall not prevent a subsequent act, which would have originally constituted a violation, from having all of the force and effect of an original violation. The receipt by Landlord of Fixed Rent and/or Additional Rent even with knowledge of the breach of any covenant of this Lease shall

not be deemed a waiver of such breach.  No provision of this Lease shall be deemed to have been waived by either Landlord or Tenant, unless such waiver be in writing signed by the party against whom such waiver is claimed.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or any Additional Rent shall be deemed to be other than on account of the next installment of Fixed Rent or Additional Rent, as the case may be (unless such Fixed Rent or Additional Rent has been abated in accordance with the terms of this Lease), or as Landlord may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent or Additional Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or Additional Rent or pursue any other remedy in this Lease provided.  Any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.  The consent or approval of Landlord or Tenant to or of any action by the other requiring such consent or approval shall not be construed to waive or render unnecessary Landlord's or Tenant's consent or approval to or of any subsequent similar act by the other.  Unless otherwise expressly provided herein, references in this Lease to the consent or approval of either party shall be deemed to mean the written consent or approval of such party and no consent or approval of such party shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by such party.

Section 23.3    If, at any time or from time to time, any windows of the Premises are temporarily blocked, darkened or bricked-up for any reason whatsoever outside of Landlord's reasonable control (except that Landlord shall have the right to erect hoisting on the exterior of the Building from time to time (without entering the Premises) which may darken windows of the Premises that are located beside such hoist, which hoist shall remain only for such time as is reasonably necessary for the construction requiring such hoist), or by Landlord in connection with the performance of repairs, maintenance or improvements to the Building, or if required by any Legal Requirements, or if any of such windows are permanently blocked, darkened or bricked-up if required by any Legal Requirement or by reason of any construction upon property adjacent to the Real Property by parties other than Landlord or any Affiliate of Landlord (but unrelated to the Building), Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement of Fixed Rent or Additional Rent nor shall the same release Tenant from its obligations hereunder or constitute an eviction or constructive eviction of Tenant from the Premises.  If any windows of the Premises are permanently blocked, darkened or bricked-up due to the application of any Legal Requirement, Landlord shall promptly commence appropriate proceedings challenging the validity, or applicability to the Premises of such Legal Requirement, and shall (i) diligently prosecute such proceedings (to completion, if necessary), (ii) keep Tenant advised of the progress of such proceedings and permit Tenant to participate in all aspects of the prosecution of such proceedings, and (iii) assign and, promptly after receipt, pay over to Tenant a percentage of the proceeds of any damage awards or other amounts received by Landlord in connection with such proceedings equal to the number of windows in the Premises affected by such blocking, darkening or bricking-up, divided by the total number of windows in the Building so affected, net of Landlord's reasonable attorney's fees, court costs, disbursements and other expenses incurred in connection with such proceedings.

ARTICLE 24

WAIVERS

Section 24.1    THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER (EXCEPT FOR PERSONAL INJURY

OR PROPERTY DAMAGE) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.    IF LANDLORD COMMENCES ANY SUMMARY PROCEEDING AGAINST TENANT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING (UNLESS FAILURE TO IMPOSE SUCH COUNTERCLAIM WOULD PRECLUDE OR OTHERWISE PREJUDICE TENANT FROM ASSERTING IN A SEPARATE ACTION THE CLAIM WHICH IS THE SUBJECT OF SUCH COUNTERCLAIM), AND WILL NOT SEEK TO CONSOLIDATE SUCH PROCEEDING WITH ANY OTHER ACTION WHICH MAY HAVE BEEN OR WILL BE BROUGHT IN ANY OTHER COURT BY TENANT.

Section 24.2    (a)    Tenant, for itself and any and all Persons claiming through or under Tenant, including its creditors, upon the termination of this Lease or expiration of the Term in accordance with the terms hereof, or in the event of entry of judgment for the recovery of the possession of the Premises in any action or proceeding, or if Landlord shall reenter the Premises by process of law, hereby waives any right of redemption provided or permitted by any statute, law or decision now or hereafter in force, and does hereby waive, surrender and give up all rights or privileges which it or they may or might have under and by reason of any present or future law or decision, to redeem the Premises or for a continuation of this Lease for the Term of this Lease after having been dispossessed or ejected therefrom by process of law.

(b)    Subject to any applicable notice and cure period, if Tenant is in arrears in the payment of Fixed Rent or Additional Rent, Tenant waives its right, if any, to designate the item against which any payments made by Tenant are to be credited and Tenant agrees that Landlord may apply any payment made by Tenant to any items as Landlord may see fit, irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payment shall be credited.

ARTICLE 25

INABILITY TO PERFORM

Except as expressly provided in this Lease, the obligation of Tenant to perform all of the covenants and agreements hereunder on the part of Tenant to be performed, and the obligation of Landlord to perform all of the covenants and agreements hereunder on the part of Landlord to be performed, will not be affected, impaired or excused because Landlord or Tenant, as the case may be, is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or Tenant, as the case may be, or because Landlord or Tenant, as the case may be, is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, unless Landlord or Tenant, as the case may be, is prevented or delayed from so doing by reason of Force Majeure or delays resulting from Mortgagee's or Superior Lessor's requirements to grant consent (all of the foregoing, collectively, "Unavoidable Delays"); provided, however, in no event shall such party's financial inability to perform be an Unavoidable Delay.  Notwithstanding anything to the contrary set forth herein, Tenant's obligation to pay Fixed Rent and Additional Rent hereunder shall not be affected hereby unless specifically provided for in this Lease.  Landlord and Tenant each shall notify the other as promptly as is reasonably practicable after learning of any Unavoidable Delays which prevent such party from fulfilling any of its obligations under this Lease, and after such initial notification promptly after request of the other party, Landlord or Tenant (as the case may be) shall notify the other party of the status of such delay.  Each party shall use all commercially reasonable efforts to mitigate the delay caused by any event of Unavoidable Delays to the extent reasonably commercially practicable, but without the necessity of employing overtime labor

unless such party elects to do so within its sole discretion or unless the other party elects to pay for such
overtime labor.

ARTICLE 26

BILLS AND NOTICES

Except as otherwise expressly provided in this Lease, any bills, statements, consents, notices,
demands, requests or other communications given or required to be given under this Lease shall be in
writing and shall be given or rendered if by (i) hand delivery, or (ii) certified or registered United States
mail, postage prepaid, return receipt requested, or (iii) expedited prepaid delivery service, either by
commercial overnight courier  (e.g., Fedex or UPS) or United States Postal Service, with proof of
delivery or attempted delivery required, in the case of (i), (ii) or (iii) above, in each case, addressed as
shown below:

If to Tenant, as at the Premises,

copies to (except for Landlord's Statements and all other rent bills, as well as other routine,
nonmaterial communications and correspondence):

VALENCE LAW GROUP, PC
20 California Street
Seventh Floor
San Francisco, CA 94111
Attention: Krista Kim, Esq.

If to Landlord, as follows:

Factory Owner LLC
c/o Atlas Capital Group, LLC
505 5th Avenue, 25th Floor
New York, New York 10017
Attention: Jay Fehskens

with copies to:

Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Attention: Alan Tarter, Esq. and Arthur Zagorsky, Esq.

and a copy of any default or termination notice to Landlord's Mortgagee at an address to be
provided by Landlord.

Such address may be changed by any party in a written notice to the other parties hereto in the
manner provided for in this Article 26. A notice shall be deemed to have been given: in the case of hand
delivery, at the time of delivery or refusal to accept delivery; in the case of registered or certified mail or

expedited prepaid delivery, upon delivery or refusal to accept delivery; or in the event of failure to deliver by reason of changed address of which no notice was given or refusal to accept delivery, as of the date of such failure or refusal. A party receiving a notice which does not comply with the technical requirements for notice under this <u>Article 26</u> may elect to waive any deficiencies and treat the notice as having been properly given. Any notice to be given by any party may be given by such party's attorney.

## ARTICLE 27

## RULES AND REGULATIONS

Annexed hereto as <u>Exhibit B</u> are the rules and regulations for the Building (the "<u>Building Rules and Regulations</u>"; the Building Rules and Regulations and the Alteration Rules and Regulations are collectively referred to herein as the "<u>Rules and Regulations</u>"). Landlord reserves the right, from time to time, to adopt additional reasonable and non-discriminatory Rules and Regulations and to amend the Rules and Regulations then in effect, all upon notice to Tenant. Tenant and Tenant's contractors, employees, agents, and licensees shall comply with the Rules and Regulations, as so supplemented or amended. Landlord agrees that Landlord shall not adopt any new Rules or Regulations affecting only Tenant, or enforce any of the Rules and Regulations against Tenant which Landlord shall not then be generally enforcing against other office tenants or occupants of the Building, if any. If there shall be any inconsistencies between this Lease and any Rules and Regulations (now existing or hereafter adopted), the provisions of this Lease shall prevail. The failure of Landlord to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Tenant or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations.

## ARTICLE 28

## BROKER

Section 28.1    Each of Landlord and Tenant represents and warrants to the other that it has not dealt with any broker in connection with this Lease other than Newmark Grubb Knight Frank (the "<u>Broker</u>") and that to the best of its knowledge and belief, no other broker, finder or similar Person procured or negotiated this Lease or is entitled to any fee or commission in connection herewith. Landlord shall be responsible for and pay all fees and commissions due to Broker in connection with this Lease pursuant to separate agreements.

Section 28.2    Each of Landlord and Tenant shall indemnify, defend, protect and hold the other party harmless from and against any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than Broker) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Lease, or arising from a breach by such party of the representation and warranty set forth in <u>Section 28.1</u>. The provisions of this <u>Article 28</u> shall be subject to <u>Sections 29.1(c)</u> and <u>(d)</u> and shall survive the expiration or earlier termination of this Lease.

## ARTICLE 29

## INDEMNITY

Section 29.1    (a)    To the maximum extent permitted by law, Tenant waives any right to contribution against any Landlord Party (as hereinafter defined) and agrees to indemnify and save harmless such Landlord Party from and against all claims of whatever nature by a third party arising from

or claimed to have arisen from (i) any act, omission or negligence of the Tenant Parties (as hereinafter defined); (ii) any accident, injury or damage whatsoever caused to any person, or to the property of any person, occurring in or about the Premises from the earlier of (A) the date on which any Tenant Party first enters the Premises for any reason or (B) the Commencement Date, and thereafter throughout and until the end of the Term and after the end of the Term for as long as Tenant or anyone acting by, through or under Tenant is in occupancy of the Premises or any portion thereof; (iii) any accident, injury or damage whatsoever occurring outside the Premises but within the Building, or on Common Areas or the Real Property, where such accident, injury or damage results, or is claimed to have resulted, from any act, omission or negligence on the part of any Tenant Party; or (iv) any breach of this Lease by Tenant. Tenant shall pay such indemnified amounts as they are incurred by any Landlord Party. This indemnification shall not be construed to deny or reduce any other rights or obligations of indemnity that a Landlord Party may have under this Lease or the common law. Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated to indemnify a Landlord Party for any claims to the extent that such Landlord Party's damages in fact result from such Landlord Party's gross negligence or willful misconduct.

(b)    In the event that Tenant breaches any of its indemnity obligations hereunder or under any other contractual or common law indemnity: (i) Tenant shall pay to the applicable Landlord Party all liabilities, loss, cost, or expense (including reasonable attorney's fees) incurred as a result of said breach; and (ii) the applicable Landlord Party may deduct and offset from any amounts due to Tenant under this Lease any amounts owed by Tenant pursuant to this Section 29.1.

(c)    Subject to the limitations in this Article 29, and to the extent not resulting from any act, omission, fault, negligence or misconduct of Tenant or its contractors, licensees, invitees, agents, servants or employees, Landlord agrees to indemnify and save harmless Tenant from and against any claim by a third party arising from any injury to any person occurring in the Premises or in the Building after the date that possession of the Premises is first delivered to Tenant and until the expiration or earlier termination of the Lease Term, to the extent such injury results from the gross negligence or willful misconduct of Landlord or Landlord's employees, or from any breach or default by Landlord in the performance or observance of its covenants or obligations under this Lease; provided, however, that in no event shall the aforesaid indemnity render Landlord responsible or liable for any loss or damage to fixtures, personal property or other property of Tenant, and Landlord shall in no event be liable for any indirect or consequential damages. Tenant shall provide notice of any such third party claim to Landlord as soon as practicable. Landlord shall have the right, but not the duty, to defend the claim. The provisions of this Section shall not be applicable to (i) the holder of any mortgage now or hereafter on the Real Property or Building (whether or not such holder shall be a mortgagee in possession of or shall have exercised any rights under a conditional, collateral or other assignment of leases and/or rents respecting the Real Property or Building), or (ii) any person acquiring title as a result of, or subsequent to, a foreclosure of any such mortgage or a deed in lieu of foreclosure, except to the extent of liability insurance maintained by either of the foregoing.

(d)    If any claim that is within the scope of any indemnity set forth in this Lease is asserted against any indemnified party, then the indemnified party shall give prompt notice (each, an "Indemnified Party Notice") thereof to the indemnifying party (i.e., within a time period so as not to prejudice the indemnifying party's or its insurer's ability to defend effectively any action or proceeding brought on such claim) and the indemnifying party shall have the right to defend and control the defense of any action or proceeding brought on such claim with counsel chosen by the indemnifying party subject to the approval of the indemnified party (such approval not to be unreasonably withheld) or by the indemnifying party's insurance company. If the indemnified party fails promptly to deliver the Indemnified Party Notice, the indemnifying party shall continue to be liable within the scope of the indemnity provided herein, provided, however, the indemnifying party shall not be liable for such loss

sustained by any indemnified party as a result of the failure by the indemnified party to promptly deliver to the indemnifying party the Indemnified Party Notice. If the indemnified party shall not afford the indemnifying party the right to defend and control the defense of any such action or proceeding then the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts. If the indemnifying party shall defend any such action or proceeding, then:

(i)     the indemnified party shall cooperate with the indemnifying party (or its insurer) in the defense of any such action or proceeding in such manner as the indemnifying party (or its insurer) may from time to time reasonably request and the indemnifying party shall not be liable for the costs of any separate counsel employed by the indemnified party;

(ii)    the indemnifying party shall not be liable for any settlement made without the indemnifying party's consent;

(iii)   if such action or proceeding can be settled by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall have the right to settle such action or proceeding without the indemnified party's consent and the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts if the indemnified party refuses to agree to such a settlement; and

(iv)    if such action or proceeding cannot be settled merely by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall not settle such action or proceeding without the indemnified party's consent (which consent shall not be unreasonably withheld, conditioned or delayed) and if the indemnified party unreasonably withholds, conditions or delays its consent to any such settlement, then the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts.

(e)     If an indemnifying party shall, in good faith, believe that a claim set forth in an Indemnified Party Notice is not or may not be within the scope of the indemnifying party's indemnity set forth in this Lease then, pending determination of that question, the indemnifying party shall not be deemed to be in default under this Lease by reason of its failure or refusal to indemnify and hold harmless any indemnified party therefrom or to pay such costs, expenses and liabilities, but if it shall be finally determined by a court of competent jurisdiction that such claim was within the scope of such indemnifying party's indemnity set forth in this Lease then such indemnifying party shall be liable for any judgment or reasonable settlement and any reasonable legal fees incurred by the party entitled to indemnity hereunder.

(f)     The indemnification obligations under this Article 29 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant or any subtenant or other occupant of the Premises or any other Tenant Party under workers' compensation acts, disability benefit acts, or other employee benefit acts. Tenant waives any immunity from or limitation on its indemnity or contribution liability to any Landlord Party based upon such acts.

(g)    Tenant shall require its subtenants and other occupants of the Premises to provide similar indemnities to any Landlord Party in a form reasonably acceptable to Landlord.

(h)    The provisions of this Article 29 shall survive the expiration or earlier termination of this Lease.

(i)    The foregoing indemnity and hold harmless agreement shall include indemnity for all costs, expenses and liabilities (including, without limitation, reasonable attorneys' fees and disbursements) incurred by any Landlord Parties in connection with any such claim or any action or proceeding brought thereon, and the defense thereof.  In addition, in the event that any action or proceeding shall be brought against one or more Landlord Party by reason of any such claim, Tenant, upon request from the Landlord Party, shall resist and defend such action or proceeding on behalf of the Landlord Party by counsel appointed by Tenant's insurer (if such claim is covered by insurance without reservation) or otherwise by counsel reasonably satisfactory to the Landlord Party.  No Landlord Party shall be bound by any compromise or settlement of any such claim, action or proceeding without the prior written consent of such Landlord Party.

## ARTICLE 30

## SECURITY DEPOSIT

Section 30.1    (a)    Tenant shall furnish to Landlord a security deposit (the "Security Deposit") in an amount equal to          (the "Security Deposit Amount"), at Tenant's sole cost and expense, in the form of a clean, irrevocable and unconditional letter of credit (the "Letter of Credit") drawn in favor of Landlord, issued by such bank reasonably acceptable to Landlord, approved in writing, and substantially in the form approved by Landlord; provided, however, as an accommodation to Tenant, Landlord agrees to accept, simultaneously with Tenant's execution and delivery of this Lease, cash security in the Security Deposit Amount, on the condition that within sixty (60) days after the execution and delivery of this Lease, Tenant shall replace such cash security with the Letter of Credit (meeting all of the conditions of this Article).  Upon receipt of the Letter of Credit, Landlord shall promptly return the cash security so held.  The Letter of Credit shall be assignable, upon request, to any Superior Lessor, Mortgagee or successor to Landlord at no additional charge.  Tenant shall, not later than thirty (30) days prior to the expiration of the term of the Letter of Credit or any replacement thereof, deliver to Landlord a replacement letter of credit in a form and from an issuing bank reasonably acceptable to Landlord (a "Replacement Letter"), such that the Letter of Credit or a Replacement Letter shall be in effect at all times after the Effective Date until thirty (30) days beyond the Expiration Date and thereafter so long as Tenant is in occupancy of any part of the Premises.  Any Replacement Letter shall be in a face amount at least equal to the Security Deposit Amount then required hereunder.  If any issuer's credit rating is reduced below "A", or if the financial condition of such issuer changes in any other materially adverse way, then Landlord shall have the right to require that Tenant obtain from a different issuer a Replacement Letter that complies in all respects with the requirements of this Article 30 within fifteen (15) Business Days following Landlord's written demand.  The Letter of Credit and any Replacement Letter are herein sometimes referred to simply as a "Letter".  If Tenant fails to deliver to Landlord a Replacement Letter within the time limits set forth in this Section 30.1(a)), Landlord may draw down the full amount of the existing Letter without notice or demand and retain the proceeds thereof as substitute security, subject to the provisions of Section 30.1(b) below.

(b)    During the Term, and thereafter so long as Tenant is in occupancy of any part of the Premises, Landlord shall hold the Letter as security for the performance by Tenant of all obligations on the part of Tenant hereunder.  If Tenant defaults in respect of any of Tenant's obligations hereunder, including but not limited to payment of Fixed Rent or Additional Rent, or if Tenant remains in occupancy

of any part of the Premises beyond the expiration of the Term, Landlord shall have the right from time to time, without notice and without prejudice to any other remedy Landlord may have on account thereof, and upon presentation of a certificate of demand, to draw upon any Letter and apply any funds so drawn to Landlord's damages arising from, or to cure, any default by Tenant, whether such damages accrue before or after summary proceedings or other reentry by Landlord. If Landlord shall so apply any funds, Tenant shall restore the Letter to the face amount required under paragraph (a) above within fifteen (15) days. If after the expiration of the Term, Tenant has vacated the Premises and there then exists no default by Tenant in any of the terms or conditions hereof, Landlord shall return the Letter, or, if applicable, the remaining proceeds thereof, to Tenant within forty five (45) days. If Landlord conveys Landlord's interest under this Lease, any Letter or, if applicable, the proceeds thereof, may be turned over and assigned by Landlord to Landlord's grantee (or, at Landlord's election, Tenant shall furnish Landlord's successor with a new Replacement Letter showing such successor as payee, provided that the original Letter then outstanding shall be simultaneously returned to Tenant). From and after any such transfer, assignment or return, Tenant agrees to look solely to such grantee for proper application of the funds in accordance with the terms of this Section 30.1 and the return thereof in accordance herewith. No Superior Lessor or Mortgagee shall be responsible to Tenant for the return or application of any such Letter, or, if applicable, the proceeds thereof, whether or not it succeeds to the position of Landlord hereunder, unless such Letter shall have been received in hand by, and assigned to, such Superior Lessor or Mortgagee.

(c)    To the extent the Security Deposit is in the form of cash rather than a Letter of Credit, then, as required by New York General Obligations Law § 7-103, Landlord hereby notifies Tenant that: (a) Landlord shall deposit the Security Deposit provided by cash or check in an account maintained with a banking organization within the State of New York, which account shall earn interest at a rate that shall be the prevailing rate earned by other such deposits made with banking organizations in the area where the Building is located; (b) Landlord has notified Tenant (and Tenant acknowledges receipt of notice) of the name and address of the banking organization in which Landlord has deposited the Security Deposit; (c) Landlord shall be entitled to receive, as administration expenses, a sum equal to one percent (1%) per annum upon the Security Deposit (including any additional Security Deposit deposited with Landlord at any time during the Term), which shall be in lieu of all other administrative and custodial expenses, provided, however, if interest on the Security Deposit is less than 1% in any year, Landlord shall not be entitled to deduct the deficiency from the principal amount of the Security Deposit or collect deficiency from Tenant; and (d) the balance of the interest paid by the banking organization shall be the money of Tenant and shall either be held in trust by Landlord until repaid or applied for the use or rental of the Premises, or annually paid to Tenant.


ARTICLE 31

INTENTIONALLY OMITTED

ARTICLE 32

REIT REPRESENTATION

Section 32.1    Landlord and Tenant hereby agree that in the event that (i) the Internal Revenue Code of 1986, as amended, (the "Code") or the U.S. Department of the Treasury Regulations promulgated thereunder (the Regulations"), or interpretations thereof by the Internal Revenue Service contained in revenue rulings or other similar public pronouncements, shall be changed so that any Fixed Rent, Additional Rent, or any other rent or charges payable to the Landlord under this Lease (hereinafter individually and collectively referred to as "Rent") does not qualify as "rents from real property" for

purposes of either Section 512(b)(3) or Section 856(d) of the Code or (ii) the Landlord, in its sole but reasonable discretion, determines that there is any risk that all or part of any Rent shall not qualify as "rents from real property" for the purposes of either said Sections 512(b)(3) or 856(d), such Rent shall be adjusted in such manner as the Landlord may require so that it will so qualify and Tenant shall execute and deliver to Landlord such other amendments to this Lease as reasonably required for Landlord to avoid such risks; provided, however, that any adjustments required pursuant to this Section 32 shall be made so as to produce the equivalent (in economic terms) Rent as payable prior to such adjustment and in the event that Landlord determines that an amendment cannot produce economically equivalent Rent and Additional Rent, the Rent and Additional Rent payable under any such amendment shall not be any less favorable to Tenant (and shall not be greater in any event) than the Rent and Additional Rent payable under this Lease immediately prior to such amendment.   The parties agree to execute such further commercially reasonable instrument as may reasonably be required by the Landlord in order to give effect to the foregoing provisions of this Section 32.

ARTICLE 33









## ARTICLE 34

### MISCELLANEOUS

Section 34.1    (a)    The obligations of Landlord under this Lease shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder (but the foregoing shall not be construed as a waiver or release by Tenant of any liability of Landlord for any failure to observe or perform such covenants and obligations required to be observed or performed prior to the date of such sale, conveyance, assignment or transfer), and the transferee of Landlord's interest in the Building or the Real Property, as the case may be, shall be deemed to have assumed all obligations under this Lease.  Landlord shall notify Tenant simultaneously with or promptly following any transfer of Landlord's interest in the Building or the Real Property, as the case may be.  The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Building and Tenant shall not look to any other property or assets of Landlord or the property or assets of any of the Landlord Exculpated Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations.  The foregoing notwithstanding, if Tenant obtains a money judgment against Landlord, and such judgment is not paid within thirty days after the same is entered, then Tenant may offset the amount of such money judgment against the Fixed Rent coming due hereunder, together with interest thereon at the Applicable Rate from the date such judgment was entered until the date of setoff.

(b)    Except to the extent of Landlord's interest in and to the Building, no recourse shall be had on any of Landlord's obligations under this Lease or for any claim based thereon or otherwise in respect thereof against any incorporator of Landlord, subscriber to Landlord's capital stock, shareholder, employee, agent, officer or director, past, present or future, of any corporation, or any partner or joint venturer of any partnership or joint venture, or any member of any limited liability company which shall be Landlord hereunder or included in the term "Landlord" or of any successor of any such corporation or limited liability company, or against any principal, disclosed or undisclosed, or any such corporation or limited liability company, or against any principal, disclosed or undisclosed, or any affiliate of any party which shall be Landlord or included in the term "Landlord", whether directly or through Landlord or through any receiver, assignee, agent, trustee in bankruptcy or through any other person, firm or corporation (collectively, the "Landlord Exculpated Parties"), whether by virtue of any constitution, statute or rule of law or by enforcement of any assessment or penalty or otherwise, all such liability being expressly waived and released by Tenant.  Tenant shall look only and solely to Landlord's

interest in and to the Building and the rents and profits and proceeds therefrom for the satisfaction of any right of Tenant arising out of this Lease or for the collection of judgment or other judicial process requiring the payment of money by Landlord in connection with this Lease and no other property or assets of any Landlord Exculpated Party shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Tenant's rights and remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or under law, or Tenant's use and occupancy of the Premises or any other liability of Landlord to Tenant.

Section 34.2    (a)    Wherever in this Lease Landlord's consent or approval is required, if Landlord shall refuse such consent or approval, then Tenant shall not be entitled to make, nor shall Tenant make, any claim, and Tenant hereby waives any claim, for money damages (nor shall Tenant claim any money damages by way of set-off, counterclaim or defense) based upon any claim or assertion by Tenant that Landlord unreasonably withheld, conditioned or delayed its consent or approval, unless it is finally adjudicated that Landlord willfully refused such consent or approval in bad faith or with malicious intent (in which event, notwithstanding the provisions of the next sentence, Landlord shall be liable to Tenant for the actual monetary damages suffered by Tenant in connection therewith, subject in any event to the provisions of Section 34.1(a) hereof. In such event, Tenant's sole remedies shall be an action or proceeding for specific performance, injunction or declaratory judgment. Where Landlord has not so specifically agreed that it will not unreasonably withhold its consent or approval under this Lease, it is the express intent of the parties that any such consent shall be given or required only in the sole, absolute and unfettered discretion of Landlord, and may be withheld for any reason whatsoever. In no event shall Landlord's withholding consent or approval be deemed to be unreasonable if such withholding of consent is due to Landlord's failure to obtain the consent of a Mortgagee or Superior Lessor.

(b)    In the event of a breach or threatened breach by either party hereto of any term, covenant or condition of this Lease, the other party shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if no remedies were provided in this Lease for such breach. The rights to invoke the remedies herein before set forth are cumulative and shall not preclude either party from invoking any other remedy allowed at law or in equity.

Section 34.3    (a)    All of the Exhibits and Schedules attached to this Lease are incorporated in and made a part of this Lease. This Lease may not be changed, modified, terminated or discharged, in whole or in part, except by a writing, executed by the party against whom enforcement of the change, modification, termination or discharge is to be sought. Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other genders and the singular to include the plural. The captions hereof are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof. All Article and Section references set forth herein shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease. Whenever the words "include," "includes," or "including" are used in this Lease, they shall be deemed to be followed by the words "without limitation." This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing the party causing this Lease to be drafted.

(b)    This Lease shall be governed in all respects by the laws of the State of New York applicable to agreements executed in and to be performed wholly within New York including General Obligations Law 5-1401, but without giving effect to any other principles of conflict of laws. Tenant hereby submits to the jurisdiction of all state and federal courts located in the Borough and County of Queens, State of New York, United States of America in connection with any claim or action relating to this Lease and Tenant hereby waives any right to assert that such court(s) constitute an inconvenient forum. Tenant represents that it is not entitled to immunity from judicial proceedings and agrees that, in the event Landlord brings any suit, action or proceeding in New York or any other jurisdiction to enforce

any obligation or liability of Tenant arising, directly or indirectly, out of or relating to this Lease, no immunity from such suit, action or proceedings will be claimed by or on behalf of Tenant.

(c)      If any term, covenant, condition or provision of this Lease, or the application thereof to any Person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Lease or the application of such term, covenant, condition or provision to any other Person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

(d)      The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors, and, except as otherwise provided in this Lease, their assigns.

Section 34.4      (a)      Tenant represents and warrants to Landlord that (i) the financial statements of Tenant for the periods ending December 31, 2012 and 2013 and letter from First Republic Private Wealth Management dated March 18, 2015 and heretofore delivered to Landlord are true and correct and fairly reflect the financial condition and results of operation of Tenant as of the dates thereof and (ii) as of the Effective Date, there has been no material adverse change in the condition, financial or otherwise, of Tenant from the date of the latest of such financial statements which could affect Tenant ability to perform its obligations hereunder.

(b)      Tenant shall deliver to Landlord upon request  but not more often than one (1) time per year a balance sheet of Tenant, as of such last day of the fiscal year (i) prepared in accordance with GAAP, (ii) in the same form as those provided to Landlord in connection with the execution of this Lease, and (iii) certified by the chief financial officer of Tenant.

(c)      Tenant, within ten (10) Business Days after a written request therefor, shall deliver to Landlord such other financial data or information as Landlord may reasonably request.

Section 34.5      Landlord may elect, at any time during the Term, to convert the Building or the Real Property to condominium ownership (a "Conversion"), and Tenant, at Landlord's expense, shall cooperate with Landlord as reasonably requested by Landlord in connection with a Conversion, provided that:

(a)      no Conversion shall have the effect of increasing Tenant's Tax Payment and/or any other charges payable by Tenant under this Lease, in each case above the amounts as could reasonably have been anticipated to have been payable in the absence of such Conversion and if any such increase shall result from such Conversion, then the amount of such increase shall be borne by Landlord and not by Tenant;

(b)      the obligations of Landlord under this Lease shall, at Landlord's option, either (i) continue to be performed and observed by Landlord as set forth herein, or (ii) shall have been assumed in writing by (A) the successor landlord with respect to obligations hereunder to be performed within the Premises, and (B) the board of managers or equivalent governing body of the condominium association, with respect to obligations hereunder affecting the Building and the Building Systems outside of the Premises;

(c)      no Conversion shall in any other manner have the effect of (i) increasing Tenant's obligations or decreasing Tenant's rights, or (ii) decreasing Landlord's obligations or increasing Landlord's rights;

(d)    the condominium declaration shall, if permitted by law, expressly provide that this Lease is superior thereto in all respects (or if not so permitted, Tenant shall be given a non-disturbance agreement reasonably satisfactory to Tenant); and

(e)    no Conversion shall have any effect on the liability of Landlord.

Section 34.6    Except as expressly provided to the contrary in this Lease, Landlord and Tenant agree that all disputes arising, directly or indirectly, out of or relating to this Lease, and all actions to enforce this Lease, shall be dealt with and adjudicated in the courts of the State of New York or the Federal courts sitting in New York City; and for that purpose hereby expressly and irrevocably submit to the jurisdiction of such courts.

Section 34.7    If pursuant to the Federal Bankruptcy Code, Tenant is permitted to assign or otherwise transfer this Lease (whether in whole or in part in disregard of the restrictions contained in this Section 34.7 and Article 14), Tenant agrees that adequate assurance of future performance by the assignee or transferee permitted under the Federal Bankruptcy Code shall mean the deposit of cash security (or a letter of credit) with Landlord in an amount equal to the sum of one year's Fixed Rent then payable hereunder plus an amount equal to all Additional Rent payable to Landlord for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term as security for the full and faithful performance of all of the obligations under this Lease on the part of Tenant yet to be performed. If Tenant receives or is to receive any valuable consideration for such an assignment or transfer (in part or in whole) of this Lease, Landlord shall receive the same fifty percent (50%) of such consideration as Landlord would receive had the assignment or transfer (and the calculation thereunder) been made pursuant to Article 14. Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

Section 34.8    If an excavation or other substructure work shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the Person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as shall be necessary to preserve the walls of the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of Rent.

Section 34.9    (a)    Landlord represents and warrants as of the Effective Date that (i) Landlord is a duly formed and validly existing Delaware limited liability company authorized to do business in the State of New York and (ii) the execution, delivery and performance by Landlord of this Lease has been duly authorized by all necessary limited liability company action.

(b)    Tenant represents and warrants as of the Effective Date that (i) Tenant is a duly formed and validly existing Delaware corporation authorized to do business in the State of New York and (ii) the execution, delivery and performance by Tenant of this Lease has been duly authorized by all necessary corporate company action.

Section 34.10    Tenant agrees that it will neither commit nor knowingly permit discrimination by reason of race, creed, color, national origin, sex, sexual orientation, age, disability or marital status in any work performed on the Premises or the use thereof.

Section 34.11    This Lease may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

Section 34.12    Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Landlord to Tenant of any drafts of this Lease or any correspondence with respect thereto shall (i) be deemed submission solely for Tenant's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the leasing of the Premises or a lease or conveyance of the Premises by Landlord to Tenant and (iv) not confer upon Tenant or any other party any title or estate in the Premises, (b) the terms and conditions of this Lease shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all other conditions precedent to the effectiveness thereof shall have been fulfilled or waived, and (c) if this Lease and other agreements are not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Lease on account of any written or parol representations or negotiations, or drafts, comments or correspondence between the parties or their respective agents or representatives on any legal or equitable theory (including, without limitation, part performance, promissory estoppel, undue enrichment, fraud, breach of good faith negotiation obligation or otherwise).

Section 34.13    Tenant agrees that this Lease and the terms contained herein will be treated as strictly confidential and except as required by law Tenant shall not disclose the same to any third party except for Tenant's employees, partners, lenders, accountants, business advisors and attorneys who have been advised of the confidentiality provisions contained herein and agree to be bound by the same. In the event Tenant is required by law to provide this Lease or disclose any of its terms, Tenant shall give Landlord prompt notice of such requirement prior to making disclosure so that Landlord may seek an appropriate protective order. If failing the entry of a protective order Tenant is compelled to make disclosure, Tenant shall only disclose portions of this Lease that Tenant is required to disclose and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to the information so disclosed.

Section 34.14    As an inducement to Landlord to enter into this Lease, Tenant hereby represents and warrants that:  (i) Tenant is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "Prohibited Person"); (ii) Tenant is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) from and after the effective date of the above-referenced Executive Order, Tenant (and any person, group, or entity which Tenant controls, directly or indirectly) has not conducted nor will conduct business nor has engaged nor will engage in any transaction or dealing with any Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation, including, without limitation, any assignment of this Lease or any subletting of all or any portion of the Premises or the making or receiving of any contribution of funds, goods or services to or for the benefit of a Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation. In connection with the foregoing, it is expressly understood and agreed that (x) any breach by Tenant of the foregoing representations and warranties shall be deemed a default by Tenant under Section 17.1(f) of this Lease and shall be covered by the indemnity provisions of Section 29.1(a) of this Lease, and (y) the representations and warranties contained in this Section 34.14 shall be continuing in nature and shall survive the Expiration Date. Landlord represents, warrants, and certifies to and for the benefit of the

Tenant that it has at all applicable times been, is now, and will in the future be, in compliance with U.S. Executive Order 13224 (the "Order") and no action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any it alleging any failure to so comply.

Section 34.15    Recordation. Tenant agrees not to record this Lease (whether directly or indirectly), or a memorandum or short form of this Lease or any other document related thereto.

Section 34.16    Parking.  Tenant shall be entitled to two (2) parking spaces located on the Building's basement level in such areas designated by the Landlord and/or Building management from time to time. Tenant's use of the parking space shall be in strict compliance with the Building Rules and Regulations as they pertain to parking. Tenant shall pay as Additional Rent, together with payments of Fixed Rent, $1,000 each month for the parking spaces.

Section 34.17    Visual Artists Rights Act Of 1990. Tenant expressly acknowledges and agrees that Tenant shall not cause or permit any work of art or other item that is subject to the Visual Artists Rights Act of 1990 to be installed, constructed, erected or maintained in, on or at the Premises. Tenant hereby indemnifies Landlord against liability arising out of or in connection with a breach of the foregoing covenant.

Section 34.18    Reduction of Premises.  Landlord shall have the right, on not less than thirty (30) days' notice to Tenant, to recapture a *de minimis* portion or portions of the Premises solely for the purpose of (a) installing additional elevator(s) in the Building, together with such space as may be required for lobbies and other Common Areas, (b) improving the Building Systems, or (c) constructing public corridors to create access to rentable space now existing or to be constructed in the future on the floor on which the Premises are located (any or all of the foregoing work, "Building Improvements"). Said notice must provide Tenant with details of the proposed reduction of the Premises and must include detailed plans of the proposed reduced Premises.  The amount of such recaptured space which may be taken by Landlord pursuant to this Section 34.18 shall be limited to such space as is reasonably and actually required for the proper installation, access and operation of such Building Improvements. Tenant shall provide Landlord with access to the Premises to perform the work to install and maintain the Building Improvements, including the right to take all necessary materials and equipment into the Premises, without the same constituting an eviction, and Tenant shall not be entitled to any abatement of Rent while such work is in progress or any damages by reason of loss or interruption of business or otherwise. Landlord shall use reasonable efforts to minimize interference with Tenant's access to and use and occupancy of the Premises in making any Building Improvements; provided, however, that Landlord shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever. Promptly following the completion of any Building Improvements, Landlord shall make such repairs to and restoration of the Premises as may be reasonably required as a direct result thereof.  Upon the date set forth for such recapture in Landlord's notice described above, the Lease shall be deemed automatically amended by the deletion of such recaptured space from the Premises, Fixed Rent and Additional Rent shall be reduced in the proportion which the area of the part of the Premises so recaptured bears to the total area of the Premises immediately prior thereto, and Tenant shall promptly vacate and surrender such portion of the Premises to Landlord, and except as otherwise specifically set forth in this Section 34.17, the terms and conditions of this Lease shall not be modified by reason of any such Building Improvements or the maintenance thereof.

Section 34.19    Earlier Lease Expiration.  Notwithstanding anything in this Lease to the contrary, Landlord may elect to have the Term of this Lease cease and expire on an earlier date by notifying Tenant (the "Termination Notice") that Landlord intends to demolish or substantially renovate the Building or to perform such other work in the Building, whether structural or otherwise, that reasonably cannot be

performed without substantial interference with the occupancy of the Premises by Tenant. Tenant agrees that this provision is a conditional limitation. The Termination Notice shall provide that this Lease shall cease and expire on a date selected by Landlord (the "Termination Date") and such date shall be no sooner than the later of (i) the date which is four (4) years from the Commencement Date and (ii) at least twelve (12) months from the date of the Termination Notice (with a Termination Date no sooner than the fourth (4th) anniversary of the Commencement Date). Upon Landlord sending the Termination Notice as herein provided, this Lease shall cease and expire on the Termination Date with the same force and effect as if the Termination Date had originally been provided for as the expiration date of this Lease. If, after Landlord has given the Termination Notice, Tenant fails for any reason whatsoever to vacate the Premises by the Termination Date, such failure shall constitute a holdover and the provisions of Article 21 shall apply. The foregoing shall be without prejudice to Landlord's exercising any other rights or remedies provided to Landlord under this Lease or under applicable law.

Section 34.20    Tenant's Risk. Tenant agrees to use and occupy the Premises, and to use such other portions of the Building and the Real Property as Tenant is given the right to use by this Lease at Tenant's own risk. No Landlord Party shall be liable to any Tenant Party for any damage, injury, loss, compensation, or claim (including, but not limited to, claims for the interruption of or loss to a Tenant Party's business) based on, arising out of or resulting from any cause whatsoever, including, but not limited to, repairs to any portion of the Premises or the Building, any fire, robbery, theft, mysterious disappearance, or any other crime or casualty, the actions of any other tenants of the Building or of any other person or persons, or any leakage in any part or portion of the Premises or the Building, or from water, rain or snow that may leak into, or flow from any part of the Premises or the Building, or from drains, pipes or plumbing fixtures in the Building, except to the extent of the negligence or willful misconduct of a Landlord Party. Any goods, property or personal effects stored or placed in or about the Premises shall be at the sole risk of the Tenant Party, and neither any Landlord Party nor its insurers shall in any manner be held responsible therefor, except to the extent of the negligence or willful misconduct of a Landlord Party. No Landlord Party shall be responsible or liable to a Tenant Party, or to those claiming by, through or under a Tenant Party, for any loss or damage that may be occasioned by or through the acts or omissions of Persons occupying adjoining premises or any part of the premises adjacent to or connecting with the Premises or any part of the Building or otherwise. The provisions of this section shall be applicable until the expiration or earlier termination of the Term, and during such further period as Tenant may use or be in occupancy of any part of the Premises or of the Building.

ARTICLE 35

BUILDING NAME AND SIGNAGE

Section 35.1    The Building may be designated and known by any name Landlord may choose and such designated name may be changed from time to time in Landlord's sole discretion. Tenant shall have no right to require Landlord to change the name of the Building, whether in connection with an assignment of this Lease or otherwise.

Section 35.2    Landlord, at Landlord's sole cost and expense, shall install one (1) Building Standard sign identifying Tenant on the exterior door of the Premises. Tenant shall, subject to the Building Rules and Regulations, be permitted to install its logo on or next to the entry door to the Premises.

[Signatures appear on the following page]

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the date first set forth above.

**LANDLORD:**

FACTORY OWNER LLC,
a Delaware limited liability company

By: _____
　　　Name: Andrew B. Cohen
　　　Title: Andrew B. Cohen
　　　　　　Authorized Person

**TENANT:**

GWYNNIE BEE INC., a Delaware corporation

By: _____
　　　Name: Christine Hunsicker
　　　Title: CEO

EXHIBIT A

LAND

ADDRESS:        47-44 31st Street (a/k/a 30-00 47th Avenue,
                47-07 30th Place, and 47-44 30th Place)
BLOCK:          282
LOT:            1
COUNTY:         QUEENS

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the formed by the intersection of the southerly side of 47th Avenue (Nott Avenue) with the easterly side of 30th Place (Manly Street);

RUNNING THENCE Southerly along the easterly side of 30th Place (Manly Street), a distance of 600.05 feet to the northerly side of 48th Place (Anable Avenue);

THENCE Easterly along the northerly side of 48th Place (Anable Avenue), 200.01 feet to the westerly side of 31st Street (Mount Street);

THENCE Northerly along the westerly side 31st Street (Mount Street), 600.05 feet to the southerly side of 47th Avenue (Nott Avenue);

THENCE Westerly along the southerly side of 47th Avenue (Nott Avenue) 200.01 feet to the easterly side of 30th Place (Manly Street), at the point or place BEGINNING

## EXHIBIT B

### BUILDING RULES AND REGULATIONS

Please be advised all building Rules and Regulations are to be adhered to at ALL TIMES including during any phase of construction. Observance of these rules will provide for a safer environment for all parties and will help avert delays and or inconveniences.

The following list represents the current list of The Factory's ("Building") rules and regulations:

**I.    GENERAL RULES:**

1. Any and all deliveries must be made through such loading docks as may be designated by Building Management from time to time.
2. No smoking is allowed inside of the facility, on any portion of the building roof or within 20 ft. of the building's entrances and exits pursuant to applicable NYC laws and regulations.
3. Exit stairs are to be used only in event of emergency or when directed by Building Management.
4. No firearms and or any weapons are permitted in or around the facility.
5. No rowdy, lewd, or disruptive behavior shall be permitted inside the Building.
6. No defacing, damaging and/or vandalism of Building property or equipment shall be permitted.
7. No unauthorized photography of this Building or its interior premises shall be permitted unless prior written authorization is granted by the Building Management.
8. No disrupting of or hindering of activities in or around the tenants premises.
9. No storage / build-up of debris is permitted in or around the building except in designated areas or as directed by Building Management.
10. The following Building charges for after-hours services will apply, subject to reasonable increases:
    1. If $90/hour charge for freight elevator use and a $120/hour charge for superintendent services, with a minimum charge of 4 hours.
       a. This will also apply to freight elevator use during the Union breaks and lunch which fall during the following times:
          i. 10:10AM-10:30AM
          ii. 12:00PM-1:00PM
          iii. 3:10PM-3:30PM
11. No posting, removal or modification of any signage, banners and or flags in any part of the Building shall be permitted without written authorization of Landlord.
12. No loitering or blocking of the emergency exits or public lobbies and or public restrooms is permitted.
13. No parking of vehicles is permitted on any perimeter sidewalk (with the exception of delivery trucks in designated loading areas).
14. Bicycles are not permitted within the lobby area. Bicycles should be brought through the parking garage entrance on 31st Street and on the passenger elevators located in the parking area/cellar.

**II.    CONSTRUCTION RULES:**

1. All work to be performed shall be in accordance with all applicable Federal, State and City laws codes (having jurisdiction thereof), including but not limited to OSHA.

2. Full sets of plans in both electronic (CAD) format and ½ size hard copies for all work to be performed must first be submitted to the Landlord and Building Management for review and approval.

3. All equipment and material used must be BSA and MEA approved, listed by Underwriters Laboratories Inc., manufactured in accordance with ASME, ANSI and IEEE standards.

4. All work must be performed by licensed contractors. All contractors must carry Building-Standard insurance and provided certificates thereof naming Landlord and Building Management as additional insureds.

5. All necessary filing forms (i.e. demolition, construction, abatement, electrical (BEC), Department of Transportation, etc.) must be forwarded to Building Management for review and approval no less than 2 weeks prior to applying for permits.

6. Any use of cranes will require prior authorization by Building Management and no more than one crane in a 24-hour period will generally be permitted.

7. All filing and permit requirements in support of any rigging operation or hoisting equipment use shall be completed no less than four business days in advance of said operation.

8. All necessary permits must be posted (as required by applicable law or code) at all times. Copies of said permits must be provided to Building Management before commencement of any work.

9. The tenant shall arrange for all necessary inspections, pay all fees and forward copies of inspection reports/sign-offs in connection with all work performed by or on Tenant's behalf to Building Management.

10. A Project Directory must be provided to Building Management in connection with any project undertaken by Tenant which must include a complete list of all project related companies including company address, names and titles of contact personnel, telephone/fax numbers, e-mail addresses, cell phone numbers, etc.

11. Any injury or incident occurring due to and or related to a project, must immediately be documented and reported to Building Management.

12. All sprinkler, electrical and water shut down requests must be arranged with Building Management at least 72 hours in advance.

13. Work involving use of other tenant's premises or equipment must be arranged with Building Management not less than 72 hours in advance. All such work will require building supervision and will be scheduled after regular Building hours (i.e., between the hours of 5:30 pm to 8:00 am daily, and all day Saturday and Sunday). Any costs associated with this shall be the responsibility of the tenant completing the requested work.

14. All work involving base-building infrastructure (i.e. plumbing, electrical, water, steam, structural, sprinkler, fire alarm, etc.) will require Building staff supervision, at tenant's cost.

15. All noisy work shall be scheduled after regular Building hours.

16. Any work requiring the disabling of the automatic sprinkler system will require fire watch by a certified fire guard, at tenant's cost.

17. All operators of an open-flame torch, tenant's fire alarm vendors and sprinkler system contractors performing work at this facility, must be approved by the Building, EAP & Fire Safety Director and shall provide appropriate certifications prior to the start of the project.

18. Restoration and clean-up of any work performed in other tenant premises must be completed by party performing said work immediately upon completion or at intervals of the project as determined by Building Management.

19. Throughout any project, Building Management must be briefed at least 48 hours in advance of the work to be performed on both the scope of work and the area to be worked in.

20. Preventive measures must always be taken to limit to the fullest extent possible, any noise, vibration, dust, etc., and any other inconveniences to the other tenants resulting from any work being performed by or on tenant's behalf.

21. All wall or slab penetrations must be fire stopped and water tight upon completion.

22. Temporary protective barriers around any horizontal or vertical opening must be in place at all times.

23. Construction debris is not permitted in or around the Building.

24. All existing security measures in effect either by the Building Management or other tenants must be followed at all times.

25. Operation of equipment, performance of work producing fumes, dust vapors or other noxious or injurious substances without the appropriate ventilation, is prohibited.

26. Nothing shall be attached, hung or tied to any sprinkler pipe, gas pipe or fire alarm wire.

27. During any phase of construction, all persons within the construction area must wear hard hats and or other safety equipment required by applicable laws and codes.

28. Copies of all final closeout documents and as-built drawings must be supplied to Building Management no later than 30 days after completion of the project.

29. Insurance documentation for all contractors must be made available and forwarded to the attention of **Flavia Vogt**, Construction Administrator, at the following address:

> **ACG Property Management, LLC**
> **a/a/f Factory Owner LLC**
> **c/o Atlas Capital Group, LLC**
> **505 Fifth Avenue, 28th Floor**
> **New York, New York 10017**
> **Tel: (212) 554-2279 Fax: (212) 554-2410**

30. Building Management reserves the right to refuse entry into the facility to any occupant(s), contractor(s), consultant(s) and their employees or any other tenant representatives should such individual(s) exhibit unacceptable conduct, poor quality of work, improper authorization or is otherwise in violation of these Building Rules and Regulations.

31. Please be advised that we reserve the right to order an immediate halt to any operation that is deemed hazardous or poses any potential danger to the premises the Building or any occupants thereof.

32. Building Management reserves the right to charge tenant for damages caused by their employees, licenses, subtenants, invitees and contractors.

33. The Building Rules & Regulations are subject to change at any time at Management's discretion.

EXHIBIT C

TENANT'S PRE-APPROVED ALTERATIONS



30-30 47ᵗʰ Avenue – #540

① Create Office/Conf Rm from Breakout Room

② Remove Desks stations and Create (2) Offices

EXHIBIT D

PREMISES

The floor plan that follows is intended solely to identify the general location of the Premises, and should not be used for any other purpose.  All areas, dimensions and locations are approximate, and any physical conditions indicated may not exist as shown.

# LIC BUSINESS CENTER
## 5th Floor - Building Page



Suite 0540



EXHIBIT E

FIXED RENT



EXHIBIT F

CALCULATION OF LEASE COSTS

EXHIBIT G

COMMERCIAL EXPANSION PROGRAM APPLICATION CERTIFICATION

**Commercial Expansion Program**

Provided Tenant is in good standing under the Lease, Landlord shall make reasonable efforts to cooperate with Tenant, but Landlord shall have no obligation to expend any monies, including, without limitation, filing fees and legal fees, in connection with any application for real estate tax abatements under the Commercial Expansion Program. Pursuant to Title 4 of Article 4 the Real Property Tax Law of the State of New York ("Title 4"):

Tenant hereby informs that an application for abatement of real property taxes under the Commercial Expansion Program will be or has been made for the premises.

Tenant shall pay, as Additional Rent, its proportionate share of real property taxes which will accurately reflect any abatement of real property taxes, as provided in the Lease.

For commercial tenants with leases commencing on or after July 1, 2000: At least $25.00 per square foot has been or will be spent on improvements to the Premises and/or the Common Areas.

All abatements granted will be revoked if, during the benefit period, real estate taxes, water or sewer charges or other lienable charges are unpaid for more than one year, unless such delinquent amounts are paid as provided in the relevant law.

## FIRST AMENDMENT TO LEASE

FIRST AMENDMENT TO LEASE (this "First Amendment") dated as of the 15th day of March, 2016 (the "Effective Date") by and between **FACTORY OWNER LLC**, a Delaware limited liability company, having an address at c/o Atlas Capital Group, LLC, 450 Park Avenue, 4th Floor, New York, New York 10022 (the "Landlord") and **GWYNNIE BEE INC.**, a Delaware corporation with an office at 30-30 47th Avenue, Suite 540, Long Island City, New York 11101 (the "Tenant").

### WITNESSETH:

**WHEREAS,** Landlord and Tenant are parties to that certain Agreement of Lease dated May 15, 2015 (the "Lease") with respect to a portion of the 5th floor of the Building consisting of approximately 12,702 rentable square feet, known as Suite 540 and as depicted the floor plan attached to the Lease as Exhibit A (the "Original Premises") in the building known as 30-30 47th Avenue, Long Island City, New York (the "Building");

**WHEREAS,** Tenant wishes to lease from Landlord and Landlord wishes to lease to Tenant additional space located on the 4th floor of the Building consisting of approximately 6,306 rentable square feet, known as Suite 460 and as depicted in Schedule A attached hereto and made a part hereof (the "Expansion Premises"), which when combined with the Original Premises will comprise approximately 19,008 rentable square feet;

**WHEREAS,** pursuant to the terms set forth in this First Amendment, Landlord and Tenant desire to amend the Lease, subject to and in accordance with the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, the parties agree as follows:

1.     **Definitions**.  Defined and/or capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease, unless otherwise defined herein.  From and after the Expansion Commencement Date (as defined below), (i) the term "Lease", as used herein and in the Lease, shall mean the Lease, as amended by this First Amendment and as hereafter amended; (ii) the term "Premises", as used herein and in the Lease, shall be deemed to mean the Original Premises and the Expansion Premises, and (iii) the "Term" of the Lease for the Expansion Premises shall be co-terminous with the "Term" of the Lease for the Original Premises, and both shall terminate on the Expiration Date. The "Expansion Commencement Date" shall mean the later of (i) the date of execution of this First Amendment, (ii) April 1, 2016, and (iii) delivery of possession of the Expansion Premises to Tenant with Landlord's Work (as set forth below) in the Expansion Premises substantially completed.

2.     **Additional Definitions**. As of the Expansion Commencement Date, with respect to the leasing of the entire Premises pursuant to this First Amendment,

(a)  "Premises Area" shall mean approximately 19,008 R.S.F.;

(b) "<u>Fixed Rent</u>" shall mean the Fixed Rent, as defined in <u>Section 1.1(a)</u> and set forth in Exhibit E attached to the Lease for the Original Premises, and Exhibit E attached hereto for the Expansion Premises, which shall together constitute the Fixed Rent payable pursuant to Article 1 of the Lease for the Premises.

(c) "<u>Base Tax Year</u>" for the Expansion Premises: the Tax Year commencing on July 1, 2016 and ending on June 30, 2017.

(d) "<u>Base Taxes</u>" for the Expansion Premises: the actual Taxes for the Base Tax Year.

(e) "<u>Tenant's Share of Taxes</u>" for the Expansion Premises: means 56/100 percent (0.56%).

Base Tax Year, Base Taxes and Tenant's Share of Taxes for the Original Premises shall not be modified by this First Amendment and shall remain as outlined in the Lease.



4.    **Taxes**.  For the period commencing on the Expansion Commencement Date and ending on the Expiration Date, Tenant shall pay Tenant's Share of Taxes applicable to the combined Original Premises and Expansion Premises in accordance with the applicable terms of the Lease; provided, however, Tenant's Share of Taxes attributable to the Expansion Premises shall be calculated based on the Base Tax Year and Base Taxes for the Expansion Premises as set forth in

Section 2 of this Amendment.

5.    **Condition of Premises; Tenant's Initial Improvements; Landlord's Work; Early Access**.

(a)    Landlord shall perform the work ("Landlord's Work") in the Expansion Premises as set forth in Exhibit B attached hereto.

(b)    By executing this Amendment, Tenant acknowledges that it has taken possession of the Original Premises and subject to Landlord's Work in the Expansion Premises, it shall take possession of the Expansion Premises hereunder, and Tenant has accepted the Original Premises and will accept Expansion Premises as of the Expansion Commencement Date in "as is" condition, provided, however, in addition to Landlord's Work, Landlord shall deliver the Expansion Premises with all Building Systems serving the Expansion Premises in good working order.  Except for Landlord's Work in the Expansion Premises, Landlord shall not be obligated to perform any work whatsoever to prepare the Original Premises and/or Expansion Premises for Tenant.

(c)    Provided that Tenant does not interfere with Landlord's performance of Landlord's Work, Landlord shall provide Tenant with access to the Expansion Premises fourteen (14) days prior to the Expansion Commencement Date (the "Early Access Period") to permit Tenant to install in the Expansion Premises its data and telecommunications cabling, wiring and equipment.  Tenant shall have no obligation to pay Rent for the Expansion Premises during the Early Access Period.  Tenant shall not be permitted to conduct business in the Expansion Premises during the Early Access Period.

(d)    Tenant intends to undertake renovations in the Expansion Premises to prepare the same for Tenant's occupancy (the "Expansion Space Initial Improvements").  As soon as is reasonably practical after the date of this Amendment, Tenant shall deliver to Landlord, for Landlord's approval, construction drawings for the Expansion Space Initial Improvements.  Landlord shall not unreasonably withhold, condition or delay its approval of such construction drawings provided that Tenant and such drawings comply with the requirements set forth in Article 4 of the Lease, which is incorporated herein.  Tenant shall have no obligation to remove or restore any of Landlord's Work at the end of the Term.

6.    **Electricity.**  Landlord shall furnish electricity to the Expansion Premises and Tenant shall pay for such electricity in accordance with the terms of section 10.1 of the Lease.

7.    **Waiver and Cancellation of Termination Option**.    Article 33 of the Lease is hereby deleted in its entirety, and Tenant shall have no further expansion and/or termination option, and it shall not be allowed to terminate the Lease as provided therein.

8.    **Freight Elevator**.  In connection with Tenant's initial move-in to the Expansion Premises, upon not less than forty-eight (48) hours' notice to Landlord, Tenant shall be entitled to sixteen (16) hours of freight elevator time at no charge, which must be used in two consecutive 8-hour blocks.

9. **Signage**. Landlord, at Landlord's sole cost and expense, shall install one (1) Building-standard sign identifying Tenant on the exterior door of the Expansion Premises. Tenant shall, subject to the Building Rules and Regulations, be permitted to install its logo on or next to the entry door to the Expansion Premises.

10. **Brokers**. Landlord and Tenant represent that no broker or agent other than Newmark & Company Real Estate, Inc. d/b/a Newmark Grubb Knight Frank ("Broker") participated with Landlord and Tenant in or was a procuring cause of this transaction. Landlord and Tenant acknowledge that the payment for brokerage fees due and payable as a result of Landlord and Tenant executing this Amendment shall be the sole cost and responsibility of the Landlord pursuant to Landlord's separate agreement(s) with the Broker. Landlord and Tenant agree to indemnify and hold each other harmless from and against any claim, loss and/or demand of any other broker or agent who claims that he, she or it participated with Landlord and/or Tenant, as applicable, in this transaction.

11. **No default**. Tenant hereby certifies to Landlord that as of the date hereof: (i) the Lease is in full force and effect; (ii) to Tenant's actual knowledge, there currently exists no default by Landlord under the Lease, nor any condition which with the giving of notice or the passage of time, or both, would constitute a default under the Lease on the part of Landlord; (iii) to Tenant's actual knowledge, Tenant has no existing set-offs, counterclaims or defenses against Landlord under the Lease, and (iv) the Lease, as modified hereby, contains the entire agreement between the parties hereto with respect to the Original Premises, the Expansion Premises, the Lease and the Building.

12. **Counterparts**. This First Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which counterparts together shall be deemed to be one and the same instrument. In any action or proceeding, any photographic, photostatic, or other copy of this First Amendment may be introduced into evidence without foundation. This Amendment shall not be binding in any respect upon Landlord or Tenant until duplicate counterparts hereof are executed and exchanged by Landlord and Tenant.

13. **Affirmation; Ratification of Lease; Inconsistencies**. Except as expressly modified herein, the Lease and all covenants, agreements, terms and conditions thereof shall continue in full force and effect, and the Landlord and the Tenant hereby affirm and ratify all terms and conditions of the Lease. The provisions set forth herein will be deemed to be part of the Lease and shall supersede any contrary provisions in the Lease.

14. **Entire Agreement**. This First Amendment embodies the entire understanding between Landlord and Tenant with respect to the modifications set forth herein. This First Amendment may not be changed orally, but only by a writing signed by the party against whom enforcement thereof is sought.

15. **Successors and Assigns**. The covenants, agreements, terms and conditions contained in this First Amendment shall bind and inure to the benefit of the parties hereto and

their respective successors and, except as otherwise provided in the Lease, their respective assigns.

**[Remainder of this page intentionally left blank]**

**IN WITNESS WHEREOF**, the parties hereto have caused this First Amendment to
Lease to be executed as of the day and year first above written.

**LANDLORD:**

**FACTORY OWNER LLC**

By: _____
            Name:
            Title:

By: _____
            Name:
            Title:

**TENANT:**

**GWYNNIE BEE INC.**

By: _____
            Name: Stephen P. Lambertan
            Title: VP of Finance

**IN WITNESS WHEREOF,** the parties hereto have caused this First Amendment to Lease to be executed as of the day and year first above written.

**LANDLORD:**

**FACTORY OWNER LLC**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**TENANT:**

**GWYNNIE BEE INC.**

By: _____
      Name: Stephen P. Lamberton
      Title: VP of Finance

<u>Exhibit A</u>

<u>EXPANSION PREMISES</u>

See attached.



## Exhibit B
### LANDLORD'S WORK  – EXPANSION PREMISES

Landlord, at Landlord's sole cost and expense, shall perform the following Landlord Work in the Expansion Premises:

1. Deliver ACP-5 or equivalent for the Expansion Premises;
2. Deliver to Tenant for the Expansion Premises a Tenant–controlled central AC package unit in good working order with Tenant being responsible for ongoing maintenance and repairs, and Landlord being responsible for repair and replacement of major components only, in accordance with the applicable sections of the Lease.  From the Expansion Commencement Date, the foregoing AC System shall be considered an "AC System" and governed by Section 10.2 of the Lease;
3. Install ten (10) electrical outlets, in mutually agreed upon locations throughout the space; and
4. Install the sink to be provided by Tenant pursuant to the attached specifications in a location to be determined by Landlord (in exchange for the $6,000.00 reduction of the Abatement in the sixth (6th) month after the Expansion Commencement Date as provided in Section 3(a)).

Tenant acknowledges that Landlord's Work may be performed by Landlord in the Expansion Premises during normal business hours.  Landlord and Tenant agree to cooperate with each other in order to enable Landlord's Work to be performed in a timely manner.  Notwithstanding anything herein to the contrary, any delay in the completion of Landlord's Work due to any delay caused by Tenant (i) shall not delay the Expansion Commencement Date and the Expansion Commencement Date shall be the date that Landlord's Work would have been completed if not for Tenant's delay and/or (ii) will allow Landlord to make unilateral decisions with regard to the completion of Landlord's Work.  Landlord shall provide Tenant with written notice and a two (2) day opportunity to cure before claiming any "Tenant delays."  Tenant shall have no obligation to remove or restore any components of Landlord's Work at the end of the Term.



## Shopping list



Bring it to the store

Prices on products not featured in the IKEA 2015 catalog may vary at your local store.
IKEA OH, West Chester Mar 1, 2016 6:03 PM EST

| Product | | Quantity | Total Price | Weight | In stock? | | |
|---|---|---|---|---|---|---|---|
| | **RINGHULT**<br>Cover panel, high gloss white<br>**$71.00**<br>Width: 24 5/8"<br>Height: 30"<br>Thickness: 5/8"<br>Article no:: 202.666.97 | 1 | $71.00 | 1x5.5kg | This product will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4<br><br>**RINGHULT**<br>Cover panel<br>Article no:: 202.666.97 | Aisle<br><br>Contact staff for purchase and information | Bin |
| | **CAPITA**<br>Leg, white<br>**$12.00**<br>Min. height: 4"<br>Max. height: 5"<br>Height: 4 1/2"<br>Article no:: 302.635.75 | 1 | $12.00 | 1x0.8kg | This product will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4<br><br>**CAPITA**<br>Leg<br>Article no:: 302.635.75 | Aisle<br><br>31 | Bin<br><br>19 |
| | **RINGHULT**<br>Toekick, high gloss white<br>**$19.00**<br>Width: 85"<br>Height: 4 1/2"<br>Thickness: 3/8"<br>Article no:: 702.667.46 | 1 | $19.00 | 1x0.9kg | This product will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4<br><br>**RINGHULT**<br>Toekick<br>Article no:: 702.667.46 | Aisle<br><br>Contact staff for purchase and information | Bin |
| | **SANDSJÖN**<br>Single lever kitchen faucet, chrome plated<br>**$99.00**<br>Height: 13 3/8"<br>Height: 34 cm"<br>Article no:: 702.818.22 | 1 | $99.00 | 1x2.0kg | This product will most likely be in stock : Today Mar 1<br><br>**SANDSJÖN**<br>Single lever kitchen faucet<br>Article no:: 702.818.22 | Aisle<br><br>Contact staff for purchase and information | Bin |

**SEKTION**
Base cabinet for sink + 2
doors, white, Märsta white
**$304.00**
Width: 36"
System depth: 24
Depth: 24 3/4
Article no:: 190.404.40

1    $304.00

*This is a multipart product. All parts will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4*

1x0.1kg    **1xUTRUSTA**
door damper for hinge    Aisle    Bin
Article no:: 402.418.23    *Contact staff for purchase and information*

2x0.2kg    **2xUTRUSTA**
hinge
Article no:: 602.046.45    *Contact staff for purchase and information*

1x0.9kg

1x21.4kg    **1xSEKTION**
reinforced ventilated top rail
Article no:: 602.845.81    *Contact staff for purchase and information*

2x5.0kg    **1xSEKTION**
base cabinet frame
Article no:: 802.653.98    *Contact staff for purchase and information*

**2xMÄRSTA**
door
Article no:: 902.983.60    *Contact staff for purchase and information*

*7 Price/pk*

---

**EKBACKEN**
Countertop, light oak effect
**$99.00**
Length: 90"
Depth: 25 5/8"
Thickness: 1 1/8"
Article no:: 602.752.18

1    $99.00

*This product will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4*

1x28.3kg    **EKBACKEN**
Countertop    Aisle    Bin
Article no:: 602.752.18    *Contact staff for purchase and information*

---

**DOMSJÖ**
Single-bowl inset sink
**$105.99**
Width: 19 7/8"
Depth: 17 3/4
Height: 7 1/8"
Article no:: 198.220.36

1    $105.99

*This is a multipart product. All parts will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4*

1x16.0kg    **1xDOMSJÖ**
single-bowl inset sink    Aisle    Bin
Article no:: 000.446.45    *Contact staff for purchase and information*

1x0.2kg    **1xATLANT**
waste strainer
Article no:: 900.560.21    *Contact staff for purchase and information*

*2 Price/pk*

---

**ORRNÄS**
Handle, stainless steel color
stainless steel
**$12.99**
Length: 13"
Drilled hole diameter: 3/16
Hole spacing: 12 5/8
Article no:: 402.254.13

3    $38.97

*This product will most likely be in stock : Today Mar 1, Wed Mar 2, Thu Mar 3, Fri Mar 4*

3x0.3kg    **ORRNÄS**
Handle    Aisle    Bin
Article no:: 402.254.13    *Contact staff for purchase and information*

**Total price**                    $748.96
        **Total weight**:                    **87.6kg/17 Packages**

EXHIBIT E

FIXED RENT – EXPANSION PREMISES

| Period | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| ▭▭▭▭▭▭▭ | ▭▭▭ | ▭▭▭ |
| ▭▭▭▭▭▭▭ | ▭▭▭ | ▭▭▭ |
| ▭▭▭▭▭▭▭ | ▭▭▭ | ▭▭▭ |
| ▭▭▭▭▭▭▭ | ▭▭▭ | ▭▭▭ |
| ▭▭▭▭▭▭▭ | ▭▭▭ | ▭▭▭ |

* For purposes of clarification, "Commencement Date" set forth in this Exhibit E is the Commencement Date in the Lease, not the Expansion Commencement Date, so that Fixed Rent for the Expansion Premises increases on the same date as Fixed Rent increases for the Original Premises.

## SECOND AMENDMENT TO LEASE

SECOND AMENDMENT TO LEASE (this "Second Amendment") dated as of the 28th day of June, 2017 (the "Effective Date") by and between **FACTORY LESSOR LLC**, a Delaware limited liability company, having an address at c/o Atlas Capital Group, LLC, 450 Park Avenue, 4th Floor, New York, New York 10022 (the "Landlord") and **GWYNNIE BEE INC.**, a Delaware corporation with an office at 30-30 47th Avenue, Suite 540, Long Island City, New York 11101 (the "Tenant").

### WITNESSETH:

**WHEREAS**, Landlord's predecessor-in-interest, Factory Owner LLC, and Tenant are parties to that certain Agreement of Lease dated May 15, 2015 (the "Original Lease") with respect to a portion of the 5th floor of the Building consisting of approximately twelve thousand seven hundred two (12,702) rentable square feet, known as Suite 540 and as depicted in the floor plan attached to the Lease as Exhibit A (the "Original Premises"), as amended by that certain First Amendment to Lease dated as of March 15, 2016 (the "First Amendment") with respect to a portion of the 4th floor of the Building consisting of approximately six thousand three hundred six (6,306) rentable square feet, known as Suite 460 and as depicted in the floor plan attached to the First Amendment as Exhibit A (the "Expansion Premises"), in the building known as 30-30 47th Avenue, Long Island City, New York (the "Building");

**WHEREAS**, Tenant wishes to lease from Landlord and Landlord wishes to lease to Tenant additional space located on the 4th floor of the Building consisting of approximately one thousand fifty-five (1,055) rentable square feet, known as Suite 470 and as depicted in Schedule A attached hereto and made a part hereof (the "2nd Amendment Expansion Premises"), which when combined with the Original Premises and the Expansion Premises will comprise approximately twenty thousand sixty-three (20,063) rentable square feet;

**WHEREAS**, pursuant to the terms set forth in this Second Amendment, Landlord and Tenant desire to amend the Lease, subject to and in accordance with the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, the parties agree as follows:

**Definitions**.  Defined and/or capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease, unless otherwise defined herein.  From and after the Effective Date, (i) the term "Lease", as used herein and in the Lease, shall mean the Lease, as amended by the First Amendment, as amended by this Second Amendment and as hereafter amended; (ii) the term "Premises", as used herein and in the Lease, shall be deemed to mean the Original Premises, the Expansion Premises and the 2nd Amendment Expansion Premises, and (iii) the "Term" of the Lease for the 2nd Amendment Expansion Premises shall be co-terminous with the "Term" of the Lease for the Original Premises and the Expansion Premises, and all shall terminate on the Expiration Date.

**Additional Definitions**. As of the Effective Date, with respect to the leasing of the entire

Premises pursuant to this Second Amendment,

>   (a) "Premises Area" shall mean approximately 20,063 R.S.F.;
>
>   (b) "Fixed Rent" shall mean the Fixed Rent, as defined in Section 1.1(a) and set forth in Exhibit E attached to the Original Lease for the Original Premises, Exhibit E attached to the First Amendment for the Expansion Premises, and Exhibit E attached hereto for the 2nd Amendment Expansion Premises, which shall together constitute the Fixed Rent payable pursuant to Article 1 of the Original Lease for the Premises.
>
>   (c) "Base Tax Year" for the 2nd Amendment Expansion Premises: the Tax Year commencing on July 1, 2017 and ending on June 30, 2018.
>
>   (d) "Base Taxes" for the 2nd Amendment Expansion Premises: the actual Taxes for the Base Tax Year.
>
>   (e) "Tenant's Share of Taxes" for the 2nd Amendment Expansion Premises: means 09/100 percent (0.09%).

Base Tax Year, Base Taxes and Tenant's Share of Taxes for the Original Premises and the Expansion Premises shall not be modified by this Second Amendment and shall remain as outlined in the Lease.

**Taxes**.  For the period commencing on the Effective Date and ending on the Expiration Date, Tenant shall pay Tenant's Share of Taxes applicable to the combined Original Premises, Expansion Premises and 2nd Amendment Expansion Premises in accordance with the applicable terms of the Lease; provided, however, Tenant's Share of Taxes attributable to the 2nd Amendment Expansion Premises shall be calculated based on the Base Tax Year and Base Taxes for the 2nd Amendment Expansion Premises as set forth in Section 2 of this Second Amendment.

**Condition of Premises**. Whereas Tenant is in occupancy of the Original Premises and the Premises, the Original Premises and the Expansion Premises are accepted by Tenant in their "as is" condition and configuration without any representations or warranties by Landlord as to the condition, and Landlord hereby accepts the 2nd Amendment Expansion Premises in its "as is" condition and configuration without any representations or warranties by Landlord as to the condition and Landlord shall have no obligation to perform in the 2nd Amendment Expansion Premises any additions, alterations, improvements, demolition or other work therein or pertaining thereto.

**Electricity.**  Landlord shall furnish electricity to the 2nd Amendment Expansion Premises and Tenant shall pay for such electricity in accordance with the terms of Section 10.1 of the Original Lease.

**Signage**.  Landlord, at Landlord's sole cost and expense, shall install one (1) Building-standard sign identifying Tenant on the exterior door of the 2nd Amendment Expansion Premises.

Tenant shall, subject to the Building Rules and Regulations, be permitted to install its logo on or next to the entry door to the 2nd Amendment Expansion Premises.

**Brokers**. Landlord and Tenant represent that no broker or agent participated with Landlord and Tenant in or was a procuring cause of this transaction. Landlord and Tenant agree to indemnify and hold each other harmless from and against any claim, loss and/or demand of any other broker or agent who claims that he, she or it participated with Landlord and/or Tenant, as applicable, in this transaction.

**No Default**. Tenant hereby certifies to Landlord that as of the date hereof: (i) the Lease is in full force and effect; (ii) to Tenant's actual knowledge, there currently exists no default by Landlord under the Lease, nor any condition which with the giving of notice or the passage of time, or both, would constitute a default under the Lease on the part of Landlord; (iii) to Tenant's actual knowledge, Tenant has no existing set-offs, counterclaims or defenses against Landlord under the Lease, and (iv) the Lease, as modified hereby, contains the entire agreement between the parties hereto with respect to the Original Premises, the Expansion Premises, the 2nd Amendment Expansion Premises, the Lease and the Building.

**Counterparts**. This Second Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which counterparts together shall be deemed to be one and the same instrument. In any action or proceeding, any photographic, photostatic, or other copy of this Second Amendment may be introduced into evidence without foundation. This Second Amendment shall not be binding in any respect upon Landlord or Tenant until duplicate counterparts hereof are executed and exchanged by Landlord and Tenant.

**Affirmation; Ratification of Lease; Inconsistencies**. Except as expressly modified herein, the Lease and all covenants, agreements, terms and conditions thereof shall continue in full force and effect, and the Landlord and the Tenant hereby affirm and ratify all terms and conditions of the Lease. The provisions set forth herein will be deemed to be part of the Lease and shall supersede any contrary provisions in the Lease.

**Entire Agreement**. This Second Amendment embodies the entire understanding between Landlord and Tenant with respect to the modifications set forth herein. This Second Amendment may not be changed orally, but only by a writing signed by the party against whom enforcement thereof is sought.

**Successors and Assigns**. The covenants, agreements, terms and conditions contained in this Second Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and, except as otherwise provided in the Lease, their respective assigns.

**[Remainder of this page intentionally left blank]**

{Client/007989/RE3626/01356262.DOCX;1 }

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to Lease to be executed as of the day and year first above written.

**LANDLORD:**

**FACTORY LESSOR LLC**

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:


**TENANT:**

**GWYNNIE BEE INC.**

By: _____
        Name: Stephen P. Lamberton
        Title: Vice President of Finance

Exhibit A

2ND AMENDMENT EXPANSION PREMISES

See attached.

EXHIBIT E

FIXED RENT – 2nd AMENDMENT EXPANSION PREMISES

| Period | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| ███████████████<br>██████████████<br>███████████████<br>███ | ████████ | ████████ |
| ██████████████<br>███████████████<br>█████████████████<br>███████████ | ████████ | ████████ |
| ███████████████<br>██████████████<br>██████████████ | ██████████ | ████████ |

* For purposes of clarification, "Commencement Date" set forth in this Exhibit E is the Commencement Date in the Original Lease, not the Expansion Commencement Date set forth in the First Amendment or the Effective Date set forth in this Second Amendment, so that Fixed Rent for the 2nd Amendment Expansion Premises increases on the same date as Fixed Rent increases for both the Original Premises and the Expansion Premises.

**EXHIBIT C**

<u>Existing Furniture</u>

1 Mini Refrigerator

1 Small Wood Coffee Table

1 Small Gray Shag Rug

2 Tall Lamps

1 Medium Black Cabinet

**EXHIBIT D**

Approved Subtenant Initial Work







MADEWELL
TYPICAL: 72"W 3-RUN, RH CUT-OUT
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 3-RUN, RH CUT-OUT
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY





MADEWELL
TYPICAL: 72"W 4-RUN, RH CUT-OUT
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 6-PACK
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 6-PACK
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 9-PACK
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 9-PACK
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 10-PACK
IBE - INSCAPE BENCH (SEATED HT)
NEW YORK, NY



MADEWELL
TYPICAL: 72"W 10-PACK
IBE - INSCAPE BENCH (SEATED HT)