## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

```
-------------------------------------------------------------x
                                      :
In re                                 :        Chapter 11
                                      :
CHINOS HOLDINGS, INC., et al.,        :        Case No. 20–32181 (KLP)
                                      :
                  Debtors.¹           :        (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

### DISCLOSURE STATEMENT FOR AMENDED JOINT
### PREARRANGED CHAPTER 11 PLAN OF REORGANIZATION
### OF CHINOS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

August 9, 2020
Richmond, Virginia

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Attorneys for Debtors*
*and Debtors in Possession*

---

**THE DEADLINE TO VOTE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., EASTERN TIME, ON AUGUST 17, 2020, UNLESS EXTENDED BY THE COURT OR THE DEBTORS.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS JULY 15, 2020 (THE "VOTING RECORD DATE").**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

<u>**RECOMMENDATION BY THE DEBTORS**</u>

**THE DEBTORS RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

WEIL:\97584794\2\54457.0007

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE OFFER, ISSUANCE, AND DISTRIBUTION OF THE NEW COMMON EQUITY ISSUED ON ACCOUNT OF ALLOWED TERM LOAN SECURED CLAIMS (AS DEFINED IN THE PLAN) AND ALLOWED IPCO NOTES CLAIMS (AS DEFINED IN THE PLAN) AND AS BACKSTOP PREMIUM (AS DEFINED IN THE PLAN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AND ALL RULES AND REGULATIONS PROMULGATED THEREUNDER, AND ANY STATE OR LOCAL LAW REQUIRING REGISTRATION FOR THE OFFER, ISSUANCE, OR DISTRIBUTION OF SECURITIES. THESE SECURITIES SHALL BE FREELY TRADABLE BY THE RECIPIENTS THEREOF, SUBJECT TO: (I) THE HOLDER NOT BEING AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR THAT ISSUED SUCH SECURITIES; (II) COMPLIANCE WITH ANY RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION APPLICABLE AT THE TIME OF ANY FUTURE TRANSFER OF SUCH SECURITIES OR INSTRUMENTS; (III) ANY RESTRICTIONS ON THE TRANSFERABILITY OF THE NEW COMMON EQUITY CONTAINED IN THE STOCKHOLDERS AGREEMENT; AND (IV) APPLICABLE REGULATORY APPROVAL.

THE OFFER, ISSUANCE, AND DISTRIBUTION OF THE NEW EQUITY ALLOCATION AND THE NEW WARRANTS TO THE NEW TERM LENDERS ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(a)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES TOGETHER WITH THE UNITS OF NEW COMMON EQUITY ISSUABLE UPON EXERCISE OF THE NEW WARRANTS SHALL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT. ADDITIONALLY, THE NEW WARRANTS ARE SUBJECT TO ANY RESTRICTIONS ON THE TRANSFERABILITY OF SUCH NEW WARRANTS CONTAINED IN THE WARRANT AGREEMENT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE NEW COMMON EQUITY AND NEW WARRANTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.    CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS AND VARIATIONS OF SUCH WORDS.    THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.    FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS HEREIN.

ALL PARTIES ENTITLED TO VOTE ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

PLEASE BE ADVISED THAT SECTIONS 10.6, 10.7, AND 10.8 OF THE PLAN CONTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.

iv

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................... 1

II. OVERVIEW OF THE DEBTORS' BUSINESS ................................................................. 8

    A.      History and Formation ................................................................................. 8

    B.      Debtors' Business Operations ..................................................................... 8

        1.      J. Crew Business ............................................................................. 8

        2.      Madewell Business ......................................................................... 8

        3.      Business Operations and Employees .............................................. 9

        4.      International Operations ................................................................ 10

        5.      Recent Operational Initiatives ..................................................... 10

    C.      Board of Directors and Senior Executive Officers. ................................. 11

    D.      Regulation of Debtors' Business. ............................................................. 12

    E.      Prepetition Capital Structure. ................................................................... 12

        1.      Corporate Structure ...................................................................... 12

        2.      Prepetition Indebtedness ............................................................... 13

III. EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ................... 16

    A.      COVID-19: Liquidity Challenges and Preservation Measures ................ 17

    B.      Trends and Uncertainties Affecting the Businesses ................................. 18

    C.      Funded Debt and Contractual Obligations ............................................... 18

    D.      Prepetition Balance Sheet Restructuring Initiatives ................................ 19

        1.      2017 Transaction .......................................................................... 19

        2.      2019 and 2020 Stakeholder Engagement and Chapter 11 Filing ...... 20

    E.      Material Terms of Transaction Support Agreement ................................ 21

    F.      DIP Financing and Backstop Commitment .............................................. 21

IV. THE CHAPTER 11 CASES ............................................................................................ 22

    A.      First Day Motions ..................................................................................... 22

    B.      DIP Order .................................................................................................. 22

    C.      Procedural Motions ................................................................................... 23

    D.      Retention of Chapter 11 Professionals ..................................................... 23

    E.      Statements and Schedules and Claims Bar Dates .................................... 23

    F.      Exclusivity ................................................................................................ 24

    G.      Executory Contracts and Unexpired Leases ............................................ 24

    H.      Trade Agreements ..................................................................................... 25

    I.      Appointment of Creditors' Committee and Ongoing Investigation ................. 25

WEIL:\97584794\2\54457.0007

J.      Review Committee ........................................................................................... 26

K.      U.S. Trustee Matters and Reports ................................................................... 27

V. PENDING LITIGATION .................................................................................................. 27

A.      Eaton Vance Litigation .................................................................................... 27

B.      Other Litigation ................................................................................................ 27

VI. SUMMARY OF PLAN ..................................................................................................... 27

A.      Administrative Expense and Priority Claims .................................................. 28

    1.      Administrative Expense Claims ............................................................ 28

    2.      Professional Fee Claims ........................................................................ 29

    3.      DIP Claims ............................................................................................ 30

    4.      Priority Tax Claims ............................................................................... 30

    5.      Payment of Statutory Fees .................................................................... 30

B.      Reclamation Claims ......................................................................................... 30

C.      Employee, Director, and Officer Matters ........................................................ 31

D.      Classification of Claims and Interests ............................................................. 31

E.      Conditions Precedent to Confirmation of Plan and Effective Date ................ 33

    1.      Conditions Precedent to Confirmation of Plan ..................................... 33

    2.      Conditions Precedent to Effective Date ................................................ 33

    3.      Satisfaction or Waiver of Conditions Precedent ................................... 35

    4.      Effect of Failure of a Condition ............................................................ 35

F.      Effect of Confirmation of Plan ........................................................................ 35

    1.      Vesting of Assets ................................................................................... 35

    2.      Binding Effect ....................................................................................... 35

    3.      Discharge of Claims and Termination of Interests ............................... 36

    4.      Term of Injunctions or Stays ................................................................ 36

    5.      Injunction .............................................................................................. 36

    6.      Releases ................................................................................................. 37

    7.      Exculpation ........................................................................................... 39

    8.      Releases and Exculpation Provisions Generally ................................... 39

VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................... 40

A.      Continuation of the Chapter 11 Cases ............................................................ 40

B.      363 Sale ............................................................................................................ 40

C.      Liquidation under Chapter 7 ............................................................................ 40

VIII. TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER FEDERAL
    SECURITIES LAWS .......................................................................................................... 41

vi

A.    Section 1145 Securities................................................................................. 41

B.    Private Placement ...................................................................................... 42

IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN ................... 43

A.    Consequences to Debtors............................................................................ 45

1.    Cancellation of Debt ....................................................................... 46

2.    Limitation on NOLs and Other Tax Attributes.................................... 47

3.    Potential Application of AHYDO Provisions........................................ 49

B.    Consequences to Holders of Claims ............................................................. 50

1.    Holders of Class 4 Term Loan Secured Claims and Holders of Class 5
IPCo Notes Claims........................................................................... 50

2.    Holders of Class 6(a) Ongoing Trade Claims....................................... 53

3.    Holders of Class 6(b) Other General Unsecured Claims ........................ 54

4.    Character of Gain or Loss ................................................................. 54

5.    Distributions in Discharge of Accrued Interest ................................... 55

6.    Information Reporting and Backup Withholding .................................. 55

X. CERTAIN RISK FACTORS TO BE CONSIDERED............................................... 56

A.    Certain Bankruptcy Law Considerations ....................................................... 56

1.    Risk of Non-Confirmation of Plan...................................................... 56

2.    Risk of Non-Consensual Confirmation................................................ 56

3.    Risk of Non-Occurrence of Effective Date........................................... 57

4.    Risk of Termination of Transaction Support Agreement........................ 57

5.    Conversion to Chapter 7 Cases ......................................................... 57

6.    Claims Could Be More than Projected ................................................ 57

B.    Risks Relating to Reorganized Debtors' Business and Financial Condition ................... 57

1.    Risks Associated with Debtors' Business and Industry........................... 57

2.    COVID-19 Risks.............................................................................. 58

3.    Merchandising Operations ................................................................ 58

4.    Right-Sizing Real Estate Portfolio...................................................... 58

5.    Post-Effective Date Indebtedness ...................................................... 58

6.    Pending and Future Litigation .......................................................... 58

C.    Factors Relating to Securities to Be Issued under Plan Generally.................... 59

1.    Implied Valuation of Securities ......................................................... 59

2.    Potential Dilution........................................................................... 59

3.    Dividends...................................................................................... 59

4.    Restrictions on Ability to Resell New Common Equity .......................... 59

WEIL:\97584794\2\54457.0007

D.    Risks Related to New Common Equity ........................................................... 60

    1.    Significant Holders ............................................................................. 60

    2.    Interests Subordinated to Reorganized Debtors' Indebtedness............ 60

    3.    Implied Valuation of New Common Equity Not Intended to Represent Trading Value of New Common Equity ................................................ 60

    4.    New Common Equity May Be Subject to Further Dilution................... 60

E.    Additional Factors..................................................................................... 60

    1.    Debtors Could Withdraw Plan ............................................................ 60

    2.    Debtors Have No Duty to Update ....................................................... 61

    3.    No Representations Outside Disclosure Statement Are Authorized.................... 61

    4.    No Legal or Tax Advice Is Provided by Disclosure Statement ........... 61

    5.    No Admission Made ........................................................................... 61

    6.    Certain Tax Consequences ................................................................. 61

XI. VOTING PROCEDURES AND REQUIREMENTS .................................................. 61

A.    Voting Instructions and Voting Deadline .................................................. 61

B.    Voting Procedures..................................................................................... 62

C.    Parties Entitled to Vote ............................................................................. 63

    1.    Voting Creditors (Who Are Record Holders) ..................................... 64

    2.    Beneficial Holders (Class 5 – IPCo Notes Claims) ............................ 64

    3.    Nominees ........................................................................................... 65

    4.    Non-Voting Parties ............................................................................ 65

    5.    Miscellaneous ................................................................................... 66

    6.    Fiduciaries and Other Representatives................................................ 66

    7.    Agreements upon Furnishing Ballots.................................................. 66

    8.    Change of Vote .................................................................................. 67

    9.    Requirement to File a Proof of Claim................................................. 67

D.    Waivers of Defects, Irregularities, etc. ..................................................... 67

E.    Further Information, Additional Copies ..................................................... 67

XII. CONFIRMATION OF PLAN .................................................................................... 67

A.    Confirmation Hearing ............................................................................... 67

B.    Objections to Confirmation ....................................................................... 68

C.    Requirements for Confirmation of Plan ..................................................... 70

    1.    Requirements of Section 1129(a) of the Bankruptcy Code ................. 70

    2.    Additional Requirements for Non-Consensual Confirmation ............. 72

XIII. CONCLUSION AND RECOMMENDATION ............................................................ 1

WEIL:\97584794\2\54457.0007

**EXHIBIT A:**  Plan

**EXHIBIT B:**  Financial Projections

**EXHIBIT C:**  Liquidation Analysis

**EXHIBIT D:**  Valuation Analysis

WEIL:\97584794\2\54457.0007

# I.
# INTRODUCTION

Chinos Holdings, Inc. ("**Chinos Holdings**") and its debtor affiliates (collectively, the "**Debtors**") submit this joint disclosure statement (the "**Disclosure Statement**") in connection with the solicitation of votes on the *Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors*, (the "**Plan**")[2], attached hereto as **Exhibit A**.  The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**") on May 4, 2020 (the "**Petition Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, explanation of certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

On May 3, 2020, after extensive arm's-length, good faith negotiations overseen by an independent special committee, the Debtors and certain of their stakeholders executed a transaction support agreement (the "**Transaction Support Agreement**"), attached as Exhibit B to the *Declaration of Michael J. Nicholson In Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 6].  Specifically, the following stakeholders executed the Transaction Support Agreement: (i) certain holders of Term Loans, IPCo Notes, Series A Preferred Stock, and Common Stock (each as defined herein) (collectively, with any subsequent joinders, the "**Consenting Support Parties**") and (ii) the prepetition equity sponsors composed of funds managed or affiliated with TPG Capital LP ("**TPG**") and Leonard Green & Partners LP ("**LGP**" and together with TPG, the "**Sponsors**").  As of the date hereof, Consenting Support Parties and Sponsors holding approximately 96% of the Term Loans, 100% of the IPCo Notes, 85% of Series A Preferred Stock, and 89% of the Common Stock are party to the Transaction Support Agreement.[3]  Under the terms of the Transaction Support Agreement, the Consenting Support Parties, the Sponsors, and the Debtors agreed to the series of transactions set forth in the Plan and described herein (the "**Restructuring**").

The Restructuring is expected to materially de-leverage the Debtors' balance sheet, thereby positioning the Debtors to successfully compete in the retail industry.  The Restructuring is also expected to enhance the Debtors' long-term growth prospects and allow them to focus on operational performance and value creation.

The material terms of the Plan are summarized below:

- Each holder of an Allowed ABL Facility Claim will receive cash in the full amount of its Allowed ABL Facility Claim.[4]

- Each holder of an Allowed Term Loan Secured Claim will receive its *pro rata* share of the common equity of Reorganized Chinos Holdings (the "**New Common Equity**") representing, in the aggregate, 76.5% of the New Common Equity issued on the Effective Date remaining after

---

[2]    Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern in all respects. Figures referenced in this Disclosure Statement are as of the Petition Date unless otherwise expressly provided.

[3]    The disclosable economic interests of the Consenting Support Parties constituting the Ad Hoc Committee are set forth in the *Amended Verified Statement Pursuant to Bankruptcy Rule 2019* filed on June 24, 2020 [Docket No. 533].

[4]    Pursuant to the terms of the ABL Credit Agreement, the existing commitments under the ABL Credit Agreement were terminated automatically upon the Petition Date.

distributions on account of the Backstop Premium and the New Equity Allocation, and of any other New Common Equity distributed pursuant to the Plan (other than the New Common Equity distributed to holders of IPCo Notes Claims as described below), subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by the Reorganized Debtors after the Effective Date, including the Incremental Debt Equity.

▪ Each holder of an Allowed IPCo Notes Claim will receive its *pro rata* share of New Common Equity representing, in the aggregate, 23.5% of the New Common Equity issued on the Effective Date remaining after distribution on account of the Backstop Premium, the New Equity Allocation, and of any other New Common Equity distributed pursuant to the Plan (other than the New Common Equity distributed to holders of Term Loan Secured Claims as described above), subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by the Reorganized Debtors after the Effective Date, including the Incremental Debt Equity.

▪ Each holder of a general unsecured claims that will provide goods and services necessary to the operation of the Reorganized Debtors, as determined by the Debtors in consultation with the Requisite Consenting Support Parties[5] (the "**Ongoing Trade Claims**") and that has executed a trade agreement that expressly designates such party as a holder of an Ongoing Trade Claim,[6] will on the Effective Date receive its *pro rata* share of $71 million in cash; *provided* that the aggregate amount of cash distributed on account of any Ongoing Trade Claim will not exceed 50% of the allowed amount of such Claim.

▪ Holders of Other General Unsecured Claims, which include rejection damages claims and the Term Loan Deficiency Claims,[7] will, on the Effective Date, receive their *pro rata* share of cash allocable to the applicable Debtor from a cash pool that will aggregate (a) $3 million if the class votes to accept the Plan and (b) $1 million if the class votes to reject the Plan; *provided*, that the aggregate amount of cash distributed on account of any Other General Unsecured Claim will not exceed 50% of the allowed amount of such Claim.

▪ On the Effective Date, all Existing Holdings Preferred Equity and Existing Holdings Equity shall be cancelled and will be of no further force and effect, regardless of whether surrendered for cancellation.

In addition to supporting the Plan, certain Consenting Support Parties (in such capacity, the "**DIP Lenders**") have committed to provide the Debtors with debtor-in-possession financing pursuant to a term loan facility in an aggregate principal amount of up to $400,000,000 (the "**DIP Facility**", and the Debtors' obligations thereunder, the "**DIP Obligations**"). On May 3, 2020, certain of the Consenting Support Parties (in such capacity, the "**Backstop Parties**") executed that certain *Backstop Commitment Letter* (as the same may be amended from time to time, the "**Backstop Commitment Letter**"), committing to backstop the

---

[5]   Pursuant to the Transaction Support Agreement, "**Requisite Consenting Support Parties**" means, as of the date of determination, Consenting Support Parties (excluding the Sponsors), holding at least two-thirds in aggregate principal amount of Term Loans and IPCo Notes, taken together, held by all Consenting Support Parties.

[6]   Such agreements obligate the holders of Ongoing Trade Claims to provide goods and services to the Reorganized Debtors for a period of at least 365 days after the Effective Date on terms no less favorable to the Debtors than those in place for the year before the Petition Date, except as otherwise agreed by the Debtors with the consent of the Requisite Consenting Support Parties (such consent not to be unreasonably withheld).

[7]   As a gift to holders of Other General Unsecured Claims, holders of Term Loan Claims will forgo their entitled distribution on account of Term Loan Deficiency Claims, subject to occurrence of the Effective Date and solely for purposes of the Plan.

2

DIP Facility and to provide, if necessary, the Additional New Term Loans (as defined in the Transaction Support Agreement).

The Debtors expect to conduct these chapter 11 cases on an expedited timeline to preserve and maximize the going-concern value of their estates. The Transaction Support Agreement reflects, among other things, the mutual commitment by the Debtors and their economic stakeholders to pursue the following timeline (subject to the Bankruptcy Court's availability):

| Milestone | Transaction Support Agreement Deadline |
|---|---|
| Begin Solicitation of the Plan | Within 80 calendar days of the Petition Date (*i.e.*, by July 23, 2020) |
| Entry of Confirmation Order | Within 120 calendar days of the Petition Date (*i.e.*, by September 1, 2020) |
| Effective Date | Within 130 calendar days after the Petition Date (*i.e.*, by September 11, 2020) |

| |
|---|
| **THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN** |

### Summary of Plan Classification and Treatment of Claims and Interests

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a chapter 11 plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or notwithstanding any legal right to an accelerated payment of such claim or interest, a plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article VI—Summary of the Plan, below.

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[8] |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims (All Debtors) | Except if a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, at the sole option of the Reorganized Debtors, | Unimpaired<br><br>Not Entitled to Vote | Estimated Allowed Amount: $250,000<br><br>Estimated Percentage Recovery: 100% |

---

[8]   Estimated amounts are as of the date hereof and are subject to material change. Recovery percentages presented on account of Term Loan Secured Claims and IPCo Notes Claims do not reflect the estimated value of securities issued in consideration of capital committed by Backstop Parties or Electing Subsequent Consenting Support Parties (as defined in the Transaction Support Agreement). In addition, the estimated amount of the Term Loan Secured Claims and of the percentage recovery for Term Loan Secured Claims and IPCo Notes Claims each assume New Common Equity having value based on a transaction enterprise value of $1.75 billion.

3

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[8] |
|---|---|---|---|---|
| | | (i) each such holder shall receive payment in cash in an amount equal to the Allowed amount of such Claim, payable on the later of the Effective Date and the date that is 10 business days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | (Presumed to accept) | |
| 2 | Other Secured Claims (All Debtors) | Except if a holder of an Allowed Other Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, at the option of the Reorganized Debtors, on the later of the Effective Date and the date that is 10 business days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive on account of such Allowed Claim (i) cash in an amount equal to the Allowed amount of such Claim, (ii) delivery of the collateral securing such Allowed Claim and cash for any interest required under section 506(b) of the Bankruptcy Code, or (iii) Reinstatement or such other treatment that will render such holder's Allowed Other Secured Claim Unimpaired.  If an Other Secured Claim is treated under clauses (i) or (ii), the Liens securing such Other Secured Claim shall be deemed released immediately upon payment or delivery of collateral, as applicable. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: Non-Material and Undetermined<br><br>Estimated Percentage Recovery: 100% |
| 3 | ABL Facility Claims (Only Loan Debtors) | Except if a holder of an Allowed ABL Facility Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed ABL Facility Claim, each holder of an Allowed ABL Facility Claim will receive, on the Effective Date, cash in the full amount of its Allowed ABL Facility Claim and all issued and outstanding letters of credit shall be cash collateralized in accordance with the terms and conditions of the ABL Credit Agreement.  To the extent that any ABL Facility Claim is contingent as of the Effective Date, the Reorganized Debtors may, in their sole discretion, elect to (i) terminate any further commitments under the ABL Facility, (ii) cash collateralize such contingent amounts, or (iii) provide the ABL Lenders with such other treatment mutually satisfactory. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: $309,093,952 *plus* $63,960,717 of letter of credit obligations<br><br>Estimated Percentage Recovery: 100% |
| 4 | Term Loan Secured Claims (Only Loan Debtors) | Except if a holder of an Allowed Term Loan Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and | Impaired | Estimated Allowed Amount: $716,645,605[9] |

---

[9]    For illustrative purposes, Term Lenders would receive approximately 53.4% recovery if considering the aggregate amount outstanding of both the Term Loan Secured Claims and the Term Loan Deficiency Claims.  The blended recovery assumes New Common Equity having value based on a transaction enterprise value of $1.75 billion.

4

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[8] |
|---|---|---|---|---|
| | | discharge of, and in exchange for, its Allowed Term Loan Secured Claim, each holder of an Allowed Term Loan Secured Claim will receive, on the Effective Date, its Pro Rata share of New Common Equity representing, in the aggregate, 76.5% of the New Common Equity issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation, and any other New Common Equity distributed pursuant to the Plan other than the New Common Equity distributed to holders of IPCo Notes Claims, which will be subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by Reorganized Chinos Holdings after the Effective Date, including the Incremental Debt Equity. | Entitled to Vote | Estimated Percentage Recovery: 100% |
| 5 | IPCo Notes Claims (Only IPCo Debtors) | Except if a holder of an Allowed IPCo Notes Claim agrees to a less favorable treatment of such Claim and notwithstanding anything to the contrary in the IPCo Indentures or the IPCo Intercreditor Agreement, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed IPCo Notes Claim, each holder of an Allowed IPCo Notes Claim will receive, on the Effective Date, its Pro Rata share of New Common Equity representing, in the aggregate, 23.5% of the New Common Equity issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation, and any other New Common Equity distributed pursuant to the Plan other than the New Common Equity distributed to holders of Term Loan Secured Claims, subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by NewCo Holdings after the Effective Date, including the Incremental Debt Equity. | Impaired  Entitled to Vote | Estimated Allowed Amount: $411,668,976  Estimated Percentage Recovery: 53.4% |
| 6-A | Ongoing Trade Claims (All Debtors) | Except if a holder of an Allowed Ongoing Trade Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, each holder of an Allowed Ongoing Trade Claim will receive, on the Effective Date, its Pro Rata share of a cash pool in an aggregate amount equal to $71,000,000; *provided* that the aggregate amount of cash distributed on account of any Allowed Ongoing Trade Claim will not exceed 50% of the Allowed amount of such Claim. | Impaired  Entitled to Vote | Estimated Allowed Amount: $134,934,228  Estimated Percentage Recovery: 50% |

5

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[8] |
|---|---|---|---|---|
| 6-B[10] | Other General Unsecured Claims (All Debtors) | Except if a holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, each holder of an Allowed Other General Unsecured Claim will receive, on the Effective Date, its Pro Rata share of the cash pool allocated to each Debtor as set forth in Section 4.7(b) of the Plan[11]; *provided* that the aggregate amount of cash distributed on account of any Allowed Other General Unsecured Claim will not exceed 50% of the Allowed amount of such Claim. The cash pool may be reallocated among the Debtors after the occurrence of the Claims bar date, in their reasonable business judgement, to recalibrate for, among other things, the Claims asserted against each Debtor. | Impaired<br><br>Entitled to Vote | Estimated Allowed Amount against J. Crew Inc.: $5,193,885<br><br>Estimated Percentage Recovery: <1.6% |

| Debtor | Cash Pool | |
|---|---|---|
| | If Class 6-B Accepts | If Class 6-B Rejects |
| J. Crew Inc. | $82,200 | $27,380 |
| J. Crew Operating Corp. | $1,666,450 | $555,600 |
| Grace Holmes, Inc. | $474,000 | $158,000 |
| H.F.D. No. 55, Inc. | $195,500 | $65,100 |
| Madewell Inc. | $581,500 | $193,800 |
| J. Crew Group, Inc. | $350 | $120 |
| Total | $3,000,000 | $1,000,000 |

The Plan shall be deemed a filed objection for purposes of section 502 of the Bankruptcy Code to any Claim arising out of or relating to the rejection of an Executory Contract or Unexpired Lease whose holder is seeking the allowance of such Claim in excess of the amounts allowable under section 502(b) of the Bankruptcy Code.

Subject to occurrence of the Effective Date and solely for purposes of the Plan, holders of the Term Loan Deficiency Claims agree to forgo any distribution under

Estimated Allowed Amount against J. Crew Operating Corp.: $105,214,784

Estimated Percentage Recovery: <1.6%

Estimated Allowed Amount against Grace Holmes, Inc.: $29,880,913

Estimated Percentage Recovery: <1.6%

Estimated Allowed Amount against H.F.D. No. 55, Inc.: $12,340,383

Estimated Percentage Recovery: <1.6%

Estimated Allowed Amount against Madewell Inc.: $36,705,531

Estimated Percentage Recovery: <1.6%

---

[10]  The estimated allowed amounts included herein (a) exclude rejection damages and the Term Loan Deficiency Claims and (b) do not take into account reductions to the Class on account of curing executory contracts and unexpired leases.

[11]  The aggregate consideration for Class 6-B for all Debtors will not exceed $3,000,000 (assuming all applicable Classes 6-B accept) or $1,000,000 (assuming all Classes 6-B reject). The amount of consideration for Class 6-B was negotiated with the Consenting Support Parties representing over a majority of the Term Loans and IPCo Notes Claims, who are not being repaid in full. The Debtors allocated the cash pool based on their good faith and best estimates of the Allowed Claims in Class 6-B against each Debtor. The Debtors will reallocate the cash pool as necessary after occurrence of the claims bar date to, in their reasonable business judgment, recalibrate for the claims asserted against each Debtor and seek to ensure that the relative recoveries of general unsecured creditors in Class 6-B is comparable as between all Debtors. Because the final amount of Allowed claims in Class 6-B could change as a result of claims reconciliation, the actual recoveries to creditors in Class 6-B could materially change or be materially less than set forth herein.

6

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[8] |
|---|---|---|---|---|
| | | the Plan on account of the $625,475,614[12] of such Term Loan Deficiency Claims. | | Estimated Allowed Amount against J. Crew Group, Inc.: $21,867 <br><br> Estimated Percentage Recovery: <1.6% |
| 7 | Intercompany Claims (All Debtors)[13] | From and after the Effective Date, all Intercompany Claims, including the PIK Toggle Notes Claim, shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion. | Unimpaired <br><br> Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: N/A <br><br> Estimated Percentage Recovery: N/A |
| 8 | Section 510(b) Claims (All Debtors) | On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and holders of such claims will not receive any distribution on account of such claims. | Impaired <br><br> Not Entitled to Vote (Presumed to reject) | Estimated Allowed Amount: N/A <br><br> Estimated Percentage Recovery: 0% |
| 9 | Intercompany Interests (All Debtors) | From and after the Effective Date, all Intercompany Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors in their sole discretion. | Unimpaired <br><br> Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: N/A <br><br> Estimated Percentage Recovery: 0% |
| 10-A | Existing Holdings Preferred Equity (Only Chinos Holdings) | Holders of Series A Preferred Stock and Series B Preferred Stock (together, the "**Existing Holdings Preferred Equity**") shall not receive or retain any property under the Plan on account of such Existing Holdings Preferred Equity. On the Effective Date, all Existing Holdings Preferred Equity shall be cancelled and shall be of no further force and effect, regardless of whether surrendered for cancellation. | Impaired <br><br> Not Entitled to Vote (Deemed to reject) | Estimated Allowed Amount: N/A <br><br> Estimated Percentage Recovery: 0% |
| 10-B | Existing Holdings Equity (Only Chinos Holdings) | Holders of equity in Chinos Holdings as of the Petition Date except for Existing Holdings Preferred Equity (the "**Existing Holdings Equity**") shall not receive or retain any property under the Plan on account of such Existing Holdings Equity. On the Effective Date, all Existing Holdings Equity shall be cancelled and shall be of no further force and effect, regardless of whether surrendered for cancellation. | Impaired <br><br> Not Entitled to Vote (Deemed to reject) | Estimated Allowed Amount: N/A <br><br> Estimated Percentage Recovery: 0% |

---

[12]   Subject to change if the amount of the Term Loan Secured Claims change.

[13]   Under the Plan, there are no distributions on account of Intercompany Claims and Intercompany Interests. To the extent Intercompany Claims or Interests are Reinstated, they are being done as a matter of administrative convenience to preserve the Debtors' corporate structure. The Debtors do not believe that this treatment violates the absolute priority rule and will be prepared to demonstrate at the confirmation hearing that the treatment of Classes 7 and 9 are consistent with the Bankruptcy Code.

WEIL:\97584794\2\54457.0007

## II.
## OVERVIEW OF THE DEBTORS' BUSINESS

### A.    History and Formation

Introduced in 1983, the Debtors emerged as a fashion retailer rooted in iconic American style, and, in 1989, the Debtors opened their first store in downtown Manhattan with a clothing line targeting working professionals.  From there, the Debtors began expanding by opening retail locations across the United States.  In 2006, the Debtors acquired the defunct "Madewell" brand from the brand's former private owners, and later that year, launched their first Madewell store and quickly expanded Madewell stores across the United States.  The Debtors also began expanding internationally in 2011.

Although the Debtors began as a privately-held company, the Debtors went public in 2006, with its common shares traded on the New York Stock Exchange.  In 2011, the Debtors again became a privately-held company.

### B.    Debtors' Business Operations

Today, the Debtors are an internationally recognized multi-brand apparel and accessories retailer for young professionals and fashion-conscious men and women.  With the J. Crew brand recognized as a household name for nearly four decades, the Debtors enjoy a strong reputation for providing their customers with stylish and quality products.  In recent years, the Debtors have also seen fast and innovative growth from their Madewell brand, which offers a full product assortment rooted in premium denim and packaged in a cool, unexpected, and artful aesthetic.

The Debtors operate their retail stores under two distinct brands: (a) the J. Crew brand, which is the Debtors' primary global brand used for both J. Crew stores and J. Crew factory outlet stores, and (b) the Madewell brand.  The Debtors sell their merchandise in stores, online, as well as through partnered wholesalers, such as Nordstrom.  The differentiation across the business lines allows the Debtors to operate multiple store locations in close proximity and to serve a wider demographic.

#### 1.    J. Crew Business

There are approximately 181 J. Crew stores across the world, with the flagship J. Crew retail store located in South Street Seaport, Manhattan, where the J. Crew store first opened in 1983.  The J. Crew brand represents signature "classics with a twist" apparel and accessories, featuring the highest-quality style, design, and fabrics with consistent fits and authentic details.  J. Crew retail stores are located in upscale regional malls, lifestyle centers, and street locations.

The Debtors also operate approximately 170 J. Crew Factory brand stores related to the J. Crew business.  First launched in 1988, J. Crew Factory stores offer the same iconic J. Crew style but sold through outlet stores instead of traditional retail locations.  J. Crew Factory features merchandise with different designs, fabrics, and washes than those offered at the regular J. Crew retail stores.

For fiscal year 2019, revenues from the J. Crew brand, including J. Crew factory stores, totaled approximately $1.7 billion or approximately 67.2% of the Debtors' revenue in fiscal year 2019.

#### 2.    Madewell Business

In 2006, the Debtors introduced the first Madewell store in Dallas, Texas.  Initially only featuring women's clothing and accessories, the Debtors' approximately 140 Madewell stores now offer merchandise

8

for both men and women, including jeans and related products, swimwear, accessories, shoes, beauty products, and other leather goods. Madewell stores focus on providing customers with a cool, unexpected, and artful aesthetic. The Madewell brand has amassed a community of loyal customers and brand enthusiasts who actively participate in the brand through (a) *Madewell Insider*, Madewell's membership loyalty program that offers benefits and deals to loyal customers, (b) store events, such as pop-ups, panels, workshops, and charity events, and (c) digital content featured on the Madewell website and social media platforms.

For fiscal year 2019, revenues from the Madewell brand totaled approximately $602 million or approximately 23.7% of the Debtors' revenue in fiscal year 2019.[14]

### 3. Business Operations and Employees

Nearly all of the Debtors' merchandise is sourced either (a) by purchasing directly from manufacturing vendors or (b) through the use of buying agents. Like many retailers, the substantial majority of the vendors and service providers utilized by the Debtors are based outside of the United States. In fiscal year 2019, the Debtors purchased nearly all of their inventory from suppliers located outside of the United States. The Debtors have historically done business with over 200 vendors that operate hundreds of factories, with the top 10 vendors supplying 32% of the Debtors' merchandise. The Debtors have strong relationships with their vendors, some of which rely upon the Debtors for a significant portion of their business and others who advance costs for the Debtors in connection with producing the Debtors' merchandise.

The Debtors source the balance of their merchandise on an order-by-order basis with a select group of buying agents that, among other things, identify suitable vendors, place orders with those vendors for merchandise on the Debtors' behalf, manage timely delivery of goods to the Debtors, inspect the finished merchandise, and handle vendor communications on the Debtors' behalf. In an effort to directly source and reduce reliance on buying agents, the Debtors have established a sourcing office in Hong Kong under the purview of a non-debtor affiliate, J. Crew Sourcing Asia, Limited. The sourcing office acts as a local intermediary between the Debtors and their foreign sourcing base. The Debtors also have smaller sourcing offices in mainland China, India, and Vietnam. In the fiscal year 2019, 87% of the Debtors' merchandise was sourced in Asia (with 45% of their products sourced from mainland China and 16% of their products sourced from Vietnam), 12% sourced in Europe and other regions, and 1% in the United States.

As of the Petition Date, the Debtors own and operate two distribution facilities in Asheville, North Carolina and Lynchburg, Virginia. The Asheville facility houses the Debtors' distribution operations for their stores and wholesale business and historically has employed approximately 330 full and part-time associates, with additional temporary associates, sourced from various staffing agencies, as needed during peak seasons. The Lynchburg facility houses the Debtors' customer call center and order fulfillment operations for the Debtors' e-commerce business. The Lynchburg facility historically has employed approximately 1,270 full and part-time associates and an additional 310 additional temporary associates, also sourced from various staffing agencies, during peak seasons. Merchandise sold through the Debtors' e-commerce business is sent through the mail system directly to domestic customers from the Lynchburg distribution center or to the Debtors' stores for in-store pickup. For international orders, the Debtors use a single third-party provider to accept and fulfill online orders from customers in approximately 100 countries outside of the United States.

---

[14]    An additional approximately $230 million and 9.1% of the Debtors' revenue come from wholesale customers and shipping and handling fees.

Before implementing a furlough program that began on April 1, 2020 as a result of the COVID-19 pandemic, the Debtors employed approximately 13,000 individuals in the United States, Canada, the United Kingdom, China, Hong Kong, Vietnam, and India, approximately 4,000 of whom were employed on a full-time basis, and approximately 9,000 of whom were employed on a part-time basis (collectively, the "**Employees**").  Due to store closures in response to the COVID-19 pandemic, the Debtors made the decision to furlough approximately 11,000 Employees.  As of the Petition Date, the Debtors employed approximately 2,000 active full-time Employees.

### 4.    International Operations

As noted, the Debtors sell merchandise to customers in approximately 100 countries worldwide. Such merchandise first arrives to the Debtors in the United States, and the Debtors then export inventory from the United States to their stores in the United Kingdom and Canada.  The bulk of revenue generated internationally comes from customers located in the United Kingdom and Canada.

In order to ensure a seamless process with their international operations, the Debtors, in the ordinary course of their business, are party to arm's-length procurement and sourcing services agreements with certain of their non-debtor affiliates.  Under these agreements, several non-debtor affiliates acquire, source, and facilitate the purchase of materials and goods for the Debtors' products.  In exchange, the Debtors pay commissions for such services to J. Crew Global Holdings B, LLC (a non-debtor foreign affiliate), which in turn pays the appropriate foreign account for the provision of goods and services provided by the applicable non-debtor affiliate.

### 5.    Recent Operational Initiatives

Cost-Optimization.  The Debtors' management team have made significant efforts to reduce costs, improve efficiencies, and increase brand loyalty and presence.  For example, during the second quarter of fiscal year 2019, the Debtors completed a comprehensive review of their J. Crew business and launched a multi-year cost-optimization program, which the Debtors expected to generate savings of approximately $50 million over three years with approximately $15 million realized in the 2019 fiscal year.  The Debtors' cost-optimization efforts have been spearheaded by a dedicated management team, which recently experienced leadership changes in both the J. Crew and Madewell businesses.  In March 2019, for example, the Debtors promoted Libby Wadle to President and Chief Executive Officer of Madewell, and in January 2020, the Debtors hired Jan Singer as the new Chief Executive Officer of J. Crew.

Lease Negotiations.  The Debtors lease all of their retail store locations from approximately 140 landlords and are party to approximately 500 unexpired leases of nonresidential real property, located in nearly every state in the United States.  The Debtors' lease agreements typically have terms between five and ten years.  As of the Petition Date, the Debtors have approximately $20 million in monthly domestic lease obligations.

Beginning in early April 2020, after several weeks of government mandated store closures and uncertainty as to the duration and resulting impact of the pandemic, the Debtors began to evaluate their lease portfolio to, among other things, quantify and realize the potential for lease savings.  In furtherance of the comprehensive lease strategy, the Debtors with the assistance of their real estate consultants, Hilco Real Estate, LLC ("**Hilco**"), communicated with landlords in an effort to improve lease terms.  If certain accommodations with landlords are not achieved, the Debtors likely will reject certain burdensome leases and close the related stores.  On May 5, 2020, the Bankruptcy Court entered the *Order Authorizing Debtors to (I) Establish Procedures for Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith and (II) Granting Related Relief* [Docket No. 118] (the "**Lease Procedures Order**") authorizing the Debtors to establish procedures for the rejection of unexpired

10

leases and related subleases of nonresidential real property and the abandonment of certain *de minimis* property in connection therewith and granting related relief.

On May 26, 2020, the Bankruptcy Court entered the *Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases, and (II) Granting Related Relief* [Docket No. 323] (the "**365(d)(3) Order**"). Pursuant to the 365(d)(3) Order, the Bankruptcy Court extended performance of the Debtors' lease obligations under their unexpired real property leases for 60 days from the Petition Date though July 6, 2020.

COVID-19 Initiatives. In light of disruptions and challenges posed by the current environment, the Debtors have undertaken critical initiatives in an effort to effectively manage liquidity while continuing to provide their customers with high-quality products and services. Based on the Debtors' budget plan for the 2020 fiscal year prepared before COVID-19, the Debtors expect a loss of almost $900 million in sales due primarily to store closures across all brands. The Debtors have taken action to redirect and reduce inventory and explore options to modify delivery time and costs of merchandise. During this time, the Debtors are leveraging their e-commerce platform to generate revenue while certain stores remain closed.

Moreover, the Debtors initiated a variety of temporary Employee-related measures to ensure public health and safety and manage the impact of the crisis until business stabilizes, including closing all retail store locations, furloughing Employees, reducing certain Employee hours, and decreasing the salary of certain field, distribution, and corporate Employees. Specifically, and as noted above, starting April 1, 2020, the Debtors furloughed approximately 11,000 Employees, which constituted approximately 85% of their full-time Employees and all of their part-time Employees—though the Debtors remain hopeful that jobs will be minimally impacted when stores reopen.

Beginning May 2020, the Debtors began reopening stores on a limited basis, as permitted by applicable law and the economic and social circumstances. Approximately 475 stores reopened by the end of June 2020, which are subject to any closures that result from the Debtors' evaluation of their lease portfolio and lease rejections attendant therewith.

## C.     **Board of Directors and Senior Executive Officers.**

The following table sets forth the names of the Debtors' executive officers as of the Petition Date:

| Name | Position |
|------|----------|
| Jan Singer | Chief Executive Officer, J. Crew |
| Vincent Zanna | Chief Financial Officer and Treasurer |
| Michael Nicholson | President and Chief Operating Officer |
| Libby Wadle | President and Chief Executive Officer, Madewell |
| Lynda Markoe | Chief Administrative Officer |
| Lisa Greenwald | Chief Merchandising Officer |

The identities of the members of the New Board and other board of directors or managers of a Reorganized Debtor, and to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or before the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### D.    Regulation of Debtors' Business.

The Debtors are subject to regulation by a variety of governmental authorities, including federal, state and local agencies that regulate customs, truth-in-advertising, consumer protection, employment, data privacy, product safety and other laws, including zoning and occupancy ordinances that regulate retailers and/or govern the promotion and sale of merchandise and the operation of retail stores and warehouse facilities.

A substantial portion of the Debtors' products are manufactured outside the United States. These products are imported and are subject to U.S. customs laws, which impose tariffs as well as import quota restrictions for textiles and apparel. Some of the Debtors' imported products are eligible for duty-advantaged programs. In addition, the Debtors' importation of goods from foreign countries from which the Debtors buy their products may be subject to embargo by U.S. Customs authorities if shipments exceed quota limits.

### E.    Prepetition Capital Structure.

#### 1.    Corporate Structure

An organizational chart illustrating the Debtors' corporate structure is below. As set forth on the organizational chart, Chinos Holdings is the Debtors' ultimate parent, which directly or indirectly owns each of the other Debtor entities. Additionally, the Debtors have 24 non-debtor affiliates, 17 of which are foreign subsidiaries. The foreign non-debtor affiliates are incorporated in India, Japan, China, Hong Kong, the Cayman Islands, Bermuda, Canada, France, the Netherlands, and the United Kingdom.

12

WEIL:\97584794\2\54457.0007



### 2.    Prepetition Indebtedness

As of the Petition Date, the Debtors' prepetition capital structure included approximately $2 billion in funded debt.  The Debtors' funded debt obligations are summarized below:

| As of Petition Date:<br>Debt Instrument | | Approximate<br>Outstanding Amount<br>($ millions) |
|---|---|---|
| ABL Facility | $ | 310.0 |
| Term Loans | $ | 1,337.4 |
| IPCo Notes | $ | 411.7[15] |
| Total Funded Debt | $ | 2,059.1 |

(a)    **Prepetition ABL**

On March 7, 2011, certain of the Debtors entered into the *Credit Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), among J. Crew Group, Inc. ("**Group, Inc.**") as borrower, Chinos Intermediate Holdings B, Inc. ("**Chinos B**"), Bank of

---

[15]    This amount includes the makewhole premium equal to $58,044,927, calculated as of the Petition Date.

13

America, N.A. ("**ABL Agent**"), as administrative agent, collateral agent, lender and issuer, and the other lenders and issuers from time to time party thereto (collectively, the "**ABL Lenders**"), pursuant to which, among other things, the ABL Lenders agreed to provide the Debtors with an asset-based revolving credit facility (the "**ABL Credit Facility**"). As of the Petition Date, approximately $310 million in principal amount was outstanding under the ABL Credit Facility, along with approximately $64 million of outstanding but undrawn letters of credit securing the Debtors' obligations with respect to their workers' compensation policies, certain leases, customs bonds, and inventory. In addition, the Debtors are obligated on account of any outstanding cash management obligations. The ABL Credit Facility will mature on December 4, 2020.

Pursuant to a guaranty agreement, Chinos B, J. Crew Operating Corp ("**J. Crew OpCo**"), J. Crew Inc. ("**JCI**"), J. Crew International, Inc., Grace Holmes, Inc., H. F. D. No. 55, Inc., Madewell Inc., and J. Crew Virginia, Inc. (the "**Guarantors**", and together with Group, Inc., the "**Loan Debtors**") guaranteed Group, Inc.'s obligation under the ABL Credit Agreement. All obligations of the Loan Debtors under the ABL Credit Facility and the related guarantees are secured by substantially all of the assets of the Loan Debtors, including: (a) a first-priority security interest in the Loan Debtors' accounts receivable, inventory, cash, certain deposit accounts, securities accounts, commodities accounts, and certain proceeds thereof (the "**ABL Priority Collateral**"), and (b) a second-priority security interest in the Term Loan Priority Collateral (as defined below).

(b)      **Prepetition Term Loan**

On March 5, 2014, certain of the Debtors entered into the *Amended and Restated Credit Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Agreement**"), among Group, Inc. as borrower, Chinos B., Wilmington Savings Fund Society, FSB ("**Term Loan Agent**"), as administrative agent and collateral agent, and the other lenders from time to time party thereto (collectively, the "**Term Lenders**"), pursuant to which, among other things, the Term Lenders agreed to provide Group, Inc. with a term loan in the initial principal amount of approximately $1.57 billion (the "**Term Loans**"). As of the Petition Date, approximately $1.34 billion in principal amount of the Term Loans remained outstanding. The Term Loans will mature on March 5, 2021.

Group, Inc.'s obligations under the Term Loan are also guaranteed by each of the Guarantors. All obligations of the Loan Debtors with respect to the Term Loans and the related guarantees are secured by substantially all of the assets of the Loan Debtors, including: (a) a first-priority security interest in substantially all of the tangible and intangible assets of the Loan Debtors (other than ABL Priority Collateral), including certain capital stock directly held by any Loan Party (the "**Term Loan Priority Collateral**") and (b) a second-priority security interest in the ABL Priority Collateral.

(c)      **IPCo Notes and License Agreements**

Pursuant to the *Indenture* dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "**IPCo New Money Notes Indenture**"), among J. Crew Brand, LLC ("**Brand**"), J. Crew Brand Corp. ("**Brand Corp.**, and together with Brand, the "**IPCo Issuers**"), the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, the IPCo Issuers issued 13.00% Senior Secured Notes due 2021 (the "**IPCo New Money Notes**") in the aggregate principal amount of $97,000,000.

Pursuant to the *Indenture*, dated July 13, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "**IPCo Exchange Notes Indenture**", and together with the IPCo New Money Notes Indenture, the "**IPCo Indentures**"), among the IPCo Issuers, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, the IPCo Issuers issued 13.00%

14

Senior Secured Notes due 2021 (the "**IPCo Exchange Notes**", and together with the IPCo New Money Notes, the "**IPCo Notes**," and their holders, the "**IPCo Noteholders**") in the aggregate principal amount of approximately $250 million.  The IPCo Notes mature on September 15, 2021.

All obligations under the IPCo Notes and IPCo Indentures are guaranteed on (a) a secured basis by the IPCo Issuers and J. Crew Brand Intermediate, LLC ("**Brand Intermediate**"), J. Crew International Brand, LLC ("**JCI Brand**"), and J. Crew Domestic Brand, LLC ("**Domestic Brand**") (each, an "**IPCo Guarantor**"), and (b) an unsecured basis by Chinos Intermediate Holdings A, Inc. ("**Chinos A**"), as supplemental guarantor.  The IPCo Notes and the guarantees thereof are senior secured obligations of the IPCo Issuers and IPCo Guarantors, secured by the Licensed Marks (as defined below).  The collateral securing the IPCo Notes, including with respect to the Licensed Marks (as defined below), is governed by each of the IPCo Indentures, the *Intercreditor Agreement*, dated July 13, 2017, between the IPCo Trustees, and related security documents.

Domestic Brand owns 100% of an undivided ownership interest in the domestic J. Crew brand intellectual property (the "**Licensed Marks**").  Pursuant to two license agreements (the "**License Agreements**"), Domestic Brand, as the licensor, provides exclusive, non-transferrable, sublicensable, royalty-bearing licenses with respect to 100% of the Licensed Marks to JCI Brand, as licensee.  J. Crew OpCo., as payor, on behalf of JCI Brand, is obligated to pay a fixed license fee in the amount of $59 million to Domestic Brand, with $29.5 million due on each of March 1st and September 1st (collectively, the "**License Fees**").  The proceeds from the License Fees are used by Brand and Domestic Brand to service the IPCo Notes, and any License Fees in excess of such debt service requirements are loaned back to other Debtors on a subordinated basis.

(d)    **Intercreditor Relationships**

The relative contractual rights of the ABL Lenders and Term Lenders are governed by the *Intercreditor Agreement* between Bank of America, N.A., as administrative agent for the ABL Lenders and the Term Loan Agent, dated as of March 7, 2011 (as amended, supplemented, restated or otherwise modified from time to time).  As noted previously, the liens on the ABL Priority Collateral held by the ABL Agent on behalf of the ABL Lenders are senior in priority to the liens on the ABL Priority Collateral granted to the Term Loan Agent on behalf of the Term Lenders.  Conversely, the liens on the Term Priority Collateral held by the Term Loan Agent on behalf of the Term Lenders are senior in priority to the liens on the Term Priority Collateral granted to the ABL Agent on behalf of the ABL Lenders.

(e)    **Intercompany Claims and Interests**

On November 4, 2013, Chinos A issued approximately $500 million in aggregate 7.75%/8.50% Senior PIK Toggle Notes due 2022 (the "**PIK Toggle Notes**").  The PIK Toggle Notes were initially set to mature on May 1, 2019, but such maturity has since been extended to March 15, 2022.  Thus, the PIK Toggle Notes remain outstanding and are held by Brand as collateral for the IPCo Notes.  Under the terms of the PIK Toggle Notes, upon certain events of default, Chinos A and certain other Debtors are subject to certain restrictions concerning, among others, the ability to declare or pay dividend or any distributions, create encumbrances or incur indebtedness.

Pursuant to the *IPCo Intercompany Note* dated July 13, 2017 (the "**Intercompany Note**"), among Group, Inc. as borrower, and the IPCo Issuers and IPCo Guarantors as lenders (collectively, the "**Intercompany Lenders**"), Group, Inc. is obligated to the Intercompany Lenders in the principal amount of approximately $120 million and interest on such amount accruing at 1.89% per annum.  The Intercompany Note matures on September 6, 2021 and constitutes collateral for the IPCo Notes.

Additionally, under the terms of the Intercompany Note, obligations thereunder are subordinate and junior to payment in full of any outstanding amounts under the Term Loan Agreement.

Chinos Intermediate, Inc. ("**Intermediate**") has issued 300,000 shares of preferred Series A common stock (the "**Intercompany Preferred Shares**"), which were distributed to Chinos Holdings in July 2017 in exchange for Chinos Holdings' participation in the 2017 Exchange Offer.  The Intercompany Preferred Shares have a liquidation value of $1,000 per share.  On account of the Intercompany Preferred Shares, Intermediate pays preferential dividends of 7% in kind to Holdings on each March 15 and September 15.

Although the Debtors and their non-debtor affiliates regularly engage in ordinary-course intercompany transactions to support the global enterprise, none of the Debtors are obligated on any of their non-debtor affiliates' funded debt; and, conversely, none of the Debtors' non-debtor affiliates are obligated on any of the Debtors' funded debt.[16]  The intercompany transfers are tracked and accounted for, as discussed in greater detail in the Cash Management Motion (as defined below).

(f)      **Preferred Stock**

As of February 1, 2020, Chinos Holdings issued approximately 190,000 shares of 7% non-convertible perpetual series A preferred stock ("**Series A Preferred Stock**") and approximately 130,000 shares of 7% non-convertible perpetual series B preferred stock ("**Series B Preferred Stock**").  As of the Petition Date, the Consenting Support Parties held approximately 66% of the Series A Preferred Stock, with the remainder held by other holders.  The Sponsors held approximately 92.0% of the Series B Preferred Stock, with the remainder held by various other holders.

(g)      **Common Stock**

As of February 1, 2020, Chinos Holdings has also issued approximately 115 million shares of class A common stock ("**Common Stock**").  As of the Petition Date, the Sponsors held approximately 76% of the Common Stock, the Consenting Support Parties held approximately 9% of the Common Stock, and the remainder was held by other holders.

(h)      **General Unsecured Claims**

In addition to their funded debt, in the ordinary course of business, the Debtors incur fixed, liquidated, and undisputed payment obligations to various third-party providers of goods and services.  As discussed in greater details in the Vendors Motion (as defined below), certain of these claims (a) are entitled to statutory priority in payment, such as under section 503(b)(9) of the Bankruptcy Code, or (b) may give rise to liens on the Debtors' property if left unpaid.

### III.
### EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

The Debtors commenced these chapter 11 cases to implement a prearranged restructuring supported by the Sponsors and the Consenting Support Parties, as described above and memorialized in the Transaction Support Agreement.  Although the Debtors' business is operationally sound, the Debtors have substantial long-term funded debt and lease obligations that they must restructure.  In addition, the Debtors have been heavily impacted, like many of their retail peers, by the unprecedented and evolving global

---

[16]    Pursuant to the ABL Credit Agreement and Term Loan Agreement, equity of certain non-debtor affiliates has been pledged to secure the Loan Parties' obligations under the ABL Credit Facility and Term Loans.

16

pandemic, COVID-19. Through these chapter 11 cases, the Debtors will have the opportunity to address their substantial indebtedness and lease obligations while raising additional capital to fund their operations and make strategic investments to allow them to emerge as a stronger global enterprise.

### A.    COVID-19: Liquidity Challenges and Preservation Measures

The President of the United States has declared COVID-19 to be a national emergency. *See* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020). Similarly, nearly every state (including the states where the Debtors operate) has declared a state of emergency and issued orders mandating non-essential business closures or otherwise restricting the movement of people in a manner that would functionally prevent the Debtors from operating their stores.[17]

Beginning in late February 2020, the Debtors began to face unprecedented liquidity and operational challenges with the spread of COVID-19. Though many companies across all industries faced hardships and tumultuous market conditions, the Debtors were uniquely and severely impacted as a customer-facing retailer in an already struggling industry. The Debtors quickly encountered, among other things, (a) a steep decrease in net sales across their business lines and (b) inability of the Debtors' foreign vendors to operate, produce, and ship merchandise. By early March 2020, the Debtors were forced to close all retail stores consistent with governmental health guidelines and directives. The Debtors have been relying primarily on e-commerce activities. As noted, the Debtors expect a loss of almost $900 million in sales due primarily to store closures across all brands. As a result of the foregoing, the Debtors have experienced a steep drop in revenue, which forced the Debtors to employ liquidity preservation measures.

The precipitous decline in the Debtors' revenue has resulted in shared concessions by nearly all of the Debtors' economic constituencies, including:

- temporary closures of approximately 500 retail stores worldwide;

- furlough of approximately 11,000 employees;

- reduction of salaries for remaining corporate employees between 10-25%; and

- prepetition extension of trade payment terms, in some cases by up to 75 days.

---

[17]   *See* Ala. Order of the State Health Officer (Apr. 28, 2020); Alaska Essential Services and Critical Workforce Infrastructure Order (amended May 5, 2020); Ariz. Exec. Order 2020-33 (Apr. 29, 2020); Cal. Exec. Order N-33-20 (Mar. 4, 2020); Colo. Exec. Order D 2020 024 (Apr. 6, 2020); Conn. Exec. Order No. 7H (Mar. 20, 2020); Del. Fourth Modification of the Decl. of State of Emergency (Mar. 22, 2020); D.C. Mayor's Order 2020-053 (Mar. 24, 2020); Ga. Exec. Order No. 04.30.20.01 (Apr. 20, 2020); Haw. Third Supplementary Proclamation (Mar. 23, 2020); Haw. Sixth Supplementary Proclamation (Apr. 16, 2020); Idaho Order to Self-Isolate (amended Apr. 15, 2020); Ill. Exec. Order 2020-32 (Apr. 30, 2020); Ind. Exec. Order 20-22 (Apr. 20, 2020); Kan. Exec. Order No. 20-16 (Mar. 28, 2020); Ky. Exec. Order 2020-257 (Mar. 25, 2020); La. Proclamation Number 33 JBE 2020 (Mar. 22, 2020); La. Proclamation Number 41 JBE 2020 (Apr. 2, 2020); Me. Exec. Order No. 28 FY 19/20 (Mar. 31, 2020); Md. Exec. Order No. 20-03-30-01 (Mar. 30, 2020); Mass. COVID-19 Order No. 21 (Mar. 31, 2020); Mich. Exec. Order No. 2020-59 (Apr. 24, 2020); Minn. Emergency Exec. Order 20-33 (Apr. 8, 2020); Miss. Exec Order 1473 (Apr. 17, 2020); Mo. Dep't of Health & Human Servs. Order (Apr. 16, 2020); Mont. Exec. Order extending 2-2020 and 3-2020 (Apr. 7, 2020); Nev. Directive 010 (Mar. 31, 2020); N.H. Emergency Order #17 Pursuant to Exec. Order 2020-04 (Mar. 26, 2020); N.J. Exec. Order No. 107 (Mar. 21, 2020); N.M. Public Health Order (Apr. 30, 2020); N.Y. Exec. Order No. 202.18 (Apr. 16, 2020); Ohio Dep't of Health Amended Stay at Home Order (Apr. 2, 2020); N.C. Exec. Order No. 135 (Apr. 23, 2020); Or. Exec. Order No. 20-12 (Mar. 23, 2020); Pa. Amendment to Stay at Home Order (Apr. 20, 2020); R.I. Executive Order 20-14 (Mar. 28, 2020); S.C. Exec. Order No. 2020-21 (Apr. 6, 2020); Tenn. Exec. Order No. 22 (Mar. 30, 2020); Tenn. Exec. Order No. 27 (Apr. 13, 2020); Tex. Exec. Order No. GA-14 (Mar. 31, 2020); Vt. Addendum 9 to Exec. Order 01-20 (Apr. 10, 2020); Va. Exec. Order No. 55 (Mar. 30, 2020); Wash. Proclamation 20-25.1 (Apr. 2, 2020); W. Va. Exec. Order No. 9-20 (Mar. 23, 2020); Wis. Emergency Order #12 (Mar. 24, 2020); and Wis. Emergency Order #28 (Apr. 16, 2020).

17

### B.    Trends and Uncertainties Affecting the Businesses

The specialty retail industry is highly competitive and, in recent years, the retail industry as a whole has been challenged by shifts in consumer purchasing preferences and habits.  The Debtors primarily compete with specialty retailers, department stores, and e-commerce businesses that engage in the sale of women's, men's and children's apparel, accessories, and similar merchandise.  The Debtors are not in the business of "fast fashion" and pride themselves on long-lasting merchandise, quality designs, and attentive customer service.  Nevertheless, the Debtors face increasing competition from "fast fashion" retailers due to their aggressive pricing strategies.

Moreover, economic conditions around the world have impacted the Debtors' customers and affected the general business environment in which the Debtors operate and compete.  Because apparel and accessories generally are discretionary purchases, consumer purchases of the Debtors' products have declined when consumer disposable income is lower.  As a result, the Debtors' sales, growth, and profitability have been adversely affected by unfavorable economic conditions across the United States and abroad.

Before the sharp decline in sales due directly to COVID-19, however, the Debtors' business performance showed signs of an upward trend.  Below is a summary of the Debtors' revenues in fiscal year 2019[18] as compared to fiscal year 2018, which showed an overall revenue increase of 2.3% of the combined enterprise.

| Business | Fiscal Year 2018 | Fiscal Year 2019 | Variance |
|---|---|---|---|
| **J. Crew** | $1,779,500,000 | $1,707,700,000 | 4% decrease |
| **Madewell** | $529,200,000 | 602,400,000 | 13.8% increase |
| **Other Revenues** (*i.e. wholesale revenue*) | $175,300,000 | $230,000,000 | 31.2% increase |
| **Total** | **$2,484,000,000** | **$2,540,100,000** | **2.3% increase** |

In addition, unfavorable economic conditions abroad have impacted the Debtors' ability to meet production goals.  As noted previously, approximately 87% of the Debtors' merchandise is sourced in Asia, with approximately 45% of the Debtors' products sourced from mainland China and 12% sourced from Europe and other regions.  Each of those regions have been particularly affected by COVID-19 and have faced significant prolonged shutdowns, which has affected the Debtors' ability to obtain supplies and finished goods from those areas.  Although the Debtors believe their quality, design, customer service, and price remain a compelling proposition over the long term, the Debtors are not immune from these broader trends, particularly in light of COVID-19.

### C.    Funded Debt and Contractual Obligations

The Debtors have a substantial amount of funded debt and a considerable level of interest expense. For example, the Debtors paid approximately $143 million in fiscal year 2019 for cash interest expense. The debt service obligations reduced the Debtors' ability to make capital expenditures, including to refresh store locations, drive growth initiatives, and further enhance their customer experience.  The Debtors also have substantial fixed contractual commitments, including, as noted above, approximately $20 million of

---

[18]    The Debtors' 2019 fiscal year ended February 1, 2020.

18

monthly domestic lease obligations or approximately $240 million of such rental expense on an annualized basis.

### D.    Prepetition Balance Sheet Restructuring Initiatives

#### 1.    2017 Transaction

In 2016, the Debtors began exploring options to address the maturity of approximately $543 million of the PIK Toggle Notes.  In an effort to reduce their indebtedness and address their obligations under the PIK Toggle Notes, the Debtors entered into a two-step liability management transaction (the "**2017 Transaction**").  First, in late 2016, the Debtors transferred the Licensed Marks (such transfer, the "**IP Transfer**") into an unrestricted subsidiary, Domestic Brand.  The IP Transfer allowed the IPCo Issuers to issue IPCo Notes secured by the Licensed Marks.  Then, in June 2017, with the support of an ad hoc group of holders of PIK Toggle Notes, the Debtors executed a debt-for-debt exchange (the "**2017 Exchange Offer**"),[19] whereby approximately 99.85% of the PIK Toggle Notes were consensually exchanged through a public offer for a pro rata share of (a) IPCo Notes, (b) $190 million of Series A Preferred Stock, and (c) 15% of the Common Stock.  The 2017 Exchange Offer functionally extended the Debtors' maturity profile by exchanging PIK Toggle Notes maturing May 2019 with IPCo Notes maturing 2021.

Concurrently with the 2017 Exchange Offer, the Debtors amended the Term Loan Agreement to facilitate, among other things, the repayment of Term Loans then-outstanding, the 2017 Exchange Offer, and the raising of approximately $30 million of Term Loans from the Sponsors (collectively, the "**Term Loan Amendment**").  The Debtors obtained support for the Term Loan Amendment from approximately 87.8% of the Term Lenders.

The Debtors were party to two lawsuits in connection with the 2017 Transaction.[20]  On February 1, 2017, the Debtors initiated a lawsuit against the Term Loan Agent seeking a declaratory judgment that the IP Transfer was permissible under the applicable documents, which was ultimately settled in connection with the Term Loan Amendment to allow the closing of the 2017 Transaction.  On June 22, 2017, certain Term Lenders that did not consent to the 2017 Transaction or the Term Loan Amendment filed a lawsuit alleging, among other things, that the Term Loan Amendment and other transactions in connection with the 2017 Transaction violated the Term Lenders' unanimous consent rights under the Term Loan Agreement and that the transfer of the Licensed Marks was a fraudulent conveyance.  The Debtors filed a partial motion to dismiss all claims asserted by the dissenting Term Lenders, except for their breach of contract claims relating to their alleged unanimous consent rights.  On April 25, 2018, the Supreme Court of New York County granted the Debtors' partial motion to dismiss.  On April 25, 2019, the Appellate Division of the Supreme Court in the First Department unanimously affirmed the trial court's decision.

Among other benefits, the 2017 Transaction permitted the Debtors to extend their maturity profile, implement key turnaround changes for the business, and delever their balance sheet by approximately $340 million.  Moreover, the Debtors were able to gain greater flexibility under their existing debt instruments with the Term Loan Amendment.  The Debtors utilized the runway provided by the 2017 Transaction to continue to evaluate strategic alternatives to achieving optimal, long-term, and sustainable growth.

Though the issues surrounding the 2017 Transaction have been extensively litigated, the Debtors have established a committee (the "**Review Committee**") to investigate potential estate claims and causes of action relating to the 2017 Transaction, including fraudulent transfer claims.  The Debtors appointed

---

[19]    The Debtors were represented by Weil, Gotshal & Manges LLP ("**Weil**") and Lazard Frères & Co. LLC ("**Lazard**") in the 2017 Exchange Offer.

[20]    One lawsuit is still pending as of the Petition Date.

Mr. D.J. (Jan) Baker on or about April 24, 2020 as the sole member of the Review Committee, which has retained independent legal counsel and financial advisor and has undertaken and finalized a review of the 2017 Transaction in accordance with its mandate, as described herein.

The Official Committee of Unsecured Creditors is conducting its own independent investigation of the 2017 Transaction, which remains ongoing.

### 2.    2019 and 2020 Stakeholder Engagement and Chapter 11 Filing

Since the 2017 Transaction and in the time leading up to the Petition Date, the Debtors have taken a number of steps to evaluate strategic alternatives, enhance performance, right-size their capital structure, and position themselves for success within their current operating environment.  Despite their best efforts, the general economic downturn and industry trends affecting retail, as discussed above, has strained the Debtors' liquidity.

In April 2019, the Debtors engaged Lazard as investment banker and Weil as legal counsel to assist with, among other things, identifying and developing potential strategic alternatives, including strategic considerations surrounding a potential separation of the Madewell and J. Crew businesses.

At that time, the Debtors established the special committee of the board of directors of Chinos A (the "**Chinos A Special Committee**") to evaluate strategic alternatives or transactions that may be available to the Debtors.  The Chinos A Special Committee is composed of Messrs. Chad Leat, Richard Feintuch, and Seth Farbman, and, together with the special committee of J.Crew OpCo,[21] remains charged with overseeing the Debtors' strategic review.

As noted, the Debtors and their advisors proactively engaged with their stakeholder groups before the Petition Date.  Since May 2019, the Debtors engaged in arms-length negotiations with a certain ad hoc committee (the "**Ad Hoc Committee**") represented by PJT Partners LP as investment banker and Milbank LLP as legal counsel.  As of the Petition Date, members of the Ad Hoc Committee held approximately 69.1% of the Term Loans, 77.9% of the IPCo Notes, 66.5% of the Series A Preferred Stock, and 9.8% of the Common Stock.

After eight months of arms-length and good faith negotiations, on December 2, 2019, the Debtors executed a consensual transaction support agreement (as amended, modified, or restated from time to time, the "**IPO Support Agreement**") with the members of the Ad Hoc Committee and the Sponsors.  The IPO Support Agreement contemplated, among other things, a separation of the J. Crew and Madewell businesses, enabling a potential initial public offering for the Madewell business, and a material deleveraging of the Debtors' capital structure through the use of the IPO proceeds and the issuance of new capital stock.  In the subsequent months, the Debtors took substantial steps to effectuate the transactions contemplated under the IPO Support Agreement.  The Debtors, through their advisors, engaged with certain Term Lenders to execute joinders to the IPO Support Agreement.  The Debtors also filed a preliminary prospectus, dated January 17, 2020, for the issuance of common stock by Chinos Holdings.

Beginning in late February 2020, however, the Debtors began to face abrupt and unprecedented liquidity and operational challenges with the spread of COVID-19.  In the span of just a few weeks, by early March 2020, the Debtors were forced to close all retail stores consistent with governmental health guidelines and directives, which stressed the Debtors' cash liquidity.  On March 2, 2020, the parties further amended the IPO Support Agreement to modify certain milestones therein to provide more time for the

---

[21]    In May 2020, the Debtors also established a special committee of the Board of Directors of J. Crew OpCo composed of Messrs. D.J. (Jan) Baker, Chad Leat, Richard Feintuch, and Seth Farbman.

parties to review and explore additional strategic alternatives in light of the uncertain market for initial public offerings and other global economic considerations.

In February 2020, the Debtors reengaged with the Ad Hoc Committee and the Sponsors with the good faith goal of maximizing and preserving the value of the Debtors' business. After weeks of negotiations, the Debtors and their various stakeholders agreed that the transactions contemplated by the IPO Support Agreement would entail significant execution risk under the circumstances. On May 3, 2020, the Debtors, after good faith and arm's-length negotiations, reached a consensual resolution with the Consenting Support Parties and the Sponsors regarding the value-maximizing transactions contemplated under the Transaction Support Agreement and, with the approval of an independent special committee, entered into the Transaction Support Agreement, as described herein.

### E.    Material Terms of Transaction Support Agreement

On May 3, 2020, the Debtors executed the Transaction Support Agreement with (i) certain of the Consenting Support Parties and (ii) the Sponsors. Pursuant to the Transaction Support Agreement, the Consenting Support Parties and the Sponsors agreed to support a restructuring transaction by, among other things:

- subject to Disclosure Statement approval, voting to accept a plan embodying the restructuring transaction described in the Transaction Support Agreement;

- agreeing to grant and not opt-out of the releases contemplated by the Plan;

- refraining from taking any action that would delay or impede consummation of the Plan; and

- supporting and effectuating the documentation within the timeframes contemplated in the Transaction Support Agreement.

### F.    DIP Financing and Backstop Commitment

A key component of the Transaction Support Agreement necessary to facilitate the transactions contemplated by the Plan is the financing commitments provided the Backstop Parties. Contemporaneous with the execution of the Transaction Support Agreement, the Debtors and the Backstop Parties entered into the Backstop Commitment Letter, pursuant to which the Backstop Parties committed to provide the DIP Facility in an aggregate principal amount of up to $400,000,000. On the Effective Date, in accordance with the DIP Credit Agreement, the principal amount of the DIP Facility will be converted into the New Term Loans, and the DIP Lenders will, severally but not jointly, provide any additional New Term Loans. In exchange for providing the commitments under the Backstop Commitment Letter, the Backstop Parties will receive a premium in an amount equal to $40,000,000, which will be paid on the Effective Date in the form of New Common Equity (the "**Backstop Premium**"), which equity will be subject to dilution by New Common Equity issuable upon exercise of the New Warrants, issued pursuant to the Management Incentive Plan, and otherwise issued after the Effective Date in accordance with the Backstop Commitment Letter and the Plan.

In accordance with the Transaction Support Agreement, each IPCo Noteholder and Term Lender that is a qualified institutional buyer or accredited institutional investor was given the right to join the Transaction Support Agreement. As of the date hereof, Consenting Support Parties and Sponsors holding approximately 96% of the Term Loans, 100% of the IPCo Notes, 85% of Series A Preferred Stock, and 89% of the Common Stock are party to the Transaction Support Agreement. Each such person that joined

21

the Transaction Support Agreement within 10 business days after the Petition Date and any Electing Sponsor (as defined in the Transaction Support Agreement) was given the right to participate in providing the DIP Obligations.  If they exercised such right to participate in providing the DIP Obligations, each such person is required to participate in providing the New Term Loans upon the Effective Date and, in connection therewith, will receive the New Equity Allocation and New Warrants on the Effective Date.

## IV.
## THE CHAPTER 11 CASES

### A.    First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 (the "**First Day Motions**"). The Bankruptcy Court has granted substantially all of the relief requested in the First Day Motions and entered various interim and final orders authorizing the Debtors to, among other things:

- obtain postpetition financing and authorization to use cash collateral [Docket Nos. 84 and 447];

- continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket Nos. 101 and 378] (such motion, the "**Cash Management Motion**");

- continue insurance programs and the processing of workers' compensation claims [Docket Nos. 102 and 379];

- pay certain prepetition taxes and assessments [Docket No. 103];

- continue certain customer programs, promotions, and practices [Docket Nos. 104 and 380];

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket Nos. 105 and 381];

- restrict certain transfers of equity interests in the Debtors [Docket Nos. 106 and 382];

- continue paying employee wages and benefits [Docket Nos. 108 and 383] ("**Wages and Benefits Motion**"); and

- pay certain shipping charges and other amounts owed to lien holders and prepetition obligations for certain vendors [Docket Nos. 110 and 384] (such motion, the "**Vendors Motion**").

### B.    DIP Order

On May 5, 2020, the Bankruptcy Court approved the DIP Facility on an interim basis [Docket No. 84], and on June 5, 2020, approved the DIP Facility on a final basis [Docket No. 447] (together, the "**DIP Order**").

The DIP Facility includes certain milestones with respect to the Chapter 11 Cases, such as (a) no later than 70 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order; (b) no later than 80 calendar days after the Petition Date, the solicitation of the Approved

22

Plan of Reorganization shall have commenced; (c) no later than 120 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and (d) the effective date of the Approved Plan of Reorganization shall have occurred not later than 130 calendar days following the Petition Date.

In accordance with the DIP Order, upon (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Order, (b) the occurrence of an "Event of Default" as defined in the DIP Credit Agreement, or (c) delivery of an ABL Cash Collateral Termination Declaration (as defined therein), the DIP Agent may (i) terminate any further commitments under the DIP Credit Agreement and (ii) reduce or restrict the Debtors' use of cash collateral.

## C.  **Procedural Motions**

The Debtors have filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity.  On May 5, 2020, the Bankruptcy Court granted the relief requested in the motions noted below and entered orders to, among other things:

- approving joint administration of the Debtors' Chapter 11 Cases [Docket No. 99];

- approving the form and manner of notice of commencement of the Chapter 11 Cases [Docket No. 100]; and

- establishing certain notice, case management, and administrative procedures [Docket No. 109].

## D.  **Retention of Chapter 11 Professionals**

The Debtors have filed applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.  These professionals include (i) AlixPartners, LLP as financial advisor [Docket No. 404]; (ii) Hilco as real estate consultant [Docket No. 387]; (iii) Hunton Andrews Kurth LLP as co-counsel [Docket No. 385]; (iv) KPMG LLP to provide tax compliance and tax consulting services [Docket No. 575]; (v) Lazard as investment banker [Docket No. 449]; (vi) Omni Agent Solutions ("**Omni**") as claims, noticing, and administrative agent [Docket No. 107], and (vii) Weil as counsel [Docket No. 448].  Debtor J. Crew OpCo also filed applications and obtained authority to retain (i) Quinn Emanuel Urquhart & Sullivan, LLP to render independent services to, and at the direction of Mr. Baker as independent director and sole member of the Review Committee [Docket No. 391], and (ii) Goldin Associates, LLC to render independent financial advisory services to, and at the direction of Mr. Baker [Docket No. 392].

On May 26, 2020, the Bankruptcy Court entered the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and (II) Granting Related Relief* [Docket No. 389] and *Order (I) Authorizing Debtors to Retain and Employ Professionals Utilized in the Ordinary Course of Business, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 388].

## E.  **Statements and Schedules and Claims Bar Dates**

On May 6, 2020, the Bankruptcy Court entered an order extending the deadline by which the Debtors must file (a) their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") to June 12, 2020, and (b) the deadline by which the Debtors must file the financial reports required under Bankruptcy Rule 2015.3 to the earlier of (i) five business days before any Disclosure Statement Objection Deadline and (ii) 45 days after the 341 meeting [Docket No. 117].  On June 11, 2020,

the Debtors filed their initial 2015.3 report [Docket No. 475].  On June 12, 2020, each Debtor filed its respective Schedule in its respective chapter 11 case.

On May 28, 2020, the Bankruptcy Court entered the *Order (I) Establishing a General Bar Date to File Proofs Of Claim, (II) Establishing a Bar Date to File Proofs of Claim By Governmental Units, (III) Establishing an Amended Schedules Bar Date,  (IV) Establishing a Rejection Damages Bar Date, (V) Approving the  Form and Manner For Filing Proofs of Claim, (VI) Approving the Proposed Notice of Bar Dates, and (VII) Granting Related Relief* [Docket No. 390] (the "**Bar Date Order**").  Pursuant to the Bar Date Order, the Bankruptcy Court has established (i) July 15, 2020, at 5:00 p.m., Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code), including claims arising under section 503(b)(9), to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) November 2, 2020, at 5:00 p.m., Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., Eastern Time, on the date that is 30 days from the date on which the Debtors provide notice of an amendment or supplement to the Schedule as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m. (Eastern Time) on the date that is thirty days following the entry of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

**F.      Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case (*i.e.*, September 1, 2020) during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case (*i.e.*, November 2, 2020) to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Periods currently remain in effect.

**G.      Executory Contracts and Unexpired Leases**

As of the Petition Date, the Debtors were parties to approximately 500 unexpired leases of nonresidential real property (the "**Leases**") and approximately 600 unexpired executory contracts ("**Unexpired Contracts**").  Section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has a period of 120 days after the commencement of the chapter 11 case (in this case, until September 1, 2020) to assume, assign, or reject unexpired leases of nonresidential real property (the "**Lease Assumption Period**").  Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Lease Assumption Period an additional 90 days.

As noted above, on May 5, 2020, the Bankruptcy Court entered the Lease Procedures Order (as defined above) establishing procedures for the rejection of unexpired leases and related subleases of nonresidential real property and the abandonment of certain *de minimis* property in connection therewith.  On June 12, 2020, the Debtors filed a rejection notice of certain leases in accordance with the Lease Procedures Order [Docket No. 476].  On June 25, 2020, the Bankruptcy Court approved the rejection of certain unexpired leases with a proposed rejection date of July 31, 2020 [Docket No. 558] (the "**Rejection Order**").  On July 10, 2020, the Bankruptcy Court entered the *Amended Order Approving the Rejection of*

*Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith*
[Docket No. 605], which amended the Rejection Order.

With the assistance of their advisors, the Debtors have continued their prepetition efforts of examining their lease portfolio and curating the optimal footprint necessary for their viability as a reorganized enterprise. The Debtors' lease analysis includes, among other things, a review of the historical and future revenue and profits of each store, considerations of the impact of COVID-19, and the likelihood of realizing future cost savings through, for example, negotiating lease modifications with landlords. Through this process, the Debtors have identified stores that are underperforming or not part of their core business needs and that they determine, in their business judgment, should be sold, assigned or otherwise closed in furtherance of maximizing value for the benefit of their estates and stakeholders.

As noted above, the Bankruptcy Court has extended the Debtors' lease obligations under their leases for 60 days from the Petition Date though July 6, 2020.

As set forth in Article VIII of the Plan, on the Effective Date and subject to payment of any applicable cure obligations, the Debtors intend to assume all Leases and Unexpired Contracts effective as of the Effective Date, other than Leases and Unexpired Contracts that will be rejected, including those identified on the Schedule of Rejected Contracts and Leases portion of the Plan Supplement.

### H.    Trade Agreements

On May 28, 2020, the Bankruptcy Court approved a form of the Debtors' trade agreements [Docket No. 384]. As of the date hereof, the Debtors have entered into trade agreements with 81 key vendors that represent approximately $212 million of prepetition trade claims (the "**Trade Agreements**"). The key vendors were identified by the Debtors with the assistance of their advisors as essential to the Debtors' operations and essential to the Reorganized Debtors' success. These Trade Agreements generally require the vendors to provide customary trade terms for the Reorganized Debtors for a period of one year after the Effective Date as a condition for being classified in Class 6-A under the Plan. In negotiating the Trade Agreements, the Debtors in their reasonable business judgement determined that the treatment contemplated under the Plan for Class 6-A was a key factor in causing holders of the Ongoing Trade Claims to execute the Trade Agreements providing the Reorganized Debtors.

### I.    Appointment of Creditors' Committee and Ongoing Investigation

On May 13, 2020, the United States Trustee for the Eastern District of Virginia appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code [Docket No. 188]. The members of the Creditors' Committee are: (a) Simon Properties, Inc., (b) United Parcel Service, Inc., (c) Brookfield Property REIT, Inc., (d) First Glory Limited, and (e) Pan Pacific Co. Ltd.

The Creditors' Committee has filed applications and obtained authority to retain (a) Pachulski Stang Ziehl & Jones LLP and Hirschler Fleischer, P.C. as counsel and co-counsel, respectively, (b) Province, Inc. as its financial advisor, and (c) Back Bay Management Corporation and its division, the Michel-Shaked Group as expert consultant. In addition, the Creditors' Committee has filed an application and obtained authority to retain Morrison & Foerster LLP as special intellectual property and tax counsel.

Under the DIP Order, the Creditors' Committee may (a) object to or challenge the amount, validity, or enforceability of the prepetition obligations or the perfection or priority of the liens, or (b) otherwise assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Debtors'

25

prepetition secured creditors or any of such parties' affiliates, representatives, attorneys or advisors in connection with matters related to the "Prepetition Documents, the Prepetition Secured Debt, and the Prepetition Collateral" (each as defined in the DIP Order).

On August 3, 2020, the Creditors' Committee filed three motions: (a) the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Avoidance Action and Challenges Relating to the Prepetition Secured Parties* [Docket No. 676], (b) the *Motion of the Official Committee of Unsecured Creditors for an Order: (I) Determining, Pursuant to Section 506(A)(1) of the Bankruptcy Code and Bankruptcy Rule 3012, That the Term Loan Creditors are Oversecured and There are No Term Loan Deficiency Claims; (II) To the Extent There Are Any Such Deficiency Claims, Determining Pursuant to Bankruptcy Rule 3013, That Such Claims are Improperly Classified in Class 6-B Under the Debtors' Plan of Reorganization; and (III) Designating, Pursuant to Section 1126(E) of the Bankruptcy Code, the Term Loan Deficiency Claim Holders' Votes as Note in Good Faith and Not Counting Any Votes of Such Claimants in Determining Acceptances by Class 6-B* [Docket No. 677]; and (c) *Motion of the Official Committee of Unsecured Creditors to Determine the Secured and Undersecured Amounts of the IPCo Notes Claims Against the IPCo Debtor Pursuant to 11 U.S.C. § 506(A)(1) and Rule 3012 of the Federal Rules of Bankruptcy Procedure* [Docket No. 678] (collectively, the "**Committee Motions**").

Through the Committee Motions, the Creditors' Committee, among other things, (a) seeks a Bankruptcy Court order determining that the Term Lenders are oversecured or, in the alternate, that the Plan impermissibly classifies the Term Loan Deficiency Claim in Class 6-B and any votes on account of such claim should not be counted in determining plan acceptance; (b) asserts the value of the collateral securing the IPCo Notes Claim is worth no more than $180 million, and the IPCo Notes exceeding the collateral value should be treated as a general unsecured claim against the IPCo Debtors; and (c) seeks derivative standing on behalf of the Debtors, to the extent necessary, in an adversary proceeding to assert certain lien challenges as contemplated by the DIP Order to provide value for unsecured creditors at one or more Debtors entities.  As of August 9, 2020, no findings or rulings have been made by the Bankruptcy Court with respect to the Creditors' Committee's investigations or with respect to the Committee Motions.

The Creditors' Committee has also indicated that it believes that (a) the Plan constitutes a de facto substantive consolidation of the Debtors, and (b) the releases contemplated by the Plan are inappropriate. The Debtors dispute these assertions and believe that the classifications and releases contemplated under the Plan are consistent with applicable law.  As set forth above, the Debtors also do not believe that the distributions under the Plan result in substantive consolidation.

In view of the cost, expense, and uncertainties attendant to litigation, including evolving applicable law regarding makewholes, the Debtors believe that the compromises and settlements embodied in the Plan are reasonable and constitute a fair, equitable, and appropriate resolution of claims that maximizes values for stakeholders and includes a distribution to junior general unsecured creditors notwithstanding that the senior secured lenders are not being paid in full.

### J.    Review Committee

As noted above, the Debtors have established a Review Committee to investigate potential estate claims and causes of action relating to the 2017 Transaction, including fraudulent transfer claims.  As discussed in greater details in the *Response of the Review Committee of J. Crew Operating Corp. to Motion of Debtors for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*

WEIL:\97584794\2\54457.0007

[Docket No. 414] ("**Review Committee Report**"), the Review Committee determined that any potential claims or causes of action related to the 2017 Transaction are "speculative and unlikely to lead to any value to the estate of [J. Crew OpCo] or any of its subsidiaries." Review Committee Report, ¶ 25. The Review Committee further noted that the mutual releases contemplated under the Plan with respect to participants in the 2017 Transaction are similarly appropriate. Review Committee Report, n. 9.

### K.        U.S. Trustee Matters and Reports

The Debtors will continue to file reports including, among other things, information regarding their deposits, expenditures, and other relevant financial information in monthly operating reports (before the Effective Date). After the Effective Date, the Reorganized Debtors will file quarterly operating reports with the Bankruptcy Court until the applicable Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## V.
## PENDING LITIGATION

### A.        Eaton Vance Litigation

The Debtors are subject to ongoing litigation pursuant to the lawsuit filed on June 22, 2017 by, among others, Eaton Vance Management, along with certain of their affiliates. The Debtors believe this matter will be resolved in connection with the Restructuring contemplated by their Transaction Support Agreement. Any Claims relating to such litigation will be classified as Other General Unsecured Claims.

### B.        Other Litigation

The Debtors are involved in a number of lawsuits and matters that have arisen in the ordinary course of business. Any Claims relating to such litigation will be classified as Other General Unsecured Claims. The Debtors expect that to the extent Allowed, certain of these Claims may be covered by the Debtors' insurance coverage, in whole or in part. The Debtors do not expect any liability they may have in these matters to have a material adverse effect on their business or restructuring efforts.

## VI.
## SUMMARY OF PLAN

This Section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class. Under the Plan, Class 4 (Term Loan Secured Claims), Class 5 (IPCo Notes Claims), Class 6-A (Ongoing Trade Claims), Class 6-B (Other General Unsecured Claims), Class 8 (Section 510(b) Claims), Class 10-A (Existing Holdings Preferred Equity), and Class 10-B (Existing Holdings Equity) are impaired, and Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are

27

deemed to reject the Plan (e.g., Classes 8, 10-A, and 10-B) or a Holder's Claim is subject to an objection filed by the Debtors. Ballots are being furnished herewith to all Holders of Claims in Classes 4, 5, 6-A, and 6-B that are entitled to vote to facilitate their voting to accept or reject the Plan. Classes 2, 3, 7, and 9 are presumed to accept the Plan and Classes 8, 10-A, and 10-B are deemed to reject the Plan, and, therefore, holders of Claims or Interests in such Classes will not vote on the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled.

For additional information regarding the Plan not discussed in this section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Special Provision Governing Unimpaired Claims | Section III.4 |
| Voting Classes; Presumed Acceptance by Non-Voting Classes | Section III.6 |
| Treatment of Claims and Interests | Article IV |
| Means for Implementation of the Plan | Article V |
| Provisions Governing Distributions | Article VI |
| Procedures for Disputed Claims | Article VII |
| Treatment of Executory Contracts and Unexpired Leases[22] | Article VIII |
| Compromise and Settlement of Claims, Interests, and Controversies | Section X.3 |
| Retention of Causes of Action/Reservation of Rights | Section X.9 |
| Retention of Jurisdiction | Article XI |
| Miscellaneous Provisions | Article XII |
| Modification and Amendments of the Plan | Section XII.5 |

### A.    Administrative Expense and Priority Claims

#### 1.    Administrative Expense Claims

Each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim or DIP Claim), except to the extent such holder agrees to less favorable treatment, shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first business day after the date that is 30 calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided* that (a) any Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to the applicable transaction and (b) the holders of any adequate protection claims granted by the DIP Order will not receive any recovery on account of such claims, having waived such recovery solely for purposes of the Plan.

---

[22]    The Debtors have provided the Financial Projections as Exhibit B hereto and are prepared to demonstrate the feasibility of the Plan at the Confirmation in satisfaction of any obligation to provide adequate assurance of future performance under the Lease and Unexpired Contracts that are assumed under the Plan.

WEIL:\97584794\2\54457.0007

Except as otherwise provided in Section 2.1 of the Plan and except with respect to Professional Fee Claims, requests for payment of Administrative Expense Claims must be filed and served on the Debtors or Reorganized Debtors no later than the Administrative Claims Bar Date. Holders of Administrative Expense Claims that are required to file and serve a request for payment and that do not timely file and serve such a request shall be forever barred from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Expense Claims shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims as of the Effective Date.

### 2.    Professional Fee Claims

(a)    <u>Final Fee Applications</u>

All final requests for Professional Fee Claims shall be filed no later than 60 days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

(b)    <u>Professional Fee Reserve Amount</u>

All Professionals shall estimate in good faith their unpaid Professional Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Ad Hoc Committee at least three calendar days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide such estimate, the Debtors and Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(c)    <u>Professional Fee Escrow</u>

If the Professional Fee Reserve Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with cash equal to the Professional Fee Reserve Amount, and no Liens, Claims, or interests will encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fe Escrow) will (i) not be and will not be deemed to be property of the Debtors or the Reorganized Debtors and (ii) will be held in trust for the Professionals; *provided* that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full will revert to the Reorganized Debtors. Allowed Professional Fee Claims will be paid in cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' obligations with respect to Professional Fee Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency will be promptly funded to the Professional Fee Escrow from the Debtors' estates and Reorganized Debtors without any further action or order of the Bankruptcy Court.

(d)    <u>Post-Effective Date Fees and Expenses</u>

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will pay in the ordinary course of business and without any further action or order of the Bankruptcy Court, pay in

29

cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors and Reorganized Debtors, as applicable.

On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services provided after such date shall terminate, and the Reorganized Debtors may employ and pay any post-Effective Date fees and expenses of any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    DIP Claims

Except if a holder of an Allowed DIP Claim agrees to less favorable treatment, each holder of an Allowed DIP Claim will receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Allowed DIP Claim, (a) (i) on account of the outstanding principal amount of such Claim, an equal principal amount of New Term Loans, (ii) a portion of the New Equity Allocation and New Warrants, and (iii) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, or (b) such other treatment agreed upon among the Debtors, the Requisite Consenting Support Parties, and the holders of Allowed DIP Claims.

### 4.    Priority Tax Claims

Except if a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Reorganized Debtors, cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first business day after the date that is 30 calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; *provided* that the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any Allowed Priority Tax Claim at any time without penalty or premium.

### 5.    Payment of Statutory Fees

On and after the Effective Date, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing Debtor's case is entered.

### B.    <u>Reclamation Claims</u>

Pursuant to section 546(c) of the Bankruptcy Code, a seller of goods that sold goods to a debtor in the ordinary course of such seller's business may reclaim such goods if the debtor received the goods while insolvent and within forty-five days of commencement of a bankruptcy case (each such claim, a "**Reclamation Claim**").  Section 546(c) of the Bankruptcy Code requires that the seller demand, in writing, reclamation of such goods not later than forty-five days after the date of receipt of such goods by the debtor or not later than twenty days after the date of commencement of the case, if the forty-five day period expires after the commencement of a case.  The Plan does not include any recovery for Reclamation Claims.  Rather, pursuant to section 546(c) of the Bankruptcy Code, Reclamation Claims are subject to the prior perfected liens held by other parties on the Debtors' inventory.  Accordingly, the Debtors do not believe

that any valid Reclamation Claims exist, and any claims on account of such losses would be Other General Unsecured Claims.

C.      **Employee, Director, and Officer Matters**

The Plan provides that on the Effective Date, the Reorganized Debtors will be deemed to have assumed all Benefit Plans and Employee Arrangements, other than those Executory Contracts that have been rejected by the Debtors or which are the subject to a pending rejection motion on the Confirmation Date; *provided that* notwithstanding anything in the contrary in the Employee Arrangements, the consummation of the Plan will not be treated as a "change in control" with respect to the Employee Arrangements.  A description of most Employee Arrangements is set forth in the Wages and Benefits Motion, and material employment agreements have been filed on Forms 8-K made available to the public or otherwise identified on the Schedules.

The Plan contemplates that certain of the New Common Equity could be diluted by awards under the Management Incentive Plan.  After the Effective Date, the New Board has the sole discretion on whether to adopt a Management Incentive Plan and the terms, allocation, and vesting of awards under such plan.

D.      **Restructuring Transaction Steps**

The Debtors will take the series of corporate transactions and steps on or around the Effective Date, as set forth in the Restructuring Transaction Steps.

The Reorganized Debtors' post-emergence corporate structure is set forth below:



### E.    Classification of Claims and Interests

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Reorganized Debtors shall continue to exist as separate legal entities after the Effective Date.

In deciding to pursue the Plan, the Debtors and their advisors considered the circumstances related to intercompany transactions and the secured lenders' prepetition collateral, including with respect to the 2017 Transaction, to evaluate whether substantive consolidation would be appropriate.  The Plan does not

32

contemplate substantive consolidation, and in view of the compromises and settlements embodied in the Plan and that the Debtors' secured lenders are significantly undersecured, the Debtors do not believe that recoveries for general unsecured creditors would be materially different if the Debtors were substantively consolidated.  In particular, the Term Lenders and IPCo Noteholders have validly perfected liens and security interests, as described herein, on substantially all of the Debtors' assets that requires that their claims be repaid in full before general unsecured creditors of the Loan Debtors and IPCo Debtors would be entitled to a distribution.  Based on the Valuation Analysis set forth herein, the Debtors' prepetition secured parties are not being repaid in full and as a result, any chapter 11 plan (regardless of substantive consolidation) that contemplates a distribution to general unsecured creditors of the Loan Debtors and IPCo Debtors must be contributed from the secured lenders.

A Claim or Interest is placed in a particular Class under sections 1122 and 1123(a)(1) of the Bankruptcy Code for all purposes, including voting, confirmation, and distribution under the Plan; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled.  The Creditors' Committee and certain other creditors assert that the Plan improperly classifies the Term Loan Deficiency Claim with Other General Unsecured Claims.  Based on applicable law and the nature of the claims, the Debtors dispute that assertion and believe that the Term Loan Deficiency Claim can be classified with Other General Unsecured Claims and will be prepared to demonstrate the same at the confirmation hearing.

**F.** **Conditions Precedent to Confirmation of Plan and Effective Date**

**1.** **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)    the Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)    the proposed Confirmation Order shall be consistent with the Transaction Support Agreement and otherwise in form and substance reasonably satisfactory to the Debtors, the Requisite Consenting Support Parties, the Required DIP Lenders, the DIP Agent, the Exit ABL Agent, and the Exit Term Agent; *provided that* the Debtors will also consult in good faith with the ABL Agent regarding the form and substance of the Confirmation Order; and

(c)    the Backstop Commitment Letter and the Transaction Support Agreement shall not have been terminated by the parties thereto and shall be in full force and effect and binding on all parties thereto.

**2.** **Conditions Precedent to Effective Date**

The occurrence of the Effective Date will be subject to the following conditions precedent, among others; *provided that* any condition can be waived with the prior written consent of the Debtors and the Requisite Consenting Support Parties:

(a)    the Transaction Support Agreement shall not have been terminated by the parties thereto and remains in full force and effect and binding on the parties thereto;

(b)      the Bankruptcy Court shall have entered the Confirmation Order consistent with the Transaction Support Agreement and the Confirmation Order shall not have been stayed;

(c)      the Definitive Documents shall be consistent with the Transaction Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Transaction Support Agreement;

(d)      all actions, documents, and agreements necessary to implement and consummate the Plan shall have been performed or executed, as applicable;

(e)      the Bankruptcy Court shall have entered the DIP Order, the DIP Loan Documents shall be in full force and effect in accordance with their terms, the DIP Termination Date (as defined in the DIP Order) shall not have occurred, no Event of Default (as defined in the DIP Loan Documents) shall have occurred or be continuing, and the obligations outstanding under the DIP Credit Agreement shall not have been accelerated in accordance with the terms thereof;

(f)      all documentation related to the Exit ABL Facility shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived;

(g)      all documentation related to the New Term Credit Agreement shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived; *provided* that the DIP Lenders shall be deemed to have executed and delivered the New Term Credit Agreement in accordance with the terms of the DIP Credit Agreement;

(h)      all conditions precedent to the issuance of the New Common Equity, other than the occurrence of the Effective Date, shall have occurred;

(i)      the New Equity Allocation and New Warrants shall have been issued to the Consenting Support Parties in accordance with the Transaction Support Agreement;

(j)      the organizational documents and bylaws for Reorganized Chinos Holdings will be adopted on terms consistent with the Transaction Support Agreement and otherwise in form and substance reasonably satisfactory to the Debtors and the Requisite Consenting Support Parties;

(k)      the Backstop Commitment Letter shall not have been terminated and remains in full force and effect;

(l)      the Professional Fee Escrow Account shall have been established and funded as provided herein;

(m)      all fees and expenses owed pursuant to the Transaction Support Agreement or the DIP Order, including all Ad Hoc Committee Fees, to the extent unpaid and invoiced at least two business days before the Effective Date, shall have been paid by the Debtors or the Reorganized Debtors;

(n)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Transaction Support Agreement shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

34

(o)     all other actions, documents, and agreements necessary to implement and effectuate the Plan shall have been performed or executed, as applicable.

### 3.     Satisfaction or Waiver of Conditions Precedent

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.  No leave or order of the Bankruptcy Court shall be required for the waiver by the Debtors, with the prior written consent of the Requisite Consenting Support Parties, of any condition precedent set forth in Section 9.1 of the Plan, except the condition precedent set forth in Section 9.1(a), in accordance with the terms thereof.

(b)     The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(h), and 7062.

### 4.     Effect of Failure of a Condition

If the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected under the Plan, and document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claim or Interest or any claims or Causes of Action by the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute any admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Support Parties, or any other Entity.

### G.     Effect of Confirmation of Plan

### 1.     Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors' Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may take any action, including, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under the Bankruptcy Code, except as expressly provided herein.

### 2.     Binding Effect

As of the Effective Date, the Plan shall bind (a) all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, (b) each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, (c) all parties to the Transaction Support Agreement, and (d) all holders of Claims and Interests and their respective successors and assigns, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan, (ii) deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, or (iv) voted to reject the Plan.

35

### 3.    Discharge of Claims and Termination of Interests

Upon the Effective Date, in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date.  Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including (unless otherwise specifically provided herein) any interest accrued on Claims from and after the Petition Date, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim or interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is Allowed; or (c) the holder of such Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination, subject to the Effective Date occurring, of the discharge of all Claims and Interests except as otherwise expressly provided in the Plan.  Upon the Effective Date, all holders of Interests and Claims of any nature whatsoever shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or terminated Interest against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a proof of claim and whether or not the facts or legal bases therefor were known or existed before the Effective Date.

### 4.    Term of Injunctions or Stays

Unless otherwise provided herein, in the Confirmation Order, or in another Final Order of the Bankruptcy Court, all injunctions or stays arising or issued under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.    Injunction

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or agreed to by the Debtors and a holder of a Claim or Interest, all Entities who have held, hold, or may hold Claims or Interests (whether or not proof of such claims or interests has been filed and whether or not such Entities voted for or against the Plan or abstained from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to the Claims, Interests, and Causes of Action that are extinguished, discharged, or released pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting**

36

the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated by the Plan, and (v) acting in any manner that does not conform to or comply with the provisions of the Plan or the Confirmation Order.

(c)    By accepting distributions under the Plan, each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

(d)    The injunctions in Section 10.6 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

6.    Releases

(a)    Releases by Debtors

As of the Effective Date, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Entity seeking to exercise the rights of the foregoing, including any successors to the Debtors or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, the Reorganized Debtors, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the formation, operation, and conduct of the Debtors' businesses, the Chapter 11 Cases, the acquisition, purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors (including the New Equity Allocation and the New Warrants), the subject matter of, or the transactions or events giving rise to, any Claim or Interest, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases (including the restructuring of the IPCo Notes Claims notwithstanding the separate nature of the IPCo Indentures or the IPCo Intercreditor Agreement), the DIP Order, the Disclosure Statement, the Transaction Support Agreement, the New Term Loan, the Backstop Commitment, the Backstop Commitment Letter, the Plan, the Plan Supplement and other related agreements, instruments, and documents related to the foregoing (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes on the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Claims and Causes of Action under Chapter 5 of the Bankruptcy Code or any other Avoidance Actions under the Bankruptcy Code or applicable

37

federal or state law, including any preference or fraudulent transfer Claims or Causes of Action; *provided that* nothing in this release shall be construed to release any post-Effective Date obligations of any Entity under the Plan, the Transaction Support Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)    Consensual Releases by Holders of Claims or Interests

As of the Effective Date, for good and valuable consideration, on and after the Effective Date, each of the Released Parties shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by:

i.    the other Released Parties;

ii.    the holders of Impaired Claims who voted to accept the Plan;

iii.    the holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not opt-out of these releases on their ballots;

iv.    the holders of Unimpaired Claims and Interests in Classes 1, 2, 3, 7, and 9 that are presumed to accept the Plan but do not timely opt-out of the releases by completing a written opt-out form; and

v.    the holders of Impaired Claims and Interests in Classes 8, 10-A, and 10-B, that are deemed to reject the Plan but do not timely opt-out of the releases by completing a written opt-out form;

and with respect to any Entity in the foregoing clauses (i) through (iv), (a) such Entity's predecessors, successors, and assigns, and (b) all Entities entitled to assert Claims through or on behalf of such Entities with respect to the matters to which these releases apply, in each case, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their Estates, the formation, operation, and conduct of the Debtors' businesses, the Chapter 11 Cases, the acquisition, purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors (including the New Equity Allocation and New Warrants), the subject matter of, or the transactions or events giving rise to, any Claim or Interest, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring (including the restructuring of the IPCo Notes Claims notwithstanding the separate nature of the IPCo Indentures or the IPCo Intercreditor Agreement), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the DIP Order, the Disclosure Statement, the Transaction Support Agreement, the New Term Loan, the Backstop Commitment, the Backstop Commitment Letter, the Plan, the Plan Supplement, and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes on the Plan, or any other act or omission, in all cases based upon any transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Claims and Causes of Action under chapter 5 of the Bankruptcy Code or any other Avoidance Actions under the Bankruptcy Code or applicable federal or state law, including any preference or fraudulent transfer Claims or Causes of Action; *provided* that nothing in this release shall be construed to release any post-Effective Date obligations of any Entity under the Plan, the Transaction Support Agreement, or any document,

38

**instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

             (c)      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the compromises memorialized in the releases set forth herein, and shall constitute the Bankruptcy Court's finding that the releases set forth in the Plan are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims released; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; and (g) given and made after due notice and opportunity for hearing.**

        7.      **Exculpation**

    **Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the formulation, preparation, and pursuit of the Disclosure Statement, the Transaction Support Agreement, the transactions relating to the Debtors' restructuring, the Plan (including the Plan Supplement), the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan, the Definitive Documents, or any related agreements, instruments, or other documents, the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date, the occurrence of the Effective Date, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined to constitute gross negligence, willful misconduct, or intentional fraud as determined by a Final Order by a court of competent jurisdiction. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.**

        8.      **Releases and Exculpation Provisions Generally**

    The Debtors believe that the release and exculpation provisions set forth above are an important and integral part of the Plan, and that the Released Parties have made substantial contributions to these Chapter 11 Cases. For example, certain of the Released Parties have contributed to the Chapter 11 Cases through, among other things, managing the ordinary course of business of the Debtors during the Chapter 11 Cases, managing and negotiating the Debtors' lease portfolio, negotiating and finalizing the DIP financing, negotiating the Trade Agreements, negotiating the compromises and settlements set forth in the Plan, and assisting in prosecution of the Plan. The parties to the Transaction Support Agreement, in their capacities as Consenting Support Parties and as Backstop Parties, have made substantial contributions to these Chapter 11 Cases by, for example, providing substantial financing necessary to administer these chapter 11 cases and consummate the Plan, and also compromising their claims to facilitate a distribution to junior creditors. The Debtors believe that under these circumstances, including as a result of the Review Committee's determinations with respect to the 2017 Transaction, the releases contemplated under the Plan are appropriate.

The releases set forth herein would affect claims held by the Debtors and by third-parties against the Released Parties with respect to the matters released, including any alleged claims arising from payments made to certain Released Parties and that are identified in the Schedules.

WEIL:\97584794\2\54457.0007

The Debtors will be prepared to demonstrate at confirmation that the release and exculpation provisions set forth herein are appropriate and consistent with applicable law.

## VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors, the Consenting Support Parties, and the Sponsors. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the filing of an alternative chapter 11 plan of reorganization, (b) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' Plan Exclusive Period has expired, any other party in interest) could attempt to formulate a different plan. Such alternative plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.

### B.    363 Sale

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the Bankruptcy Code. Holders of Claims in Classes 3, 4, and 5 would be entitled to credit bid on any property to which their security interests attach to the extent of the value of such security interests, and to offset their Claims against the purchase price of such property. In addition, the security interests of the holders of Other Secured Claims would attach to the proceeds of any sale of their respective collateral to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Allowed Claims than what they would receive under the Plan.

### C.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the assets of the Debtors and distribute their proceeds to their creditors in accordance with the priorities established by the Bankruptcy Code.

As demonstrated in the Liquidation Analysis, attached hereto as **Exhibit C**, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

WEIL:\97584794\2\54457.0007

## VIII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

### A.   Section 1145 Securities

The issuance of and the distribution under the Plan of the New Common Equity on account of Allowed Term Loan Secured Claims and Allowed IPCo Notes Claims, and as Backstop Premium will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder, as well as any state or local law requiring registration for the offer, issuance, or distribution of securities (the "**Registration Requirements**"), pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity.

Section 1145 of the Bankruptcy Code generally exempts from the Registration Requirements the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under such plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the New Common Equity issued on account of Allowed Term Loan Secured Claims and IPCo Notes Claims, will be exempt from the Registration Requirements.  These securities shall be freely tradable by the recipients thereof, subject to: (i) the holder not being an "underwriter" with respect to such securities, as that term is defined in subsection (b) of section 1145 the Bankruptcy Code or being directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Reorganized Debtor that issued such securities; (ii) compliance with any rules and regulations of the Securities and Exchange Commission applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions on the transferability of the New Common Equity contained in the Stockholders Agreement; and (iv) any applicable regulatory approval.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"**Control**," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

41

### B. Private Placement

The offer, issuance, and distribution of the New Common Equity allocated to the Consenting Support Parties in consideration for commitments to participate in the New Term Loans in accordance with the Transaction Support Agreement (the "**New Equity Allocation**") and of the New Warrants (together with the New Common Equity issued as the New Equity Allocation and upon exercise of the New Warrants, the "**4(a)(2) Securities**") to the New Term Lenders are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder.  Only Term Lenders and IPCo Noteholders that are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) will be eligible to participate in the New Term Loans and thus receive the 4(a)(2) Securities. The 4(a)(2) Securities will be "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the Registration Requirements such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Additionally, the New Warrants are subject to the restrictions on transferability contained in the Warrant Agreement.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 units or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to the 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date.  Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of the 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the filing an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

WEIL:\97584794\2\54457.0007

\* \* \* \* \*

*Legends.* Each book entry position or certificate representing the 4(a)(2) Securities or the New Common Equity issued pursuant to Section 1145 of the Bankruptcy Code to the Entities that are "underwriters" as defined in section 1145(b) of the Bankruptcy Code (collectively, the "**Restricted Securities**"), will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS REORGANIZED SEG RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Restricted Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any Restricted Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive Restricted Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any Restricted Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the Restricted Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## IX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors (including the Reorganized Debtors) and to holders of certain Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or equity interests who are unimpaired or deemed to reject the Plan. In addition, this discussion does not

43

address any consideration being received on account of a person's capacity other than as a holder of a Claim.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the U.S. Department of the Treasury regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, or Other General Unsecured Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the "Medicare" tax on net investment income, persons subject to the alternative minimum tax or to the special accounting rules under section 451(b) of the Tax Code, and persons whose Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, or Other General Unsecured Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquired the New Common Equity in the secondary market, unless otherwise provided herein. This discussion assumes that the New Common Equity will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and, except as otherwise discussed herein, that the various debt and other arrangements to which any of the Debtors is a party and the transactions pursuant to the Plan will be respected for U.S. federal income tax purposes in accordance with their form.

In accordance with the Transaction Support Agreement and in connection with the implementation of the Plan, holders of Term Loan Secured Claims and IPCo Notes Claims that are qualified institutional buyers or accredited investors were given the right to join the Transaction Support Agreement. Each holder of Term Loan Secured Claims or IPCo Notes Claims that joined the Transaction Support Agreement was given the right to participate in providing the DIP Obligations and, if it so participated, is required to participate in providing the New Term Loans and thereby will receive the New Equity Allocation and New Warrants (the "**Joinder Right**"). Any value attributable to the Joinder Right may be considered for tax purposes as value received by such holders of Term Loan Secured Claims and IPCo Notes Claims as a recovery on such Claims under the Plan. The Debtors have not yet determined whether treatment of the Joinder Right as a recovery on the Term Loan Secured Claims and IPCo Notes Claims is appropriate or whether the Joinder Right has any value. The remainder of this summary assumes (unless otherwise indicated) that the Joinder Right is treated for U.S. federal income tax purposes as an option to acquire an "investment unit" comprised of a portion of the New Term Loans, New Equity Allocation and New Warrants. One of the other possible characterizations is that the receipt and exercise of the Joinder Right could be treated as an integrated transaction pursuant to which a portion of the New Term Loans, New Equity Allocation and New Warrants is acquired directly in partial satisfaction of a holder's Term Loan Secured Claim or IPCo Notes Claim. The Debtors have not yet determined whether any such treatment is

44

appropriate. The characterization of the Joinder Right and its subsequent exercise for U.S. federal income tax purposes—as the exercise of an option to acquire an investment unit comprised of a portion of the New Term Loans, New Equity Allocation or New Warrants or, alternatively, as an integrated transaction pursuant to which a portion of the New Term Loans, New Equity Allocation and New Warrants is acquired directly in partial satisfaction of a holder's Term Loan Secured Claim or IPCo Notes Claim, or otherwise—is uncertain. If the Joinder Right is treated as an option, it is also unclear if it is treated as a "security" for U.S. federal income tax purposes (as discussed below). If it is not treated as a "security" and the exchange of the Term Loan Secured Claims or IPCo Notes Claims pursuant to the Plan is treated as a tax-free transaction (as discussed further below), the Joinder Right would be treated as "boot" received by holders in the exchange.

**The following summary of certain material U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a U.S. Holder's individual circumstances. All holders of Claims are urged to consult their own tax advisor for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.**

### A.    Consequences to Debtors

For U.S. federal income tax purposes, Chinos Holdings is a common parent of an affiliated group of corporations that files a single consolidated U.S. federal income tax return (the "**Chinos Group**"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the Chinos Group. The Debtors estimate that, as of the end of the fiscal year ending February 2, 2020, the Chinos Group had carryforwards of disallowed business interest expense in excess of $148 million, unused general business credits in excess of $1 million, a deferred loss of approximately $828 million, and certain other tax attributes (collectively, the "**Tax Attributes**"). With respect to the fiscal year ending on February 2, 2021, the Debtors currently project book losses before interest expense of $180 million (which are expected to result in consolidated federal net operating loss carryforwards ("**NOLs**")) and expect that a portion of their interest expense for the fiscal year ending on February 2, 2021 will be subject to disallowance and carryforward under section 163(j) of the Tax Code. The amount of any such NOLs and other Tax Attributes remain subject to further analysis of the Debtors and audit and adjustment by the IRS. Certain equity trading activity and the claiming of certain worthless stock deductions prior to the Effective Date could result in an ownership change of Chinos Holdings independent of the Plan, which could adversely affect the ability to fully utilize the Chinos Group's Tax Attributes. In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing protective procedures with respect to certain equity trading and worthless stock deductions.

As discussed below, in connection with the implementation of the Plan, the Debtors expect the amount of certain of the Tax Attributes will be reduced. In addition, the subsequent utilization of any loss and other Tax Attributes remaining following the Effective Date may be limited. Alternatively, depending on certain tax elections that could be made in connection with the implementation of the Restructuring Transaction Steps (as described below), the Tax Attributes may not carry over to the Reorganized Debtors.

The Debtors anticipate that the restructuring will constitute a transfer of the Debtors' assets to a new group of limited liability companies as described in the Restructuring Transaction Steps (the "**Asset Transfers**").[23] Depending on whether the Reorganized Debtors cause the NewCo Entity Group to make

---

[23]    The Debtors are analyzing the potential benefits for the Debtors and holders of Claims and Interests of an alternative transaction structure commonly described as a "Bruno's" transaction structure that may be beneficial for tax purposes. If such a transaction structure is determined to be beneficial for the Debtors and holders of Claims and Interests, the Debtors do not

certain tax elections after the Effective Date in connection with, and effective as of, the implementation of the Restructuring Transaction Steps (the "**Restructuring Elections**"), the Asset Transfers will constitute (i) a taxable transaction, (ii) a tax-free reorganization or (ii) a taxable transaction, in part, and a tax-free reorganization, in part. Debtors expect that the acquirer(s) described in the Restructuring Transaction Steps will initially hold the Debtors' assets with a fair market value tax basis to the extent the transfer of such assets constitutes a taxable transaction. To the extent the Asset Transfers constitute a taxable transfer, the Debtors' NOLs or other Tax Attributes would not be carried over. The tax consequences to the Debtors of the Restructuring Transaction Steps, including the potential amount of cash tax liability (if any) resulting from a taxable transfer of assets, remain subject to ongoing analysis and depend on whether the Restructuring Elections are determined to be beneficial by the Reorganized Debtors.

### 1.    Cancellation of Debt

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the Debtors issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. The Plan provides that holders of Term Loan Secured Claims and holders of IPCo Note Claims will receive New Common Equity in exchange for their Term Loan Secured Claims and IPCo Notes Claims, respectively, so the amount of COD income for J.Crew Group, Inc., the borrower with respect to the Term Loan, and J.Crew Brand, LLC, the borrower with respect to the IPCo Notes, will depend in part on the fair market value of the New Common Equity. In addition, as discussed below (*see* IX.B.1(b)—"Consequences to Holders of Certain Claims—Treatment of the Joinder Right"), the Joinder Right may be viewed for tax purposes as a recovery on the Term Loan Secured Claims and IPCo Notes Claims, in which case the value of the Joinder Right would be taken into account in determining the amount of COD income. Accordingly, the estimated amount of COD income with respect to the Term Loan Secured Claims or IPCo Notes Claims is subject to further analysis.

Under section 108 of the Tax Code, any COD income of a debtor is excluded from gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD income that it excluded from gross income. In general, tax attributes of the debtor are reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with excluded COD income may elect first to reduce the basis of its depreciable assets. Although not free from doubt, it is expected that carryovers of disallowed business interest expense are not tax attributes subject to such reduction. The reduction of the debtor's tax attributes occurs at the end of the tax year for which the excluded COD income is realized, but only after the net income or loss for the taxable year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the taxable year following the discharge. If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

---

believe that implementing such a transaction structure would adversely affect the recoveries to holders of Claims and Interests contemplated in the Plan and described in the Disclosure Statement.

In connection with the implementation of the Plan, the Debtors expect to realize a substantial amount of excluded COD income for U.S. federal income tax purposes. Depending on whether the Reorganized Debtors determine that it is beneficial to make the Restructuring Elections in connection with the implementation of the Restructuring Transaction Steps, the realization of excluded COD income for U.S. federal income tax purposes could result in an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the respective Debtor's liabilities, as determined for these purposes, immediately after the Effective Date).  As noted above, depending on whether the Restructuring Elections are made in connection with the implementation of the Restructuring Transaction Steps, the Reorganized Debtors will not succeed to part or all of the Tax Attributes of the Debtors.

### 2.        Limitation on NOLs and Other Tax Attributes

Following the Effective Date, any NOLs, carryforwards of disallowed business interest expense and certain other Tax Attributes allocable to tax periods or portions thereof ending on or prior to the Effective Date (collectively, "**Pre-Change Losses**") may be subject to certain limitations under sections 382 and 383 of the Tax Code.  Any such limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the exclusion of COD income arising in connection with the Plan.

If a corporation or consolidated group undergoes an "ownership change" as defined under section 382 of the Tax Code, the amount of its "pre-change losses" that may be utilized to offset future taxable income generally is subject to an annual limitation.  The Debtors anticipate that the distribution of the New Common Equity pursuant to the Plan will result in an ownership change of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.  The rules under sections 382 and 383 of the Tax Code are not expected to be relevant if the Reorganized Debtors do not succeed to any of the Tax Attributes of the Debtors, which will depend on whether the Restructuring Elections are made in connection with the implementation of the Restructuring Transaction Steps, as noted above.

(a)        General Annual Limitation

In general, the amount of the annual limitation to which a corporation or consolidated group that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three (3)-calendar-month period ending with the calendar month in which the ownership change occurs, *e.g.*, 1.47 percent for ownership changes occurring in May, 2020).  For a corporation or consolidated group in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, unless the special exception described below (*see* IX.A.2(b)—"Limitation on NOLs and Other Tax Attributes —Section 382(l)(5) Exception") applies, the annual limitation is generally determined by reference to the fair market value of the stock of the corporation (or the parent of the consolidated group) immediately after (rather than before) the ownership change and after giving effect to the discharge of creditors' claims, subject to certain adjustments (the "**382(l)(6) Exception**"); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the assets of the corporation or consolidated group.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

47

Under certain circumstances, the annual limitation otherwise computed may be increased if the corporation or consolidated group has an overall built-in gain in its assets at the time of the ownership change. If a loss corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to a currently effective IRS notice, treated as recognized) during the following sixty (60)-month period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to use its pre-change losses against such built-in gain income in addition to its otherwise applicable annual limitation. Alternatively, if a loss corporation or consolidated group has a "net unrealized built-in loss" at the time of an ownership change, then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the sixty (60)-month period following the ownership change (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses, the deductibility of which will be subject to the annual limitation. In general, the net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) fifteen percent (15%) of the fair market value of the corporation's or consolidated group's assets (with certain adjustments) before the ownership change. On September 9, 2019, the U.S. Department of the Treasury issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the U.S. Department of the Treasury subsequently amended the proposed effective date provision to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, the proposed regulations should not apply to the Debtors. Although not free from doubt, it is currently expected that the Chinos Group will have a net unrealized built-in gain as of the Effective Date.

If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized built-in gains). Currently, the Debtors anticipate that regardless of the application of section 382 of the Tax Code, all of their NOLs generated in taxable years ending prior to the Effective Date will be fully utilized in the fiscal year ending February 2, 2020 and/or carried back to prior taxable years pursuant to provisions of the recently enacted coronavirus-related stimulus legislation known as the CARES Act. However, section 382 of the Tax Code may restrict the subsequent utilization of other Tax Attributes, such as the carryforward of any disallowed business interest expense allocable to the period through the Effective Date and the portion of any NOLs generated during the current taxable year and allocable to the period through the Effective Date.

(b)      Section 382(*l*)(5) Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when, among other requirements, existing shareholders and "qualified creditors" of a debtor corporation receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy. Generally, qualified creditors are creditors who (a) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter, (b) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred, or (c) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's pre-change losses are not subject to the annual limitation. However, if the 382(l)(5) Exception applies, the amount of the debtor's pre-change losses is re-determined

48

as if no interest deductions were allowable during the three (3) taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors thereafter undergo another ownership change within two (2) years after the Effective Date, the annual limitation with respect to such later ownership change could be zero, effectively precluding the utilization of any Pre-Change Losses at the time of such later ownership change against future income of the Reorganized Debtors. Any future ownership change after such two (2)-year period would subject the Reorganized Debtors to the general limitations under sections 382 and 383 of the Tax Code. A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above.

The Debtors have not determined whether or not the 382(l)(5) Exception will apply in connection with the Plan. Accordingly, it is possible that the Debtors will not qualify for, or that the Debtors will elect not to apply, this exception. In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors provided notice at the inception of the Chapter 11 Cases that if and to the extent determined necessary, the Debtors may seek to implement certain procedures to monitor the trading and accumulation of Claims against the Debtors, and subsequent court orders in connection therewith may require that a purchaser of certain Claims after the Petition Date resell some or all of such Claims.

(c)    Section 382(<em>l</em>)(6) Bankruptcy Exception

As described above, where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), the 382(l)(6) Exception will generally apply. When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to re-determine the amount of its pre-change losses as if no interest deductions were allowable with respect to the debt exchanged for stock in the manner described above, and the debtor may undergo a change of ownership within two years without completely losing the ability to use its pre-change losses.

### 3.    Potential Application of AHYDO Provisions

The New Term Loan may be subject to the provisions of the Tax Code dealing with "applicable high yield discount obligations" ("**AHYDOs**"). These provisions can result in the deferral, and even disallowance, of an issuer's deduction of interest with respect to "original issue discount" ("**OID**"). The New Term Loan is expected to be issued with OID. A debt obligation is generally treated as an AHYDO if it is issued with substantial OID (meaning that there is accrued unpaid OID as of the close of the first accrual period ending after the fifth (5th) anniversary of issuance in excess of one year's interest, both actual and imputed), has a yield to maturity of at least five percentage points (5%) over the applicable federal rate in effect for the calendar month in which such notes are issued, and has a maturity of over five (5) years.

In the event that a debt instrument constitutes an AHYDO, the issuer's deduction with respect to any interest is generally deferred until such interest is paid in cash. Moreover, if the yield to maturity on the debt instrument is more than six percentage points (6%) over the applicable federal rate, a portion of the issuer's interest deduction is disallowed. Because the New Term Loan will be structured to include so-called AHYDO catch-up payments, the New Term Loan is not expected to constitute an AHYDO. If,

49

however, contrary to that expectation, the New Term Loan is considered to be an AHYDO, Reorganized Chinos Holdings' deduction with respect to any interest relating to New Term Loan may, in part, be deferred or disallowed.

### B.    Consequences to Holders of Claims

This summary discusses the U.S. federal income tax consequences to holders of Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, and Other General Unsecured Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders.  Except as otherwise discussed herein, the summary below generally assumes that holders of such Claims will, each as a class, vote to accept the Plan.  As used herein, the term "U.S. Holder" means a beneficial owner of Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, Other General Unsecured Claims, New Common Equity or, if applicable, the Joinder Right or New Warrants, that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, Other General Unsecured Claims, New Common Equity or, if applicable, the Joinder Right or New Warrants, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Each U.S. Holder that is a partner in such a partnership holding any of such instruments should consult its own tax advisor.

### 1.    Holders of Class 4 Term Loan Secured Claims and Holders of Class 5 IPCo Notes Claims

#### (a)    Gain or Loss

Pursuant to the Plan, holders of Allowed Term Loan Secured Claims and holders of Allowed IPCo Notes Claims will receive New Common Equity in Reorganized Chinos Holdings in satisfaction of their Claims against certain subsidiary Debtors.  Each U.S. Holder of a Term Loan Secured Claim or an IPCo Notes Claim, as applicable, will realize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the New Common Equity received in respect of the Claim and potentially the fair market value of the Joinder Right, as discussed below under "Treatment of the Joinder Right" (other than the fair market value of any consideration received for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* IX.B.4—"Character of Gain or Loss," below.  Whether the holders of the Allowed Term Loan Secured Claims or holders of the Allowed

50

IPCo Notes Claims recognize any such realized gain or loss will depend on whether the receipt of the New Common Equity (and potentially the Joinder Right) in exchange for Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims, as applicable, constitutes a taxable transaction or a tax-free (or partially tax-free) transaction for such holders, which will depend on whether certain Restructuring Elections are made in connection with the implementation of the Restructuring Transaction Steps and whether the Claim surrendered in the exchange constitutes a "security" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Each holder of a Term Loan Claim or IPCo Notes Claim is urged to consult its own tax advisor regarding the appropriate status for U.S. federal income tax purposes of such Claim.

If the exchange of the Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims for the New Common Equity (and potentially the Joinder Right), as applicable, constitutes a taxable transaction to a U.S. Holder, such U.S. Holder of Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims, as applicable, should recognize all realized gain or loss.  If the exchange of the Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims for the New Common Equity, as applicable, constitutes a tax-free transaction, a U.S. Holder of Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims, as applicable, should not recognize any loss and would only recognize any gain to the lesser of (i) the amount of gain realized and (ii) the fair market value of any "boot" received.

In addition, a U.S. Holder of a Term Loan Secured Claim or an IPCo Notes Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income in respect of the Term Loan or IPCo Note, as applicable. *See* B.5.—"Distributions in Discharge of Accrued Interest," below.  If the exchange of Allowed Term Loan Secured Claims or Allowed IPCo Notes Claims, as applicable, constitutes a taxable transaction to a U.S. Holder, such U.S. Holder of Term Loan Secured Claims or IPCo Notes Claims (as applicable) will have a tax basis in the New Common Equity received in exchange for its Term Loan Secured Claims or IPCo Notes Claims, as applicable, equal to the fair market value of the New Common Equity received and U.S. Holder's holding period in such New Common Equity received should commence on the day following the Effective Date. If the exchange of the Allowed Term Loan Secured Claims or IPCo Notes Claims (as applicable) for the New Common Equity constitutes a tax-free transaction and the Joinder Right constitutes a security (or is not treated as part of the recovery on a holder's Claims), such holder will have an aggregate tax basis in the New Common Equity (and Joinder Right, if treated as part of the recovery) received in exchange for its Term Loan Secured Claims or IPCo Notes Claims, as applicable, equal to the holder's basis in such Claim. If the exchange of the Allowed Term Loan Secured Claims or IPCo Notes Claims (as applicable) for the New Common Equity constitutes a tax-free transaction and the Joinder Right does not constitute a security (but is treated as part of the recovery on a holder's Claims), such holder will have a tax basis in the New Common Equity received in exchange for its Term Loan Secured Claims or IPCo Notes Claims, as applicable, equal to the holder's basis in such Claim, increased by the amount of any gain recognized in the exchange, and decreased by the fair market value of the Joinder Right received.  If the exchange of the Allowed Term Loan Secured Claims or IPCo Notes Claims (as applicable) for the New Common Equity is treated as a tax-free transaction, a U.S. Holder's holding period in such New Common Equity generally includes the holder's holding period in such Claim.

51

(b)    Treatment of the Joinder Right

Because the Joinder Right was made available to holders of Term Loan Secured Claims and IPCo Notes Claims that are qualified institutional buyers or accredited investors in accordance with the Transaction Support Agreement and in connection with the implementation of the Plan, any value attributable to the Joinder Right may be considered for tax purposes as value received by holders of Term Loan Secured Claims and IPCo Notes Claims as a recovery on such Claims under the Plan.  The Debtors have not yet determined whether the treatment of the Joinder Right as a recovery on the Term Loan Secured Claims and IPCo Notes Claims is appropriate or whether the Joinder Right has any value.  As discussed above, the characterization of the Joinder Right and its subsequent exercise for U.S. federal income tax purposes is uncertain.

If the Joinder Right is treated as a recovery on the Term Loan Secured Claims and the IPCo Notes Claims, the fair market value of the Joinder Right would be taken into account in determining a U.S. Holder's realized gain or loss, if any, with respect to its Term Loan Secured Claim or IPCo Notes Claim, as applicable. The Debtors have not yet determined whether this treatment is appropriate. If the exchange of the Allowed Term Loan Secured Claims or IPCo Notes claims (as applicable) for the New Common Equity is treated as a taxable transaction and the Joinder Right is treated as a recovery, a U.S. Holder would have a tax basis in the Joinder Right equal to the fair market value of the Joinder Right. If the exchange of the Allowed Term Loan Secured Claims or IPCo Notes claims (as applicable) for the New Common Equity is treated as a tax-free transaction and the Joinder Right is treated as a recovery, a U.S. Holder will have either an exchange basis in the Joinder Right (if the Joinder Right is treated as a security), as discussed above, or a tax basis in the Joinder Right equal to the fair market value of the Joinder Right (if the Joinder Right is not treated as a security).

If the Joinder Right is characterized as an option, a U.S. Holder of Term Loan Secured Claims or IPCo Notes Claims generally would not recognize any gain or loss upon the exercise of the Joinder Right. If the Joinder Right is treated as an option, a U.S. Holder's aggregate tax basis in the New Term Loans, New Equity Allocation and New Warrants would be equal to the sum of (a) the amount paid, whether in the form of cash or in the form of the converted DIP Obligations, for the New Term Loans, New Equity Allocation and New Warrants and (b) the U.S. Holder's tax basis, if any, in the Joinder Right.  Such aggregate basis would be allocated between the New Term Loans, New Equity Allocation and New Warrants so received in accordance with their relative fair market values.  A U.S. Holder's holding period in the New Term Loans, New Equity Allocation and New Warrants received upon exercise of the Joinder Right generally should commence on the day following the Effective Date.

It is uncertain whether a U.S. Holder that receives but does not exercise the Joinder Right should be treated as receiving anything of additional value in respect of its Term Loan Secured Claim or IPCo Notes Claim.  If the U.S. Holder is treated as having received a Joinder Right of value (despite their subsequent lapse), such that it obtains a tax basis in the Joinder Right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Joinder Right.  In general, such loss would be a short-term capital loss.

(c)    New Common Equity

If Reorganized Chinos Holdings makes cash distributions with respect to the New Common Equity, the distributions will generally be includible as ordinary dividend income on the day on which the dividends are actually or constructively received by a U.S. Holder to the extent paid out of the Reorganized Chinos Holdings' current earnings and profits or earnings and profits accumulated as of the end of the prior year, as determined under U.S. federal income tax principles.  To the extent the amount of any such distribution exceeds such current and accumulated earnings and profits, the excess will be treated as a non-taxable return of capital to the extent, and in reduction, of the U.S. Holder's adjusted tax basis in the New Common Equity and as gain from the sale or exchange of such equity to the extent it exceeds the U.S. Holder's adjusted tax basis.  Non-corporate U.S. Holders may be eligible for reduced rates of taxation on dividends.  Dividends paid to corporate U.S. Holders may be eligible for the dividends received deduction.

Unless a nonrecognition provision applies, U.S. Holders generally will recognize gain or loss upon the sale or exchange of the New Common Equity in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in the New Common Equity held and (ii) the sum of the cash and the fair market value of any property received from such disposition.  Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Equity exceeds one year at that time.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Equity (or any stock or property received for such New Common Equity in a later tax-free exchange) received in exchange for a Term Loan Secured Claim or IPCo Notes Claim, as applicable, will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

## 2.    Holders of Class 6(a) Ongoing Trade Claims

Pursuant to the Plan, holders of Allowed Ongoing Trade Claims will receive, in final satisfaction of their Claims, their Pro Rata share of a cash pool in an aggregate amount equal to $71,000,000; *provided* that the aggregate amount of cash distributed on account of an Allowed Ongoing Trade Claim will not exceed fifty percent of the Allowed amount of such Claim.

In general, a U.S. Holder of an Allowed Ongoing Trade Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the cash received in satisfaction of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* IX.B.4—"Character of Gain or Loss," below.  A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income.  *See* IX.B.5—"Distributions in Discharge of Accrued Interest," below.  The tax treatment of a holder of Allowed Ongoing Trade Claims is not expected to change regardless of whether the Restructuring Elections are made in connection with the implementation of the Restructuring Transaction Steps.

In the event of the subsequent disallowance of any Ongoing Trade Claims, a U.S. Holder of a previously Allowed Ongoing Trade Claim may receive additional post-Effective Date distributions.

53

Accordingly, it is possible that any loss, or a portion of any gain, realized by a U.S. Holder may be deferred until all Disputed Ongoing Trade Claims are Allowed or Disallowed. In addition, a U.S. Holder may have imputed interest income with respect to such post-Effective Date distribution. U.S. Holders are urged to consult their own tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by them in respect of their Claims due to the receipt of consideration in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

### 3.    Holders of Class 6(b) Other General Unsecured Claims

Pursuant to the Plan, holders of Other General Unsecured Claims (other than holders of Term Loan Deficiency Claims) will receive, in final satisfaction of their Claims, their Pro Rata share of cash allocable to the applicable Debtor cash pool in an aggregate amount equal to (a) $3,000,000, if the class votes to accept the Plan, or (b) $1,000,000, if the class votes to reject the Plan; provided that the aggregate amount of cash distributed on account of an Allowed Ongoing Trade Claim will not exceed fifty percent of the Allowed amount of such Claim.

In general, a U.S. Holder of an Allowed Other General Unsecured Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) any cash received in satisfaction of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* IX.B.4—"Character of Gain or Loss," below. A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* IX.B.5—"Distributions in Discharge of Accrued Interest," below. The tax treatment of a holder of Allowed Other General Unsecured Claims is not expected to change regardless of whether the Restructuring Elections are made in connection with the implementation of the Restructuring Transaction Steps.

In the event of the subsequent disallowance of any Other General Unsecured Claims, a U.S. Holder of a previously Allowed Other General Unsecured Claim (other than holders of Term Loan Deficiency Claims) may receive additional post-Effective Date distributions subject to the treatment discussed above (*see* IX.B.2—"Holders of Class 6(a) Ongoing Trade Claims"). U.S. Holders are urged to consult their own tax advisors regarding the treatment of additional post-Effective Date distributions.

### 4.    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction. In general, any gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

A U.S. Holder that purchased its Term Loan Secured Claims, IPCo Notes Claims, or Ongoing Trade Claims, or Other General Unsecured Claims from a prior holder at a "market discount" (relative to the principal amount of the Term Loan Secured Claims, IPCo Notes Claims, or Ongoing Trade Claims, or Other General Unsecured Claims at the time of acquisition) may be subject to the market discount rules of

54

the Tax Code.  In general, a debt instrument is considered to have been acquired with market discount if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) its "stated redemption price at maturity" (which generally would be equal to the stated principal amount if all stated interest was required to be paid in cash or property at least annually) or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.  Under these rules, any gain recognized on the exchange of Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, or Other General Unsecured Claims (other than in respect of a Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  If a U.S. Holder of a Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim, such deferred amounts would become deductible at the time of the exchange.

### 5.        Distributions in Discharge of Accrued Interest

In general, to the extent that any exchange consideration received pursuant to the Plan by a U.S. Holder of a Term Loan Secured Claim, IPCo Notes Claim, Ongoing Trade Claim, or Other General Unsecured Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled in the case of a tax-free exchange that a holder could not claim an ordinary loss with respect to any unpaid OID.  It is unclear whether the same result would arise in the case of a taxable transaction with respect to previously included OID that is not paid in full.

The Plan provides that except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to Allowed Term Loan Secured Claims, IPCo Notes Claims, Ongoing Trade Claims, or Other General Unsecured Claims are allocable first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claims, including any Allowed Claim for accrued but unpaid interest, if any.  *See* Section 6.18 of the Plan.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  U.S. Holders are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### 6.        Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information, fails properly to report interest or dividends, and, under certain circumstances, fails to provide a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of

payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. U.S. Holders should consult their own tax advisor regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. U.S. Holders are urged to consult their own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax return.

**The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, non-U.S., and other tax consequences applicable under the Plan.**

## X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

A.    **Certain Bankruptcy Law Considerations**

1.    **Risk of Non-Confirmation of Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Classes entitled to vote on the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent plan of reorganization.

2.    **Risk of Non-Consensual Confirmation**

If any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Debtors believe that the Plan satisfies these requirements.

### 3.      Risk of Non-Occurrence of Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 4.      Risk of Termination of Transaction Support Agreement

The Transaction Support Agreement contains certain provisions that give the parties thereto the right to terminate the Transaction Support Agreement if various events occur.  As noted above, termination of the Transaction Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and customers.  The Transaction Support Agreement provides that if the Transaction Support Agreement is terminated, each vote or any consent given by the Consenting Support Parties or the Sponsors prior to such termination will be deemed null and void *ab initio*.

### 5.      Conversion to Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, after which a trustee would be appointed to liquidate the Debtors' assets and distribute their proceeds in accordance with the priorities established by the Bankruptcy Code.  See Article VII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 6.      Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

### B.      Risks Relating to Reorganized Debtors' Business and Financial Condition

### 1.      Risks Associated with Debtors' Business and Industry

The fashion retail business is highly competitive. The fashion retail industry generally compete on quality, design, customer service, and price.  The Reorganized Debtors will compete primarily with specialty retailers, department stores and e-commerce businesses that engage in the sale of women's, men's, and children's apparel, accessories and similar merchandise, some of whom are or may become the Reorganized Debtors' wholesale customers.  Heightened competition could include the intensification of price competition, the entry of new competitors and the expansion, renovation, and opening of new stores by new and existing competitors.  If the Reorganized Debtors fail to successfully respond to competitive pressures in this industry or to effectively implement their strategies to respond to these pressures, their operating results may be negatively affected.  Some of the Reorganized Debtors' principal competitors will

57

have greater financial resources than the Reorganized Debtors and either have used or may in the future use those resources to take steps that may have an adverse effect on the Reorganized Debtors' competitive position and financial performance.

### 2. COVID-19 Risks

The Debtors have experienced operational and liquidity issues as a result of COVID-19. As of the Petition Date, all of the Debtors' retail stores are closed. Continued store closures may adversely impact the Debtors' sale volume and online traffic. In addition, while the Debtors' two distribution facilities continue to operate as of the Petition Date, a worsening COVID-19 situation could force the Debtors to temporarily close these operations, which would reduce the Debtors' ability to operate their business and increase risk of liquidity constraints. These risks may also affect the Financial Projections.

### 3. Merchandising Operations

The Debtors rely significantly on their suppliers. Adverse changes in any of the relationships with their suppliers, or the inability to enter into new relationships with suppliers, could negatively impact the Debtors' operations and performance. The Debtors' current arrangements with suppliers may not remain in effect on current or similar terms, and the impact of changes to those arrangements may adversely impact the Debtors' revenue.

### 4. Right-Sizing Real Estate Portfolio

The Debtors' efforts to renegotiate leases and potentially close stores during the Chapter 11 Cases is part of the Debtors' wider effort to cut costs and maintain profitability. The Debtors' forward-looking financial projections are based on substantial concessions from various landlords. If the Debtors are unable to reach satisfactory terms with the quantity of landlords they anticipate, the Debtors may be forced to close additional stores, thereby decreasing revenue. Further, the actual lease savings realized by the Debtors may be substantially less than the Debtors anticipate.

### 5. Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have to satisfy the obligations related to the Exit ABL Facility and New Term Loans. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Reorganized Debtors' compliance with affirmative and negative covenants, and the Reorganized Debtors' future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 6. Pending and Future Litigation

There is, and may be in the future, certain litigation that could result in a material judgment against the Debtors or the Reorganized Debtors. Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.

WEIL:\97584794\2\54457.0007

### C.      Factors Relating to Securities to Be Issued under Plan Generally

#### 1.      Implied Valuation of Securities

The estimated value of the New Common Equity for purposes of estimating recovery percentages under the Plan is based on the Valuation Analysis, which is annexed hereto as **Exhibit D** and which represents a hypothetical valuation of the Reorganized Debtors and assumes that, among other things, the Reorganized Debtors continue as an operating business.  The Valuation Analysis does not purport to constitute an appraisal of the Reorganized Debtors or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors or their assets, which may be materially different than the estimate set forth in the Valuation Analysis.

In preparing the Valuation Analysis, Lazard performed a variety of financial analyses and considered a variety of factors, as set forth in greater detail in the Valuation Analysis.

Furthermore, a liquid trading market for the New Common Equity may not develop or, if it develops, continue.  In addition, the New Common Equity will not be listed on any securities exchange and the Reorganized Debtors will not be obligated to cause the New Common Equity to be listed on any securities exchange or over-the-counter market.  Accordingly, the estimated value of the New Common Equity does not necessarily reflect the actual market value of the New Common Equity that might be realized after confirmation of the Plan, which may be materially lower than the estimated valuation of the New Common Equity as set forth in this Disclosure Statement and the exhibits hereto.  Accordingly, such estimated value is not necessarily indicative of the prices at which the New Common Equity may trade after giving effect to the transactions set forth in the Plan.

#### 2.      Potential Dilution

The ownership percentage represented by the New Common Equity distributed on the Effective Date under the Plan will be subject to dilution from exercise of the New Warrants, the post-Effective Date Management Incentive Plan, and other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other units issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Equity issuable upon such conversion.  The amount and dilutive effect of the foregoing could be material.

#### 3.      Distributions

The Reorganized Debtors may not pay any distributions on account of the New Common Equity.  In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the New Common Equity.  There is, however, no guarantee that the New Common Equity will appreciate in value or even maintain its initial implied valuation.

#### 4.      Restrictions on Ability to Resell New Common Equity

For a discussion of transfer restrictions on the New Common Equity under applicable federal or state securities law, *see* Section VIII of this Disclosure Statement.

WEIL:\97584794\2\54457.0007

### D.     Risks Related to New Common Equity

#### 1.     Significant Holders

The holders of Term Loan Secured Claims and IPCo Notes Claims as well as Backstop Parties are expected to acquire a significant ownership interest in the Reorganized Debtors upon consummation of the Plan.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors, control the appointment of a majority of the board of directors, and approve significant mergers and other material corporate transactions.

#### 2.     Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity will rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its debt holders have been satisfied.

#### 3.     Implied Valuation of New Common Equity Not Intended to Represent Trading Value of New Common Equity

The valuation of the Reorganized Debtors may not represent the trading value of the New Common Equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Common Equity is likely to be volatile.  Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Equity to rise and fall.  Accordingly, the implied value, stated in the Valuation Analysis, attached hereto as **Exhibit D**, and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Equity in the public or private markets.

#### 4.     New Common Equity May Be Subject to Further Dilution

The New Common Equity to be issued on the Effective Date are subject to dilution from (a) New Common Equity issued upon the exercise of the New Warrants, (ii) New Common Equity issued pursuant to the Management Incentive Plan, and (iii) other New Common Equity issued by the Reorganized Debtors after the Effective Date.  The Reorganized Debtors may issue equity securities in connection with future investments, acquisitions, or capital raising transactions.  Such issuances or grants could constitute a significant portion of the then-outstanding common equity, which may result in a dilution in ownership of common equity, including units of New Common Equity issued pursuant to the Plan.

### E.     Additional Factors

#### 1.     Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Transaction Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2.      Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.      No Representations Outside Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.      No Legal or Tax Advice Is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.      No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6.      Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article IX hereof.

### XI.
### VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (each, a "**Voting Creditor**") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.      Voting Instructions and Voting Deadline

All Voting Creditors have been sent a Ballot together with this Disclosure Statement and should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.  Special procedures are set forth below for the beneficial holders of Claims ("**Beneficial Holders**") held in "street name" through a broker, dealer, commercial bank, trust company, or other agent or nominee (each, a "**Nominee**").

61

The Debtors have engaged Omni as their voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes on the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW OR THROUGH THE E-BALLOT PORTAL ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (EASTERN TIME) ON AUGUST 17, 2020 UNLESS EXTENDED BY THE DEBTORS.**

A BENEFICIAL HOLDER OF THE IPCO NOTES HOLDING SUCH NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.

IF IT IS A NOMINEE'S CUSTOMARY AND ACCEPTED PRACTICE TO COLLECT VOTES FROM BENEFICIAL HOLDERS BY VOTER INFORMATION FORM ("**VIF**"), E-MAIL, TELEPHONE, OR OTHER CUSTOMARY MEANS OF COMMUNICATION, THE NOMINEE MAY EMPLOY THAT METHOD OF COMMUNICATION IN LIEU OF COLLECTING PAPER BENEFICIAL HOLDER BALLOTS.

IF YOU MUST RETURN YOUR BALLOT (OR OTHERWISE CONVEY YOUR VOTE) TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT (OR OTHER CUSTOMARY COMMUNICATION) TO YOUR NOMINEE IN SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR VOTE AND RETURN A MASTER BALLOT INCORPORATING YOUR VOTE TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Chinos Holdings, Inc. Ballot Processing**
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

Telephone: (866) 991-8218 (U.S. & Canada) and (818) 924-2298 (International)
E-mail: chinosinquiries@omniagnt.com with "Chinos" in the subject line

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to all Voting Creditors. Voting Creditors may include Nominees. If such Nominees do not hold Claims for their own account, they must provide copies of the Solicitation Package to their customers that are the Voting Creditors as of the Record Date. Any Voting Creditor that is a Beneficial Holder and has not received a Ballot should contact its Nominee. Any Voting Creditor that is a Nominee and has not received a Ballot should contact the Voting Agent.

62

Voting Creditors should provide all of the information requested by the Ballot and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Voting Agent or their Nominee, as applicable.

In addition to accepting hard-copy Ballots, the Debtors will seek authorization to accept Ballots (from voting parties that are not required to vote through a Nominee) via electronic, online transmissions, solely through a customized online balloting portal on the Debtors' case website to be maintained by the Voting Agent (the "**E-Ballot Portal**"). The encrypted ballot data and audit trail created by such electronic submission through the E-Ballot Portal shall become part of the record of any Ballot submitted in this manner, and the Voting Creditor's electronic signature will be deemed to be immediately legally valid and effective.

The Record Date for determining which Voting Creditors are entitled to vote on the Plan is July 15, 2020. The administrative agents or indenture trustees under any debt documents will not vote on behalf of their respective holders. Such holders must submit their own Ballots.

C.    **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, the holders of such Claims and Interests will not vote on the Plan and will not receive a Ballot. If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, the holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of (a) Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims that cast ballots for acceptance or rejection of the Plan and (b) Interests as acceptance by interest holders in that class that hold at least two-thirds in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 4 Claims – Term Loan Secured Claims (Only Loan Debtors)

- Class 5 Claims – IPCo Notes Claims (Only IPCo Debtors)

- Class 6-A Claims – Ongoing Trade Claims (All Debtors)

63

- Class 6-B Claims – Other General Unsecured Claims (All Debtors)[24]

For the avoidance of doubt, holders of Ongoing Trade Claims will be expressly designated as such in the Trade Agreements before the Voting Deadline.

### 1.    Voting Creditors (Who Are Record Holders)

A Voting Creditor that holds a Claim as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Voting Agent on or before the Voting Deadline (a) using the enclosed pre-addressed, postage-paid return envelope or (b) via the E-Ballot Portal. The Voting Agent will not accept Ballots submitted by e-mail or facsimile.

### 2.    Beneficial Holders (Class 5 – IPCo Notes Claims)

A Beneficial Holder of a Claim in Class 5 (IPCo Notes Claims) holding such Claim in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such Beneficial Holder's Nominee):

- Complete and sign a Ballot (each, a "**Beneficial Ballot**"). Return the Beneficial Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed "master" Ballot (each, a "**Master Ballot**") to the Voting Agent by the Voting Deadline; or

- Complete and sign the pre-validated Beneficial Ballot (as described below) provided to you by your Nominee.  Return the pre-validated Beneficial Ballot to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Beneficial Ballot returned to a Nominee will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent a Master Ballot casting the vote of the applicable Beneficial Holder.

If a Beneficial Holder holds Claims in Class 5 through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Ballot and each such Beneficial Holder should execute a separate Beneficial Ballot for each block of Claims in Class 5 that it holds through any one Nominee and must return each such Beneficial Ballot to the appropriate Nominee.  Votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees, as of the Record Date, as evidenced by the applicable securities position report(s) obtained from DTC. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Record Date.

If a Beneficial Holder is registered directly with the applicable indenture trustee, the voting amounts of its Claims shall be the amounts set forth on the books and records of the applicable indenture trustee as of the Record Date.

---

[24]    For the avoidance of doubt, holders of Term Loan Deficiency Claims are entitled to vote as part of Class 6-B.

### 3.    Nominees

A Nominee that, on the Record Date, is the record holder of Claims for one or more Beneficial Holders can obtain and/or convey the votes of such Beneficial Holders, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

#### (a)    Pre-Validated Ballots

The Nominee may "pre-validate" a Beneficial Ballot by (i) signing the Beneficial Ballot; (ii) indicating on the Beneficial Ballot the amount and the account number of the Claims held by the Nominee for the Beneficial Holder; and (iii) forwarding such Beneficial Ballot, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, Omni, and other materials requested to be forwarded, to the Beneficial Holder for voting. The Beneficial Holder must then complete the information requested in the Beneficial Ballot, and return the Beneficial Ballot directly to Omni in the pre-addressed, postage-paid return envelope so that it is RECEIVED by Omni on or before the Voting Deadline. A list of the Beneficial Holders to whom "pre-validated" Beneficial Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

#### (b)    Master Ballots

If the Nominee elects not to pre-validate Beneficial Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Ballots, VIF, e-mail, or other customary method of collecting votes from a Beneficial Holder, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate his, her, or its vote on the Beneficial Ballot, complete the information requested on the Beneficial Ballot, review the certifications contained on the Beneficial Ballot, execute the Beneficial Ballot, and return the Beneficial Ballot to the Nominee. If it is accepted practice for a Nominee to collect votes via e-mail, telephone, or other customary method of communication, the Beneficial Holder shall follow the Nominee's instruction for completing and submitting its votes to the Nominee. After collecting the Beneficial Holders' votes, the Nominee must, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Ballots, execute the Master Ballot, and deliver the Master Ballot to Omni so that it is RECEIVED by Omni on or before the Voting Deadline.[25] All Beneficial Ballots returned by Beneficial Holders should either be forwarded to Omni (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL HOLDERS TO RETURN THEIR BENEFICIAL BALLOTS (OR OTHERWISE CONVEY THEIR VOTES) TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO OMNI SO THAT IT IS RECEIVED BY OMNI ON OR BEFORE THE VOTING DEADLINE.[26]

### 4.    Non-Voting Parties

The Debtors will, in connection with solicitation on the Plan, send an Opt Out Election Form to each holder of Claims and Interests not entitled to vote, pursuant to section 1126(f) and 1126(g) of the Bankruptcy Code. The Opt Out Election Form allows such holders, despite their non-voting status, to opt

---

[25]    Nominees will be permitted to submit their Master Ballots to the Voting Agent by e-mail.

[26]    Notwithstanding the foregoing, Nominees are authorized to transmit Solicitation Packages and collect votes to accept or to reject the Plan from Beneficial Holders in accordance with their customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

WEIL:\97584794\2\54457.0007

out of certain third-party releases as detailed in the Plan.  Moreover, the Opt Out Election Form includes certain additional information that the Debtors believe is relevant and appropriate, including the *Release by Holders of Claims and Interest* in clear and conspicuous language.

### 5.      Miscellaneous

All Ballots must be signed by the Voting Creditor, or any person who has obtained a properly completed Ballot proxy from the Voting Creditor, by the Voting Deadline.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  Any Ballot marked to both accept and reject the Plan shall not be counted.  If you return more than one Ballot voting the same Claims differently, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.  The Debtors may request that the Voting Agent attempt to contact voters to cure any such defects in the Ballots.

The Ballots provided to Voting Creditors will reflect the principal amount of such Voting Creditor's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Voting Creditor's Claim to reflect the amount of the Claim actually voted, including prepetition interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Voting Creditors that actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent or its Nominee will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot or Master Ballot, as applicable, is submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot or Master Ballot, the Debtors may, in their sole discretion, reject such Ballot or Master Ballot as invalid, and therefore decline to utilize the vote(s) cast thereon in connection with seeking confirmation of the Plan.

### 6.      Fiduciaries and Other Representatives

If a Beneficial Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Voting Agent of authority to so act.  Authorized signatories should submit a separate Beneficial Ballot for each Voting Creditor for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT OR MASTER BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED* THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT OR MASTER BALLOT TO BE COUNTED.

### 7.      Agreements upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voter with respect to such Ballot to accept (a) all of the terms of, and conditions to, this solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth

WEIL:\97584794\2\54457.0007

in Sections 10.6, 10.7, and 10.8 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 8.    Change of Vote

Any party that has previously submitted a properly completed Ballot before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent or its Nominee, as applicable, a subsequent, properly completed Ballot for acceptance or rejection of the Plan before the Voting Deadline.

### 9.    Requirement to File a Proof of Claim

Any person or entity that is required to timely file a proof of Claim in the form and manner specified by the order entered by the Bankruptcy Court establishing the date for filing proofs of claim in these Chapter 11 Cases and who failed to do so on or before such date shall not, with respect to such Claim, be treated as a creditor of the Debtors for the purposes of voting on the Plan.

### D.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots and Master Ballots will be determined by the Voting Agent or the Debtors, as applicable, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots and Master Ballots submitted not in proper form or the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot or Master Ballot.  The interpretation (including the Ballots, the Master Ballots, and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots and Master Ballots must be cured prior to the Voting Deadline or within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots and Master Ballots other than as set forth in the Disclosure Statement Order nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots and Master Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots and Master Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## XII.
## CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for August 25, 2020 at 10:00 a.m. (Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the

WEIL:\97584794\2\54457.0007

Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

**B.**     **Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and applicable local rules, must set forth the name of the objector, the nature and amount of Claims or Interests asserted by the objector, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge supervising the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

**1.**     **The Debtors at:**

225 Liberty St.
New York, NY 10281
Attn:  Maria DiLorenzo

**2.**     **Office of the U.S. Trustee at:**

Office of the U.S. Trustee for the Eastern District of Virginia
701 East Broad Street
Suite 4304
Richmond, VA 23219
Attn:    Kenneth N. Whitehurst, III
Email: USTPRegion04.RH.ECF@usdoj.gov

**3.**     **Counsel to the Debtors at:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
          Ryan Preston Dahl, Esq.
          Candace M. Arthur, Esq.
          Daniel Gwen, Esq.
Email:  Ray.Schrock@weil.com
          Ryan.Dahl@weil.com
          Candace.Arthur@weil.com
          Daniel.Gwen@weil.com

-and-

Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Attn:    Tyler P. Brown, Esq.
          Henry P. (Toby) Long, III, Esq.
          Nathan Kramer, Esq.

68

Email: tpbrown@HuntonAK.com
hlong@HuntonAK.com
nkramer@HuntonAK.com

**4.** **Counsel to the Ad Hoc Committee at:**

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne, Esq.
Samuel A. Khalil, Esq.
Matthew L. Brod, Esq.

-and-

Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Attn:   Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
Email:  LTavenner@Tb-Lawfirm.com
pberan@Tb-Lawfirm.com

**5.** **Counsel to the Creditors' Committee at:**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Attn:   Bradford J. Sandler, Esq.
Robert J. Feinstein, Esq.
Shirley S. Cho, Esq.
Debra Grassgreen, Esq.
Email:  bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
scho@pszjlaw.com
dgrassgreen@pszjlaw.com

-and-

Hirschler Fleischer, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Attn:   Robert S. Westermann
Email:  rwestermann@hf-law.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT**

---

WEIL:\97584794\2\54457.0007

C.     **Requirements for Confirmation of Plan**

    1.     **Requirements of Section 1129(a) of the Bankruptcy Code**

    (a)     **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

    (i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

    (iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

    (v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

    (vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

    (vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

    (viii)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that an Allowed Administrative Expense Claim (other than a Professional Fee Claim or DIP Claims), will be paid in full on the Effective Date, and that Administrative Expense

70

Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

(b)     **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each holder thereof either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that all holders of impaired Claims and Interests will receive under the Plan property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on the Liquidation Analysis attached hereto as **Exhibit C**.

Any liquidation analysis is speculative as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of describing to the holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)     **Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the plan. The Effective Date will not occur unless the transactions contemplated by the Plan close. Upon such

71

closing, the Reorganized Debtors will have sufficient funds to make the distributions required under the Plan and funds will be available to them under the Exit ABL Facility and the New Term Loans. Accordingly, the Debtors believe that the Plan is feasible.

(d)    **Equitable Distribution of Voting Power**

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

2.    **Additional Requirements for Non-Consensual Confirmation**

Pursuant to the Plan, holders of Claims and Interests in Class 8 (Section 510(b) Claims), Class 10-A (Existing Holdings Preferred Equity), and Class 10-B (Existing Holdings Equity) will not receive a distribution and are thereby deemed to reject the Plan. In addition, holders of Claims in Class 4 (Term Loan Secured Claims), Class 5 (IPCo Notes Claims), Class 6-A (Ongoing Trade Claims), or Class 6-B (Other General Unsecured Claims) may also vote to reject the Plan. Accordingly, the Debtors will request the Bankruptcy Court to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) requires that, with respect to each such rejecting Class, the Plan "does not discriminate unfairly" and is "fair and equitable."

(a)    **Unfair Discrimination Test**

A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it is legally entitled to receive. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. To the extent that there is disparate treatment between Claims and Interests of equal priority, the Debtors believe that such treatment is fair as contemplated under the Bankruptcy Code and under the circumstances.

(b)    **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all rejecting Classes, as further explained below.

(i)    Secured Creditors

The Bankruptcy Code requires that each holder of an impaired secured claim either (a) retain its liens on the property to the extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (b) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the

proceeds of the sale (or if sold, on the proceeds thereof), or (c) receive the "indubitable equivalent" of its allowed secured claim.

(ii)      Unsecured Creditors

The Bankruptcy Code requires that either (a) each holder of an impaired unsecured claim receive or retain under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and equity interests that are junior to the claims of the dissenting class not receive any property under the plan.

(iii)      Equity Interests

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.

73

## XIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 4, 5, 6-A, and 6-B to vote in favor thereof.

Dated:  August 9, 2020

Respectfully submitted,

**CHINOS HOLDINGS, INC.**
**CHINOS INTERMEDIATE HOLDINGS A, INC.**
**CHINOS INTERMEDIATE, INC.**
**CHINOS INTERMEDIATE HOLDINGS B, INC.**
**J. CREW GROUP, INC.**
**J. CREW OPERATING CORP.**
**GRACE HOLMES, INC.**
**H.F.D. NO. 55, INC.**
**J. CREW INC.**
**J. CREW INTERNATIONAL, INC.**
**J. CREW VIRGINIA, INC.**
**MADEWELL INC.**
**J. CREW BRAND HOLDINGS, LLC**
**J. CREW BRAND INTERMEDIATE, LLC**
**J. CREW BRAND, LLC**
**J. CREW BRAND CORP.**
**J. CREW DOMESTIC BRAND, LLC**
**J. CREW INTERNATIONAL BRAND, LLC**
By: */s/ Michael Nicholson*
Name:    Michael Nicholson
Title:     Authorized Signatory

## Exhibit A

**Plan**

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

```
-------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
CHINOS HOLDINGS, INC., et al.,          :        Case No. 20–32181 (KLP)
                                        :
                    Debtors.¹           :        (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

### AMENDED JOINT PREARRANGED CHAPTER 11 PLAN
### OF REORGANIZATION OF CHINOS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Candace Arthur (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Nathan Kramer (VSB No. 87720)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

*Attorneys for Debtors and Debtors in Possession*

Dated:  August 9, 2020
        Richmond, Virginia

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

## TABLE OF CONTENTS

**Page**

**ARTICLE I**      DEFINITIONS, INTERPRETATION AND CONSENTS ........................................... 1

  A.      Definitions ................................................................................................. 1

  B.      Interpretation; Application of Definitions and Rules of Construction ..................................... 13

  C.      Reference to Monetary Figures ................................................................... 13

  D.      Controlling Document .............................................................................. 13

**ARTICLE II**      ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS ........................ 14

  2.1.      Administrative Expense Claims ................................................................. 14

  2.2.      Professional Fee Claims ........................................................................... 14

  2.3.      DIP Claims ............................................................................................ 15

  2.4.      Priority Tax Claims ................................................................................. 15

  2.5.      Payment of Statutory Fees ........................................................................ 16

**ARTICLE III**      CLASSIFICATION OF CLAIMS AND INTERESTS. ................................... 16

  3.1.      Classification in General ........................................................................... 16

  3.2.      Formation of Debtor Groups for Convenience Only ......................................... 16

  3.3.      Summary of Classification ........................................................................ 16

  3.4.      Special Provision Governing Unimpaired Claims ........................................... 17

  3.5.      Elimination of Vacant Classes ................................................................... 17

  3.6.      Voting Classes; Presumed Acceptance by Non-Voting Classes .......................... 17

**ARTICLE IV**      TREATMENT OF CLAIMS AND INTERESTS ...................................... 18

  4.1.      Priority Non-Tax Claims (Class 1) ............................................................. 18

  4.2.      Other Secured Claims (Class 2) ................................................................. 18

  4.3.      ABL Facility Claims (Class 3) ................................................................... 18

  4.4.      Term Loan Secured Claims (Class 4) .......................................................... 19

  4.5.      IPCo Notes Claims (Class 5) .................................................................... 20

  4.6.      Ongoing Trade Claims (Class 6-A) ............................................................ 20

  4.7.      Other General Unsecured Claims (Class 6-B) ............................................... 20

  4.8.      Intercompany Claims (Class 7) .................................................................. 21

  4.9.      Section 510(b) Claims (Class 8) ................................................................. 21

  4.10.      Intercompany Interests (Class 9) ................................................................ 22

i

4.11. Existing Holdings Preferred Equity (Class 10-A)............................................................22

4.12. Existing Holdings Equity (Class 10-B)...........................................................................22

**ARTICLE V       MEANS FOR IMPLEMENTATION.** ............................................................22

5.1. Sources of Funding for Plan Distributions......................................................................22

5.2. General Corporate Authority ...........................................................................................23

5.3. Exit ABL Facility.............................................................................................................23

5.4. Conversion of DIP Claims; New Term Loans .................................................................24

5.5. Backstop Commitments ...................................................................................................25

5.6. Authorization and Issuance of New Common Equity and the New Warrants.................25

5.7. Continued Corporate Existence .......................................................................................25

5.8. Exemption from Securities Laws.....................................................................................26

5.9. Cancellation of Existing Securities and Agreements ......................................................27

5.10. Cancellation of Liens .......................................................................................................27

5.11. Officers and Boards of Directors .....................................................................................28

5.12. Certain Employee, Director, and Officer Matters............................................................28

**ARTICLE VI       DISTRIBUTIONS.** ......................................................................................28

6.1. Distributions Generally....................................................................................................28

6.2. Distribution Record Date .................................................................................................29

6.3. Date of Distributions........................................................................................................29

6.4. Distribution Agent ...........................................................................................................29

6.5. Rights and Powers of Distribution Agent .......................................................................29

6.6. Expenses of Distribution Agent .......................................................................................30

6.7. Postpetition Interest .........................................................................................................30

6.8. Delivery of Distributions .................................................................................................30

6.9. Distributions after Effective Date ....................................................................................30

6.10. Unclaimed Property .........................................................................................................30

6.11. Time Bar to Cash Payments.............................................................................................31

6.12. Manner of Payment under Plan........................................................................................31

6.13. Satisfaction of Claims ......................................................................................................31

6.14. Fractional Stock and New Warrants .................................................................................31

6.15. Minimum Cash Distributions...........................................................................................32

6.16. Maximum Distributions and Rights of Reimbursement ..................................................32

6.17. Setoffs and Recoupments.................................................................................................32

6.18.    Allocation of Distributions between Principal and Interest ............................................. 32

6.19.    Withholding and Reporting Requirements ..................................................................... 32

6.20.    Hart-Scott-Rodino Antitrust Improvements Act ............................................................ 33

**ARTICLE VII    PROCEDURES FOR DISPUTED CLAIMS.** ............................................................ 33

7.1.    Allowance of Claims .................................................................................................... 33

7.2.    Disputed Claims Process .............................................................................................. 33

7.3.    Objections to Claims .................................................................................................... 34

7.4.    Estimation of Claims .................................................................................................... 34

7.5.    Adjustment to Claims Without Objection ..................................................................... 34

7.6.    Disallowance of Certain Claims ................................................................................... 34

7.7.    Amendment to Claims .................................................................................................. 34

7.8.    Late Filed Claims ......................................................................................................... 35

7.9.    No Distributions Pending Allowance ............................................................................ 35

7.10.    Distributions after Allowance ...................................................................................... 35

7.11.    Claim Resolution Procedures Cumulative .................................................................... 35

**ARTICLE VIII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** ................................... 35

8.1.    General Treatment ........................................................................................................ 35

8.2.    Determination of Assumption Disputes and Deemed Consent ....................................... 36

8.3.    Claims Based on Rejection of Executory Contracts and Leases ..................................... 37

8.4.    Contracts and Leases Entered into After the Petition Date ............................................ 37

8.5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 38

8.6.    Survival of the Debtors' Indemnification Obligations ................................................... 38

8.7.    Insurance Policies ........................................................................................................ 38

8.8.    Intellectual Property Licenses and Agreements ............................................................ 38

8.9.    Employee Compensation and Benefits .......................................................................... 39

8.10.    Assignment ................................................................................................................. 39

8.11.    Reservation of Rights ................................................................................................... 39

**ARTICLE IX    CONDITIONS PRECEDENT** ................................................................................. 40

9.1.    Conditions Precedent to Confirmation of the Plan ........................................................ 40

9.2.    Conditions Precedent to Effective Date ........................................................................ 40

9.3.    Satisfaction or Waiver of Conditions Precedent ........................................................... 41

9.4.    Effect of Failure of a Condition ................................................................................... 41

iii

**ARTICLE X**        EFFECT OF CONFIRMATION OF PLAN. .................................................. 42

    10.1.   Vesting of Assets ............................................................................................ 42

    10.2.   Binding Effect ................................................................................................. 42

    10.3.   Compromise and Settlement of Claims, Interests, and Controversies ............... 42

    10.4.   Discharge of Claims and Termination of Interests ........................................... 42

    10.5.   Term of Injunctions or Stays ............................................................................ 43

    10.6.   Injunction ....................................................................................................... 43

    10.7.   Releases ......................................................................................................... 44

    10.8.   Exculpation .................................................................................................... 46

    10.9.   Retention of Causes of Action/Reservation of Rights ...................................... 46

    10.10.  Ad Hoc Committee and Indenture Trustee Fees .............................................. 46

**ARTICLE XI**        RETENTION OF JURISDICTION. .......................................................... 47

    11.1.   Retention of Jurisdiction .................................................................................. 47

    11.2.   Courts of Competent Jurisdiction .................................................................... 48

**ARTICLE XII**        MISCELLANEOUS PROVISIONS. ........................................................ 48

    12.1.   Substantial Consummation of the Plan ............................................................ 48

    12.2.   Expedited Determination of Taxes ................................................................... 49

    12.3.   Dissolution of Committees .............................................................................. 49

    12.4.   Exemption from Certain Transfer Taxes .......................................................... 49

    12.5.   Modifications and Amendments ...................................................................... 49

    12.6.   Revocation or Withdrawal of Plan ................................................................... 50

    12.7.   Severability of Plan Provisions ........................................................................ 50

    12.8.   Governing Law ............................................................................................... 51

    12.9.   Time .............................................................................................................. 51

    12.10.  Dates of Actions to Implement the Plan ........................................................... 51

    12.11.  Immediate Binding Effect ................................................................................ 51

    12.12.  Successors and Assigns ................................................................................... 51

    12.13.  Entire Agreement ............................................................................................ 51

    12.14.  Exhibits to Plan ............................................................................................... 51

    12.15.  Notices ........................................................................................................... 52

WEIL:\97578913\4\54457.0008

Chinos Holdings, Inc.; Chinos Intermediate Holdings A, Inc.; Chinos Intermediate, Inc.; Chinos Intermediate Holdings B, Inc.; J. Crew Group, Inc.; J. Crew Operating Corp.; Grace Holmes, Inc.; H.F.D. No. 55, Inc.; J. Crew Inc.; J. Crew International, Inc.; J. Crew Virginia, Inc.; Madewell Inc.; J. Crew Brand Holdings, LLC; J. Crew Brand Intermediate, LLC; J. Crew Brand, LLC; J. Crew Brand Corp.; J. Crew Domestic Brand, LLC; and J. Crew International Brand, LLC, as debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code.

## ARTICLE I        DEFINITIONS, INTERPRETATION AND CONSENTS.

**A.    Definitions.** The following terms shall have the respective meanings specified below:

1.1    **ABL Agent** means Bank of America, N.A., in its capacity as administrative and collateral agent for the ABL Lenders.

1.2    **ABL Credit Agreement** means the *Credit Agreement*, dated March 7, 2011, as amended, restated, amended and restated, modified, or supplemented from time to time through the Petition Date.

1.3    **ABL Facility** means that certain asset-based lending facility pursuant to the ABL Credit Agreement.

1.4    **ABL Facility Claims** means all "Obligations," as defined in the ABL Credit Agreement, as of the Effective Date, including any accrued but unpaid interest, costs, fees, issued and outstanding letters of credit, cash management obligations, guarantees and indemnities.

1.5    **ABL Facility Documents** means the ABL Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

1.6    **ABL Lenders** means the "Secured Parties" as defined in the ABL Credit Agreement and any other Entity that becomes a "Secured Party" under the ABL Facility from time to time in accordance with the ABL Credit Agreement, each in their capacity as such.

1.7    **Ad Hoc Committee** means the ad hoc committee composed of certain holders of Term Loan Claims, IPCo Notes Claims, Existing Holdings Preferred Equity, and Existing Holdings Equity, each in their capacity as such, represented by PJT Partners LP, Milbank LLP, and Tavenner & Beran, PLC.

1.8    **Ad Hoc Committee Fees** means, collectively, to the extent not previously paid, all outstanding, reasonable and documented fees and expenses of any professional retained on behalf of the Ad Hoc Committee (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including PJT Partners LP, Milbank LLP, and Tavenner & Beran, PLC.

1.9    **Administrative Expense Bar Date** means the date that is 60 days after the Effective Date, which will be the deadline by which parties seeking payment of Administrative Expense Claims must file a motion seeking Allowance of such claim, submit a proof of claim, or otherwise request in writing payment of such claims from the Debtors or Reorganized Debtors.

1

1.10    **Administrative Expense Claim** means any Claim for costs or expenses of administration of any of the Chapter 11 Cases incurred after the Petition Date and through the Effective Date under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code that have not already been paid by the Debtors, including (a) any actual and necessary costs and expenses of preserving the Estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases, including for the acquisition or lease of property or an interest in property or the performance of services, and (d) any compensation and reimbursement of expenses to the extent allowed under sections 330 or 503 of the Bankruptcy Code.

1.11    **Affiliates** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.12    **Allowed** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection or dispute has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or the Reorganized Debtors, (d) that is included in the Schedules, but is not listed as unliquidated, contingent, or disputed; (e) as to which the liability of the Debtors or the Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, (f) is not Disputed, or (g) is expressly allowed under the Plan; *provided*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.13    **Assumption Dispute** means an objection or dispute relating to assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including to any Cure Obligation or adequate assurance of future performance under an Executory Contract or Unexpired Lease to be assumed, which objection or dispute has been timely filed or interposed in accordance with the Plan and applicable law and has not been withdrawn or determined by a Final Order.

1.14    **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to chapter 5 of the Bankruptcy Code including sections 544, 545, 547, 548, 549, 550, or 551.

1.15    **Backstop Commitment Letter** means the backstop commitment letter dated May 3, 2020, as amended from time to time, executed by the Backstop Parties, providing for, among other things, the DIP Obligations and the New Term Loans.

1.16    **Backstop Parties** means the "Backstop Term Lenders" as defined in the Backstop Commitment Letter, each in their capacity as such.

1.17    **Backstop Premium** means a fee in an amount equal to $40,000,000, which will be paid on the Effective Date to the Backstop Parties in accordance with the Backstop Commitment Letter in the form of New Common Equity, which equity will be subject to dilution by New Common Equity issuable upon exercise of the New Warrants, issued pursuant to the Management Incentive Plan, and otherwise issued after the Effective Date.

1.18    **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as now in effect or hereafter amended from time to time, as applicable to the Chapter 11 Cases.

2

1.19    **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of Virginia having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court having subject matter jurisdiction over the Chapter 11 Cases under section 157 of title 28 of the United States Code.

1.20    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.21    **Benefit Plans** means (a) each "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and (b) any other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests, or consideration based on the value of Interests, in the Debtors, which shall be assumed by the Debtors on the Effective Date.

1.22    **Causes of Action** means any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, claims, Avoidance Actions, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, or assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring before the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.  Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their Estates, Causes of Action shall include (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity, (b) claims (including Avoidance Actions) pursuant to section 362, and chapter 5 of the Bankruptcy Code including sections 510, 542, 543, 544 through 550, or 553, and (c) claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.23    **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and styled *In re Chinos Holdings, Inc., et al.*, Ch. 11 Case No. 20-32181 (KLP) (Jointly Administered).

1.24    **Chinos Holdings** means Chinos Holdings, Inc., as debtor or debtor in possession, as the context requires.

1.25    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.26    **Class** means a category of holders of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

1.27    **Collateral** means any asset of the Estates that is subject to a Lien securing the payment or performance of a Claim to the extent provided by section 506 of the Bankruptcy Code, which Lien is valid,

3

perfected and enforceable, and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

1.28     **Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order within the meaning of Bankruptcy Rules 5003 and 9021.

1.29     **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.30     **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.31     **Consenting Support Parties** has the meaning set forth in the Transaction Support Agreement.

1.32     **Creditor** has the meaning set forth in section 101(10) of the Bankruptcy Code.

1.33     **Creditors' Committee** means the statutory committee of unsecured creditors appointed in these Chapter 11 Cases.

1.34     **Cure Obligation** means the amount of cash or other property the Debtors must distribute (as the parties may agree or the Bankruptcy Court may order), as necessary, to (a) cure a monetary default by the applicable Debtor under an Executory Contract or Unexpired Lease as required by section 365(b)(1) of the Bankruptcy Code , and (b) permit the applicable Debtor to assume or assume and assign such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

1.35     **Definitive Documents** has the meaning set forth in the Transaction Support Agreement.

1.36     **DIP Agent** means Wilmington Savings Fund Society, FSB in its capacity as administrative and collateral agent under the DIP Loan Documents.

1.37     **DIP Claims** means all Claims arising under or related to the DIP Loan Documents, including any accrued but unpaid interest, costs, fees, guarantees and indemnities.

1.38     **DIP Credit Agreement** means the postpetition credit agreement among the Debtors and the DIP Lenders as approved by the DIP Order.

1.39     **DIP Facility** means the debtor-in-possession financing used to fund the operations of the Debtors during the pendency of these Chapter 11 Cases under the terms set forth in the DIP Loan Documents.

1.40     **DIP Lenders** means the lenders party under the DIP Credit Agreement and any other Entity that becomes a lender under the DIP Facility from time to time in accordance with the DIP Credit Agreement, each in their capacity as such.

1.41     **DIP Loan Documents** means, collectively, the DIP Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

1.42     **DIP Obligations** has the meaning set forth in the DIP Order.

1.43     **DIP Order** means the Interim DIP Order or the Final DIP Order, as applicable.

1.44     **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest (a) has been determined by a Final Order or specified in a provision of the Plan not to be Allowed, (b) has been agreed to by the holder of such Claim or Interest and the applicable Debtor to be equal to $0 or to be expunged, (c) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no proof of claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code, any Final Order of the Bankruptcy Court or otherwise, (d) is not listed in the Schedules and as to which no proof of claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code, any Final Order of the Bankruptcy Court, or otherwise.

1.45     **Disclosure Statement** means the disclosure statement in respect of the Plan, as may be amended from time to time as approved by the Bankruptcy Court.

1.46     **Disputed** means, with respect to a Claim or Interest, that (a) such Claim or Interest is neither Allowed nor Disallowed, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or (b) the Debtors or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute and Disputed as to the balance of such Claim.

1.47     **Distribution Agent** means any Entity in its capacity as a distribution agent under Article VI of the Plan (including a Reorganized Debtor that acts in such capacity).

1.48     **Distribution Record Date** means, except as otherwise provided in the Plan or designated by the Bankruptcy Court, the Effective Date.

1.49     **DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

1.50     **Effective Date** means the date after entry of the Confirmation Order on which all conditions to the effectiveness of the Plan set forth in Article IX of the Plan have been satisfied or waived in accordance with the terms of the Plan.

1.51     **Eligible Holder** means the IPCo Noteholders and Term Lenders that are qualified institutional buyers or accredited institutional investors eligible to participate in the DIP Facility and the New Term Loan.

1.52     **Employee Arrangements** means all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which any Debtor is a party.

1.53     **Entity** means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, person (as defined in section 101(41) of the Bankruptcy Code), or other entity (as defined in section 101(15) of the Bankruptcy Code.

1.54     **Estates** means the estates of the Debtors created under section 541 of the Bankruptcy Code.

1.55     **Exchange Act** means the Securities Exchange Act of 1934, as amended.

1.56    **Exculpated Parties** means, collectively and, in each case, in their capacities as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Creditors' Committee, (iv) the Consenting Support Parties, (v) the ABL Agent and the ABL Lenders, (vi) the Term Agent and the Term Lenders, (vi) the Indenture Trustees and the IPCo Noteholders, (vii) the Backstop Parties, (viii) the DIP Lenders, (ix) the DIP Agent, (x) the New Term Lenders, (xi) the New Term Agent, (xii) the Sponsors, and (xiii) the Related Parties for each of the foregoing.

1.57    **Executory Contract** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.58    **Existing Holdings Equity** means all Interests in Chino's Holdings, Inc. as of the Petition Date except for Existing Holdings Preferred Equity.

1.59    **Existing Holdings Preferred Equity** means the Series A Preferred Stock and Series B Preferred Stock, each issued by Chinos Holdings.

1.60    **Exit ABL Agent** means the administrative and collateral agents under the Exit ABL Facility, solely in their capacity as such.

1.61    **Exit ABL Credit Agreement** means that certain senior secured revolving credit agreement, dated as of the Effective Date (as it may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), which will be filed as part of the Plan Supplement.

1.62    **Exit ABL Facility** means the senior secured asset-based revolving credit facility to be provided to certain of the Reorganized Debtors on the Effective Date on the terms and subject to the conditions set forth in the Exit ABL Credit Agreement.

1.63    **Exit ABL Facility Documents** means, collectively, the Exit ABL Credit Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document or instrument executed or delivered in connection with the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented or replaced from time to time.

1.64    **Exit Facility Documents** means, collectively, the New Term Documents and the Exit ABL Facility Documents.

1.65    **Exit ABL Lenders** means the lenders under the Exit ABL Credit Agreement and any other Entity that becomes a lender under the Exit ABL Facility from time to time in accordance with the Exit ABL Credit Agreement.

1.66    **Final DIP Order** means the order entered by the Bankruptcy Court, among other things, approving the DIP Facility and the Debtors' use of cash collateral on a final basis (Docket No. 447).

1.67    **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or

rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.68    **General Unsecured Claim** means any Claim as of the Petition Date that is neither secured by a Lien nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court; *provided* that a General Unsecured Claim does not include (a) any Intercompany Claim, (b) any deficiency claims with respect to the IPCo Notes, or (c) any Section 510(b) Claim.

1.69    **Governmental Entity** means the United States and any State (including the District of Columbia and Puerto Rico), Commonwealth, District, Territory, municipality (including a political subdivision or public agency or instrumentality of a State), foreign state, or a department, agency, or instrumentality of the foregoing.

1.70    **Group, Inc.** means J. Crew Group, Inc.

1.71    **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a) and 1124 of the Bankruptcy Code.

1.72    **Incremental Debt Equity** means New Common Equity issued after the Effective Date in connection with the "Fixed Component" as defined in the New Term Credit Agreement.

1.73    **Indentures** means, collectively, the IPCo Indentures and the indenture for the 7.75%/8.50% Senior PIK Toggle Notes due 2022

1.74    **Indenture Trustees** means the IPCo Trustee and indenture trustee for the 7.75%/8.50% Senior PIK Toggle Notes due 2022.

1.75    **Indenture Trustee Fees** means, collectively, to the extent not previously paid, all outstanding, reasonable and documented fees and expenses of the Indenture Trustees (including, without limitation, attorneys' and agents' fees, expenses, and disbursements) to the extent permitted under the applicable indenture regardless of whether such fees were incurred before or after the Petition Date.

1.76    **Intercompany Claim** means any Claim held by a Debtor against another Debtor as of the Petition Date.

1.77    **Intercompany Interest** means an Interest in a Debtor held by another Debtor as of the Petition Date.

1.78    **Interests** means any equity interest in a Debtor immediately before the Effective Date, including, all issued, unissued, authorized or outstanding shares of stock, preferred stock, membership interests, other instruments evidencing an ownership interest, or equity security in any of the Debtors, whether or not transferable, and any option, warrant, right to purchase or acquire any such interests at any time, or any other interest that is exercisable, convertible or exchangeable into equity of a Debtor, contractual or otherwise, including equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors to acquire any such interests in a Debtor.

7

1.79    **Interim DIP Order** means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying Automatic stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 84).

1.80    **IPCo Debtors** means J. Crew Brand, LLC, J. Crew Brand Corp., J. Crew Brand Intermediate, LLC, J. Crew International Brand, LLC, and J. Crew Domestic Brand, LLC, each in their capacity as obligor under or guarantor of the obligations under the IPCo Indentures, as applicable.

1.81    **IPCo Indentures** means the two *Indentures* dated July 13, 2017 pursuant to which the IPCo Notes were issued, as amended from time to time.

1.82    **IPCo Intercreditor Agreement** means the *Intercreditor Agreement* dated July 13, 2017 between U.S. Bank National Association, as collateral agent for the New Notes Secured Parties (as defined in the IPCo Intercreditor Agreement) and U.S. Bank National Association, as collateral agent for the New Private Placement Notes Secured Parties (as defined in the IPCo Intercreditor Agreement).

1.83    **IPCo Noteholders** means the holders of IPCo Notes, each in their capacity as such.

1.84    **IPCo Notes** means the 13% Senior Secured Notes due 2021 and the 13% Senior Secured New Money Notes due 2021, issued under the respective IPCo Indentures.

1.85    **IPCo Notes Claims** means all Claims as of the Petition Date arising under or related to the IPCo Indentures and the IPCo Notes, including any deficiency claims and all accrued but unpaid interest, costs, fees, and indemnities.

1.86    **IPCo Trustees** means, collectively, U.S. Bank National Association in its capacity as collateral agent and trustee under each of the IPCo Indentures, or any duly appointed successor trustee and collateral agent under either IPCo Indenture.

1.87    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.88    **Loan Debtors** means J. Crew Group, Inc., Chinos B, J. Crew Operating Corp., J. Crew Inc., J. Crew International, Inc., Grace Holmes, Inc., H. F. D. No. 55, Inc., Madewell Inc., and J. Crew Virginia, Inc., each in their capacity as obligor or guarantor of the obligations under the ABL Facility Documents and Term Loan Documents, as applicable.

1.89    **Management Incentive Plan** means the form, terms, allocation and vesting of awards under any management incentive plan adopted after the Effective Date by the New Board in its sole discretion.

1.90    **NewCo Holdings** means a newly formed limited liability company formed pursuant to the Restructuring Transaction Steps that will issue the New Common Equity.

1.91    **NewCo Entity Group** means the newly formed entities pursuant to the Restructuring Transaction Steps.

1.92    **New Board** means the initial board of directors of NewCo Holdings consisting of seven directors to be selected in accordance with Section 5.11 of the Plan.

WEIL:\97578913\4\54457.0008

1.93    **New Common Equity** means the common equity of NewCo Holdings issued on the Effective Date authorized pursuant to the New Organizational Documents of NewCo Holdings, as set forth in the Plan Supplement.

1.94    **New Equity Allocation** means 15% of New Common Equity allocated to the New Term Lenders in consideration for their commitments to participate in the New Term Loans in accordance with the Transaction Support Agreement, subject to dilution from (a) New Common Equity issued upon the exercise of the New Warrants, (b) New Common Equity issued pursuant to the Management Incentive Plan, and (c) New Common Equity issued after the Effective Date other than the Incremental Debt Equity.

1.95    **New Organizational Documents** means the organizational and governance documents for the Reorganized Debtors, including, as applicable, the certificates or articles of incorporation, certificates of formation or certificates of limited partnership, bylaws, limited liability company agreements, or limited partnership agreements (or equivalent governing documents of any of the foregoing).  To the extent such New Organizational Documents reflect material changes to the Debtors' existing organizational documents and bylaws, draft forms of such New Organizational Documents will be included in the Plan Supplement.

1.96    **New Term Agent** means the administrative and collateral agent under the New Term Credit Agreement, in its capacity as such.

1.97    **New Term Credit Agreement** means the credit agreement with respect to the New Term Loans, dated as of the Effective Date (as it may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof), which will be filed as part of the Plan Supplement.

1.98    **New Term Documents** means, collectively, the New Term Credit Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, notice, mortgage, control agreement, guarantee, certificate, document or instrument executed or delivered in connection with the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, amended and restated, supplemented or replaced from time to time.

1.99    **New Term Lender** means any lender in respect to the New Term Loan, including all DIP Lenders that convert DIP Obligations into New Term Loans, each in their capacity as such.

1.100    **New Term Loans** means new senior secured first lien term loans extended to some of the Reorganized Debtors under the New Term Documents in an initial aggregate amount of $400 million, including any principal amount of DIP Obligations converted into such loans on a dollar-for-dollar basis.

1.101    **New Warrants** means warrants entitling the holders thereof to purchase, in the aggregate, 15% of the New Common Equity at a security price that assumes enterprise value of $1,750,000,000, which securities (a) will dilute New Common Equity issued (i) pursuant to the Plan, (ii) as New Equity Allocation or as Incremental Debt Equity, and (iii) as the Backstop Premium, and (b) will be diluted by any New Common Equity issued after the Effective Date before exercise of the New Warrants, on the terms and subject to the conditions set forth in the Warrant Agreement.

1.102    **Ongoing Trade Claim** means any General Unsecured Claim held by a party that, within 30 days of the Petition Date, has executed a trade agreement that expressly designates such party as a holder of an Ongoing Trade Claim and that provides for continuity of goods and services to be provided to the Reorganized Debtors for a period of at least 180 days on terms no less favorable to the Debtors than those in place for the year before the Petition Date, except as otherwise agreed by the Debtors with the consent of the Requisite Consenting Support Parties (such consent not to be unreasonably withheld).

1.103  **Operating Agreement** means the operating agreement among the holders of New Common Equity, which will be filed as part of the Plan Supplement.

1.104  **Other General Unsecured Claim** means any General Unsecured Claim other than an Ongoing Trade Claim, including, for the avoidance of doubt, the Term Loan Deficiency Claims and all Claims arising from rejection of an Executory Contract or Unexpired Lease pursuant to sections 365 or 1123 of the Bankruptcy Code.

1.105  **Other Secured Claim** means a Claim as of the Petition Date, other than an ABL Facility Claim, Term Loan Secured Claim, or IPCo Notes Claim, that is (a) secured by a Lien that is valid, perfected, and enforceable under applicable law or by reason of a Final Order, to the extent of the value of the applicable Collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors (with the consent of the Requisite Consenting Support Parties) or the Reorganized Debtors, as applicable, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.106  **Petition Date** means, with respect to each Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.107  **PIK Toggle Notes Claim** means a Claim arising under the indenture for the 7.75%/8.50% Senior PIK Toggle Notes due 2022.

1.108  **Plan** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, any appendices, schedules, and supplements contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code.

1.109  **Plan Supplement** means the forms of certain documents, schedules, and exhibits effectuating the transactions contemplated in the Plan, which are to be filed with the Bankruptcy Court not later than 10 calendar days before the deadline for filing objections to the Plan, including, (a) the Exit ABL Credit Facility commitment letter, (b) the New Term Credit Agreement, (c) the Warrant Agreement, (d) the Operating Agreement and New Organizational Documents (to the extent such New Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), (e) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the schedule of Causes of Action retained by the Debtors; (g) the Schedule of Rejected Contracts and Leases; (h) the Schedule of Assigned Contracts and Leases; and (i) the Restructuring Transaction Steps; *provided* that the Debtors shall have the right to amend any schedules, exhibits, or amendments filed as the Plan Supplement through the Effective Date, in accordance with the terms of the Plan and the Transaction Support Agreement.

1.110  **Priority Non-Tax Claim** means any Claim entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim, DIP Claim, or a Priority Tax Claim.

1.111  **Priority Tax Claim** means any Claim of a Governmental Entity of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.112  **Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed

Claims or Allowed Interests and Disputed Interests, as applicable, in a particular Class and other Classes entitled to share in the same recovery under the Plan.

1.113    **Professional** means any professional retained pursuant to section 327, 328, or 363 of the Bankruptcy Code by the Debtors or any official committee appointed in the Chapter 11 Cases.

1.114    **Professional Fee Claims** means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

1.115    **Professional Fee Escrow** means an escrow account established and funded pursuant to Section 2.2 of the Plan.

1.116    **Professional Fee Reserve Amount** means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Section 2.2(b) of the Plan.

1.117    **Registration Rights Agreement** means the agreement pursuant to which NewCo Holdings will register, offer, and sell the New Common Equity.

1.118    **Reinstate, Reinstated, or Reinstatement** means providing a Claim or Interest with the treatment contemplated by section 1124(a)(2) of the Bankruptcy Code.

1.119    **Related Parties** means individually or collectively, and each in their capacity as such: with respect to a given Entity, all present and former officers (including chief restructuring officers), directors (including independent directors), stockholders, general or limited partners, managers, managing directors, managing members, members, principals, employees, attorneys, agents, trustees, financial advisors, restructuring advisors, accountants, investment bankers, consultants, managed accounts, managed funds and other representatives and agents of such Entity.

1.120    **Released Parties** means each of, and solely in their capacity as such, (a) the Debtors and the Reorganized Debtors, (b) the ABL Agent and ABL Lenders, (c) the Term Agent and Term Lenders, (d) the Indenture Trustees and IPCo Noteholders, (e) the Consenting Support Parties, (f) the Sponsors, (g) the DIP Agent and DIP Lenders, (h) the Exit ABL Agent and Exit ABL Lenders, (i) the New Term Agent and New Term Lenders, (j) the Backstop Parties, and (k) the Related Parties for each of the foregoing; *provided* that a holder of a Claim or Interest that objects to or opts-out of the releases set forth in Section 10.7(b) of the Plan shall not be a "Released Party."

1.121    **Reorganized Debtors** means each of the Debtors, NewCo Holdings, the NewCo Entity Group, or any successor thereto, on and after the Effective Date.

1.122    **Required DIP Lenders** means the "Required Lenders" under the DIP Credit Agreement.

1.123    **Requisite Consenting Support Parties** has the meaning set forth in the Transaction Support Agreement.

1.124    **Restructuring Transaction Steps** means the series of corporate transactions and actions to be implemented on or around the Effective Date pursuant to the Plan and filed as part of the Plan Supplement.

1.125    **Schedule of Assigned Contracts and Leases** means a schedule, filed as part of the Plan Supplement, that sets forth those Unexpired Leases and Executory Contracts that the Debtors with the

11

consent of the Requisite Consenting Support Parties, have determined to assign to an entity in the NewCo Entity Group or another Debtor.

1.126    **Schedule of Rejected Contracts and Leases** means a schedule, filed as part of the Plan Supplement, that sets forth those Unexpired Leases and Executory Contracts that the Debtors with the consent of the Requisite Consenting Support Parties, have determined to reject under the Plan.

1.127    **Schedules** means, collectively, the schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as the same may be amended, modified, or supplemented from time to time.

1.128    **Section 510(b) Claims** means any Claim as of the Petition Date (a) arising from the recession of a purchase or sale of a Security of a Debtor; (b) for damages arising from the purchase or sale of such Security; or (c) for reimbursement of contribution Allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.129    **Securities Act** means the Securities Act of 1933, as amended.

1.130    **Security** has the meaning set forth in in section 101(49) of the Bankruptcy Code.

1.131    **Sponsors** means, collectively, TPG Chinos, L.P., TPG Chinos Co-Invest, L.P., Green Equity Investors V, L.P., Green Equity Investors Side V, L.P., and LGP Chino Coinvest LLC.

1.132    **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.133    **Term Agent** means Wilmington Savings Fund Society, FSB in its capacity as successor administrative agent under the Term Loan Agreement.

1.134    **Term Lenders** means the lenders under the Term Loan Agreement and any other Entity that becomes a lender thereunder from time to time in accordance with the Term Loan Agreement, each in their capacity as such.

1.135    **Term Loan Agreement** means the *Amended and Restated Credit Agreement*, dated March 5, 2014 (as amended, restated, supplemented and otherwise modified from time to time) between Group, Inc. as the borrower, the Term Lenders, and the Term Agent.

1.136    **Term Loan Claims** means the Term Loan Deficiency Claims and the Term Loan Secured Claims, collectively.

1.137    **Term Loan Deficiency Claims** means any Claim arising under the Term Loan Documents that is not a secured Claim as determined pursuant to section 506(a) of the Bankruptcy Code.

1.138    **Term Loan Documents** means the Term Loan Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

1.139    **Term Loan Secured Claims** means all Claims arising under or related to the Term Loan Documents, including all accrued but unpaid interest, costs, fees, guarantees and indemnities, other than any Term Loan Deficiency Claims.

WEIL:\97578913\4\54457.0008

1.140   **Transaction Support Agreement** means the *Transaction Support Agreement*, dated May 3, 2020, among the Debtors and the other parties thereto, as it may be amended, supplemented, or modified from time to time in accordance with the terms thereof.

1.141   **Unexpired Lease** means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.142   **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a) and 1124 of the Bankruptcy Code.

1.143   **Warrant Agreement** means the warrant agreement providing for issuance of the New Warrants, which will be filed as part of the Plan Supplement.

### B.      Interpretation; Application of Definitions and Rules of Construction

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to legal tender of the United States of America, unless otherwise expressly provided.

### D.      Controlling Document

In the event of an inconsistency between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; *provided*, that notwithstanding anything herein to the contrary, in the event of a conflict between the Confirmation Order, on the one hand, and the Plan or any of the instruments in the Plan Supplement, on the other hand, the Confirmation Order shall govern and control in all respects.

WEIL:\97578913\4\54457.0008

## ARTICLE II          ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS.

2.1.    **Administrative Expense Claims**

Each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim or DIP Claim), except to the extent such holder agrees to less favorable treatment, shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first business day after the date that is 30 calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided* that (a) any Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to the applicable transaction and (b) the holders of any adequate protection claims granted by the DIP Order will not receive any recovery on account of such claims, having waived such recovery solely for purposes of the Plan.

Except as otherwise provided in Section 2.1 of the Plan and except with respect to Professional Fee Claims, requests for payment of Administrative Expense Claims must be filed and served on the Debtors or Reorganized Debtors no later than the Administrative Expense Bar Date. Holders of Administrative Expense Claims that are required to file and serve a request for payment and that do not timely file and serve such a request shall be forever barred from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, or their respective property, and such Administrative Expense Claims shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims.

2.2.    **Professional Fee Claims**

(a)      Final Fee Applications

All final requests for Professional Fee Claims shall be filed no later than 60 days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

(b)      Professional Fee Reserve Amount

All Professionals shall estimate in good faith their unpaid Professional Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Ad Hoc Committee at least three calendar days before the Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide such estimate, the Debtors and Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(c)      Professional Fee Escrow

If the Professional Fee Reserve Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with cash equal to the Professional Fee Reserve Amount, and no Liens,

WEIL:\97578913\4\54457.0008

Claims, or interests will encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including funds held in the Professional Fe Escrow) will (i) not be and will not be deemed to be property of the Debtors or the Reorganized Debtors and (ii) will be held in trust for the Professionals; *provided* that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full will revert to the Reorganized Debtors.  Allowed Professional Fee Claims will be paid in cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' obligations with respect to Professional Fee Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency will be promptly funded to the Professional Fee Escrow from the Debtors' estates and Reorganized Debtors without any further action or order of the Bankruptcy Court.

(d)    <u>Post-Effective Date Fees and Expenses</u>

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will pay in the ordinary course of business and without any further action or order of the Bankruptcy Court, pay in cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors and Reorganized Debtors, as applicable.

On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services provided after such date shall terminate, and the Reorganized Debtors may employ and pay any post-Effective Date fees and expenses of any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3.    **DIP Claims**

Except if a holder of an Allowed DIP Claim agrees to less favorable treatment, each holder of an Allowed DIP Claim will receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Allowed DIP Claim, (a) (i) on account of the outstanding principal amount of such Claim, an equal principal amount of New Term Loans, (ii) a portion of the New Equity Allocation and New Warrants, and (iii) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, or (b) such other treatment agreed upon among the Debtors, the Requisite Consenting Support Parties, and the holders of Allowed DIP Claims.

2.4.    **Priority Tax Claims**

Except if a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Reorganized Debtors, cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first business day after the date that is 30 calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; *provided* that the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any Allowed Priority Tax Claim at any time without penalty or premium.

2.5.     **Payment of Statutory Fees**

On and after the Effective Date, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

## ARTICLE III      CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.     **Classification in General**

A Claim or Interest is placed in a particular Class under sections 1122 and 1123(a)(1) of the Bankruptcy Code for all purposes, including voting, confirmation, and distribution under the Plan; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled.

3.2.     **Formation of Debtor Groups for Convenience Only**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Reorganized Debtors shall continue to exist as separate legal entities after the Effective Date.

3.3.     **Summary of Classification**

The below table designates Classes of Claims and Interests for each Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

16

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims (All Debtors) | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims (All Debtors) | Unimpaired | No (Presumed to accept) |
| 3 | ABL Facility Claims (Only Loan Debtors) | Unimpaired | No (Presumed to accept) |
| 4 | Term Loan Secured Claims (Only Loan Debtors) | Impaired | Yes |
| 5 | IPCo Notes Claims (Only IPCo Debtors) | Impaired | Yes |
| 6-A | Ongoing Trade Claims (All Debtors) | Impaired | Yes |
| 6-B | Other General Unsecured Claims (All Debtors) | Impaired | Yes |
| 7 | Intercompany Claims (All Debtors) | Unimpaired | No (Presumed to accept) |
| 8 | Section 510(b) Claims (All Debtors) | Impaired | No (Deemed to reject) |
| 9 | Intercompany Interests (All Debtors) | Unimpaired | No (Presumed to accept) |
| 10-A | Existing Holdings Preferred Equity (Only Chinos Holdings) | Impaired | No (Deemed to reject) |
| 10-B | Existing Holdings Equity (Only Chinos Holdings) | Impaired | No (Deemed to reject) |

3.4.   **Special Provision Governing Unimpaired Claims**

Nothing in the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.   **Elimination of Vacant Classes**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of the applicable Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Plan satisfies section 1129(a)(8) of the Bankruptcy Code.

3.6.   **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by such Class.

WEIL:\97578913\4\54457.0008

## ARTICLE IV        TREATMENT OF CLAIMS AND INTERESTS.

4.1.    **Priority Non-Tax Claims (Class 1)**

(a)    Classification:  For each Debtor, Class 1 consists of Priority Non-Tax Claims against such Debtor.

(b)    Treatment:  Except if a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, at the sole option of the Reorganized Debtors, (i) each such holder shall receive payment in cash in an amount equal to the Allowed amount of such Claim, payable on the later of the Effective Date and the date that is 10 business days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)    Voting:  Class 1 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Priority Non-Tax Claims will not be solicited.

4.2.    **Other Secured Claims (Class 2)**

(a)    Classification:  For each Debtor, Class 2 consists of Other Secured Claims against such Debtor.  If Other Secured Claims are secured by different Collateral or different interests in the same Collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    Treatment:  Except if a holder of an Allowed Other Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, at the option of the Reorganized Debtors, on the later of the Effective Date and the date that is 10 business days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive on account of such Allowed Claim (i) cash in an amount equal to the Allowed amount of such Claim, (ii)  delivery of the collateral securing such Allowed Claim and cash for any interest required under section 506(b) of the Bankruptcy Code, or (iii) Reinstatement or such other treatment that will render such holder's Allowed Other Secured Claim Unimpaired.  If an Other Secured Claim is treated under clauses (i) or (ii), the Liens securing such Other Secured Claim shall be deemed released immediately upon payment or delivery of collateral, as applicable.

(c)    Voting:  Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Other Secured Claims will not be solicited.

4.3.    **ABL Facility Claims (Class 3)**

(a)    Classification:  For each Loan Debtor, Class 3 consists of ABL Facility Claims, and such Class is vacant for all other Debtors.

18

(b)    Allowance:  The ABL Facility Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against each of the Loan Debtors in the aggregate face amount of the then outstanding amount under the ABL Credit Agreement, (i) plus any unreimbursed amounts thereunder, and any accrued and unpaid interest payable at the default rate specified under the ABL Credit Agreement on such unreimbursed amounts through the Effective Date, (ii) plus the amount of any outstanding letters of credit issued pursuant to the ABL Facility, (iii) plus any fees, charges, expenses, and other amounts due but unpaid under the ABL Credit Agreement including any "Cash Management Obligations" as defined therein. Neither the ABL Lenders nor the ABL Agent shall be required to file proofs of claim on account of any ABL Facility Claims, but the ABL Agent will submit a payoff letter for the Debtors' approval at least 14 days before the Effective Date.

(c)    Treatment:  Except if a holder of an Allowed ABL Facility Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed ABL Facility Claim, each holder of an Allowed ABL Facility Claim will receive, on the Effective Date, cash in the full amount of its Allowed ABL Facility Claim and all issued and outstanding letters of credit shall be cash collateralized in accordance with the terms and conditions of the ABL Credit Agreement.  To the extent that any other ABL Facility Claim is contingent as of the Effective Date, the Reorganized Debtors may, in their sole discretion, elect to (i) terminate any further commitments under the ABL Facility, (ii) cash collateralize such contingent amounts, or (iii) provide the ABL Lenders with such other treatment mutually satisfactory.

(d)    Voting:  Class 3 is Unimpaired, and the holders of ABL Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed ABL Facility Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of ABL Facility Claims will not be solicited.

4.4.    **Term Loan Secured Claims (Class 4)**

(a)    Classification:  For each Loan Debtor, Class 4 consists of Term Loan Secured Claims, and such Class is vacant for all other Debtors.

(b)    Allowance:  The Term Loan Secured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against each Loan Debtor in the aggregate amount of $716,645,605.

(c)    Treatment:  Except if a holder of an Allowed Term Loan Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Term Loan Secured Claim, each holder of an Allowed Term Loan Secured Claim will receive, on the Effective Date, its Pro Rata share of New Common Equity representing, in the aggregate, 76.5% of the New Common Equity issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation, and any other New Common Equity distributed pursuant to the Plan other than the New Common Equity distributed to holders of IPCo Notes Claims, which will be subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by NewCo Holdings after the Effective Date, including the Incremental Debt Equity.

(d)    Voting:  Class 4 is Impaired, and the holders of Allowed Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

19

4.5.    **IPCo Notes Claims (Class 5)**

(a)    <u>Classification</u>:  For each IPCo Debtor, Class 5 consists of IPCo Notes Claims, and such Class is vacant for all other Debtors.

(b)    <u>Allowance</u>:  The IPCo Notes Claims are Allowed against each IPCo Debtor in the aggregate principal amount of $347,599,000, plus (i) a make-whole premium equal to $58,044,927, (ii) accrued and unpaid interest through the Petition Date equal to $6,025,049, and (iii) any other prepetition obligations payable under the IPCo Indentures and IPCo Notes.

(c)    <u>Treatment</u>:  Except if a holder of an Allowed IPCo Notes Claim agrees to a less favorable treatment of such Claim and notwithstanding anything to the contrary in the IPCo Indentures or the IPCo Intercreditor Agreement, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed IPCo Notes Claim, each holder of an Allowed IPCo Notes Claim will receive, on the Effective Date, its Pro Rata share of New Common Equity representing, in the aggregate, 23.5% of the New Common Equity issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation, and any other New Common Equity distributed pursuant to the Plan other than the New Common Equity distributed to holders of Term Loan Secured Claims, subject to dilution from New Common Equity (i) issuable upon exercise of the New Warrants, (ii) issued pursuant to the Management Incentive Plan, and (iii) otherwise issued by NewCo Holdings after the Effective Date, including the Incremental Debt Equity.

(d)    <u>Voting</u>:  Class 5 is Impaired, and the holders of Allowed IPCo Notes Claims are entitled to vote to accept or reject the Plan.

4.6.    **Ongoing Trade Claims (Class 6-A)**

(a)    <u>Classification</u>:  For each Debtor, Class 6-A consists of Ongoing Trade Claims.

(b)    <u>Treatment</u>:  Except if a holder of an Allowed Ongoing Trade Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, each holder of an Allowed Ongoing Trade Claim will receive, on the Effective Date, its Pro Rata share of a cash pool in an aggregate amount equal to $71,000,000; *provided* that the aggregate amount of cash distributed on account of any Allowed Ongoing Trade Claim will not exceed 50% of the Allowed amount of such Claim.

(c)    <u>Voting</u>:  Class 6-A is Impaired, and the holders of Allowed Ongoing Trade Claims are entitled to vote to accept or reject the Plan.

4.7.    **Other General Unsecured Claims (Class 6-B)**

(a)    <u>Classification</u>:  For each Debtor, Class 6-B consists of Other General Unsecured Claims.

(b)    <u>Treatment</u>:  Except if a holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, each holder of an Allowed Other General Unsecured Claim will receive, on the Effective Date, its Pro Rata share of the cash pool allocated to each Debtor as set forth below; *provided* that the aggregate amount of cash distributed on account of any Allowed Other General Unsecured Claim will not exceed 50% of the Allowed amount of such Claim.  The cash pool may be

reallocated among the Debtors after the occurrence of the Claims bar date, in their reasonable business judgement, to recalibrate for, among other things, the Claims asserted against each Debtor.

| Debtor | Cash Pool | |
|---|---|---|
| | If Class 6-B Accepts | If Class 6-B Rejects |
| J. Crew Inc. | $69,000 | $23,000 |
| J. Crew Operating Corp. | $1,877,000 | $625,900 |
| Grace Holmes, Inc. | $399,000 | $133,000 |
| H.F.D. No. 55, Inc. | $165,000 | $55,000 |
| Madewell Inc. | $489,700 | $163,000 |
| J. Crew Group, Inc. | $300 | $100 |
| Total | $3,000,000 | $1,000,000 |

The Plan shall be deemed a filed objection for purposes of section 502 of the Bankruptcy Code to any Claim arising out of or relating to the rejection of an Executory Contract or Unexpired Lease whose holder is seeking the allowance of such Claim in excess of the amounts allowable under section 502(b) of the Bankruptcy Code.

Subject to occurrence of the Effective Date and solely for purposes of the Plan, holders of the Term Loan Deficiency Claims agree to forgo any distribution under the Plan on account of such Term Loan Deficiency Claims.

(c)    Voting:  Class 6-B is Impaired, and the holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.8.    **Intercompany Claims (Class 7)**

(a)    Classification:  For each Debtor, Class 7 consists of Intercompany Claims.

(b)    Treatment:  From and after the Effective Date, all Intercompany Claims, including the PIK Toggle Notes Claim, shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion.

(c)    Voting:  Class 7 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.9.    **Section 510(b) Claims (Class 8)**

(a)    Classification: For each Debtor, Class 8 consists of Section 510(b) Claims.

(b)    Treatment:  On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and holders of such claims will not receive any distribution on account of such claims.

(c)    Voting:  Class 8 is Impaired, and the holders of Section 510(b) Claims are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

21

4.10.    **Intercompany Interests (Class 9)**

(a)    Classification:  For each Debtor, Class 9 consists of Intercompany Interests.

(b)    Treatment:  From and after the Effective Date, all Intercompany Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors in their sole discretion.

(c)    Voting:  Class 9 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.11.    **Existing Holdings Preferred Equity (Class 10-A)**

(a)    Classification:  For Chinos Holdings, Class 10-A consists of Existing Holdings Preferred Equity, and such Class is vacant for all other Debtors.

(b)    Treatment:  Holders of Existing Holdings Preferred Equity shall not receive or retain any property under the Plan on account of such Existing Holdings Preferred Equity.  On the Effective Date, all Existing Holdings Preferred Equity shall be cancelled and shall be of no further force and effect, regardless of whether surrendered for cancellation.

(c)    Voting:  Class 10-A is Impaired, and the holders of Existing Holdings Preferred Equity are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Existing Holdings Preferred Equity are not entitled to vote to accept or reject the Plan, and the votes of such holders of Existing Holdings Preferred Equity will not be solicited.

4.12.    **Existing Holdings Equity (Class 10-B)**

(a)    Classification:  For Chinos Holdings, Class 10-B consists of Existing Holdings Equity, and such Class is vacant for all other Debtors.

(b)    Treatment:  Holders of Existing Holdings Equity shall not receive or retain any property under the Plan on account of such Existing Holdings Equity.  On the Effective Date, all Existing Holdings Equity shall be cancelled and shall be of no further force and effect, regardless of whether surrendered for cancellation.

(c)    Voting:  Class 10-B is Impaired, and the holders of Existing Holdings Equity are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Existing Holdings Equity are not entitled to vote to accept or reject the Plan, and the votes of such holders of Existing Holdings Equity will not be solicited.

**ARTICLE V    MEANS FOR IMPLEMENTATION.**

5.1.    **Sources of Funding for Plan Distributions**

Distributions under the Plan will be funded with (a) the Debtors' cash on hand, (b) cash proceeds from the Exit ABL Facility, (c) conversion of principal of DIP Obligations to New Term Loans pursuant to Section 2.3 of the Plan, (d) any cash proceeds from the New Term Loans, and (e) issuance of

22

New Common Equity and New Warrants.  The Confirmation Order will be deemed to authorize, among other things, the foregoing transactions.

5.2.  **General Corporate Authority**

(a)    On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the New Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, including the New Common Equity, New Equity Allocation, New Warrants, and the New Common Equity issuable upon exercise of the New Warrants, all of which shall be authorized and approved in all respects, without further action being required under applicable law, regulation, order, or rule; (v) if the Debtors expect to qualify for and elect to utilize the special bankruptcy exception under section 382(*l*)(5) of the Tax Code, the Debtors may seek Bankruptcy Court approval of certain procedures and potential restrictions on the accumulation of Claims by Entities who are or will be substantial claimholders and the charter, bylaws, and other organizational documents may restrict certain transfer of the New Common Equity, and (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the New Organizational Documents.

(b)    Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the Reorganized Debtors, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan (including the New Equity Allocation and New Warrants) in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)    All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, to the extent applicable, or any corporate or related action required by the Debtors or Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Reorganized Debtors.

5.3.  **Exit ABL Facility**

(a)    On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit ABL Facility Documents, the Reorganized Debtors (which may include an entity in the NewCo

Entity Group) will enter into the Exit ABL Facility without the need for any further corporate action and without further action by the holders of Claims or Interests.  Any proceeds of the Exit ABL Facility shall be used to (i) fund distributions, costs, and expenses contemplated by the Plan, and (ii) fund general working capital and for general corporate purposes of the Reorganized Debtors, in each case subject to the terms of the Exit ABL Facility Documents.

(b)    On the Effective Date, the Exit ABL Facility Documents shall be executed and delivered by the Reorganized Debtors.  All Liens and security interests granted pursuant to the Exit ABL Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens on and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law, (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer, and (iii) not otherwise subject to avoidance, recharacterization, or subordination under any applicable law.  Each of the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.4.    **Conversion of DIP Claims; New Term Loans**

In consideration of each Consenting Support Party (which includes any IPCo Noteholder or Term Lender that is a qualified institutional buyer or accredited institutional investor and becomes a Consenting Support Party by electing to participate in the DIP Obligations and New Term Loans in accordance with the Transaction Support Agreement) agreeing to support the transactions described in the Transaction Support Agreement to be consummated pursuant to the Plan, consenting to exchange such party's Term Loan Secured Claims and IPCo Notes Claims for the New Common Equity, and consenting to the various conditions and covenants set forth in the Transaction Support Agreement, including, among other things, the imposition of restrictions on the transfer of its Claims and Interests, each Consenting Support Party shall have the right to participate in providing the DIP Loans and the New Term Loans, and also to receive the New Equity Allocation and New Warrants.  On the Effective Date:

(a)    the principal amount of the DIP Claims will be converted to New Term Loans (the DIP Claims so converted shall be deemed to have been paid in full and be no longer outstanding);

(b)    in accordance with, and subject to, the terms and conditions of the New Term Documents, the Reorganized Debtors will borrow or be deemed to have borrowed the New Term Loans without the need for any further corporate action and without further action by the holders of Claims or Interests;

(c)    the New Term Documents shall be executed and delivered by the Reorganized Debtors.  All Liens and security interests granted pursuant to the New Term Documents shall be (i) valid, binding, perfected, and enforceable Liens on and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law, (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer, and (iii) not otherwise subject to avoidance, recharacterization, or subordination under any applicable law.  Each of the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties; and

24

(d)      the Reorganized Debtors will distribute to each Consenting Support Party the pro rata share (the numerator being the outstanding principal amount of New Term Loans held by such party on the Effective Date and the denominator being the aggregate outstanding principal amount of all New Term Loans on the Effective Date) of the New Equity Allocation and the New Warrants.

Proceeds of the New Term Loans shall be used to (i) fund distributions, costs, and expenses contemplated by the Plan, and (ii) fund general working capital and general corporate needs of the Reorganized Debtors, in each case subject to the terms of the New Term Documents.

5.5.    **Backstop Commitments**

On the Effective Date, in exchange for providing the commitments described in the Backstop Commitment Letter, the Backstop Parties will receive the Backstop Premium in accordance with the Backstop Commitment Letter.

5.6.    **Authorization and Issuance of New Common Equity and the New Warrants**

(a)      On the Effective Date, the Reorganized Debtors shall issue or cause to be issued the New Common Equity (including New Common Equity on account of the New Equity Allocation and the Backstop Premium) and the New Warrants in accordance with the terms of the Plan, the New Organizational Documents, and the Warrant Agreement, without the need for any further corporate, limited liability company, or shareholder action. All of the New Common Equity, including the New Common Equity issuable upon exercise of the New Warrants, upon payment of the exercise price in accordance with the terms of such New Warrant, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable when so issued.

(b)      On the Effective Date, (i) neither the New Common Equity nor the New Warrants shall be registered under the Securities Act, and neither the New Common Equity nor the New Warrants shall be listed for public trading on any securities exchange and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.

(c)      Except as provided in the Plan or the Confirmation Order, the New Common Equity and the New Warrants shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Equity and New Warrants will only be issued in accordance with DTC book-entry procedures if permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable. If the New Common Equity or New Warrants are issued in accordance with DTC book-entry procedures (i) one or more global certificates representing such New Common Equity or New Warrants, as applicable, shall be registered with the transfer agent or warrant agent, as applicable, as agent for the New Common Equity or New Warrants, as applicable, in the name of, and shall be deposited with, DTC or its nominee, (ii) the ownership interest of each holder of such New Common Equity or New Warrants, and transfers of ownership interests therein, shall be recorded on the records of the direct and indirect participants in DTC, and (iii) to receive distributions of New Common Equity or New Warrants, holders of applicable Allowed Claims shall be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such New Common Equity or New Warrants, as applicable, may be deposited.

5.7.    **Continued Corporate Existence**

(a)      Except as otherwise set forth in the Restructuring Transaction Steps, the Debtors shall continue to exist after the Effective Date as the Reorganized Debtors in accordance with the applicable

laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents.

(b)    On or after the Effective Date, each Reorganized Debtor may take such action that may be necessary or appropriate as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate, the Plan, including causing: (i) a Reorganized Debtor to be merged or dissolved; (ii) a Reorganized Debtor to be converted to a limited liability company or other entity; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Chapter 11 Case on the Effective Date or any time thereafter.

5.8.    **Exemption from Securities Laws**

(a)    On and as of the Effective Date, in accordance with the Transaction Support Agreement, if any party will beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) 2% or more of the New Common Equity outstanding on the Effective Date, NewCo Holdings shall enter into and deliver the Registration Rights Agreement to each such party and such agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each party thereto shall be bound thereby.

(b)    The offer, issuance, and distribution of the New Common Equity pursuant to Section 4.4 and Section 4.5 of the Plan and the Backstop Premium will be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any state or local law requiring registration for the offer, issuance, or distribution of Securities. These securities shall be freely tradable by the recipients thereof, subject to: (i) the holder not being an "underwriter" with respect to such securities, as that term is defined in subsection (b) of section 1145 the Bankruptcy Code or being directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Reorganized Debtor that issued such securities; (ii) compliance with any rules and regulations of the Securities and Exchange Commission applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions on the transferability of the New Common Equity contained in the Operating Agreement; and (iv) any applicable regulatory approval.

(c)    The offer, issuance, and distribution of the New Equity Allocation and the New Warrants to the New Term Lenders are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder. Such securities together with the New Common Equity issuable upon exercise of the New Warrants will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 or Rule 144A under the Securities Act. Additionally, the New Warrants are subject to any restrictions on the transferability of such New Warrants contained in the Warrant Agreement.

(d)    If the Reorganized Debtors elect, on or after the Effective Date, for any portion of the New Common Equity to be held through the facilities of the DTC, then DTC will be required to accept and conclusively rely on the Plan and the Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity are exempt from registration or eligible for DTC book-entry delivery, settlement, and depository services.

5.9.    **Cancellation of Existing Securities and Agreements**

(a)    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors on the Effective Date, all agreements, instruments, and other documents evidencing the ABL Facility Claims, Term Loans Claims, IPCo Notes Claims, PIK Toggle Notes Claims (if cancelled by the Reorganized Debtors pursuant to Section 4.8 of the Plan), Existing Holdings Preferred Equity, or Existing Holders Equity, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, the ABL Credit Agreement, the IPCo Indentures, the indentures for the 7.75%/8.50% Senior PIK Toggle Notes due 2022 and the Term Loan Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed ABL Facility Claims, Allowed IPCo Claims, and Allowed Term Loans Claims to receive distributions under the Plan, (ii) allow the Reorganized Debtors, the ABL Agent, the Term Agent, the Indenture Trustees, and the Distribution Agent, as applicable, to make post-Effective Date distributions or to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims (including, if applicable, the right of the IPCo Trustees to exercise their respective charging lien), (iii) except as otherwise released, enjoined, or exculpated under the Plan, preserve their respective rights and obligations of the holders of such Claims vis-à-vis other holders of such Claims pursuant to any applicable documents, (iv) allow each of the ABL Agent, the Term Agent, and the Indenture Trustees to enforce its rights, claims, and interests vis-à-vis any non-Debtor, (v) preserve the rights of the ABL Agent and the Indenture Trustees to payment of fees and expenses, including in the exercise of its charging lien from any money or property distributable to the holders of the ABL Facility Claims or IPCo Notes Claims, and any rights to priority of payment, (vi) preserve the right of each Indenture Trustee to exculpation and indemnification from the Reorganized Debtors, (vii) allow the ABL Agent, the Term Agent, and the Indenture Trustees to enforce any obligations owed to them under the Plan, (viii) permit the ABL Agent, the Term Agent, and the Indenture Trustees to perform any function necessary to effectuate the foregoing, (ix) permit the ABL Agent, the Term Agent, and the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court relating to the ABL Credit Agreement, the Indentures, or the Term Credit Agreement, as applicable, and (x) permit and require the ABL Agent, the Term Agent, and the Indenture Trustees to execute, deliver, and file any payoff or lien termination documentation requested by the Debtors in accordance with the ABL Credit Agreement, the Term Loan Agreement, or the Indentures (or any documents related thereto or otherwise delivered in connection therewith), as applicable; *provided* that nothing in this Section 5.9(b) shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.9 shall be deemed null and void and shall be of no force and effect.

5.10.    **Cancellation of Liens**

Except as otherwise specifically provided in Section 5.9(b) of the Plan, upon the satisfaction of an Other Secured Claim, ABL Facility Claim, Term Loan Secured Claim, or IPCo Claim in accordance with the Plan, any Lien on the property securing such Claim shall be deemed automatically released and discharged without further action, and all of the right, title, and interest of any holder of such Lien, including any rights to any applicable Collateral, will revert to the applicable Reorganized Debtor and

27

its successors and assigns.  The holder of such Claim shall be directed to release any Collateral or other property of the Debtors held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.  The Reorganized Debtors also shall be authorized to execute and file on behalf of the holders of such Liens any instruments that may be necessary or appropriate to implement the provisions of this Section 5.10.  The Indenture Trustees will be authorized and directed to execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' expense, any documents the Reorganized Debtors may request to evidence the cancellation of Liens and rights to Collateral securing the applicable claims.

5.11.   **Officers and Boards of Directors**

(a)      The identities of the members of the New Board and other boards of directors or managers of the Reorganized Debtors, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or before the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)      Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

5.12.   **Certain Employee, Director, and Officer Matters**

(a)      On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Benefit Plans and Employee Arrangements, other than those Executory Contracts that have been rejected by the Debtors or which are the subject of a pending rejection motion on the Confirmation Date; *provided that* notwithstanding anything to the contrary in the Employee Arrangements, the consummation of the Plan shall not be treated as a "change in control" or "change of control" or other similar transaction with respect to the Employee Arrangements.

(b)      For the avoidance of doubt, if a Benefit Plan or an Employee Arrangement is assumed, and such Benefit Plan or Employment Arrangement provides for an award or potential award of Existing Holdings Equity, such Benefit Plan or Employment Arrangement shall be assumed in all respects other than the provisions of such agreement relating to such award.

## ARTICLE VI      DISTRIBUTIONS.

6.1.   **Distributions Generally**

The Distribution Agent shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

Distributions to be made to holders of IPCo Notes Claims shall be made to the applicable IPCo Trustee, which, subject to their rights to assert their charging lien against distributions, shall transmit such distributions to holders of IPCo Notes Claims under their respective Indenture.  The IPCo Trustees may, with the consent of the Debtors and the Requisite Consenting Support Parties, establish a different record date for distributions to holders of IPCo Notes Claims and shall transfer or direct the transfer of such distributions through the facilities of DTC.  The Indenture Trustees shall be entitled to recognize and deal for all purposes under the Plan with holders of IPCo Notes Claims to the extent consistent with the customary practices of DTC, and all distributions to be made to holders of IPCo Notes Claims shall be

28

delivered to the IPCo Trustee in a form that is eligible to be distributed through the facilities of DTC. No later than five business days prior to the Effective Date, the Debtors shall provide the IPCo Trustees with written instructions by CUSIP number regarding the number of New Common Equity to be distributed to holders of IPCo Notes Claims.

6.2.    **Distribution Record Date**

As of the close of business on the Effective Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests. The Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date. In addition, with respect to payment of any Cure Obligation or disputes over any Cure Obligation, neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Obligation.

6.3.    **Date of Distributions**

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic distributions to the extent they determine it to be appropriate. If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day but shall be deemed to have been completed as of the required date. Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

6.4.    **Distribution Agent**

The Debtors and the Reorganized Debtors, as applicable, shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. All distributions under the Plan shall be made by the Distribution Agent, on behalf of the applicable Debtor (unless otherwise provided herein), or by the Reorganized Debtors if no Distribution Agents are engaged, on or after the Effective Date. The Reorganized Debtors shall use all commercially reasonable efforts to provide the Distribution Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or the Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the Distribution Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

6.5.    **Rights and Powers of Distribution Agent**

(a)    From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including holders of Claims and Interests and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Distribution Agent. No holder of a Claim or Interest or other party in interest

29

shall have or pursue any claim or Cause of Action against the Distribution Agent, solely in its capacity as Distribution Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Distribution Agent.

(b)    The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions provided for in the Plan, and (iii) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

### 6.6.    **Expenses of Distribution Agent**

If the Distribution Agent is an Entity other than the Reorganized Debtors, and except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Distribution Agent acting in such capacity (including reasonable documented attorneys' fees, expenses, and taxes) on or after the Effective Date shall be paid in cash by the Reorganized Debtors in the ordinary course of business upon presentation of invoices to the Reorganized Debtors and without the need for approval by the Bankruptcy Court.

### 6.7.    **Postpetition Interest**

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, interest shall not accrue or be paid on any Claims on or after the Petition Date, and no holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on such Claim or (b) interest at the contract default rate.

### 6.8.    **Delivery of Distributions**

Subject to the provisions contained in this Article VI, the Distribution Agent will issue or cause to be issued, and authenticate, as applicable, all distributions or payments to holders of Allowed Claims, as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; (b) the address included on any filed proofs of claim; or (c) the address in any written notice of address change delivered to the Debtors or indicated on any transfers of Claims filed with the Bankruptcy Court. If any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address, at which time all then-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent or the Reorganized Debtors to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 6.19 of the Plan.

### 6.9.    **Distributions after Effective Date**

Distributions made after the Effective Date to holders of Disputed Claims that become Allowed Claims after the Effective Date shall be deemed to have been made on the Effective Date.

### 6.10.    **Unclaimed Property**

Undeliverable or unclaimed distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable or the holder accepts distribution, and shall not accrue interest, dividends, or other accruals of any kind. No further distributions shall be made to the

applicable holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such holder within 90 days of receipt of such holder's then-current address or other necessary information.  Undeliverable or unclaimed distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the later of (a) the Effective Date and (b) the date of the initial attempted distribution.  On such date, all unclaimed property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any other Entity to such property shall be discharged and forever barred.  The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

6.11.  **Time Bar to Cash Payments**

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Distribution Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.  **Manner of Payment under Plan**

Except as otherwise specifically provided in the Plan, at the option of the Reorganized Debtors, any cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.  The wire transfer fee will be deducted from the amount of the distribution to a holder of an Allowed Claim would otherwise receive.

6.13.  **Satisfaction of Claims**

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.  **Fractional Stock and New Warrants**

If any distribution of New Common Equity or exercise of New Warrants would result in the issuance of a fractional amount of New Common Equity, then the amount of New Common Equity to be issued in respect of such distribution or exercise, as applicable, shall be calculated to one decimal place and rounded up or down to the closest whole unit (with a half unit or greater rounded up and less than a half unit rounded down).  The total number of New Common Equity shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional units that are rounded down.  DTC is considered a single holder of New Common Equity for the rounding and distribution purposes.  Neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to make a distribution that is less than one New Common Equity.

WEIL:\97578913\4\54457.0008

6.15. **Minimum Cash Distributions**

The Distribution Agent shall not be required to make any distribution on account of an Allowed Claim that is less than $50; *provided* that if no distribution is made to a holder of an Allowed Claim pursuant to this Section 6.15, the amount of such distribution shall be added to any subsequent distribution(s) to such holder on account of such Allowed Claim until the distribution such holder is entitled to is $50 or higher.

6.16. **Maximum Distributions and Rights of Reimbursement**

In no event shall an Allowed Claim receive distributions under the Plan in excess of the Allowed amount of such Claim, except to the extent postpetition interest is expressly Allowed by the Plan. Nothing contained herein shall in any way affect, impair or modify the rights of a holder of a claim against any Entity that is not a Debtor.

6.17. **Setoffs and Recoupments**

The Debtors and the Reorganized Debtors, as applicable, or such Entity's designee (including the Distribution Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor or assign of any claims, rights, or Causes of Action that a Debtor or a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

6.18. **Allocation of Distributions between Principal and Interest**

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to Allowed Claims in Classes 4, 5, 6-A, and 6-B shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.19. **Withholding and Reporting Requirements**

(a)    Withholding Rights.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-cash issuance or distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate cash necessary to pay over the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Entity, including income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

32

(b)      Forms.  Any party entitled to receive any property as an issuance or distribution under the Plan shall deliver to the withholding agent (which, if such withholding agent is not the Distribution Agent, shall subsequently deliver to the Distribution Agent) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by the Reorganized Debtors, and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the applicable Reorganized Debtor or its property.

6.20.  **Hart-Scott-Rodino Antitrust Improvements Act**

Any New Common Equity or the New Warrants to be distributed to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

**ARTICLE VII      PROCEDURES FOR DISPUTED CLAIMS.**

7.1.  **Allowance of Claims**

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim until such Claim is deemed Allowed pursuant to the Plan, the Confirmation Order, or a Final Order.  All settlements approved pursuant to Bankruptcy Rule 9019 or otherwise before the Effective Date by an order of the Bankruptcy Court shall be binding on all parties.

7.2.  **Disputed Claims Process**

(a)      If a holder of a Claim elects to file a proof of claim, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to such Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), adjudication in a forum other than the Bankruptcy Court, or by withdrawal of the Claims by the holders of such Claims.

(b)      The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims; *provided* that, consistent with section 502(a) of the Bankruptcy Code, any party in interest is permitted to object to any proof of claim that is filed with the Bankruptcy Court.  Except for the Claims that are expressly Allowed by the Plan or a Final Order, all proofs of claim filed in these Chapter 11 Cases shall be considered Disputed Claims without further action by the Debtors.

(c)      Except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses the applicable Debtor had immediately before the Effective Date, including the Causes of Action retained pursuant to the Plan.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

WEIL:\97578913\4\54457.0008

7.3.    **Objections to Claims**

Only the Reorganized Debtors shall be entitled to object to Disputed Claims after the Effective Date.  Any objections to proofs of claim shall be served and filed (a) on or before 180 days following the later of (i) the Effective Date and (ii) the date that a proof of claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors. The expiration of such period shall not limit or affect the Reorganized Debtors' rights to dispute Claims asserted other than through a proof of claim.

7.4.    **Estimation of Claims**

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. Notwithstanding any provision in the Plan to the contrary, a Claim that has been expunged but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

7.5.    **Adjustment to Claims Without Objection**

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

7.6.    **Disallowance of Certain Claims**

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that are transferees of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to the Plan, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against such holders have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.

7.7.    **Amendment to Claims**

A Claim may not be filed, amended, or supplemented after the applicable bar date established by the Bankruptcy Court without the prior written authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

7.8.    **Late Filed Claims**

Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any proof of claim filed after the deadline established by the Bankruptcy Court with respect to such Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim has been deemed timely filed by a Final Order

7.9.    **No Distributions Pending Allowance**

If an objection, motion to estimate, or other challenge to a Claim is filed, no distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.10.    **Distributions after Allowance**

To the extent that a Disputed Claim ultimately becomes, in whole or in part, an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the provisions of Article IV of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.  In the event the Bankruptcy Court issues a Final Order deeming a Claim an Allowed Claim, the Distribution Agent shall remit for distribution to the holder of such Allowed Claim, the cash or cash equivalents in an amount equal to the amount that would have been distributed to the holder of such Claim from the Effective Date through and including the date of distribution had such Claim been Allowed as of the Effective Date.

7.11.    **Claim Resolution Procedures Cumulative**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

## ARTICLE VIII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    **General Treatment**

(a)    Unless otherwise provided by an order of the Bankruptcy Court, at least 21 days before the Confirmation Hearing, the Debtors shall file or serve notices of proposed assumption and proposed Cure Obligations on counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan.  Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed, served and actually received by the Debtors no later than seven days before the Confirmation Hearing, unless otherwise extended by the Debtors. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and the proposed Cure Obligations.

(b)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Obligation, all Executory Contracts and Unexpired Leases, which have not expired or terminated by their own terms on or before the Effective Date, shall be deemed assumed by the Reorganized

35

Debtors on the Effective Date, except for any Executory Contract or Unexpired Lease that (i) is listed on the Schedule of Rejected Contracts and Leases; (ii) has been previously rejected pursuant to a Final Order of the Bankruptcy Court (including where the effective date of such rejection is scheduled for after the Effective Date); (iii) has been previously assumed or assigned; or (iv) is the subject of a motion to assume, assign, or reject pending on the Effective Date; *provided* that the Debtors shall not reject, nor seek to reject, any Executory Contract or Unexpired Lease without the prior written consent of the Requisite Consenting Support Parties (such consent not to be unreasonably withheld).

In addition to the foregoing and subject to occurrence of the Effective Date and the payment of any applicable Cure Obligation, the Executory Contracts and Unexpired Leases of Debtors Chinos Holdings, Inc., Chinos Intermediate Holdings A, Inc., Chinos Intermediate, Inc., Chinos Intermediate Holdings B, Inc., and J. Crew Group, Inc. will be assigned to Debtor J. Crew Operating Corp. or an entity in the NewCo Entity Group designated by the Debtors, unless designated otherwise on the Schedule of Assigned Contracts and Leases.

(c)     Subject to the occurrence of the Effective Date, the payment of any applicable Cure Obligations, and resolution of any Assumption Dispute in accordance with Section 8.2 of the Plan, entry of the Confirmation Order shall constitute approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumptions, assignments, or rejections, as applicable, of the Executory Contract and Unexpired Lease in accordance with Section 8.1(b) of the Plan and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under each assumed Executory Contract and Unexpired Lease. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by any order of the Bankruptcy Court authorizing and providing for its assumption or assignment. To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assigned pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by the assumption or assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the assumption or assignment contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

8.2.     **Determination of Assumption Disputes and Deemed Consent**

(a)     Any Cure Obligation due under an Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in cash on the Effective Date, subject to the limitation described below, by the applicable Reorganized Debtor, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

(b)     In the event of an Assumption Dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iii) any other matter pertaining to the assumption of an Executory Contract or Unexpired Lease, sections 365 and 1123 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided that* the Reorganized Debtors may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)     After resolution of an Assumption Dispute by Final Order of the Bankruptcy Court or by the parties, the applicable Executory Contract or Unexpired Lease shall be deemed assumed effective

as of the Effective Date; *provided that* if any Assumption Dispute is resolved unfavorably to the Reorganized Debtors, including a determination that the Claim subject to such Assumption Dispute is Allowed in an amount greater than the Cure Obligation for such Claim asserted by the Debtors or the Reorganized Debtors, the applicable Debtor may reject the applicable Executory Contract or Unexpired Lease by filing a notice indicating such rejection with the Bankruptcy Court, and any such rejection shall be effective as of the Effective Date.

(d)     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to satisfaction of the applicable Cure Obligation, shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such assumed Executory Contract or Unexpired Lease at any time before the effective date of its assumption.  Any Claim set forth in the Schedules or any proofs of claim with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

(e)     With respect to any Assumption Dispute, neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred such Executory Contract or Unexpired Lease or its Claim thereunder.

### 8.3.    **Rejection of Executory Contracts and Leases**

(a)     Unless otherwise provided by an order of the Bankruptcy Court, any proofs of claim based on the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise must be filed with Bankruptcy Court and served on the Debtors or Reorganized Debtors, as applicable, no later than 30 days after the later of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.

(b)     Claims arising from the rejection of Executory Contracts and Unexpired Leases, to the extent Allowed, shall be Other General Unsecured Claims in Class 6-B.

(c)     Each holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease for which a proof of claim was not timely filed as set forth in Section 8.3(a) above shall not be treated as a creditor with respect to such Claim, and any such Claim will be automatically Disallowed without the need for any objection or further notice to, or action, order, or approval of the Bankruptcy Court.

(d)     The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all Executory Contracts and Unexpired Leases identified on the Schedule of Rejected Contracts and Leases, to the extent not already rejected by prior orders of the Bankruptcy Court.  Any Executory Contract or Unexpired Lease that is rejected will comply with the procedures set forth in the *Order Authorizing Debtors to (I) Establish Procedures for Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith and (II) Granting Related Relief* [Docket No. 118] unless the Plan provides otherwise.

### 8.4.    **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor, will be performed by the applicable Debtor or

WEIL:\97578913\4\54457.0008

Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases will remain unaffected by entry of the Confirmation Order and the occurrence of the Effective Date.

8.5.    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

(a)    Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including any easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

(b)    Unless otherwise provided in an order entered by the Bankruptcy Court, modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.6.    **Survival of the Debtors' Indemnification Obligations**

Any obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Debtors, shall not be discharged or impaired by confirmation of the Plan. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on such obligations shall not be a Disputed Claim or subject to any objection by reason of section 502(e)(1)(B) of the Bankruptcy Code. The Debtors and the Reorganized Debtors, as applicable, shall not amend or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

8.7.    **Insurance Policies**

All insurance policies (including all directors' and officers' insurance policies, any extended discovery provisions thereunder, and tail coverage liability insurance policies), related agreements, endorsements, addenda, schedules, documents or instruments related thereto pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts under the Plan and shall be assumed by, and vest in, the applicable Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any directors' and officers' insurance policies (including any "tail policy" and extended discovery provisions of any insurance policies) for the full term of such policies regardless of whether such members, managers, directors, or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

8.8.    **Intellectual Property Licenses and Agreements**

All intellectual property contracts, licenses, royalties, or other similar agreements under which the Debtors have any rights or obligations as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts under the Plan, shall be assumed by, and vest in, the applicable Reorganized Debtors on the Effective Date, and shall continue in full force and effect unless any such

intellectual property contract, license, royalty, or other similar agreement is rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  The Reorganized Debtors may take all actions as may be necessary or appropriate to ensure the vesting of such intellectual property contracts, licenses, royalties, or other similar agreements as contemplated herein.

8.9.  **Employee Compensation and Benefits**

Except as listed in the Schedule of Rejected Contracts and Leases, all Benefit Plans and Employee Arrangements shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  The Reorganized Debtors shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Any assumption of the Benefit Plans and Employee Arrangements hereunder shall not trigger any applicable change of control, immediate vesting, termination, or similar provisions therein.  No participant shall have rights under the Benefit Plans and Employee Arrangements assumed pursuant to the Plan other than those existing immediately before such assumption.

8.10.  **Assignment**

To the extent any Executory Contract or Unexpired Lease is transferred or assigned hereunder, it shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

8.11.  **Reservation of Rights**

(a)  Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will waive, exclude, limit, dismiss or otherwise alter any of the defenses, claims, causes of action, or other rights of the Debtors or Reorganized Debtors to subsequently argue that such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective affiliates do not have any liability thereunder.

(b)  Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(c)  Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

WEIL:\97578913\4\54457.0008

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors shall have 60 days following entry of a Final Order resolving such dispute to alter the proposed treatment of such contract or lease.

## ARTICLE IX      CONDITIONS PRECEDENT

9.1.    **Conditions Precedent to Confirmation of the Plan**

The following are conditions precedent to confirmation of the Plan:

(a)      the Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)      the proposed Confirmation Order shall be consistent with the Transaction Support Agreement and otherwise in form and substance reasonably satisfactory to the Debtors, the Requisite Consenting Support Parties, the Required DIP Lenders, the DIP Agent, the Exit ABL Agent, and the Exit Term Agent; *provided that* the Debtors will also consult in good faith with the ABL Agent regarding the form and substance of the Confirmation Order; and

(c)      the Backstop Commitment Letter and the Transaction Support Agreement shall not have been terminated by the parties thereto and shall be in full force and effect and binding on all parties thereto.

9.2.    **Conditions Precedent to Effective Date**

The occurrence of the Effective Date will be subject to the following conditions precedent, among others; *provided that* any condition can be waived with the prior written consent of the Debtors and the Requisite Consenting Support Parties:

(a)      the Transaction Support Agreement shall not have been terminated by the parties thereto and remains in full force and effect and binding on the parties thereto;

(b)      the Bankruptcy Court shall have entered the Confirmation Order consistent with the Transaction Support Agreement and the Confirmation Order shall not have been stayed;

(c)      the Definitive Documents shall be consistent with the Transaction Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Transaction Support Agreement;

(d)      all actions, documents, and agreements necessary to implement and consummate the Plan shall have been performed or executed, as applicable;

(e)      the Bankruptcy Court shall have entered the Final DIP Order, the DIP Loan Documents shall be in full force and effect in accordance with their terms, the DIP Termination Date (as defined in the DIP Orders) shall not have occurred, no Event of Default (as defined in the DIP Loan Documents) shall have occurred or be continuing, and the obligations outstanding under the DIP Credit Agreement shall not have been accelerated in accordance with the terms thereof;

(f)      all documentation related to the Exit ABL Facility shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived;

40

(g)     all documentation related to the New Term Credit Agreement shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived; *provided* that the DIP Lenders shall be deemed to have executed and delivered the New Term Credit Agreement in accordance with the terms of the DIP Credit Agreement;

(h)     all conditions precedent to the issuance of the New Common Equity, other than the occurrence of the Effective Date, shall have occurred;

(i)     the New Equity Allocation and New Warrants shall have been issued to the Consenting Support Parties in accordance with the Transaction Support Agreement;

(j)     the organizational documents for NewCo Holdings will be adopted on terms consistent with the Transaction Support Agreement and otherwise in form and substance reasonably satisfactory to the Debtors and the Requisite Consenting Support Parties;

(k)     the Backstop Commitment Letter shall not have been terminated and remains in full force and effect;

(l)     the Professional Fee Escrow Account shall have been established and funded as provided herein;

(m)     all fees and expenses owed pursuant to the Transaction Support Agreement or the DIP Order, including all Ad Hoc Committee Fees, to the extent unpaid and invoiced at least two business days before the Effective Date, shall have been paid by the Debtors or the Reorganized Debtors;

(n)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Transaction Support Agreement shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

(o)     all other actions, documents, and agreements necessary to implement and effectuate the Plan shall have been performed or executed, as applicable.

9.3.   **Satisfaction or Waiver of Conditions Precedent**

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.  No leave or order of the Bankruptcy Court shall be required for the waiver by the Debtors, with the prior written consent of the Requisite Consenting Support Parties, of any condition precedent set forth in Section 9.1 of the Plan, except the condition precedent set forth in Section 9.1(a), in accordance with the terms thereof.

(b)     The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(h), and 7062.

9.4.   **Effect of Failure of a Condition**

If the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired

WEIL:\97578913\4\54457.0008

Leases effected under the Plan, and document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claim or Interest or any claims or Causes of Action by the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute any admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Support Parties, or any other Entity.

## ARTICLE X      EFFECT OF CONFIRMATION OF PLAN.

### 10.1.    Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors' Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may take any action, including, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under the Bankruptcy Code, except as expressly provided herein.

### 10.2.    Binding Effect

As of the Effective Date, the Plan shall bind (a) all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, (b) each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, (c) all parties to the Transaction Support Agreement, and (d) all holders of Claims and Interests and their respective successors and assigns, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan, (ii) deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, or (iv) voted to reject the Plan.

### 10.3.    Compromise and Settlement of Claims, Interests, and Controversies

(a)      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

(b)      The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed nonseverable from one another and from all other provisions of the Plan.

### 10.4.    Discharge of Claims and Termination of Interests

Upon the Effective Date, in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on

WEIL:\97578913\4\54457.0008

behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date.  Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including (unless otherwise specifically provided herein) any interest accrued on Claims from and after the Petition Date, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim or interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is Allowed; or (c) the holder of such Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination, subject to the Effective Date occurring, of the discharge of all Claims and Interests except as otherwise expressly provided in the Plan.  Upon the Effective Date, all holders of Interests and Claims of any nature whatsoever shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or terminated Interest against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a proof of claim and whether or not the facts or legal bases therefor were known or existed before the Effective Date.

### 10.5.   **Term of Injunctions or Stays**

Unless otherwise provided herein, in the Confirmation Order, or in another Final Order of the Bankruptcy Court, all injunctions or stays arising or issued under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.6.   **Injunction**

(a)   **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)   **Except as expressly provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or agreed to by the Debtors and a holder of a Claim or Interest, all Entities who have held, hold, or may hold Claims or Interests (whether or not proof of such claims or interests has been filed and whether or not such Entities voted for or against the Plan or abstained from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to the Claims, Interests, and Causes of Action that are extinguished, discharged, or released pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or**

WEIL:\97578913\4\54457.0008

indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated by the Plan, and (v) acting in any manner that does not conform to or comply with the provisions of the Plan or the Confirmation Order.

(c)     By accepting distributions under the Plan, each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this Section 10.6.

(d)     The injunctions in this Section 10.6 shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

10.7.    **Releases**

(a)    **Releases by Debtors**

As of the Effective Date, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Entity seeking to exercise the rights of the foregoing, including any successors to the Debtors or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, the Reorganized Debtors, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the formation, operation, and conduct of the Debtors' businesses, the Chapter 11 Cases, the acquisition, purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors (including the New Equity Allocation and the New Warrants), the subject matter of, or the transactions or events giving rise to, any Claim or Interest, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases (including the restructuring of the IPCo Notes Claims notwithstanding the separate nature of the IPCo Indentures or the IPCo Intercreditor Agreement), the DIP Order, the Disclosure Statement, the Transaction Support Agreement, the New Term Loan, the Backstop Commitment, the Backstop Commitment Letter, the Plan, the Plan Supplement and other related agreements, instruments, and documents related to the foregoing (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes on the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Claims and Causes of Action under chapter 5 of the Bankruptcy Code or any other Avoidance Actions under the Bankruptcy Code or applicable federal or state law, including any preference or fraudulent transfer Claims or Causes of Action; *provided that* nothing in this release shall be construed to release any post-Effective Date obligations of any Entity under the Plan, the Transaction Support Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

44

(b)      <u>Consensual Releases by Holders of Claims and Interests</u>

As of the Effective Date, for good and valuable consideration, on and after the **Effective Date, each of the Released Parties shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by:**

> i.  the other Released Parties;
>
> ii.  the holders of Impaired Claims who voted to accept the Plan;
>
> iii.  the holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not opt-out of these releases on their ballots;
>
> iv.  the holders of Unimpaired Claims and Interests in Classes 1, 2, 3, 7, and 9 that are presumed to accept the Plan but do not timely opt-out of the releases by completing a written opt-out form; and
>
> v.  the holders of Impaired Claims and Interests in Classes 8, 10-A, and 10-B, that are deemed to reject the Plan but do not timely opt-out of the releases by completing a written opt-out form;

**and with respect to any Entity in the foregoing clauses (i) through (iv), (a) such Entity's predecessors, successors, and assigns, and (b) all Entities entitled to assert Claims through or on behalf of such Entities with respect to the matters to which these releases apply, in each case, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their Estates, the formation, operation, and conduct of the Debtors' businesses, the Chapter 11 Cases, the acquisition, purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors (including the New Equity Allocation and New Warrants), the subject matter of, or the transactions or events giving rise to, any Claim or Interest, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring (including the restructuring of the IPCo Notes Claims notwithstanding the separate nature of the IPCo Indentures or the IPCo Intercreditor Agreement), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the DIP Order, the Disclosure Statement, the Transaction Support Agreement, the New Term Loan, the Backstop Commitment, the Backstop Commitment Letter, the Plan, the Plan Supplement, and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes on the Plan, or any other act or omission, in all cases based upon any transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Claims and Causes of Action under chapter 5 of the Bankruptcy Code or any other Avoidance Actions under the Bankruptcy Code or applicable federal or state law, including any preference or fraudulent transfer Claims or Causes of Action;** *provided* **that nothing in this release shall be construed to release any post-Effective Date obligations of any Entity under the Plan, the Transaction Support Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

(c)      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the compromises memorialized in the releases set**

45

forth herein, and shall constitute the Bankruptcy Court's finding that the releases set forth in the Plan are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims released; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; and (g) given and made after due notice and opportunity for hearing.

10.8.  **Exculpation**

**Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the formulation, preparation, and pursuit of the Disclosure Statement, the Transaction Support Agreement, the transactions relating to the Debtors' restructuring, the Plan (including the Plan Supplement), the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan, the Definitive Documents, or any related agreements, instruments, or other documents, the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date, the occurrence of the Effective Date, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined to constitute gross negligence, willful misconduct, or intentional fraud as determined by a Final Order by a court of competent jurisdiction.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.**

10.9.  **Retention of Causes of Action/Reservation of Rights**

Except as otherwise provided in Section 10.7(a) of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against any parties other than the Released Parties.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any claims or Causes of Action against any of the Released Parties released pursuant to the Plan (except that such claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation procedures).

10.10.  **Ad Hoc Committee and Indenture Trustee Fees**

On the Effective Date, the Debtors shall pay all Ad Hoc Committee Fees and Indenture Trustee Fees in cash to the extent not already paid by the Debtors subject to receipt by the Debtors of an invoice from any Entity entitled to Ad Hoc Committee Fees or Indenture Trustee Fees and in accordance with the applicable engagement letter, the applicable governing documents, or as otherwise agreed between the Debtors and such Entity.  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay all Ad Hoc Committee Fees and Indenture Trustee Fees in cash, to the extent not

already paid by the Debtors, in each case, within ten business days of receipt by the Debtors or the Reorganized Debtors, as applicable, of an invoice from any Entity entitled to Ad Hoc Committee Fees or Indenture Trustee Fees for any unpaid fees in accordance with the applicable engagement letter, the applicable governing documents, or as otherwise agreed between the Debtors or Reorganized Debtors, as applicable, and such Entity.

## ARTICLE XI    RETENTION OF JURISDICTION.

### 11.1.    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising under, or arising in, or relating to these Chapter 11 Cases to the fullest extent legally permissible by 28 U.S.C. § 1334 to hear, and by 28 U.S.C. § 157 to determine, all proceedings in respect thereof, including, without limitation, for the following purposes:

(a)    to hear and determine matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, and contested matter pending on or commenced after the Confirmation Date, including any proceeding with respect to a Cause of Action;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    to resolve disputes concerning Disputed Claims and consider the allowance, classification, priority, compromise, estimation, secured or unsecured status, amount, or payment of any Claim, including any Administrative Expense Claims, including any dispute over the application to any Claim of any limitation on its allowance set forth in sections 502 or 503 of the Bankruptcy Code or asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code;

(e)    to enter, implement, or enforce such orders as may be appropriate if the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, and any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order;

(h)    to hear and determine all Professional Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing, including, without limitation, the Transaction Support Agreement and the Backstop

Commitment Letter; *provided*, for the avoidance of doubt, that any dispute arising after the Effective Date under or with respect to the Exit Facility Documents, the New Organizational Documents, or any other documents entered into by the Reorganized Debtors shall be adjudicated in accordance with the terms of such documents;

(j)        to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)        to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)        to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)        to enforce all orders previously entered by the Bankruptcy Court;

(o)        to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code, including in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing;

(p)        to enter a final decree closing the Chapter 11 Cases;

(q)        to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)        to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(s)        to hear any other matter not inconsistent with the Bankruptcy Code.

### 11.2.    **Courts of Competent Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### ARTICLE XII        MISCELLANEOUS PROVISIONS.

### 12.1.    **Substantial Consummation of the Plan**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

WEIL:\97578913\4\54457.0008

12.2.  **Expedited Determination of Taxes**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

12.3.  **Dissolution of Committees**

On the Effective Date, the Creditors' Committee and any other official committees appointed in these Chapter 11 Cases will dissolve; *provided* that, after the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Professional Fee Claims or applications filed by the committee, and any relief related thereto, for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeal to which the committee is a party.  Upon the dissolution of the Creditors' Committee, the Creditors' Committee, its members, and the Committee's Professionals will cease to have any duty, obligation, or role arising from or related to these Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to these Chapter 11 Cases.

12.4.  **Exemption from Certain Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities or instruments hereunder, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of Collateral under the Exit Facility Documents, (e) any assumption, assignment, or sale of interests in Unexpired Leases or Executory Contracts pursuant to section 365 of the Bankruptcy Code and (f) the issuance, renewal, modification, or securing of indebtedness in furtherance of, or in connection with, the Plan, including the Confirmation Order, and in each case whether by the Debtors or the Reorganized Debtors, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Entity in which any such instrument is to be recorded shall be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.5.  **Modifications and Amendments**

(a)  Subject to the terms of the Transaction Support Agreement, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify or supplement the Plan before the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without

additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b)    Subject to the Transaction Support Agreement, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests hereunder, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and that any such technical adjustment or modification is consistent with the Transaction Support Agreement.

(c)    Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of votes thereon are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 12.6.    <u>Revocation or Withdrawal of Plan</u>

Subject to the terms of the Transaction Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Effective Date as to any or all of the Debtors.  If, subject to any consent required under the Transaction Support Agreement, the Plan has been revoked or withdrawn with respect to any Debtor before the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting an amount of any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or Interest in, such Debtor (ii) constitute a waiver or release of any claim of any other Entity, (iii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort with respect to such Debtors by any other Debtor, any Consenting Support Party, or any other Entity.

### 12.7.    <u>Severability of Plan Provisions</u>

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors with the consent of the Requisite Consenting Support Parties, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

WEIL:\97578913\4\54457.0008

12.8. **Governing Law**

Except if the Bankruptcy Code or other U.S. federal law is applicable, or if an exhibit or schedule hereto, or a document in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws there of; *provided* that corporate or entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of incorporation or organization of the Debtors or the Reorganized Debtors.

12.9. **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10. **Dates of Actions to Implement the Plan**

If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding business day, but shall be deemed to have been completed as of the required date.

12.11. **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.12. **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of such Entity.

12.13. **Entire Agreement**

Except as provided in the Transaction Support Agreement, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.14. **Exhibits to Plan**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

WEIL:\97578913\4\54457.0008

12.15.  **Notices**

        To be effective, all notices, requests, and demands to or upon the Debtors, the Creditors' Committee, the Ad Hoc Committee, or other notice parties shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      (a)      if to the Debtors or the Reorganized Debtors:

          225 Liberty Street, 17th Floor
          New York, NY 10281
          Attn: Maria DiLorenzo

               -and-

          Weil, Gotshal & Manges LLP
          767 Fifth Avenue
          New York, New York 10153
          Attn:   Ray C. Schrock, P.C. (ray.schrock@weil.com)
                  Ryan Preston Dahl, Esq. (ryan.dahl@weil.com)
                  Candace M. Arthur, Esq. (candace.arthur@weil.com)
                  Daniel Gwen, Esq. (daniel.gwen@weil.com)

               -and-

          Hunton Andrews Kurth LLP
          Riverfront Plaza, East Tower
          951 East Byrd Street
          Richmond, Virginia 23219
          Attn:   Tyler P. Brown, Esq. (tpbrown@HuntonAK.com)
                  Henry P. (Toby) Long, III, Esq. (hlong@HuntonAK.com)
                  Nathan Kramer, Esq. (nkramer@HuntonAK.com)

      (b)      if to the Creditors' Committee:

          Pachulski Stang Ziehl & Jones LLP
          780 Third Avenue, 34th Floor
          New York, New York 10017
           Attn:   Bradford J. Sandler, Esq. (bsandler@pszjlaw.com)
                  Robert J. Feinstein, Esq. (rfeinstein@pszjlaw.com)
                  Shirley S. Cho, Esq. (scho@pszjlaw.com)
                  Debra Grassgreen, Esq. (dgrassgreen@pszjlaw.com)

          -and-

          Hirschler Fleischer, P.C.
          The Edgeworth Building
          2100 East Cary Street
          Richmond, Virginia 23223
          P.O. Box 500

Attn:   Robert S. Westermann (rwestermann@hf-law.com)

(c)   If to the Ad Hoc Committee:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne, Esq. (ddunne@milbank.com)
        Samuel A. Khalil, Esq. (skhalil@milbank.com)
        Matthew L. Brod, Esq. (mbrod@milbank.com)

-and-

Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Attn:   Lynn L. Tavenner, Esq. (LTavenner@Tb-Lawfirm.com)
        Paula S. Beran, Esq. (pberan@Tb-Lawfirm.com)

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send notice to all parties in interest that to continue to receive documents pursuant to Bankruptcy Rule 2002, such parties must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

WEIL:\97578913\4\54457.0008

Dated:    August 9, 2020

Respectfully submitted,

**Chinos Holdings, Inc. and Its Debtor Affiliates**

By:   */s/ Michael Nicholson*
      Name: Michael Nicholson
      Title:   Authorized Signatory

**<u>Exhibit B</u>**

**Financial Projections**

## Financial Projections

In connection with the Disclosure Statement,[1] the Debtors' management team ("Management") prepared financial projections (the "Financial Projections") for Chinos Holdings Inc. and its debtor affiliates (collectively, the "Debtors") for the remainder of fiscal year 2020 ending January 30, 2021 through fiscal years 2024 ending February 1, 2025 (the "Projection Period"). The Financial Projections were prepared by Management with the assistance of the Debtors' advisors and are based upon a number of assumptions made by Management with respect to the future performance of the Debtors' operations. **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

## Principal Assumptions for the Financial Projections

The Financial Projections are based upon, and assume the successful implementation of, the Debtors' long range business plan for the Projection Period (the "LRP"). Both the LRP and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period may materially vary from the projected results. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations. *See* "Risk Factors" in Art. X of the Disclosure Statement.

---

[1]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Disclosure Statement to which this is an exhibit.

In deciding whether to vote to accept or reject the Plan, holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.  *See* "Risk Factors" in Art. X of the Disclosure Statement.

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations", the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon the occurrence of the Effective Date.  Fresh start accounting requires all assets, liabilities, and equity instruments to be fair valued. The Financial Projections account for the reorganization and related transactions pursuant to the Plan.  While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which effect could be material. Accordingly, the current balance sheet projections include high level illustrative adjustments to be representative of fresh start accounting, but not intended to replace the full implementation of fresh start accounting, which effect could be material.

## Safe Harbor under The Private Securities Litigation Reform Act of 1995

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act.  Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, LRP, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

## Select Risk Factors Related to the Financial Projections

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control.  Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements.  A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article X of the Disclosure Statement.

## Financial Projection General Assumptions

## Basis of Presentation (Non-GAAP)

- The Financial Projections assume that the Debtor' stores are open by August 2020 and remain open throughout the period, which may be subject to material change in light of COVID-19 and the economic circumstances.  In general, the Debtors' financial performance since the Petition Date through June 15, 2020 has met or exceeded expectations under the LRP for the same period.  As set forth in the Disclosure Statement, there can be no assurance that the

2

Debtors' financial performance will meet or exceed any particular levels, especially in light of COVID-19.

- The financial projections by brand include allocations for corporate overhead, including costs related to finance, information technology, human resources, corporate occupancy, legal, production and sourcing, supply chain, store and ecommerce operations, executive leadership, loss prevention, real estate and construction. Costs are allocated using a systematic and rational allocation methods, most commonly using percent of revenues or percent of employee headcount. While the financial projections include these allocations, the projections are not intended to reflect the results of operations or cash flows of each brand as if the brands were independent standalone companies.

- Non-GAAP profits and losses excludes certain expenses including income tax expense, interest expense, depreciation and amortization, transaction expenses, impairment losses, one time items, sponsor/management fees, and stock-based compensation.

   Balance sheet projections include high level illustrative adjustments for fresh start accounting; projections are non-GAAP and not created in accordance with American Institute of Certified Public Accountants Statement of Position 90-7.

- The Projections include certain assumptions regarding the Debtors' lease footprint and related lease obligations, which may materially change as a result of discussions and negotiations with lease counterparties.

- The Projections assume a capital structure contemplated by the Plan consisting of (a) a $400 million Exit ABL Facility of which $291.0 million is assumed to be outstanding as of the assumed Effective Date which includes $64.8 million of letters of credit and (b) $400 million of New Term Loans.  Intercompany payables to J. Crew Domestic Brand, LLC for intellectual property royalties would be assumed to cease on the Effective Date.

**Non-GAAP P&L**

- Total Revenue
  - Includes net sales of merchandise through stores, wholesale customers, and websites.
  - Net sales are net of returns, shipping and handling fees, discounts and concessions, cancellations, and loyalty rewards from gross sales.
  - Sales are recognized in stores at the point of sale, at date of receipt by a customer for e-commerce, and upon transfer of ownership to wholesale customers.
- Cost of Goods Sold
  - Primarily includes the direct cost of purchased merchandise, freight including customs and duties, design, and all shipping costs associated with the e-commerce business, as well as costs associated with buying, production, and occupancy costs related to store operations such as rent and utilities.
- SG&A
  - Includes all operating expenses not included in cost of goods sold, primarily administrative payroll, store expenses other than occupancy costs, corporate overhead, depreciation and amortization, certain warehousing expenses and credit card fees.

**Non-GAAP Cash Flows**

- The Debtors have not included a cash flow projection for fiscal year 2020 given the number of one-time restructuring-related charges that would not be representative of a normalized cash flow during the Projection Period
- Change in Working capital
  - Driven by ordinary course changes in accounts receivable, accounts payable, inventory, prepaid assets and other current assets, other current liabilities, and accrued compensation.
- Interest Expense
  - Interest expense for post-emergence period is based on pro forma $400 million New Term Loans with an interest rate of LIBOR plus 100 basis points payable in cash and 900 basis points in PIK or "paid in kind" interest, switching to LIBOR plus 800 basis points payable in cash after September 11, 2021, with quarterly amortization payments of $1 million, an Exit ABL Facility of $400 million with an interest rate of LIBOR plus 125 basis points.
- Cash Taxes
  - Cash taxes based upon analyses conducted by the Debtors' tax advisors in conjunction with the Plan.
- Capital Expenditures
  - Primarily reflects warehouse facility upgrades, corporate IT, real estate, store remodeling and improvements, and other investments.

**Non-GAAP Balance Sheet**

- Cash and Cash Equivalents
  - Includes cash, credit card receivables, and cash held in international balance accounts.
- Accounts Receivable, Net
  - Includes amounts due from wholesale customers, net of allowance for doubtful accounts.
- Inventory
  - Inventory consists primarily of purchased finished goods and merchandise and is valued at the lower of average cost or net realizable value. The Debtors capitalize certain design, purchasing and warehousing costs in inventory and these costs are included in cost of goods sold as the inventories are sold.
  - Inventory also includes in-transit inventories which have yet to be received in the Debtors' warehouses.
- Prepaid and Other Current Assets
  - Consists of various prepaid expenses relating to occupancy, selling, maintenance, insurance, monitoring fees, and other expenses that have not yet been fully amortized.
  - Other current assets consist of miscellaneous receivables such as uncollected landlord contributions, corporate receivables, cost of anticipated inventory returns, hosting implementation costs, net vendor debit balances, and list rental receivables.
- Taxes Receivable
  - Projections assume balance consists of net federal income tax refund not expected to be received prior to Q4 2020 and expects to receive an additional $13 million in regard to the U.S. stimulus tax refund in Q2 2020.
- Property, Plant & Equipment, Net

4

- Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation and amortization of property and equipment is computed on a straight-line basis over the estimated useful lives of the related assets, which is twenty (20) years for buildings and improvements, three (3) to ten (10) years for furniture, fixtures and equipment, and the shorter of their useful lives or related lease terms for leasehold improvements. Certain costs (included in fixtures and equipment) related to the acquisition and development of software are capitalized and amortizes these costs using the straight-line method over the estimated useful life of the software, which is three (3) to five (5) years.

- Right-of-Use Asset
  - Reflects the Debtors' right to use leased space over the life of a lease. The asset is calculated as the initial amount of lease liability minus any lease incentives received.

- Intangible Assets, Net
  - Intangible assets include the J.Crew and Madewell trade names, loyalty program, customer lists, and favorable lease commitments. Indefinite-lived intangibles are not subject to amortization. Definite-lived intangibles are amortized on a straight-line basis over their useful life or remaining lease term.

- Goodwill
  - Includes illustrative fresh start accounting adjustment at emergence. Goodwill is held constant over the projection period for illustrative purposes.

- Accounts Payable
  - Includes obligations related primarily to inventory.

- Other Current Liabilities
  - Consist of reserve for sales returns, accrued operating expenses, customer liabilities, accrued freight expenses, and other accrued expenses.

- Deferred Tax Liabilities
  - Are recognized based on the difference between the financial statement carrying amount of existing assets and liabilities and their respective tax bases.

- Right-of-Use Lease Liability
  - Right-of-use Lease Liability represents the present value of lease obligations with terms of more than one year.

| 1. Consolidated Non-GAAP P&L | Projection | Projection | Projection | Projection | Projection |
|---|---|---|---|---|---|
| ($ in Millions) | FY20 | FY21 | FY22 | FY23 | FY24 |
| **Total Revenue** | **1,754.9** | **2,275.6** | **2,357.3** | **2,408.0** | **2,496.3** |
| YoY Growth (%) | (30.9%) | 29.7% | 3.6% | 2.2% | 3.7% |
| | | | | | |
| Cost of Goods Sold | (1,227.6) | (1,362.5) | (1,392.1) | (1,420.0) | (1,462.8) |
| **Gross Margin** | **527.3** | **913.0** | **965.1** | **988.0** | **1,033.5** |
| Gross Margin (%) | 30.0% | 40.1% | 40.9% | 41.0% | 41.4% |
| | | | | | |
| SG&A | (705.0) | (774.8) | (796.9) | (814.1) | (836.0) |
| **Operating Income** | **(177.7)** | **138.2** | **168.2** | **173.9** | **197.5** |
| Operating Margin (%) | (10.1%) | 6.1% | 7.1% | 7.2% | 7.9% |
| | | | | | |
| Adjustments[2] | 52.7 | 0.2 | 0.2 | 0.2 | 0.2 |
| D&A | 72.3 | 69.9 | 70.4 | 70.1 | 70.5 |
| **Adj. EBITDA** | **(52.7)** | **208.2** | **238.8** | **244.2** | **268.2** |
| Adj. Ebitda Margin (%) | (3.0%) | 9.2% | 10.1% | 10.1% | 10.7% |

| 2. Consolidated Non-GAAP Cash Flow Metrics | Projection | Projection | Projection | Projection |
|---|---|---|---|---|
| ($ in Millions) | FY21 | FY22 | FY23 | FY24 |
| Adjusted EBITDA | 208.2 | 238.8 | 244.2 | 268.2 |
| Cash Interest and Amortization | (19.3) | (42.7) | (42.3) | (42.0) |
| Cash Taxes[3] | (34.1) | (96.6) | (47.5) | (54.7) |
| Change in Working Capital | 48.4 | 18.0 | (1.7) | (3.0) |
| **Operating Cash Flow** | **203.3** | **117.6** | **152.6** | **168.5** |
| Capital Expenditures | (23.1) | (35.0) | (34.4) | (36.8) |
| **Total Cash Flow** | **180.1** | **82.5** | **118.2** | **131.7** |

2. Add-backs include share-based comp, amortization of lease commitments, and one time items

3. Consolidated cash flows includes levered cash tax forecast

| 3. Non-GAAP Balance Sheet<br>($ in Millions) | Pro Forma<br>September '20 | Projection<br>FY21 | Projection<br>FY22 | Projection<br>FY23 | Projection<br>FY24 |
|---|---|---|---|---|---|
| Cash and Cash Equivalents | 25.0 | 192.8 | 275.3 | 393.5 | 525.2 |
| Accounts Receivable | 55.7 | 24.7 | 25.5 | 26.3 | 27.1 |
| Merchandise Inventories | 468.5 | 363.4 | 376.0 | 383.7 | 398.1 |
| Prepaid Exp. & Other Crnt Assets | 59.3 | 54.8 | 56.1 | 56.9 | 58.4 |
| Refundable Income Taxes | 7.0 | - | - | - | - |
| **Total Current Assets** | **615.4** | **635.7** | **732.9** | **860.5** | **1,008.8** |
| | | | | | |
| Property, Plant & Equipment | 190.9 | 134.7 | 103.6 | 72.2 | 42.7 |
| Right of Use Asset | 431.0 | 415.5 | 441.8 | 507.6 | 600.2 |
| Intangible Assets, Net | 293.1 | 287.8 | 283.6 | 279.4 | 275.1 |
| Goodwill | 1,062.2 | 1,062.2 | 1,062.2 | 1,062.2 | 1,062.2 |
| Other Assets | 45.6 | 58.2 | 127.3 | 145.3 | 164.8 |
| **Total Assets** | **2,638.3** | **2,594.1** | **2,751.3** | **2,927.1** | **3,153.9** |
| | | | | | |
| **Liabilities** | | | | | |
| Accounts Payable | 68.9 | 47.5 | 74.0 | 79.6 | 87.2 |
| Other Current Liabilities | 224.3 | 118.2 | 123.2 | 124.3 | 129.2 |
| Borrowing Under ABL | 226.2 | - | - | - | - |
| ST ROU Lease Liability | 108.7 | 89.1 | 69.8 | 50.4 | 37.1 |
| Accrued Compensation | 2.0 | 25.6 | 26.6 | 27.7 | 28.8 |
| **Total Current Liabilities** | **630.2** | **280.4** | **293.6** | **281.9** | **282.3** |
| | | | | | |
| LT Debt | 400.0 | 432.1 | 428.1 | 424.1 | 420.1 |
| ROU Lease Liability | 432.8 | 424.0 | 459.3 | 534.4 | 636.2 |
| Other Liabilities | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 |
| **Total Liabilities** | **1,489.5** | **1,163.0** | **1,207.5** | **1,266.9** | **1,365.2** |
| **Stockholders' Equity** | **1,148.8** | **1,431.1** | **1,543.7** | **1,660.1** | **1,788.7** |
| **Total Liabilities and SE** | **2,638.3** | **2,594.1** | **2,751.3** | **2,927.1** | **3,153.9** |

| 1a. J.Crew & Factory Non-GAAP P&L ($ in Millions) | Projection FY20 | Projection FY21 | Projection FY22 | Projection FY23 | Projection FY24 |
|---|---|---|---|---|---|
| **Total Revenue** | **1,215.7** | **1,504.9** | **1,518.1** | **1,495.6** | **1,502.8** |
| Cost of Goods Sold | (884.7) | (944.3) | (948.6) | (940.2) | (942.8) |
| **Gross Margin** | **331.0** | **560.6** | **569.5** | **555.4** | **560.1** |
| SG&A | (467.3) | (508.2) | (512.9) | (509.8) | (514.3) |
| **Operating Income** | **(136.3)** | **52.4** | **56.6** | **45.6** | **45.8** |
| Adjustments | 25.5 | 0.1 | 0.1 | 0.1 | 0.1 |
| D&A | 45.3 | 44.4 | 44.1 | 42.9 | 42.3 |
| **Adj. EBITDA** | **(65.5)** | **96.9** | **100.8** | **88.6** | **88.3** |

| 2a. J.Crew & Factory Non-GAAP Cash Flow Metrics ($ in Millions) | Projection FY21 | Projection FY22 | Projection FY23 | Projection FY24 |
|---|---|---|---|---|
| Adjusted EBITDA | 96.9 | 100.8 | 88.6 | 88.3 |
| Unlevered Cash Taxes[4] | (18.8) | (96.4) | (14.7) | (15.3) |
| Change in Working Capital | 41.5 | 16.6 | 3.0 | 2.2 |
| **Operating Cash Flow** | **119.6** | **21.0** | **77.0** | **75.1** |
| Capital Expenditures | (17.0) | (18.4) | (19.8) | (21.3) |
| **Total Cash Flow** | **102.6** | **2.6** | **57.1** | **53.8** |

| 1b. Madewell Non-GAAP P&L ($ in Millions) | Projection FY20 | Projection FY21 | Projection FY22 | Projection FY23 | Projection FY24 |
|---|---|---|---|---|---|
| **Total Revenue** | **539.2** | **770.7** | **839.2** | **912.4** | **993.5** |
| Cost of Goods Sold | (343.0) | (418.3) | (443.5) | (479.9) | (520.0) |
| **Gross Margin** | **196.3** | **352.4** | **395.6** | **432.5** | **473.4** |
| SG&A | (227.9) | (266.3) | (283.7) | (303.9) | (321.4) |
| **Operating Income** | **(31.6)** | **86.2** | **112.0** | **128.6** | **152.1** |
| Adjustments | 21.9 | 4.2 | 4.2 | 4.2 | 4.2 |
| D&A | 22.5 | 21.0 | 21.9 | 22.8 | 23.7 |
| **Adj. EBITDA** | **12.8** | **111.4** | **138.1** | **155.6** | **180.0** |

| 2b. Madewell Non-GAAP Cash Flow Metrics ($ in Millions) | Projection FY21 | Projection FY22 | Projection FY23 | Projection FY24 |
|---|---|---|---|---|
| Adjusted EBITDA | 111.4 | 138.1 | 155.6 | 180.0 |
| Unlevered Cash Taxes[4] | (26.4) | (32.3) | (36.8) | (43.0) |
| Change in Working Capital | 6.9 | 1.4 | (4.7) | (5.2) |
| **Operating Cash Flow** | **91.8** | **107.1** | **114.1** | **131.8** |
| Capital Expenditures | (6.1) | (16.7) | (14.6) | (15.5) |
| **Total Cash Flow** | **85.7** | **90.5** | **99.5** | **116.3** |

4. Brand cash flows includes unlevered cash tax forecast

## Exhibit C

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR CHINO HOLDINGS, INC., ET AL.

### I. Overview

This Liquidation Analysis[1] has been prepared assuming that the Debtors hypothetically commence a liquidation under chapter 7 of the Bankruptcy Code as of September 12, 2020 (the "**Conversion Date**"), a day after the outside date under the Transaction Support Agreement for effectiveness of the Plan.  Except as otherwise noted herein, the asset values reflected in this Liquidation Analysis are based upon the Debtors' unaudited books and records as of May 2, 2020, and those values are assumed to be representative of the Debtors' assets as of the Conversion Date.[2] The claim values reflected in this Liquidation Analysis are estimated as at the Conversion Date. It is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") on the Liquidation Date to oversee the liquidation of the Debtors' Estates, during which time substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the Cash proceeds, net of liquidation-related costs, would then be distributed in accordance with applicable law.  In addition, it is assumed that all of the non-Debtor affiliates would undertake parallel liquidations, whereby the proceeds of such liquidations are, in turn, distributed in accordance with the priority of claims and ownership on an entity-by-entity basis.  The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered case, but each Debtor is treated as an independent legal entity without substantive consolidation.

Debtors that are not specifically presented in the Liquidation Analysis do not have any material assets for purposes of identifying distributable proceeds in a chapter 7 with respect to those entities, but those entities are also subject to material liabilities including obligations outstanding under the DIP Facility, namely: Chinos Holdings, Inc.; Chinos Intermediate Holdings A, Inc.; Chinos Intermediate, Inc.; J. Crew Group, Inc.; J. Crew International, Inc.; J. Crew Virginia, Inc.; J. Crew Brand Holdings, LLC; J. Crew Brand Intermediate, LLC; J. Crew Brand, LLC; J. Crew Brand Corp.; and J. Crew International Brand, LLC.  Such entities are not specifically presented herein but, instead, are presumed to be administratively insolvent in a hypothetical chapter 7 proceeding.

This Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. Although the Debtors consider the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. The impact of the COVID-19 (coronavirus) global health emergency has increased uncertainty with the temporary closure of stores and the negative impact on global economic output, product demand, foreign sourcing and operations generally.  Accordingly, there can be no assurance that the results set forth in this Liquidation Analysis would be realized if the Debtors were actually liquidated pursuant to chapter 7 of the Bankruptcy Code, and actual results in such a proceeding could vary materially from those presented in this Liquidation Analysis, and distributions available to holders of Claims and Interests could differ materially from the projected recoveries set forth in this Liquidation Analysis.

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, to which this Liquidation Analysis is attached as an exhibit.

[2]   Cash and cash equivalents and the intellectual property value of the J. Crew and Madewell trademarks are estimated as at the Conversion Date.  The value of land and buildings is based on a third-party appraisal the Debtors received in April 2019.

1

ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

### I.  Global Assumptions and Basis of Presentation

The actual amount and priority of Allowed Claims against the Debtors' Estates may differ from the claim amounts used in this Liquidation Analysis.

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

### a)  Chapter 7 Process

On the Conversion Date, it is assumed that the Trustee would liquidate the Estates, during which time all of the Debtors' assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code.  Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The liquidation of the Debtors' estates is assumed to be completed over a six month period, in which the Trustee would first conduct sales of the Debtors' inventory,[3] followed by the sale of other assets.  For both the J. Crew and Madewell businesses, it is assumed the Trustee would conduct simultaneous going-out-of-business sales of the inventory at their remaining retail locations and online sales.  The Trustee would discontinue online sales after week six, at which time, the remaining inventory for both businesses would be transferred to the Debtors' respective retail stores for sale.  The going-out-of-business sales for the J. Crew and Madewell inventory is projected to last for 19 weeks and 15 weeks, respectively.[4]  The sale of furniture, fixtures, and equipment of the Debtors' retail stores, along with all intellectual property and other assets would occur during months four through six.

Throughout this period, the Trustee would also incur administrative expenses, such payroll, certain overhead, and professional expenses reasonably required to complete the wind-down of the Estates.

---

[3]  For purposes of this Liquidation Analysis, it is assumed that the Debtors would have access to the necessary intellectual property related to the J. Crew and Madewell brands during the inventory sale period following which the intellectual property assets would be liquidated as described herein.

[4]  The Liquidation Analysis assumes that all remaining stores will be operational by the Conversion Date.

WEIL:\97510270\7\54457.0007

### b) Non-Debtor Affiliates

The Liquidation Analysis assumes all of the non-Debtor affiliates would undertake parallel liquidations, whereby the proceeds of such liquidations are, in turn, distributed in accordance with the priority of Claims asserted against such entities on an entity-by-entity basis. Specifically, the Liquidation Analysis assumes that any recoveries from the non-Debtor affiliates are used (i) *first* to satisfy the wind-down or sale costs arising from the monetization of those assets; and (ii) *second* to satisfy indebtedness outstanding with respect to those interests or claims against those entities. The material assumptions (e.g. liquidation costs and asset recovery percentages) of the non-Debtors' hypothetical liquidation analysis are substantially consistent with the assumptions underlying the liquidation of the Debtors.

### c) Additional Claims

The cessation of business in a liquidation is likely to cause additional Claims to be asserted against the Debtors and the non-Debtor affiliates that otherwise would not exist absent such a liquidation. Examples of these kinds of Claims include employee-related Claims, such as severance or similar Claims, tax liabilities, Claims related to the rejection of Executory Contracts and Unexpired Leases, including real property leases and customer contracts, among others. These additional Claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code. No adjustment has been made for these potential Claims in this Liquidation Analysis.

### d) Avoidance Actions and Litigation

No recovery or related litigation costs attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are included in the Liquidation Analysis. In addition, the Liquidation Analysis does not consider any additional recovery or claims that may arise from the outcome of current or potential actions by or against the Debtors. The Debtors believe that recoveries from such actions or litigation, if any, would be speculative in nature and are therefore not presented here.[5]

## II.   Conclusion

The Debtors have determined that confirmation of the Plan will provide holders of Claims and Interests with a recovery that is not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtors' Estates under chapter 7 of the Bankruptcy Code.

## III.    Notes to the Liquidation Analysis

## A.    Gross Proceeds

## 1.  Cash and Cash Equivalents

The Debtors' estimated balance of cash and cash equivalents as of the Conversion Date is approximately $90.3 million. This includes $56.8 million assumed to be held in the segregated domestic DIP Funding Account, providing primary security for the DIP Claims. The balance of domestic cash of $33.5 million is

---

[5]    *See, e.g.*, *Response of the Review Committee of J.Crew Operating Corp. to Motion of Debtors for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 414].

estimated to be held in the Debtors' concentration accounts, subject to priority claims of the ABL Lenders. In liquidation, the estimated recovery on the balance of cash is estimated at 100%.

**2.   Accounts Receivable**

The Debtors' estimated accounts receivables balance as of the Conversion Date is approximately $34.5 million. This includes:

- A projected credit card receivables balance of $12.2 million with an estimated recovery of 90% to 100%.  These accounts consist of ordinary course credit card receivables and private label credit card deferred billing receivables, net of applicable fees and estimated chargebacks.

- $22.3 million of wholesale and corporate receivables with an estimated recovery of 70% to 80% in liquidation. Corporate receivables are primarily comprised of duty refunds and postage rebates, most, if not all, of which the Debtors anticipate recovering.

For the purposes of the Liquidation Analysis, the Debtors assume an aggregate recovery range of $26.6 million to $30.1 million.

**3.   Inventory**

The Debtors' estimated inventory book balance as of the Conversion Date is $397.1 million. This amount is net of certain reserves and ineligibles such as shrink and overstock.

A 91% to 99% recovery has been estimated for the J. Crew inventory (including factory and wholesale) of $297.6 million, and a recovery of 62% to 70% has been estimated for J. Crew merchandise in transit of $8.8 million.

A 124% to 130% recovery has been estimated for the Madewell inventory of $88.1 million, and a recovery of 95% to 100% has been estimated for Madewell merchandise in transit of $2.6 million.

The estimated recoveries reflect the net orderly liquidation values ("**NOLV**"), based on a third party appraisal the Debtors received in February 2020.

The NOLV is presented net of selling costs such as liquidator fees, store payroll, occupancy and advertising.

**4.   Prepaid Expenses and Other Current Assets**

The Debtors' estimated book balance of prepaid expenses and other current assets as of the Conversion Date is approximately $47.1 million. The balance includes prepayments for maintenance, insurance premiums, information technology, supplies and marketing-related services paid in advance as well as store related deposits. The Debtors estimate a recovery of prepaid expenses and deposits between 10% and 15% in aggregate, based on a review of actual balances at May 2, 2020.

For the purposes of the Liquidation Analysis, the Debtors assume an aggregate recovery range of $4.7 million to $7.1 million.

**5.   Property and Equipment**

Property, plant, and equipment ("**PP&E**") primarily consists of the Debtors' owned real property in Lynchburg and Ashville as well as furniture, leasehold improvements, and equipment at the Debtors' retail

WEIL:\97510270\7\54457.0007

stores and corporate headquarters facility. The Debtors' estimated PP&E book value as of the Conversion Date is approximately $211.8 million.

In liquidation, the land and buildings are assumed to be sold at between $12.1 million and $18.1 million. This is based on applying an assumed recovery of 50% to 75% to an appraisal value of $24.1 million as of April 2019, to account for the accelerated timeline and uncertainty of a liquidation sales process.

The store furniture, fixtures and computer equipment are assumed to achieve recoveries of $3.4 million to $6.9 million, representing 5% to 10% of net book value. No recovery is assumed for leasehold improvements or other PP&E.

In aggregate, the Debtors assume a 7% to 12% recovery for PP&E.

## 6.   Intangible Assets

Intangible assets primarily consist of (a) the Licensed Marks,[6] (b) the Madewell trade names and trademarks, and (c) goodwill and other intangibles.

Proceeds of the Licensed Marks are (a) *first* used to satisfy the DIP Claims, which has a first priority lien on all collateral securing the IPCo Notes and IPCo Indentures and (b) *secondly* used to pay off the obligations under the IPCo Notes and IPCo Indentures, which are guaranteed by substantially all of the assets of the IPCo Issuers and IPCo Guarantors and secured by the Licensed Marks.

In liquidation, the Debtors estimate the Licensed Marks will be liquidated at a value of approximately $113.0 million to $146.0 million.[7]

In liquidation, the Debtors estimate the Madewell trade names and intellectual property will be liquidated at a value of approximately $47.0 million to $61.0 million.

No liquidation value has been ascribed to goodwill or other intangible assets on the balance sheet, including the value of any intellectual property owned by J.Crew International, Inc. with respect to the use by certain parties outside the United States.  The Debtors believe the value of such non-U.S. intellectual property is *de minimis* relative to the secured claims asserted against J. Crew International, Inc.

## 7.   Proceeds from Non-Debtor Affiliates

The Debtors' collection from intercompany balances depends on, among other things, the available proceeds from Debtor and non-Debtor liquidations and the characterization or recharacterization of such balances under applicable law. In addition, many of the non-Debtor affiliates are domiciled in foreign countries which may make it challenging to distribute proceeds to domestic Debtor entities or other foreign non-Debtor affiliates. The ultimate treatment of such balances in a chapter 7 liquidation cannot be guaranteed with any certainty.

---

[6]   J. Crew Domestic Brand, LLC owns 100% of an undivided ownership interest in the domestic J. Crew brand intellectual property (the "**Licensed Marks**"). Pursuant to two license agreements, Domestic Brand, as the licensor, provides exclusive, non-transferrable, sublicensable, royalty-bearing licenses with respect to 100% of the Licensed Marks to J. Crew International Brand, LLC, as licensee.

[7]   The range of values for the Licensed Marks and for the Madewell trade names and intellectual property are derived from third-party analysis of relevant distressed company transactions.  It is noted that the disposition of intellectual property and trademarks in a distressed scenario is subject to significant uncertainty and could result in materially less proceeds for stakeholders.

WEIL:\97510270\7\54457.0007

Intercompany equity interests are valued based on net liquidation proceeds on an entity-by-entity basis.

For the purposes of this Liquidation Analysis the Debtors assume no material recoveries from the non-Debtor affiliates through either intercompany debt balances or equity investments.

## B.    Liquidation Costs

### 8.    Chapter 7 Wind Down Costs

Wind down costs are assumed to consist primarily of the ordinary course general and administrative costs that will be required to operate the Debtors' businesses during a six month wind down period after the Conversion Date. Expenses are mainly comprised of corporate salaries and wages, information technology costs, and facility costs, not considered in the liquidation of inventory, as discussed in Note [3] regarding NOLV.

Wind down costs include an estimate for severance assuming that all terminated full-time salaried corporate employees receive payments of, on average, two-months' salary. However, the severance period and corresponding costs could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to holders of Claims and Interests.

Gift cards are assumed to be accepted during the first 30 days of the going-out-of-business sales, after the Conversion Date.

Wind down costs associated with the Madewell brand are assumed to be allocated to Madewell Inc. with the remaining wind down costs split pro rata between the other Debtor entities based on projected hypothetical recovery amounts.

### 9.    Chapter 7 Trustee Fees

Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the case by the Trustee to parties in interest.  This analysis assumes total fees amount to 2% to 3% of liquidation proceeds realized, excluding cash.

### 10. Other Chapter 7 Trustee Fees

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets and winding down operations, will be entitled to payment in full before any distribution to administrative claims and other priority claims.  The Liquidation Analysis assumes that the fees for legal, financial and other Trustee professionals is assumed to be 3% of the total liquidation proceeds realized, excluding cash.

## C.    Claims

### 11. Certain Administrative Expense Claims (Carve-Out)

The DIP Order provides that certain fees and expenses of professionals retained in the Debtors' chapter 11 cases, fees payable to the United States Trustee for Region 4 pursuant to title 28 of the United States Code, fees payable to members of the Creditors' Committee, and a certain amount of Trustee's fees pursuant to

section 726(b) of the Bankruptcy Code, in each case subject to the terms of the DIP Order, are senior to the Debtors' secured indebtedness, including the ABL Facility Claims, the DIP Claims, the Term Loan Claims, and the IPCo Notes Claims.

The Liquidation Analysis assumes this Carve-Out amount totals approximately $8.0 million composed of: (a) $1.7 million of accrued but unpaid Professional Fee Claims that were not yet previously funded as of the Conversion Date in accordance with the DIP Order, (b) approximately $250,000 of fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under title 28 of the United States Code plus interest at the statutory rate, (c) $50,000 of fees and expenses incurred by the Trustee under section 726(b) of the Bankruptcy Code, and (d) $6 million of Professional Fee Claims incurred after the Carve-Out Trigger Notice as contemplated by the DIP Order.

## 12. ABL Facility Claims

The ABL Facility Claims include estimated balances outstanding on the ABL Facility and letters of credit[8] as of the Conversion Date including accrued interest for a total aggregate amount of approximately $375.5 million.

Proceeds from the Current Asset Collateral (as defined in the ABL Credit Agreement) of $449.7 million to $482.6 million in aggregate constitute priority collateral for the ABL Facility Claims. After estimated liquidation costs of $61.4 million to $56.6 million and a pro rata allocation of the Carve-Out detailed above, the net proceeds of such collateral are assumed to be $382.3 million to $420.1 million in aggregate. Any residual proceeds from disposition of such collateral is assumed to be applied in accordance with the DIP Order.

The Liquidation Analysis concludes that ABL Facility Claims will receive payment in full in a chapter 7 scenario.

## 13. DIP Claims and Diminution in Value

The DIP Claims of $255.9 million include estimated borrowings under the DIP Facility as of the Conversion Date, including interest and any related fees outstanding.[9] The DIP Claim does not include payment of the Backstop Premium for consummating an alternative transaction, which totals $12 million. There can be no assurance that such fee will not be due and payable by the Debtors in the event of a chapter 7 liquidation.

In accordance with the DIP Order, the liens securing the DIP Claims with respect to the DIP Collateral (as defined in the DIP Order) are senior in priority to liens securing the Term Loan Claims and IPCo Notes Claims (including any adequate protection claims in favor of the Term Lenders and IPCo Noteholders).

Pursuant to the DIP Order, the Prepetition Term Secured Parties and Prepetition IPCo Secured Parties (each as defined in the DIP Order) are entitled to adequate protection for the diminution in value, if any, of their respective interests in their collateral as of the Petition Date. In the event of a chapter 7 liquidation, diminution in their secured parties' collateral may be material and substantially reduce recoveries for junior stakeholders on a dollar-for-dollar basis. Because the Liquidation Analysis concludes that no recoveries

---

[8]    It is assumed that all letters of credit will be exercised by holders on the Debtors' chapter 11 cases being converted to chapter 7.

[9]    The Liquidation Analysis assumes that the $145.0 million of Additional New Term Loans (as defined in the DIP Order) will remain undrawn.

are otherwise available for administrative claims, the Liquidation Analysis does not specifically present the impact of adequate protection claims on junior stakeholder recoveries.

The Liquidation Analysis concludes DIP Claims will receive approximately 85% to 100% in a chapter 7 liquidation.  It is assumed that DIP collateral is marshalled to utilize proceeds from the Licensed Marks last, so that remaining proceeds are made available as recoveries towards the IPCo Notes Claims.  Even if DIP collateral were marshalled in favor of Term Loan Claims, the change would not result in holders of Term Loan Claims receiving more under a chapter 7 liquidation than under the Plan.

### 14. IPCo Notes Claims

The IPCo Notes Claims are assumed to be approximately $411.7 million, composed of (a) $347.6 million of principal as of the Petition Date, (b) approximately $6.1 million of accrued and unpaid interest as of the Petition Date, and (c) a "make-whole" premium of approximately $58 million as of the Petition Date.

The Liquidation Analysis anticipates no recovery for the IPCo Notes in the low scenario, and recoveries of approximately 13% in a high scenario.

### 15. Term Loan Claims

The Term Loan Claims are assumed to be approximately $1,342.1 million of principal and interest as of the Petition Date.

The Liquidation Analysis concludes that there will be no recoveries on account of Term Loan Claims in a chapter 7 liquidation.

### 16. Other Secured Claims

The Debtors do not believe that there will be any material Other Secured Claims as of the Conversion Date. The Liquidation Analysis assumes that such claims will receive the value of their collateral, but that there will be no other recoveries on account of the Other Secured Claims in a chapter 7 liquidation.

### 17. Other Administrative Expense Claims

Administrative Expense Claims arising in a hypothetical chapter 7 liquidation include the costs of administering the chapter 7 estates, and claims arising during the Debtors' chapter 11 cases before conversion into a chapter 7 such as (a) claims arising pursuant to section 503(b)(9) of the Bankruptcy Code; (b) postpetition trade payables; (c) accrued postpetition employee obligations; (d) accrued taxes; (e) accrued utility payments; (f) postpetition intercompany payables; and (h) other liabilities incurred by the Estates in the ordinary course of business.

The Debtors estimate that amounts payable incurred on a postpetition basis, but not paid as of the Conversion Date, will exceed $129 million in the aggregate among all Debtors.

The Liquidation Analysis concludes that there will be no recoveries on account of Administrative Expense Claims in a chapter 7 liquidation.

### 18. Priority Non-Tax Claims

The Liquidation Analysis assumes that Priority Non-Tax Claims outstanding as of the Conversion Date totals approximately $250,000.

WEIL:\97510270\7\54457.0007

The Liquidation Analysis concludes that there will be no recoveries on account of Priority Non-Tax Claims in a chapter 7 liquidation.

## 19. General Unsecured Claims

General Unsecured Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) prepetition trade claims; (b) prepetition lease rejection damages claims; and (c) numerous other types of prepetition liabilities.

The Liquidation Analysis does not include the Term Loan Deficiency Claim, any prepetition intercompany payables, or rejection claims for other executory contracts that the Debtors are a party to as of the Conversion Date, each of which may be significant.  In addition, the Liquidation Analysis does not include claims that are unliquidated or speculative, including litigation claims asserted against the Debtors.

The Liquidation Analysis concludes that there will be no recoveries on account of General Unsecured Claims in a chapter 7 liquidation.

## 20. Section 510(b) Claims

This Liquidation Analysis concludes that there will be no recoveries on account of Section 510(b) Claims in a chapter 7 liquidation.

## 21. Intercompany Claims and Interests

This Liquidation Analysis concludes that there will be no recoveries on account of Intercompany Claims or Intercompany Interests in a chapter 7 liquidation.

## 22. Existing Holdings Preferred and Common Equity

The Liquidation Analysis concludes that there will be no recoveries on account of Existing Holdings Preferred Equity or Existing Holdings Equity in a chapter 7 liquidation.

9

**Chinos Holdings, Inc**
Hypothetical Liquidation Analysis by Entity - Summary

($ in millions)

| | Notes | Consolidated Book Value / Claim | Low Recovery | | | | | | | | High Recovery | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Madewell Inc. | J. Crew Inc. | J. Crew Operating Corp. | Grace Holmes, Inc. | H.F.D. No. 55, Inc. | J. Crew Domestic Brand, LLC | Chinos Intermediate Holdings A, Inc. | Consolidated | Madewell Inc. | J. Crew Inc. | J. Crew Operating Corp. | Grace Holmes, Inc. | H.F.D. No. 55, Inc. | J. Crew Domestic Brand, LLC | Chinos Intermediate Holdings A, Inc. | Consolidated |
| **Gross Proceeds** | | | | | | | | | | | | | | | | | | |
| ABL Collateral | | 465.1 | 124.2 | 143.0 | 36.1 | 91.5 | 54.8 | - | - | 449.7 | 130.7 | 156.1 | 36.5 | 99.6 | 59.6 | - | - | 482.6 |
| DIP Funding Acct | | 56.8 | - | - | - | - | - | - | 56.8 | 56.8 | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | 411.2 | 47.7 | 6.5 | 5.9 | 6.9 | 0.1 | - | - | 67.2 | 62.3 | 10.0 | 10.0 | 10.5 | 0.2 | - | - | 93.0 |
| Licensed Marks | | 250.2 | - | - | - | - | - | 113.0 | - | 113.0 | - | - | - | - | - | 146.0 | - | 146.0 |
| | | $1,183.3 | $172.0 | $149.5 | $42.1 | $98.4 | $54.9 | $113.0 | $56.8 | $686.7 | $192.9 | $166.1 | $46.5 | $110.2 | $59.9 | $146.0 | $56.8 | $778.5 |
| **Liquidation costs** | | | | | | | | | | | | | | | | | | |
| Wind Down Costs | B8 | | 13.6 | 12.2 | 3.4 | 8.0 | 4.5 | 9.2 | - | 51.1 | 13.6 | 11.8 | 3.3 | 7.8 | 4.2 | 10.3 | - | 51.1 |
| Chapter 7 Trustee Fees | B9 | | 5.2 | 4.5 | 0.3 | 3.0 | 1.6 | 3.4 | - | 17.9 | 3.9 | 3.3 | 0.3 | 2.2 | 1.2 | 2.9 | - | 13.8 |
| Other Professional Fees | B10 | | 5.2 | 4.5 | 0.3 | 3.0 | 1.6 | 3.4 | - | 17.9 | 5.8 | 5.0 | 0.4 | 3.3 | 1.8 | 4.4 | - | 20.6 |
| | | | $23.9 | $21.2 | $4.0 | $13.9 | $7.8 | $16.0 | - | $86.8 | $23.3 | $20.1 | $3.9 | $13.3 | $7.2 | $17.6 | - | $85.5 |
| **Net Recovery** | | | | | | | | | | | | | | | | | | |
| ABL Collateral | | | 106.9 | 122.8 | 33.0 | 78.5 | 47.0 | - | - | 388.2 | 114.9 | 137.3 | 33.8 | 87.6 | 52.4 | - | - | 426.0 |
| DIP Funding Acct | | | - | - | - | - | - | - | 56.8 | 56.8 | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | | 41.1 | 5.6 | 5.1 | 5.9 | 0.1 | - | - | 57.8 | 54.8 | 8.8 | 8.8 | 9.2 | 0.2 | - | - | 81.8 |
| Licensed Marks | | | - | - | - | - | - | 97.0 | - | 97.0 | - | - | - | - | - | 128.4 | - | 128.4 |
| | | | $148.0 | $128.3 | $38.1 | $84.5 | $47.1 | $97.0 | $56.8 | $599.9 | $169.7 | $146.0 | $42.6 | $96.9 | $52.6 | $128.4 | $56.8 | $693.0 |
| **Claims** | | | | | | | | | | | | | | | | | | |
| Certain Administrative Expense Claims (Carve-Out) | C11 | 8.0 | (2.0) | (1.7) | (0.5) | (1.1) | (0.6) | (1.3) | (0.8) | (8.0) | (2.0) | (1.7) | (0.5) | (1.1) | (0.6) | (1.5) | (0.7) | (8.0) |
| **Net ABL Priority Collateral Liquidation Proceeds** | | | $105.0 | $121.1 | $32.5 | $77.4 | $46.4 | - | - | $382.3 | $112.9 | $135.6 | $33.3 | $86.5 | $51.8 | - | - | $420.1 |
| Less: ABL Credit Facility Claims (including LCs) | C12 | 375.5 | (103.1) | (118.9) | (31.9) | (76.0) | (45.6) | - | - | (375.5) | (101.0) | (121.2) | (29.8) | (77.3) | (46.3) | - | - | (375.5) |
| *Percentage Recovery* | | | | | | | | | | 100% | | | | | | | | 100% |
| Remaining amount available for distribution | | | 1.9 | 2.1 | 0.6 | 1.4 | 0.8 | - | - | 6.8 | 12.0 | 14.4 | 3.5 | 9.2 | 5.5 | - | - | 44.6 |
| **Net Amount Available for Distribution to the DIP Loans** | | | $42.9 | $7.7 | $5.7 | $7.3 | $0.9 | $95.7 | $56.1 | $216.3 | $66.7 | $23.2 | $12.3 | $18.4 | $5.7 | $126.9 | $56.2 | $309.4 |
| Less: DIP Loans Claims | C13 | 255.9 | (42.9) | (7.7) | (5.7) | (7.3) | (0.9) | (95.7) | (56.1) | (255.9) | (66.7) | (23.2) | (12.3) | (18.4) | (5.7) | (73.3) | (56.2) | (255.9) |
| *Percentage Recovery* | | | | | | | | | | 85% | | | | | | | | 100% |
| Remaining amount available for distribution | | | - | - | - | - | - | - | - | - | - | - | - | - | - | 53.5 | - | 53.5 |
| **Remaining IPCo Notes Collateral Available for Distribution** | | | - | - | - | - | - | - | - | - | - | - | - | - | - | $53.5 | - | $53.5 |
| Less: IPCo Notes Claims | C14 | 411.7 | | | | | | | | - | | | | | | (53.5) | | (53.5) |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 13% |
| Remaining Amount Available for Distribution | | | | | | | | | | - | | | | | | - | | - |
| **Remaining Term Loan Collateral Available for Distribution** | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Prepetition Term Loan Claim | C15 | 1,342.1 | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Remaining Amount Available for Distribution | | | | | | | | | | - | | | | | | | | - |
| Less: Other Secured Claims | C16 | - | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: Administrative Claims | C17 | 129.4 | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: Priority Non-Tax Claims | C18 | 0.3 | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: General Unsecured Claims | C19 | 324.3 | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: Section 510(b) Claims | C20 | N/A | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: Prepetition Intercompany Claims | C21 | N/A | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |
| Less: Preferred and Common Equity | C22 | N/A | | | | | | | | - | | | | | | | | - |
| *Percentage Recovery* | | | | | | | | | | 0% | | | | | | | | 0% |

10

**Chinos Holdings, Inc**

Hypothetical Liquidation Analysis by Entity - Low Scenario     **Hypothetical Recovery**

*($ in millions)*

| | Notes | Book Value | Low | High | Madewell Inc. | J. Crew Inc. | J. Crew Operating Corp. | Grace Holmes, Inc. | H.F.D. No. 55, Inc. | J. Crew Domestic Brand, LLC | Chinos Intermediate Holdings A, Inc. | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | A1 | $90.3 | 100% | 100% | - | - | $33.5 | - | - | - | $56.8 | $90.3 |
| Accounts Receivable | A2 | 34.5 | 77% | 87% | 12.2 | 11.1 | 2.7 | 0.7 | 0.0 | - | - | 26.6 |
| Inventory, Net | A3 | 397.1 | 98% | 106% | 112.1 | 132.0 | - | 90.8 | 54.8 | - | - | 389.6 |
| Prepaid Expenses & Other Current Assets | A4 | 47.1 | 10% | 15% | 0.3 | 0.0 | 3.7 | 0.6 | 0.0 | - | - | 4.7 |
| Property and Equipment, Net | A5 | 211.8 | 7% | 12% | 0.4 | 6.5 | 2.2 | 6.3 | 0.1 | - | - | 15.5 |
| Intangible Assets and Goodwill, Net | A6 | 402.5 | 40% | 51% | 47.0 | - | - | - | - | 113.0 | - | 160.0 |
| Intercompany Receivables from Non-Debtors | A7 | N/A | | | - | - | - | - | - | - | - | - |
| Equity Interest in Non-Debtors | | N/A | | | - | - | - | - | - | - | - | - |
| | | $1,183.3 | | | $172.0 | $149.5 | $42.1 | $98.4 | $54.9 | $113.0 | $56.8 | $686.7 |
| **Gross Proceeds** | | | | | | | | | | | | |
| ABL Collateral | | 465.1 | | | 124.2 | 143.0 | 36.1 | 91.5 | 54.8 | - | - | 449.7 |
| DIP Funding Acct | | 56.8 | | | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | 411.2 | | | 47.7 | 6.5 | 5.9 | 6.9 | 0.1 | - | - | 67.2 |
| Licensed Marks | | 250.2 | | | - | - | - | - | - | 113.0 | - | 113.0 |
| | | $1,183.3 | | | $172.0 | $149.5 | $42.1 | $98.4 | $54.9 | $113.0 | $56.8 | $686.7 |
| **Liquidation costs** | | | | | | | | | | | | |
| Wind Down Costs | B8 | | | | 13.6 | 12.2 | 3.4 | 8.0 | 4.5 | 9.2 | - | 51.1 |
| Chapter 7 Trustee Fees | B9 | | | | 5.2 | 4.5 | 0.3 | 3.0 | 1.6 | 3.4 | - | 17.9 |
| Other Professional Fees | B10 | | | | 5.2 | 4.5 | 0.3 | 3.0 | 1.6 | 3.4 | - | 17.9 |
| | | | | | $23.9 | $21.2 | $4.0 | $13.9 | $7.8 | $16.0 | - | $86.8 |
| **Net Recovery** | | | | | | | | | | | | |
| ABL Collateral | | | | | 106.9 | 122.8 | 33.0 | 78.5 | 47.0 | - | - | 388.2 |
| DIP Funding Acct | | | | | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | | | | 41.1 | 5.6 | 5.1 | 5.9 | 0.1 | - | - | 57.8 |
| Licensed Marks | | | | | - | - | - | - | - | 97.0 | - | 97.0 |
| | | | | | $148.0 | $128.3 | $38.1 | $84.5 | $47.1 | $97.0 | $56.8 | $599.9 |
| **Claims** | | **Claims** | | | | | | | | | | |
| Certain Administrative Expense Claims (Carve-Out) | C11 | 8.0 | | | (2.0) | (1.7) | (0.5) | (1.1) | (0.6) | (1.3) | (0.8) | (8.0) |
| **Net Collateral after Carve Out** | | | | | | | | | | | | |
| ABL Collateral | | | | | 105.0 | 121.1 | 32.5 | 77.4 | 46.4 | - | - | 382.3 |
| DIP Funding Acct | | | | | - | - | - | - | - | - | 56.1 | 56.1 |
| Other DIP Loan Collateral | | | | | 41.1 | 5.6 | 5.1 | 5.9 | 0.1 | - | - | 57.8 |
| Licensed Marks | | | | | - | - | - | - | - | 95.7 | - | 95.7 |
| | | | | | $146.0 | $126.6 | $37.6 | $83.3 | $46.5 | $95.7 | $56.1 | $591.8 |
| **Net ABL Priority Collateral Available for Distribution** | | | | | **$105.0** | **$121.1** | **$32.5** | **$77.4** | **$46.4** | **-** | **-** | **$382.3** |
| Less: ABL Credit Facility Claims (including LCs) | C12 | 375.5 | | | (103.1) | (118.9) | (31.9) | (76.0) | (45.6) | - | - | (375.5) |
| Remaining amount available for distribution | | | | | 1.9 | 2.1 | 0.6 | 1.4 | 0.8 | - | - | 6.8 |
| **Net Amount Available for Distribution to the DIP Loans** | | | | | **$42.9** | **$7.7** | **$5.7** | **$7.3** | **$0.9** | **$95.7** | **$56.1** | **$216.3** |
| Less: DIP Loans Claims | C13 | 255.9 | | | (42.9) | (7.7) | (5.7) | (7.3) | (0.9) | (95.7) | (56.1) | (255.9) |
| Remaining amount available for distribution | | | | | - | - | - | - | - | - | - | - |
| **Remaining IPCo Notes Collateral Available for Distribution** | | | | | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Less: IPCo Notes Claims | C14 | 411.7 | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| **Remaining Term Loan Collateral Available for Distribution** | | | | | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Less: Prepetition Term Loan Claim | C15 | 1,342.1 | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Other Secured Claims | C16 | - | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Administrative Claims | C17 | 129.4 | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Priority Non-Tax Claims | C18 | 0.3 | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: General Unsecured Claims | C19 | 324.3 | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Section 510(b) Claims | C20 | N/A | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Prepetition Intercompany Claims | C21 | N/A | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Preferred and Common Equity | C22 | N/A | | | | | | | | | | |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |

11

**Chinos Holdings, Inc**
Hypothetical Liquidation Analysis by Entity - High Scenario    **Hypothetical Recovery**
($ in millions)

| | Notes | Book Value | Low | High | Madewell Inc. | J. Crew Inc. | J. Crew Operating Corp. | Grace Holmes, Inc. | H.F.D. No. 55, Inc. | J. Crew Domestic Brand, LLC | Chinos Intermediate Holdings A, Inc. | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | A1 | $90.3 | 100% | 100% | - | - | $33.5 | - | - | - | $56.8 | $90.3 |
| Accounts Receivable | A2 | 34.5 | 77% | 87% | 13.8 | 12.4 | 3.1 | 0.8 | 0.0 | - | - | 30.1 |
| Inventory, Net | A3 | 397.1 | 98% | 106% | 116.9 | 143.7 | - | 98.9 | 59.6 | - | - | 419.0 |
| Prepaid Expenses & Other Current Assets | A4 | 47.1 | 10% | 15% | 0.5 | 0.0 | 5.6 | 0.9 | 0.0 | - | - | 7.1 |
| Property and Equipment, Net | A5 | 211.8 | 7% | 12% | 0.7 | 10.0 | 4.4 | 9.6 | 0.2 | - | - | 25.0 |
| Intangible Assets and Goodwill, Net | A6 | 402.5 | 40% | 51% | 61.0 | - | - | - | - | 146.0 | - | 207.0 |
| Intercompany Receivables from Non-Debtors | A7 | N/A | | | - | - | - | - | - | - | - | - |
| Equity Interest in Non-Debtors | | N/A | | | - | - | - | - | - | - | - | - |
| | | $1,183.3 | | | $192.9 | $166.1 | $46.5 | $110.2 | $59.9 | $146.0 | $56.8 | $778.5 |
| **Gross Proceeds** | | | | | | | | | | | | |
| ABL Collateral | | 465.1 | | | 130.7 | 156.1 | 36.5 | 99.6 | 59.6 | - | - | 482.6 |
| DIP Funding Acct | | 56.8 | | | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | 411.2 | | | 62.3 | 10.0 | 10.0 | 10.5 | 0.2 | - | - | 93.0 |
| Licensed Marks | | 250.2 | | | - | - | - | - | - | 146.0 | - | 146.0 |
| | | $1,183.3 | | | $192.9 | $166.1 | $46.5 | $110.2 | $59.9 | $146.0 | $56.8 | $778.5 |
| **Liquidation costs** | | | | | | | | | | | | |
| Wind Down Costs | B8 | | | | 13.6 | 11.8 | 3.3 | 7.8 | 4.2 | 10.3 | - | 51.1 |
| Chapter 7 Trustee Fees | B9 | | | | 3.9 | 3.3 | 0.3 | 2.2 | 1.2 | 2.9 | - | 13.8 |
| Other Professional Fees | B10 | | | | 5.8 | 5.0 | 0.4 | 3.3 | 1.8 | 4.4 | - | 20.6 |
| | | | | | $23.3 | $20.1 | $3.9 | $13.3 | $7.2 | $17.6 | - | $85.5 |
| **Net Recovery** | | | | | | | | | | | | |
| ABL Collateral | | | | | 114.9 | 137.3 | 33.8 | 87.6 | 52.4 | - | - | 426.0 |
| DIP Funding Acct | | | | | - | - | - | - | - | - | 56.8 | 56.8 |
| Other DIP Loan Collateral | | | | | 54.8 | 8.8 | 8.8 | 9.2 | 0.2 | - | - | 81.8 |
| Licensed Marks | | | | | - | - | - | - | - | 128.4 | - | 128.4 |
| | | | | | $169.7 | $146.0 | $42.6 | $96.9 | $52.6 | $128.4 | $56.8 | $693.0 |
| **Claims** | | **Claims** | | | | | | | | | | |
| Certain Administrative Expense Claims (Carve-Out) | C11 | 8.0 | | | (2.0) | (1.7) | (0.5) | (1.1) | (0.6) | (1.5) | (0.7) | (8.0) |
| **Net Collateral after Carve Out** | | | | | | | | | | | | |
| ABL Collateral | | | | | 112.9 | 135.6 | 33.3 | 86.5 | 51.8 | - | - | 420.1 |
| DIP Funding Acct | | | | | - | - | - | - | - | - | 56.2 | 56.2 |
| Other DIP Loan Collateral | | | | | 54.8 | 8.8 | 8.8 | 9.2 | 0.2 | - | - | 81.8 |
| Licensed Marks | | | | | - | - | - | - | - | 126.9 | - | 126.9 |
| | | | | | $167.7 | $144.4 | $42.1 | $95.7 | $52.0 | $126.9 | $56.2 | $685.0 |
| **Net ABL Priority Collateral Available for Distribution** | | | | | $112.9 | $135.6 | $33.3 | $86.5 | $51.8 | - | - | $420.1 |
| Less: ABL Credit Facility Claims (including LCs) | C12 | 375.5 | | | (101.0) | (121.2) | (29.8) | (77.3) | (46.3) | - | - | (375.5) |
| Remaining amount available for distribution | | | | | 12.0 | 14.4 | 3.5 | 9.2 | 5.5 | - | - | 44.6 |
| **Net Amount Available for Distribution to the DIP Loans** | | | | | $66.7 | $23.2 | $12.3 | $18.4 | $5.7 | $126.9 | $56.2 | $309.4 |
| Less: DIP Loans Claims | C13 | 255.9 | | | (66.7) | (23.2) | (12.3) | (18.4) | (5.7) | (73.3) | (46.5) | (255.9) |
| Remaining amount available for distribution | | | | | - | - | - | - | - | 53.5 | 9.7 | 53.5 |
| **Remaining IPCo Notes Collateral Available for Distribution** | | | | | - | - | - | - | - | $53.5 | - | $53.5 |
| Less: IPCo Notes Claims | C14 | 411.7 | | | | | | | | ($53.5) | | (53.5) |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| **Remaining Term Loan Collateral Available for Distribution** | | | | | - | - | - | - | - | - | | - |
| Less: Prepetition Term Loan Claim | C15 | 1,342.1 | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Other Secured Claims | C16 | - | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Administrative Claims | C17 | 129.4 | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Priority Non-Tax Claims | C18 | 0.3 | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: General Unsecured Claims | C19 | 324.3 | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Section 510(b) Claims | C20 | N/A | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Prepetition Intercompany Claims | C21 | N/A | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |
| Less: Preferred and Common Equity | C22 | N/A | | | | | | | | | | - |
| Remaining Amount Available for Distribution | | | | | | | | | | | | - |

12

## Exhibit D

**Valuation Analysis**

WEIL:\97430022\15\54457.0007

## Valuation Analysis of Reorganized Chinos Holdings

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE VALUATION ANALYSIS DOES NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS OR ANY OTHER PERSON AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN. LAZARD HAS NOT BEEN REQUESTED TO, AND DOES NOT EXPRESS ANY VIEW AS TO, THE POTENTIAL TRADING VALUE OF REORGANIZED CHINOS HOLDINGS'S SECURITIES ON ISSUANCE OR AT ANY OTHER TIME.

### A.  Lazard's Estimated Valuation

Solely for the purposes of the Plan and the Disclosure Statement, Lazard Frères & Co. LLC ("Lazard"), as investment banker to the Debtors, has estimated a range of total enterprise value ("Enterprise Value") for Reorganized Chinos Holdings on a consolidated going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis").  The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the financial projections for the period of fiscal years 2020 through 2024 (the "Project Period") attached to the Disclosure Statement as **Exhibit B** (collectively the "Projections"), and information that is publicly available or was provided by other sources.  The Valuation Analysis assumes that the Effective Date will occur on September 11, 2020.  The valuation estimates set forth herein represent valuation analyses of Reorganized Chinos Holdings based on the application of customary valuation techniques to the extent deemed appropriate by Lazard.

Based on the Projections and solely for the purposes of the Plan, Lazard estimates that the potential range of Enterprise Value of Reorganized Chinos Holdings is approximately $1.66 to $2.03 billion.  Based on the potential range of Enterprise Value and assumed net debt of $0.60 billion as of the Effective Date, Lazard estimates an imputed range of potential equity value for Reorganized Chinos Holdings of $1.06 to $1.43 billion.  For purposes of the Valuation Analysis, Lazard assumed that, between the date of filing of the Disclosure Statement and the assumed Effective Date, no material changes will occur that would affect the Projections or Valuation Analysis.  Lazard's Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

B. **Valuation Methodology**

Lazard has estimated the consolidated value of Reorganized Chinos Holdings by primarily relying on two generally accepted valuation techniques: (i) Discounted Cash Flow ("DCF") Analysis and (ii) Comparable Public Company Analysis.  While Lazard recognizes that the precedent transaction methodology is often used, Lazard believes that this methodology has less relevance for purposes of assessing the Enterprise Value of Reorganized Chinos Holdings due to the lack of recent comparable precedent transactions, among other factors.  For purposes of estimating the consolidated value of Reorganized Chinos Holdings, Lazard employed a sum-of-the-parts approach that values the Debtors' two operating segments separately, taking into account differences in the business and financial characteristics of the J. Crew and Madewell businesses. Based on the sum-of-the-parts valuation, Lazard estimates that the potential range of Enterprise Value of J. Crew is approximately $0.40 to $0.52 billion and the potential range of Enterprise Value of Madewell is approximately $1.26 to $1.50 billion.

(i)      Discounted Cash Flow Analysis:

DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  Under this methodology, projected future cash flows are discounted by the weighted average cost of capital (the "Discount Rate") of the business.  The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period, known as the terminal value.  The terminal value is derived using the normalized unlevered after-tax free cash flow in the final year of the Projection Period, and discounted back to the assumed Effective Date.

(ii)     Comparable Public Company Analysis:

Comparable Public Company Analysis estimates the value of a company relative to other publicly traded companies with similar business and financial characteristics. Lazard first selected sets of publicly traded companies that it believes exhibit similar business and financial characteristics to J. Crew and Madewell.  Criteria for the selected reference groups included, among other relevant characteristics, similarity in operations, business risks, growth prospects, product mix, customer base, margins, market presence, size and scale of operations.  The selected reference groups may not be comparable to J. Crew and Madewell in all aspects, and may differ materially in certain specific respects.

In deriving Enterprise Value ranges under the Comparable Public Company Analysis methodology, Lazard used earnings before interest, taxes, depreciation and amortization ("EBITDA") as its primary valuation metric.  Lazard calculated FY2019A (representing  Chinos Holdings's fiscal year ending February 1, 2020) and FY2021E (representing  Chinos Holdings's fiscal year ending February 1, 2022) multiples of this reference group, applying certain qualitative judgments based on the characteristics of

J. Crew and Madewell and each of their selected reference groups.  Lazard then applied a range of multiples to the implied FY2019A and FY2021E EBITDA of each of J. Crew and Madewell.

(iii)    <u>Precedent Transaction Analysis:</u>

Precedent Transaction analysis estimates value by examining comparable precedent merger and acquisition transactions.  The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial metrics.  These transaction multiples are calculated based on the purchase price paid to acquire companies that are comparable to J. Crew and Madewell.  Precedent Transaction analysis reflects aspects of value other than the intrinsic value of a company, and the transactions analyzed invariably will have occurred in different operating and financial environments.  As a result, there are inherent limitations in the application of Precedent Transaction analysis to determining the Enterprise Value for Reorganized Chinos Holdings.    While Lazard considered precedent transactions since 2010, Lazard believes that the transactions identified have less relevance when assessing the Enterprise Value of Reorganized Chinos Holdings due to the lack of recent and comparable observations, among other factors.

## C.  <u>Application of Valuation Methodologies to the Reorganized Debtors' Operating Segments</u>

In performing the sum-of-the-parts valuation analysis described above, Lazard separately estimated the enterprise values of J. Crew and Madewell based on the application of the Discounted Cash Flow and Comparable Public Company analyses.  While a sum-of-the-parts approach assigns value to each of the Debtors' two operating segments, the valuation analysis described herein must be considered as a whole.  Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to Enterprise Value.

(i)    <u>J. Crew</u>

Lazard relied primarily relied on two generally accepted valuation techniques: (i) DCF Analysis and (ii) Comparable Public Company Analysis in estimating the Enterprise Value range for J. Crew.

(ii)    <u>Madewell</u>

Lazard relied primarily relied on two generally accepted valuation techniques: (i) DCF Analysis and (ii) Comparable Public Company Analysis in estimating the Enterprise Value range for Madewell.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF JUNE 10, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND

DOES NOT INTEND TO DO SO. LAZARD IS NOT MAKING ANY ASSESSMENT REGARDING IMPACT OR THE ECONOMIC EFFECTS OF THE COVID-19 VIRUS, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. SUBSEQUENT DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, IN RELATION TO COVID-19, MAY AFFECT THE PROJECTIONS AND OTHER INFORMATION THAT LAZARD UTILIZED IN THE VALUATION ANALYSIS. LAZARD ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE VALUATION ANALYSIS BASED ON CIRCUMSTANCES OR EVENTS AFTER THE DATE HEREOF.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.

THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER.    THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.    IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Management of the Debtors advised Lazard that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of Reorganized Chinos Holdings. The Valuation Analysis assumes that the actual performance of Reorganized Chinos Holdings will correspond to the Projections in all material respects. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Projections and anticipated store closure plan; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of Reorganized Chinos Holdings; (e) reviewed certain publicly available financial data for transactions involving companies similar in certain respects to J. Crew and Madewell; (f) considered certain economic and industry information that Lazard deemed generally relevant to Reorganized Chinos Holdings; and (g) conducted such other studies, analyses, inquiries, and investigations as Lazard deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.