**LOEB & LOEB LLP**
901 New York Avenue NW
Suite 300 East
Washington, DC 20001
(202) 618-5000
John D. Taliaferro

**LOEB & LOEB LLP**
345 Park Avenue
New York, New York 10154
(212) 407-4000
Daniel B. Besikof (admitted *pro hac vice*)
Noah Weingarten (admitted *pro hac vice*)

*Counsel for Deloitte Consulting LLP and*
*Deloitte Tax LLP*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

```
------------------------------------------------------------- X
                                                              :
In re                                                         :        Chapter 11
                                                              :
CHINOS HOLDINGS, INC., et al.,                                :        Case No. 20-32181-KLP
                                                              :
                  Debtors.1                                   :        (Jointly Administered)
                                                              :
------------------------------------------------------------- X
```

## OBJECTION OF DELOITTE CONSULTING LLP AND
## DELOITTE TAX LLP TO CONFIRMATION OF AMENDED JOINT
## PREARRANGED CHAPTER 11 PLAN OF REORGANIZATION
## OF CHINOS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

Deloitte Consulting LLP ("Deloitte Consulting") and Deloitte Tax LLP ("Deloitte Tax,"

and collectively, "Deloitte"), by and through their undersigned counsel, hereby submit this

objection (this "Objection") to the confirmation of the *Amended Joint Prearranged Chapter 11*

*Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors* [Docket No. 706] (the

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

"Plan") filed by the above-captioned debtors and debtors-in-possession (the "Debtors").[2]    In

support of this Objection, Deloitte respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Plan violates both the letter of the Bankruptcy Code and several of the

Bankruptcy Code's bedrock principles, including the right of creditors to vote on a plan, the

absolute priority rule and equality of distribution among creditors of equal priority.  The Plan is

based on an understated valuation that will likely pay secured creditors more than in full to the

detriment of unsecured creditors, and it discriminates unfairly against holders of Class 6-B.  Worse

yet, the Plan is built on a classification structure that disenfranchises and suppresses the vote of

Other General Unsecured Claims in order to ensure acceptance of the Plan by that class and to

avoid compliance with the Bankruptcy Code's cram down provisions.   In light of its many

deficiencies, the Plan should not be confirmed.

2.    First, the classification structure alone should cause the Plan to fail.  Combining

into one class the $625 million of purported Term Loan Deficiency Claims (on which any recovery

is being waived) with Other General Unsecured Claims constitutes impermissible gerrymandering

and undermines the fundamental right of creditors to cast a meaningful vote.  The Term Loan

Deficiency Claims and the Other General Unsecured Claims are not "substantially similar."  The

holders of Other General Unsecured Claims – trade vendors, landlords and service providers – are

afforded only their Class 6-B recoveries on account of their claims and thus are motivated to

achieve at least a reasonable recovery for that class.  The Term Lenders – the Debtors' senior

secured lenders – are waiving recoveries on the Term Loan Deficiency Claims and are not even

---

[2]  Except as otherwise provided herein, capitalized terms used herein but not defined herein shall
have the meanings ascribed to such terms in the Plan.

participants in the class. Their recoveries come from another source – Class 4. Moreover, because the Term Lenders will hold the majority of the equity in the Reorganized Debtors, they are motivated to have the Debtors pay as little as possible to the holders of Other General Unsecured Claims. Yet despite these differences, the Plan would permit the Term Lenders likely to control the Class 6-B vote – an absurd and unfair result.

3.      The Term Loan Deficiency Claims are also dissimilar from the Other General Unsecured Claims because they do not actually exist. They are the product of a valuation that is flawed and that understates the Debtors' value, *potentially by $1 billion*. The Committee has filed a motion to determine that the Term Loan Deficiency Claims are oversecured, based on a total enterprise value of approximately $2.94 billion. At that value, not only are the Term Lenders oversecured, holders of Other General Unsecured Claims are entitled to full payment. Because the Term Lenders have no deficiency claims, they cannot be classified together with, and have a right to overwhelm the vote of, the holders of valid unsecured claims in Class 6-B.

4.      This classification structure, coupled with the "deathtrap" that reduces Class 6-B recoveries to just $1 million if the class rejects, can only have been intended to manipulate and suppress voting. The Term Lenders have no economic interest in Class 6-B, yet they will be allowed to put their thumbs heavily on the scale for voting purposes, leaving the other holders of Class 6-B claims disenfranchised. 3

5.      Importantly, the Plan's success depends on this gerrymandering and manipulation. If Class 6-B were to reject the Plan – a result that would have been automatic had the Plan provided zero recoveries to Class 6-B, rather than *de minimis* recoveries – the Debtors would be required to satisfy the cram-down provisions of section 1129(b) of the Bankruptcy Code, which they cannot do. This disenfranchisement and gerrymandering should be rejected.

6.      Second, the Plan should fail under section 1129(b)(1) because it unfairly discriminates against the holders of Other General Unsecured Claims.  The discrimination is not the least bit subtle.  Although Class 6-A and 6-B claims are identical both legally and in terms of the nature of the business relationships with the Debtors that gave rise to such claims, holders of Class 6-A claims are projected to recover potentially as much as *100 times* the recovery proposed for Class 6-B by percentage.  The only difference is that the Debtors have chosen to confer this highly privileged status on holders of Class 6-A claims, ostensibly in exchange for those holders continuing to do business with the Debtors.  But it is far from clear that this discrimination is necessary to achieve a successful reorganization, and this privilege was never offered to holders of Class 6-B claims, many of which – including Deloitte – would no doubt have been willing to consider doing business with the Reorganized Debtors on appropriate terms.

7.      Finally, the Plan fails under Section 1129(b)(1) because it is not fair and equitable. The fair and equitable test incorporates another fundamental bankruptcy concept – the absolute priority rule – over which the Plan runs roughshod.  Under the absolute priority rule, no junior class is to receive recovery until senior classes have been paid in full.  A well-settled corollary is that no senior class is entitled to receive payment more than in full.  Because Plan appears to provide the Term Lenders with recoveries worth more than 100% of their claims, the Plan fails the fair and equitable test and should not be confirmed.

8.      In the event the Court is inclined to confirm the Plan, the allocation of the recoveries, by Debtor, in Class 6-B appear to be arbitrary and put creditors at risk of under or overpayment depending the Debtor(s) at which their Class 6-B claims arise.  The Debtors should be required to reallocate the actual cash figures during the claim resolution process to ensure fair

4

distributions to holders of claims, regardless of the Debtor or Debtors against which those claims arose, recognizing that claims against multiple Debtors must be preserved.

## BACKGROUND

**A.      Deloitte's Claims.**

9.      As of the Petition Date, the Debtors owed Deloitte Consulting in excess of $24 million and Deloitte Tax approximately $4.5 million.  Deloitte's unpaid claims relate to consulting and tax services provided in connection with the Debtors' proposed IPO of its Madewell business line.

**B.      Summary of the Debtors' Defective Plan.**

10.      The Debtors filed the *Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors* [Docket No. 247] (the "Original Plan") on May 18, 2020.  The Debtors filed revised versions of the Original Plan reflecting "technical changes" on June 11, 2020 [Docket No. 468] and on June 24, 2020 [Docket No. 540].  The Debtors then filed the Plan, which contained additional modifications, on August 10, 2020.

11.      Under the Plan, the holders of the Debtors' approximately $2 billion in prepetition secured debt will receive all of the New Common Equity issued on the Effective Date remaining after distributing the Backstop Premium, the New Equity Allocation (which is also being distributed to certain of the secured lenders), and any other New Common Equity distributed pursuant to the Plan, subject to dilution.  *See* Plan § 4.4-4.5.  Included in the approximate $2 billion in prepetition secured debt are the claims of the Term Lenders, totaling $1.34 billion.  *See Disclosure Statement for Amended Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and Its Affiliated Debtors* [Docket No. 707] (the "Disclosure Statement") at 14.

12.     The Plan divides claims into twelve classes. *See* Plan § 3.3. Of particular relevance here, Class 4 includes the Term Loan Secured Claims of the Term Lenders. *See* Plan § 4.4(a). Under the Plan, the Debtors propose to allow the Term Loan Secured Claims at an aggregate amount of $716,645,605. *See id.* § 4.4(b). In exchange for the Term Loan Secured Claims, the Term Lenders have agreed to accept 76.5% of the New Common Equity, subject to dilution as described in the Plan. *See id.* § 4.4(c).

13.     The Plan also separates general unsecured claims into two classes: Class 6-A for "Ongoing Trade Claims" and Class 6-B for "Other General Unsecured Claims." *See id.* § 3.3. However, despite the parties receiving distributions in both classes of general unsecured claims being substantially similar in legal rights and in the nature of the relationship with the Debtors that gave rise to the claim, the Debtors propose to afford those claims widely disparate treatment under the Plan.

14.     The Plan defines Class 6-A Ongoing Trade Claims as parties that, within 30 days of the Petition Date, "executed a trade agreement that expressly designates such party as a holder of an Ongoing Trade Claim." *See id.* at § 1.102. Under the Plan, holders of Class 6-A Ongoing Trade Claims will share a cash distribution pool of $71,000,000, resulting in a projected distribution of 50%. *See id.* at § 4.6(b); Disclosure Statement at p. 5. Notably, under the Original Plan, the proposed cash distribution pool to holders of Ongoing Trade Claims was $50,000,000, resulting in a $21 million increase in the cash earmarked for Class 6-A under the Plan. Original Plan § 4.6(b).

15.     The Plan designates all general unsecured claims other than Ongoing Trade Claims as Class 6-B Other General Unsecured Claims. *See id.* at § 1.104. The Plan specifically includes Term Loan Deficiency Claims, which are the purported unsecured deficiency claims of the Term

Lenders arising under section 506(a) of the Bankruptcy Code. *See id.* at § 1.137. The Debtors purport to value the Term Loan Deficiency Claims at more than $625 million.

16.    While the Term Lenders are obligated to vote their hundreds of millions of purported Class 6-B claims in favor of the Plan, they will not receive any distribution on account of such claims and thus have no stake in the class. *See id.* at § 4.7(b).[3] The Debtors have estimated that the value of the remaining Allowed Other General Unsecured Claims will be approximately $189.4 million. *See* Disclosure Statement at pp. 6-7 (adding the estimated allowed amount for Class 6-B at each of the Debtors).[4] Accordingly, because the Term Lenders must vote the Term Loan Deficiency Claims in favor of the Plan, Class 6-B will almost certainly be found to have accepted the Plan, at least with respect to the amount element.

17.    The Plan calls for holders of Class 6-B claims to share a cash pool of $3,000,000, but only if Class 6-B votes to accept the Plan. If holders of Class 6-B claims vote to reject the Plan, the Plan contains a "deathtrap" that will reduce the distribution pool to $1,000,000. *See* Plan at § 4.7(b). While the Debtors increased the cash distribution pool allocated to Class 6-A by $21 million between the filing of the Original Plan and the Plan, the Debtors made no adjustment to the cash distribution pool allocated to Class 6-B. Moreover, while holders of Class 6-A claims are projected to recover 50% on account of their claims, holders of Class 6-B claims are projected to receive a distribution of less than 1.6% on account of their claims, even after the Term Lenders waive whatever Term Loan Deficiency Claims they purport to hold and even assuming the holders of Class 6-B claims at each of the Debtors votes to accept the Plan. *See* Disclosure Statement at

---

[3]  According to the Disclosure Statement, the holders of Term Loan Claims are foregoing their distribution of their purported general unsecured claims, the Term Loan Deficiency Claims, "[a]s a gift" to holders of Other General Unsecured Claims (Disclosure Statement at 2 n.7).

[4]  These estimates may be incorrect, as it is not clear whether they reflect that certain creditors may have claims against more than one Debtor.

pp. 6-7.  This is true even though the Other General Unsecured Claims rank *pari passu* with the holders of Ongoing Trade Claims and, with the exception of the Term Loan Deficiency Claim, are similar in nature – *i.e.*, all unsecured claims incurred in the operation of the Debtors' business.

18.     Because Deloitte was not offered the opportunity to enter into a trade agreement with the Debtors, its claims will be treated as Class 6-B Other General Unsecured Claims and will be entitled to merely a nominal recovery – vastly less than the other similarly situated general unsecured creditors in Class 6-A will receive.

## C.     Committee Valuation Motion.

19.     On August 3, 2020, the Committee filed the *Motion Of The Official Committee Of Unsecured Creditors For An Order: (I) Determining, Pursuant To Section 506(a)(1) Of The Bankruptcy Code And Bankruptcy Rule 3012, That The Term Loan Creditors Are Oversecured And There Are No Term Loan Deficiency Claims; (II) To The Extent There Are Any Such Deficiency Claims, Determining Pursuant To Bankruptcy Rule 3013, That Such Claims Are Improperly Classified In Class 6-B Under The Debtors' Plan Of Reorganization; And (III) Designating, Pursuant To Section 1126(e) Of The Bankruptcy Code, The Term Loan Deficiency Claim Holders' Votes As Not In Good Faith And Not Counting Any Votes Of Such Claimants In Determining Acceptances By Class 6-B* [Docket No. 677] (the "Committee Determination Motion").

20.     The Committee Determination Motion seeks a determination, among other things, that the Term Lenders are oversecured and, to the extent the Term Loan Deficiency Claims exist, such claims do not belong in Class 6-B.  The Committee supported the Term Lender Determination with a valuation of the Debtors that fixed the Debtors' total enterprise value at $2.94 billion (the "Committee Valuation").  Deloitte supports the Committee Determination Motion.

**OBJECTION**

21.    The Plan cannot be confirmed because it impermissibly classifies the legally and factually dissimilar Term Loan Deficiency Claims together with Other General Unsecured Claims in Class 6-B in violation of applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(1) (plan must comply with "applicable provisions" of the Bankruptcy Code).  The Term Loan Deficiency Claims are themselves the product of the Debtor Valuation, which undervalues the Debtors and appears to afford the Term Lenders recoveries of more than 100% of the amount of their claims.  Moreover, the Plan discriminates unfairly between similarly situated groups of creditors and is not fair and equitable.  *See id.* § 1129 (a)(8)(A), (b)(1).

22.    Section 1129(a) of the Bankruptcy Code provides that a court may confirm a plan "only if" certain requirements are met, including that (i) "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]," *id.* at § 1129(a)(1); and (ii) "[w]ith respect to each class of claims or interests . . . such class has accepted the plan, *id.* at § 1129(a)(8)(A), *or* "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan," *id.* at § 1129(b)(1).  As the Plan proponent, the Debtors bear the burden of proof with respect to all elements of confirmation of the Plan.  *See, e.g.*, *In re Manchester Oaks Homeowners Ass'n*, No. 11-10179-BFK, 2014 Bankr. LEXIS 951, at *11 (Bankr. E.D. Va. Mar. 12, 2014) (denying confirmation of plan where debtor did not satisfy burden).  Because the Debtors cannot meet their burden on any of these elements, the Plan should not be confirmed.

I.    **The Plan should not be confirmed because it violates Section 1122 of the Bankruptcy Code by classifying dissimilar claims together in order to gerrymander the <u>acceptance of Class 6-B and avoid the scrutiny of cram down</u>.**

23.    "The ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case." *In re Adelphia Communs. Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006).  Yet the Plan would effectively eliminate that voting right for Deloitte and the other holders of Class 6-B claims by impermissibly classifying the Term Loan Deficiency Claims in Class 6-B with the Other General Unsecured Claims.  This structure is both unfair and antithetical to the fundamental rights of the holders of Other General Unsecured Claims to have a meaningful vote as creditors on the Plan.  As a result, confirmation should be denied.

24.    For the Plan to be confirmed, Section 1129(a)(1) requires that it comply with the Bankruptcy Code, including *inter alia* Section 1122.  *See* 11 U.S.C. § 1129(a)(1).  In turn, section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is **substantially similar** to the other claims or interests of such class."  11 U.S.C. § 1122 (emphasis added).  The analysis of whether classification is appropriate involves two considerations.  First, the Court reviews the claims to determine whether substantially similar claims have been classified together.  If they are not substantially similar, it is the end of the inquiry:  they cannot be classified together.  *See*, *e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of [section 1122] explicitly forbids a plan from placing dissimilar claims in the same class."); *Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 537 (B.A.P. 9th Cir. 2012).  Second, even if the claims may be in some ways similar, a classification structure cannot be approved where it is designed, as here, to gerrymander

or manipulate voting.  *See In re Bryson Props., XVIII*, 961 F.2d 496, 498 (4th Cir. 1992)

(classification cannot be for purpose of manipulating the vote).

> **A.**    **The Term Loan Deficiency Claims are not similar to the remaining Other General Unsecured Claims because they are of a different nature, and their holders have divergent legal and economic rights and motivations in respect of the Plan.**

25.    The Debtors and the Ad Hoc Committee of Term Lenders and IPCo Noteholders

(the "Ad Hoc Committee") have argued that because the purported Term Lender Deficiency

Claims and the non-lender Other General Unsecured Claims are all unsecured claims, they are

substantially similar and should appropriately be classified together.  They are wrong.  The

Bankruptcy Court has "broad latitude" in determining the similarity of claims" and it "need not

follow some narrow definition."  *In re Loop 76, LLC*, 465 B.R. at 540 (citing *Steelcase Inc. v.

Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994)) (affirming finding that deficiency

claim supported by guaranty is not substantially similar to unsecured trade claims despite all being

unsecured claims).

26.    For example, in *In re Durrett*, 139 B.R. 1 (Bankr. D.N.H. 1992), a secured lender

agreed to take back its collateral in satisfaction of its claim and to waive any deficiency claim.

Like here, the Plan provided for the secured lender to vote its deficiency claim, apparently in order

to ensure the existence of an impaired accepting class.  The Court rejected this structure, finding

that the secured lender was "influenced by totally different considerations from those motivating

the other creditors," and that the disparate treatment of the deficiency claim prevented it from

being substantially similar to the other unsecured creditors.  *Id.* at 3; *see also JER WHTR Servs.,

Inc. v. Lavin*, 213 B.R. 791, 793 (D. Mass. 1997) (where creditor waived his claim, he "was not,

therefore, eligible to vote").

27.     *In re City Homes III, LLC* is also instructive.  There, the plan proponents classified together unsecured litigation creditors holding lead poisoning claims against their landlords that could access the debtor's insurance with others creditors holding identical lead poisoning claims that were not covered by insurance and were relegated to a minimal fund established by the debtor under the plan.  *See In re City Homes III LLC*, 564 B.R. 827, 870 (Bankr. D. Md. 2017).  The court denied confirmation of the plan, finding that the plan proponents had "wrongfully gerrymander[ed]" the voting process by classifying dissimilar claims together and that the plan proponents had "engaged in a reverse, inclusive version of" gerrymandering to secure the vote of an impaired, accepting class.  *Id.* at 869.  Although all of the claimants held identical litigation claims, the court found that the claims were "like night and day" as a result of their different treatment and thus determined that the claims were not "substantially similar" for purposes of Section 1122.  *Id.* at 870.  The court further concluded that the dissimilar claimants were classified together to ensure the acceptance of the plan by the uninsured claimants and their "overwhelming[] support" for release provisions in the plan by way of the dominant strength of the ballots submitted by the insured claimants.  *Id.*  The Debtors have engaged in the same "reverse, inclusive" gerrymandering tactic here, which should doom the Plan.

28.     Unlike the claims in *City Homes*, which although found to be dissimilar were all were substantively identical, the Term Loan Deficiency Claims and the remaining Other General Unsecured Claims have almost no similarities other than that (to the extent the Term Loan Deficiency Claims actually exist) they are both unsecured claims.  The holders of those claims have greatly different rights and motivations, and the claims themselves arose from completely different facts, circumstances and relationships with the Debtors.  The Other General Unsecured Claim holders are vendors, landlords, service providers and holders of claims otherwise generally

arising in the operation of the Debtors' business.  They did not extend loans to the Debtors, and

they are not holders of secured funded debt.  They are looking to the Plan as their only source of

recovery.  They are motivated to receive at least a reasonable recovery.

29.     Conversely, the purported Term Loan Deficiency Claims are held by the Term

Lenders – professional investors – and are the result of a secured lending transaction.  They are

contractually obligated to vote in favor of the Plan as a result of the deal they cut in respect of their

secured claims.  Unlike the Other General Unsecured Creditors, the Term Lenders have driven the

formulation of the Plan and are parties to the RSA, pursuant to which they negotiated to receive,

even under the Debtors' understated Valuation, hundreds of millions of dollars of recoveries.

30.     Most significantly, the Term Lenders have agreed to waive recoveries on the Term

Loan Deficiency Claims – they are not even participating in Class 6-B and have no economic

interest in Class 6-B.  Accordingly, their motivations are exactly opposite those of the other holders

of Class 6-B claims.  They are benefitted by paying as little as possible to holders of Other General

Unsecured Claims, since as the Debtors' new owners they would benefit from any cash savings.

Finally, As the future owners of the reorganized enterprise, the Term Lenders "have a different

stake in the future viability of the reorganized company" that render their claims substantially

dissimilar from the other Class 6-B holders.  *See In re U.S. Truck Co.*, 800 F.2d 581, 587 (6th Cir.

1986).  These substantial differences should preclude common classification with the Other

General Unsecured Claim holders.

31.     No doubt, Deloitte expects that the Term Lenders will contend that by waiving the

Term Loan Deficiency Claims they are providing a benefit to holders of Other General Unsecured

Claims.  In fact, however, the bargain that the Term Lenders have reached under the Plan is so rich

that the Term Lenders have agreed to forego any distribution on account of their purported Term

Loan Deficiency Claims – a tacit acknowledgment that their claims are being satisfied through the equity grant.

32.      In short, the classification structure should fail.  the Term Loan Deficiency Claims and the remaining Other General Unsecured Claims are substantially dissimilar, both in terms of the nature of the claims themselves and the position of their holders with respect to the Debtors both now and in the future.  The classification of those claims together is intended to gerrymander the vote in Class 6-B, disenfranchise the holders of Other General Unsecured Claims and evade the enhanced scrutiny of the Plan that accompanies the cram-down provisions of Section 1129(b).  This structure should be rejected.

**B.      The Term Loan Deficiency Claims are also dissimilar from the remaining Other General Unsecured Claims because the Term Lenders are oversecured, so the Term Loan Deficiency Claims do not exist.**

33.      The Term Loan Deficiency Claims are also dissimilar from the other Class 6-B claims for an additional reason – they don't actually exist.  The Term Loan Deficiency Claims are predicated on a Lazard valuation (the "Debtor Valuation") that is far too low.  More specifically, the Debtor Valuation sets the total enterprise value of both J. Crew and Madewell at just $1.84 billion (up from the $1.75 billion valuation on which the plan was initially based) – total enterprise value of approximately $0.40 to $0.52 billion for J. Crew and total enterprise value of approximately $1.26 to $1.50 billion for Madewell.  Disclosure Statement, Ex. D at p. 2.

34.      The Committee Determination Motion filed by the Committee, which seeks to disallow the Term Loan Deficiency Claims under Section 506(a) of the Bankruptcy Code, gets it right.  It is supported by the Committee Valuation, which remedies a number of significant deficiencies that plague the Debtor Valuation.  First, the Debtor Valuation assumes that Madewell's growth will decrease dramatically after 2024, from the rapid growth rate projected in the Disclosure Statement projections (Disclosure Statement, Ex. B.) to a significantly lower

number in 2025 and extending into perpetuity.  These growth assumptions materially undervalue

Madewell, defy common sense and do not reflect economic reality.  The Committee Valuation

employs a more logical methodology that steps down the growth over a period of years extending

beyond 2024.  Second, the weighted average cost of capital (WACC) in the Debtors' discounted

cash flow valuation is too high as a result of temporary COVID-related volatility and because the

Debtors overstate the risk premium that investors require for equity investment.  Third, the Debtors

have chosen inappropriate comparable companies – including low-growth companies and

excluding certain companies with high growth projections, like Madewell.  These inappropriate

comparable companies carry with them lower growth projections and valuation multiples, which

have the effect of substantially depressing the Debtors' value.  Deloitte believes that the Committee

Valuation, which corrects for these points, more accurately reflects the true value of the Debtors.

35.    In this way, too, the Term Loan Deficiency Claims – which are illusory – could not

be more dissimilar from the other, entirely legitimate claims in Class 6-B.  Accordingly, the Plan's

classification structure violates Section 1122 of the Bankruptcy Code and renders the Plan

unconfirmable.

**C.    The classification scheme is designed to manipulate class voting in order to ensure the acceptance of Class 6-B and avoid having to satisfy the cram down standards of Section 1129(b).**

36.    There is a second consideration to the analysis, which the Plan fails because of its

attempt to artificially distort the vote through gerrymandering.  *See In re Loop 76, LLC*, 465 B.R.

at 537 (plan cannot be approved in the face of gerrymandered acceptance).  In applying section

1122, the Fourth Circuit has held that "[i]f the plan unfairly creates too many or too few classes,

if the classifications are designed to manipulate class voting, or if the classification scheme violates

basic priority rights, the plan cannot be confirmed."  *In re Bryson Props., XVIII*, 961 F.2d at 502

(quoting *Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.)*, 913 F.2d 873,

880 (11th Cir. 1990)) (remanding confirmation of plan for improper claims classification). Moreover, the classification of claims "clearly for the purpose of manipulating voting . . . may not stand." *Id.* Instead, classification of claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *In re Manchester Oaks Homeowners Ass'n*, 2014 Bankr. LEXIS 951, at *17-19 (denying confirmation because "[t]he Court finds that the Debtor has separately classified the [] claim solely in an effort to gain the affirmative vote of an impaired class of claims" and because "the separate classification of this claim constitutes impermissible gerrymandering.") (citation omitted).

37.    The Debtors have classified the Term Loan Deficiency Claims, which are receiving no recovery from Class 6-B, as part of the Other General Unsecured Claims.  This classification is meant to manipulate the vote in order to ensure approval of the Plan by Class 6-B, thus disenfranchising the non-Lender holders of Other General Unsecured Claims.  The vote of Class 6-B is hugely consequential.  Having proposed a Plan that (i) provides Class 6-A with potentially 100 times the percentage recovery as it does Class 6-B and (ii) that apparently pays the Term Lenders more than in full, the Debtors will need to establish compliance with the cram down requirements set forth in section 1129(b) – which they will not be able to do – if Class 6-B votes to reject the Plan.

38.    Holders of Term Loan Deficiency Claims are receiving no distribution on account of their claims, irrespective of where those claims are classified.  If the Debtors did not want to classify the Term Loan Deficiency Claims in their own class, the Debtors could have just as easily classified the Term Loan Deficiency Claims in Class 6-A, since doing so would at least have classified all unsecured claims with an interest in the future viability of the Debtors in the same class.  Likewise, the Debtors could have put all of the Term Lenders' claims in one single class,

as they did with respect to the claims of the IPCo Lenders. Rather than any of these more rational approaches, however, the Debtors chose to classify the Term Loan Deficiency Claims with the remainder of the Other General Unsecured Claims in a transparent attempt to squelch any dissent from Class 6-B and ensure that it accepts the Plan. The Fourth Circuit has clearly spoken: such manipulation "may not stand." *In re Bryson Properties, XVIII*, 961 F.2d at 502; *In re Manchester Oaks Homeowners Ass'n*, 2014 Bankr. LEXIS 951, at *14 (the "classification of this claim constitutes impermissible gerrymandering.").

39.    While there are cases, including those cited by the Ad Hoc Committee in support of approval of the Disclosure Statement, that counsel in favor of classifying deficiency claims with the remainder of general unsecured claims, those cases are distinguishable on the facts, and their holdings actually support Deloitte's argument that voting should not be manipulated to silence economic stakeholders. *See Omnibus Reply of the Ad Hoc Committee to Objections to the Debtors' Motion Seeking Approval of the Disclosure Statement* [Docket No. 536] (the "Ad Hoc Committee Reply") at ¶¶ 10-13. First, in each of the cases cited by the Ad Hoc Committee, the debtor owned a single real estate asset and was seeking to separately classify the deficiency claim of its secured lender to disenfranchise the secured lender and obtain an impaired, accepting class so that cram down of the Plan was possible. *See In re Bryson Props., XVIII*, 961 F.2d 496, 498 (4th Cir. 1992) ("[The debtor's] sole asset is a complex of three commercial buildings in Omaha, Nebraska, known as "Mid-America Plaza."); *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1522 (9th Cir. 1996) ("title to the Kittridge property was consolidated in [the debtor] and his wife"); *Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 478 (2d Cir. 1994) ("[The debtor] was formed in 1984 to acquire and manage a residential and office complex located in Waterford, Connecticut."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987

F.2d 154, 155 (3d Cir. 1993) ("The [debtor's main asset is an industrial and commercial park located on Route 37 in Toms River, New Jersey."); *In re Lumber Exch. Bldg. Ltd. P'ship*, 968 F.2d 647, 648 (8th Cir. 1992) ("[The debtor] was formed to acquire, renovate, and own as an investment the Lumber Exchange Building, located in Minneapolis."); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1276 (5th Cir. 1991) (lender provided funds for debtor to purchase office building).

40.     Here, however, the Debtors are not classifying the Term Loan Deficiency Claims along with the Other General Unsecured Claims to cram down a plan over the objection of their secured lender but, rather, to disenfranchise the holders of Other General Unsecured Claims and avoid having to meet the cram down requirements at all.  This manipulation of classes to effectuate voting is even more apparent considering that holders of the Term Loan Deficiency Claims, despite being classified as Other General Unsecured Claims, have agreed to their treatment elsewhere in the Plan, and the Plan provides that the Term Lenders will not participate in the class.

41.     Second, even cases cited by the Ad Hoc Committee recognize that a debtor's proposed classification must be supported by business and economic reasons and must not be for the purpose of manipulating the vote.  *See*, *e.g.*, *In re Bryson Props., XVIII*, 961 F.2d at 502 ("If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.").  As suggested in *Bryson*, the Debtors have created "too few" classes here. There is no other justification for the classification scheme other than to manipulate the vote to ensure that Class 6-B accepts the Plan.  Accordingly, the Plan cannot be confirmed.

**II.     The Debtors will be unable to satisfy the requirements for cram down of the Plan.**

42.     If the Plan were structured in a manner that is fair and consistent with the classification requirements of the Bankruptcy Code, Class 6-B would likely vote to reject the Plan.

In that case, the Plan would be subjected to additional scrutiny, and the Debtors would be required to demonstrate compliance with the Bankruptcy Code's cram down provisions. Pursuant to section 1129(b)(1), the Debtors may only confirm a plan without the unanimous consent from all impaired classes "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Because these are standards the Debtors cannot meet, the Plan cannot be confirmed.

A. **The Plan unfairly discriminates among similarly-situated creditors by providing for recoveries to Class 6-A creditors that are as much as 100 times the recoveries provided for Class 6-B creditors.**

43.    The Plan is unconfirmable because it "discriminate[s] *unfairly*" against the holders of Other General Unsecured Claim. *See* 11 U.S.C. § 1129(b)(1) (emphasis added). The discrimination is significant – holders of Class 6-A claims are set to receive as much as 100 times the recovery of holders of substantively identical claims in Class 6-B.

44.    "One of the major themes of bankruptcy administration is equality of distribution among similarly-situated creditors." *In re Cook*, No. 06-11627-SSM, 2007 Bankr. LEXIS 2613, at *6 (Bankr. E.D. Va. July 31, 2007). When, as here, "a debtor uses money that belongs to the estate to pay certain creditors, but not others, the policy of equal distribution is violated." *Id.* This policy is at the heart of the requirement under Section 1129(b)(1) that the Plan not "discriminate unfairly" against holders of claims.

45.    Courts in the Fourth Circuit apply a four-part test for determining whether a plan "unfairly discriminates": (1) whether there is a reasonable basis for the discrimination; (2) whether the plan can be confirmed and consummated without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against. *In re Sutton*, No. 10-10539-8-RDD, 2012 Bankr. LEXIS 752, at *7-8 (Bankr. E.D.N.C. Feb. 9, 2012) (denying confirmation because debtor failed to prove that the plan "does not unfairly

discriminate") (citing *Ownby v. Jim Beck, Inc. (In re Jim Beck, Inc.)*, 214 B.R. 305, 307 (W.D. Va. 1997) (applying same four-part test), *aff'd*, 162 F.3d 1155 (Table) (4th Cir. 1998)); *Gorman v. Birts (In re Birts)*, No. 1:12cv427 (LMB/TCB), 2012 U.S. Dist. LEXIS 107811, at *4-17 (E.D. Va. Aug. 1, 2012) (reversing plan confirmation due to unfair discrimination).  The Debtors have failed to demonstrate that the Plan satisfies any part of this test.

46.     There is no "reasonable basis" for the discrimination between Class 6-A and Class 6-B, and common sense suggests that the plan could be confirmed absent such substantial (or any) discrimination.  The Debtors will likely argue that the agreement by the holders of Class 6-A claims to continue doing business with the Debtors after emergence from bankruptcy provides sufficient justification for the discriminatory treatment and facilitates confirmation of the Plan.  That argument is a makeweight.  The Debtors obtained the right, outside of the Plan process, to placate their critical trade creditors by paying their claims in the ordinary course of business – up to $20 million – and to satisfy all section 503(b)(9) and lien claims in the ordinary course of business (estimated to be another $40 million).  *See Final Order (I) Authorizing Debtors to Pay Certain Prepetition Claims, Lien Claims, and 503(b)(9) Claims, (II) Confirming Administrative Expense Priority of Undisputed Prepetition Orders, and (III) Granting Related Relief* [Docket No. 384].  In total, as much as $60 million has already been approved to ensure smooth relationships with the Debtors' important vendors.  The Debtors have articulated no need to heap further rewards on these selected vendors.

47.     Moreover, basic common sense dictates that rich rewards are not required to induce vendors to continue doing business with the reorganized Debtors or to support the Plan.  The reorganized company will have substantial liquidity and an improved balance sheet.  These vendors presumably intend to earn a profit on their work for the Debtors and, if they were to act

in an economically rational way, they would welcome the opportunity to continue working with the Debtors post-emergence, since the outstanding amounts are now sunk costs.  Continued engagement with the Debtors after the effective date is in their own interests, even without taking a disproportionately high recovery on their claims.  The Debtors have articulated no basis to suggest persuasively that the Plan would fail if all holders of unsecured claims were treated alike.  Accordingly, this discrimination has no "reasonable basis" and is not necessary to effectuate the reorganization.

48.    The extent of the discrimination further suggests that the Plan discriminates unfairly.  Courts place special emphasis on the "disparate treatment" of similar claims factor.  *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 229-30 (Bankr. E.D. Va. 2016).  "[C]ourts often conclude that a plan is unfairly discriminatory when there is a large discrepancy in the percentage recovery between similarly situated creditors."  *In re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 Bankr. LEXIS 4985, at *26-28 (Bankr. E.D.N.C. Oct. 23, 2012) (citing *In re Tuscon Self-Storage, Inc.*, 166 B.R. 892 (9th Cir. BAP 1994) (finding unfair discrimination when plan provided 100% recovery for unsecured trade creditors and 10% to deficiency claim)); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001) (finding unfair discrimination when plan provided for 100% recovery for one class of unsecured creditors and 1% recovery to another class of unsecured creditors); *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994) (finding unfair discrimination when plan paid deficiency claims 100% over ten years and paid trade creditors only 15% of claims within ninety days); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (finding unfair discrimination when plan paid insider unsecured claims in full while paying nonrecourse deficiency claim only 3%)).

49.     Here, the holders of Class 6-B claims, whose claims rank *pari passu* with those of

the holders of Class 6-A claims, will share in a pot of between $1-3 million (estimated to result in

0.5-1.6% in recoveries), while holders of Class 6-A claims will share in a pot of $71 million

(estimated to result in 50% recoveries).  Those same creditors, as discussed above, will receive (or

likely have received) at least $20 million, and potentially as much as $60 million, in additional

payments under the Vendor Order, for a total of as much as $131 million in recoveries.  Those

creditors will also have a paying, financially healthy customer going forward.  When compared to

the $1-3 million, total, afforded to other the Other General Unsecured Claims (a total of at most

1.6%), which have identical legal rights and substantially similar claims, the extent of the

discrimination is far too large to be justified.

50.     For these reasons, the Plan unfairly discriminates against the Other General

Unsecured Claims, and the Plan should not be confirmed.

**B.     The Plan is not fair and equitable because it is premised on an improperly understated valuation of the Debtors and pays the senior lenders more than in full on their claims.**

51.     To satisfy the "fair and equitable" standard with respect to a class of non-accepting

creditors, the Plan must also comply with the absolute priority rule with regard to such class.  *See*,

*e.g.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988); *In re MCorp. Fin., Inc.*, 137

B.R. 219, 234-35 (Bankr. S.D. Tex. 1992) ("According to the absolute priority rule, a plan must

provide that an impaired non-accepting class of creditors be paid in full with respect to their claims,

or that no interest junior to that class receive any distributions under the plan with respect to the

junior claimants' prepetition claims or interest.").  A critical and highly relevant corollary of the

absolute priority rule is that a senior class cannot receive more than full compensation for its

claims.  *See*, *e.g.*, *In re MCorp. Fin., Inc.*, 137 B.R. at 235 (the court needs to ensure, in "applying

the 'fair and equitable' standard contained in § 1129(b) . . . that no class senior to the dissenting class will receive more than full compensation for its claims or interests"); *In re Walat Farms, Inc.*, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) (it "would do violence to the 'fair and equitable' standard by paying [the creditor] more than its claim").

52.     Where, as here, a class of unsecured creditors is being paid less than in full, "a valuation is required to make sure that the senior classes of claims are not being provided for more than in full." *In re MCorp. Fin., Inc.*, 137 B.R. at 235. The Debtors did prepare such a valuation, but it is significantly understated and unreliable. The Committee Valuation – which is more reliable and fixes numerous deficiencies plaguing the Debtor Valuation – indicates that the Term Lenders will receive value in excess of the amount of their claims under the Plan. On this basis, too, the Plan should fail.

**III.    The distributions, by Debtor, in Class 6-B should be reallocated to reflect the actual amount of allowed claims at each Debtor.**

53.     The Plan provides that "each holder of an Allowed Other General Unsecured Claim will receive, on the Effective Date, its Pro Rata share of the cash pool allocated to *each Debtor as set forth*" in Section 4.7(b) (emphasis added). Section 4.7(b) provides for specific amounts to be allocated to creditors of each Debtor, with amounts ranging between $350 and $1,666,450 (assuming the Plan is accepted). The Debtors apparently have allocated those amounts based on the anticipated claims asserted at each Debtor in order to engineer a consistent recovery of less than 1.6% at each debtor. Disclosure Statement, p. 6. In furtherance of that apparent goal, the Debtors reserve the somewhat amorphous right to reallocate the Class 6-B recoveries among the Debtors "in their reasonable business judgement, to recalibrate for, among other things, the Claims asserted against each Debtor." Plan § 4.7(b).

54.    In allocating the amounts to be distributed in Class 6-B, the Debtors should be required to take into account the actual amounts due on account of claims against each of the Debtors, as determined in the claims resolution process.  Just by way of example, holders of claims against J. Crew Group, Inc. are projected to recover a total of just $300, assuming acceptance of the Plan by Class 6-B.   To the extent valid claims exist against that Debtor exceeding approximately $18,750, that amount will be insufficient to produce a recovery of approximately 1.6%.

55.    Any allocation should likewise take into account that certain creditors – including Deloitte – have claims against more than one Debtor.  Absent substantive consolidation, which the Debtors are not expressly seeking and for which there is no factual basis that has been disclosed, a party with claims against multiple debtors is entitled to a recovery from each of the Debtors against which it hold allowed claims, up to full satisfaction of the creditor's claim (which obviously will not happen here).  The language of Plan section 4.7(b) appears to provide for this reality in concept (providing allowed claims to receive distributions from "each Debtor"), but the cash allocation must reflect it as well, and the right of claimants with valid claims against multiple Debtors must be preserved.

## **CONCLUSION**

WHEREFORE, DELOITTE respectfully requests that the Court (i) deny approval of the

Plan; and (ii) grant Deloitte such other and further relief as is just and proper.

| | | |
|---|---|---|
| Dated: | Washington D.C.<br>August 17, 2020 | By: /s/ John D. Taliaferro<br>John D. Taliaferro (Va. Bar No. 71502)<br>LOEB & LOEB LLP<br>901 New York Avenue NW<br>Washington D.C. 20001<br>Telephone: (202) 618-5000<br>jtaliaferro@loeb.com<br><br>and<br><br>Daniel B. Besikof (admitted *pro hac vice*)<br>Noah Weingarten (admitted *pro hac vice*)<br>LOEB & LOEB LLP<br>345 Park Avenue<br>New York, New York 10154<br>Telephone: (212) 407-4000<br>dbesikof@loeb.com<br>nweingarten@loeb.com<br><br>*Counsel to Deloitte Consulting LLP*<br>*and Deloitte Tax LLP* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of August 2020, a copy of the foregoing was served through the Court's EM/ECF system on all parties receiving notices in these cases. I also certify that a copy of the foregoing was served by email on the Parties identified on the most recent Master Service List.

By: /s/ John D. Taliaferro
John D. Taliaferro (Va. Bar No. 71502)
LOEB & LOEB LLP
901 New York Avenue NW
Washington D.C. 20001
Telephone: (202) 618-5000
jtaliaferro@loeb.com

*Counsel to Deloitte Consulting LLP
and Deloitte Tax LLP*

19138401