| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **HUNTON ANDREWS KURTH LLP** |
| Ray C. Schrock, P.C. (admitted *pro hac vice*) | Tyler P. Brown (VSB No. 28072) |
| Ryan Preston Dahl (admitted *pro hac vice*) | Henry P. (Toby) Long, III (VSB No. 75134) |
| Candace M. Arthur (admitted *pro hac vice*) | Nathan Kramer (VSB No. 87720) |
| Daniel Gwen (admitted *pro hac vice*) | Riverfront Plaza, East Tower |
| 767 Fifth Avenue | 951 East Byrd Street |
| New York, New York  10153 | Richmond, Virginia 23219 |
| Telephone:  (212) 310-8000 | Telephone:  (804) 788-8200 |
| Facsimile:  (212) 310-8007 | Facsimile:   (804) 788-8218 |

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| ---------------------------------------------------------- x | | |
| | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **CHINOS HOLDINGS, INC.,** *et al.*, | : | **Case No. 20–32181 (KLP)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| ---------------------------------------------------------- x | | |

**NOTICE OF FILING OF THIRD PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE** that on August 9, 2020, Chinos Holdings, Inc. and its

debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**") filed the *Notice of Filing of Plan Supplement* [Docket No. 705] (the

"**First Plan Supplement**").[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471).  The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Plan Supplement or Second Plan Supplement, as applicable.

PLEASE TAKE FURTHER NOTICE that on August 21, 2020, the Debtors filed the *Notice of Filing of Second Plan Supplement* [Docket No. 841] (the "**Second Plan Supplement**").

PLEASE TAKE FURTHER NOTICE the Debtors hereby file this amended Plan Supplement (the "**Third Plan Supplement**," and collectively with the First Plan Supplement and Second Plan Supplement, as may be modified, amended, or supplemented from time to time, the "**Plan Supplement**") with respect to following documents:

| Exhibit | Document[3] |
|---|---|
| Exhibit A (marked as Exhibit D in the First Plan Supplement) | LLC Agreement of NewCo Holdings |
| Exhibit B (marked as Exhibit E in the First Plan Supplement) | New Board Disclosures |
| Exhibit C (marked as Exhibit G in the First Plan Supplement) | Amendment to Schedule of Rejected Contracts of Leases |
| Exhibit D | Class 6-B GUC Trust Agreement |

PLEASE TAKE FURTHER NOTICE that documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve all rights to amend, modify, or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan. If material amendments or modifications are made to

---

[3]    The exhibits set forth in the Plan Supplement remain subject to ongoing review and material revision in all respects.

2

085105.0000010 EMF_US 81614029v1

any of these documents, the Debtors may file a blackline with the Bankruptcy Court marked to reflect the same.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider confirmation of the Plan is scheduled to begin on **August 25, 2020 at 10:00 a.m. (prevailing Eastern Time)** before the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the exhibits contained in the Plan Supplement, and all documents filed in these chapter 11 cases are available free of charge by visiting https://www.omniagentsolutions.com/chinos. You may also obtain copies of the pleadings by visiting the Bankruptcy Court's website at https://www.vaeb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

3

Dated: August 24, 2020
   Richmond, Virginia

         */s/ Henry P. (Toby) Long, III*
         HUNTON ANDREWS KURTH LLP
         Tyler P. Brown (VSB No. 28072)
         Henry P. (Toby) Long, III (VSB No. 75134)
         Nathan Kramer (VSB No. 87720)
         Riverfront Plaza, East Tower
         951 East Byrd Street
         Richmond, Virginia 23219
         Telephone:  (804) 788-8200
         Facsimile:   (804) 788-8218

         -and-

         WEIL, GOTSHAL & MANGES LLP
         Ray C. Schrock, P.C. (admitted *pro hac vice*)
         Ryan Preston Dahl (admitted *pro hac vice*)
         Candace M. Arthur (admitted *pro hac vice*)
         Daniel Gwen (admitted *pro hac vice*)
         767 Fifth Avenue
         New York, New York  10153
         Telephone:  (212) 310-8000
         Facsimile:   (212) 310-8007

         *Attorneys for Debtors*
         *and Debtors in Possession*

4

## Exhibit A

**LLC Agreement of NewCo Holdings**

LIMITED LIABILITY COMPANY AGREEMENT

OF

[●], LLC

Dated as of [●], 2020

TABLE OF CONTENTS

Page

Article I Defined Terms .........................................................................................................2

    1.1    Definitions.............................................................................................................2
    1.2    Rules of Construction .........................................................................................8

Article II Organization .........................................................................................................8

    2.1    Formation of the Company .................................................................................8
    2.2    Name .....................................................................................................................9
    2.3    Purpose.................................................................................................................9
    2.4    Registered Office; Registered Agent; Principal Office; Other Offices ..................9
    2.5    Interest of Members; Property of Company .........................................................9
    2.6    Limited Liability .................................................................................................9
    2.7    Term ....................................................................................................................9

Article III Contributions of Members .................................................................................10

    3.1    Initial Contribution............................................................................................10
    3.2    Additional Capital Contributions......................................................................10
    3.3    Return of Contributions ....................................................................................10
    3.4    Interest on Capital Contributions .....................................................................10
    3.5    Advances by Members.......................................................................................10
    3.6    Common Interests .............................................................................................10
    3.7    Transfer Books ..................................................................................................11
    3.8    Certificate Signature .........................................................................................12

Article IV Distributions; Distributions in Kind .................................................................12

    4.1    Distributions......................................................................................................12
    4.2    Limitations on Distributions .............................................................................12
    4.3    Reserves ............................................................................................................12

Article V Transferability......................................................................................................12

    5.1    Transfer Generally ............................................................................................12
    5.2    Tag-Along Rights..............................................................................................12
    5.3    Drag-Along Right ..............................................................................................14
    5.4    Preemptive Rights.............................................................................................16
    5.5    General Restrictions on Transfer; Admission of New Members.......................19
    5.6    Resignation .......................................................................................................20
    5.7    Record of Members...........................................................................................20
    5.8    Registration Rights............................................................................................20

Article VI Governance .........................................................................................................20

    6.1    Board of Directors.............................................................................................20
    6.2    Appointment of Directors .................................................................................21
    6.3    Removal of Directors.........................................................................................22
    6.4    Vacancies ..........................................................................................................22
    6.5    Authority and Duties of the Board and Board Committees...............................22

6.6 Meetings; Telephonic Meetings.................................................................................23
6.7 Quorum; Acts of the Board and Board Committees....................................................24
6.8 Special Member Approval Requirements...................................................................25
6.9 Qualified IPO.............................................................................................................26
6.10 Officers ....................................................................................................................26
6.11 Officers as Agents; Duties of Officers......................................................................27
6.12 Powers of Members ..................................................................................................27
6.13 Confidentiality ..........................................................................................................27

Article VII Powers, Duties and Restrictions of the Company and the Members; Other
          Provisions Relating to the Members...................................................................28
7.1 Powers of the Company.............................................................................................28
7.2 Compensation of the Members and Directors ...........................................................28
7.3 Cessation of Status as a Member ..............................................................................29
7.4 Other Activities of the Members................................................................................29
7.5 Use of Name and Trade Marks .................................................................................29

Article VIII Books, Records and Accounting; Information Rights ...........................................29
8.1 Books of Account; Access .........................................................................................30
8.2 Deposits of Funds .....................................................................................................30
8.3 Information Rights.....................................................................................................30
8.4 Information Rights of the Company ...........................................................................31
8.5 Tax Matters ...............................................................................................................32

Article IX Term and Dissolution ...........................................................................................32
9.1 Term..........................................................................................................................32
9.2 Dissolution ................................................................................................................32
9.3 Application and Distribution of Assets......................................................................33
9.4 Termination of the LLC .............................................................................................33

Article X Representations and Warranties of Members ..........................................................33
10.1 Authority....................................................................................................................33
10.2 Binding Obligations...................................................................................................33
10.3 No Conflict................................................................................................................33
10.4 Purchase Entirely for Own Account ..........................................................................34
10.5 No Registration .........................................................................................................34
10.6 Investment Experience...............................................................................................34
10.7 Accredited Investor....................................................................................................34
10.8 Restricted Securities..................................................................................................34
10.9 Nonreliance................................................................................................................34

Article XI General Provisions................................................................................................35
11.1 Exculpation and Indemnification...............................................................................35
11.2 Entire Agreement; Amendments................................................................................36
11.3 Avoidance of Provisions............................................................................................36
11.4 Binding Agreement ...................................................................................................37
11.5 Notices ......................................................................................................................37

11.6    Governing Law ................................................................................................37
11.7    Consent to Jurisdiction; WAIVER OF JURY TRIAL.......................................37
11.8    Construction....................................................................................................38
11.9    Severability .....................................................................................................38
11.10   Counterparts, Electronic Copies ....................................................................38
11.11   Survival ...........................................................................................................38
11.12   Termination.....................................................................................................38
11.13   Further Assurance ..........................................................................................38

ANNEX I       REGISTRATION RIGHTS

SCHEDULE I COMPETITORS

EXHIBIT A   CERTIFICATE OF FORMATION
EXHIBIT B   FORM OF WARRANT
EXHIBIT C   INTERESTS OF MEMBERS
EXHIBIT D   CAPITAL CONTRIBUTIONS
EXHIBIT E   FORM OF JOINDER AGREEMENT

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF [●], LLC**

This Limited Liability Company Agreement of [●], LLC (the "Company") is made as of [●], 2020 (the "Effective Date"), by and among the Members listed on the signature pages hereto.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.1.

Recitals

WHEREAS, on [●], 2020, the Members formed the Company as a limited liability company pursuant to the Act, by causing to be filed a Certificate of Formation of the Company, attached hereto as Exhibit A (the "Certificate"), with the office of the Secretary of State of the State of Delaware;

WHEREAS, Chinos Holdings, Inc., a Delaware corporation ("Chinos Holdings"), along with certain of its Affiliates, commenced voluntary reorganization cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court for the Eastern District of Virginia on May 4, 2020, pursuant to a Transaction Support Agreement, dated May 3, 2020 (the "TSA"), which sets forth the plan of reorganization (the "Plan");

WHEREAS, on May 7, 2020, Chinos Holdings and certain consenting support parties entered into that certain credit agreement (the "DIP Credit Agreement") pursuant to which the DIP Lenders will provide up to $400,000,000 of senior secured term loan post-petition financing to Chinos Holdings (the "DIP Loan");

WHEREAS, on May 3, 2020, the Backstop Term Lenders have entered into that certain backstop commitment letter (the "Backstop Commitment Letter"), pursuant to which they have committed, subject to customary terms and conditions, to provide, severally and not jointly, (a) DIP Loans, the principal amount of which on the Effective Date will be converted into the New Term Loans and (b) on the Plan Effective Date, any additional New Term Loans not issued during the Chapter 11 Cases, in each case on terms consistent with the DIP Credit Agreement; and

WHEREAS, the Company was formed for the purpose of reorganizing Chinos Holdings, and in connection therewith and pursuant to the Plan, the Confirmation Order and the Backstop Commitment Letter (as applicable), the Company will (a) issue Common Interests to (i) existing holders of Term Loans and IPCo Notes on account of allowed Term Loan Secured Claims and allowed IPCo Notes Claims, (ii) the Backstop Term Lenders pursuant to the Backstop Commitment Letter, and (iii) the New Term Lenders for their pro rata portion of the New Term Loans and (b) issue warrants in the form attached hereto as Exhibit B to the New Term Lenders (the "Warrants") that entitle the holders thereof to acquire an additional fifteen percent (15%) of the Common Interests, in the aggregate, exercisable at a share price that assumes a transaction enterprise value of $1,750,000,000 (collectively, the "Transaction").

1

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**Article I**
**Defined Terms**

1.1     Definitions.  The following terms shall have the following meanings as used in this Agreement:

"ACG Directors" shall have the meaning set forth in Section 6.2(c).

"ACG Director Default" shall have the meaning set forth in Section 6.2(c).

"Act" shall mean the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as amended and in effect from time to time and any successor statute.

"Additional Capital Contribution" shall have the meaning set forth in Section 3.2(a).

"Affiliate" shall mean, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, including a Related Fund of such Person; provided that for purposes of this Agreement, no Member shall be deemed an Affiliate of the Company or any of its Subsidiaries.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Limited Liability Company Operating Agreement, including all annexes and exhibits hereto, as amended, restated or supplemented from time to time in accordance with the terms hereof.

"Anchorage" shall mean [●], and any of its Affiliates that are Members from time to time in accordance with the terms of this Agreement.

"Anchorage Cure Right" shall have the meaning set forth in Section 6.2(c).

"Available Cash" at the time of any proposed distribution shall mean the excess, as determined by the Board, of (a) all unrestricted cash and cash equivalents then held by the Company to the extent not otherwise required to pay the Company's expenses that have then accrued and are due and owing and all outstanding and unpaid current obligations of the Company as of such time over (b) the amount of reserves established by the Company in accordance with Section 4.3.

"Backstop Commitment Letter" shall have the meaning set forth in the recitals.

2

"Backstop Term Lenders" shall have the meaning ascribed thereto in the Backstop Commitment Letter.

"Bankruptcy" shall have the meaning ascribed thereto in Sections 18-101(1) and 18-304 of the Act.

"Board" shall have the meaning set forth in Section 6.1(a).

"Business Day" shall mean any day other than a Saturday, Sunday or another day on which commercial banks in New York are required or permitted under applicable laws or regulations to close.

"Capital Contribution" shall mean, at any date, the amount of all capital contributions contributed by a Member to the Company in its capacity as such at or prior to such date, which may be in the form of cash or property.

"Certificate" shall have the meaning set forth in the recitals.

"Chief Executive Officer" shall mean the chief executive officer of the Company.

"Chinos Holdings" shall have the meaning set forth in the recitals.

"Common Directors" shall have the meaning set forth in Section 6.2(e).

"Common Interests" shall mean the limited liability company interest(s) of a Member in the Company representing the rights of a Member to distributions (liquidating or otherwise) and any and all of the other benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the provisions of this Agreement and of the Act.

"Company" shall have the meaning set forth in the preamble.

"Company Confidential Information" shall have the meaning set forth in Section 6.13.

"Compelled Members" shall have the meaning set forth in Section 5.3(a).

"Competitor" shall mean any Person set forth on Schedule I and its Affiliates, provided that Schedule I may be modified by the Board in good faith from time to time to add Persons who are engaged in the business of selling clothing to retail consumers in North America or to remove Persons who are no longer engaged in such business.

"Covered Persons" shall have the meaning set forth in Section 11.1(a).

"D&O Insurance Policy" shall have the meaning set forth in Section 11.1(d).

"DIP Credit Agreement" shall have the meaning set forth in the recitals.

"DIP Loan" shall have the meaning set forth in the recitals.

3

"Director" shall have the meaning set forth in Section 6.1(a).

"DK" shall mean Davidson Kempner Capital Management LP and any of its Affiliates that are Members from time to time in accordance with the terms of this Agreement.

"Drag-Along Notice" shall have the meaning set forth in Section 5.3(b).

"Drag-Along Sale" shall have the meaning set forth in Section 5.3(a).

"Drag-Along Transaction" shall have the meaning set forth in Section 5.3(a).

"Effective Date" shall have the meaning set forth in the preamble.

"Ending Date" shall have the meaning set forth in Section 5.4(e).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended and any successor statute and the rules and regulations of the SEC thereunder, in each case as in effect from time to time.

"Excluded Securities" shall have the meaning set forth in Section 5.4(f).

"Exempt Person" shall mean, with respect to any Person, any Affiliate of such Person and such Person's or such Person's Affiliates' respective Representatives, in each case, who (a) has a reasonable need to know the contents of the Company Confidential Information or Member Confidential Information, as the case may be, (b) is informed of the confidential nature of the Company Confidential Information or Member Confidential Information and (c) agrees to keep such information confidential in accordance with the terms of this Agreement.

"Exit ABL Facility" shall have the meaning ascribed to it in the Term Sheet.

"Exit Term Loan Facility" shall have the meaning ascribed to it in the Term Sheet.

"Fair Market Value" shall mean (i) in the case of Publicly Traded Securities, the average closing price on the applicable trading exchange or quotation system on each trading day during the five (5) trading day period ending on the trading day prior to the measurement date, (ii) in the case of equity securities other than Publicly Traded Securities, the fair market value per equity security, as determined on a reasonable basis and in good faith by the Board, but without regard for any liquidity or minority discounts, or (iii) in the case of any other asset or property, the fair market value of such asset or property, as determined on a reasonable basis and in good faith by the Board.

"Fiscal Year" shall mean the fiscal year of the Company, which shall end on the Saturday nearest to January 31 of each year.

"GAAP" shall mean United States generally accepted accounting principles.

"GSO" shall mean GSO Capital Partners LP and any of its Affiliates that are Members from time to time in accordance with the terms of this Agreement.

4

"GSO/DK Cure Right" shall have the meaning set forth in Section 6.2(d).

"GSO/DK Director Default" shall have the meaning set forth in Section 6.2(d).

"Independent Director" shall have the meaning set forth in Section 6.2(e).

"Independent Director Selection Committee" shall have the meaning set forth in Section 6.2(e).

"Initial Capital Contribution" shall have the meaning set forth in Section 3.1.

"Interested Party" shall have the meaning set forth in Section 6.8(d).

"IPCo Notes" shall have the meaning ascribed to it in the TSA.

"IPCo Notes Claims" shall have the meaning ascribed to it in the Plan.

"Issuance Period" shall have the meaning set forth in Section 5.4(e).

"Issuance Price" shall have the meaning set forth in Section 5.4(a).

"Issuance Terms" shall have the meaning set forth in Section 5.4(a).

"Issued Securities" shall have the meaning set forth in Section 5.4(a).

"Liquidator" shall have the meaning set forth in Section 9.2(b).

"Member" shall mean any Person (i) listed on the signature pages hereto and automatically admitted to the Company as a member pursuant to the Plan and the Confirmation Order or (ii) hereafter admitted to the Company as an additional or substitute member of the Company as provided in this Agreement, each in its capacity as a member of the Company, and shall have the same meaning as the term "member" under the Act, but does not include any Person who has ceased to be a member of the Company from and after the date such Person has ceased to be a Member.

"Member Confidential Information" shall have the meaning set forth in Section 6.13.

"Member Director" shall mean a Director that is appointed hereunder by a Member.

"Member List" shall have the meaning set forth in Section 5.7.

"Minority Director" shall have the meaning set forth in Section 6.2(d).

"NASDAQ" shall mean the NASDAQ National Market.

"New Term Lenders" shall have the meaning ascribed to it in the Plan.

"New Term Loans" shall mean new senior secured first lien term loans extended to some of the Reorganized Debtors in an initial aggregate amount of $400,000,000, including any principal amount of DIP Obligations converted into such loans on a dollar-for-dollar basis.

"NYSE" shall mean the New York Stock Exchange.

"Observer" shall have the meaning set forth in Section 6.6(d).

"Offered Interests" shall have the meaning set forth in Section 5.4(a).

"Other Indemnitors" shall have the meaning set forth in Section 11.1(e).

"Percentage Interest" shall mean, with respect to a Member, the ratio of the number of Common Interests held by the Member at any time to the total number of Common Interests issued and outstanding at such time, expressed as a percentage.

"Person" shall mean any individual, partnership, joint stock company, corporation, entity, association, trust, limited liability company, joint venture, unincorporated organization and any government, governmental department or agency or political subdivision of any government.

"Plan" shall have the meaning set forth in the recitals.

"Potential Purchaser" shall mean, with respect to any Member, any Person or group of Persons other than an Affiliate of such Member or the Company or any of its Subsidiaries.

"Presiding Director" shall have the meaning set forth in Section 6.8.

"Publicly Traded Securities" shall mean securities that are registered under the Securities Act, are freely tradable and listed for trading on a national securities exchange.

"Purchase Period" shall have the meaning set forth in Section 5.4(b).

"Purchase Right" shall have the meaning set forth in Section 5.4(b).

"Purchase Right Notice" shall have the meaning set forth in Section 5.4(a).

"Purchasing Member" shall have the meaning set forth in Section 5.4(b).

"Qualified IPO" shall mean the issuance by the Company of its Common Interests in an underwritten primary public offering or any series of underwritten primary public offerings (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) that results in gross proceeds of at least $100,000,000, but excluding, for the avoidance of doubt, any distribution or dividend by the Company to its equityholders of any equity interest of a subsidiary of the Company that was formed to own or operate the Madewell business or the J. Crew business individually.

"Quarterly Financials" shall have the meaning set forth in Section 8.3(a).

6

"Reallotment Securities" shall have the meaning set forth in Section 5.4(c).

"Related Fund" shall mean, with respect to any Member, any fund, account or investment vehicle that is controlled, managed advised or sub-advised by such Member, a controlled Affiliate of such Member or the same investment manager or advisor as such Member or an Affiliate of such investment manager or advisor.

"Remaining Issued Securities" shall have the meaning set forth in Section 5.4(e).

"Reorganization" shall have the meaning set forth in Section 6.9.

"Representatives" shall have the meaning set forth in Section 6.13.

"Response Notice" shall have the meaning set forth in Section 5.4(b).

"Sale of the Company" shall mean any of the following: (a) a merger, consolidation, share exchange, business combination or other sale of the Company or its Subsidiaries into or with any other Person or Persons, or a transfer of units in a single transaction or a series of transactions, in which in any case the Members of the Company or the members of its Subsidiaries immediately prior to such merger, consolidation, share exchange, business combination or other sale or first of such series of transactions possess less than a majority of the voting power of the Company's or its Subsidiaries' or any successor entity's issued and outstanding capital securities immediately after such transaction or series of such transactions; or (b) a single transaction or series of transactions, pursuant to which a Person or Persons who are not direct or indirect wholly-owned Subsidiaries of the Company acquire all or substantially all of the Company's or its Subsidiaries' assets determined on a consolidated basis, provided that the sale or other disposition of the assets comprising either the Madewell business or the J. Crew business individually, at a time when the Company owns and operates both businesses, shall not be considered a sale of all or substantially all of the Company's or its Subsidiaries' assets for purposes of this definition.

"SEC" shall mean the United States Securities and Exchange Commission.

"Secure Site" shall have the meaning set forth in Section 8.3(a).

"Securities Act" shall mean the Securities Act of 1933, as amended and any successor statute and the rules and regulations of the SEC thereunder, in each case as in effect from time to time.

"Selling Members" shall have the meaning set forth in Section 5.3(a).

"Subsequent Purchase Period" shall have the meaning set forth in Section 5.4(c).

"Subsidiary" shall mean, with respect to any Person, any corporation fifty percent (50%) or more of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation is at the time owned by such Person, directly or indirectly through one or more Subsidiaries, and any other Person, including but not limited to a joint venture, a general or limited partnership or a limited liability company, in

which such Person, directly or indirectly through one or more Subsidiaries, at the time owns at least fifty percent (50%) or more of the ownership interests entitled to vote in the election of managing partners, managers or trustees thereof (or other Persons performing such functions) or acts as the general partner, managing member, trustee (or Persons performing similar functions) of such other Person.  For the avoidance of doubt, "Subsidiary" shall include any Person that is included in the Company's consolidated group for purposes of preparing the Company's consolidated financial statements in accordance with GAAP.

"Tag-Along Notice" shall have the meaning set forth in Section 5.2(b).

"Tag-Along Offered Interests" shall have the meaning set forth in Section 5.2(a).

"Tag-Along Purchaser" shall have the meaning set forth in Section 5.2(a).

"Tag-Along Record Date" shall have the meaning set forth in Section 5.2(b).

"Tag-Along Rightholder" shall have the meaning set forth in Section 5.2(a).

"Tag-Along Rightholder's Offer" shall have the meaning set forth in Section 5.2(b).

"Tag-Along Sale" shall have the meaning set forth in Section 5.2(a).

"Tag-Along Seller" shall have the meaning set forth in Section 5.2(a).

"Term Loans" shall have the meaning ascribed to it in the TSA.

"Term Loan Secured Claims" shall have the meaning ascribed to it in the Plan.

"Term Sheet" shall mean that certain Transaction Term Sheet attached as Exhibit A to the TSA.

"Transaction" shall have the meaning set forth in the recitals.

"Transfer" shall mean, (i) when used as a verb, to sell, transfer, assign, encumber or otherwise dispose of, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise and (ii) when used as a noun, a direct or indirect, voluntary or involuntary, sale, transfer, assignment, encumbrance or other disposition by operation of law or otherwise.

"TSA" shall have the meaning set forth in the recitals.

"Undiluted Percentage Interest" shall mean, without limiting the application of the last sentence of Section 1.2, (x) the ratio of the number of Common Interests held by the Member at any time to (y) the total number of Common Interests issued and outstanding at such time less the number of Common Interests issued pursuant to any management incentive plan of the Company or as equity incentives attached to a non-pro rata offering of the "Fixed Component" under the Exit Term Sheet (as defined in the TSA), as determined by the Board in good faith and expressed as a percentage.

"Warrants" shall have the meaning set forth in the recitals.

8

1.2     Rules of Construction.  Unless the context otherwise requires, definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The terms "include" and "including" and other words of similar import shall be deemed to be followed by the phrase "without limitation".  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or subsection.  The headings appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All section, subsection, clause and exhibit references not attributed to a particular document shall be references to such parts of this Agreement.  All equity percentage calculations set forth in this Agreement shall exclude therefrom any equity interests in the Company (including interests convertible into or exercisable or exchangeable for such equity interests) that constitute Excluded Securities, in addition to any other equity interests to be excluded from such calculations pursuant to the terms of this Agreement.

**Article II**
**Organization**

2.1     Formation of the Company.  The Company was formed as a limited liability company under the Act by the filing of the Certificate with the Secretary of State of the State of Delaware on [●], 2020.  The Company shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all requirements for operation of the Company as a limited liability company under this Agreement and the Act and under all other applicable laws of the State of Delaware and such other jurisdictions in which the Company determines that it may conduct business.

2.2     Name.  The name of the Company shall be "[●], LLC", as such name may be modified from time to time by the Board as it may deem advisable.

2.3     Purpose.  Subject to any limitations on the activities of the Company otherwise specified in this Agreement, the purpose and business of the Company shall be to (a) engage in any and all activities as the Board may reasonably determine to be necessary or advisable to the carrying out of the foregoing purpose and business of the Company and (b) conduct any other business or activity that may be conducted by a limited liability company organized pursuant to the Act.

2.4     Registered Office; Registered Agent; Principal Office; Other Offices.  The registered office of the Company shall be the office of the initial registered office named in the Certificate or such other registered office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Act.  The registered agent of the Company shall be [The Corporation Service Company, which is located at 251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808][1], or such other Person or Persons as the Board may designate from time to time in the manner provided by the Act.  The address of the principal office of the Company on the date hereof is [●] and the Company shall maintain there the records required to be maintained under

---

[1] **Note to Draft**: Registered Agent to be confirmed.

Section 18-305 of the Act.  In addition, the Company may maintain such other offices as the Board may deem advisable at any other place or places within or without the State of Delaware.

2.5     Interest of Members; Property of Company.  Common Interests held by a Member shall be personal property of such Member for all purposes.  All real and other property owned by the Company shall be deemed property of the Company that is owned by the Company as an entity, and no Member shall own such property in an individual capacity.  No Member shall be entitled to interest on or with respect to any Capital Contribution.  Except as provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or to receive distributions from the Company.

2.6     Limited Liability.  Except as otherwise expressly required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Member shall be obligated personally for any such debt, obligation or liability solely by reason of being a Member of the Company.

2.7     Term.  The term of the Company commenced on the date of filing of the Certificate, and shall be perpetual unless the Company is earlier dissolved and its existence terminated in accordance with the provisions of this Agreement.

## Article III
## Contributions of Members

3.1     Initial Contributions.  Pursuant to the Plan and the Confirmation Order, each Member shall be automatically deemed to have made the initial Capital Contributions (the "Initial Capital Contributions") set forth in Exhibit D in exchange for its Common Interests. After giving effect to the Initial Capital Contributions, each Member shall hold the Common Interests set forth on Exhibit C opposite such Member's name.

3.2     Additional Capital Contributions.

(a)     Subject to Sections 5.4, and without limitation to Section 3.2(b), in addition to the Initial Capital Contributions, Members may from time to time make Capital Contributions to the Company (each, an "Additional Capital Contribution" and, for the avoidance of doubt, any Initial Capital Contribution shall not be deemed to be an Additional Capital Contribution) at such times and in such amounts as the Board may determine to accept from the Members.  Except as required by law, no Member shall be required to make any Additional Capital Contributions to the Company.

(b)     Additional Capital Contributions shall be made in cash or, with the approval of the Board, in other property.  The value assigned to any non-cash Additional Capital Contribution shall be equal to the Fair Market Value thereof.

3.3     Return of Contributions.  No Member shall be entitled to the return of any part of its Capital Contributions except as specified in this Agreement.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to

contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.4     Interest on Capital Contributions.  No Member shall be entitled to interest on, or with respect to, any Capital Contribution.

3.5     Advances by Members.  If the Company does not have sufficient funds to pay its obligations, any Member(s) that may agree to do so, with the consent of the Board, may advance all or part of the funds required to, or on behalf of, the Company.  An advance described in this Section 3.5 constitutes a loan from such Member(s) to the Company, and shall not constitute a Capital Contribution.

3.6     Common Interests.

(a)     The Company shall have one class of Common Interests, which shall constitute limited liability company interests under the Act.  All Common Interests are identical to each other and accord the holders thereof the same obligations, rights and privileges as are accorded to each other holder thereof, except for any specific obligations, rights and privileges expressly set forth in this Agreement.

(b)     The Company is authorized to issue certificates to represent any or all of the Common Interests.  In the event the Company issues certificates evidencing the Common Interests issued by the Company, the certificates shall bear the following restrictive legends (in addition to any legend restrictions required under applicable state securities laws):

"THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SET FORTH IN, AND THIS CERTIFICATE AND THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY ARE ISSUED IN ACCORDANCE WITH AND SHALL IN ALL RESPECTS BE SUBJECT TO, THE TERMS AND PROVISIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT OF [●], LLC, DATED AS OF [●], 2020, AS THE SAME MAY BE AMENDED AND/OR RESTATED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS (THE "AGREEMENT").   THE   TRANSFER,   SALE,   ASSIGNMENT, ENCUMBRANCE OR DISPOSITION IN ANY MANNER, WHETHER DIRECT OR INDIRECT, VOLUNTARY OR INVOLUNTARY, BY OPERATION OF LAW OR OTHERWISE, OF THIS CERTIFICATE AND THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY ARE RESTRICTED AS DESCRIBED IN THE AGREEMENT."

In addition, unless counsel to the Company has advised the Company that such legend is not necessary, each certificate evidencing Common Interests issued by the Company shall bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED

11

PURSUANT TO THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND SUCH SECURITIES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THEY ARE REGISTERED AND QUALIFIED IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL APPLY."

(c)     Subject to the requirements of Section 5.4, the Company is hereby authorized to issue additional Common Interests from time to time, subject to prior authorization of the Board in accordance with the terms of this Agreement.  In addition, the Company is hereby authorized to issue Common Interests pursuant to the exercise of any Warrant, which shall not require any prior authorization of the Board or the Members.

3.7     Transfer Books.  The Company shall maintain books for the purpose of registering the Transfer of Common Interests.  If Common Interests are represented by certificates, in connection with a Transfer in accordance with this Agreement of any certificated Common Interests, the endorsed certificate(s) evidencing the Common Interests shall be delivered to the Company for cancellation, and the Company shall thereupon issue a new certificate to the transferee evidencing the Common Interests that were Transferred and, if applicable, the Company shall issue a new certificate to the transferor evidencing any Common Interests registered in the name of the transferor that were not Transferred.

3.8     Certificate Signature.  If Common Interests are represented by certificates, each such certificate shall be executed by manual or .pdf signature of an officer on behalf of the Company.

**Article IV**
**Distributions; Distributions in Kind**

4.1     Distributions.  Subject to the provisions of Section 4.2, the Company shall distribute Available Cash to the Members pro rata in accordance with the respective number of Common Interests held by such Member from time to time as determined by the Board.

4.2     Limitations on Distributions.

(a)     Anything to the contrary herein notwithstanding, no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of the Act.

(b)     In the event that a distribution is not made as a result of the application of paragraph (a) of this Section 4.2, all amounts so retained by the Company shall continue to be subject to all of the debts and obligations of the Company.  The Company shall make such distribution as soon as such distribution would not be prohibited pursuant to this Section 4.2.

4.3     Reserves.  The Company may establish reserves in such amounts and for such time periods as the Board determines is reasonably necessary or prudent for estimated accrued Company expenses, obligations and liabilities (including amounts owed, restricted or reserved by or in connection with, to the extent applicable, any agreement or any other instrument to which

the Company or any of its direct or indirect Subsidiaries is a party governing indebtedness of the Company or any of its Subsidiaries) and any contingent or unforeseen Company liabilities. When such reserves are no longer necessary, the balance shall be distributed to the Members in accordance with this Article IV.

### Article V
### Transferability

5.1     Transfer Generally.  No Member shall be permitted to Transfer all or any portion of its Common Interests except pursuant to, and in compliance with, this Article V.  No Transfer of any Common Interest in the Company shall be effective until such time as all requirements of this Article V in respect thereof have been satisfied and, if consents, approvals or waivers are required by the Board, all of same shall have been confirmed in writing by the Board.  Subject to Section 5.2, Section 5.3 and Section 5.5, a Member may Transfer all or a portion of its Common Interest in the Company without the consent of the Board or any other Member.

5.2     Tag-Along Rights.

(a)     Without limiting the other terms and conditions hereof, if at any time one or more Members (a "Tag-Along Seller") propose to Transfer twenty-five percent (25%) or more of the outstanding Common Interests (but less than one hundred percent (100%) of the Common Interests), in a single transaction or series of transactions (other than any Drag-Along Transaction or any Transfers by a Member to any Affiliates of such Member, a "Tag-Along Sale", and the purchaser involved in such transaction(s), the "Tag-Along Purchaser"), then, each other Member (other than Affiliates of a Tag-Along Seller) (each, a "Tag-Along Rightholder") shall have the right to make an offer to sell to such Tag-Along Purchaser, at the same price and upon the same terms and conditions set forth in the Tag-Along Notice (as defined below), a number of Common Interests held by such Tag-Along Rightholder (the "Tag-Along Offered Interests") equal to the product obtained by multiplying (i) the total number of Common Interests owned by such Tag-Along Rightholder at the Tag-Along Record Date (as defined below) by (ii) a fraction, the numerator of which is the number of Common Interests intended to be sold by the Tag-Along Seller in such Tag-Along sale and the denominator of which is the total number of Common Interests owned by such Tag-Along Seller at the Tag-Along Record Date.

(b)     The Tag-Along Seller shall give written notice to the Company of each proposed Transfer by it that gives rise to the rights of the Tag-Along Rightholders set forth in this Section 5.2, at least thirty (30) days prior to the proposed consummation of such Transfer and the Company, within three (3) Business Days after receiving notice from such Tag-Along Seller, shall give notice of such Transfer to each Tag-Along Rightholder.  The close of business on the tenth (10th) Business Day following the date that each notice is given by the Company shall be deemed to be the "Tag-Along Record Date".  The notice provided by the Tag-Along Seller, and forwarded by the Company, shall set forth in reasonable detail, based on information available to the Tag-Along Seller, the name of such Tag-Along Seller, the number of Common Interests that will be held by such Tag-Along Seller as of the Tag-Along Record Date and the number of Common Interests proposed to be sold by such Tag-Along Seller, the name of and contact information for the proposed Tag-Along Purchaser (including any material relationships with the Company or any Tag-Along Seller), the proposed amount and form of consideration and terms

13

and conditions of payment offered by such Tag-Along Purchaser, the percentage (or a reasonable estimate of the minimum and maximum percentage) of its Common Interests that such Tag-Along Rightholder may sell to such Tag-Along Purchaser (determined in accordance with Section 5.2(a)) and the per share purchase price (or a reasonable estimate of the maximum and minimum per share purchase price) (the "Tag-Along Notice").  The tag-along rights provided by this Section 5.2 must be exercised by any Tag-Along Rightholder wishing to sell Tag-Along Offered Interests no later than the Tag-Along Record Date, which exercise shall be by delivery of a written irrevocable offer (the "Tag-Along Rightholder's Offer") to the Tag-Along Seller and the Company indicating such Tag-Along Rightholder's wish to have its Tag-Along Offered Interests included in the Tag-Along Sale and specifying the number of Tag-Along Offered Interests (up to the maximum number of Tag-Along Offered Interests as determined in accordance with Section 5.2(a)) it wishes to sell; provided that any Tag-Along Rightholder may waive its tag-along rights under this Section 5.2 with respect to such Tag-Along Sale prior to the expiration of such ten (10) Business Day period by giving written notice thereof to the Tag-Along Seller, with a copy to the Company (and failure to deliver a Tag-Along Rightholder's Offer by the Tag-Along Record Date will be deemed to be a waiver of such Tag-Along Rightholder's tag-along rights under this Section 5.2 with respect to such Tag-Along Sale). Subject to the other terms herein, delivery of the Tag-Along Rightholder's Offer will constitute an irrevocable binding commitment by such Tag-Along Rightholder to sell the number of Tag-Along Offered Interests specified in such Tag-Along Rightholder's Offer on the terms set forth in the Tag-Along Notice.

(c)    The Tag-Along Seller shall attempt to obtain the inclusion in the proposed Tag-Along Sale of the entire number of Tag-Along Offered Interests that the Tag-Along Rightholders timely elect to have included in such Tag-Along Sale.  If the Tag-Along Seller is unable to obtain such inclusion of all such Tag-Along Offered Interests, then (i) the number of Tag-Along Offered Interests to be sold in such Tag-Along Sale shall be allocated on a pro rata basis among the Tag-Along Seller and each Tag-Along Rightholder who shall have timely elected to participate in such Tag-Along Sale in proportion to the total number of Common Interests offered and eligible to be sold in the Tag-Along Sale by each such Member or (ii) the Tag-Along Seller shall be permitted to sell its Common Interests in such Tag-Along Sale provided that it purchases, for the same price and upon the same terms, from each Tag-Along Rightholder who shall have timely elected to participate in such Tag-Along Sale the number of Common Interests that such Tag-Along Rightholder could have included in such Tag-Along Sale.

(d)    The Tag-Along Rightholders shall make or provide the same representations, warranties, covenants (other than non-competes and restrictive covenants), indemnities and agreements the Tag-Along Seller makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Tag-Along Seller, the Tag-Along Rightholders shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to them).  The liability of any Tag-Along Rightholder shall be capped at the proceeds actually received in such sale by such Tag-Along Rightholder and no Tag-Along Rightholder shall be required to enter into noncompetition, non-solicitation or similar restrictive covenants and each Tag-Along Rightholder's liability shall be several and not joint.  If (i) the Tag-Along Seller has not consummated the Tag-Along Sale within forty-five (45) days of the delivery to the

14

Company of the related Tag-Along Notice (for any reason other than the failure of a Tag-Along Rightholder to sell its Common Interests under this Section 5.2) or (ii) the terms and conditions of the Tag-Along Sale shall change, in any respect, from those in the Tag-Along Notice, then the Tag-Along Notice and any Tag-Along Rightholder's Offer shall be null and void and it shall be necessary for a separate Tag-Along Notice to be furnished and the terms and provisions of this Section 5.2 separately complied with, in order to subsequently consummate such proposed Tag-Along Sale pursuant to this Section 5.2; provided, however, that the Tag-Along Notice and the Tag-Along Rightholder's Offers shall not be null and void if the Tag-Along Seller receives the unanimous written consent of each of the Tag-Along Rightholders agreeing to an extension and/or revised terms.  Notwithstanding any other provision of this Section 5.2, there shall be no liability on the part of any Tag-Along Seller to any other Member arising from the failure of any Tag-Along Seller to consummate the Tag-Along Sale for any reason and the decision to consummate such Tag-Along Sale shall be in the sole discretion of the Tag-Along Seller.

5.3     Drag-Along Right.

(a)     If one (1) or more Members holding sixty-six percent (66%) or more of the outstanding Common Interests (such Members, the "Selling Members") propose to consummate a Drag-Along Transaction with a Potential Purchaser in a bona fide transaction, the Selling Members may, at their option, require the other Members (the "Compelled Members") to sell to the Potential Purchaser the same portion of its own Common Interests as is being sold by the Selling Members in such transaction, or otherwise participate in such transaction, on the same terms and conditions upon which the Selling Members propose to enter into such sale (a "Drag-Along Sale"), subject to the other provisions of this Section 5.3.  "Drag-Along Transaction" means: (a) any merger, recapitalization, consolidation or restructuring or any other transaction that would result in a change of control of the Company; (b) a sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries (together as a whole) to be followed promptly by a dissolution with respect to the Company or a distribution to the Members of all or substantially all of the net proceeds of such disposition after payment or other satisfaction of liabilities and other obligations of the Company and its Subsidiaries; or (c) the sale of sixty-six percent (66%) or more of the outstanding Common Interests in a single transaction or series of related transactions.  Notwithstanding the foregoing, any Transfers solely among Members, on one hand, and Affiliates of such Members, on the other hand, shall be excluded from the definition of "Drag-Along Transaction".

(b)     The Selling Members shall provide a written notice (the "Drag-Along Notice") of such Drag-Along Sale to each of the Compelled Members, with a copy to the Company, not later than ten (10) Business Days prior to the proposed consummation of the Drag-Along Sale by the Potential Purchaser.  The Drag-Along Notice shall contain written notice of the exercise of the rights of the Selling Members pursuant to Section 5.3(a), setting forth the applicable form of consideration, and price per Common Interest, to be paid by the Potential Purchaser and all other material terms and conditions of the Drag-Along Sale and a copy of the definitive purchase agreement or similar document providing for the Drag-Along Sale.

(c)     At the closing of the Drag-Along Sale, the Potential Purchaser shall remit to each Compelled Member the total consideration due such Compelled Member in respect of the Common Interests sold by such Compelled Member in the Drag-Along Sale, less a pro rata

15

portion of any amounts to be held in escrow or subject to an earn-out or similar provision and of the expenses (including reasonable documented legal expenses) incurred by the Selling Members in connection with such sale for the benefit of and on behalf of all the Selling Members.

(d)	If the Selling Members shall not have completed the Drag-Along Sale on the later of (i) the date that is one hundred twenty (120) calendar days following delivery of the Drag-Along Notice and (ii) the fifth Business Day following the expiration or termination of all waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and receipt of all requisite consents or approvals under any other applicable regulatory regimes, to the extent applicable to such Drag-Along Sale, then no Member shall have any obligation with respect to the Drag-Along Sale set forth in such Drag-Along Notice; provided that the provisions of this Section 5.3 shall apply to any subsequent Drag-Along Sale.

(e)	Except as expressly provided in this Section 5.3, the Selling Members shall have no obligation to any Compelled Member to consummate any Drag-Along Sale (it being understood that any and all such decisions shall be made by the Selling Members in their sole discretion).  In the event that the Drag-Along Sale is not consummated by the Selling Members, the Compelled Members shall not be entitled to sell or otherwise dispose of any of their Common Interests directly to any third party or parties pursuant to such Drag-Along Sale (it being understood that all such sales and other dispositions shall be made only on the terms and pursuant to the procedures set forth in this Article V).

(f)	In furtherance of, and not in limitation of, the foregoing, in connection with any Drag-Along Sale, each Member will (i) to the fullest extent permitted by law, raise no objections in its capacity as a Member against the Drag-Along Sale or the process pursuant to which it was arranged and waive all dissenters rights, appraisal rights and similar rights in connection with the Drag-Along Sale, (ii) vote or provide its written consent with respect to all of its Common Interests in favor of the transaction pursuant to which the Transfer is effected and (iii) execute all documents containing terms and conditions consistent with the provisions of this Section 5.3 which are also executed by the Selling Members and are reasonably necessary to effect the transaction; provided, however, that no Compelled Member shall be required to enter into a release or non-compete or non-solicitation or no-hire provision, an exclusivity provision or any other provision that is not a strictly financial term related directly to such Drag-Along Sale; provided further that (A) the liability of the Members shall be several and not joint, (B) no Compelled Member shall have any liability to the Company or any other Member for any breaches of the representations, warranties or covenants of any other Member or the fraud or willful misconduct of any other Member, (C) any obligations of a Compelled Member under the agreement governing such transaction and any related escrow agreement shall be borne pro rata among the Members based on the proceeds and assets payable to such Members in such transaction (other than with respect to representations and warranties that relate specifically to a particular Member or its Common Interests, which obligations shall be borne solely by such Member) and shall in no event exceed the actual proceeds and assets received by such Compelled Member in such transaction, and (D) no Compelled Member shall be required to make any representations or warranties or covenants in connection with such transaction except, as applicable, with respect to (1) such Compelled Member's ownership of such Compelled Member's Common Interests, (2) subject to the provisions of clauses (B) and (C) above, customary security holder indemnities for breaches of such Compelled Member's

representations, warranties and covenants, (3) such Compelled Member's ability to convey title to such Compelled Member's Common Interests free and clear of liens, (4) such Compelled Member's ability, power and authority to enter into the transaction, and (5) customary and reasonable covenants regarding confidentiality, publicity and similar matters that are consistent with those set forth in this Agreement.

(g)     Notwithstanding anything in this Section 5.3 to the contrary, if the Selling Members or any of their respective Representatives, directly or indirectly, receive any consideration from the Potential Purchaser or any of the Potential Purchaser's Affiliates in connection with, or pursuant to oral or written agreements entered into substantially contemporaneously with, a Drag-Along Sale (including any payment for non-compete covenants, consulting arrangements or advisory or transaction services) other than (i) the consideration that is received by the Compelled Members on a pro rata basis as part of the Drag-Along Sale in accordance with Section 5.3(h) and (ii) consideration that is received by any Member for bona fide services rendered to the Company for periods commencing following the closing of a Drag-Along Sale on an arm's-length basis, then the Selling Members shall cause each of the Compelled Members to receive their pro rata share, determined by reference to the respective amounts of consideration otherwise payable to each Member (including the Selling Members) as part of the Drag-Along Sale, of such consideration.

(h)     All Members shall receive the same type and amount of consideration per share of Common Interests in connection with a Drag-Along Sale (or if any Member is given an option as to the form of consideration to be received, all other Members shall be given the same option on the same terms).

5.4     Preemptive Rights.

(a)     At any time prior to a Qualified IPO, if the Company or any of its Subsidiaries proposes to issue or sell (i) any Common Interests (including any securities exchangeable or exercisable for, or convertible into, Common Interests) or other equity or equity-linked securities (including any securities exchangeable or exercisable for, or convertible into, such other equity securities), (ii) convertible debt securities, or (iii) other securities issued in any private placement or that carry with them any right to receive equity securities of the Company (collectively, the "Offered Interests"), in each case, other than Excluded Securities, the Company shall (or shall cause such Subsidiary to) first deliver written notice of its proposal to do so (the "Purchase Right Notice") to each of the Members that, together with its Affiliates, holds, in the aggregate, one percent (1%) or more of the outstanding Common Interests. The Purchase Right Notice must: (A) identify the name and address of each Person (if known) to which the Company or such Subsidiary proposes to issue or sell the Offered Interests; (B) specify the number of Offered Interests (other than Excluded Securities) that the Company or such Subsidiary proposes to issue or sell (such Offered Interests or other equity securities, the "Issued Securities"); (C) describe the consideration per Issued Security (expressed as a value in cash, the "Issuance Price"); (D) describe the material terms and conditions upon which the Company or such Subsidiary proposes to issue or sell the Issued Securities (the "Issuance Terms"); and (E) irrevocably offer to issue or sell to each Member any number of Issued Securities up to a pro rata portion of the Issued Securities, based on the ratio of the number of Common Interests held by such Member to the number of Common Interests held by all the Members at such time (which in the case of an

issuance by a Subsidiary of the Company, will be determined on a "look-through" basis), for the Issuance Price and on the Issuance Terms and in accordance with this <u>Section 5.4(a)</u>.

(b)      Each eligible Member shall have an option, exercisable for a period of ten (10) calendar days from the date of delivery of the Purchase Right Notice (the "<u>Purchase Period</u>"), to purchase any number of Issued Securities up to a pro rata portion of the Issued Securities, based on the ratio of the number of Common Interests held by such Member to the number of Common Interests held by all the Members at such time (determined without regard to Members not eligible for such Purchase Right (as defined below)) (which in the case of an issuance by a Subsidiary of the Company, will be determined on a "look-through" basis), for the Issuance Price and on the Issuance Terms (the "<u>Purchase Right</u>").  The Purchase Right shall be exercised by delivery by such Member (a "<u>Purchasing Member</u>") of written notice to the Company (a "<u>Response Notice</u>"), which shall state the number of Issued Securities to be purchased by such Member and shall include a representation letter certifying that such Member is an "accredited investor" within the meaning of Rule 501 under the Securities Act.  Any Response Notice delivered by a Purchasing Member to the Company exercising its Purchase Right shall constitute an irrevocable commitment by such Purchasing Member to purchase the number of Issued Securities specified in such written notice in accordance with the Purchase Right Notice and this <u>Section 5.4</u>.

(c)      If a Member does not exercise its Purchase Right during the applicable Purchase Period, then such Member's Purchase Right with respect to such Issued Securities shall irrevocably terminate with respect to such issuance.  If any Member does not exercise its Purchase Right with respect to any such issuance, each Purchasing Member will have the option, exercisable for a period of five (5) calendar days from the date on which the Purchase Period concludes (the "<u>Subsequent Purchase Period</u>"), to purchase all or any portion of the Issued Securities not subscribed for during the Purchase Period. This right will be described in the Purchase Right Notice, and the Response Notice may set forth an amount of additional Issued Securities ("<u>Reallotment Securities</u>") that such Purchasing Member would be willing to purchase in the event there is any under-subscription for the entire amount of the Issued Securities. In the event the Response Notices (after taking into account the Reallotment Securities) are given for an amount less than or equal to the amount of the Issued Securities, each Purchasing Member that has requested Reallotment Securities shall be issued the amount of Reallotment Securities so requested. In the event that the Response Notices (after taking into account the Reallotment Securities) are given for an amount greater than the amount of the Issued Securities, the Company shall apportion the Issued Securities unsubscribed for to those Purchasing Members whose Response Notices requested an amount of Reallotment Securities, which apportionment shall be made among such Purchasing Members pro rata based on the ratio of the number of Issued Securities initially subscribed for by each such Purchasing Member relative to the number of Issued Securities initially subscribed for by all Purchasing Members; <u>provided</u>, <u>however</u> that in no event will any Purchasing Member be obligated to purchase any amount of Reallotment Securities that is greater than the amount of Reallotment Securities that such Purchasing Member stated it would be willing to purchase in its Response Notice.

(d)      Each Purchasing Member shall purchase from the Company or such Subsidiary, and the Company or such Subsidiary shall issue or sell to such Purchasing Member, the number of Issued Securities that such Purchasing Member elected to purchase in accordance with this

18

Section 5.4 for the Issuance Price and on the Issuance Terms on (i) the date of the closing of the issuance of the Issued Securities described in the Purchase Right Notice or (ii) such other date as may be agreed in writing by the Company or such Subsidiary and such Purchasing Member.

(e)      Upon the earlier of (i) the expiration of the Subsequent Purchase Period and (ii) delivery of written notices to the Company from all the Members indicating their intent, in the aggregate, to purchase less than all of the Issued Securities (the date of such earlier occurrence, the "Ending Date"), the Company or such Subsidiary shall have the right, exercisable for a period of forty-five (45) calendar days from the Ending Date (the "Issuance Period"), to issue or sell all or a portion of the Issued Securities that the Members have elected not to purchase (the "Remaining Issued Securities") to any Person for a price per Issued Security that is not less than the Issuance Price and on material terms and conditions that are not more favorable to such other Person than the Issuance Terms; provided that (A) the Company or such Subsidiary shall be deemed to have issued or sold Remaining Issued Securities during the Issuance Period if it, during the Issuance Period, has irrevocably entered into a bona fide binding agreement to issue or sell the Remaining Issued Securities to any Person and (B) the closing of such Transfer must occur within forty-five (45) calendar days after the execution of such bona fide binding agreement.  If the Company or such Subsidiary ever wishes to issue or sell the Remaining Issued Securities for a price per Issued Security that is less than the Issuance Price or on material terms and conditions that are more favorable than the Issuance Terms, or if the Company or such Subsidiary wishes to issue or sell the Remaining Issued Securities following the expiration of the Issuance Period, the Company or such Subsidiary shall be required first to comply with this Section 5.4 anew.

(f)      The Purchase Rights established by this Section 5.4 shall have no application to any of the following issuances (collectively, the "Excluded Securities"):

(i)      Common Interests issuable upon conversion or exercise of the Warrants issued or to be issued to the New Term Lenders pursuant to the Plan and the Confirmation Order;

(ii)      Common Interests or other equity securities issued in connection with any equity split, dividend, distribution, division or recapitalization by the Company or any Subsidiary of the Company, pursuant to which all holders of the Common Interests or such other equity securities are treated equivalently;

(iii)      Common Interests or other equity securities or options to purchase Common Interests or such other equity securities, in each case issued in connection with bona fide employee compensation, director compensation, hiring or retention arrangements or plans approved by the Board or the applicable governing body of any Subsidiary of the Company;

(iv)      Common Interests or other equity securities or options to purchase Common Interests or such other equity securities issued as consideration to unaffiliated third parties (or to affiliated parties in a transaction complying with Section 6.8(d)) in connection with bona fide acquisitions, mergers, joint ventures or similar transactions;

19

(v)      Common Interests or other equity securities issued by the Company or any of its Subsidiaries to any of the Company or its Subsidiaries;

(vi)      Equity securities which are the subject of an effective registration statement being filed under the Securities Act in connection with the closing of an underwritten public offering, covering the offer and sale of the equity securities of the Company, after which closing such equity securities will be quoted on NASDAQ or listed or quoted on the NYSE or other national securities exchange acceptable to the Board;

(vii)      Common Interests issued to financial institutions, commercial lenders, broker/finders or any similar party, or their respective designees, as "equity kickers" in connection with the incurrence or guarantee of additional indebtedness by the Company or any of its subsidiaries under the Exit Term Loan Facility; and

(viii)      Common Interests issued as distributions-in-kind to all holders of Common Interests on a pro rata basis.

(g)      Each Member shall have the right to transfer its Purchase Right, and its right to purchase any Issued Securities resulting from the exercise of such Purchase Right, to one or more of its Affiliates; provided that any such assignment by a Member shall not relieve such Member from any liability for breach of this Section 5.4 by such Affiliate.

      5.5      General Restrictions on Transfer; Admission of New Members.

(a)      Any Person acquiring one or more Common Interests from the Company or from any Member in accordance with this Agreement shall, unless such acquiring Person is already a Member as of immediately prior to such acquisition, be admitted to the Company as a Member only upon execution of a joinder to this Agreement substantially in the form attached hereto as Exhibit E.

(b)      Notwithstanding anything to the contrary contained in this Agreement, no Transfer of Common Interests issued to a Member pursuant to the Plan or in connection with the exercise of the Warrants shall be made if such Transfer or issuance (i) would result in any circumstances that the Board determines could require the Company to file reports under the Exchange Act, (ii) would violate any state or U.S. federal securities laws, (iii) would require the Company to register as an investment company under the Investment Company Act of 1940, as amended, or (iv) would require the Company to register as an investment adviser under state or U.S. federal securities laws.

(c)      If any Member purports to Transfer Common Interests to any Person in a transaction that would violate the provisions of this Article V or that would violate any applicable federal or state securities law, such Transfer shall be void *ab initio* and of no effect.

(d)      No Transfer of Common Interests may be made to any Competitor of the Company without the approval of the Board, other than in a Drag-Along Sale in accordance with Section 5.3.

20

5.6     Resignation.  No Member shall have the right or power to resign, withdraw or retire from the Company, except upon a Transfer of all of such Member's Common Interests in compliance with and subject to, the provisions of this Article V.

5.7     Record of Members. The Board shall be responsible for maintaining, at the Company's principal place of business, an up-to-date list of all Members ("Member List"), which shall reflect the name of each Member and the number Common Interests and Percentage Interest held by such Member.  The Board shall be required to update the Member List and Exhibit C of this Agreement from time to time so as to accurately reflect the information contained thereon upon (a) the resignation of a Member, (b) the admission of a new Member or (c) any change in the number of Common Interests owned by a Member.

5.8     Registration Rights.  The Members shall have the registration rights, and Transfers shall be subject to terms and conditions, set forth on Annex I, which is hereby made part of this Agreement as if it was set forth in full in this Section 5.8.

**Article VI**
**Governance**

6.1     Board of Directors.

(a)     Except for situations in which the approval of any Member is required by this Agreement, management of the Company shall be vested in the Board.  "Board" means all the Persons elected and serving from time to time as the Board in accordance with Section 6.1(c) and Section 6.2.  Each member of the Board is referred to as a "Director". There is no limit on the number of terms a Director may serve on the Board and a Director need not be a resident of the State of Delaware or a Member of the Company.

(b)     The Company shall require that each of its Subsidiaries be governed by governing documents that prohibit such Subsidiary from taking action in subversion of the rights of Members as set forth herein (it being understood that any action by the Company permitted hereunder, including with respect to actions relating to it and its Subsidiaries on a consolidated basis, shall not require additional consent hereunder solely because such action instead is taken by a Subsidiary of the Company).

(c)     Subject to the provisions of Section 6.11 to the extent applicable, (i) this Agreement is not intended to, and does not, create or impose any fiduciary duty on any Director, and each of the Members and the Company hereby waive any and all fiduciary duties that, absent such waiver, may be implied by applicable law and, in doing so, acknowledge and agree that the duties and obligations of each such Director to the Company are only as expressly set forth in this Agreement, and (ii) the provisions of this Agreement, to the extent that they restrict the duties and liabilities of any Director otherwise existing at law or in equity, are agreed by the Members and the Company to replace such other duties and liabilities of any such Director. Each Director's liability to the Company, any Member, any other Director or any other Person for breach of duties (including fiduciary duties) to the Company, any Members, any other Directors or any other Person by reason of or arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company, shall be limited to

21

the fullest extent permitted by Delaware law, except to the extent that it is determined by a final, non-appealable order of a court of competent jurisdiction that any of the foregoing was caused by a bad faith violation of the implied contractual covenant of good faith and fair dealing or actual fraud or willful misconduct, or, with respect to any criminal action or proceeding against a Director, that such Director had reasonable cause to believe such Director's conduct was unlawful.

6.2    Appointment of Directors.   The Board shall initially consist of seven (7) Directors, of which:

(a)    one (1) shall be the chief executive officer of J.Crew Group, Inc.;

(b)    one (1) shall be the chief executive officer of Madewell, Inc.;

(c)    three (3) shall be appointed by funds sponsored or affiliated with Anchorage (the "ACG Directors"); provided that in the event Anchorage's Undiluted Percentage Interest (i) is less than thirty percent (30%) but greater than fifteen percent (15%), Anchorage shall have the right to appoint two (2) ACG Directors, and one (1) ACG Director shall immediately resign from the Board, (ii) is less than fifteen percent (15%) but greater than ten percent (10%), Anchorage shall have the right to appoint one (1) ACG Director, and any additional ACG Directors shall immediately resign from the Board, and (iii) is less than ten percent (10%), Anchorage shall lose the right to appoint an ACG Director and all ACG Directors shall immediately resign from the Board; provided, that in the event the Undiluted Percentage Interests referenced in this Section 6.2(c) shall fall below the applicable thresholds (each, an "ACG Director Default"), (x) Anchorage shall have the right to purchase (an "Anchorage Cure Right"), on not more than one occasion, within ninety (90) days of an ACG Director Default, additional equity in such amount sufficient to cure the ACG Director Default and (y) upon exercise of an Anchorage Cure Right, Anchorage shall not lose the right to appoint such ACG Director as a result of such ACG Director Default;

(d)    one (1) shall be appointed by mutual agreement of GSO and DK (such Director, the "Minority Director"), who shall hold office for so long as GSO's and DK's collective Undiluted Percentage Interest is at least fifteen percent (15%); provided, that in the event GSO's and DK's collective Undiluted Percentage Interest shall fall below fifteen percent (15%) (a "GSO/DK Director Default"), (x) GSO and/or DK shall have the right to purchase (a "GSO/DK Cure Right"), on not more than one occasion, within ninety (90) days of an GSO/DK Director Default, additional equity in such amount sufficient to cure the GSO/DK Director Default and (y) upon exercise of an GSO/DK Cure Right, GSO and DK shall not lose the right to appoint such GSO/DK Director as a result of such GSO/DK Director Default; and

(e)    one (1) independent Director who shall be nominated by the Independent Director Selection Committee and approved by the holders of at least seventy-five percent (75%) of the Company's outstanding Common Interests, which approval must include the affirmative vote of each of GSO, Anchorage and DK, but only to the extent such Member has the right to designate a Director pursuant to this Section 6.2 (such Director, the "Independent Director" and together with the Minority Director, the "Common Directors"); provided that if the number of ACG Directors decreases or there is no longer a Minority Director, then the number of Independent

22

Directors will increase correspondingly. The "Independent Director Selection Committee" shall, at any given time, mean a committee of holders of Common Interests selected by taking the holder that, together with its Affiliates, has the greatest Percentage Interest, and then adding the holder that, together with its Affiliates, has the next greatest Percentage Interest, and so on, until the total Percentage Interest of the holders on the committee (together with their Affiliates) is at least sixty-seven percent (67%).

The Board shall initially consist of [Jan Singer], [Libby Wadle], [●], [●], [●], [●], and [●].

6.3     Removal of Directors.  Each Director shall hold office from the time of his or her appointment until his or her resignation or removal. Each Director may be removed or replaced at any time, with or without cause, as determined by the Members entitled to appoint or select such Director.  For the avoidance of doubt, the Independent Director may be removed at any time by a vote of the holders of at least seventy-five percent (75%) of the Company's outstanding Common Interests, and replaced by an individual nominated by the Independent Director Selection Committee and approved by the holders of at least seventy-five percent (75%) of the Company's outstanding Common Interests, which must include the affirmative vote of each of Anchorage, GSO and DK for so long as such Member has the right to designate a director under this Section 6.

6.4     Vacancies.  Any Director may resign at any time upon written notice to the Company.  Any such resignation shall take effect at the time specified therein or, if the time be not specified, upon receipt by the Company thereof, and the acceptance of such resignation, unless required by the terms thereof, shall not be necessary to make such resignation effective. In the event that any Director resigns, is removed from the Board or dies, a successor Director shall be elected in accordance with Section 6.2 to fill such vacancy.

6.5     Authority and Duties of the Board and Board Committees.

(a)     Except as set forth in Sections 6.8(a), 6.8(b), 6.8(c), 7.5(b) and 9.2(b), the Board, acting as a body in accordance with the affirmative votes required by this Agreement (and no Director, individually), shall have the right, power and authority to oversee the business and affairs of the Company and to do all things necessary to manage the business of the Company, and the Board is hereby authorized to take any action of any kind and to do anything and everything the Board deems necessary or appropriate in accordance with the provisions of this Agreement and applicable law.

(b)     The Board, including at least one Common Director in accordance with Section 6.7(a), may from time to time designate one or more committees; provided, that the composition of any such committee shall include at least one Common Director.  To the extent authorized by the Board and permitted by this Agreement and applicable law, a committee shall have and may exercise specific powers of the Board in the management of the business and affairs of the Company; provided, however, that no committee shall have or may exercise any powers of the Board relating to the approval of any of the matters set forth in Sections 6.8(a), 6.8(b) or 6.8(c).

6.6     Meetings; Telephonic Meetings.

23

(a)      The Board and any committee thereof may hold regular or special meetings within or outside of the State of Delaware.  Regular meetings of the Board shall be held at least quarterly, and regular or special meetings of the Board or any committee thereof may otherwise be held from time to time, in each case at such time and at such place as may be determined by a majority of all the Directors serving on the Board or on such committee, as applicable; provided that at least seventy-two (72) hours advance notice of any such meeting shall be provided to each Director serving on the Board or such committee.  Any Director may call a special meeting of the Board or of a committee thereof, as applicable, on notice of not less than seventy-two (72) hours' advance notice to all the other Directors serving on the Board or such committee.  Any notice of a regular or special meeting of the Board or a committee thereof shall be given in writing to each applicable Director, at the address provided by such Director to the Board or at such other address that such Director shall have advised the Company to use for the purpose of delivering notice, or via electronic mail.  Any such notice provided shall be deemed to be given when delivered in accordance with this Section 6.6(a).  Each notice of a regular or special meeting of the Board shall set forth the time, date, location and agenda for the meeting in reasonable detail and attach the relevant papers to be discussed at the meeting and all available data and information relating to matters to be discussed at the meeting.

(b)      Any Director that is entitled to notice of a meeting of the Board or any committee thereof may waive such notice in writing, whether before or after the time of such meeting.  Attendance by a Director at a meeting of the Board or any committee thereof shall constitute a waiver of notice of such meeting by such Director, except when such Director attends such meeting for the express purpose of objecting, at the beginning of such meeting, to the transaction of any business at such meeting because such meeting is called or convened in violation of this Agreement or any applicable law.

(c)      Directors may participate in and hold a meeting of the Board by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a meeting by such means shall constitute presence in Person at the meeting, except where a Director participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(d)      Prior to and until the first anniversary of the Effective Date, GSO, DK and Anchorage shall each have the right to authorize one (1) observer to attend any meeting of the Board (each, an "Observer").  From and after the first anniversary of the Effective Date, (A) GSO and DK, collectively, acting by mutual agreement, and (B) Anchorage shall each have the right to designate one Observer, in each case, so long as GSO and DK, collectively, and Anchorage, as applicable, together with their Affiliates, continue to hold at least fifty percent (50%) of the Common Interests held by them and their respective Affiliates as of the Effective Date.  Subject to such restrictions as the Board may establish (which may include a requirement that the Observer enter into a confidentiality agreement with the Company in form and substance satisfactory to the Board), (i) the Observer shall be entitled to participate in discussions of any matters presented at any meeting, but shall not be entitled to vote on any such matters and (ii) the Company shall give the Observer the same advance notice of all meetings and the same materials given to Directors and any committee of the Board.  Notwithstanding the foregoing, (x) the Board or any committee of it may restrict any Person's attendance as an Observer at any portion

24

of a meeting if the Board or any committee of it makes a good-faith determination that such Person has a conflict of interest with respect to the subject matter of such portion of the meeting or that the attendance by such Person at such portion of the meeting would cause the Company to lose the benefit of protection in respect of what would otherwise be privileged communications, and (y) the failure of any Observer to attend any meeting of the Board or any committee of it shall not prevent any such meeting from proceeding or otherwise affect the validity of such meeting or any actions taken at such meeting.

6.7     Quorum; Acts of the Board and Board Committees.

(a)     At all meetings of the Board, a majority of the Directors then serving on the Board, which must include at least one Common Director, shall constitute a quorum for the transaction of business by the Board.  At all meetings of any committee of the Board, a majority of the Directors then serving on such committee, which must include a Common Director, shall constitute a quorum for the transaction of business by such committee.  Each Director, whether in respect of matters brought before the Board or any committee thereof, shall have one (1) vote in respect of each matter submitted for consideration and approval.  Except as otherwise provided in this Agreement or required by applicable law, the approval of a majority of the Directors present at any meeting of the Board at which there is a quorum, which approval must include the affirmative vote of at least one Common Director, shall be required for any act of the Board. Except as otherwise provided in this Agreement or required by the Board or applicable law, the scope of authority of any committee of the Board (including the form of charter of any such committee) and the Directors whose approval is required for any act of any committee of the Board shall be specified by the Board in resolutions establishing such committee approved in accordance with Section 6.5(b).  If a quorum shall not be present at any meeting of the Board or any committee thereof, the Directors present at such meeting may adjourn the meeting from time to time, with notice of the time and place of the adjourned meeting provided to any Director who is not in attendance at the meeting, until a quorum shall be present.

(b)     Any action required or permitted to be taken at any meeting of the Board or any action that may be taken at a meeting of a committee of the Board may be taken without a meeting if the action is taken in writing (including by electronic transmission) by all of the Directors of the Board or of such committee, as the case may be, who are entitled to vote on such action and the writing or writings are filed with the minutes of proceedings of the Board or such committee.

(c)     From time to time, the ACG Directors, in consultation with the Minority Director, shall elect a chairman of the Board or a non-executive lead director (the "Presiding Director") who shall preside at all meetings of the Board; provided that if the number of ACG Directors is less than three (3), the Presiding Director shall be selected by the Board in accordance with this Section 6.7.

6.8     Special Member Approval Requirements.

(a)     Notwithstanding anything to the contrary contained in this Agreement, and subject to any applicable approval requirements set forth in Section 6.8(b) and Section 6.8(c), the following actions by the Company or any of its Subsidiaries shall require the approval of, and

25

shall be authorized upon obtaining the approval of, each of (i) the Board and (ii) the holders of at least sixty-six percent (66%) of the outstanding Common Interests:

    (i)    Any material change in the Company's line of business;

    (ii)    Any issuance of Common Interests to employees and directors pursuant to any incentive plans, arrangements for management or similar arrangement, in excess of ten percent (10%) of the outstanding Common Interests;

    (iii)    Declaring or paying any non-pro rata distribution with respect to the Company's equity securities, other than a distribution in accordance with Article IV or Article IX;

    (iv)    Any incurrence of indebtedness for borrowed money by the Company or its Subsidiaries, other than (a) indebtedness under the Exit ABL Facility, (b) indebtedness under the Exit Term Loan Facility and (c) other indebtedness for borrowed money not in excess of $400,000,000 in the aggregate;

    (v)    Any acquisition of assets or securities, whether through merger, consolidation, share exchange, business combination or otherwise by the Company or any of its Subsidiaries in any transaction or series of related transactions for an amount of consideration in excess of $500,000,000;

    (vi)    Any change in the size or composition of the Board not contemplated by this Article VI;

    (vii)    Subject to the proviso of Section 11.2(b), any amendment, modification, supplement or waiver of any limited liability company agreement, charter, bylaws or comparable organizational document of any material Subsidiary of the Company with respect to any of the other matters in this Section 6.8(a);

    (viii)    Any election to change its tax characterization, or enter into any merger, conversion or other transaction that would change its tax characterization; or

    (ix)    Agreeing to take any of the foregoing actions.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the following actions by the Company or any of its Subsidiaries shall require only the approval of, and shall be authorized only upon obtaining the approval of, the holders of at least sixty-six percent (66%) of the outstanding Common Interests, so long as prior to such approval, such action shall have been presented to the Board for its consideration and the Board shall have either approved such action, or failed to approve such action within ten (10) Business Days of such presentment:

    (i)    Without limiting the right of holders of Common Interests to compel a Drag-Along Transaction in accordance with Section 5.3, any Sale of the Company;

26

(ii)    Subject to the proviso of Section 11.2(b), any amendment, modification, supplement or waiver of any limited liability company agreement, charter, bylaws or comparable organizational document of any material Subsidiary of the Company with respect to any of the other matters in this Section 6.8(b); or

(iii)   Agreeing to take any of the foregoing actions.

(c)    Notwithstanding anything to the contrary contained in this Agreement, and without limiting the authority of the Board to approve and authorize such actions, the following actions by the Company or any of its Subsidiaries may be approved by, and shall be authorized upon obtaining the approval of, the holders of at least sixty-six percent (66%) of the outstanding Common Interests, so long as prior to such approval, such action shall have been presented to the Board for its consideration and the Board shall have failed to approve such action within ten (10) Business Days of such presentment:

(i)    Acquisitions of assets or securities, whether through merger, consolidation, share exchange, business combination or otherwise by the Company and/or any of its Subsidiaries for consideration that is not in excess of $100,000,000 in the aggregate per fiscal year;

(ii)   Any incurrence of indebtedness for borrowed money by the Company or its Subsidiaries solely to the extent incurred in furtherance of acquisitions under Section 6.8(c)(i); or

(iii)  Agreeing to take any of the foregoing actions.

(d)    The Company and its Subsidiaries will not enter into any agreement or other transaction with any Affiliates or Members of the Company (including portfolio companies of any Members) (each, an "Interested Party") without the approval of a majority of the Directors then serving on the Board who are not affiliated with such Interested Party or any of such Interested Party's executive officers, directors or Affiliates; provided that (i) if such transaction involves aggregate payment or value less than $250,000, such transaction shall not require disinterested Director approval if such transaction is on terms no less favorable than can be obtained at arms' length with a non-affiliated third party, and (ii) if such transaction or series of transactions involves aggregate payments in excess of $20,000,000, prior to consummating such transaction(s), in addition to disinterested Director approval either (A) the Board shall have received a fairness opinion from a reputable, independent third-party firm, as determined in the Board's discretion or (B) the holders of at least sixty-six percent (66%) of the outstanding Common Interests of the Company, including at least three holders of outstanding Common Interests unaffiliated with the Interested Parties, shall have approved such transaction(s).

(e)    The Members may act without a meeting by written consent signed by the holders of Common Interests having not fewer than the minimum number of votes that would be necessary to authorize or take such action at a meeting.

6.9    Qualified IPO.  Notwithstanding anything to the contrary contained in this Agreement, the Board, including at least one Common Director, must approve any Qualified IPO or listing on the NYSE or NASDAQ. The Company may at any time reorganize into a

27

corporation or use any other structure or means to effect such a Qualified IPO or listing approved in accordance with the preceding sentence, including by the conversion, recapitalization, reorganization or exchange of securities of the Company or any portion of the Company or any Subsidiary of the Company into one or more corporations, limited liability companies, limited partnerships or other business entities (such conversion, a "Reorganization"), in each case without the need to obtain approval from the holders of the outstanding Common Interests. The Company shall pay the reasonable, documented organizational, legal and accounting expenses and filing fees incurred by the Company or the Members in connection with such a Reorganization. Subject to the terms of this Agreement, in connection with any Reorganization involving a Transfer of Common Interests or Warrants, each Member and holder of a Warrant agrees to the Transfer of its Common Interests or Warrants, as applicable, in accordance with the terms of conversion or exchange as provided by the Company.  In connection with any Reorganization in which Common Interests or Warrants held by such Member or holder of a Warrant, as applicable, are converted or exchanged, in exchange for the Common Interests or Warrants held by such holder, each Member and holder of a Warrant shall receive capital stock, warrants or other securities, in each case with substantially similar economic and other rights, privileges and preferences as the Common Interests or Warrants, as applicable, being exchanged had prior to the consummation of such Reorganization.

6.10    Officers.  The Board shall appoint such other officers and agents of the Company as it shall from time to time deem necessary and may assign any title to such officer or agent as it deems appropriate.  Such officers and agents shall have such terms of employment, shall receive such compensation and shall exercise such powers and perform such duties as the Board shall from time to time determine.  Any number of offices may be held by the same Person.  The Board shall have the authority to remove any officers or agents, including the Chief Executive Officer, with or without cause.

6.11    Officers as Agents; Duties of Officers.  The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.  Each officer of the Company shall owe the same fiduciary duty to the Company and the Members that such individual would owe to a corporation and its stockholders thereof under the laws of the State of Delaware.

6.12    Powers of Members.    Except as otherwise specifically provided by this Agreement or as required by the Act, no Member shall have the power to act for or on behalf of or to bind, the Company.

6.13    Confidentiality.  No Member shall, (a) without the Company's prior written consent, disclose to any Person other than an Exempt Person of such Member any confidential, non-public information of the Company or any Member obtained from the Company or one of its Affiliates concerning, without limitation, the following:  (i) any dealings between the Company or any of its Subsidiaries, on the one hand, and any material customer or vendor or any employee, director, officer, Director or Member of the Company or such Subsidiary, on the other hand; (ii) any financial information or results of operations of the Company or any of its Subsidiaries; or (iii) any business plans, pricing information, customer information or regulatory

28

information of the Company or any of its Subsidiaries (collectively, "Company Confidential Information"), or (b) disclose to any Person other than an Exempt Person of such Member any confidential, non-public information obtained from the Company or one of its Affiliates (including the Members) relating to another Member (the "Member Confidential Information") without such Member's prior written consent; provided, however, that, notwithstanding anything to the contrary in the foregoing, neither Company Confidential Information nor Member Confidential Information shall include, with respect to any Person, any information that: (i) is or becomes generally available to the public other than as a result of a disclosure directly or indirectly by any Person or any of its Affiliates or any of their respective directors, officers, managers, partners, members, employees, attorneys, advisors or other representatives (collectively, "Representatives") in breach of this Section 6.13; (ii) is disclosed by another Person not known by the recipient to be under a confidentiality agreement or obligation to the Company or such other Member not to disclose such information; or (iii) is independently developed by such Person or any of its Affiliates or any of their respective Representatives without derivation from, reference to or reliance upon any Company Confidential Information or Member Confidential Information, as the case may be; provided further that, notwithstanding anything to the contrary in this Agreement, any Member may disclose any Company Confidential Information or Member Confidential Information, as the case may be, (A) to the extent required by any applicable law, statute, rule or regulation or any request, order or subpoena issued by any court or other governmental entity; provided that, to the extent permitted by law, the Member required to make such disclosure shall provide to the Board prompt notice of such disclosure; provided further that to the extent such Member or its Representatives are subject to examination by a regulatory or self-regulatory authority, bank examiner or auditor, notice to the Board shall not be required where disclosure is in connection with a routine audit or examination by, or a blanket document request from, such auditor or a regulatory or governmental entity that does not reference the Company, its Subsidiaries or this Agreement, (B) as part of such Member's normal reporting, rating or review procedure (including normal credit rating or pricing process) or in connection with such Member's or its Affiliates' normal fund raising, marketing, informational or reporting activities or (C) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Common Interests held by such Member or prospective merger partner of such Member or its Affiliates, in each case other than a Competitor unless approved by the Board; provided that in the case of this clause (C) prior written notice of any disclosure of Company Confidential Information or Member Confidential Information is given to the Company and such prospective purchaser or merger partner agrees in writing prior to such disclosure to be bound by the provisions of this Section 6.13 (which agreement shall be enforceable by the Company and in form and substance reasonably acceptable to the Board). Each Member shall be responsible for any breach of this Section 6.13 by any of its Representatives and agrees to use commercially reasonable efforts to cause its Representatives to treat all Company Confidential Information and Member Confidential Information in the same manner as such Member would generally treat its own confidential, non-public information.

## Article VII
### Powers, Duties and Restrictions of the Company and the Members;
### Other Provisions Relating to the Members

29

7.1     Powers of the Company.  In furtherance of the purposes set forth in Section 2.3 and subject to the provisions of Article VI, the Company shall possess the power to do anything not prohibited by the Act, by other applicable law or by this Agreement, including but not limited to the following powers:  (a) to undertake any of the activities described in Section 2.3; (b) to make, perform and enter into any contract, commitment, activity or agreement relating thereto; (c) to open, maintain and close bank and money market accounts, to endorse, for deposit to any such account or otherwise, checks payable or belonging to the Company from any other Person, and to draw checks or other orders for the payment of money on any such account; (d) to hold, distribute and exercise all rights (including voting rights), powers and privileges and other incidents of ownership with respect to assets of the Company; (e) to borrow funds, issue evidences of indebtedness and refinance any such indebtedness in furtherance of any or all of the purposes of the Company; (f) to employ or retain such agents, employees, managers, accountants, attorneys, consultants and other Persons necessary or appropriate to carry out the business and affairs of the Company, and to pay such fees, expenses, salaries, wages and other compensation to such Persons; (g) to bring, defend and compromise actions, in its own name, at law or in equity; and (h) to take all actions and do all things necessary or advisable or incident to carry out the purposes of the Company, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the Company's business, purposes or activities.

7.2     Compensation of the Members and Directors.  The Members shall not be entitled to any compensation for their services hereunder.  Each ACG Director and Common Director who is not an employee of any Member or such Member's Affiliates shall be entitled to a reasonable fee be paid by the Company in an amount determined by the Board and shall be reimbursed for the reasonable out-of-pocket expenses, if any, incurred in connection with attendance at each meeting of the Board and at each meeting of a committee of the Board of which they are members, as determined by the Board.  All other Directors may be reimbursed for all reasonable out-of-pocket expenses incurred in connection with each meeting of the Board or each meeting of a committee of the Board, as determined by the Board.

7.3     Cessation of Status as a Member.  A Member shall cease to be a member of the Company (a) upon the Bankruptcy or involuntary dissolution of such Member, provided that thereafter such Person shall only be entitled to the economic rights of an assignee of membership interests under the Act, or (b) upon the Transfer of all of such Member's Common Interests.

7.4     Other Activities of the Members.  Notwithstanding any duty otherwise existing at law or in equity, each of the Members and its Affiliates may have other business interests and may engage in any business or trade, profession, employment or activity whatsoever (regardless of whether any such activity competes, directly or indirectly, with the business or activities of the Company or any of its Subsidiaries), for its own account, or in partnership or participation with, or as an employee, officer, director, stockholder, member, manager, trustee, general or limited partner, agent or representative of, any other Person, and no Member shall be required to devote its entire time (business or otherwise), or any particular portion of its time (business or otherwise) to the business of the Company or any of its Subsidiaries.  Neither the Company nor any Member nor Director, nor any Affiliate of any thereof, by virtue of this Agreement, shall have any rights in and to any such independent venture or the income or profits derived therefrom.  Notwithstanding any duty otherwise existing at law or in equity, no Member, ACG

30

Director or Minority Director shall have any obligation hereunder to present any business opportunity to the Company, even if the opportunity is one that the Company might reasonably have pursued or had the ability or desire to pursue, in each case, if granted the opportunity to do so and, to the fullest extent permitted by law, no Member shall be liable to the Company or any other Member (or any Affiliate thereof) for breach of any fiduciary or other duty relating to the Company (whether imposed by applicable law or otherwise), by reason of the fact that such Member pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity or information regarding such business opportunity, to the Company.

7.5    Use of Name and Trade Marks.

(a)    Each Member shall not, without the prior written consent of the Company, use in advertising, publicity or otherwise the name of the Company or any of its Affiliates (other than, if applicable, such Member) or any trade name, trademark, trade device, logo service mark, symbol or abbreviation, contraction or simulation thereof owned or used by the Company or any of its Affiliates (other than, if applicable, such Member).

(b)    The Company shall not, without the prior written consent of the Member in question for each instance, use in advertising, publicity or otherwise the name of any Member or its Affiliates (other than the Company) or any trade name, trademark, trade device, logo service mark, symbol or abbreviation, contraction or simulation thereof owned or used by a Member or its Affiliates (other than the Company).

## Article VIII
## Books, Records and Accounting; Information Rights

8.1    Books of Account; Access.  The Board shall cause to be entered in appropriate books, kept at the Company's principal place of business, all transactions of or relating to the Company.  The books and records of the Company shall be made and maintained, and the financial position and the results of operations recorded, at the expense of the Company, in accordance with such method of accounting as is determined by the Board.  Each Member, for any purpose reasonably related to such Member's interest as a Member in the Company, shall have access to and the right, at such Member's sole cost and expense, to inspect and copy such books and records and to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the officers, employees and the other Representatives of the Company and its Subsidiaries during normal business hours; provided that the inspecting Member shall be responsible for any out-of-pocket costs or expenses incurred by the Company in making any books and records available for inspection.

8.2    Deposits of Funds.  All funds of the Company shall be deposited in its name in such checking, money market or other account or accounts as the Board may from time to time designate; withdrawals shall be made therefrom on such signature or signatures as the Board shall determine.

8.3    Information Rights.

31

(a)      Each Member who agrees to such customary confidentiality restrictions as the Company shall reasonably request shall have the right to receive the following information (which right the Company may satisfy by providing access to each Member to a confidential website such as [Intralinks][2] and timely posting such information on such website (which website shall have a system of email notification of new postings and may require confirmation by viewers of the site of the confidentiality obligations set forth in Section 6.13, a "Secure Site")), and each Member may share and discuss such information (along with any other information provided to Members pursuant to this Agreement and otherwise made available to Members via the Secure Site) with its Affiliates, directors, officers, partners, managers, stockholders, employees, investors and advisors as well as any bona fide prospective purchaser of Common Interests or indebtedness for borrowed money incurred by the Company or its Subsidiaries and held by such Member that (x) is not a Competitor and (y)(i) has entered into, and delivered to the Company, a confidentiality agreement regarding the treatment of such information (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Common Interests) or (ii) has entered into, and delivered to such Member, a confidentiality agreement regarding the treatment of such information containing provisions at least as restrictive as those of a similar confidentiality agreement with the Company and provides that the Company shall be a third party beneficiary with full enforcement rights thereunder:

(i)      within one hundred and twenty (120) days of the end of each Fiscal Year beginning on or after January 1, 2021, copies of annual consolidated financial statements of the Company and its Subsidiaries as of the end of such Fiscal Year, which financial statements shall (x) be prepared in accordance with GAAP, and (y) be audited by a nationally recognized accounting firm approved by the Board; and

(ii)      as soon as available and, in any event, within sixty (60) days after the end of each of the first three quarters of each such Fiscal Year or such earlier date as the Company or any of its Subsidiaries may be required to deliver such information to the Company's lenders under any credit agreement, indenture or similar agreement with respect to indebtedness for borrowed money of the Company or any of its Subsidiaries, consolidated balance sheets of the Company and its subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and, if applicable, its Subsidiaries for the period then ended prepared in accordance with GAAP, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments (collectively, the "Quarterly Financials"); provided, however, following the Effective Date, the Company shall provide the Quarterly Financials with respect to the second quarter of the 2020 Fiscal Year on or prior to [_____], 2020.

(b)      The Company shall host, and each Member shall have access to, regular conference calls with senior officers of the Company to discuss the results of operations for the relevant reporting period, which calls shall include a reasonable and customary question and answer session.  Each such call shall be hosted no later than ten (10) Business Days after the

---

[2] Note to Draft: Confirm datasite to be used.

Company furnishes the corresponding annual or quarterly report in accordance with this <u>Section 8.3</u>.

(c)     For so long as the Common Interests remain outstanding and during any period during which the Company is not subject to Section 13 or Section 15(d) of the Exchange Act, as amended, nor exempt therefrom pursuant to Rule 12g3-2(b), the Company shall furnish to the holders of Common Interests and, upon their request, prospective purchasers of the Common Interests, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act

(d)     During the term of the Company's existence, there shall be maintained in the Company's principal office or at the office of the Company's agents and representatives all records required to be kept pursuant to the Act, including (whether or not so required) a current list of the names, addresses and Common Interests held by each of the Members (including the dates on which each of the Members became a Member), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and each of the Company's organizational documents, including all amendments thereto and restatements thereof, and correct and complete books and records of account of the Company. Prior to any termination of the Company's existence, the Company shall use all reasonable efforts to ensure that, for a period of six (6) years after any such termination, such information, to the extent still in existence and available, may be obtained by a Member's request in writing to a legal advisor or agent of the Company to be designated prior to any such termination, with the cost (as reasonably determined by such legal advisor or agent) of accessing and providing such information being borne by the requesting Member.

(e)     The rights of each Member granted pursuant to <u>Sections 8.3(a)</u> through <u>8.3(d)</u> of this Agreement shall be freely Transferable by such Member in connection with any Transfer of its Common Interests otherwise permitted in accordance with <u>Article V</u>.

(f)     The Company shall provide to each Director and, subject to the limitations set out in <u>Section 6.6(d)</u>, each Observer, copies of any materials distributed or made available to any other Directors or Observers.  A Member Director or Observer shall be entitled to share and discuss with directors, officers and employees of the Member that appointed such Member Director or Observer any materials or other information obtained by such person in such capacity.

8.4     <u>Information Rights of the Company</u>.  The Company may from time to time (including in connection with the admission of a new Member), but a Member may be compelled to answer no more frequently than once per calendar quarter (unless, with respect to clause (i) hereof, required by applicable law), reasonably request of any or all Members (at the expense of the Company) information (i) needed by the Company to comply with applicable law and/or (ii) regarding such Member's "accredited investor" status (within the meaning of Regulation D promulgated under the Securities Act).

8.5     <u>Tax Matters</u>. The Company shall elect to be treated as a corporation for U.S. federal and, where applicable, state and local income tax purposes, effective as of the Company's date of formation.

**Article IX**
**Term and Dissolution**

9.1     Term.   The legal existence of the Company shall be perpetual, unless the Company is sooner dissolved as a result of an event specified in the Act or pursuant to a provision of this Agreement.

9.2     Dissolution.

(a)     The Company shall be dissolved and its affairs wound up upon the first to occur of the following:

(i)     The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act;

(ii)     The resignation, expulsion, Bankruptcy or dissolution of the last remaining Member or the occurrence of any other event which terminates the continued membership of the last remaining Member in the Company, unless the business of the Company is continued without dissolution in accordance with the Act; and

(iii)     The occurrence of any other event that causes the dissolution of a limited liability company under the Act, unless the Company is continued without dissolution in accordance with the Act.

(b)     Upon dissolution of the Company, the business of the Company shall continue for the sole purpose of winding up its affairs.  The winding up process shall be carried out by the Members unless the dissolution is caused by an event of withdrawal by the sole remaining Member, in which case the Board shall appoint a liquidating trustee.  Otherwise, a liquidating trustee may be appointed for the Company by vote of a majority in Percentage Interest of the Members holding Common Interests (the Members or such liquidating trustee appointed by the Board or the Members is referred to herein as the "Liquidator").  In winding up the Company's affairs, every effort shall then be made to dispose of the assets of the Company in an orderly manner, having regard to the liquidity, divisibility and marketability of the Company's assets. The Liquidator shall not be entitled to be paid by the Company any fee for services rendered in connection with the liquation of the Company, but the Liquidator (whether one or more Members or a liquidating trustee) shall be reimbursed by the Company for all third-party costs and expenses incurred by it in connection therewith and shall, to the fullest extent permitted by law, be indemnified by the Company with respect to any action brought against it in connection therewith by applying, *mutatis mutandis*, the provisions of Section 11.1.

9.3     Application and Distribution of Assets.   Upon a windup of the Company, the Company shall distribute its assets as follows:

(a)     first, to creditors of the Company, including Members and Directors who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for the payment thereof) and including any contingent, conditional and unmatured liabilities of the Company, taking into account the relative priorities thereof;

(b)    second, to the Members and former Members in satisfaction of liabilities under the Act for distributions to such Members and former Members; and

(c)    third, to Members holding Common Interests in accordance with their Percentage Interests of Common Interests.

9.4    Termination of the LLC.  Subject to Section 2.7, the separate legal existence of the Company shall terminate upon a Reorganization or when all assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article IX and a certificate of cancellation of the Certificate shall have been filed in the manner required by Section 18-203 of the Act.

## Article X
## Representations and Warranties of Members

Each Member severally, but not jointly, represents and warrants as of the Effective Date to the Company and the other Members that:

10.1    Authority.  Each such Member that is a corporation or a limited liability company or a partnership is an entity duly formed and validly existing under the laws of the jurisdiction of its formation and the execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary corporate, limited liability company or partnership action, as applicable.  Each such Member that is an individual is an individual with full legal capacity under the laws of his jurisdiction of domicile and has the capacity to execute, deliver and perform this Agreement, and this Agreement has been duly executed and delivered by such Member.

10.2    Binding Obligations.  This Agreement has been duly and validly executed and delivered by such Member and constitutes the binding obligation of such Member, enforceable against such Member in accordance with its terms.

10.3    No Conflict.  The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time or both, (a) violate any provision of law to which such Member is subject, (b) violate any order, judgment or decree applicable to such Member or (c) conflict with or result in a breach or default under, any term or condition of its certificate of incorporation or bylaws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, as applicable or, except where such conflict, breach or default would not reasonably be expected to, individually or in the aggregate, have an adverse effect on such Member's ability to satisfy its obligations hereunder.

10.4    Purchase Entirely for Own Account.  The Common Interests to be acquired by such Member will be acquired for investment for such Member's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof; such Member has no present intention of selling, granting any participation in or otherwise distributing the same; and such Member does not have any contract, undertaking, agreement or other arrangement with any

35

Person to sell, transfer or grant participation to such Person or to any third Person, with respect to any of the Common Interests.

10.5   No Registration.  Such Member understands that the Common Interests, at the time of issuance, will not be registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Member's representations as expressed herein or otherwise made pursuant hereto.

10.6   Investment Experience.  Such Member confirms that the Member has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of an investment in the Common Interests and of making an informed investment decision and understands that (a) this investment is suitable only for an investor that is able to bear the economic consequences of losing its entire investment, (b) the acquisition of Common Interests hereunder is a speculative investment that involves a high degree of risk of loss of the entire investment and (c) there are substantial restrictions on the transferability of and there will be no public market for, the Common Interests.

10.7   Accredited Investor.  Such Member is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the SEC under the Securities Act.

10.8   Restricted Securities.  Such Member understands that the Common Interests may not be sold, transferred or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of either an effective registration statement covering such Common Interests or an available exemption from registration under the Securities Act, the Common Interests must be held indefinitely.  In particular, such Member is aware that the Common Interests may not be sold pursuant to Rule 144 promulgated by the SEC under the Securities Act unless all of the conditions thereof are met.

10.9   Nonreliance.  No promise, agreement, statement or representation that is not expressly set forth in this Agreement or in any other agreement by and among any of the Company, the Members or their respective Affiliates has been made to such Member by any other Member or any other Member's Affiliates, counsel, agent or any other Person with respect to the terms set forth in this Agreement, and such Member is not relying upon any such promise, agreement, statement or representation of any other Member or any other Member's Affiliates, counsel, agent or any other Person.

**Article XI**
**General Provisions**

11.1   Exculpation and Indemnification.

(a)   Unless specifically set forth herein, to the fullest extent permitted by applicable law, no Member, officer, Director, employee or agent of the Company and no officer, director, employee, Representative, agent or Affiliate of any Member (collectively, the "Covered Persons") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably

36

believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's fraud, gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by a Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's fraud, gross negligence or willful misconduct with respect to such acts or omissions as determined by a final, non-appealable judgment of a court of competent jurisdiction.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon demand by such Covered Person and receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 11.1.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets of the Company from which distributions to any Member might properly be paid.

(d)     As of or prior to the Effective Date, the Company has obtained directors' and officers' liability insurance for the Directors and officers of the Company, if any (a "D&O Insurance Policy"), with coverage under such D&O Insurance Policy to be effective no later than the Effective Date, naming each Director and officer as an insured in such a manner as to provide such Director the same rights and benefits, subject to the same limitations, as are accorded to the Directors or officers of the Company most favored by such D&O Insurance Policy.  The Company shall use its commercially reasonable efforts to maintain a D&O Insurance Policy at all times that are no less favorable to the Directors than the D&O Insurance Policy entered into pursuant to the first sentence of this Section 11.1(d).

(e)     The Company hereby acknowledges that a Covered Person may have certain rights to indemnification, advancement of expenses and/or insurance provided by companies for which such Covered Person serves as a director, officer or employee (collectively, the "Other Indemnitors").  The Company hereby agrees that it (i) is the indemnitor of first resort (*i.e.*, its obligations to a Covered Person are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of such Covered Person are secondary), (ii) shall be required to advance the full

37

amount of expenses incurred by or on behalf of such Covered Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent not prohibited by applicable law and as required by the terms of this Agreement, without regard to any rights such Covered Person may have against the Other Indemnitors and (iii) irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for reimbursement, subrogation or any other recovery of any kind in respect thereof.  The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of a Covered Person with respect to any claim for which a Covered Person has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of reimbursement and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Covered Person against the Company.  The Company and any Covered Person agree that the Other Indemnitors are express third-party beneficiaries of the terms of this Section 11.1(e).

11.2    Entire Agreement; Amendments.

(a)    This Agreement (including the exhibits and annexes attached hereto) contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

(b)    Subject to the proviso hereafter, this Agreement may be modified or amended or supplemented with the approval of a 66% supermajority in Percentage Interest of the Members; provided, however, that, notwithstanding anything in this Agreement to the contrary, (i) without the consent of any Member, the Board may amend Exhibit C from time to time so as to accurately reflect the information contained thereon upon (A) the withdrawal of a Member, (B) the admission of a new Member and (C) any changes to Percentage Interests and the number of Common Interests held by Members as a consequence thereof, (ii) any change to any voting, consent or approval threshold or requirement specified in this Agreement shall require the approval of Members or Directors, as the case may be, constituting at least such voting, consent or approval threshold or otherwise satisfying such requirement, and (iii) any amendment to this Agreement or any limited liability company agreement, charter, bylaws or comparable organizational document of the Company or any material Subsidiary of the Company that could reasonably be expected to materially adversely affect any holder or group of holders of Common Interests in the Company in a manner that is disproportionate to the effect on any other holder or group of holders of Common Interests in the Company (including any amendment to a Member's Director appointment or Board observer designation rights in Article VI) shall require the prior written consent of such holder or, with respect to a group of holders, a majority of such holders of Common Interests.

11.3    Avoidance of Provisions.  No party hereto shall avoid the provisions of this Agreement by making one or more Transfers to one or more Affiliates and then disposing of all or any portion of such party's interest in any such Affiliate.

11.4    Binding Agreement.  The covenants and agreements herein contained shall inure to the benefit of and shall be binding upon the parties hereto and their respective Representatives, successors in interest and permitted assigns.

11.5   Notices.   Unless otherwise provided in this Agreement, any and all notices contemplated by this Agreement shall be deemed adequately given if in writing and delivered in hand, or upon receipt when sent by telecopy or electronic transmission confirmed by one of the other methods for providing notice set forth herein, or one (1) Business Day after being sent, postage prepaid, by nationally recognized overnight courier (*e.g.*, Federal Express), or five (5) Business Days after being sent by certified or registered mail, return receipt requested, postage prepaid, to the party or parties for whom such notices are intended.  All such notices to Members shall be addressed to the last address of record on the books of the Company; all such notices to the Company shall be addressed to the Company at the address set forth in Section 2.4 or at such other address as the Company may have designated by notice given in accordance with the terms of this subsection.

11.6   Governing Law.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws, without regard to its conflict of laws rules.

11.7   Consent to Jurisdiction; WAIVER OF JURY TRIAL.

(a)   The Company and each Member (i) irrevocably submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware and the United States District Court for the District of Delaware (and the appropriate appellate courts), for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in the Chancery Court of the State of Delaware.  Notwithstanding the foregoing, any party hereto may commence an action, suit or proceeding with any governmental body anywhere in the world for the sole purpose of seeking recognition and enforcement of a judgment of any court referred to in the first sentence of this Section 11.7(a).  The Company and each Member further (x) agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth on the Member List (or in the case of the Company, at the Company's principal office in Delaware) shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 11.7(a) and (y) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (A) the Chancery Court of the State of Delaware, or (B) the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)   THE COMPANY AND EACH MEMBER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR SUCH MEMBER'S OWNERSHIP OF COMPANY COMMON EQUITY.  THE COMPANY AND EACH MEMBER (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE COMPANY OR ANY MEMBER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE COMPANY OR SUCH MEMBER WOULD NOT, IN THE

EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT THE COMPANY AND EACH MEMBER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.7(B).

11.8   Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and, to the fullest extent permitted by law, the parties intend that no rule of strict construction will be applied against any party.

11.9   Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.  In the case of any such invalidity or unenforceability, the parties hereto agree to use all reasonable best efforts to achieve the purpose of such provision by a new legally valid and enforceable stipulation.

11.10   Counterparts, Electronic Copies.  This Agreement may be executed in multiple counterparts, including by electronic transmission or portable document format (.pdf), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.11   Survival.   The provisions of Sections 6.13 and 7.5 and this Article XI shall survive the termination of this Agreement for any reason or the dissolution of the Company. Subject to the Act, all other rights and obligations of the Members shall cease upon the earlier of the termination of this Agreement or dissolution of the Company.

11.12   Termination.

(a)   This Agreement will be automatically effective as of the Effective Date and will continue in effect until the earlier to occur of (i) its termination by the unanimous written consent of all Members of the Company, (ii) the dissolution, liquidation or winding up of the Company and (iii) the consummation of a Drag-Along Sale in which, for whatever reason, all of the Members participate either as Selling Members or Compelled Members.

(b)   Section 3.6(b), Sections 5.1 through 5.5, Section 6.8, Section 6.13, Section 7.5, Section 8.3, Section 8.4 and Article X shall automatically terminate upon (i) a Qualified IPO or (ii) the listing of any equity securities of the Company on the NASDAQ, the NYSE or another U.S. national securities exchange, but not, for the avoidance of doubt, solely as a result of any distribution or dividend by the Company to its equityholders of any equity interest of a subsidiary of the Company that was formed to own or operate the Madewell business or the J. Crew business individually.

11.13   Further Assurance.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents and to do all such other acts and things, as may be required by law or as, in the reasonable judgment of the Board, may be necessary or reasonably advisable to carry out the intent and purpose of this Agreement.

[Signature pages follow]

IN WITNESS WHEREOF, the Members signatory hereto have entered into this Agreement on the date first above written:

MEMBERS:

*[●]Member*

_____

Name:
Title:

[SIGNATURE PAGE TO LLC AGREEMENT OF [●], LLC]

*[●],*
*Member*

By:  _____
     Name:
     Title:

[SIGNATURE PAGE TO LLC AGREEMENT]

**Annex I**
**Registration Rights**

Annex I

**Exhibit A**
**Certificate of Formation**

**Exhibit B**
**Form of Warrant**

See attached.

**Exhibit C**
**Name and Notice Information of Members, Number of Common Interests and Percentage Interests**

*Last Updated: [●]*

| Name of Member | Notice Information | Number of Common Interests | Number of Convertible Common Interests | Percentage Interest |
|---|---|---|---|---|
| [●] | | | | |

**Exhibit D**
**Capital Contributions**

| Name of Member | Amount of DIP Loans Contributed | Amount of New Term Loans Contributed | Total Initial Capital Contributions | Additional Capital Contributions |
|---|---|---|---|---|
| [●] | $ [●] | $ [●] | $ [●] | $[●] |

*Shall not be deemed a Member of the Company, or to hold any Common Interests, until a joinder in the form of <u>Exhibit E</u> is executed by such Person and delivered to the Company in accordance with <u>Section 5.5</u>.[3]

---

[3] Note to Draft: Asterisk to be included next to the names of those who hold warrants (but are not otherwise a Member/holder of Common Interests).

**Exhibit E**
**Form of Joinder Agreement**

This Joinder Agreement (this "Joinder Agreement") is made as of [_____ ___, 20__] by the undersigned (the "Transferee") in accordance with the Limited Liability Company Agreement of [●], LLC, dated as of [●], 2020 (as the same may be amended from time to time in accordance with its terms, the "LLC Agreement").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

The Transferee hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Transferee hereby makes the representations and warranties of a Member set forth in the LLC Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

[TRANSFEREE]

By:_____
    Name:
    Title:

E-1

**Schedule I**
**Competitors**

Schedule I

## Exhibit B

**New Board Disclosures**

085105.0000010 EMF_US 81614029V1

**Initial Directors, Managers, or Officers of Reorganized Debtors[1]**

The information set forth herein is being provided in compliance with section 1129(a)(5) of the Bankruptcy Code, and the Debtors reserve the right to amend, supplement, or modify this disclosure at any time.

### I.   NewCo Holdings – Managers:

The following table discloses the managers of NewCo Holdings as of the Effective Date and their affiliations:

| Name & Position | Responsibilities & Experience |
| --- | --- |
| Jan Singer<br>*Chief Executive Officer of J. Crew* | Ms. Singer was appointed Chief Executive Officer of J.Crew Group, Inc. and elected to the Board of Directors of the J.Crew Group, Inc. on January 27, 2020, in each case, with an effective date of February 2, 2020.  Ms. Singer has over 25 years of retail experience and most recently was the Chief Executive Officer of Victoria's Secret Lingerie at L Brands, Inc., from 2016 to 2019. Prior to joining L Brands, Inc., she was the Chief Executive Officer of Spanx, Inc. from 2014 to 2016. She also served in various executive roles at Nike, Inc. from 2004 to 2014, including most recently as Corporate Vice President, Global Apparel. Prior to Nike, Ms. Singer held key merchandising, marketing and global communications roles for Reebok, Chanel, Calvin Klein and Prada.  From 2015 to 2017, Ms. Singer also served as an independent board director of Kate Spade & Company. |
| Libby Wadle<br>*President & Chief Executive Officer – Madewell* | Ms. Wadle has served as President & Chief Executive Officer – Madewell since March 31, 2019.  She became President – Madewell in May 2017. She had previously been J.Crew Group, Inc.'s President - J.Crew Brand since April 2013. Before that, she was the Executive Vice President-J.Crew Brand from 2011 to 2013, and Executive Vice President-Retail and Factory from 2010 to 2011, and was Executive Vice President-Factory and Madewell from 2007 to 2010. Before that Ms. Wadle served as Vice President and then Senior Vice President of J.Crew Factory since 2004. Prior to joining J.Crew, Ms. Wadle was Division Vice President of Women's Merchandising at Coach, Inc. from 2003 to 2004 and held various merchandising positions at The Gap, Inc. from 1995 to 2003. |

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Second Amended Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and its Affiliated Debtors* [Docket No. 838].

| Name & Position | Responsibilities & Experience |
| --- | --- |
| Alvaro Jose Aguirre<br>*Manager* | Alvaro Jose Aguirre has served on public and private boards and has extensive experience with strategy, governance, executive compensation, senior talent acquisition, operational improvements, M&A, financings, and exits. Mr. Aguirre currently serves as the Chairman of the Board and member of the Compensation and Audit Committees at EmployBridge, one of the largest workforce specialist firms in North America. He also chairs the Board of Directors for Halo Technology Ltd, a global provider of optical networking solutions and Critical Content, a leading content production studio. Prior to that, Mr. Aguirre served in several director roles, including as Lead Director and member of the Compensation Committee of Advanstar Communications Inc., a leading events, online and publishing platform serving the fashion industry; Director and member of the Compensation and Governance Committees of Central Pacific Financial Corp. (NYSE:CPF), the holding company for Central Pacific Bank; and Chairman of the Board and member of the Audit and Compensation Committees of Cygnus Business Media, a business-to-business publishing company. Earlier in his career, Mr. Aguirre served in principal investing, capital markets, and advisory roles as a managing director at Warburg Pincus, an investment banker at Morgan Stanley, and a securities attorney at Sullivan & Cromwell. He also served in senior management roles at several media and technology businesses where he was instrumental in shaping strategy, driving growth, and achieving successful financings and exits. Mr. Aguirre has also served in various not-for-profit capacities, including, as a Director and Chairman of the Governance Committee of Father Joe's Villages, the largest homeless services provider in San Diego, and Chairman of the Town of Tiburon Planning Commission in Tiburon, CA. |
| Kevin Ulrich<br>*Manager* | Kevin Ulrich is Chief Executive Officer, Chief Investment Officer, and Partner at Anchorage Capital Group, LLC ("Anchorage") Mr. Ulrich co-founded Anchorage in New York in 2003. In his role as Chief Investment Officer, he is responsible for overseeing the firm's portfolio management, risk management, asset allocation, and investment decisions. He is the Chair of Anchorage's Investment Committee. During his time leading Anchorage, the firm has grown to become a leading alternative credit and distressed investment manager, operating affiliate offices in London, Sydney, and Luxembourg. Mr. Ulrich is Chairman of the Board of MGM Holdings, Inc. ("MGM") and has been a director of MGM since December 2010, and serves as the head of the Compensation Committee. Prior to co-founding Anchorage, Mr. Ulrich was Managing Director, Head of Distressed Bank Loans and Global Head of Bank Loan Trading at Goldman Sachs. In this capacity, Mr. Ulrich was directly responsible for the trading operation and proprietary investment portfolio of the Goldman Sachs Bank Loan business. Mr. Ulrich has a total of 25 years of experience in the financial services industry and received a J.D. from Harvard Law School, where he graduated with honors, and a B.A. from the University of Western Ontario. |
| TBD Manager | A manager to be appointed by funds sponsored by or affiliated with Anchorage Capital Group, L.L.C., subject to the terms of the New Organizational Documents. |
| TBD Manager | A manager to be selected by the mutual agreement of GSO Capital Partners LP and Davidson Kempner Capital Management LP, subject to the terms of the New Organizational Documents. |
| TBD Manager | A manager that is independent from any Debtor or any other equity holders, selected by an independent search process headed by a committee composed of holders of at least 67% of New Common Equity and approved by holders of at least 75% of New Common Equity. |

2

WEIL:\97573587\4\54457.0007

| Name & Position | Responsibilities & Experience |
|---|---|
| TBD Manager | A manager that is independent from any Debtor or any other equity holders, selected by an independent search process headed by a committee composed of holders of at least 67% of New Common Equity and approved by holders of at least 75% of New Common Equity. |

## II.    NewCo Holdings – Officers:

The following discloses the names of the executive officers of NewCo Holdings as of the Effective Date:

| Name | Position |
|---|---|
| Jan Singer | Chief Executive Officer, J. Crew |
| Vincent Zanna | Chief Financial Officer and Treasurer |
| Michael Nicholson | President and Chief Operating Officer |
| Libby Wadle | President and Chief Executive Officer, Madewell |
| Lisa Greenwald | Chief Merchandising Officer |

## III.    Other Reorganized Debtors – Directors, Managers, and Officers:

Except as noted herein, the remaining directors, managers, and officers of the remaining Reorganized Debtors will continue to serve in their respective roles as of the Effective Date.[2]

---

[2] Lynda Markoe will not serve as a director, manager, or officer for any Reorganized Debtor.

WEIL:\97573587\4\54457.0007

## Exhibit C

### Amendment to Schedule of Rejected Contracts or Leases

This amendment shows contracts that are hereby removed from the Schedule of Rejected Contracts or Leases previously filed with the Second Plan Supplement.  In accordance with Section 8.3 of the Plan, any proofs of claim based on the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise must be filed with Bankruptcy Court and served on the Debtors or Reorganized Debtors, as applicable, no later than 30 days after the later of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.

The inclusion of any Executory Contract or Unexpired Lease herein does not constitute an admission that a particular Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Executory Contract or Unexpired Lease ultimately will be rejected.  The Debtors reserve all rights to amend, supplement, and otherwise modify the Schedule of Rejected Contracts and Leases, including to add or remove executory contracts and unexpired leases, and to assert that contracts or leases identified herein are not executory or unexpired.

All rights of the Debtors and other parties in interest with respect thereto are reserved and none are waived.

085105.0000010 EMF_US 81614029V1

**Amendment to Schedule of Rejected Contracts or Leases**

The following contracts are hereby removed from the Schedule of Rejected Contracts or Leases previously filed
with the Second Plan Supplement.

| Counterparty Name | Debtor Name | Agreement Name and Description |
|---|---|---|
| DRAGON YU BAG MFG CO LTD | J. Crew Group, Inc. | Exclusive Product Third Party Agreement between J. Crew Group, Inc. & DRAGON YU BAG MFG CO LTD |
| Deloitte & Touche USA LLP | J. Crew Group, Inc. | Master Services Agreement dated as of July 20, 2006 |

**Exhibit D**

**Class 6-B GUC Trust Agreement**

085105.0000010 EMF_US 81614029V1

**CLASS 6-B GUC TRUST AGREEMENT**

This Class 6-B GUC Trust Agreement (as it may be amended, modified, supplemented or restated from time to time, this "Agreement") dated as of [•], 2020, is made and entered into by and among Chinos Holdings, Inc., Chinos Intermediate Holdings A, Inc., Chinos Intermediate, Inc., Chinos Intermediate Holdings B, Inc., J. Crew Group, Inc., J. Crew Operating Corp., Grace Holmes, Inc., H.F.D. No. 55, Inc., J. Crew Inc., J. Crew International, Inc., J. Crew Virginia, Inc., Madewell Inc., J. Crew Brand Holdings, LLC, J. Crew Brand Intermediate, LLC, J. Crew Brand, LLC, J. Crew Brand Corp., J. Crew Domestic Brand, LLC, and J. Crew International Brand, LLC (each a "Debtor" and collectively, the "Debtors"), and [•], solely in its capacity as Trustee for purposes of this Agreement for the purpose of forming a trust and is executed in connection with and pursuant to the terms of the *Second Amended Joint Prearranged Chapter 11 Plan of Reorganization of Chinos Holdings, Inc. and its Affiliated* [Docket No. •] (as it may be amended, modified, supplemented or restated from time to time, the "Plan"), which Plan provides for, among other things, the establishment of the Class 6-B GUC Trust evidenced hereby (the "Trust").

**W I T N E S S E T H**

WHEREAS, the Chapter 11 Cases were commenced by the Debtors filing voluntary chapter 11 petitions in the Bankruptcy Court on May 4, 2020;

WHEREAS, the Bankruptcy Court confirmed the Plan by order dated August [•], 2020;

WHEREAS, this Agreement is entered into to effectuate the establishment of the Trust as provided in the Plan and the Confirmation Order;

WHEREAS, the Trust is established for the benefit of the holders of Class 6-B GUC Trust Beneficiaries as defined in the Plan (each a "Beneficiary");

WHEREAS, the Trust is established (i) for the purpose of collecting, holding, administering, distributing and liquidating the Class 6-B GUC Trust Net Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan and (ii) to pay certain Allowed Class 6-B Other General Unsecured Claims of the Beneficiaries, in each case to the extent required by the Plan;

WHEREAS, the Trust shall have no objective or authority to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Trust as set forth in this Agreement and the Plan;

WHEREAS, the Beneficiaries are entitled to their applicable Class 6-B GUC Trust Interests;

WHEREAS, the Trust is intended to qualify as a liquidating trust within the meaning of United States Treasury Regulation (hereinafter "Treasury Regulation") Section 301.7701-4(d) and to be exempt from the requirements of the Investment Company Action of 1940;

WHEREAS, the Debtors, the Trustee, and the Beneficiaries agree to treat, for all federal income tax purposes, the transfer of the Trust Assets to the Trust as a deemed transfer of the Trust Assets by the Debtors to the Beneficiaries on account of their Allowed Claims under the Plan,

followed by a deemed transfer of the Trust Assets by the Beneficiaries to the Trust in exchange for the beneficial interests herein, and to treat the Beneficiaries as the grantors and owners of the Trust in accordance with Treasury Regulation Section 301.7701-4;

WHEREAS, the Trust is intended to be treated as a grantor trust for federal income tax purposes pursuant to I.R.C. Section 671, *et seq.*, with the Beneficiaries treated as the grantors of the Trust; and

WHEREAS, the Bankruptcy Court shall have jurisdiction over the Trust, the Trustee, and the Trust Assets as provided herein and in the Plan.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein and in the Plan, the Debtors and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

1.1     Definitions. All capitalized terms used in this Agreement not otherwise defined herein shall have the respective meanings ascribed to such terms in the Plan. The following capitalized terms have the meanings herein as described below:

1.1.1.   "Transfer" shall mean, with respect to a Trust Interest, any transfer, sale, pledge, assignment, conveyance, gift, bequest, inheritance, grant, distribution, hypothecation or other disposition of or creation or a security interest in such Trust Interest, whether voluntarily or by operation of law. "Transferor," "Transferee," and "Transferred" shall have correlative meanings.

1.1.2.    "Trust Assets" shall mean the Class 6-B GUC Trust Administrative Reserve and the Class 6-B GUC Trust Assets.

1.1.3.   "Trust Interest" shall mean a Class 6-B GUC Trust Interest.

1.1.4.   "Trustee" shall mean (x) initially, the Person named in the introductory paragraph to this Agreement as the Trustee, and (y) any successors or replacements duly appointed under the terms of this Agreement.

1.2     Plan Terms Control.  In the case of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control.  This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

## ARTICLE II
## ESTABLISHMENT, PURPOSE AND FUNDING OF TRUST

2.1     Creation and Name; Formation

2.1.1.    Upon the Effective Date of the Plan, the Trust, which is referred to in the Plan (in Article I thereof in the definition of "Class 6-B GUC Trust" and in certain other sections thereof),

2

DOCS_LA:331866.3 45388/002

is hereby created. The Trustee may conduct the affairs of the Trust under the name of the "J. Crew GUC Trust" or such variation thereof as the Trustee sees fit.

2.2    Purpose of Trust.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order and in accordance with the Bankruptcy Code, hereby establish the Trust (i) for the purpose of collecting, administering, distributing and liquidating the Trust Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan and (ii) to make distributions to the Beneficiaries, in each case to the extent required by the Plan.  The Debtors or Reorganized Debtors shall have no liability with respect to the distribution or payment of any proceeds of the Trust Assets to any of the Beneficiaries.  The activities of the Trust shall be limited to those activities set forth in this Agreement and as otherwise contemplated by the Plan.  The Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and the primary purpose of the Trust shall be to liquidate and distribute the Trust Assets and the Trustee understands and agrees that the Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust as set forth in the Plan.

2.3    Transfer of Trust Assets.

2.3.1.   On or prior to the date of Effective Date, the Debtors shall have transferred to the Trust the Trust Assets.  Each Debtor hereby grants, releases, assigns, conveys, transfers and delivers, on behalf of the Beneficiaries, all of the Trust Assets owned, held, possessed or controlled by such Debtor to the Trustee as of the Effective Date, in trust for the benefit of the Beneficiaries for the uses and purposes as specified in this Agreement and the Plan.  None of the Debtors shall have any further obligations with respect to the Allowed Class 6-B Other General Unsecured Claims under the Plan or the distribution or payment of any proceeds of the Trust Assets to any of the Beneficiaries upon the transfer of the Trust Assets to the Trust in accordance with this Agreement and the Plan, except that the Debtors or their successor shall, from time to time, execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate) and the Debtors or their successor (i.e., the Reorganized Debtors) shall take or cause to be taken such further action, in each case as the Trustee may reasonably deem necessary or appropriate, to vest or perfect in or confirm to the Trustee title to and possession of the Trust Assets.

2.3.2.   For all federal, state, and local income tax purposes, the Debtors, the Beneficiaries, and the Trustee shall treat the transfer of the Trust Assets to the Trust as a deemed transfer of the Trust Assets by the Debtors to the Beneficiaries on account of their Allowed Claims under the Plan, followed by a deemed transfer of the Trust Assets by the Beneficiaries to the Trust in exchange for their beneficial interests in the Trust.  Thus, the Beneficiaries shall be treated as the grantors and owners of the Trust for federal income tax purposes.

2.3.3.   To the extent that any Trust Assets cannot be transferred to the Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Trust Assets shall be deemed to have been retained by the Debtors or their successor and the Trustee shall be deemed to have been designated as a representative of the Debtors or their successor pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Trust Assets on the behalf of the Debtors or their successor.  Notwithstanding the foregoing, all proceeds of such

3

Trust Assets (net of all reasonable costs and expenses (including the reasonable fees and expenses of professionals)), if received by the Debtors, the Reorganized Debtors, or their successor, shall be transferred to the Trust or the Trustee on behalf its behalf to be distributed in accordance with this Agreement and the terms of the Plan.

2.4     Nature of Trust.  The Trust is irrevocable but this Agreement is subject to amendment and waiver as provided in this Agreement.  The Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, limited liability partnership, joint venture, corporation, limited liability company, joint stock company or association, nor shall the Trustee, or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Beneficiaries, on the one hand, to the Trust and the Trustee, on the other hand, shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Agreement, the Plan and the Confirmation Order.

2.5     Effectiveness.  The effectiveness of this Agreement shall occur upon the Effective Date of the Plan.

**ARTICLE III**
**ADMINISTRATION OF THE TRUST**

3.1     Rights, Powers and Privileges.  In connection with the administration of the Trust, the Trustee is authorized to perform any and all acts necessary or desirable to accomplish the purposes of the Trust (including, without limitation, all powers, rights, and duties under applicable law); provided, that the Trustee shall not perform any acts that are inconsistent with this Agreement and/or the Plan.  The Trust and the Trustee, as applicable, shall have all of the rights and powers granted to the "Reorganized Debtors" in the Plan as it pertains to Beneficiaries, including *inter alia*, without limitation Article VI, VII, VIII of the Plan, such as, by example only, and in addition to any powers and authority specifically set forth in other provisions of the Plan, the power to (i) effect all actions and execute all agreements, instruments and other documents necessary to reconcile and resolve Class 6-B Other General Unsecured Claims, (ii) establish, as necessary, disbursement accounts for the deposit and distribution of all amounts to be distributed under the Plan to holders of Allowed Class 6-B Other General Unsecured Claims, (iii) make Distributions in accordance with the Plan to the Beneficiaries, (iv) object to Class 6-B Other General Unsecured Claims, as appropriate, (v) employ and compensate professionals to represent the Trustee with respect to the Trustee's responsibilities, and (iv) exercise such other powers as may be vested in the Trustee by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Trustee to be necessary and proper to implement the provisions of the Plan as it pertains to the Class 6-B Other General Unsecured Claims, the Trust Assets, and the Beneficiaries.

3.2     Agents and Professionals.  The Trustee may, but shall not be required to, consult with and retain attorneys, accountants, real estate brokers, appraisers, valuation counselors, transfer agents, or other parties deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust.  The Trustee may pay the reasonable salaries, fees, and expenses of such persons (including himself/herself), including contingency fees, out of the Trust Assets.

4

3.3     <u>Investment and Safekeeping of Trust Assets</u>.  All Trust Assets received by the Trustee shall, until distributed or paid as provided in this Agreement or the Plan, be held in the Trust for the benefit of the Beneficiaries.  The Trustee shall be under no obligation to generate or produce, or have any liability for, interest or other income on any monies received by the Trust and held for distribution or payment to the Beneficiaries, except as such interest or income shall be actually received by the Trustee.  Investments of any monies held by the Trustee shall be administered in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs; <u>provided</u>, <u>however</u>, that the right and power of the Trustee to invest monies held by the Trustee, or any income earned by the Trust shall be limited to the right and power to invest such monies, pending periodic distributions in accordance with the terms hereof and the Plan.  For the avoidance of doubt, the investment powers of the Trustee in this Agreement, other than those reasonably necessary to maintain the value of the Trust Assets and the liquidation purpose of the Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposits, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills, and in all cases limited only to those assets permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d).

3.4     <u>Limitations on Trustee</u>.  On behalf of the Trust or the Beneficiaries, the Trustee shall not at any time: (i) enter into or engage in any trade or business (other than the management and disposition of the Trust Assets), and no part of the Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Trust in furtherance of any trade or business, (ii) except as provided in section 3.3 hereof and below, reinvest any Trust Assets, or (iii) take any action that would jeopardize treatment of the Trust as a "liquidating trust" for federal income tax purposes.

3.4.1.   Other than as contemplated by the Plan or this Agreement, the Trustee is not empowered to incur indebtedness.

3.4.2.   The Trustee may invest Cash of the Trust, including any earnings thereon or proceeds therefrom, any Cash realized from the liquidation of the Trust Assets, or any Cash that is remitted to the Trust from any other Person, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code Section 345(b); <u>provided</u>, <u>however</u>, that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable guidelines, rulings, or other controlling authorities.  The Trustee shall have no liability in the event of the insolvency or failure of any institution in which he or she has invested any funds of the Trust.

3.4.3.   The Trustee shall hold, collect, conserve, protect and administer the Trust Assets in accordance with the provisions of this Agreement and the Plan, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement.  Any determination by the Trustee as to what actions are in the best interest of the Trust shall be determinative.

3.5     <u>Bankruptcy Court Approval of Trustee Actions</u>.  Except as provided in the Plan or otherwise specified in this Agreement, the Trustee need not obtain the order or approval of the Bankruptcy Court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Bankruptcy Court.  Except as otherwise provided herein, the Trustee shall exercise his business judgment for the benefit of the Beneficiaries in order to maximize the value of the Trust Assets and distributions, giving due regard to the cost, risk, and delay of any course of action.

DOCS_LA:331866.3 45388/002

Notwithstanding the foregoing, the Trustee shall have the right to submit to the Bankruptcy Court any question or questions regarding which the Trustee may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Trust with respect to any of the Trust Assets, this Agreement, or the Plan, including the administration or distribution of any of the Trust Assets.  The Bankruptcy Court shall retain jurisdiction and power for such purposes and shall approve or disapprove any such proposed action upon motion by the Trust.

3.6    Reliance by Trustee:

(a)    The Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties;

(b)    The Trustee may consult with any and all of the Trustee's professionals and the Trustee shall not be liable for any action taken or omitted to be taken by the Trustee in accordance with the advice of such professionals; and

(c)    Persons dealing with the Trustee shall look only to the Trust Assets to satisfy any liability incurred by the Trustee to such Person in carrying out the terms of this Agreement, and the Trustee shall not have any personal obligation to satisfy any such liability.

3.7    Valuation of Trust Assets.  The Trustee shall apprise the Beneficiaries of the value of the Trust Assets.  The Debtors, the Beneficiaries, and the Trust will consistently report the valuation of the assets transferred to the Trust.  Such consistent valuations and revised reporting will be used for all federal, state, local, or other income tax purposes. Income, deductions, gain, or loss from the Trust shall be reported to the Beneficiaries of the Trust in conjunction with the filing of the Trust's income tax returns.  Each Beneficiary shall report income, deductions, gain, or loss on such Beneficiary's income tax returns. Any dispute regarding the valuation of Trust Assets shall be resolved by the Bankruptcy Court.

## ARTICLE IV
## DISTRIBUTIONS FROM THE TRUST

4.1    Distributions.  After the Effective Date, as and to the extent required by the Plan, the Trustee shall make distributions from the Class 6-B GUC Trust Assets in accordance herewith to Beneficiaries in respect of their Trust Interests.

4.2    Provisions Governing Distributions.  All distributions to be made under this Agreement shall be made in accordance with the Plan, the relevant provisions of which are incorporated herein by this reference.

4.3    Timing of Distributions.  Any payment or other distribution required to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day, but shall be deemed to have been made on the required date.  Any payment of Cash to be made pursuant to the Plan, subject to the terms hereof, shall be deemed made, if by electronic wire transfer, when the applicable electronic wire transfer is initiated by the sending bank or, if by check

6

drawn on a domestic bank, when the earliest occurs of depositing in the mail for the entitled recipient, receipt by the entitled recipient, or delivery to a third party delivery service for delivery to the entitled recipient.

4.4     Payments Limited to Trust Assets.  All payments to be made by the Trustee to or for the benefit of any Beneficiary shall be made only to the extent that the Trust has sufficient funds or reserves to make such payments in accordance with this Agreement and the Plan.  Each Beneficiary shall have recourse only to the Trust Assets for distributions under this Agreement and the Plan.

4.5     Fees and Expenses.

4.5.1.   The Trustee is authorized to pay the Class 6-B GUC Trust Fees and Expenses from the Trust Assets.

4.6     Priority of Distributions.  Any recovery by the Trust on account of the Trust Assets shall be applied in accordance with the Plan.

4.7     Compliance with Laws.  Any and all distributions of Trust Assets shall be in compliance with applicable laws except as may be expressly provided herein or in the Plan.  Without limiting the generality of the foregoing, (a) the Trustee shall make distributions from the Trust to the Beneficiaries at least annually, to the extent it determines the Trust has sufficient cash available for distribution from all net cash income and all other cash received by the Trust; provided, however, that the Trustee may, to the extent consistent with applicable law as to liquidating trusts (*e.g.*, Revenue Procedure 82-58, 1982-2 C.B. 847, as amplified by Revenue Procedure 91-15, 1991-1 C.B. 484 and Revenue Procedure 94-45, 1994-2 C.B. 684), retain such amounts (i) as are reasonably necessary to meet contingent liabilities (including Disputed Claims), and to maintain the value of the Trust Assets during the term of the Trust, (ii) to pay reasonable administrative expenses including, without limitation, the compensation and the reimbursement of reasonable, actual and necessary costs, fees (including attorneys' fees) and expenses of the Trustee in connection with the performance of the Trustee's duties in connection with this Agreement and any amounts owed to the Trustee pursuant to the terms hereof, and (iii) to satisfy all other liabilities incurred or assumed by the Trust (or to which the Trust Assets are otherwise subject) in accordance with the Plan and this Agreement and (b) the Trustee, in its discretion, may cause the Trust to withhold and / or pay to the appropriate tax authority from amounts distributable from the Trust to any Holder of an Allowed Class 6-B Other General Unsecured Claim any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any law, regulation, rule, ruling, directive, or other governmental requirement on such Holder or the Trust with respect to the amount to be distributed to such Holder.  The Trustee shall determine such maximum amount to be withheld by the Trust in its sole, reasonable discretion and shall cause the Trust to distribute to the Holder any excess amount withheld.  All such amounts withheld and paid to the appropriate tax authority (or reserved pending resolution of the need to withhold) shall be treated as amounts distributed to such Holders of Claims for all purposes of this Agreement.

4.8     Setoff Rights.  The Trustee may, but shall not be required to, setoff against or recoup from the holder of any Allowed Claim (including any Beneficiary) on which payments or other distributions are to be made hereunder, claims or defenses of any nature that the Trust may have against such Person.  However, neither the failure to do so, nor the allowance of any Claim under the

7

Plan or otherwise, shall constitute a waiver or release of any such claim, right of setoff or right of recoupment against the holder of such Allowed Claim.

4.9      Right to Object to Claims.  The Trustee shall have the responsibility and authority for administering, disputing, compromising and settling or otherwise resolving and finalizing payments or other distributions with respect to Class 6-B Other General Unsecured Claims that are Beneficiaries under the Plan, all without Bankruptcy Court-approval, and may object to any such Claim until the later of one-hundred eighty (180) days following the Effective Date and such later date as may be approved by the Bankruptcy Court.  The Trustee at any time may move the Bankruptcy Court for an extension of such Claim objection deadline. The Trustee shall generally prosecute objections to Class 6-B Other General Unsecured Claims pending as of the Effective Date and any additional objections filed from and after the Effective Date but shall be entitled to exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Class 6-B Other General Unsecured Claims.  In addition, subject to the foregoing sentence, the Trustee may, at any time, request that the Bankruptcy Court estimate any Contingent Claim, Disputed Claim or Unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether any party previously objected to or sought estimation of such Claim.

4.10     No Distributions Pending Allowance.  If a Claim or any portion of a Claim is Disputed, no payment or distribution shall be made on account of any portion of such Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan or this Agreement.

### ARTICLE V
### BENEFICIARIES

5.1      Identification and Addresses of Beneficiaries.  In order to determine the actual names and addresses of the Beneficiaries, the Trustee may deliver a notice to the Beneficiaries.  Such notice may include a form for each Beneficiary to complete in order to be properly registered as a Beneficiary and be eligible for distributions under the Trust.  Such form may request the Beneficiary's federal taxpayer identification number or social security number if the Trustee determines that such information is necessary to fulfill the Trust's tax reporting and withholding obligations.  A Beneficiary may, after the Effective Date, select an alternative mailing address by notifying the Trustee in writing of such alternative distribution address.  Absent receipt of such notice, the Trustee shall not be obligated to recognize any such change of address.  Such notification shall be effective only upon receipt by the Trustee.  The Trustee, in its reasonable discretion, may suspend distributions to any Beneficiary that has not provided its federal taxpayer identification number or social security number, as the case may be, after a request is made pursuant to this Section 5.1.  If tax information is not provided within ninety (90) days after such request, the applicable Beneficiary's underlying claim will be expunged and its Trust Interest disallowed for all purposes of this Agreement to the extent provided under the Plan. Each Beneficiary's Trust Interest is dependent upon such Beneficiary's classification under the Plan and the status of its Allowed Claim.

5.2      Beneficial Interest Only.  The ownership of a Trust Interest shall not entitle any Beneficiary to any title in or to, possession of, management of or control of any of the Trust Assets or to any right to call for a partition or division of such Trust Assets or to require an accounting,

8

except as specifically provided herein.  Except as expressly provided in this Agreement, a Beneficiary shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Trust Assets.

5.3     Ownership of Beneficial Interests Hereunder.  Each Beneficiary shall own a beneficial interest in the Trust (as represented by the Trust Interest(s) issued to such Beneficiary consistent with the Plan).  The record holders of the Trust Interests shall be recorded and set forth in a registry maintained by, or at the direction of, the Trustee expressly for such purpose.

5.4     Evidence of Beneficial Interest.

5.4.1.   Ownership of a Trust Interest shall not be evidenced by any certificate, security, or receipt (unless otherwise determined by the Trustee) or in any other form or manner whatsoever.  Ownership of the Trust Interests shall be maintained on books and records of the Trust maintained by the Trustee, which may be the official claims register maintained in the Chapter 11 Cases.  The Trustee shall, upon the written request of a holder of a beneficial interest, provide reasonably adequate documentary evidence of such holder's Claim, as indicated on the books and records of the Trust. The expense of providing such documentation shall be borne by the requesting holder.

5.5     No Right to Accounting.  Except as set forth in sections 7.4 and 7.9 of this Agreement, neither the Beneficiaries nor their successors, assigns, creditors, or any other Person shall have any right to an accounting by the Trustee, and the Trustee shall not be obligated to provide any accounting to any Person.  Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition for making any advance, payment, or distribution out of proceeds of Trust Assets.

5.6     No Standing.  Except as expressly provided in this Agreement, if at all, a Beneficiary shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Trust Assets.

5.7     Requirement of Undertaking.  The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this section 5.7 shall not apply to any suit by the Trustee.

5.8     Limitation on Transferability.  It is understood and agreed that the Trust Interests shall be non-transferable and non-assignable during the term of this Agreement other than if transferred by will, intestate succession, or otherwise by operation of law.  Any such Transfer by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to cause the Trust to pay all amounts to or for the benefit of the assigning Beneficiaries until receipt of proper notification and proof of such Transfer.  The

9

Trustee may rely upon such proof without the requirement of any further investigation. Notwithstanding any other provision to the contrary, the Trustee may disregard any purported Transfer of Claims by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

5.9     Exemption from Registration.   The parties hereto intend that the rights of the Beneficiaries arising under this Agreement shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities law. If such rights constitute securities, the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws shall apply to their issuance under the Plan.  No party to this Agreement shall make a contrary or different contention.

## ARTICLE VI
## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1     Parties Dealing With the Trustee.  In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Trust Assets.  No Person that may deal with the Trustee shall have any obligation to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

6.2     Limitation of Trustee's Liability.  Anything herein to the contrary notwithstanding, in exercising the rights granted herein, the Trustee shall exercise his best judgment, to the end that the affairs of the Trust shall be properly managed and the interests of all the Beneficiaries are safeguarded; but the Trustee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under this Agreement, unless the Trustee has acted with gross negligence, fraud or willful misconduct.  The Trustee's obligations, duties and responsibilities under the Plan, the Confirmation Order and this Agreement are qualified in their entirety by the availability of and reasonable likelihood of recovery of sufficient assets or Cash to fund the Trustee's activities.  Upon the appointment of a successor Trustee and the delivery of the then remaining Trust Assets to the successor Trustee, the predecessor Trustee and any of its respective accountants, agents, assigns, attorneys, bankers, consultants, directors, employees, executors, financial advisors, investment bankers, real estate brokers, transfer agents, managers, members, officers, partners, predecessors, principals, professional persons, representatives, affiliate, employer, and successors shall have no further liability or responsibility with respect thereto (other than liabilities arising prior to the cessation of its role as Trustee).  A successor Trustee shall have no duty to examine or inquire into the acts or omissions of its immediate or remote predecessor, and no successor Trustee shall be in any way liable for the acts or omissions of any predecessor Trustee, unless a successor Trustee expressly assumes such responsibility.  A predecessor Trustee shall have no liability for the acts or omissions of any immediate or subsequent successor Trustee for any events or occurrences subsequent to the cessation of its role as Trustee.

6.3     Indemnification.  The Trustee and each of its respective accountants, agents, assigns, attorneys, bankers, consultants, directors, employees, executors, financial advisors, investment bankers, real estate brokers, transfer agents, managers, members, officers, partners, predecessors,

10

DOCS_LA:331866.3 45388/002

principals, professional persons, representatives, affiliate, employer and successors (each, an "Indemnified Party") shall be indemnified for, and defended and held harmless against, by the Trust and solely from the Trust Assets, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) actually incurred without gross negligence, willful misconduct, or fraud on the part of the applicable Indemnified Party (which gross negligence, willful misconduct, or fraud, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or this Agreement, as applicable if the applicable Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Trust or the Beneficiaries. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud. The amounts necessary for the indemnification provided in this Section 6.3 (including, but not limited to, any costs and expenses incurred in enforcing the right of indemnification in this Section 6.3) shall be paid by the Trustee out of the Trust Assets. The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Person shall look to the Trustee personally for the payment of any such expense or liability. The indemnification provided in this Section 6.3 shall survive the death, dissolution, resignation or removal of the Trustee, Indemnified Party or the termination of the Trust, and shall inure to the benefit of each Indemnified Party's heirs and assigns.

## ARTICLE VII
## SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

7.1     Appointment. The Trustee has been selected pursuant to the provisions of the Plan. To effectuate an orderly and efficient transition of the administration, in accordance herewith, of the Trust Assets for the benefit of the Beneficiaries.

7.2     Term of Service. The Trustee shall serve until the earlier to occur of (a) the termination of the Trust in accordance with this Agreement and the Plan or (b) the Trustee's death, dissolution, resignation or removal.

7.3     Removal of a Trustee. Any Person serving as Trustee may be removed and replaced by an order of the Bankruptcy Court upon a motion by the Creditors' Committee (which may be reconstituted for this limited purpose) and a showing of good cause. The removal shall be effective on the date specified in the order. Notwithstanding the removal of the Trustee pursuant to this Section 7.3, the rights of the resigning Trustee under this Agreement with respect to acts or omissions occurring prior to the effectiveness of such removal will continue for the benefit of such resigning Trustee following the effectiveness of such resignation.

7.4     Resignation of Trustee. The Trustee may resign at any time by giving prior written notice of his intention to do so to the Persons who were members of the Creditors' Committee and its counsel as of the day prior to the Effective Date and to the Reorganized Debtors, which notice shall be at least thirty (30) days unless the resignation is due to a disability or other incapacity. Without limiting any other reporting or accounting obligations under the Plan or this Agreement, in the event of a resignation, the resigning Trustee shall file with the Bankruptcy Court a full and

11

complete written accounting of monies and Trust Assets received, disbursed, and held during the term of office of that Trustee.  The resignation shall be effective on the later to occur of: (a) the date specified in the notice; or (b) the appointment of a successor by the Committee, the acceptance by such successor of such appointment and the approval of the successor's appointment by the Bankruptcy Court; provided, that such resignation shall become effective on the date specified in the Trustee's notice without the appointment of a successor Trustee if the Insurance Coverages (as defined below) terminate for any reason other than the Trustee's unreasonable refusal to renew such Insurance Coverages, and provided further that if a successor Trustee is not appointed or does not accept his appointment or if the appointment of a successor Trustee has not been approved by the Bankruptcy Court within sixty (60) days following delivery of notice of resignation, the resigning Trustee may petition the Bankruptcy Court for the appointment of a successor Trustee. Notwithstanding the resignation of the Trustee pursuant to this Section 7.4, the rights of the resigning Trustee under this Agreement with respect to acts or omissions occurring prior to the effectiveness of such resignation will continue for the benefit of such resigning Trustee following the effectiveness of such resignation.

7.5     Appointment of Successor Trustee.  Upon the resignation, death, dissolution, or removal of a Trustee, the Committee (which shall be deemed reconstituted for this limited purpose) shall appoint a successor Trustee to fill the vacancy so created, subject to the approval of the Bankruptcy Court so long as any of the Chapter 11 Cases are pending.  Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agrees that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee.

7.6     Powers and Duties of Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers, and duties of his predecessor under this Agreement and the Plan. Notwithstanding anything to the contrary herein, a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or, instruments conveying and transferring to such successor Trustee under the Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

7.7     Trust Continuance.  The death, resignation, dissolution, incapacity or removal of the Trustee shall not terminate the Trust or revoke any then-existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

7.8     Compensation and Costs of Administration.  The Trustee shall receive fair and reasonable compensation for its services as determined by agreement between the Trustee and the Creditors' Committee either on an hourly basis at the Trustee's standard hourly billing rates or a flat fee percentage not to exceed what a chapter 7 Trustee would be entitled to be paid under section 326 of the Bankruptcy Code (as may be amended from time to time) plus all reasonable and documented costs and expenses, which shall be charged against and paid out of the Trust Assets without further Bankruptcy Court approval or order (subject to the limitations set forth in this Agreement and the Plan).  All reasonable and documented costs, expenses, and obligations, including filing fees, incurred by the Trustee (or professionals who may be employed by the Trustee in administering the Trust, in carrying out their responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid from the applicable Trust Assets prior to any distribution to the Beneficiaries without further Bankruptcy Court approval or order (subject to the limitations set forth in this Agreement and the Plan).

DOCS_LA:331866.3 45388/002

7.9     Periodic Reporting; Filing Requirements.

7.9.1.   The Trustee on behalf of the Trust shall, as soon as practicable after the end of each calendar year and upon termination of the Trust, provide or make available a written report and account to the holders of Trust Interests, which report and account sets forth (i) the assets and liabilities of the Trust at the end of such calendar year or upon termination and the receipts and disbursements of the Trust for such calendar year or period, and (ii) changes in the Trust Assets and actions taken by the Trustee in the performance of its duties under the Plan or the Agreement that the Trustee determines in its discretion may be relevant to holders of Trust Interests, such as material changes or actions that, in the opinion of the Trustee, may have a material effect on the Trust Assets that were not previously reported.  The Trustee on behalf of the Trust may provide or make available to holders of Trust Interests similar reports for such interim periods during the calendar year as the Trustee deems advisable.  Such reports may be provided or made available to the holders of Trust Interests, in the discretion of the Trustee, by any reasonable means, including U.S. mail, electronic transmission, display on IntraLinks or a similar virtual data room to which holders shall have access, publication to a publicly-available website or by press release distributed via a generally recognized business news service.

7.9.2.   The Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable laws or regulations with the Beneficiaries treated as the grantors of the Trust for federal income tax purposes in respect of their Trust Interests.  In addition, the Trustee shall file in a timely manner such other tax returns as are required by applicable law and pay any taxes shown as due thereon.  The Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

7.9.3.   The tax returns filed by the Trustee shall report all Trust earnings for the taxable year being reported.  The "taxable year" of the Trust shall be the "calendar year" as those terms are defined in I.R.C Section 441.

7.10     Confidentiality.  Except as required in the performance of his duties, the Trustee shall, while serving as Trustee under this Agreement, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Trust Assets relate or of which he has become aware in his capacity as Trustee.

**ARTICLE VIII**
**MAINTENANCE OF RECORDS**

8.1     During the term of the Trust, the Trustee may destroy business records in the Trustee's possession as the Trustee deems appropriate provided that, absent express Bankruptcy Court approval to do otherwise, the Trustee shall maintain books and records containing a description of all property from time to time constituting the Trust Assets and an accounting of all receipts and disbursements until at least three (3) years after the final report to the Bankruptcy Court has been rendered by the Trustee.  At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after three (3) years from the completion and winding up of the affairs of the Trust (except to the extent such records and documents are necessary to be held

13

longer to fulfill the Trustee's obligations pursuant to this Agreement).  The Trustee may estimate and include, as part of the Trustee's compensation, a reasonable sum to be used for the purposes of maintaining, accessing and destroying records during the term of the Trust and for three (3) or more years thereafter, as applicable, which costs shall be payable from the Trust Assets.

## ARTICLE IX
## DURATION OF TRUST

9.1     Duration.  This Agreement shall remain and continue in full force and effect until the Trust is terminated in accordance with the provisions of this Agreement and the Plan.

9.2     Termination of the Trust.   The Trustee and the Trust shall be discharged or terminated, as the case may be, at such time as: (a) all distributions required to be made by the Trustee to the Beneficiaries have been made, but in no event shall the Trust be terminated later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, unless a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Trust Assets.  The Trust may not be terminated at any time by the Beneficiaries.  In connection with the termination of the Trust, notwithstanding other provisions hereof, including section 3.1, any remaining Trust Assets that are of inconsequential value or otherwise insufficient to support the cost of a distribution may be transferred by the Trustee to a non-profit charitable organization qualifying under section 501(c)(3) of the IRC.

9.3     Continuance of Trust for Winding Up.  After the termination of the Trust and for the purpose of liquidation and winding up the affairs of the Trust, the Trustee shall continue to act as such until his duties have been fully performed, including such post-distribution tasks as necessary to wind up the affairs of the Trust.  Subject to the provisions of Section 8.1 hereof, after the termination of the Trust, the Trustee, for a time, shall retain or cause to be retained certain books, records, Beneficiary lists, and certificates and other documents and files that shall have been delivered to or created by the Trustee.  Except as otherwise specifically provided herein, upon the discharge of all liabilities of the Trust and final distribution of the Trust, the Trustee shall have no further duties or obligations hereunder.

## ARTICLE X
## MISCELLANEOUS

10.1    Books and Records.  The Trustee shall be provided with reasonable access, during normal business hours, to the Debtors' personnel and books and records upon request in order to allow the Trustee to discharge its duties in reconciling and prosecuting objections to Class 6-B Other General Unsecured Claims.

10.2    Preservation of Privilege.  In connection with the rights, claims, and causes of action that constitute Trust Assets, any attorney-client privilege, work-product doctrine, or other privilege

14

DOCS_LA:331866.3 45388/002

or immunity attaching to any documents or communications (whether written or oral) transferred to the Trust pursuant to the terms of the Plan or otherwise shall vest in the Trustee and his representatives, and the Trustee is authorized to take all necessary actions to effectuate the transfer of such privileges, as necessary.  The Trustee's receipt of such privileges shall not operate as a waiver of any other privileges or immunities possessed or retained by the Debtors.

10.3    Notices.  Unless otherwise expressly provided herein, all notices to be given to Beneficiaries may be given by ordinary mail, or may be delivered personally, to the holders at the addresses appearing on the books kept by the Trustee.  Any notice or other communication which may be or is required to be given, served, or sent to the Trust shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery (if receipt is confirmed) addressed as follows:

If to the Trust: [TBD]

10.4    No Bond / Insurance.  Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving any bond or other security in any jurisdiction, unless the Trustee decides in his reasonable judgment to obtain such bond or other security.  The Trustee is hereby authorized, but not required to obtain all reasonable insurance coverage for itself, its agents, representatives, employees or independent contractors, including coverage with respect to the liabilities, duties and obligations of the Trustee and its agents, representatives, employees or independent contractors under this Agreement and the Plan ("Insurance Coverages").  The cost of any such Insurance Coverage shall be an expense of the Trust and paid out of the Trust Assets.

10.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (excluding conflict of laws rules), including all matters of validity, construction and administration; provided, however, that there shall not be applicable to the Trust, the Trustee or this Agreement, (a) the provisions of Section 3540 of Title 12 of the Delaware Code and (b) any provisions of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate, in a manner inconsistent with the terms hereof, (i) the filing with any court or governmental body or agency of trustee accounts or schedule of trustee fees and charges, (ii) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (iii) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (iv) fees or other sums payable to trustees, officers, agents or employees of a trust, (v) the allocation of receipts and expenditures to income and principal, (vi) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding or investing trust assets, or (vii) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees.

10.6    Successors and Assigns.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

10.7    Headings.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or understanding of this Agreement or any provision hereof.

DOCS_LA:331866.3 45388/002

10.8    Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

10.9    No Execution.  All funds in the Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Trust Assets or the Trust in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court.  Payment will be solely governed by this Agreement and the Plan.

10.10    Intention of Parties to Establish Grantor Trust.  This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust.  Consistent with Revenue Procedure 82-58, 1982-2 C.B. 847, as amplified by Revenue Procedure 91-15, 1991-1 C.B. 484 and Revenue Procedure 94-45, 1994-2 C.B. 684, the Trust shall be treated as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Sections 671-677 of the Internal Code of 1986 as amended ("IRC").  As such, for federal income tax purposes, the Beneficiaries will be treated as both the grantors and the deemed owners of the Trust.

10.11    Tax Treatment of Reserves for Disputed Claims.  The Trustee shall maintain reserves for Disputed Claims as provided in the Plan. The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for any Disputed Claims of Beneficiaries, including, but not limited to, (i) filing a tax election to treat any and all reserves for Disputed Claims as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for Disputed Claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including, but not limited to, the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.  For the avoidance of doubt, all of the Trust's income shall be treated as subject to tax on a current basis consistent with Revenue Procedure 82-58, 1982-2, C.B. 847, as amplified by Revenue Procedure 91-15, 1991-1 C.B. 484 and Revenue Procedure 94-45, 1994-2 C.B. 684.

10.12    Amendment.  The Trustee may, from time to time, modify, supplement, or amend this Agreement but only to clarify any ambiguity or inconsistency, or render the Agreement in compliance with its stated purposes, and only if such amendment does not materially and adversely affect the interests, rights, treatment, or distributions of any Beneficiary.  The Trustee, with the approval of the Bankruptcy Court may, from time to time, modify, supplement, or amend this Agreement in any way that is not inconsistent with the Plan or the Confirmation Order.

10.13    Waiver.  No failure by any Party to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

10.14    Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and

16

DOCS_LA:331866.3 45388/002

restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

10.15   Counterparts and Facsimile Signatures.   This Agreement may be executed in counterparts and a facsimile or other electronic form of signature shall be of the same force and effect as an original.

10.16   Jurisdiction.   The Bankruptcy Court shall have jurisdiction regarding the Trust, the Trustee, and the Trust Assets, including the determination of all disputes arising out of or related to administration of the Trust.   The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters arising out of or related to this Agreement or the administration of the Trust.   The parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, then the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

[*The remainder of this page is intentionally left blank.*]

17

DOCS_LA:331866.3 45388/002

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year written above.

**DEBTORS**:

Chinos Holdings, Inc.
Chinos Intermediate Holdings A, Inc.
Chinos Intermediate, Inc.
Chinos Intermediate Holdings B, Inc.
J. Crew Group, Inc.
J. Crew Operating Corp.
Grace Holmes, Inc.
H.F.D. No. 55, Inc.
J. Crew Inc.
J. Crew International, Inc.
J. Crew Virginia, Inc.
Madewell Inc.
J. Crew Brand Holdings, LLC
J. Crew Brand Intermediate, LLC
J. Crew Brand, LLC
J. Crew Brand Corp.
J. Crew Domestic Brand, LLC
J. Crew International Brand, LLC

By: _____

Name:
Title:

**TRUSTEE**:

By: _____

Name: [•], solely in his capacity as Trustee and not in any individual capacity
Title:  Member

DOCS_LA:331866.3 45388/002